# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

## Case No. 19-2562

---

SIERRA CLUB, PETITIONER,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT.

---

On Petition for Review of Final Agency Action of the
United States Environmental Protection Agency

---

## STATUTORY AND REGULATORY ADDENDUM FOR PROOF BRIEF OF RESPONDENT-INTERVENOR COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF ENVIRONMENTAL PROTECTION

---

ALEXANDRA C. CHIARUTTINI
Chief Counsel

ROBERT A. REILEY
Acting Director
Bureau of Regulatory Counsel
PA Bar No. 61319

JESSE C. WALKER
Assistant Counsel
Bureau of Regulatory Counsel
PA Bar No. 317750
Commonwealth of Pennsylvania,
Department of Environmental Protection
P.O. Box 8464
Harrisburg, PA 17105-8464
717-787-7060
jeswalker@pa.gov

# STATUTORY AND REGULATORY ADDENDUM

# TABLE OF CONTENTS

**STATUTES**                                                    **PAGE**

<u>Federal</u>

42 U.S.C. §7409…………………………………………………....ADD001

42 U.S.C. §7410…………………………………………………ADD003

42 U.S.C. §7412…………………………………………………ADD012

42 U.S.C. §7475…………………………………………………ADD042

42 U.S.C. §7511a………………………………………………..ADD046

42 U.S.C. §7511b………………………………………………..ADD057

42 U.S.C. §7511c………………………………………………..ADD062

<u>Pennsylvania</u>

35 P.S. §§4004(2)-(4)…………………………………………...ADD064

35 P.S. §4010.1…………………………………………………ADD066

**REGULATIONS**

<u>Federal</u>

40 CFR §51.1100(o)……………………………………………ADD067

40 CFR §51.1105………………………………………………..ADD069

40 CFR §51.1112………………………………………………..ADD073

40 CFR §51.1116………………………………………………..ADD074

<u>Pennsylvania</u>

25 Pa. Code §127.12……………………………………………ADD075

25 Pa. Code §127.411…………………………………………...ADD077

25 Pa. Code §§127.441…………………………………………ADD079

25 Pa. Code §127.444…………………………………………...ADD081

25 Pa. Code §127.463…………………………………………...ADD082

25 Pa. Code §127.512…………………………………………………...ADD083

25 Pa. Code §§129.91-129.95…………………………………………...ADD086

25 Pa. Code §§129.96-129.100………………………………………….ADD097

Subsec. (f)(1). Pub. L. 101–549, §108(b), in introductory provisions, substituted present provisions for provisions relating to Federal agencies, States, and air pollution control agencies within either 6 months or one year after Aug. 7, 1977.

Subsec. (f)(1)(A). Pub. L. 101–549, §108(b), substituted present provisions for provisions relating to information prepared in cooperation with Secretary of Transportation, regarding processes, procedures, and methods to reduce certain pollutants.

Subsec. (f)(3), (4). Pub. L. 101–549, §111, added pars. (3) and (4).

Subsec. (g). Pub. L. 101–549, §108(o), added subsec. (g).

Subsec. (h). Pub. L. 101–549, §108(c), added subsec. (h).

1977—Subsec. (a)(1)(A). Pub. L. 95–95, §401(a), substituted "emissions of which, in his judgment, cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare" for "which in his judgment has an adverse effect on public health or welfare".

Subsec. (b)(1). Pub. L. 95–95, §104(a), substituted "cost of installation and operation, energy requirements, emission reduction benefits, and environmental impact of the emission control technology" for "technology and costs of emission control".

Subsec. (c). Pub. L. 95–95, §104(b), inserted provision directing the Administrator, not later than six months after Aug. 7, 1977, to revise and reissue criteria relating to concentrations of $NO_2$ over such period (not more than three hours) as he deems appropriate, with the criteria to include a discussion of nitric and nitrous acids, nitrites, nitrates, nitrosamines, and other carcinogenic and potentially carcinogenic derivatives of oxides of nitrogen.

Subsecs. (e), (f). Pub. L. 95–95, §105, added subsecs. (e) and (f).

EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

## § 7409. National primary and secondary ambient air quality standards

### (a) Promulgation

(1) The Administrator—

(A) within 30 days after December 31, 1970, shall publish proposed regulations prescribing a national primary ambient air quality standard and a national secondary ambient air quality standard for each air pollutant for which air quality criteria have been issued prior to such date; and

(B) after a reasonable time for interested persons to submit written comments thereon (but no later than 90 days after the initial publication of such proposed standards) shall by regulation promulgate such proposed national primary and secondary ambient air quality standards with such modifications as he deems appropriate.

(2) With respect to any air pollutant for which air quality criteria are issued after December 31, 1970, the Administrator shall publish, simultaneously with the issuance of such criteria and information, proposed national primary and secondary ambient air quality standards for any such pollutant. The procedure provided for in paragraph (1)(B) of this subsection shall apply to the promulgation of such standards.

### (b) Protection of public health and welfare

(1) National primary ambient air quality standards, prescribed under subsection (a) shall be ambient air quality standards the attainment and maintenance of which in the judgment of the Administrator, based on such criteria and allowing an adequate margin of safety, are requisite to protect the public health. Such primary standards may be revised in the same manner as promulgated.

(2) Any national secondary ambient air quality standard prescribed under subsection (a) shall specify a level of air quality the attainment and maintenance of which in the judgment of the Administrator, based on such criteria, is requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air. Such secondary standards may be revised in the same manner as promulgated.

### (c) National primary ambient air quality standard for nitrogen dioxide

The Administrator shall, not later than one year after August 7, 1977, promulgate a national primary ambient air quality standard for $NO_2$ concentrations over a period of not more than 3 hours unless, based on the criteria issued under section 7408(c) of this title, he finds that there is no significant evidence that such a standard for such a period is requisite to protect public health.

### (d) Review and revision of criteria and standards; independent scientific review committee; appointment; advisory functions

(1) Not later than December 31, 1980, and at five-year intervals thereafter, the Administrator shall complete a thorough review of the criteria published under section 7408 of this title and the national ambient air quality standards promulgated under this section and shall make such revisions in such criteria and standards and promulgate such new standards as may be appropriate in accordance with section 7408 of this title and subsection (b) of this section. The Administrator may review and revise criteria or promulgate new standards earlier or more frequently than required under this paragraph.

(2)(A) The Administrator shall appoint an independent scientific review committee composed of seven members including at least one member of the National Academy of Sciences, one physician, and one person representing State air pollution control agencies.

(B) Not later than January 1, 1980, and at five-year intervals thereafter, the committee referred to in subparagraph (A) shall complete a review of the criteria published under section 7408 of this title and the national primary and

secondary ambient air quality standards promulgated under this section and shall recommend to the Administrator any new national ambient air quality standards and revisions of existing criteria and standards as may be appropriate under section 7408 of this title and subsection (b) of this section.

(C) Such committee shall also (i) advise the Administrator of areas in which additional knowledge is required to appraise the adequacy and basis of existing, new, or revised national ambient air quality standards, (ii) describe the research efforts necessary to provide the required information, (iii) advise the Administrator on the relative contribution to air pollution concentrations of natural as well as anthropogenic activity, and (iv) advise the Administrator of any adverse public health, welfare, social, economic, or energy effects which may result from various strategies for attainment and maintenance of such national ambient air quality standards.

(July 14, 1955, ch. 360, title I, § 109, as added Pub. L. 91–604, § 4(a), Dec. 31, 1970, 84 Stat. 1679; amended Pub. L. 95–95, title I, § 106, Aug. 7, 1977, 91 Stat. 691.)

#### CODIFICATION

Section was formerly classified to section 1857c–4 of this title.

#### PRIOR PROVISIONS

A prior section 109 of act July 14, 1955, was renumbered section 116 by Pub. L. 91–604 and is classified to section 7416 of this title.

#### AMENDMENTS

1977—Subsec. (c). Pub. L. 95–95, § 106(b), added subsec. (c).

Subsec. (d). Pub. L. 95–95, § 106(a), added subsec. (d).

#### EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

#### MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

#### TERMINATION OF ADVISORY COMMITTEES

Advisory committees established after Jan. 5, 1973, to terminate not later than the expiration of the 2-year period beginning on the date of their establishment, unless, in the case of a committee established by the President or an officer of the Federal Government, such committee is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a committee established by the Congress, its duration is otherwise provided for by law. See section 14 of Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 776, set out in the Appendix to Title 5, Government Organization and Employees.

#### ROLE OF SECONDARY STANDARDS

Pub. L. 101–549, title VIII, § 817, Nov. 15, 1990, 104 Stat. 2697, provided that:

"(a) REPORT.—The Administrator shall request the National Academy of Sciences to prepare a report to the Congress on the role of national secondary ambient air quality standards in protecting welfare and the environment. The report shall:

"(1) include information on the effects on welfare and the environment which are caused by ambient concentrations of pollutants listed pursuant to section 108 [42 U.S.C. 7408] and other pollutants which may be listed;

"(2) estimate welfare and environmental costs incurred as a result of such effects;

"(3) examine the role of secondary standards and the State implementation planning process in preventing such effects;

"(4) determine ambient concentrations of each such pollutant which would be adequate to protect welfare and the environment from such effects;

"(5) estimate the costs and other impacts of meeting secondary standards; and

"(6) consider other means consistent with the goals and objectives of the Clean Air Act [42 U.S.C. 7401 et seq.] which may be more effective than secondary standards in preventing or mitigating such effects.

"(b) SUBMISSION TO CONGRESS; COMMENTS; AUTHORIZATION.—(1) The report shall be transmitted to the Congress not later than 3 years after the date of enactment of the Clean Air Act Amendments of 1990 [Nov. 15, 1990].

"(2) At least 90 days before issuing a report the Administrator shall provide an opportunity for public comment on the proposed report. The Administrator shall include in the final report a summary of the comments received on the proposed report.

"(3) There are authorized to be appropriated such sums as are necessary to carry out this section."

### § 7410. State implementation plans for national primary and secondary ambient air quality standards

#### (a) Adoption of plan by State; submission to Administrator; content of plan; revision; new sources; indirect source review program; supplemental or intermittent control systems

(1) Each State shall, after reasonable notice and public hearings, adopt and submit to the Administrator, within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof) under section 7409 of this title for any air pollutant, a plan which provides for implementation, maintenance, and enforcement of such primary standard in each air quality control region (or portion thereof) within such State. In addition, such State shall adopt and submit to the Administrator (either as a part of a plan submitted under the preceding sentence or separately) within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national ambient air quality standard (or revision thereof), a plan which provides for implementation, maintenance, and enforcement of such secondary standard in each air quality control region (or portion thereof) within such State. Unless a separate public hearing is provided, each State shall consider its plan implementing such secondary standard at the hearing required by the first sentence of this paragraph.

(2) Each implementation plan submitted by a State under this chapter shall be adopted by the

secondary ambient air quality standards promulgated under this section and shall recommend to the Administrator any new national ambient air quality standards and revisions of existing criteria and standards as may be appropriate under section 7408 of this title and subsection (b) of this section.

(C) Such committee shall also (i) advise the Administrator of areas in which additional knowledge is required to appraise the adequacy and basis of existing, new, or revised national ambient air quality standards, (ii) describe the research efforts necessary to provide the required information, (iii) advise the Administrator on the relative contribution to air pollution concentrations of natural as well as anthropogenic activity, and (iv) advise the Administrator of any adverse public health, welfare, social, economic, or energy effects which may result from various strategies for attainment and maintenance of such national ambient air quality standards.

(July 14, 1955, ch. 360, title I, § 109, as added Pub. L. 91–604, § 4(a), Dec. 31, 1970, 84 Stat. 1679; amended Pub. L. 95–95, title I, § 106, Aug. 7, 1977, 91 Stat. 691.)

CODIFICATION

Section was formerly classified to section 1857c–4 of this title.

PRIOR PROVISIONS

A prior section 109 of act July 14, 1955, was renumbered section 116 by Pub. L. 91–604 and is classified to section 7416 of this title.

AMENDMENTS

1977—Subsec. (c). Pub. L. 95–95, § 106(b), added subsec. (c).

Subsec. (d). Pub. L. 95–95, § 106(a), added subsec. (d).

EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

TERMINATION OF ADVISORY COMMITTEES

Advisory committees established after Jan. 5, 1973, to terminate not later than the expiration of the 2-year period beginning on the date of their establishment, unless, in the case of a committee established by the President or an officer of the Federal Government, such committee is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a committee established by the Congress, its duration is otherwise provided for by law. See section 14 of Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 776, set out in the Appendix to Title 5, Government Organization and Employees.

ROLE OF SECONDARY STANDARDS

Pub. L. 101–549, title VIII, § 817, Nov. 15, 1990, 104 Stat. 2697, provided that:

"(a) REPORT.—The Administrator shall request the National Academy of Sciences to prepare a report to the Congress on the role of national secondary ambient air quality standards in protecting welfare and the environment. The report shall:

"(1) include information on the effects on welfare and the environment which are caused by ambient concentrations of pollutants listed pursuant to section 108 [42 U.S.C. 7408] and other pollutants which may be listed;

"(2) estimate welfare and environmental costs incurred as a result of such effects;

"(3) examine the role of secondary standards and the State implementation planning process in preventing such effects;

"(4) determine ambient concentrations of each such pollutant which would be adequate to protect welfare and the environment from such effects;

"(5) estimate the costs and other impacts of meeting secondary standards; and

"(6) consider other means consistent with the goals and objectives of the Clean Air Act [42 U.S.C. 7401 et seq.] which may be more effective than secondary standards in preventing or mitigating such effects.

"(b) SUBMISSION TO CONGRESS; COMMENTS; AUTHORIZATION.—(1) The report shall be transmitted to the Congress not later than 3 years after the date of enactment of the Clean Air Act Amendments of 1990 [Nov. 15, 1990].

"(2) At least 90 days before issuing a report the Administrator shall provide an opportunity for public comment on the proposed report. The Administrator shall include in the final report a summary of the comments received on the proposed report.

"(3) There are authorized to be appropriated such sums as are necessary to carry out this section."

## § 7410. State implementation plans for national primary and secondary ambient air quality standards

### (a) Adoption of plan by State; submission to Administrator; content of plan; revision; new sources; indirect source review program; supplemental or intermittent control systems

(1) Each State shall, after reasonable notice and public hearings, adopt and submit to the Administrator, within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof) under section 7409 of this title for any air pollutant, a plan which provides for implementation, maintenance, and enforcement of such primary standard in each air quality control region (or portion thereof) within such State. In addition, such State shall adopt and submit to the Administrator (either as a part of a plan submitted under the preceding sentence or separately) within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national ambient air quality secondary standard (or revision thereof), a plan which provides for implementation, maintenance, and enforcement of such secondary standard in each air quality control region (or portion thereof) within such State. Unless a separate public hearing is provided, each State shall consider its plan implementing such secondary standard at the hearing required by the first sentence of this paragraph.

(2) Each implementation plan submitted by a State under this chapter shall be adopted by the

State after reasonable notice and public hearing. Each such plan shall—

(A) include enforceable emission limitations and other control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements of this chapter;

(B) provide for establishment and operation of appropriate devices, methods, systems, and procedures necessary to—

(i) monitor, compile, and analyze data on ambient air quality, and

(ii) upon request, make such data available to the Administrator;

(C) include a program to provide for the enforcement of the measures described in subparagraph (A), and regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that national ambient air quality standards are achieved, including a permit program as required in parts C and D;

(D) contain adequate provisions—

(i) prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will—

(I) contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard, or

(II) interfere with measures required to be included in the applicable implementation plan for any other State under part C to prevent significant deterioration of air quality or to protect visibility,

(ii) insuring compliance with the applicable requirements of sections 7426 and 7415 of this title (relating to interstate and international pollution abatement);

(E) provide (i) necessary assurances that the State (or, except where the Administrator deems inappropriate, the general purpose local government or governments, or a regional agency designated by the State or general purpose local governments for such purpose) will have adequate personnel, funding, and authority under State (and, as appropriate, local) law to carry out such implementation plan (and is not prohibited by any provision of Federal or State law from carrying out such implementation plan or portion thereof), (ii) requirements that the State comply with the requirements respecting State boards under section 7428 of this title, and (iii) necessary assurances that, where the State has relied on a local or regional government, agency, or instrumentality for the implementation of any plan provision, the State has responsibility for ensuring adequate implementation of such plan provision;

(F) require, as may be prescribed by the Administrator—

(i) the installation, maintenance, and replacement of equipment, and the implementation of other necessary steps, by owners or operators of stationary sources to monitor emissions from such sources,

(ii) periodic reports on the nature and amounts of emissions and emissions-related data from such sources, and

(iii) correlation of such reports by the State agency with any emission limitations or standards established pursuant to this chapter, which reports shall be available at reasonable times for public inspection;

(G) provide for authority comparable to that in section 7603 of this title and adequate contingency plans to implement such authority;

(H) provide for revision of such plan—

(i) from time to time as may be necessary to take account of revisions of such national primary or secondary ambient air quality standard or the availability of improved or more expeditious methods of attaining such standard, and

(ii) except as provided in paragraph (3)(C), whenever the Administrator finds on the basis of information available to the Administrator that the plan is substantially inadequate to attain the national ambient air quality standard which it implements or to otherwise comply with any additional requirements established under this chapter;

(I) in the case of a plan or plan revision for an area designated as a nonattainment area, meet the applicable requirements of part D (relating to nonattainment areas);

(J) meet the applicable requirements of section 7421 of this title (relating to consultation), section 7427 of this title (relating to public notification), and part C (relating to prevention of significant deterioration of air quality and visibility protection);

(K) provide for—

(i) the performance of such air quality modeling as the Administrator may prescribe for the purpose of predicting the effect on ambient air quality of any emissions of any air pollutant for which the Administrator has established a national ambient air quality standard, and

(ii) the submission, upon request, of data related to such air quality modeling to the Administrator;

(L) require the owner or operator of each major stationary source to pay to the permitting authority, as a condition of any permit required under this chapter, a fee sufficient to cover—

(i) the reasonable costs of reviewing and acting upon any application for such a permit, and

(ii) if the owner or operator receives a permit for such source, the reasonable costs of implementing and enforcing the terms and conditions of any such permit (not including any court costs or other costs associated with any enforcement action),

until such fee requirement is superseded with respect to such sources by the Administrator's approval of a fee program under subchapter V; and

(M) provide for consultation and participation by local political subdivisions affected by the plan.

(3)(A) Repealed. Pub. L. 101–549, title I, § 101(d)(1), Nov. 15, 1990, 104 Stat. 2409.

(B) As soon as practicable, the Administrator shall, consistent with the purposes of this chapter and the Energy Supply and Environmental Coordination Act of 1974 [15 U.S.C. 791 et seq.], review each State's applicable implementation plans and report to the State on whether such plans can be revised in relation to fuel burning stationary sources (or persons supplying fuel to such sources) without interfering with the attainment and maintenance of any national ambient air quality standard within the period permitted in this section. If the Administrator determines that any such plan can be revised, he shall notify the State that a plan revision may be submitted by the State. Any plan revision which is submitted by the State shall, after public notice and opportunity for public hearing, be approved by the Administrator if the revision relates only to fuel burning stationary sources (or persons supplying fuel to such sources), and the plan as revised complies with paragraph (2) of this subsection. The Administrator shall approve or disapprove any revision no later than three months after its submission.

(C) Neither the State, in the case of a plan (or portion thereof) approved under this subsection, nor the Administrator, in the case of a plan (or portion thereof) promulgated under subsection (c), shall be required to revise an applicable implementation plan because one or more exemptions under section 7418 of this title (relating to Federal facilities), enforcement orders under section 7413(d)[1] of this title, suspensions under subsection (f) or (g) (relating to temporary energy or economic authority), orders under section 7419 of this title (relating to primary nonferrous smelters), or extensions of compliance in decrees entered under section 7413(e)[1] of this title (relating to iron- and steel-producing operations) have been granted, if such plan would have met the requirements of this section if no such exemptions, orders, or extensions had been granted.

(4) Repealed. Pub. L. 101–549, title I, § 101(d)(2), Nov. 15, 1990, 104 Stat. 2409.

(5)(A)(i) Any State may include in a State implementation plan, but the Administrator may not require as a condition of approval of such plan under this section, any indirect source review program. The Administrator may approve and enforce, as part of an applicable implementation plan, an indirect source review program which the State chooses to adopt and submit as part of its plan.

(ii) Except as provided in subparagraph (B), no plan promulgated by the Administrator shall include any indirect source review program for any air quality control region, or portion thereof.

(iii) Any State may revise an applicable implementation plan approved under this subsection to suspend or revoke any such program included in such plan, provided that such plan meets the requirements of this section.

(B) The Administrator shall have the authority to promulgate, implement and enforce regulations under subsection (c) respecting indirect

source review programs which apply only to federally assisted highways, airports, and other major federally assisted indirect sources and federally owned or operated indirect sources.

(C) For purposes of this paragraph, the term "indirect source" means a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution. Such term includes parking lots, parking garages, and other facilities subject to any measure for management of parking supply (within the meaning of subsection (c)(2)(D)(ii)), including regulation of existing off-street parking but such term does not include new or existing on-street parking. Direct emissions sources or facilities at, within, or associated with, any indirect source shall not be deemed indirect sources for the purpose of this paragraph.

(D) For purposes of this paragraph the term "indirect source review program" means the facility-by-facility review of indirect sources of air pollution, including such measures as are necessary to assure, or assist in assuring, that a new or modified indirect source will not attract mobile sources of air pollution, the emissions from which would cause or contribute to air pollution concentrations—

(i) exceeding any national primary ambient air quality standard for a mobile source-related air pollutant after the primary standard attainment date, or

(ii) preventing maintenance of any such standard after such date.

(E) For purposes of this paragraph and paragraph (2)(B), the term "transportation control measure" does not include any measure which is an "indirect source review program".

(6) No State plan shall be treated as meeting the requirements of this section unless such plan provides that in the case of any source which uses a supplemental, or intermittent control system for purposes of meeting the requirements of an order under section 7413(d)[1] of this title or section 7419 of this title (relating to primary nonferrous smelter orders), the owner or operator of such source may not temporarily reduce the pay of any employee by reason of the use of such supplemental or intermittent or other dispersion dependent control system.

**(b) Extension of period for submission of plans**

The Administrator may, whenever he determines necessary, extend the period for submission of any plan or portion thereof which implements a national secondary ambient air quality standard for a period not to exceed 18 months from the date otherwise required for submission of such plan.

**(c) Preparation and publication by Administrator of proposed regulations setting forth implementation plan; transportation regulations study and report; parking surcharge; suspension authority; plan implementation**

(1) The Administrator shall promulgate a Federal implementation plan at any time within 2 years after the Administrator—

(A) finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not

---

[1] See References in Text note below.

satisfy the minimum criteria established under subsection (k)(1)(A), or

(B) disapproves a State implementation plan submission in whole or in part,

unless the State corrects the deficiency, and the Administrator approves the plan or plan revision, before the Administrator promulgates such Federal implementation plan.

(2)(A) Repealed. Pub. L. 101–549, title I, § 101(d)(3)(A), Nov. 15, 1990, 104 Stat. 2409.

(B) No parking surcharge regulation may be required by the Administrator under paragraph (1) of this subsection as a part of an applicable implementation plan. All parking surcharge regulations previously required by the Administrator shall be void upon June 22, 1974. This subparagraph shall not prevent the Administrator from approving parking surcharges if they are adopted and submitted by a State as part of an applicable implementation plan. The Administrator may not condition approval of any implementation plan submitted by a State on such plan's including a parking surcharge regulation.

(C) Repealed. Pub. L. 101–549, title I, § 101(d)(3)(B), Nov. 15, 1990, 104 Stat. 2409.

(D) For purposes of this paragraph—

(i) The term "parking surcharge regulation" means a regulation imposing or requiring the imposition of any tax, surcharge, fee, or other charge on parking spaces, or any other area used for the temporary storage of motor vehicles.

(ii) The term "management of parking supply" shall include any requirement providing that any new facility containing a given number of parking spaces shall receive a permit or other prior approval, issuance of which is to be conditioned on air quality considerations.

(iii) The term "preferential bus/carpool lane" shall include any requirement for the setting aside of one or more lanes of a street or highway on a permanent or temporary basis for the exclusive use of buses or carpools, or both.

(E) No standard, plan, or requirement, relating to management of parking supply or preferential bus/carpool lanes shall be promulgated after June 22, 1974, by the Administrator pursuant to this section, unless such promulgation has been subjected to at least one public hearing which has been held in the area affected and for which reasonable notice has been given in such area. If substantial changes are made following public hearings, one or more additional hearings shall be held in such area after such notice.

(3) Upon application of the chief executive officer of any general purpose unit of local government, if the Administrator determines that such unit has adequate authority under State or local law, the Administrator may delegate to such unit the authority to implement and enforce within the jurisdiction of such unit any part of a plan promulgated under this subsection. Nothing in this paragraph shall prevent the Administrator from implementing or enforcing any applicable provision of a plan promulgated under this subsection.

(4) Repealed. Pub. L. 101–549, title I, § 101(d)(3)(C), Nov. 15, 1990, 104 Stat. 2409.

(5)(A) Any measure in an applicable implementation plan which requires a toll or other charge for the use of a bridge located entirely within one city shall be eliminated from such plan by the Administrator upon application by the Governor of the State, which application shall include a certification by the Governor that he will revise such plan in accordance with subparagraph (B).

(B) In the case of any applicable implementation plan with respect to which a measure has been eliminated under subparagraph (A), such plan shall, not later than one year after August 7, 1977, be revised to include comprehensive measures to:

(i) establish, expand, or improve public transportation measures to meet basic transportation needs, as expeditiously as is practicable; and

(ii) implement transportation control measures necessary to attain and maintain national ambient air quality standards,

and such revised plan shall, for the purpose of implementing such comprehensive public transportation measures, include requirements to use (insofar as is necessary) Federal grants, State or local funds, or any combination of such grants and funds as may be consistent with the terms of the legislation providing such grants and funds. Such measures shall, as a substitute for the tolls or charges eliminated under subparagraph (A), provide for emissions reductions equivalent to the reductions which may reasonably be expected to be achieved through the use of the tolls or charges eliminated.

(C) Any revision of an implementation plan for purposes of meeting the requirements of subparagraph (B) shall be submitted in coordination with any plan revision required under part D.

**(d), (e) Repealed. Pub. L. 101–549, title I, § 101(d)(4), (5), Nov. 15, 1990, 104 Stat. 2409**

**(f) National or regional energy emergencies; determination by President**

(1) Upon application by the owner or operator of a fuel burning stationary source, and after notice and opportunity for public hearing, the Governor of the State in which such source is located may petition the President to determine that a national or regional energy emergency exists of such severity that—

(A) a temporary suspension of any part of the applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) may be necessary, and

(B) other means of responding to the energy emergency may be inadequate.

Such determination shall not be delegable by the President to any other person. If the President determines that a national or regional energy emergency of such severity exists, a temporary emergency suspension of any part of an applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) adopted by the State may be issued by the Governor of any State covered by the President's determination under the condition specified in paragraph (2) and may take effect immediately.

(2) A temporary emergency suspension under this subsection shall be issued to a source only if the Governor of such State finds that—

(A) there exists in the vicinity of such source a temporary energy emergency involving high levels of unemployment or loss of necessary energy supplies for residential dwellings; and

(B) such unemployment or loss can be totally or partially alleviated by such emergency suspension.

Not more than one such suspension may be issued for any source on the basis of the same set of circumstances or on the basis of the same emergency.

(3) A temporary emergency suspension issued by a Governor under this subsection shall remain in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator, if any. The Administrator may disapprove such suspension if he determines that it does not meet the requirements of paragraph (2).

(4) This subsection shall not apply in the case of a plan provision or requirement promulgated by the Administrator under subsection (c) of this section, but in any such case the President may grant a temporary emergency suspension for a four month period of any such provision or requirement if he makes the determinations and findings specified in paragraphs (1) and (2).

(5) The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c–10[1] of this title, as in effect before August 7, 1977, or section 7413(d)[1] of this title, upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

**(g) Governor's authority to issue temporary emergency suspensions**

(1) In the case of any State which has adopted and submitted to the Administrator a proposed plan revision which the State determines—

(A) meets the requirements of this section, and

(B) is necessary (i) to prevent the closing for one year or more of any source of air pollution, and (ii) to prevent substantial increases in unemployment which would result from such closing, and

which the Administrator has not approved or disapproved under this section within 12 months of submission of the proposed plan revision, the Governor may issue a temporary emergency suspension of the part of the applicable implementation plan for such State which is proposed to be revised with respect to such source. The determination under subparagraph (B) may not be made with respect to a source which would close without regard to whether or not the proposed plan revision is approved.

(2) A temporary emergency suspension issued by a Governor under this subsection shall remain in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator. The Administrator may disapprove such suspension if

he determines that it does not meet the requirements of this subsection.

(3) The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c–10[1] of this title as in effect before August 7, 1977, or under section 7413(d)[1] of this title upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

**(h) Publication of comprehensive document for each State setting forth requirements of applicable implementation plan**

(1) Not later than 5 years after November 15, 1990, and every 3 years thereafter, the Administrator shall assemble and publish a comprehensive document for each State setting forth all requirements of the applicable implementation plan for such State and shall publish notice in the Federal Register of the availability of such documents.

(2) The Administrator may promulgate such regulations as may be reasonably necessary to carry out the purpose of this subsection.

**(i) Modification of requirements prohibited**

Except for a primary nonferrous smelter order under section 7419 of this title, a suspension under subsection (f) or (g) (relating to emergency suspensions), an exemption under section 7418 of this title (relating to certain Federal facilities), an order under section 7413(d)[1] of this title (relating to compliance orders), a plan promulgation under subsection (c), or a plan revision under subsection (a)(3); no order, suspension, plan revision, or other action modifying any requirement of an applicable implementation plan may be taken with respect to any stationary source by the State or by the Administrator.

**(j) Technological systems of continuous emission reduction on new or modified stationary sources; compliance with performance standards**

As a condition for issuance of any permit required under this subchapter, the owner or operator of each new or modified stationary source which is required to obtain such a permit must show to the satisfaction of the permitting authority that the technological system of continuous emission reduction which is to be used at such source will enable it to comply with the standards of performance which are to apply to such source and that the construction or modification and operation of such source will be in compliance with all other requirements of this chapter.

**(k) Environmental Protection Agency action on plan submissions**

**(1) Completeness of plan submissions**

**(A) Completeness criteria**

Within 9 months after November 15, 1990, the Administrator shall promulgate minimum criteria that any plan submission must meet before the Administrator is required to

Case: 19-2562    Document: 47    Page: 12    Date Filed: 01/24/2020

act on such submission under this subsection. The criteria shall be limited to the information necessary to enable the Administrator to determine whether the plan submission complies with the provisions of this chapter.

**(B) Completeness finding**

Within 60 days of the Administrator's receipt of a plan or plan revision, but no later than 6 months after the date, if any, by which a State is required to submit the plan or revision, the Administrator shall determine whether the minimum criteria established pursuant to subparagraph (A) have been met. Any plan or plan revision that a State submits to the Administrator, and that has not been determined by the Administrator (by the date 6 months after receipt of the submission) to have failed to meet the minimum criteria established pursuant to subparagraph (A), shall on that date be deemed by operation of law to meet such minimum criteria.

**(C) Effect of finding of incompleteness**

Where the Administrator determines that a plan submission (or part thereof) does not meet the minimum criteria established pursuant to subparagraph (A), the State shall be treated as not having made the submission (or, in the Administrator's discretion, part thereof).

**(2) Deadline for action**

Within 12 months of a determination by the Administrator (or a determination deemed by operation of law) under paragraph (1) that a State has submitted a plan or plan revision (or, in the Administrator's discretion, part thereof) that meets the minimum criteria established pursuant to paragraph (1), if applicable (or, if those criteria are not applicable, within 12 months of submission of the plan or revision), the Administrator shall act on the submission in accordance with paragraph (3).

**(3) Full and partial approval and disapproval**

In the case of any submittal on which the Administrator is required to act under paragraph (2), the Administrator shall approve such submittal as a whole if it meets all of the applicable requirements of this chapter. If a portion of the plan revision meets all the applicable requirements of this chapter, the Administrator may approve the plan revision in part and disapprove the plan revision in part. The plan revision shall not be treated as meeting the requirements of this chapter until the Administrator approves the entire plan revision as complying with the applicable requirements of this chapter.

**(4) Conditional approval**

The Administrator may approve a plan revision based on a commitment of the State to adopt specific enforceable measures by a date certain, but not later than 1 year after the date of approval of the plan revision. Any such conditional approval shall be treated as a disapproval if the State fails to comply with such commitment.

**(5) Calls for plan revisions**

Whenever the Administrator finds that the applicable implementation plan for any area is substantially inadequate to attain or maintain the relevant national ambient air quality standard, to mitigate adequately the interstate pollutant transport described in section 7506a of this title or section 7511c of this title, or to otherwise comply with any requirement of this chapter, the Administrator shall require the State to revise the plan as necessary to correct such inadequacies. The Administrator shall notify the State of the inadequacies, and may establish reasonable deadlines (not to exceed 18 months after the date of such notice) for the submission of such plan revisions. Such findings and notice shall be public. Any finding under this paragraph shall, to the extent the Administrator deems appropriate, subject the State to the requirements of this chapter to which the State was subject when it developed and submitted the plan for which such finding was made, except that the Administrator may adjust any dates applicable under such requirements as appropriate (except that the Administrator may not adjust any attainment date prescribed under part D, unless such date has elapsed).

**(6) Corrections**

Whenever the Administrator determines that the Administrator's action approving, disapproving, or promulgating any plan or plan revision (or part thereof), area designation, redesignation, classification, or reclassification was in error, the Administrator may in the same manner as the approval, disapproval, or promulgation revise such action as appropriate without requiring any further submission from the State. Such determination and the basis thereof shall be provided to the State and public.

**(l) Plan revisions**

Each revision to an implementation plan submitted by a State under this chapter shall be adopted by such State after reasonable notice and public hearing. The Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), or any other applicable requirement of this chapter.

**(m) Sanctions**

The Administrator may apply any of the sanctions listed in section 7509(b) of this title at any time (or at any time after) the Administrator makes a finding, disapproval, or determination under paragraphs (1) through (4), respectively, of section 7509(a) of this title in relation to any plan or plan item (as that term is defined by the Administrator) required under this chapter, with respect to any portion of the State the Administrator determines reasonable and appropriate, for the purpose of ensuring that the requirements of this chapter relating to such plan or plan item are met. The Administrator shall, by rule, establish criteria for exercising his authority under the previous sentence with respect to any deficiency referred to in section 7509(a) of

this title to ensure that, during the 24-month period following the finding, disapproval, or determination referred to in section 7509(a) of this title, such sanctions are not applied on a statewide basis where one or more political subdivisions covered by the applicable implementation plan are principally responsible for such deficiency.

**(n) Savings clauses**

**(1) Existing plan provisions**

Any provision of any applicable implementation plan that was approved or promulgated by the Administrator pursuant to this section as in effect before November 15, 1990, shall remain in effect as part of such applicable implementation plan, except to the extent that a revision to such provision is approved or promulgated by the Administrator pursuant to this chapter.

**(2) Attainment dates**

For any area not designated nonattainment, any plan or plan revision submitted or required to be submitted by a State—

(A) in response to the promulgation or revision of a national primary ambient air quality standard in effect on November 15, 1990, or

(B) in response to a finding of substantial inadequacy under subsection (a)(2) (as in effect immediately before November 15, 1990),

shall provide for attainment of the national primary ambient air quality standards within 3 years of November 15, 1990, or within 5 years of issuance of such finding of substantial inadequacy, whichever is later.

**(3) Retention of construction moratorium in certain areas**

In the case of an area to which, immediately before November 15, 1990, the prohibition on construction or modification of major stationary sources prescribed in subsection (a)(2)(I) (as in effect immediately before November 15, 1990) applied by virtue of a finding of the Administrator that the State containing such area had not submitted an implementation plan meeting the requirements of section 7502(b)(6) of this title (relating to establishment of a permit program) (as in effect immediately before November 15, 1990) or 7502(a)(1) of this title (to the extent such requirements relate to provision for attainment of the primary national ambient air quality standard for sulfur oxides by December 31, 1982 as in effect immediately before November 15, 1990, no major stationary source of the relevant air pollutant or pollutants shall be constructed or modified in such area until the Administrator finds that the plan for such area meets the applicable requirements of section 7502(c)(5) of this title (relating to permit programs) or subpart 5 of part D (relating to attainment of the primary national ambient air quality standard for sulfur dioxide), respectively.

**(o) Indian tribes**

If an Indian tribe submits an implementation plan to the Administrator pursuant to section 7601(d) of this title, the plan shall be reviewed in accordance with the provisions for review set forth in this section for State plans, except as otherwise provided by regulation promulgated pursuant to section 7601(d)(2) of this title. When such plan becomes effective in accordance with the regulations promulgated under section 7601(d) of this title, the plan shall become applicable to all areas (except as expressly provided otherwise in the plan) located within the exterior boundaries of the reservation, notwithstanding the issuance of any patent and including rights-of-way running through the reservation.

**(p) Reports**

Any State shall submit, according to such schedule as the Administrator may prescribe, such reports as the Administrator may require relating to emission reductions, vehicle miles traveled, congestion levels, and any other information the Administrator may deem necessary to assess the development[2] effectiveness, need for revision, or implementation of any plan or plan revision required under this chapter.

(July 14, 1955, ch. 360, title I, §110, as added Pub. L. 91–604, §4(a), Dec. 31, 1970, 84 Stat. 1680; amended Pub. L. 93–319, §4, June 22, 1974, 88 Stat. 256; Pub. L. 95–95, title I, §§107, 108, Aug. 7, 1977, 91 Stat. 691, 693; Pub. L. 95–190, §14(a)(1)–(6), Nov. 16, 1977, 91 Stat. 1399; Pub. L. 97–23, §3, July 17, 1981, 95 Stat. 142; Pub. L. 101–549, title I, §§101(b)–(d), 102(h), 107(c), 108(d), title IV, §412, Nov. 15, 1990, 104 Stat. 2404–2408, 2422, 2464, 2466, 2634.)

REFERENCES IN TEXT

The Energy Supply and Environmental Coordination Act of 1974, referred to in subsec. (a)(3)(B), is Pub. L. 93–319, June 22, 1974, 88 Stat. 246, as amended, which is classified principally to chapter 16C (§791 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 791 of Title 15 and Tables.

Section 7413 of this title, referred to in subsecs. (a)(3)(C), (6), (f)(5), (g)(3), and (l), was amended generally by Pub. L. 101–549, title VII, §701, Nov. 15, 1990, 104 Stat. 2672, and, as so amended, subsecs. (d) and (e) of section 7413 no longer relates to final compliance orders and steel industry compliance extension, respectively.

Section 1857c–10 of this title, as in effect before August 7, 1977, referred to in subsecs. (f)(5) and (g)(3), was in the original "section 119, as in effect before the date of the enactment of this paragraph", meaning section 119 of act July 14, 1955, ch. 360, title I, as added June 22, 1974, Pub. L. 93–319, §3, 88 Stat. 248, (which was classified to section 1857c–10 of this title) as in effect prior to the enactment of subsecs. (f)(5) and (g)(3) of this section by Pub. L. 95–95, §107, Aug. 7, 1977, 91 Stat. 691, effective Aug. 7, 1977. Section 112(b)(1) of Pub. L. 95–95 repealed section 119 of act July 14, 1955, ch. 360, title I, as added by Pub. L. 93–319, and provided that all references to such section 119 in any subsequent enactment which supersedes Pub. L. 93–319 shall be construed to refer to section 113(d) of the Clean Air Act and to paragraph (5) thereof in particular which is classified to section 7413(d)(5) of this title. Section 7413 of this title was subsequently amended generally by Pub. L. 101–549, title VII, §701, Nov. 15, 1990, 104 Stat. 2672, see note above. Section 117(b) of Pub. L. 95–95 added a new section 119 of act July 14, 1955, which is classified to section 7419 of this title.

CODIFICATION

Section was formerly classified to section 1857c–5 of this title.

---

[2] So in original. Probably should be followed by a comma.

### PRIOR PROVISIONS

A prior section 110 of act July 14, 1955, was renumbered section 117 by Pub. L. 91–604 and is classified to section 7417 of this title.

### AMENDMENTS

1990—Subsec. (a)(1). Pub. L. 101–549, §101(d)(8), substituted "3 years (or such shorter period as the Administrator may prescribe)" for "nine months" in two places.

Subsec. (a)(2). Pub. L. 101–549, §101(b), amended par. (2) generally, substituting present provisions for provisions setting the time within which the Administrator was to approve or disapprove a plan or portion thereof and listing the conditions under which the plan or portion thereof was to be approved after reasonable notice and hearing.

Subsec. (a)(3)(A). Pub. L. 101–549, §101(d)(1), struck out subpar. (A) which directed Administrator to approve any revision of an implementation plan if it met certain requirements and had been adopted by the State after reasonable notice and public hearings.

Subsec. (a)(3)(D). Pub. L. 101–549, §101(d)(1), struck out subpar. (D) which directed that certain implementation plans be revised to include comprehensive measures and requirements.

Subsec. (a)(4). Pub. L. 101–549, §101(d)(2), struck out par. (4) which set forth requirements for review procedure.

Subsec. (c)(1). Pub. L. 101–549, §102(h), amended par. (1) generally, substituting present provisions for provisions relating to preparation and publication of regulations setting forth an implementation plan, after opportunity for a hearing, upon failure of a State to make required submission or revision.

Subsec. (c)(2)(A). Pub. L. 101–549, §101(d)(3)(A), struck out subpar. (A) which required a study and report on necessity of parking surcharge, management of parking supply, and preferential bus/carpool lane regulations to achieve and maintain national primary ambient air quality standards.

Subsec. (c)(2)(C). Pub. L. 101–549, §101(d)(3)(B), struck out subpar. (C) which authorized suspension of certain regulations and requirements relating to management of parking supply.

Subsec. (c)(4). Pub. L. 101–549, §101(d)(3)(C), struck out par. (4) which permitted Governors to temporarily suspend measures in implementation plans relating to retrofits, gas rationing, and reduction of on-street parking.

Subsec. (c)(5)(B). Pub. L. 101–549, §101(d)(3)(D), struck out "(including the written evidence required by part D)," after "include comprehensive measures".

Subsec. (d). Pub. L. 101–549, §101(d)(4), struck out subsec. (d) which defined an applicable implementation plan for purposes of this chapter.

Subsec. (e). Pub. L. 101–549, §101(d)(5), struck out subsec. (e) which permitted an extension of time for attainment of a national primary ambient air quality standard.

Subsec. (f)(1). Pub. L. 101–549, §412, inserted "or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets)" in subpar. (A) and in last sentence.

Subsec. (g)(1). Pub. L. 101–549, §101(d)(6), substituted "12 months of submission of the proposed plan revision" for "the required four month period" in closing provisions.

Subsec. (h)(1). Pub. L. 101–549, §101(d)(7), substituted "5 years after November 15, 1990, and every three years thereafter" for "one year after August 7, 1977, and annually thereafter" and struck out at end "Each such document shall be revised as frequently as practicable but not less often than annually."

Subsecs. (k) to (n). Pub. L. 101–549, §101(c), added subsecs. (k) to (n).

Subsec. (o). Pub. L. 101–549, §107(c), added subsec. (o).

Subsec. (p). Pub. L. 101–549, §108(d), added subsec. (p).

1981—Subsec. (a)(3)(C). Pub. L. 97–23 inserted reference to extensions of compliance in decrees entered under section 7413(e) of this title (relating to iron- and steel-producing operations).

1977—Subsec. (a)(2)(A). Pub. L. 95–95, §108(a)(1), substituted "(A) except as may be provided in subparagraph (I)(i) in the case of a plan" for "(A)(i) in the case of a plan".

Subsec. (a)(2)(B). Pub. L. 95–95, §108(a)(2), substituted "transportation controls, air quality maintenance plans, and preconstruction review of direct sources of air pollution as provided in subparagraph (D)" for "land use and transportation controls".

Subsec. (a)(2)(D). Pub. L. 95–95, §108(a)(3), substituted "it includes a program to provide for the enforcement of emission limitations and regulation of the modification, construction, and operation of any stationary source, including a permit program as required in parts C and D and a permit or equivalent program for any major emitting facility, within such region as necessary to assure (i) that national ambient air quality standards are achieved and maintained, and (ii) a procedure" for "it includes a procedure".

Subsec. (a)(2)(E). Pub. L. 95–95, §108(a)(4), substituted "it contains adequate provisions (i) prohibiting any stationary source within the State from emitting any air pollutant in amounts which will (I) prevent attainment or maintenance by any other State of any such national primary or secondary ambient air quality standard, or (II) interfere with measures required to be included in the applicable implementation plan for any other State under part C to prevent significant deterioration of air quality or to protect visibility, and (ii) insuring compliance with the requirements of section 7426 of this title, relating to interstate pollution abatement" for "it contains adequate provisions for intergovernmental cooperation, including measures necessary to insure that emissions of air pollutants from sources located in any air quality control region will not interfere with the attainment or maintenance of such primary or secondary standard in any portion of such region outside of such State or in any other air quality control region".

Subsec. (a)(2)(F). Pub. L. 95–95, §108(a)(5), added cl. (vi).

Subsec. (a)(2)(H). Pub. L. 95–190, §14(a)(1), substituted "1977;" for "1977".

Pub. L. 95–95, §108(a)(6), inserted "except as provided in paragraph (3)(C)," after "or (ii)" and "or to otherwise comply with any additional requirements established under the Clean Air Act Amendments of 1977" after "to achieve the national ambient air quality primary or secondary standard which it implements".

Subsec. (a)(2)(I). Pub. L. 95–95, §108(b), added subpar. (I).

Subsec. (a)(2)(J). Pub. L. 95–190, §14(a)(2), substituted "; and" for ", and".

Pub. L. 95–95, §108(b), added subpar. (J).

Subsec. (a)(2)(K). Pub. L. 95–95, §108(b) added subpar. (K).

Subsec. (a)(3)(C). Pub. L. 95–95, §108(c), added subpar. (C).

Subsec. (a)(3)(D). Pub. L. 95–190, §14(a)(4), added subpar. (D).

Subsec. (a)(5). Pub. L. 95–95, §108(e), added par. (5).

Subsec. (a)(5)(D). Pub. L. 95–190, §14(a)(3), struck out "preconstruction or premodification" before "review".

Subsec. (a)(6). Pub. L. 95–95, §108(e), added par. (6).

Subsec. (c)(1). Pub. L. 95–95, §108(d)(1), (2), substituted "plan which meets the requirements of this section" for "plan for any national ambient air quality primary or secondary standard within the time prescribed" in subpar. (A) and, in provisions following subpar. (C), directed that any portion of a plan relating to any measure described in first sentence of 7421 of this title (relating to consultation) or the consultation process required under such section 7421 of this title not be required to be promulgated before the date eight months after such date required for submission.

Subsec. (c)(3) to (5). Pub. L. 95–95, §108(d)(3), added pars. (3) to (5).

Subsec. (d). Pub. L. 95–95, §108(f), substituted "and which implements the requirements of this section" for

"and which implements a national primary or secondary ambient air quality standard in a State".

Subsec. (f). Pub. L. 95–95, § 107(a), substituted provisions relating to the handling of national or regional energy emergencies for provisions relating to the postponement of compliance by stationary sources or classes of moving sources with any requirement of applicable implementation plans.

Subsec. (g). Pub. L. 95–95, § 108(g), added subsec. (g) relating to publication of comprehensive document.

Pub. L. 95–95, § 107(b), added subsec. (g) relating to Governor's authority to issue temporary emergency suspensions.

Subsec. (h). Pub. L. 95–190, § 14(a)(5), redesignated subsec. (g), added by Pub. L. 95–95, § 108(g), as (h). Former subsec. (h) redesignated (i).

Subsec. (i). Pub. L. 95–190, § 14(a)(5), redesignated subsec. (h), added by Pub. L. 95–95, § 108(g), as (i). Former subsec. (i) redesignated (j) and amended.

Subsec. (j). Pub. L. 95–190 § 14(a)(5), (6), redesignated subsec. (i), added by Pub. L. 95–95, § 108(g), as (j) and in subsec. (j) as so redesignated, substituted "will enable such source" for "at such source will enable it".

1974—Subsec. (a)(3). Pub. L. 93–319, § 4(a), designated existing provisions as subpar. (A) and added subpar. (B).

Subsec. (c). Pub. L. 93–319, § 4(b), designated existing provisions as par. (1) and existing pars. (1), (2), and (3) as subpars. (A), (B), and (C), respectively, of such redesignated par. (1), and added par. (2).

EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF IMPLEMENTATION PLANS APPROVED AND IN EFFECT PRIOR TO AUG. 7, 1977

Nothing in the Clean Air Act Amendments of 1977 [Pub. L. 95–95] to affect any requirement of an approved implementation plan under this section or any other provision in effect under this chapter before Aug. 7, 1977, until modified or rescinded in accordance with this chapter as amended by the Clean Air Act Amendments of 1977, see section 406(c) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

SAVINGS PROVISION

Pub. L. 91–604, § 16, Dec. 31, 1970, 84 Stat. 1713, provided that:

"(a)(1) Any implementation plan adopted by any State and submitted to the Secretary of Health, Education, and Welfare, or to the Administrator pursuant to the Clean Air Act [this chapter] prior to enactment of this Act [Dec. 31, 1970] may be approved under section 110 of the Clean Air Act [this section] (as amended by this Act) [Pub. L. 91–604] and shall remain in effect, unless the Administrator determines that such implementation plan, or any portion thereof, is not consistent with applicable requirements of the Clean Air Act [this chapter] (as amended by this Act) and will not provide for the attainment of national primary ambient air quality standards in the time required by such Act. If the Administrator so determines, he shall, within 90 days after promulgation of any national ambient air quality standards pursuant to section 109(a) of the Clean Air Act [section 7409(a) of this title], notify the State and specify in what respects changes are needed to meet the additional requirements of such Act, including requirements to implement national secondary ambient air quality standards. If such changes are not adopted by the State after public hearings and within six months after such notification, the Administrator shall promulgate such changes pursuant to section 110(c) of such Act [subsec. (c) of this section].

"(2) The amendments made by section 4(b) [amending sections 7403 and 7415 of this title] shall not be construed as repealing or modifying the powers of the Administrator with respect to any conference convened under section 108(d) of the Clean Air Act [section 7415 of this title] before the date of enactment of this Act [Dec. 31, 1970].

"(b) Regulations or standards issued under this title II of the Clean Air Act [subchapter II of this chapter] prior to the enactment of this Act [Dec. 31, 1970] shall continue in effect until revised by the Administrator consistent with the purposes of such Act [this chapter]."

FEDERAL ENERGY ADMINISTRATOR

"Federal Energy Administrator", for purposes of this chapter, to mean Administrator of Federal Energy Administration established by Pub. L. 93–275, May 7, 1974, 88 Stat. 97, which is classified to section 761 et seq. of Title 15, Commerce and Trade, but with the term to mean any officer of the United States designated as such by the President until Federal Energy Administrator takes office and when Federal Energy Administration ceases to exist, see section 798 of Title 15, Commerce and Trade.

Federal Energy Administration terminated and functions vested by law in Administrator thereof transferred to Secretary of Energy (unless otherwise specifically provided) by sections 7151(a) and 7293 of this title.

## § 7411. Standards of performance for new stationary sources

### (a) Definitions

For purposes of this section:

(1) The term "standard of performance" means a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated.

(2) The term "new source" means any stationary source, the construction or modification of which is commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source.

immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

POWER SECTOR CARBON POLLUTION STANDARDS

Memorandum of President of the United States, June 25, 2013, 78 F.R. 39535, which related to carbon pollution standards for power plants, was revoked by Ex. Ord. No. 13783, § 3(a)(ii), Mar. 28, 2017, 82 F.R. 16094, set out as a note under section 13201 of this title.

## § 7412. Hazardous air pollutants

### (a) Definitions

For purposes of this section, except subsection (r)—

#### (1) Major source

The term "major source" means any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants. The Administrator may establish a lesser quantity, or in the case of radionuclides different criteria, for a major source than that specified in the previous sentence, on the basis of the potency of the air pollutant, persistence, potential for bioaccumulation, other characteristics of the air pollutant, or other relevant factors.

#### (2) Area source

The term "area source" means any stationary source of hazardous air pollutants that is not a major source. For purposes of this section, the term "area source" shall not include motor vehicles or nonroad vehicles subject to regulation under subchapter II.

#### (3) Stationary source

The term "stationary source" shall have the same meaning as such term has under section 7411(a) of this title.

#### (4) New source

The term "new source" means a stationary source the construction or reconstruction of which is commenced after the Administrator first proposes regulations under this section establishing an emission standard applicable to such source.

#### (5) Modification

The term "modification" means any physical change in, or change in the method of operation of, a major source which increases the actual emissions of any hazardous air pollutant emitted by such source by more than a de minimis amount or which results in the emission of any hazardous air pollutant not previously emitted by more than a de minimis amount.

#### (6) Hazardous air pollutant

The term "hazardous air pollutant" means any air pollutant listed pursuant to subsection (b).

#### (7) Adverse environmental effect

The term "adverse environmental effect" means any significant and widespread adverse effect, which may reasonably be anticipated, to wildlife, aquatic life, or other natural resources, including adverse impacts on populations of endangered or threatened species or significant degradation of environmental quality over broad areas.

#### (8) Electric utility steam generating unit

The term "electric utility steam generating unit" means any fossil fuel fired combustion unit of more than 25 megawatts that serves a generator that produces electricity for sale. A unit that cogenerates steam and electricity and supplies more than one-third of its potential electric output capacity and more than 25 megawatts electrical output to any utility power distribution system for sale shall be considered an electric utility steam generating unit.

#### (9) Owner or operator

The term "owner or operator" means any person who owns, leases, operates, controls, or supervises a stationary source.

#### (10) Existing source

The term "existing source" means any stationary source other than a new source.

#### (11) Carcinogenic effect

Unless revised, the term "carcinogenic effect" shall have the meaning provided by the Administrator under Guidelines for Carcinogenic Risk Assessment as of the date of enactment.[1] Any revisions in the existing Guidelines shall be subject to notice and opportunity for comment.

### (b) List of pollutants

#### (1) Initial list

The Congress establishes for purposes of this section a list of hazardous air pollutants as follows:

| CAS number | Chemical name |
| --- | --- |
| 75070 | Acetaldehyde |
| 60355 | Acetamide |
| 75058 | Acetonitrile |
| 98862 | Acetophenone |
| 53963 | 2-Acetylaminofluorene |
| 107028 | Acrolein |
| 79061 | Acrylamide |
| 79107 | Acrylic acid |
| 107131 | Acrylonitrile |
| 107051 | Allyl chloride |
| 92671 | 4-Aminobiphenyl |
| 62533 | Aniline |
| 90040 | o-Anisidine |
| 1332214 | Asbestos |
| 71432 | Benzene (including benzene from gasoline) |
| 92875 | Benzidine |
| 98077 | Benzotrichloride |
| 100447 | Benzyl chloride |
| 92524 | Biphenyl |
| 117817 | Bis(2-ethylhexyl)phthalate (DEHP) |
| 542881 | Bis(chloromethyl)ether |
| 75252 | Bromoform |
| 106990 | 1,3-Butadiene |

---

[1] See References in Text note below.

| CAS number | Chemical name | CAS number | Chemical name |
|---|---|---|---|
| 156627 | Calcium cyanamide | 58899 | Lindane (all isomers) |
| 105602 | Caprolactam | 108316 | Maleic anhydride |
| 133062 | Captan | 67561 | Methanol |
| 63252 | Carbaryl | 72435 | Methoxychlor |
| 75150 | Carbon disulfide | 74839 | Methyl bromide (Bromomethane) |
| 56235 | Carbon tetrachloride | 74873 | Methyl chloride (Chloromethane) |
| 463581 | Carbonyl sulfide | 71556 | Methyl chloroform (1,1,1-Trichloroethane) |
| 120809 | Catechol | 78933 | Methyl ethyl ketone (2-Butanone) |
| 133904 | Chloramben | 60344 | Methyl hydrazine |
| 57749 | Chlordane | 74884 | Methyl Iodide (Iodomethane) |
| 7782505 | Chlorine | 108101 | Methyl isobutyl ketone (Hexone) |
| 79118 | Chloroacetic acid | 624839 | Methyl isocyanate |
| 532274 | 2-Chloroacetophenone | 80626 | Methyl methacrylate |
| 108907 | Chlorobenzene | 1634044 | Methyl tert butyl ether |
| 510156 | Chlorobenzilate | 101144 | 4,4-Methylene bis(2-chloroaniline) |
| 67663 | Chloroform | 75092 | Methylene chloride (Dichloromethane) |
| 107302 | Chloromethyl methyl ether | 101688 | Methylene diphenyl diisocyanate (MDI) |
| 126998 | Chloroprene | 101779 | 4,4'-Methylenedianiline |
| 1319773 | Cresols/Cresylic acid (isomers and mixture) | 91203 | Naphthalene |
| 95487 | o-Cresol | 98953 | Nitrobenzene |
| 108394 | m-Cresol | 92933 | 4-Nitrobiphenyl |
| 106445 | p-Cresol | 100027 | 4-Nitrophenol |
| 98828 | Cumene | 79469 | 2-Nitropropane |
| 94757 | 2,4-D, salts and esters | 684935 | N-Nitroso-N-methylurea |
| 3547044 | DDE | 62759 | N-Nitrosodimethylamine |
| 334883 | Diazomethane | 59892 | N-Nitrosomorpholine |
| 132649 | Dibenzofurans | 56382 | Parathion |
| 96128 | 1,2-Dibromo-3-chloropropane | 82688 | Pentachloronitrobenzene (Quintobenzene) |
| 84742 | Dibutylphthalate | 87865 | Pentachlorophenol |
| 106467 | 1,4-Dichlorobenzene(p) | 108952 | Phenol |
| 91941 | 3,3-Dichlorobenzidene | 106503 | p-Phenylenediamine |
| 111444 | Dichloroethyl ether (Bis(2-chloroethyl)ether) | 75445 | Phosgene |
| 542756 | 1,3-Dichloropropene | 7803512 | Phosphine |
| 62737 | Dichlorvos | 7723140 | Phosphorus |
| 111422 | Diethanolamine | 85449 | Phthalic anhydride |
| 121697 | N,N-Diethyl aniline (N,N-Dimethylaniline) | 1336363 | Polychlorinated biphenyls (Aroclors) |
| 64675 | Diethyl sulfate | 1120714 | 1,3-Propane sultone |
| 119904 | 3,3-Dimethoxybenzidine | 57578 | beta-Propiolactone |
| 60117 | Dimethyl aminoazobenzene | 123386 | Propionaldehyde |
| 119937 | 3,3'-Dimethyl benzidine | 114261 | Propoxur (Baygon) |
| 79447 | Dimethyl carbamoyl chloride | 78875 | Propylene dichloride (1,2-Dichloropropane) |
| 68122 | Dimethyl formamide | 75569 | Propylene oxide |
| 57147 | 1,1-Dimethyl hydrazine | 75558 | 1,2-Propylenimine (2-Methyl aziridine) |
| 131113 | Dimethyl phthalate | 91225 | Quinoline |
| 77781 | Dimethyl sulfate | 106514 | Quinone |
| 534521 | 4,6-Dinitro-o-cresol, and salts | 100425 | Styrene |
| 51285 | 2,4-Dinitrophenol | 96093 | Styrene oxide |
| 121142 | 2,4-Dinitrotoluene | 1746016 | 2,3,7,8-Tetrachlorodibenzo-p-dioxin |
| 123911 | 1,4-Dioxane (1,4-Diethyleneoxide) | 79345 | 1,1,2,2-Tetrachloroethane |
| 122667 | 1,2-Diphenylhydrazine | 127184 | Tetrachloroethylene (Perchloroethylene) |
| 106898 | Epichlorohydrin (l-Chloro-2,3-epoxypropane) | 7550450 | Titanium tetrachloride |
| 106887 | 1,2-Epoxybutane | 108883 | Toluene |
| 140885 | Ethyl acrylate | 95807 | 2,4-Toluene diamine |
| 100414 | Ethyl benzene | 584849 | 2,4-Toluene diisocyanate |
| 51796 | Ethyl carbamate (Urethane) | 95534 | o-Toluidine |
| 75003 | Ethyl chloride (Chloroethane) | 8001352 | Toxaphene (chlorinated camphene) |
| 106934 | Ethylene dibromide (Dibromoethane) | 120821 | 1,2,4-Trichlorobenzene |
| 107062 | Ethylene dichloride (1,2-Dichloroethane) | 79005 | 1,1,2-Trichloroethane |
| 107211 | Ethylene glycol | 79016 | Trichloroethylene |
| 151564 | Ethylene imine (Aziridine) | 95954 | 2,4,5-Trichlorophenol |
| 75218 | Ethylene oxide | 88062 | 2,4,6-Trichlorophenol |
| 96457 | Ethylene thiourea | 121448 | Triethylamine |
| 75343 | Ethylidene dichloride (1,1-Dichloroethane) | 1582098 | Trifluralin |
| 50000 | Formaldehyde | 540841 | 2,2,4-Trimethylpentane |
| 76448 | Heptachlor | 108054 | Vinyl acetate |
| 118741 | Hexachlorobenzene | 593602 | Vinyl bromide |
| 87683 | Hexachlorobutadiene | 75014 | Vinyl chloride |
| 77474 | Hexachlorocyclopentadiene | 75354 | Vinylidene chloride (1,1-Dichloroethylene) |
| 67721 | Hexachloroethane | 1330207 | Xylenes (isomers and mixture) |
| 822060 | Hexamethylene-1,6-diisocyanate | 95476 | o-Xylenes |
| 680319 | Hexamethylphosphoramide | 108383 | m-Xylenes |
| 110543 | Hexane | 106423 | p-Xylenes |
| 302012 | Hydrazine | 0 | Antimony Compounds |
| 7647010 | Hydrochloric acid | 0 | Arsenic Compounds (inorganic including arsine) |
| 7664393 | Hydrogen fluoride (Hydrofluoric acid) | | |
| 123319 | Hydroquinone | 0 | Beryllium Compounds |
| 78591 | Isophorone | 0 | Cadmium Compounds |

| CAS number | Chemical name |
| --- | --- |
| 0 | Chromium Compounds |
| 0 | Cobalt Compounds |
| 0 | Coke Oven Emissions |
| 0 | Cyanide Compounds [1] |
| 0 | Glycol ethers [2] |
| 0 | Lead Compounds |
| 0 | Manganese Compounds |
| 0 | Mercury Compounds |
| 0 | Fine mineral fibers [3] |
| 0 | Nickel Compounds |
| 0 | Polycyclic Organic Matter [4] |
| 0 | Radionuclides (including radon) [5] |
| 0 | Selenium Compounds |

NOTE: For all listings above which contain the word "compounds" and for glycol ethers, the following applies: Unless otherwise specified, these listings are defined as including any unique chemical substance that contains the named chemical (i.e., antimony, arsenic, etc.) as part of that chemical's infrastructure.

[1] 'X'CN where X = H' or any other group where a formal dissociation may occur. For example KCN or $Ca(CN)_2$.

[2] Includes mono- and di- ethers of ethylene glycol, diethylene glycol, and triethylene glycol $R-(OCH2CH2)_n-OR'$ where

    n = 1, 2, or 3

    R = alkyl or aryl groups

    R' = R, H, or groups which, when removed, yield glycol ethers with the structure: $R-(OCH2CH)_n-OH$. Polymers are excluded from the glycol category.

[3] Includes mineral fiber emissions from facilities manufacturing or processing glass, rock, or slag fibers (or other mineral derived fibers) of average diameter 1 micrometer or less.

[4] Includes organic compounds with more than one benzene ring, and which have a boiling point greater than or equal to 100°C.

[5] A type of atom which spontaneously undergoes radioactive decay.

### (2) Revision of the list

The Administrator shall periodically review the list established by this subsection and publish the results thereof and, where appropriate, revise such list by rule, adding pollutants which present, or may present, through inhalation or other routes of exposure, a threat of adverse human health effects (including, but not limited to, substances which are known to be, or may reasonably be anticipated to be, carcinogenic, mutagenic, teratogenic, neurotoxic, which cause reproductive dysfunction, or which are acutely or chronically toxic) or adverse environmental effects whether through ambient concentrations, bioaccumulation, deposition, or otherwise, but not including releases subject to regulation under subsection (r) as a result of emissions to the air. No air pollutant which is listed under section 7408(a) of this title may be added to the list under this section, except that the prohibition of this sentence shall not apply to any pollutant which independently meets the listing criteria of this paragraph and is a precursor to a pollutant which is listed under section 7408(a) of this title or to any pollutant which is in a class of pollutants listed under such section. No substance, practice, process or activity regulated under subchapter VI of this chapter shall be subject to regulation under this section solely due to its adverse effects on the environment.

### (3) Petitions to modify the list

(A) Beginning at any time after 6 months after November 15, 1990, any person may petition the Administrator to modify the list of hazardous air pollutants under this subsection by adding or deleting a substance or, in case of listed pollutants without CAS numbers (other than coke oven emissions, mineral fibers, or polycyclic organic matter) removing certain unique substances. Within 18 months after receipt of a petition, the Administrator shall either grant or deny the petition by publishing a written explanation of the reasons for the Administrator's decision. Any such petition shall include a showing by the petitioner that there is adequate data on the health or environmental defects [2] of the pollutant or other evidence adequate to support the petition. The Administrator may not deny a petition solely on the basis of inadequate resources or time for review.

(B) The Administrator shall add a substance to the list upon a showing by the petitioner or on the Administrator's own determination that the substance is an air pollutant and that emissions, ambient concentrations, bioaccumulation or deposition of the substance are known to cause or may reasonably be anticipated to cause adverse effects to human health or adverse environmental effects.

(C) The Administrator shall delete a substance from the list upon a showing by the petitioner or on the Administrator's own determination that there is adequate data on the health and environmental effects of the substance to determine that emissions, ambient concentrations, bioaccumulation or deposition of the substance may not reasonably be anticipated to cause any adverse effects to the human health or adverse environmental effects.

(D) The Administrator shall delete one or more unique chemical substances that contain a listed hazardous air pollutant not having a CAS number (other than coke oven emissions, mineral fibers, or polycyclic organic matter) upon a showing by the petitioner or on the Administrator's own determination that such unique chemical substances that contain the named chemical of such listed hazardous air pollutant meet the deletion requirements of subparagraph (C). The Administrator must grant or deny a deletion petition prior to promulgating any emission standards pursuant to subsection (d) applicable to any source category or subcategory of a listed hazardous air pollutant without a CAS number listed under subsection (b) for which a deletion petition has been filed within 12 months of November 15, 1990.

### (4) Further information

If the Administrator determines that information on the health or environmental effects of a substance is not sufficient to make a determination required by this subsection, the Administrator may use any authority available to the Administrator to acquire such information.

### (5) Test methods

The Administrator may establish, by rule, test measures and other analytic procedures

---

[2] So in original. Probably should be "effects".

for monitoring and measuring emissions, ambient concentrations, deposition, and bioaccumulation of hazardous air pollutants.

**(6) Prevention of significant deterioration**

The provisions of part C (prevention of significant deterioration) shall not apply to pollutants listed under this section.

**(7) Lead**

The Administrator may not list elemental lead as a hazardous air pollutant under this subsection.

**(c) List of source categories**

**(1) In general**

Not later than 12 months after November 15, 1990, the Administrator shall publish, and shall from time to time, but no less often than every 8 years, revise, if appropriate, in response to public comment or new information, a list of all categories and subcategories of major sources and area sources (listed under paragraph (3)) of the air pollutants listed pursuant to subsection (b). To the extent practicable, the categories and subcategories listed under this subsection shall be consistent with the list of source categories established pursuant to section 7411 of this title and part C. Nothing in the preceding sentence limits the Administrator's authority to establish subcategories under this section, as appropriate.

**(2) Requirement for emissions standards**

For the categories and subcategories the Administrator lists, the Administrator shall establish emissions standards under subsection (d), according to the schedule in this subsection and subsection (e).

**(3) Area sources**

The Administrator shall list under this subsection each category or subcategory of area sources which the Administrator finds presents a threat of adverse effects to human health or the environment (by such sources individually or in the aggregate) warranting regulation under this section. The Administrator shall, not later than 5 years after November 15, 1990, and pursuant to subsection (k)(3)(B), list, based on actual or estimated aggregate emissions of a listed pollutant or pollutants, sufficient categories or subcategories of area sources to ensure that area sources representing 90 percent of the area source emissions of the 30 hazardous air pollutants that present the greatest threat to public health in the largest number of urban areas are subject to regulation under this section. Such regulations shall be promulgated not later than 10 years after November 15, 1990.

**(4) Previously regulated categories**

The Administrator may, in the Administrator's discretion, list any category or subcategory of sources previously regulated under this section as in effect before November 15, 1990.

**(5) Additional categories**

In addition to those categories and subcategories of sources listed for regulation pursuant to paragraphs (1) and (3), the Adminis-

trator may at any time list additional categories and subcategories of sources of hazardous air pollutants according to the same criteria for listing applicable under such paragraphs. In the case of source categories and subcategories listed after publication of the initial list required under paragraph (1) or (3), emission standards under subsection (d) for the category or subcategory shall be promulgated within 10 years after November 15, 1990, or within 2 years after the date on which such category or subcategory is listed, whichever is later.

**(6) Specific pollutants**

With respect to alkylated lead compounds, polycyclic organic matter, hexachlorobenzene, mercury, polychlorinated biphenyls, 2,3,7,8-tetrachlorodibenzofurans and 2,3,7,8-tetrachlorodibenzo-p-dioxin, the Administrator shall, not later than 5 years after November 15, 1990, list categories and subcategories of sources assuring that sources accounting for not less than 90 per centum of the aggregate emissions of each such pollutant are subject to standards under subsection (d)(2) or (d)(4). Such standards shall be promulgated not later than 10 years after November 15, 1990. This paragraph shall not be construed to require the Administrator to promulgate standards for such pollutants emitted by electric utility steam generating units.

**(7) Research facilities**

The Administrator shall establish a separate category covering research or laboratory facilities, as necessary to assure the equitable treatment of such facilities. For purposes of this section, "research or laboratory facility" means any stationary source whose primary purpose is to conduct research and development into new processes and products, where such source is operated under the close supervision of technically trained personnel and is not engaged in the manufacture of products for commercial sale in commerce, except in a de minimis manner.

**(8) Boat manufacturing**

When establishing emissions standards for styrene, the Administrator shall list boat manufacturing as a separate subcategory unless the Administrator finds that such listing would be inconsistent with the goals and requirements of this chapter.

**(9) Deletions from the list**

(A) Where the sole reason for the inclusion of a source category on the list required under this subsection is the emission of a unique chemical substance, the Administrator shall delete the source category from the list if it is appropriate because of action taken under either subparagraphs (C) or (D) of subsection (b)(3).

(B) The Administrator may delete any source category from the list under this subsection, on petition of any person or on the Administrator's own motion, whenever the Administrator makes the following determination or determinations, as applicable:

(i) In the case of hazardous air pollutants emitted by sources in the category that may

result in cancer in humans, a determination that no source in the category (or group of sources in the case of area sources) emits such hazardous air pollutants in quantities which may cause a lifetime risk of cancer greater than one in one million to the individual in the population who is most exposed to emissions of such pollutants from the source (or group of sources in the case of area sources).

(ii) In the case of hazardous air pollutants that may result in adverse health effects in humans other than cancer or adverse environmental effects, a determination that emissions from no source in the category or subcategory concerned (or group of sources in the case of area sources) exceed a level which is adequate to protect public health with an ample margin of safety and no adverse environmental effect will result from emissions from any source (or from a group of sources in the case of area sources).

The Administrator shall grant or deny a petition under this paragraph within 1 year after the petition is filed.

**(d) Emission standards**

**(1) In general**

The Administrator shall promulgate regulations establishing emission standards for each category or subcategory of major sources and area sources of hazardous air pollutants listed for regulation pursuant to subsection (c) in accordance with the schedules provided in subsections (c) and (e). The Administrator may distinguish among classes, types, and sizes of sources within a category or subcategory in establishing such standards except that, there shall be no delay in the compliance date for any standard applicable to any source under subsection (i) as the result of the authority provided by this sentence.

**(2) Standards and methods**

Emissions standards promulgated under this subsection and applicable to new or existing sources of hazardous air pollutants shall require the maximum degree of reduction in emissions of the hazardous air pollutants subject to this section (including a prohibition on such emissions, where achievable) that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for new or existing sources in the category or subcategory to which such emission standard applies, through application of measures, processes, methods, systems or techniques including, but not limited to, measures which—

(A) reduce the volume of, or eliminate emissions of, such pollutants through process changes, substitution of materials or other modifications,

(B) enclose systems or processes to eliminate emissions,

(C) collect, capture or treat such pollutants when released from a process, stack, storage or fugitive emissions point,

(D) are design, equipment, work practice, or operational standards (including require-

ments for operator training or certification) as provided in subsection (h), or

(E) are a combination of the above.

None of the measures described in subparagraphs (A) through (D) shall, consistent with the provisions of section 7414(c) of this title, in any way compromise any United States patent or United States trademark right, or any confidential business information, or any trade secret or any other intellectual property right.

**(3) New and existing sources**

The maximum degree of reduction in emissions that is deemed achievable for new sources in a category or subcategory shall not be less stringent than the emission control that is achieved in practice by the best controlled similar source, as determined by the Administrator. Emission standards promulgated under this subsection for existing sources in a category or subcategory may be less stringent than standards for new sources in the same category or subcategory but shall not be less stringent, and may be more stringent than—

(A) the average emission limitation achieved by the best performing 12 percent of the existing sources (for which the Administrator has emissions information), excluding those sources that have, within 18 months before the emission standard is proposed or within 30 months before such standard is promulgated, whichever is later, first achieved a level of emission rate or emission reduction which complies, or would comply if the source is not subject to such standard, with the lowest achievable emission rate (as defined by section 7501 of this title) applicable to the source category and prevailing at the time, in the category or subcategory for categories and subcategories with 30 or more sources, or

(B) the average emission limitation achieved by the best performing 5 sources (for which the Administrator has or could reasonably obtain emissions information) in the category or subcategory for categories or subcategories with fewer than 30 sources.

**(4) Health threshold**

With respect to pollutants for which a health threshold has been established, the Administrator may consider such threshold level, with an ample margin of safety, when establishing emission standards under this subsection.

**(5) Alternative standard for area sources**

With respect only to categories and subcategories of area sources listed pursuant to subsection (c), the Administrator may, in lieu of the authorities provided in paragraph (2) and subsection (f), elect to promulgate standards or requirements applicable to sources in such categories or subcategories which provide for the use of generally available control technologies or management practices by such sources to reduce emissions of hazardous air pollutants.

**(6) Review and revision**

The Administrator shall review, and revise as necessary (taking into account develop-

ments in practices, processes, and control technologies), emission standards promulgated under this section no less often than every 8 years.

**(7) Other requirements preserved**

No emission standard or other requirement promulgated under this section shall be interpreted, construed or applied to diminish or replace the requirements of a more stringent emission limitation or other applicable requirement established pursuant to section 7411 of this title, part C or D, or other authority of this chapter or a standard issued under State authority.

**(8) Coke ovens**

(A) Not later than December 31, 1992, the Administrator shall promulgate regulations establishing emission standards under paragraphs (2) and (3) of this subsection for coke oven batteries. In establishing such standards, the Administrator shall evaluate—

(i) the use of sodium silicate (or equivalent) luting compounds to prevent door leaks, and other operating practices and technologies for their effectiveness in reducing coke oven emissions, and their suitability for use on new and existing coke oven batteries, taking into account costs and reasonable commercial door warranties; and

(ii) as a basis for emission standards under this subsection for new coke oven batteries that begin construction after the date of proposal of such standards, the Jewell design Thompson non-recovery coke oven batteries and other non-recovery coke oven technologies, and other appropriate emission control and coke production technologies, as to their effectiveness in reducing coke oven emissions and their capability for production of steel quality coke.

Such regulations shall require at a minimum that coke oven batteries will not exceed 8 per centum leaking doors, 1 per centum leaking lids, 5 per centum leaking offtakes, and 16 seconds visible emissions per charge, with no exclusion for emissions during the period after the closing of self-sealing oven doors. Notwithstanding subsection (i), the compliance date for such emission standards for existing coke oven batteries shall be December 31, 1995.

(B) The Administrator shall promulgate work practice regulations under this subsection for coke oven batteries requiring, as appropriate—

(i) the use of sodium silicate (or equivalent) luting compounds, if the Administrator determines that use of sodium silicate is an effective means of emissions control and is achievable, taking into account costs and reasonable commercial warranties for doors and related equipment; and

(ii) door and jam cleaning practices.

Notwithstanding subsection (i), the compliance date for such work practice regulations for coke oven batteries shall be not later than the date 3 years after November 15, 1990.

(C) For coke oven batteries electing to qualify for an extension of the compliance date for

standards promulgated under subsection (f) in accordance with subsection (i)(8), the emission standards under this subsection for coke oven batteries shall require that coke oven batteries not exceed 8 per centum leaking doors, 1 per centum leaking lids, 5 per centum leaking offtakes, and 16 seconds visible emissions per charge, with no exclusion for emissions during the period after the closing of self-sealing doors. Notwithstanding subsection (i), the compliance date for such emission standards for existing coke oven batteries seeking an extension shall be not later than the date 3 years after November 15, 1990.

**(9) Sources licensed by the Nuclear Regulatory Commission**

No standard for radionuclide emissions from any category or subcategory of facilities licensed by the Nuclear Regulatory Commission (or an Agreement State) is required to be promulgated under this section if the Administrator determines, by rule, and after consultation with the Nuclear Regulatory Commission, that the regulatory program established by the Nuclear Regulatory Commission pursuant to the Atomic Energy Act [42 U.S.C. 2011 et seq.] for such category or subcategory provides an ample margin of safety to protect the public health. Nothing in this subsection shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce any standard or limitation respecting emissions of radionuclides which is more stringent than the standard or limitation in effect under section 7411 of this title or this section.

**(10) Effective date**

Emission standards or other regulations promulgated under this subsection shall be effective upon promulgation.

**(e) Schedule for standards and review**

**(1) In general**

The Administrator shall promulgate regulations establishing emission standards for categories and subcategories of sources initially listed for regulation pursuant to subsection (c)(1) as expeditiously as practicable, assuring that—

(A) emission standards for not less than 40 categories and subcategories (not counting coke oven batteries) shall be promulgated not later than 2 years after November 15, 1990;

(B) emission standards for coke oven batteries shall be promulgated not later than December 31, 1992;

(C) emission standards for 25 per centum of the listed categories and subcategories shall be promulgated not later than 4 years after November 15, 1990;

(D) emission standards for an additional 25 per centum of the listed categories and subcategories shall be promulgated not later than 7 years after November 15, 1990; and

(E) emission standards for all categories and subcategories shall be promulgated not later than 10 years after November 15, 1990.

**(2) Priorities**

In determining priorities for promulgating standards under subsection (d), the Administrator shall consider—

(A) the known or anticipated adverse effects of such pollutants on public health and the environment;

(B) the quantity and location of emissions or reasonably anticipated emissions of hazardous air pollutants that each category or subcategory will emit; and

(C) the efficiency of grouping categories or subcategories according to the pollutants emitted, or the processes or technologies used.

### (3) Published schedule

Not later than 24 months after November 15, 1990, and after opportunity for comment, the Administrator shall publish a schedule establishing a date for the promulgation of emission standards for each category and subcategory of sources listed pursuant to subsection (c)(1) and (3) which shall be consistent with the requirements of paragraphs (1) and (2). The determination of priorities for the promulgation of standards pursuant to this paragraph is not a rulemaking and shall not be subject to judicial review, except that, failure to promulgate any standard pursuant to the schedule established by this paragraph shall be subject to review under section 7604 of this title.

### (4) Judicial review

Notwithstanding section 7607 of this title, no action of the Administrator adding a pollutant to the list under subsection (b) or listing a source category or subcategory under subsection (c) shall be a final agency action subject to judicial review, except that any such action may be reviewed under such section 7607 of this title when the Administrator issues emission standards for such pollutant or category.

### (5) Publicly owned treatment works

The Administrator shall promulgate standards pursuant to subsection (d) applicable to publicly owned treatment works (as defined in title II of the Federal Water Pollution Control Act [33 U.S.C. 1281 et seq.]) not later than 5 years after November 15, 1990.

### (f) Standard to protect health and environment

### (1) Report

Not later than 6 years after November 15, 1990, the Administrator shall investigate and report, after consultation with the Surgeon General and after opportunity for public comment, to Congress on—

(A) methods of calculating the risk to public health remaining, or likely to remain, from sources subject to regulation under this section after the application of standards under subsection (d);

(B) the public health significance of such estimated remaining risk and the technologically and commercially available methods and costs of reducing such risks;

(C) the actual health effects with respect to persons living in the vicinity of sources, any available epidemiological or other health studies, risks presented by background concentrations of hazardous air pollutants, any uncertainties in risk assess-

ment methodology or other health assessment technique, and any negative health or environmental consequences to the community of efforts to reduce such risks; and

(D) recommendations as to legislation regarding such remaining risk.

### (2) Emission standards

(A) If Congress does not act on any recommendation submitted under paragraph (1), the Administrator shall, within 8 years after promulgation of standards for each category or subcategory of sources pursuant to subsection (d), promulgate standards for such category or subcategory if promulgation of such standards is required in order to provide an ample margin of safety to protect public health in accordance with this section (as in effect before November 15, 1990) or to prevent, taking into consideration costs, energy, safety, and other relevant factors, an adverse environmental effect. Emission standards promulgated under this subsection shall provide an ample margin of safety to protect public health in accordance with this section (as in effect before November 15, 1990), unless the Administrator determines that a more stringent standard is necessary to prevent, taking into consideration costs, energy, safety, and other relevant factors, an adverse environmental effect. If standards promulgated pursuant to subsection (d) and applicable to a category or subcategory of sources emitting a pollutant (or pollutants) classified as a known, probable or possible human carcinogen do not reduce lifetime excess cancer risks to the individual most exposed to emissions from a source in the category or subcategory to less than one in one million, the Administrator shall promulgate standards under this subsection for such source category.

(B) Nothing in subparagraph (A) or in any other provision of this section shall be construed as affecting, or applying to the Administrator's interpretation of this section, as in effect before November 15, 1990, and set forth in the Federal Register of September 14, 1989 (54 Federal Register 38044).

(C) The Administrator shall determine whether or not to promulgate such standards and, if the Administrator decides to promulgate such standards, shall promulgate the standards 8 years after promulgation of the standards under subsection (d) for each source category or subcategory concerned. In the case of categories or subcategories for which standards under subsection (d) are required to be promulgated within 2 years after November 15, 1990, the Administrator shall have 9 years after promulgation of the standards under subsection (d) to make the determination under the preceding sentence and, if required, to promulgate the standards under this paragraph.

### (3) Effective date

Any emission standard established pursuant to this subsection shall become effective upon promulgation.

### (4) Prohibition

No air pollutant to which a standard under this subsection applies may be emitted from

any stationary source in violation of such standard, except that in the case of an existing source—

    (A) such standard shall not apply until 90 days after its effective date, and

    (B) the Administrator may grant a waiver permitting such source a period of up to 2 years after the effective date of a standard to comply with the standard if the Administrator finds that such period is necessary for the installation of controls and that steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment.

**(5) Area sources**

The Administrator shall not be required to conduct any review under this subsection or promulgate emission limitations under this subsection for any category or subcategory of area sources that is listed pursuant to subsection (c)(3) and for which an emission standard is promulgated pursuant to subsection (d)(5).

**(6) Unique chemical substances**

In establishing standards for the control of unique chemical substances of listed pollutants without CAS numbers under this subsection, the Administrator shall establish such standards with respect to the health and environmental effects of the substances actually emitted by sources and direct transformation byproducts of such emissions in the categories and subcategories.

**(g) Modifications**

**(1) Offsets**

    (A) A physical change in, or change in the method of operation of, a major source which results in a greater than de minimis increase in actual emissions of a hazardous air pollutant shall not be considered a modification, if such increase in the quantity of actual emissions of any hazardous air pollutant from such source will be offset by an equal or greater decrease in the quantity of emissions of another hazardous air pollutant (or pollutants) from such source which is deemed more hazardous, pursuant to guidance issued by the Administrator under subparagraph (B). The owner or operator of such source shall submit a showing to the Administrator (or the State) that such increase has been offset under the preceding sentence.

    (B) The Administrator shall, after notice and opportunity for comment and not later than 18 months after November 15, 1990, publish guidance with respect to implementation of this subsection. Such guidance shall include an identification, to the extent practicable, of the relative hazard to human health resulting from emissions to the ambient air of each of the pollutants listed under subsection (b) sufficient to facilitate the offset showing authorized by subparagraph (A). Such guidance shall not authorize offsets between pollutants where the increased pollutant (or more than one pollutant in a stream of pollutants) causes adverse effects to human health for which no safety threshold for exposure can be determined unless there are corresponding decreases in such types of pollutant(s).

**(2) Construction, reconstruction and modifications**

    (A) After the effective date of a permit program under subchapter V in any State, no person may modify a major source of hazardous air pollutants in such State, unless the Administrator (or the State) determines that the maximum achievable control technology emission limitation under this section for existing sources will be met. Such determination shall be made on a case-by-case basis where no applicable emissions limitations have been established by the Administrator.

    (B) After the effective date of a permit program under subchapter V in any State, no person may construct or reconstruct any major source of hazardous air pollutants, unless the Administrator (or the State) determines that the maximum achievable control technology emission limitation under this section for new sources will be met. Such determination shall be made on a case-by-case basis where no applicable emission limitations have been established by the Administrator.

**(3) Procedures for modifications**

The Administrator (or the State) shall establish reasonable procedures for assuring that the requirements applying to modifications under this section are reflected in the permit.

**(h) Work practice standards and other requirements**

**(1) In general**

For purposes of this section, if it is not feasible in the judgment of the Administrator to prescribe or enforce an emission standard for control of a hazardous air pollutant or pollutants, the Administrator may, in lieu thereof, promulgate a design, equipment, work practice, or operational standard, or combination thereof, which in the Administrator's judgment is consistent with the provisions of subsection (d) or (f). In the event the Administrator promulgates a design or equipment standard under this subsection, the Administrator shall include as part of such standard such requirements as will assure the proper operation and maintenance of any such element of design or equipment.

**(2) Definition**

For the purpose of this subsection, the phrase "not feasible to prescribe or enforce an emission standard" means any situation in which the Administrator determines that—

    (A) a hazardous air pollutant or pollutants cannot be emitted through a conveyance designed and constructed to emit or capture such pollutant, or that any requirement for, or use of, such a conveyance would be inconsistent with any Federal, State or local law, or

    (B) the application of measurement methodology to a particular class of sources is not practicable due to technological and economic limitations.

**(3) Alternative standard**

If after notice and opportunity for comment, the owner or operator of any source estab-

lishes to the satisfaction of the Administrator that an alternative means of emission limitation will achieve a reduction in emissions of any air pollutant at least equivalent to the reduction in emissions of such pollutant achieved under the requirements of paragraph (1), the Administrator shall permit the use of such alternative by the source for purposes of compliance with this section with respect to such pollutant.

**(4) Numerical standard required**

Any standard promulgated under paragraph (1) shall be promulgated in terms of an emission standard whenever it is feasible to promulgate and enforce a standard in such terms.

**(i) Schedule for compliance**

**(1) Preconstruction and operating requirements**

After the effective date of any emission standard, limitation, or regulation under subsection (d), (f) or (h), no person may construct any new major source or reconstruct any existing major source subject to such emission standard, regulation or limitation unless the Administrator (or a State with a permit program approved under subchapter V) determines that such source, if properly constructed, reconstructed and operated, will comply with the standard, regulation or limitation.

**(2) Special rule**

Notwithstanding the requirements of paragraph (1), a new source which commences construction or reconstruction after a standard, limitation or regulation applicable to such source is proposed and before such standard, limitation or regulation is promulgated shall not be required to comply with such promulgated standard until the date 3 years after the date of promulgation if—

(A) the promulgated standard, limitation or regulation is more stringent than the standard, limitation or regulation proposed; and

(B) the source complies with the standard, limitation, or regulation as proposed during the 3-year period immediately after promulgation.

**(3) Compliance schedule for existing sources**

(A) After the effective date of any emissions standard, limitation or regulation promulgated under this section and applicable to a source, no person may operate such source in violation of such standard, limitation or regulation except, in the case of an existing source, the Administrator shall establish a compliance date or dates for each category or subcategory of existing sources, which shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the effective date of such standard, except as provided in subparagraph (B) and paragraphs (4) through (8).

(B) The Administrator (or a State with a program approved under subchapter V) may issue a permit that grants an extension permitting an existing source up to 1 additional year to comply with standards under sub-

section (d) if such additional period is necessary for the installation of controls. An additional extension of up to 3 years may be added for mining waste operations, if the 4-year compliance time is insufficient to dry and cover mining waste in order to reduce emissions of any pollutant listed under subsection (b).

**(4) Presidential exemption**

The President may exempt any stationary source from compliance with any standard or limitation under this section for a period of not more than 2 years if the President determines that the technology to implement such standard is not available and that it is in the national security interests of the United States to do so. An exemption under this paragraph may be extended for 1 or more additional periods, each period not to exceed 2 years. The President shall report to Congress with respect to each exemption (or extension thereof) made under this paragraph.

**(5) Early reduction**

(A) The Administrator (or a State acting pursuant to a permit program approved under subchapter V) shall issue a permit allowing an existing source, for which the owner or operator demonstrates that the source has achieved a reduction of 90 per centum or more in emissions of hazardous air pollutants (95 per centum in the case of hazardous air pollutants which are particulates) from the source, to meet an alternative emission limitation reflecting such reduction in lieu of an emission limitation promulgated under subsection (d) for a period of 6 years from the compliance date for the otherwise applicable standard, provided that such reduction is achieved before the otherwise applicable standard under subsection (d) is first proposed. Nothing in this paragraph shall preclude a State from requiring reductions in excess of those specified in this subparagraph as a condition of granting the extension authorized by the previous sentence.

(B) An existing source which achieves the reduction referred to in subparagraph (A) after the proposal of an applicable standard but before January 1, 1994, may qualify under subparagraph (A), if the source makes an enforceable commitment to achieve such reduction before the proposal of the standard. Such commitment shall be enforceable to the same extent as a regulation under this section.

(C) The reduction shall be determined with respect to verifiable and actual emissions in a base year not earlier than calendar year 1987, provided that, there is no evidence that emissions in the base year are artificially or substantially greater than emissions in other years prior to implementation of emissions reduction measures. The Administrator may allow a source to use a baseline year of 1985 or 1986 provided that the source can demonstrate to the satisfaction of the Administrator that emissions data for the source reflects verifiable data based on information for such source, received by the Administrator prior to November 15, 1990, pursuant to an information request issued under section 7414 of this title.

(D) For each source granted an alternative emission limitation under this paragraph there shall be established by a permit issued pursuant to subchapter V an enforceable emission limitation for hazardous air pollutants reflecting the reduction which qualifies the source for an alternative emission limitation under this paragraph. An alternative emission limitation under this paragraph shall not be available with respect to standards or requirements promulgated pursuant to subsection (f) and the Administrator shall, for the purpose of determining whether a standard under subsection (f) is necessary, review emissions from sources granted an alternative emission limitation under this paragraph at the same time that other sources in the category or subcategory are reviewed.

(E) With respect to pollutants for which high risks of adverse public health effects may be associated with exposure to small quantities including, but not limited to, chlorinated dioxins and furans, the Administrator shall by regulation limit the use of offsetting reductions in emissions of other hazardous air pollutants from the source as counting toward the 90 per centum reduction in such high-risk pollutants qualifying for an alternative emissions limitation under this paragraph.

**(6) Other reductions**

Notwithstanding the requirements of this section, no existing source that has installed—

(A) best available control technology (as defined in section 7479(3) of this title), or

(B) technology required to meet a lowest achievable emission rate (as defined in section 7501 of this title),

prior to the promulgation of a standard under this section applicable to such source and the same pollutant (or stream of pollutants) controlled pursuant to an action described in subparagraph (A) or (B) shall be required to comply with such standard under this section until the date 5 years after the date on which such installation or reduction has been achieved, as determined by the Administrator. The Administrator may issue such rules and guidance as are necessary to implement this paragraph.

**(7) Extension for new sources**

A source for which construction or reconstruction is commenced after the date an emission standard applicable to such source is proposed pursuant to subsection (d) but before the date an emission standard applicable to such source is proposed pursuant to subsection (f) shall not be required to comply with the emission standard under subsection (f) until the date 10 years after the date construction or reconstruction is commenced.

**(8) Coke ovens**

(A) Any coke oven battery that complies with the emission limitations established under subsection (d)(8)(C), subparagraph (B), and subparagraph (C), and complies with the provisions of subparagraph (E), shall not be required to achieve emission limitations promulgated under subsection (f) until January 1, 2020.

(B)(i) Not later than December 31, 1992, the Administrator shall promulgate emission limitations for coke oven emissions from coke oven batteries. Notwithstanding paragraph (3) of this subsection, the compliance date for such emission limitations for existing coke oven batteries shall be January 1, 1998. Such emission limitations shall reflect the lowest achievable emission rate as defined in section 7501 of this title for a coke oven battery that is rebuilt or a replacement at a coke oven plant for an existing battery. Such emission limitations shall be no less stringent than—

(I) 3 per centum leaking doors (5 per centum leaking doors for six meter batteries);

(II) 1 per centum leaking lids;

(III) 4 per centum leaking offtakes; and

(IV) 16 seconds visible emissions per charge,

with an exclusion for emissions during the period after the closing of self-sealing oven doors (or the total mass emissions equivalent). The rulemaking in which such emission limitations are promulgated shall also establish an appropriate measurement methodology for determining compliance with such emission limitations, and shall establish such emission limitations in terms of an equivalent level of mass emissions reduction from a coke oven battery, unless the Administrator finds that such a mass emissions standard would not be practicable or enforceable. Such measurement methodology, to the extent it measures leaking doors, shall take into consideration alternative test methods that reflect the best technology and practices actually applied in the affected industries, and shall assure that the final test methods are consistent with the performance of such best technology and practices.

(ii) If the Administrator fails to promulgate such emission limitations under this subparagraph prior to the effective date of such emission limitations, the emission limitations applicable to coke oven batteries under this subparagraph shall be—

(I) 3 per centum leaking doors (5 per centum leaking doors for six meter batteries);

(II) 1 per centum leaking lids;

(III) 4 per centum leaking offtakes; and

(IV) 16 seconds visible emissions per charge,

or the total mass emissions equivalent (if the total mass emissions equivalent is determined to be practicable and enforceable), with no exclusion for emissions during the period after the closing of self-sealing oven doors.

(C) Not later than January 1, 2007, the Administrator shall review the emission limitations promulgated under subparagraph (B) and revise, as necessary, such emission limitations to reflect the lowest achievable emission rate as defined in section 7501 of this title at the time for a coke oven battery that is rebuilt or a replacement at a coke oven plant for an existing battery. Such emission limitations shall be no less stringent than the emission limitation promulgated under subparagraph (B). Notwithstanding paragraph (2) of this subsection, the compliance date for such emission

limitations for existing coke oven batteries shall be January 1, 2010.

(D) At any time prior to January 1, 1998, the owner or operator of any coke oven battery may elect to comply with emission limitations promulgated under subsection (f) by the date such emission limitations would otherwise apply to such coke oven battery, in lieu of the emission limitations and the compliance dates provided under subparagraphs (B) and (C) of this paragraph. Any such owner or operator shall be legally bound to comply with such emission limitations promulgated under subsection (f) with respect to such coke oven battery as of January 1, 2003. If no such emission limitations have been promulgated for such coke oven battery, the Administrator shall promulgate such emission limitations in accordance with subsection (f) for such coke oven battery.

(E) Coke oven batteries qualifying for an extension under subparagraph (A) shall make available not later than January 1, 2000, to the surrounding communities the results of any risk assessment performed by the Administrator to determine the appropriate level of any emission standard established by the Administrator pursuant to subsection (f).

(F) Notwithstanding the provisions of this section, reconstruction of any source of coke oven emissions qualifying for an extension under this paragraph shall not subject such source to emission limitations under subsection (f) more stringent than those established under subparagraphs (B) and (C) until January 1, 2020. For the purposes of this subparagraph, the term "reconstruction" includes the replacement of existing coke oven battery capacity with new coke oven batteries of comparable or lower capacity and lower potential emissions.

**(j) Equivalent emission limitation by permit**

**(1) Effective date**

The requirements of this subsection shall apply in each State beginning on the effective date of a permit program established pursuant to subchapter V in such State, but not prior to the date 42 months after November 15, 1990.

**(2) Failure to promulgate a standard**

In the event that the Administrator fails to promulgate a standard for a category or subcategory of major sources by the date established pursuant to subsection (e)(1) and (3), and beginning 18 months after such date (but not prior to the effective date of a permit program under subchapter V), the owner or operator of any major source in such category or subcategory shall submit a permit application under paragraph (3) and such owner or operator shall also comply with paragraphs (5) and (6).

**(3) Applications**

By the date established by paragraph (2), the owner or operator of a major source subject to this subsection shall file an application for a permit. If the owner or operator of a source has submitted a timely and complete application for a permit required by this subsection, any failure to have a permit shall not be a vio-

lation of paragraph (2), unless the delay in final action is due to the failure of the applicant to timely submit information required or requested to process the application. The Administrator shall not later than 18 months after November 15, 1990, and after notice and opportunity for comment, establish requirements for applications under this subsection including a standard application form and criteria for determining in a timely manner the completeness of applications.

**(4) Review and approval**

Permit applications submitted under this subsection shall be reviewed and approved or disapproved according to the provisions of section 7661d of this title. In the event that the Administrator (or the State) disapproves a permit application submitted under this subsection or determines that the application is incomplete, the applicant shall have up to 6 months to revise the application to meet the objections of the Administrator (or the State).

**(5) Emission limitation**

The permit shall be issued pursuant to subchapter V and shall contain emission limitations for the hazardous air pollutants subject to regulation under this section and emitted by the source that the Administrator (or the State) determines, on a case-by-case basis, to be equivalent to the limitation that would apply to such source if an emission standard had been promulgated in a timely manner under subsection (d). In the alternative, if the applicable criteria are met, the permit may contain an emissions limitation established according to the provisions of subsection (i)(5). For purposes of the preceding sentence, the reduction required by subsection (i)(5)(A) shall be achieved by the date on which the relevant standard should have been promulgated under subsection (d). No such pollutant may be emitted in amounts exceeding an emission limitation contained in a permit immediately for new sources and, as expeditiously as practicable, but not later than the date 3 years after the permit is issued for existing sources or such other compliance date as would apply under subsection (i).

**(6) Applicability of subsequent standards**

If the Administrator promulgates an emission standard that is applicable to the major source prior to the date on which a permit application is approved, the emission limitation in the permit shall reflect the promulgated standard rather than the emission limitation determined pursuant to paragraph (5), provided that the source shall have the compliance period provided under subsection (i). If the Administrator promulgates a standard under subsection (d) that would be applicable to the source in lieu of the emission limitation established by permit under this subsection after the date on which the permit has been issued, the Administrator (or the State) shall revise such permit upon the next renewal to reflect the standard promulgated by the Administrator providing such source a reasonable time to comply, but no longer than 8 years after such standard is promulgated or 8

years after the date on which the source is first required to comply with the emissions limitation established by paragraph (5), whichever is earlier.

**(k) Area source program**

**(1) Findings and purpose**

The Congress finds that emissions of hazardous air pollutants from area sources may individually, or in the aggregate, present significant risks to public health in urban areas. Considering the large number of persons exposed and the risks of carcinogenic and other adverse health effects from hazardous air pollutants, ambient concentrations characteristic of large urban areas should be reduced to levels substantially below those currently experienced. It is the purpose of this subsection to achieve a substantial reduction in emissions of hazardous air pollutants from area sources and an equivalent reduction in the public health risks associated with such sources including a reduction of not less than 75 per centum in the incidence of cancer attributable to emissions from such sources.

**(2) Research program**

The Administrator shall, after consultation with State and local air pollution control officials, conduct a program of research with respect to sources of hazardous air pollutants in urban areas and shall include within such program—

(A) ambient monitoring for a broad range of hazardous air pollutants (including, but not limited to, volatile organic compounds, metals, pesticides and products of incomplete combustion) in a representative number of urban locations;

(B) analysis to characterize the sources of such pollution with a focus on area sources and the contribution that such sources make to public health risks from hazardous air pollutants; and

(C) consideration of atmospheric transformation and other factors which can elevate public health risks from such pollutants.

Health effects considered under this program shall include, but not be limited to, carcinogenicity, mutagenicity, teratogenicity, neurotoxicity, reproductive dysfunction and other acute and chronic effects including the role of such pollutants as precursors of ozone or acid aerosol formation. The Administrator shall report the preliminary results of such research not later than 3 years after November 15, 1990.

**(3) National strategy**

(A) Considering information collected pursuant to the monitoring program authorized by paragraph (2), the Administrator shall, not later than 5 years after November 15, 1990, and after notice and opportunity for public comment, prepare and transmit to the Congress a comprehensive strategy to control emissions of hazardous air pollutants from area sources in urban areas.

(B) The strategy shall—

(i) identify not less than 30 hazardous air pollutants which, as the result of emissions from area sources, present the greatest threat to public health in the largest number of urban areas and that are or will be listed pursuant to subsection (b), and

(ii) identify the source categories or subcategories emitting such pollutants that are or will be listed pursuant to subsection (c). When identifying categories and subcategories of sources under this subparagraph, the Administrator shall assure that sources accounting for 90 per centum or more of the aggregate emissions of each of the 30 identified hazardous air pollutants are subject to standards pursuant to subsection (d).

(C) The strategy shall include a schedule of specific actions to substantially reduce the public health risks posed by the release of hazardous air pollutants from area sources that will be implemented by the Administrator under the authority of this or other laws (including, but not limited to, the Toxic Substances Control Act [15 U.S.C. 2601 et seq.], the Federal Insecticide, Fungicide and Rodenticide Act [7 U.S.C. 136 et seq.] and the Resource Conservation and Recovery Act [42 U.S.C. 6901 et seq.]) or by the States. The strategy shall achieve a reduction in the incidence of cancer attributable to exposure to hazardous air pollutants emitted by stationary sources of not less than 75 per centum, considering control of emissions of hazardous air pollutants from all stationary sources and resulting from measures implemented by the Administrator or by the States under this or other laws.

(D) The strategy may also identify research needs in monitoring, analytical methodology, modeling or pollution control techniques and recommendations for changes in law that would further the goals and objectives of this subsection.

(E) Nothing in this subsection shall be interpreted to preclude or delay implementation of actions with respect to area sources of hazardous air pollutants under consideration pursuant to this or any other law and that may be promulgated before the strategy is prepared.

(F) The Administrator shall implement the strategy as expeditiously as practicable assuring that all sources are in compliance with all requirements not later than 9 years after November 15, 1990.

(G) As part of such strategy the Administrator shall provide for ambient monitoring and emissions modeling in urban areas as appropriate to demonstrate that the goals and objectives of the strategy are being met.

**(4) Areawide activities**

In addition to the national urban air toxics strategy authorized by paragraph (3), the Administrator shall also encourage and support areawide strategies developed by State or local air pollution control agencies that are intended to reduce risks from emissions by area sources within a particular urban area. From the funds available for grants under this section, the Administrator shall set aside not less than 10 per centum to support areawide strategies addressing hazardous air pollutants

emitted by area sources and shall award such funds on a demonstration basis to those States with innovative and effective strategies. At the request of State or local air pollution control officials, the Administrator shall prepare guidelines for control technologies or management practices which may be applicable to various categories or subcategories of area sources.

**(5) Report**

The Administrator shall report to the Congress at intervals not later than 8 and 12 years after November 15, 1990, on actions taken under this subsection and other parts of this chapter to reduce the risk to public health posed by the release of hazardous air pollutants from area sources. The reports shall also identify specific metropolitan areas that continue to experience high risks to public health as the result of emissions from area sources.

**(l) State programs**

**(1) In general**

Each State may develop and submit to the Administrator for approval a program for the implementation and enforcement (including a review of enforcement delegations previously granted) of emission standards and other requirements for air pollutants subject to this section or requirements for the prevention and mitigation of accidental releases pursuant to subsection (r). A program submitted by a State under this subsection may provide for partial or complete delegation of the Administrator's authorities and responsibilities to implement and enforce emissions standards and prevention requirements but shall not include authority to set standards less stringent than those promulgated by the Administrator under this chapter.

**(2) Guidance**

Not later than 12 months after November 15, 1990, the Administrator shall publish guidance that would be useful to the States in developing programs for submittal under this subsection. The guidance shall also provide for the registration of all facilities producing, processing, handling or storing any substance listed pursuant to subsection (r) in amounts greater than the threshold quantity. The Administrator shall include as an element in such guidance an optional program begun in 1986 for the review of high-risk point sources of air pollutants including, but not limited to, hazardous air pollutants listed pursuant to subsection (b).

**(3) Technical assistance**

The Administrator shall establish and maintain an air toxics clearinghouse and center to provide technical information and assistance to State and local agencies and, on a cost recovery basis, to others on control technology, health and ecological risk assessment, risk analysis, ambient monitoring and modeling, and emissions measurement and monitoring. The Administrator shall use the authority of section 7403 of this title to examine methods for preventing, measuring, and controlling emissions and evaluating associated health and ecological risks. Where appropriate, such activity shall be conducted with not-for-profit organizations. The Administrator may conduct research on methods for preventing, measuring and controlling emissions and evaluating associated health and environment risks. All information collected under this paragraph shall be available to the public.

**(4) Grants**

Upon application of a State, the Administrator may make grants, subject to such terms and conditions as the Administrator deems appropriate, to such State for the purpose of assisting the State in developing and implementing a program for submittal and approval under this subsection. Programs assisted under this paragraph may include program elements addressing air pollutants or extremely hazardous substances other than those specifically subject to this section. Grants under this paragraph may include support for high-risk point source review as provided in paragraph (2) and support for the development and implementation of areawide area source programs pursuant to subsection (k).

**(5) Approval or disapproval**

Not later than 180 days after receiving a program submitted by a State, and after notice and opportunity for public comment, the Administrator shall either approve or disapprove such program. The Administrator shall disapprove any program submitted by a State, if the Administrator determines that—

(A) the authorities contained in the program are not adequate to assure compliance by all sources within the State with each applicable standard, regulation or requirement established by the Administrator under this section;

(B) adequate authority does not exist, or adequate resources are not available, to implement the program;

(C) the schedule for implementing the program and assuring compliance by affected sources is not sufficiently expeditious; or

(D) the program is otherwise not in compliance with the guidance issued by the Administrator under paragraph (2) or is not likely to satisfy, in whole or in part, the objectives of this chapter.

If the Administrator disapproves a State program, the Administrator shall notify the State of any revisions or modifications necessary to obtain approval. The State may revise and resubmit the proposed program for review and approval pursuant to the provisions of this subsection.

**(6) Withdrawal**

Whenever the Administrator determines, after public hearing, that a State is not administering and enforcing a program approved pursuant to this subsection in accordance with the guidance published pursuant to paragraph (2) or the requirements of paragraph (5), the Administrator shall so notify the State and, if action which will assure prompt compliance is not taken within 90 days, the Administrator shall withdraw approval of the program. The

Administrator shall not withdraw approval of any program unless the State shall have been notified and the reasons for withdrawal shall have been stated in writing and made public.

**(7) Authority to enforce**

Nothing in this subsection shall prohibit the Administrator from enforcing any applicable emission standard or requirement under this section.

**(8) Local program**

The Administrator may, after notice and opportunity for public comment, approve a program developed and submitted by a local air pollution control agency (after consultation with the State) pursuant to this subsection and any such agency implementing an approved program may take any action authorized to be taken by a State under this section.

**(9) Permit authority**

Nothing in this subsection shall affect the authorities and obligations of the Administrator or the State under subchapter V.

**(m) Atmospheric deposition to Great Lakes and coastal waters**

**(1) Deposition assessment**

The Administrator, in cooperation with the Under Secretary of Commerce for Oceans and Atmosphere, shall conduct a program to identify and assess the extent of atmospheric deposition of hazardous air pollutants (and in the discretion of the Administrator, other air pollutants) to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters. As part of such program, the Administrator shall—

(A) monitor the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters, including monitoring of the Great Lakes through the monitoring network established pursuant to paragraph (2) of this subsection and designing and deploying an atmospheric monitoring network for coastal waters pursuant to paragraph (4);

(B) investigate the sources and deposition rates of atmospheric deposition of air pollutants (and their atmospheric transformation precursors);

(C) conduct research to develop and improve monitoring methods and to determine the relative contribution of atmospheric pollutants to total pollution loadings to the Great Lakes, the Chesapeake Bay, Lake Champlain, and coastal waters;

(D) evaluate any adverse effects to public health or the environment caused by such deposition (including effects resulting from indirect exposure pathways) and assess the contribution of such deposition to violations of water quality standards established pursuant to the Federal Water Pollution Control Act [33 U.S.C. 1251 et seq.] and drinking water standards established pursuant to the Safe Drinking Water Act [42 U.S.C. 300f et seq.]; and

(E) sample for such pollutants in biota, fish, and wildlife of the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters and characterize the sources of such pollutants.

**(2) Great Lakes monitoring network**

The Administrator shall oversee, in accordance with Annex 15 of the Great Lakes Water Quality Agreement, the establishment and operation of a Great Lakes atmospheric deposition network to monitor atmospheric deposition of hazardous air pollutants (and in the Administrator's discretion, other air pollutants) to the Great Lakes.

(A) As part of the network provided for in this paragraph, and not later than December 31, 1991, the Administrator shall establish in each of the 5 Great Lakes at least 1 facility capable of monitoring the atmospheric deposition of hazardous air pollutants in both dry and wet conditions.

(B) The Administrator shall use the data provided by the network to identify and track the movement of hazardous air pollutants through the Great Lakes, to determine the portion of water pollution loadings attributable to atmospheric deposition of such pollutants, and to support development of remedial action plans and other management plans as required by the Great Lakes Water Quality Agreement.

(C) The Administrator shall assure that the data collected by the Great Lakes atmospheric deposition monitoring network is in a format compatible with databases sponsored by the International Joint Commission, Canada, and the several States of the Great Lakes region.

**(3) Monitoring for the Chesapeake Bay and Lake Champlain**

The Administrator shall establish at the Chesapeake Bay and Lake Champlain atmospheric deposition stations to monitor deposition of hazardous air pollutants (and in the Administrator's discretion, other air pollutants) within the Chesapeake Bay and Lake Champlain watersheds. The Administrator shall determine the role of air deposition in the pollutant loadings of the Chesapeake Bay and Lake Champlain, investigate the sources of air pollutants deposited in the watersheds, evaluate the health and environmental effects of such pollutant loadings, and shall sample such pollutants in biota, fish and wildlife within the watersheds, as necessary to characterize such effects.

**(4) Monitoring for coastal waters**

The Administrator shall design and deploy atmospheric deposition monitoring networks for coastal waters and their watersheds and shall make any information collected through such networks available to the public. As part of this effort, the Administrator shall conduct research to develop and improve deposition monitoring methods, and to determine the relative contribution of atmospheric pollutants to pollutant loadings. For purposes of this subsection, "coastal waters" shall mean estuaries selected pursuant to section 320(a)(2)(A) of the Federal Water Pollution Control Act [33 U.S.C. 1330(a)(2)(A)] or listed pursuant to section 320(a)(2)(B) of such Act [33 U.S.C. 1330(a)(2)(B)] or estuarine research reserves designated pursuant to section 1461 of title 16.

**(5) Report**

Within 3 years of November 15, 1990, and biennially thereafter, the Administrator, in cooperation with the Under Secretary of Commerce for Oceans and Atmosphere, shall submit to the Congress a report on the results of any monitoring, studies, and investigations conducted pursuant to this subsection. Such report shall include, at a minimum, an assessment of—

(A) the contribution of atmospheric deposition to pollution loadings in the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters;

(B) the environmental and public health effects of any pollution which is attributable to atmospheric deposition to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters;

(C) the source or sources of any pollution to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters which is attributable to atmospheric deposition;

(D) whether pollution loadings in the Great Lakes, the Chesapeake Bay, Lake Champlain or coastal waters cause or contribute to exceedances of drinking water standards pursuant to the Safe Drinking Water Act [42 U.S.C. 300f et seq.] or water quality standards pursuant to the Federal Water Pollution Control Act [33 U.S.C. 1251 et seq.] or, with respect to the Great Lakes, exceedances of the specific objectives of the Great Lakes Water Quality Agreement; and

(E) a description of any revisions of the requirements, standards, and limitations pursuant to this chapter and other applicable Federal laws as are necessary to assure protection of human health and the environment.

**(6) Additional regulation**

As part of the report to Congress, the Administrator shall determine whether the other provisions of this section are adequate to prevent serious adverse effects to public health and serious or widespread environmental effects, including such effects resulting from indirect exposure pathways, associated with atmospheric deposition to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters of hazardous air pollutants (and their atmospheric transformation products). The Administrator shall take into consideration the tendency of such pollutants to bioaccumulate. Within 5 years after November 15, 1990, the Administrator shall, based on such report and determination, promulgate, in accordance with this section, such further emission standards or control measures as may be necessary and appropriate to prevent such effects, including effects due to bioaccumulation and indirect exposure pathways. Any requirements promulgated pursuant to this paragraph with respect to coastal waters shall only apply to the coastal waters of the States which are subject to section 7627(a) of this title.

**(n) Other provisions**

**(1) Electric utility steam generating units**

(A) The Administrator shall perform a study of the hazards to public health reasonably anticipated to occur as a result of emissions by electric utility steam generating units of pollutants listed under subsection (b) after imposition of the requirements of this chapter. The Administrator shall report the results of this study to the Congress within 3 years after November 15, 1990. The Administrator shall develop and describe in the Administrator's report to Congress alternative control strategies for emissions which may warrant regulation under this section. The Administrator shall regulate electric utility steam generating units under this section, if the Administrator finds such regulation is appropriate and necessary after considering the results of the study required by this subparagraph.

(B) The Administrator shall conduct, and transmit to the Congress not later than 4 years after November 15, 1990, a study of mercury emissions from electric utility steam generating units, municipal waste combustion units, and other sources, including area sources. Such study shall consider the rate and mass of such emissions, the health and environmental effects of such emissions, technologies which are available to control such emissions, and the costs of such technologies.

(C) The National Institute of Environmental Health Sciences shall conduct, and transmit to the Congress not later than 3 years after November 15, 1990, a study to determine the threshold level of mercury exposure below which adverse human health effects are not expected to occur. Such study shall include a threshold for mercury concentrations in the tissue of fish which may be consumed (including consumption by sensitive populations) without adverse effects to public health.

**(2) Coke oven production technology study**

(A) The Secretary of the Department of Energy and the Administrator shall jointly undertake a 6-year study to assess coke oven production emission control technologies and to assist in the development and commercialization of technically practicable and economically viable control technologies which have the potential to significantly reduce emissions of hazardous air pollutants from coke oven production facilities. In identifying control technologies, the Secretary and the Administrator shall consider the range of existing coke oven operations and battery design and the availability of sources of materials for such coke ovens as well as alternatives to existing coke oven production design.

(B) The Secretary and the Administrator are authorized to enter into agreements with persons who propose to develop, install and operate coke oven production emission control technologies which have the potential for significant emissions reductions of hazardous air pollutants provided that Federal funds shall not exceed 50 per centum of the cost of any project assisted pursuant to this paragraph.

(C) On completion of the study, the Secretary shall submit to Congress a report on the results of the study and shall make recommendations to the Administrator identifying practicable and economically viable control technologies for coke oven production facili-

ties to reduce residual risks remaining after implementation of the standard under subsection (d).

(D) There are authorized to be appropriated $5,000,000 for each of the fiscal years 1992 through 1997 to carry out the program authorized by this paragraph.

**(3) Publicly owned treatment works**

The Administrator may conduct, in cooperation with the owners and operators of publicly owned treatment works, studies to characterize emissions of hazardous air pollutants emitted by such facilities, to identify industrial, commercial and residential discharges that contribute to such emissions and to demonstrate control measures for such emissions. When promulgating any standard under this section applicable to publicly owned treatment works, the Administrator may provide for control measures that include pretreatment of discharges causing emissions of hazardous air pollutants and process or product substitutions or limitations that may be effective in reducing such emissions. The Administrator may prescribe uniform sampling, modeling and risk assessment methods for use in implementing this subsection.

**(4) Oil and gas wells; pipeline facilities**

(A) Notwithstanding the provisions of subsection (a), emissions from any oil or gas exploration or production well (with its associated equipment) and emissions from any pipeline compressor or pump station shall not be aggregated with emissions from other similar units, whether or not such units are in a contiguous area or under common control, to determine whether such units or stations are major sources, and in the case of any oil or gas exploration or production well (with its associated equipment), such emissions shall not be aggregated for any purpose under this section.

(B) The Administrator shall not list oil and gas production wells (with its associated equipment) as an area source category under subsection (c), except that the Administrator may establish an area source category for oil and gas production wells located in any metropolitan statistical area or consolidated metropolitan statistical area with a population in excess of 1 million, if the Administrator determines that emissions of hazardous air pollutants from such wells present more than a negligible risk of adverse effects to public health.

**(5) Hydrogen sulfide**

The Administrator is directed to assess the hazards to public health and the environment resulting from the emission of hydrogen sulfide associated with the extraction of oil and natural gas resources. To the extent practicable, the assessment shall build upon and not duplicate work conducted for an assessment pursuant to section 8002(m) of the Solid Waste Disposal Act [42 U.S.C. 6982(m)] and shall reflect consultation with the States. The assessment shall include a review of existing State and industry control standards, techniques and enforcement. The Administrator shall report to the Congress within 24 months after November 15, 1990, with the findings of

such assessment, together with any recommendations, and shall, as appropriate, develop and implement a control strategy for emissions of hydrogen sulfide to protect human health and the environment, based on the findings of such assessment, using authorities under this title including sections[3] 7411 of this title and this section.

**(6) Hydrofluoric acid**

Not later than 2 years after November 15, 1990, the Administrator shall, for those regions of the country which do not have comprehensive health and safety regulations with respect to hydrofluoric acid, complete a study of the potential hazards of hydrofluoric acid and the uses of hydrofluoric acid in industrial and commercial applications to public health and the environment considering a range of events including worst-case accidental releases and shall make recommendations to the Congress for the reduction of such hazards, if appropriate.

**(7) RCRA facilities**

In the case of any category or subcategory of sources the air emissions of which are regulated under subtitle C of the Solid Waste Disposal Act [42 U.S.C. 6921 et seq.], the Administrator shall take into account any regulations of such emissions which are promulgated under such subtitle and shall, to the maximum extent practicable and consistent with the provisions of this section, ensure that the requirements of such subtitle and this section are consistent.

**(o) National Academy of Sciences study**

**(1) Request of the Academy**

Within 3 months of November 15, 1990, the Administrator shall enter into appropriate arrangements with the National Academy of Sciences to conduct a review of—

(A) risk assessment methodology used by the Environmental Protection Agency to determine the carcinogenic risk associated with exposure to hazardous air pollutants from source categories and subcategories subject to the requirements of this section; and

(B) improvements in such methodology.

**(2) Elements to be studied**

In conducting such review, the National Academy of Sciences should consider, but not be limited to, the following—

(A) the techniques used for estimating and describing the carcinogenic potency to humans of hazardous air pollutants; and

(B) the techniques used for estimating exposure to hazardous air pollutants (for hypothetical and actual maximally exposed individuals as well as other exposed individuals).

**(3) Other health effects of concern**

To the extent practicable, the Academy shall evaluate and report on the methodology for assessing the risk of adverse human health effects other than cancer for which safe thresholds of exposure may not exist, includ-

---

[3] So in original. Probably should be "section".

ing, but not limited to, inheritable genetic mutations, birth defects, and reproductive dysfunctions.

**(4) Report**

A report on the results of such review shall be submitted to the Senate Committee on Environment and Public Works, the House Committee on Energy and Commerce, the Risk Assessment and Management Commission established by section 303 of the Clean Air Act Amendments of 1990 and the Administrator not later than 30 months after November 15, 1990.

**(5) Assistance**

The Administrator shall assist the Academy in gathering any information the Academy deems necessary to carry out this subsection. The Administrator may use any authority under this chapter to obtain information from any person, and to require any person to conduct tests, keep and produce records, and make reports respecting research or other activities conducted by such person as necessary to carry out this subsection.

**(6) Authorization**

Of the funds authorized to be appropriated to the Administrator by this chapter, such amounts as are required shall be available to carry out this subsection.

**(7) Guidelines for carcinogenic risk assessment**

The Administrator shall consider, but need not adopt, the recommendations contained in the report of the National Academy of Sciences prepared pursuant to this subsection and the views of the Science Advisory Board, with respect to such report. Prior to the promulgation of any standard under subsection (f), and after notice and opportunity for comment, the Administrator shall publish revised Guidelines for Carcinogenic Risk Assessment or a detailed explanation of the reasons that any recommendations contained in the report of the National Academy of Sciences will not be implemented. The publication of such revised Guidelines shall be a final Agency action for purposes of section 7607 of this title.

**(p) Mickey Leland National Urban Air Toxics Research Center**

**(1) Establishment**

The Administrator shall oversee the establishment of a National Urban Air Toxics Research Center, to be located at a university, a hospital, or other facility capable of undertaking and maintaining similar research capabilities in the areas of epidemiology, oncology, toxicology, pulmonary medicine, pathology, and biostatistics. The center shall be known as the Mickey Leland National Urban Air Toxics Research Center. The geographic site of the National Urban Air Toxics Research Center should be further directed to Harris County, Texas, in order to take full advantage of the well developed scientific community presence on-site at the Texas Medical Center as well as the extensive data previously compiled for the comprehensive monitoring system currently in place.

**(2) Board of Directors**

The National Urban Air Toxics Research Center shall be governed by a Board of Directors to be comprised of 9 members, the appointment of which shall be allocated pro rata among the Speaker of the House, the Majority Leader of the Senate and the President. The members of the Board of Directors shall be selected based on their respective academic and professional backgrounds and expertise in matters relating to public health, environmental pollution and industrial hygiene. The duties of the Board of Directors shall be to determine policy and research guidelines, submit views from center sponsors and the public and issue periodic reports of center findings and activities.

**(3) Scientific Advisory Panel**

The Board of Directors shall be advised by a Scientific Advisory Panel, the 13 members of which shall be appointed by the Board, and to include eminent members of the scientific and medical communities. The Panel membership may include scientists with relevant experience from the National Institute of Environmental Health Sciences, the Center for Disease Control, the Environmental Protection Agency, the National Cancer Institute, and others, and the Panel shall conduct peer review and evaluate research results. The Panel shall assist the Board in developing the research agenda, reviewing proposals and applications, and advise on the awarding of research grants.

**(4) Funding**

The center shall be established and funded with both Federal and private source funds.

**(q) Savings provision**

**(1) Standards previously promulgated**

Any standard under this section in effect before the date of enactment of the Clean Air Act Amendments of 1990 [November 15, 1990] shall remain in force and effect after such date unless modified as provided in this section before the date of enactment of such Amendments or under such Amendments. Except as provided in paragraph (4), any standard under this section which has been promulgated, but has not taken effect, before such date shall not be affected by such Amendments unless modified as provided in this section before such date or under such Amendments. Each such standard shall be reviewed and, if appropriate, revised, to comply with the requirements of subsection (d) within 10 years after the date of enactment of the Clean Air Act Amendments of 1990. If a timely petition for review of any such standard under section 7607 of this title is pending on such date of enactment, the standard shall be upheld if it complies with this section as in effect before that date. If any such standard is remanded to the Administrator, the Administrator may in the Administrator's discretion apply either the requirements of this section, or those of this section as in effect before the date of enactment of the Clean Air Act Amendments of 1990.

### (2) Special rule

Notwithstanding paragraph (1), no standard shall be established under this section, as amended by the Clean Air Act Amendments of 1990, for radionuclide emissions from (A) elemental phosphorous plants, (B) grate calcination elemental phosphorous plants, (C) phosphogypsum stacks, or (D) any subcategory of the foregoing. This section, as in effect prior to the date of enactment of the Clean Air Act Amendments of 1990 [November 15, 1990], shall remain in effect for radionuclide emissions from such plants and stacks.

### (3) Other categories

Notwithstanding paragraph (1), this section, as in effect prior to the date of enactment of the Clean Air Act Amendments of 1990 [November 15, 1990], shall remain in effect for radionuclide emissions from non-Department of Energy Federal facilities that are not licensed by the Nuclear Regulatory Commission, coal-fired utility and industrial boilers, underground uranium mines, surface uranium mines, and disposal of uranium mill tailings piles, unless the Administrator, in the Administrator's discretion, applies the requirements of this section as modified by the Clean Air Act Amendments of 1990 to such sources of radionuclides.

### (4) Medical facilities

Notwithstanding paragraph (1), no standard promulgated under this section prior to November 15, 1990, with respect to medical research or treatment facilities shall take effect for two years following November 15, 1990, unless the Administrator makes a determination pursuant to a rulemaking under subsection (d)(9). If the Administrator determines that the regulatory program established by the Nuclear Regulatory Commission for such facilities does not provide an ample margin of safety to protect public health, the requirements of this section shall fully apply to such facilities. If the Administrator determines that such regulatory program does provide an ample margin of safety to protect the public health, the Administrator is not required to promulgate a standard under this section for such facilities, as provided in subsection (d)(9).

### (r) Prevention of accidental releases

### (1) Purpose and general duty

It shall be the objective of the regulations and programs authorized under this subsection to prevent the accidental release and to minimize the consequences of any such release of any substance listed pursuant to paragraph (3) or any other extremely hazardous substance. The owners and operators of stationary sources producing, processing, handling or storing such substances have a general duty in the same manner and to the same extent as section 654 of title 29 to identify hazards which may result from such releases using appropriate hazard assessment techniques, to design and maintain a safe facility taking such steps as are necessary to prevent releases, and to minimize the consequences of accidental releases which do occur. For purposes of this paragraph, the provisions of section 7604 of this title shall not be available to any person or otherwise be construed to be applicable to this paragraph. Nothing in this section shall be interpreted, construed, implied or applied to create any liability or basis for suit for compensation for bodily injury or any other injury or property damages to any person which may result from accidental releases of such substances.

### (2) Definitions

(A) The term "accidental release" means an unanticipated emission of a regulated substance or other extremely hazardous substance into the ambient air from a stationary source.

(B) The term "regulated substance" means a substance listed under paragraph (3).

(C) The term "stationary source" means any buildings, structures, equipment, installations or substance emitting stationary activities (i) which belong to the same industrial group, (ii) which are located on one or more contiguous properties, (iii) which are under the control of the same person (or persons under common control), and (iv) from which an accidental release may occur.

(D) The term "retail facility" means a stationary source at which more than one-half of the income is obtained from direct sales to end users or at which more than one-half of the fuel sold, by volume, is sold through a cylinder exchange program.

### (3) List of substances

The Administrator shall promulgate not later than 24 months after November 15, 1990, an initial list of 100 substances which, in the case of an accidental release, are known to cause or may reasonably be anticipated to cause death, injury, or serious adverse effects to human health or the environment. For purposes of promulgating such list, the Administrator shall use, but is not limited to, the list of extremely hazardous substances published under the Emergency Planning and Community Right-to-Know[4] Act of 1986 [42 U.S.C. 11001 et seq.], with such modifications as the Administrator deems appropriate. The initial list shall include chlorine, anhydrous ammonia, methyl chloride, ethylene oxide, vinyl chloride, methyl isocyanate, hydrogen cyanide, ammonia, hydrogen sulfide, toluene diisocyanate, phosgene, bromine, anhydrous hydrogen chloride, hydrogen fluoride, anhydrous sulfur dioxide, and sulfur trioxide. The initial list shall include at least 100 substances which pose the greatest risk of causing death, injury, or serious adverse effects to human health or the environment from accidental releases. Regulations establishing the list shall include an explanation of the basis for establishing the list. The list may be revised from time to time by the Administrator on the Administrator's own motion or by petition and shall be reviewed at least every 5 years. No air pollutant for which a national primary ambient air quality standard has been established shall be included on any such list. No substance, practice, process, or activity regulated

---

[4] So in original. Probably should be "Right-To-Know".

under subchapter VI shall be subject to regulations under this subsection. The Administrator shall establish procedures for the addition and deletion of substances from the list established under this paragraph consistent with those applicable to the list in subsection (b).

**(4) Factors to be considered**

In listing substances under paragraph (3), the Administrator—

(A) shall consider—

(i) the severity of any acute adverse health effects associated with accidental releases of the substance;

(ii) the likelihood of accidental releases of the substance; and

(iii) the potential magnitude of human exposure to accidental releases of the substance; and

(B) shall not list a flammable substance when used as a fuel or held for sale as a fuel at a retail facility under this subsection solely because of the explosive or flammable properties of the substance, unless a fire or explosion caused by the substance will result in acute adverse health effects from human exposure to the substance, including the unburned fuel or its combustion byproducts, other than those caused by the heat of the fire or impact of the explosion.

**(5) Threshold quantity**

At the time any substance is listed pursuant to paragraph (3), the Administrator shall establish by rule, a threshold quantity for the substance, taking into account the toxicity, reactivity, volatility, dispersibility, combustibility, or flammability of the substance and the amount of the substance which, as a result of an accidental release, is known to cause or may reasonably be anticipated to cause death, injury or serious adverse effects to human health for which the substance was listed. The Administrator is authorized to establish a greater threshold quantity for, or to exempt entirely, any substance that is a nutrient used in agriculture when held by a farmer.

**(6) Chemical Safety Board**

(A) There is hereby established an independent safety board to be known as the Chemical Safety and Hazard Investigation Board.

(B) The Board shall consist of 5 members, including a Chairperson, who shall be appointed by the President, by and with the advice and consent of the Senate. Members of the Board shall be appointed on the basis of technical qualification, professional standing, and demonstrated knowledge in the fields of accident reconstruction, safety engineering, human factors, toxicology, or air pollution regulation. The terms of office of members of the Board shall be 5 years. Any member of the Board, including the Chairperson, may be removed for inefficiency, neglect of duty, or malfeasance in office. The Chairperson shall be the Chief Executive Officer of the Board and shall exercise the executive and administrative functions of the Board.

(C) The Board shall—

(i) investigate (or cause to be investigated), determine and report to the public in writing the facts, conditions, and circumstances and the cause or probable cause of any accidental release resulting in a fatality, serious injury or substantial property damages;

(ii) issue periodic reports to the Congress, Federal, State and local agencies, including the Environmental Protection Agency and the Occupational Safety and Health Administration, concerned with the safety of chemical production, processing, handling and storage, and other interested persons recommending measures to reduce the likelihood or the consequences of accidental releases and proposing corrective steps to make chemical production, processing, handling and storage as safe and free from risk of injury as is possible and may include in such reports proposed rules or orders which should be issued by the Administrator under the authority of this section or the Secretary of Labor under the Occupational Safety and Health Act [29 U.S.C. 651 et seq.] to prevent or minimize the consequences of any release of substances that may cause death, injury or other serious adverse effects on human health or substantial property damage as the result of an accidental release; and

(iii) establish by regulation requirements binding on persons for reporting accidental releases into the ambient air subject to the Board's investigatory jurisdiction. Reporting releases to the National Response Center, in lieu of the Board directly, shall satisfy such regulations. The National Response Center shall promptly notify the Board of any releases which are within the Board's jurisdiction.

(D) The Board may utilize the expertise and experience of other agencies.

(E) The Board shall coordinate its activities with investigations and studies conducted by other agencies of the United States having a responsibility to protect public health and safety. The Board shall enter into a memorandum of understanding with the National Transportation Safety Board to assure coordination of functions and to limit duplication of activities which shall designate the National Transportation Safety Board as the lead agency for the investigation of releases which are transportation related. The Board shall not be authorized to investigate marine oil spills, which the National Transportation Safety Board is authorized to investigate. The Board shall enter into a memorandum of understanding with the Occupational Safety and Health Administration so as to limit duplication of activities. In no event shall the Board forego an investigation where an accidental release causes a fatality or serious injury among the general public, or had the potential to cause substantial property damage or a number of deaths or injuries among the general public.

(F) The Board is authorized to conduct research and studies with respect to the potential for accidental releases, whether or not an accidental release has occurred, where there is evidence which indicates the presence of a potential hazard or hazards. To the extent prac-

ticable, the Board shall conduct such studies in cooperation with other Federal agencies having emergency response authorities, State and local governmental agencies and associations and organizations from the industrial, commercial, and nonprofit sectors.

(G) No part of the conclusions, findings, or recommendations of the Board relating to any accidental release or the investigation thereof shall be admitted as evidence or used in any action or suit for damages arising out of any matter mentioned in such report.

(H) Not later than 18 months after November 15, 1990, the Board shall publish a report accompanied by recommendations to the Administrator on the use of hazard assessments in preventing the occurrence and minimizing the consequences of accidental releases of extremely hazardous substances. The recommendations shall include a list of extremely hazardous substances which are not regulated substances (including threshold quantities for such substances) and categories of stationary sources for which hazard assessments would be an appropriate measure to aid in the prevention of accidental releases and to minimize the consequences of those releases that do occur. The recommendations shall also include a description of the information and analysis which would be appropriate to include in any hazard assessment. The Board shall also make recommendations with respect to the role of risk management plans as required by paragraph (8)(B)[5] in preventing accidental releases. The Board may from time to time review and revise its recommendations under this subparagraph.

(I) Whenever the Board submits a recommendation with respect to accidental releases to the Administrator, the Administrator shall respond to such recommendation formally and in writing not later than 180 days after receipt thereof. The response to the Board's recommendation by the Administrator shall indicate whether the Administrator will—

(i) initiate a rulemaking or issue orders as are necessary to implement the recommendation in full or in part, pursuant to any timetable contained in the recommendation;[6]

(ii) decline to initiate a rulemaking or issue orders as recommended.

Any determination by the Administrator not to implement a recommendation of the Board or to implement a recommendation only in part, including any variation from the schedule contained in the recommendation, shall be accompanied by a statement from the Administrator setting forth the reasons for such determination.

(J) The Board may make recommendations with respect to accidental releases to the Secretary of Labor. Whenever the Board submits such recommendation, the Secretary shall respond to such recommendation formally and in writing not later than 180 days after receipt thereof. The response to the Board's recommendation by the Administrator[7] shall indicate whether the Secretary will—

(i) initiate a rulemaking or issue orders as are necessary to implement the recommendation in full or in part, pursuant to any timetable contained in the recommendation;[6]

(ii) decline to initiate a rulemaking or issue orders as recommended.

Any determination by the Secretary not to implement a recommendation or to implement a recommendation only in part, including any variation from the schedule contained in the recommendation, shall be accompanied by a statement from the Secretary setting forth the reasons for such determination.

(K) Within 2 years after November 15, 1990, the Board shall issue a report to the Administrator of the Environmental Protection Agency and to the Administrator of the Occupational Safety and Health Administration recommending the adoption of regulations for the preparation of risk management plans and general requirements for the prevention of accidental releases of regulated substances into the ambient air (including recommendations for listing substances under paragraph (3)) and for the mitigation of the potential adverse effect on human health or the environment as a result of accidental releases which should be applicable to any stationary source handling any regulated substance in more than threshold amounts. The Board may include proposed rules or orders which should be issued by the Administrator under authority of this subsection or by the Secretary of Labor under the Occupational Safety and Health Act [29 U.S.C. 651 et seq.]. Any such recommendations shall be specific and shall identify the regulated substance or class of regulated substances (or other substances) to which the recommendations apply. The Administrator shall consider such recommendations before promulgating regulations required by paragraph (7)(B),

(L) The Board, or upon authority of the Board, any member thereof, any administrative law judge employed by or assigned to the Board, or any officer or employee duly designated by the Board, may for the purpose of carrying out duties authorized by subparagraph (C)—

(i) hold such hearings, sit and act at such times and places, administer such oaths, and require by subpoena or otherwise attendance and testimony of such witnesses and the production of evidence and may require by order that any person engaged in the production, processing, handling, or storage of extremely hazardous substances submit written reports and responses to requests and questions within such time and in such form as the Board may require; and

(ii) upon presenting appropriate credentials and a written notice of inspection authority, enter any property where an accidental release causing a fatality, serious injury or substantial property damage has occurred and do all things therein necessary

---

[5] So in original. Probably should be paragraph "(7)(B)".

[6] So in original. The word "or" probably should appear.

[7] So in original. The word "Administrator" probably should be "Secretary".

for a proper investigation pursuant to subparagraph (C) and inspect at reasonable times records, files, papers, processes, controls, and facilities and take such samples as are relevant to such investigation.

Whenever the Administrator or the Board conducts an inspection of a facility pursuant to this subsection, employees and their representatives shall have the same rights to participate in such inspections as provided in the Occupational Safety and Health Act [29 U.S.C. 651 et seq.].

(M) In addition to that described in subparagraph (L), the Board may use any information gathering authority of the Administrator under this chapter, including the subpoena power provided in section 7607(a)(1) of this title.

(N) The Board is authorized to establish such procedural and administrative rules as are necessary to the exercise of its functions and duties. The Board is authorized without regard to section 6101 of title 41 to enter into contracts, leases, cooperative agreements or other transactions as may be necessary in the conduct of the duties and functions of the Board with any other agency, institution, or person.

(O) After the effective date of any reporting requirement promulgated pursuant to subparagraph (C)(iii) it shall be unlawful for any person to fail to report any release of any extremely hazardous substance as required by such subparagraph. The Administrator is authorized to enforce any regulation or requirements established by the Board pursuant to subparagraph (C)(iii) using the authorities of sections 7413 and 7414 of this title. Any request for information from the owner or operator of a stationary source made by the Board or by the Administrator under this section shall be treated, for purposes of sections 7413, 7414, 7416, 7420, 7603, 7604 and 7607 of this title and any other enforcement provisions of this chapter, as a request made by the Administrator under section 7414 of this title and may be enforced by the Chairperson of the Board or by the Administrator as provided in such section.

(P) The Administrator shall provide to the Board such support and facilities as may be necessary for operation of the Board.

(Q) Consistent with subsection [2] (G) and section 7414(c) of this title any records, reports or information obtained by the Board shall be available to the Administrator, the Secretary of Labor, the Congress and the public, except that upon a showing satisfactory to the Board by any person that records, reports, or information, or particular part thereof (other than release or emissions data) to which the Board has access, if made public, is likely to cause substantial harm to the person's competitive position, the Board shall consider such record, report, or information or particular portion thereof confidential in accordance with section 1905 of title 18, except that such record, report, or information may be disclosed to other officers, employees, and authorized representatives of the United States concerned

with carrying out this chapter or when relevant under any proceeding under this chapter. This subparagraph does not constitute authority to withhold records, reports, or information from the Congress.

(R) Whenever the Board submits or transmits any budget estimate, budget request, supplemental budget request, or other budget information, legislative recommendation, prepared testimony for congressional hearings, recommendation or study to the President, the Secretary of Labor, the Administrator, or the Director of the Office of Management and Budget, it shall concurrently transmit a copy thereof to the Congress. No report of the Board shall be subject to review by the Administrator or any Federal agency or to judicial review in any court. No officer or agency of the United States shall have authority to require the Board to submit its budget requests or estimates, legislative recommendations, prepared testimony, comments, recommendations or reports to any officer or agency of the United States for approval or review prior to the submission of such recommendations, testimony, comments or reports to the Congress. In the performance of their functions as established by this chapter, the members, officers and employees of the Board shall not be responsible to or subject to supervision or direction, in carrying out any duties under this subsection, of any officer or employee or agent of the Environmental Protection Agency, the Department of Labor or any other agency of the United States except that the President may remove any member, officer or employee of the Board for inefficiency, neglect of duty or malfeasance in office. Nothing in this section shall affect the application of title 5 to officers or employees of the Board.

(S) The Board shall submit an annual report to the President and to the Congress which shall include, but not be limited to, information on accidental releases which have been investigated by or reported to the Board during the previous year, recommendations for legislative or administrative action which the Board has made, the actions which have been taken by the Administrator or the Secretary of Labor or the heads of other agencies to implement such recommendations, an identification of priorities for study and investigation in the succeeding year, progress in the development of risk-reduction technologies and the response to and implementation of significant research findings on chemical safety in the public and private sector.

**(7) Accident prevention**

(A) In order to prevent accidental releases of regulated substances, the Administrator is authorized to promulgate release prevention, detection, and correction requirements which may include monitoring, record-keeping, reporting, training, vapor recovery, secondary containment, and other design, equipment, work practice, and operational requirements. Regulations promulgated under this paragraph may make distinctions between various types, classes, and kinds of facilities, devices and systems taking into consideration factors in-

---

[2] So in original. Probably should be "subparagraph".

cluding, but not limited to, the size, location, process, process controls, quantity of substances handled, potency of substances, and response capabilities present at any stationary source. Regulations promulgated pursuant to this subparagraph shall have an effective date, as determined by the Administrator, assuring compliance as expeditiously as practicable.

(B)(i) Within 3 years after November 15, 1990, the Administrator shall promulgate reasonable regulations and appropriate guidance to provide, to the greatest extent practicable, for the prevention and detection of accidental releases of regulated substances and for response to such releases by the owners or operators of the sources of such releases. The Administrator shall utilize the expertise of the Secretaries of Transportation and Labor in promulgating such regulations. As appropriate, such regulations shall cover the use, operation, repair, replacement, and maintenance of equipment to monitor, detect, inspect, and control such releases, including training of persons in the use and maintenance of such equipment and in the conduct of periodic inspections. The regulations shall include procedures and measures for emergency response after an accidental release of a regulated substance in order to protect human health and the environment. The regulations shall cover storage, as well as operations. The regulations shall, as appropriate, recognize differences in size, operations, processes, class and categories of sources and the voluntary actions of such sources to prevent such releases and respond to such releases. The regulations shall be applicable to a stationary source 3 years after the date of promulgation, or 3 years after the date on which a regulated substance present at the source in more than threshold amounts is first listed under paragraph (3), whichever is later.

(ii) The regulations under this subparagraph shall require the owner or operator of stationary sources at which a regulated substance is present in more than a threshold quantity to prepare and implement a risk management plan to detect and prevent or minimize accidental releases of such substances from the stationary source, and to provide a prompt emergency response to any such releases in order to protect human health and the environment. Such plan shall provide for compliance with the requirements of this subsection and shall also include each of the following:

(I) a hazard assessment to assess the potential effects of an accidental release of any regulated substance. This assessment shall include an estimate of potential release quantities and a determination of downwind effects, including potential exposures to affected populations. Such assessment shall include a previous release history of the past 5 years, including the size, concentration, and duration of releases, and shall include an evaluation of worst case accidental releases;

(II) a program for preventing accidental releases of regulated substances, including safety precautions and maintenance, monitoring and employee training measures to be used at the source; and

(III) a response program providing for specific actions to be taken in response to an accidental release of a regulated substance so as to protect human health and the environment, including procedures for informing the public and local agencies responsible for responding to accidental releases, emergency health care, and employee training measures.

At the time regulations are promulgated under this subparagraph, the Administrator shall promulgate guidelines to assist stationary sources in the preparation of risk management plans. The guidelines shall, to the extent practicable, include model risk management plans.

(iii) The owner or operator of each stationary source covered by clause (ii) shall register a risk management plan prepared under this subparagraph with the Administrator before the effective date of regulations under clause (i) in such form and manner as the Administrator shall, by rule, require. Plans prepared pursuant to this subparagraph shall also be submitted to the Chemical Safety and Hazard Investigation Board, to the State in which the stationary source is located, and to any local agency or entity having responsibility for planning for or responding to accidental releases which may occur at such source, and shall be available to the public under section 7414(c) of this title. The Administrator shall establish, by rule, an auditing system to regularly review and, if necessary, require revision in risk management plans to assure that the plans comply with this subparagraph. Each such plan shall be updated periodically as required by the Administrator, by rule.

(C) Any regulations promulgated pursuant to this subsection shall to the maximum extent practicable, consistent with this subsection, be consistent with the recommendations and standards established by the American Society of Mechanical Engineers (ASME), the American National Standards Institute (ANSI) or the American Society of Testing Materials (ASTM). The Administrator shall take into consideration the concerns of small business in promulgating regulations under this subsection.

(D) In carrying out the authority of this paragraph, the Administrator shall consult with the Secretary of Labor and the Secretary of Transportation and shall coordinate any requirements under this paragraph with any requirements established for comparable purposes by the Occupational Safety and Health Administration or the Department of Transportation. Nothing in this subsection shall be interpreted, construed or applied to impose requirements affecting, or to grant the Administrator, the Chemical Safety and Hazard Investigation Board, or any other agency any authority to regulate (including requirements for hazard assessment), the accidental release of radionuclides arising from the construction and operation of facilities licensed by the Nuclear Regulatory Commission.

(E) After the effective date of any regulation or requirement imposed under this subsection,

it shall be unlawful for any person to operate any stationary source subject to such regulation or requirement in violation of such regulation or requirement. Each regulation or requirement under this subsection shall for purposes of sections 7413, 7414, 7416, 7420, 7604, and 7607 of this title and other enforcement provisions of this chapter, be treated as a standard in effect under subsection (d).

(F) Notwithstanding the provisions of subchapter V or this section, no stationary source shall be required to apply for, or operate pursuant to, a permit issued under such subchapter solely because such source is subject to regulations or requirements under this subsection.

(G) In exercising any authority under this subsection, the Administrator shall not, for purposes of section 653(b)(1) of title 29, be deemed to be exercising statutory authority to prescribe or enforce standards or regulations affecting occupational safety and health.

(H) PUBLIC ACCESS TO OFF-SITE CONSEQUENCE ANALYSIS INFORMATION.—

(i) DEFINITIONS.—In this subparagraph:

(I) COVERED PERSON.—The term "covered person" means—

(aa) an officer or employee of the United States;

(bb) an officer or employee of an agent or contractor of the Federal Government;

(cc) an officer or employee of a State or local government;

(dd) an officer or employee of an agent or contractor of a State or local government;

(ee) an individual affiliated with an entity that has been given, by a State or local government, responsibility for preventing, planning for, or responding to accidental releases;

(ff) an officer or employee or an agent or contractor of an entity described in item (ee); and

(gg) a qualified researcher under clause (vii).

(II) OFFICIAL USE.—The term "official use" means an action of a Federal, State, or local government agency or an entity referred to in subclause (I)(ee) intended to carry out a function relevant to preventing, planning for, or responding to accidental releases.

(III) OFF-SITE CONSEQUENCE ANALYSIS INFORMATION.—The term "off-site consequence analysis information" means those portions of a risk management plan, excluding the executive summary of the plan, consisting of an evaluation of 1 or more worst-case release scenarios or alternative release scenarios, and any electronic data base created by the Administrator from those portions.

(IV) RISK MANAGEMENT PLAN.—The term "risk management plan" means a risk management plan submitted to the Administrator by an owner or operator of a stationary source under subparagraph (B)(iii).

(ii) REGULATIONS.—Not later than 1 year after August 5, 1999, the President shall—

(I) assess—

(aa) the increased risk of terrorist and other criminal activity associated with the posting of off-site consequence analysis information on the Internet; and

(bb) the incentives created by public disclosure of off-site consequence analysis information for reduction in the risk of accidental releases; and

(II) based on the assessment under subclause (I), promulgate regulations governing the distribution of off-site consequence analysis information in a manner that, in the opinion of the President, minimizes the likelihood of accidental releases and the risk described in subclause (I)(aa) and the likelihood of harm to public health and welfare, and—

(aa) allows access by any member of the public to paper copies of off-site consequence analysis information for a limited number of stationary sources located anywhere in the United States, without any geographical restriction;

(bb) allows other public access to off-site consequence analysis information as appropriate;

(cc) allows access for official use by a covered person described in any of items (cc) through (ff) of clause (i)(I) (referred to in this subclause as a "State or local covered person") to off-site consequence analysis information relating to stationary sources located in the person's State;

(dd) allows a State or local covered person to provide, for official use, off-site consequence analysis information relating to stationary sources located in the person's State to a State or local covered person in a contiguous State; and

(ee) allows a State or local covered person to obtain for official use, by request to the Administrator, off-site consequence analysis information that is not available to the person under item (cc).

(iii) AVAILABILITY UNDER FREEDOM OF INFORMATION ACT.—

(I) FIRST YEAR.—Off-site consequence analysis information, and any ranking of stationary sources derived from the information, shall not be made available under section 552 of title 5 during the 1-year period beginning on August 5, 1999.

(II) AFTER FIRST YEAR.—If the regulations under clause (ii) are promulgated on or before the end of the period described in subclause (I), off-site consequence analysis information covered by the regulations, and any ranking of stationary sources derived from the information, shall not be made available under section 552 of title 5 after the end of that period.

(III) APPLICABILITY.—Subclauses (I) and (II) apply to off-site consequence analysis information submitted to the Administrator before, on, or after August 5, 1999.

(iv) AVAILABILITY OF INFORMATION DURING TRANSITION PERIOD.—The Administrator

shall make off-site consequence analysis information available to covered persons for official use in a manner that meets the requirements of items (cc) through (ee) of clause (ii)(II), and to the public in a form that does not make available any information concerning the identity or location of stationary sources, during the period—

(I) beginning on August 5, 1999; and

(II) ending on the earlier of the date of promulgation of the regulations under clause (ii) or the date that is 1 year after August 5, 1999.

(v) PROHIBITION ON UNAUTHORIZED DISCLOSURE OF INFORMATION BY COVERED PERSONS.—

(I) IN GENERAL.—Beginning on August 5, 1999, a covered person shall not disclose to the public off-site consequence analysis information in any form, or any statewide or national ranking of identified stationary sources derived from such information, except as authorized by this subparagraph (including the regulations promulgated under clause (ii)). After the end of the 1-year period beginning on August 5, 1999, if regulations have not been promulgated under clause (ii), the preceding sentence shall not apply.

(II) CRIMINAL PENALTIES.—Notwithstanding section 7413 of this title, a covered person that willfully violates a restriction or prohibition established by this subparagraph (including the regulations promulgated under clause (ii)) shall, upon conviction, be fined for an infraction under section 3571 of title 18 (but shall not be subject to imprisonment) for each unauthorized disclosure of off-site consequence analysis information, except that subsection (d) of such section 3571 shall not apply to a case in which the offense results in pecuniary loss unless the defendant knew that such loss would occur. The disclosure of off-site consequence analysis information for each specific stationary source shall be considered a separate offense. The total of all penalties that may be imposed on a single person or organization under this item shall not exceed $1,000,000 for violations committed during any 1 calendar year.

(III) APPLICABILITY.—If the owner or operator of a stationary source makes off-site consequence analysis information relating to that stationary source available to the public without restriction—

(aa) subclauses (I) and (II) shall not apply with respect to the information; and

(bb) the owner or operator shall notify the Administrator of the public availability of the information.

(IV) LIST.—The Administrator shall maintain and make publicly available a list of all stationary sources that have provided notification under subclause (III)(bb).

(vi) NOTICE.—The Administrator shall provide notice of the definition of official use as provided in clause (i)(III)[9] and examples of actions that would and would not meet that definition, and notice of the restrictions on further dissemination and the penalties established by this chapter to each covered person who receives off-site consequence analysis information under clause (iv) and each covered person who receives off-site consequence analysis information for an official use under the regulations promulgated under clause (ii).

(vii) QUALIFIED RESEARCHERS.—

(I) IN GENERAL.—Not later than 180 days after August 5, 1999, the Administrator, in consultation with the Attorney General, shall develop and implement a system for providing off-site consequence analysis information, including facility identification, to any qualified researcher, including a qualified researcher from industry or any public interest group.

(II) LIMITATION ON DISSEMINATION.—The system shall not allow the researcher to disseminate, or make available on the Internet, the off-site consequence analysis information, or any portion of the off-site consequence analysis information, received under this clause.

(viii) READ-ONLY INFORMATION TECHNOLOGY SYSTEM.—In consultation with the Attorney General and the heads of other appropriate Federal agencies, the Administrator shall establish an information technology system that provides for the availability to the public of off-site consequence analysis information by means of a central data base under the control of the Federal Government that contains information that users may read, but that provides no means by which an electronic or mechanical copy of the information may be made.

(ix) VOLUNTARY INDUSTRY ACCIDENT PREVENTION STANDARDS.—The Environmental Protection Agency, the Department of Justice, and other appropriate agencies may provide technical assistance to owners and operators of stationary sources and participate in the development of voluntary industry standards that will help achieve the objectives set forth in paragraph (1).

(x) EFFECT ON STATE OR LOCAL LAW.—

(I) IN GENERAL.—Subject to subclause (II), this subparagraph (including the regulations promulgated under this subparagraph) shall supersede any provision of State or local law that is inconsistent with this subparagraph (including the regulations).

(II) AVAILABILITY OF INFORMATION UNDER STATE LAW.—Nothing in this subparagraph precludes a State from making available data on the off-site consequences of chemical releases collected in accordance with State law.

(xi) REPORT.—

(I) IN GENERAL.—Not later than 3 years after August 5, 1999, the Attorney General, in consultation with appropriate State,

---

[9] So in original. Probably should be "(i)(II)".

local, and Federal Government agencies, affected industry, and the public, shall submit to Congress a report that describes the extent to which regulations promulgated under this paragraph have resulted in actions, including the design and maintenance of safe facilities, that are effective in detecting, preventing, and minimizing the consequences of releases of regulated substances that may be caused by criminal activity. As part of this report, the Attorney General, using available data to the extent possible, and a sampling of covered stationary sources selected at the discretion of the Attorney General, and in consultation with appropriate State, local, and Federal governmental agencies, affected industry, and the public, shall review the vulnerability of covered stationary sources to criminal and terrorist activity, current industry practices regarding site security, and security of transportation of regulated substances. The Attorney General shall submit this report, containing the results of the review, together with recommendations, if any, for reducing vulnerability of covered stationary sources to criminal and terrorist activity, to the Committee on Commerce of the United States House of Representatives and the Committee on Environment and Public Works of the United States Senate and other relevant committees of Congress.

(II) INTERIM REPORT.—Not later than 12 months after August 5, 1999, the Attorney General shall submit to the Committee on Commerce of the United States House of Representatives and the Committee on Environment and Public Works of the United States Senate, and other relevant committees of Congress, an interim report that includes, at a minimum—

(aa) the preliminary findings under subclause (I);

(bb) the methods used to develop the findings; and

(cc) an explanation of the activities expected to occur that could cause the findings of the report under subclause (I) to be different than the preliminary findings.

(III) AVAILABILITY OF INFORMATION.—Information that is developed by the Attorney General or requested by the Attorney General and received from a covered stationary source for the purpose of conducting the review under subclauses (I) and (II) shall be exempt from disclosure under section 552 of title 5 if such information would pose a threat to national security.

(xii) SCOPE.—This subparagraph—

(I) applies only to covered persons; and

(II) does not restrict the dissemination of off-site consequence analysis information by any covered person in any manner or form except in the form of a risk management plan or an electronic data base created by the Administrator from off-site consequence analysis information.

(xiii) AUTHORIZATION OF APPROPRIATIONS.— There are authorized to be appropriated to the Administrator and the Attorney General such sums as are necessary to carry out this subparagraph (including the regulations promulgated under clause (ii)), to remain available until expended.

**(8) Research on hazard assessments**

The Administrator may collect and publish information on accident scenarios and consequences covering a range of possible events for substances listed under paragraph (3). The Administrator shall establish a program of long-term research to develop and disseminate information on methods and techniques for hazard assessment which may be useful in improving and validating the procedures employed in the preparation of hazard assessments under this subsection.

**(9) Order authority**

(A) In addition to any other action taken, when the Administrator determines that there may be an imminent and substantial endangerment to the human health or welfare or the environment because of an actual or threatened accidental release of a regulated substance, the Administrator may secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The Administrator may also, after notice to the State in which the stationary source is located, take other action under this paragraph including, but not limited to, issuing such orders as may be necessary to protect human health. The Administrator shall take action under section 7603 of this title rather than this paragraph whenever the authority of such section is adequate to protect human health and the environment.

(B) Orders issued pursuant to this paragraph may be enforced in an action brought in the appropriate United States district court as if the order were issued under section 7603 of this title.

(C) Within 180 days after November 15, 1990, the Administrator shall publish guidance for using the order authorities established by this paragraph. Such guidance shall provide for the coordinated use of the authorities of this paragraph with other emergency powers authorized by section 9606 of this title, sections 311(c), 308, 309 and 504(a) of the Federal Water Pollution Control Act [33 U.S.C. 1321(c), 1318, 1319, 1364(a)], sections 3007, 3008, 3013, and 7003 of the Solid Waste Disposal Act [42 U.S.C. 6927, 6928, 6934, 6973], sections 1445 and 1431 of the Safe Drinking Water Act [42 U.S.C. 300j–4, 300i], sections 5 and 7 of the Toxic Substances Control Act [15 U.S.C. 2604, 2606], and sections 7413, 7414, and 7603 of this title.

**(10) Presidential review**

The President shall conduct a review of release prevention, mitigation and response authorities of the various Federal agencies and shall clarify and coordinate agency responsibilities to assure the most effective and effi-

cient implementation of such authorities and to identify any deficiencies in authority or resources which may exist. The President may utilize the resources and solicit the recommendations of the Chemical Safety and Hazard Investigation Board in conducting such review. At the conclusion of such review, but not later than 24 months after November 15, 1990, the President shall transmit a message to the Congress on the release prevention, mitigation and response activities of the Federal Government making such recommendations for change in law as the President may deem appropriate. Nothing in this paragraph shall be interpreted, construed or applied to authorize the President to modify or reassign release prevention, mitigation or response authorities otherwise established by law.

**(r) State authority**

Nothing in this subsection shall preclude, deny or limit any right of a State or political subdivision thereof to adopt or enforce any regulation, requirement, limitation or standard (including any procedural requirement) that is more stringent than a regulation, requirement, limitation or standard in effect under this subsection or that applies to a substance not subject to this subsection.

**(s) Periodic report**

Not later than January 15, 1993 and every 3 years thereafter, the Administrator shall prepare and transmit to the Congress a comprehensive report on the measures taken by the Agency and by the States to implement the provisions of this section. The Administrator shall maintain a database on pollutants and sources subject to the provisions of this section and shall include aggregate information from the database in each annual report. The report shall include, but not be limited to—

(1) a status report on standard-setting under subsections (d) and (f);

(2) information with respect to compliance with such standards including the costs of compliance experienced by sources in various categories and subcategories;

(3) development and implementation of the national urban air toxics program; and

(4) recommendations of the Chemical Safety and Hazard Investigation Board with respect to the prevention and mitigation of accidental releases.

(July 14, 1955, ch. 360, title I, §112, as added Pub. L. 91–604, §4(a), Dec. 31, 1970, 84 Stat. 1685; amended Pub. L. 95–95, title I, §§109(d)(2), 110, title IV, §401(c), Aug. 7, 1977, 91 Stat. 701, 703, 791; Pub. L. 95–623, §13(5), Nov. 9, 1978, 92 Stat. 3458; Pub. L. 101–549, title III, §301, Nov. 15, 1990, 104 Stat. 2531; Pub. L. 102–187, Dec. 4, 1991, 105 Stat. 1285; Pub. L. 105–362, title IV, §402(b), Nov. 10, 1998, 112 Stat. 3283; Pub. L. 106–40, §§2, 3(a), Aug. 5, 1999, 113 Stat. 207, 208.)

REFERENCES IN TEXT

The date of enactment, referred to in subsec. (a)(11), probably means the date of enactment of Pub. L. 101–549, which amended this section generally and was approved Nov. 15, 1990.

The Atomic Energy Act, referred to in subsec. (d)(9), probably means the Atomic Energy Act of 1954, act

Aug. 1, 1946, ch. 724, as added by act Aug. 30, 1954, ch. 1073, §1, 68 Stat. 919, which is classified principally to chapter 23 (§2011 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 2011 of this title and Tables.

The Federal Water Pollution Control Act, referred to in subsecs. (e)(5) and (m)(1)(D), (5)(D), is act June 30, 1948, ch. 758, as amended generally by Pub. L. 92–500, §2, Oct. 18, 1972, 86 Stat. 816, which is classified generally to chapter 26 (§1251 et seq.) of Title 33, Navigation and Navigable Waters. Title II of the Act is classified generally to subchapter II (§1281 et seq.) of chapter 26 of Title 33. For complete classification of this Act to the Code, see Short Title note set out under section 1251 of Title 33 and Tables.

The Toxic Substances Control Act, referred to in subsec. (k)(3)(C), is Pub. L. 94–469, Oct. 11, 1976, 90 Stat. 2003, as amended, which is classified generally to chapter 53 (§2601 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 2601 of Title 15 and Tables.

The Federal Insecticide, Fungicide, and Rodenticide Act, referred to in subsec. (k)(3)(C), probably means the Federal Insecticide, Fungicide, and Rodenticide Act, act June 25, 1947, ch. 125, as amended generally by Pub. L. 92–516, Oct. 21, 1972, 86 Stat. 973, which is classified generally to subchapter II (§136 et seq.) of chapter 6 of Title 7, Agriculture. For complete classification of this Act to the Code, see Short Title note set out under section 136 of Title 7 and Tables.

The Resource Conservation and Recovery Act, referred to in subsec. (k)(3)(C), probably means the Resource Conservation and Recovery Act of 1976, Pub. L. 94–580, Oct. 21, 1976, 90 Stat. 2796, as amended, which is classified generally to chapter 82 (§6901 et seq.) of this title. For complete classification of this Act to the Code, see Short Title of 1976 Amendment note set out under section 6901 of this title and Tables.

The Safe Drinking Water Act, referred to in subsec. (m)(1)(D), (5)(D), is title XIV of act July 1, 1944, as added Dec. 16, 1974, Pub. L. 93–523, §2(a), 88 Stat. 1660, as amended, which is classified generally to subchapter XII (§300f et seq.) of chapter 6A of this title. For complete classification of this Act to the Code, see Short Title note set out under section 201 of this title and Tables.

The Solid Waste Disposal Act, referred to in subsec. (n)(7), is title II of Pub. L. 89–272, Oct. 20, 1965, 79 Stat. 997, as amended generally by Pub. L. 94–580, §2, Oct. 21, 1976, 90 Stat. 2795. Subtitle C of the Act is classified generally to subchapter III (§6921 et seq.) of chapter 82 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 6901 of this title and Tables.

Section 303 of the Clean Air Act Amendments of 1990, referred to in subsec. (o)(4), probably means section 303 of Pub. L. 101–549, which is set out below.

The Clean Air Act Amendments of 1990, referred to in subsec. (q)(1)–(3), probably means Pub. L. 101–549, Nov. 15, 1990, 104 Stat. 2399. For complete classification of this Act to the Code, see Short Title note set out under section 7401 of this title and Tables.

The Emergency Planning and Community Right-To-Know Act of 1986, referred to in subsec. (r)(3), is title III of Pub. L. 99–499, Oct. 17, 1986, 100 Stat. 1728, which is classified generally to chapter 116 (§11001 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 11001 of this title and Tables.

The Occupational Safety and Health Act, referred to in subsec. (r)(6)(C)(ii), (K), (L), probably means the Occupational Safety and Health Act of 1970, Pub. L. 91–596, Dec. 29, 1970, 84 Stat. 1590, as amended, which is classified principally to chapter 15 (§651 et seq.) of Title 29, Labor. For complete classification of this Act to the Code, see Short Title note set out under section 651 of Title 29 and Tables.

CODIFICATION

In subsec. (r)(6)(N), "section 6101 of title 41" substituted for "section 5 of title 41 of the United States

Code" on authority of Pub. L. 111–350, §6(c), Jan. 4, 2011, 124 Stat. 3854, which Act enacted Title 41, Public Contracts.

Section was formerly classified to section 1857c-7 of this title.

### AMENDMENTS

1999—Subsec. (r)(2)(D). Pub. L. 106–40, §2(5), added subpar. (D).

Subsec. (r)(4). Pub. L. 106–40, §2, substituted "Administrator—

"(A) shall consider—"

for "Administrator shall consider each of the following criteria—" in introductory provisions, redesignated subpars. (A) to (C) as cls. (i) to (iii), respectively, of subpar. (A) and added subpar. (B).

Subsec. (r)(7)(H). Pub. L. 106–40, §3(a), added subpar. (H).

1998—Subsec. (n)(2)(C). Pub. L. 105–362 substituted "On completion of the study, the Secretary shall submit to Congress a report on the results of the study and" for "The Secretary shall prepare annual reports to Congress on the status of the research program and at the completion of the study".

1991—Subsec. (b)(1). Pub. L. 103–187 struck out "7783064 Hydrogen sulfide" from list of pollutants.

1990—Pub. L. 101–549 amended section generally, substituting present provisions for provisions which related to: in subsec. (a), definitions; in subsec. (b), list of hazardous air pollutants, emission standards, and pollution control techniques; in subsec. (c), prohibited acts and exemption; in subsec. (d), State implementation and enforcement; and in subsec. (e), design, equipment, work practice, and operational standards.

1978—Subsec. (e)(5). Pub. L. 95–623 added par. (5).

1977—Subsec. (a)(1). Pub. L. 95–95, §401(c), substituted "causes, or contributes to, air pollution which may reasonably be anticipated to result in an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness" for "may cause, or contribute to, an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness".

Subsec. (d)(1). Pub. L. 95–95, §109(d)(2), struck out "(except with respect to stationary sources owned or operated by the United States)" after "implement and enforce such standards".

Subsec. (e). Pub. L. 95–95, §110, added subsec. (e).

### CHANGE OF NAME

Committee on Energy and Commerce of House of Representatives treated as referring to Committee on Commerce of House of Representatives by section 1(a) of Pub. L. 104–14, set out as a note preceding section 21 of Title 2, The Congress. Committee on Commerce of House of Representatives changed to Committee on Energy and Commerce of House of Representatives, and jurisdiction over matters relating to securities and exchanges and insurance generally transferred to Committee on Financial Services of House of Representatives by House Resolution No. 5, One Hundred Seventh Congress, Jan. 3, 2001.

### EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

### TERMINATION OF REPORTING REQUIREMENTS

For termination, effective May 15, 2000, of provisions of law requiring submittal to Congress of any annual, semiannual, or other regular periodic report listed in House Document No. 103–7 (in which reports required under subsecs. (m)(5), (r)(6)(C)(i), and (s) of this section are listed, respectively, as the 8th item on page 162, the 9th item on page 198, and the 9th item on page 162), see section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance.

### PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

### MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

### DELEGATION OF AUTHORITY

Memorandum of President of the United States, Aug. 19, 1993, 58 F.R. 52397, provided:

Memorandum for the Administrator of the Environmental Protection Agency

WHEREAS, the Environmental Protection Agency, the agencies and departments that are members of the National Response Team (authorized under Executive Order No. 12580, 52 Fed. Reg. 2923 (1987) [42 U.S.C. 9615 note]), and other Federal agencies and departments undertake emergency release prevention, mitigation, and response activities pursuant to various authorities;

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 112(r)(10) of the Clean Air Act (the "Act") (section 7412(r)(10) of title 42 of the United States Code) and section 301 of title 3 of the United States Code, and in order to provide for the delegation of certain functions under the Act [42 U.S.C. 7401 et seq.], I hereby:

(1) Authorize you, in coordination with agencies and departments that are members of the National Response Team and other appropriate agencies and departments, to conduct a review of release prevention, mitigation, and response authorities of Federal agencies in order to assure the most effective and efficient implementation of such authorities and to identify any deficiencies in authority or resources that may exist, to the extent such review is required by section 112(r)(10) of the Act; and

(2) Authorize you, in coordination with agencies and departments that are members of the National Response Team and other appropriate agencies and departments, to prepare and transmit a message to the Congress concerning the release prevention, mitigation, and response activities of the Federal Government with such recommendations for change in law as you deem appropriate, to the extent such message is required by section 112(r)(10) of the Act.

The authority delegated by this memorandum may be further redelegated within the Environmental Protection Agency.

You are hereby authorized and directed to publish this memorandum in the Federal Register.

WILLIAM J. CLINTON.

Memorandum of President of the United States, Jan. 27, 2000, 65 F.R. 8631, provided:

Memorandum for the Attorney General[,] the Administrator of the Environmental Protection Agency[, and] the Director of the Office of Management and Budget

By the authority vested in me as President by the Constitution and laws of the United States of America, including section 112(r)(7)(H) of the Clean Air Act ("Act") (42 U.S.C. 7412(r)(7)(H)), as added by section 3 of the Chemical Safety Information, Site Security and Fuels Regulatory Relief Act (Public Law 106–40), and section 301 of title 3, United States Code, I hereby delegate to:

(1) the Attorney General the authority vested in the President under section 112(r)(7)(H)(ii)(I)(aa) of the Act to assess the increased risk of terrorist and other criminal activity associated with the posting of off-site consequence analysis information on the Internet;

(2) the Administrator of the Environmental Protection Agency (EPA) the authority vested in the President under section 112(r)(7)(H)(ii)(I)(bb) of the Act to assess the incentives created by public disclosure of off-site consequence analysis information for reduction in the risk of accidental releases; and

(3) the Attorney General and the Administrator of EPA, jointly, the authority vested in the President under section 112(r)(7)(H)(ii)(II) of the Act to promulgate regulations, based on these assessments, governing the distribution of off-site consequence analysis information. These regulations, in proposed and final form, shall be subject to review and approval by the Director of the Office of Management and Budget.

The Administrator of EPA is authorized and directed to publish this memorandum in the Federal Register.

WILLIAM J. CLINTON.

REPORTS

Pub. L. 106–40, §3(b), Aug. 5, 1999, 113 Stat. 213, provided that:

"(1) DEFINITION OF ACCIDENTAL RELEASE.—In this subsection, the term 'accidental release' has the meaning given the term in section 112(r)(2) of the Clean Air Act (42 U.S.C. 7412(r)(2)).

"(2) REPORT ON STATUS OF CERTAIN AMENDMENTS.—Not later than 2 years after the date of enactment of this Act [Aug. 5, 1999], the Comptroller General of the United States shall submit to Congress a report on the status of the development of amendments to the National Fire Protection Association Code for Liquefied Petroleum Gas that will result in the provision of information to local emergency response personnel concerning the off-site effects of accidental releases of substances exempted from listing under section 112(r)(4)(B) of the Clean Air Act (as added by section 3).

"(3) REPORT ON COMPLIANCE WITH CERTAIN INFORMATION SUBMISSION REQUIREMENTS.—Not later than 3 years after the date of enactment of this Act, the Comptroller General of the United States shall submit to Congress a report that—

"(A) describes the level of compliance with Federal and State requirements relating to the submission to local emergency response personnel of information intended to help the local emergency response personnel respond to chemical accidents or related environmental or public health threats; and

"(B) contains an analysis of the adequacy of the information required to be submitted and the efficacy of the methods for delivering the information to local emergency response personnel."

REEVALUATION OF REGULATIONS

Pub. L. 106–40, §3(c), Aug. 5, 1999, 113 Stat. 213, provided that: "The President shall reevaluate the regulations promulgated under this section within 6 years after the enactment of this Act [Aug. 5, 1999]. If the President determines not to modify such regulations, the President shall publish a notice in the Federal Register stating that such reevaluation has been completed and that a determination has been made not to modify the regulations. Such notice shall include an explanation of the basis of such decision."

PUBLIC MEETING DURING MORATORIUM PERIOD

Pub. L. 106–40, §4, Aug. 5, 1999, 113 Stat. 214, provided that:

"(a) IN GENERAL.—Not later than 180 days after the date of enactment of this Act [Aug. 5, 1999], each owner or operator of a stationary source covered by section 112(r)(7)(B)(ii) of the Clean Air Act [42 U.S.C. 7412(r)(7)(B)(ii)] shall convene a public meeting, after reasonable public notice, in order to describe and discuss the local implications of the risk management plan submitted by the stationary source pursuant to section 112(r)(7)(B)(iii) of the Clean Air Act, including a summary of the off-site consequence analysis portion of the plan. Two or more stationary sources may conduct a joint meeting. In lieu of conducting such a meeting, small business stationary sources as defined in section 507(c)(1) of the Clean Air Act [42 U.S.C. 7661f(c)(1)] may comply with this section by publicly posting a summary of the off-site consequence analysis information for their facility not later than 180 days after the enactment of this Act. Not later than 10 months after the date of enactment of this Act, each such owner or operator shall send a certification to the director of the Federal Bureau of Investigation stating that such meeting has been held, or that such summary has been posted, within 1 year prior to, or within 6 months after, the date of the enactment of this Act. This section shall not apply to sources that employ only Program 1 processes within the meaning of regulations promulgated under section 112(r)(7)(B)(i) of the Clean Air Act.

"(b) ENFORCEMENT.—The Administrator of the Environmental Protection Agency may bring an action in the appropriate United States district court against any person who fails or refuses to comply with the requirements of this section, and such court may issue such orders, and take such other actions, as may be necessary to require compliance with such requirements."

RISK ASSESSMENT AND MANAGEMENT COMMISSION

Pub. L. 101–549, title III, §303, Nov. 15, 1990, 104 Stat. 2574, provided that:

"(a) ESTABLISHMENT.—There is hereby established a Risk Assessment and Management Commission (hereafter referred to in this section as the 'Commission'), which shall commence proceedings not later than 18 months after the date of enactment of the Clean Air Act Amendments of 1990 [Nov. 15, 1990] and which shall make a full investigation of the policy implications and appropriate uses of risk assessment and risk management in regulatory programs under various Federal laws to prevent cancer and other chronic human health effects which may result from exposure to hazardous substances.

"(b) CHARGE.—The Commission shall consider—

"(1) the report of the National Academy of Sciences authorized by section 112(o) of the Clean Air Act [42 U.S.C. 7412(o)], the use and limitations of risk assessment in establishing emission or effluent standards, ambient standards, exposure standards, acceptable concentration levels, tolerances or other environmental criteria for hazardous substances that present a risk of carcinogenic effects or other chronic health effects and the suitability of risk assessment for such purposes;

"(2) the most appropriate methods for measuring and describing cancer risks or risks of other chronic health effects from exposure to hazardous substances considering such alternative approaches as the lifetime risk of cancer or other effects to the individual or individuals most exposed to emissions from a source or sources on both an actual and worst case basis, the range of such risks, the total number of health effects avoided by exposure reductions, effluent standards, ambient standards, exposures standards, acceptable concentration levels, tolerances and other environmental criteria, reductions in the number of persons exposed at various levels of risk, the incidence of cancer, and other public health factors;

"(3) methods to reflect uncertainties in measurement and estimation techniques, the existence of synergistic or antagonistic effects among hazardous substances, the accuracy of extrapolating human

health risks from animal exposure data, and the existence of unquantified direct or indirect effects on human health in risk assessment studies;

"(4) risk management policy issues including the use of lifetime cancer risks to individuals most exposed, incidence of cancer, the cost and technical feasibility of exposure reduction measures and the use of site-specific actual exposure information in setting emissions standards and other limitations applicable to sources of exposure to hazardous substances; and

"(5) and comment on the degree to which it is possible or desirable to develop a consistent risk assessment methodology, or a consistent standard of acceptable risk, among various Federal programs.

"(c) MEMBERSHIP.—Such Commission shall be composed of ten members who shall have knowledge or experience in fields of risk assessment or risk management, including three members to be appointed by the President, two members to be appointed by the Speaker of the House of Representatives, one member to be appointed by the Minority Leader of the House of Representatives, two members to be appointed by the Majority Leader of the Senate, one member to be appointed by the Minority Leader of the Senate, and one member to be appointed by the President of the National Academy of Sciences. Appointments shall be made not later than 18 months after the date of enactment of the Clean Air Act Amendments of 1990 [Nov. 15, 1990].

"(d) ASSISTANCE FROM AGENCIES.—The Administrator of the Environmental Protection Agency and the heads of all other departments, agencies, and instrumentalities of the executive branch of the Federal Government shall, to the maximum extent practicable, assist the Commission in gathering such information as the Commission deems necessary to carry out this section subject to other provisions of law.

"(e) STAFF AND CONTRACTS.—

"(1) In the conduct of the study required by this section, the Commission is authorized to contract (in accordance with Federal contract law) with nongovernmental entities that are competent to perform research or investigations within the Commission's mandate, and to hold public hearings, forums, and workshops to enable full public participation.

"(2) The Commission may appoint and fix the pay of such staff as it deems necessary in accordance with the provisions of title 5, United States Code. The Commission may request the temporary assignment of personnel from the Environmental Protection Agency or other Federal agencies.

"(3) The members of the Commission who are not officers or employees of the United States, while attending conferences or meetings of the Commission or while otherwise serving at the request of the Chair, shall be entitled to receive compensation at a rate not in excess of the maximum rate of pay for Grade GS-18, as provided in the General Schedule under section 5332 of title 5 of the United States Code, including travel time, and while away from their homes or regular places of business they may be allowed travel expenses, including per diem in lieu of subsistence as authorized by law for persons in the Government service employed intermittently.

"(f) REPORT.—A report containing the results of all Commission studies and investigations under this section, together with any appropriate legislative recommendations or administrative recommendations, shall be made available to the public for comment not later than 42 months after the date of enactment of the Clean Air Act Amendments of 1990 [Nov. 15, 1990] and shall be submitted to the President and to the Congress not later than 48 months after such date of enactment. In the report, the Commission shall make recommendations with respect to the appropriate use of risk assessment and risk management in Federal regulatory programs to prevent cancer or other chronic health effects which may result from exposure to hazardous substances. The Commission shall cease to exist upon the date determined by the Commission, but not later than 9 months after the submission of such report.

"(g) AUTHORIZATION.—There are authorized to be appropriated such sums as are necessary to carry out the activities of the Commission established by this section."

[References in laws to the rates of pay for GS-16, 17, or 18, or to maximum rates of pay under the General Schedule, to be considered references to rates payable under specified sections of Title 5, Government Organization and Employees, see section 529 [title I, §101(c)(1)] of Pub. L. 101-509, set out in a note under section 5376 of Title 5.]

FLEXIBLE IMPLEMENTATION OF THE MERCURY AND AIR TOXICS STANDARDS RULE

Memorandum of President of the United States, Dec. 21, 2011, 76 F.R. 80727, provided:

Memorandum for the Administrator of the Environmental Protection Agency

Today's issuance, by the Environmental Protection Agency (EPA), of the final Mercury and Air Toxics Standards rule for power plants (the "MATS Rule") represents a major step forward in my Administration's efforts to protect public health and the environment.

This rule, issued after careful consideration of public comments, prescribes standards under section 112 of the Clean Air Act to control emissions of mercury and other toxic air pollutants from power plants, which collectively are among the largest sources of such pollution in the United States. The EPA estimates that by substantially reducing emissions of pollutants that contribute to neurological damage, cancer, respiratory illnesses, and other health risks, the MATS Rule will produce major health benefits for millions of Americans—including children, older Americans, and other vulnerable populations. Consistent with Executive Order 13563 (Improving Regulation and Regulatory Review), the estimated benefits of the MATS Rule far exceed the estimated costs.

The MATS Rule can be implemented through the use of demonstrated, existing pollution control technologies. The United States is a global market leader in the design and manufacture of these technologies, and it is anticipated that U.S. firms and workers will provide much of the equipment and labor needed to meet the substantial investments in pollution control that the standards are expected to spur.

These new standards will promote the transition to a cleaner and more efficient U.S. electric power system. This system as a whole is critical infrastructure that plays a key role in the functioning of all facets of the U.S. economy, and maintaining its stability and reliability is of critical importance. It is therefore crucial that implementation of the MATS Rule proceed in a cost-effective manner that ensures electric reliability.

Analyses conducted by the EPA and the Department of Energy (DOE) indicate that the MATS Rule is not anticipated to compromise electric generating resource adequacy in any region of the country. The Clean Air Act offers a number of implementation flexibilities, and the EPA has a long and successful history of using those flexibilities to ensure a smooth transition to cleaner technologies.

The Clean Air Act provides 3 years from the effective date of the MATS Rule for sources to comply with its requirements. In addition, section 112(i)(3)(B) of the Act allows the issuance of a permit granting a source up to one additional year where necessary for the installation of controls. As you stated in the preamble to the MATS Rule, this additional fourth year should be broadly available to sources, consistent with the requirements of the law.

The EPA has concluded that 4 years should generally be sufficient to install the necessary emission control equipment, and DOE has issued analysis consistent with that conclusion. While more time is generally not expected to be needed, the Clean Air Act offers other important flexibilities as well. For example, section 113(a) of the Act provides the EPA with flexibility to bring sources into compliance over the course of an additional year, should unusual circumstances arise that warrant such flexibility.

To address any concerns with respect to electric reliability while assuring MATS' public health benefits, I direct you to take the following actions:

1. Building on the information and guidance that you have provided to the public, relevant stakeholders, and permitting authorities in the preamble of the MATS Rule, work with State and local permitting authorities to make the additional year for compliance with the MATS Rule provided under section 112(i)(3)(B) of the Clean Air Act broadly available to sources, consistent with law, and to invoke this flexibility expeditiously where justified.

2. Promote early, coordinated, and orderly planning and execution of the measures needed to implement the MATS Rule while maintaining the reliability of the electric power system. Consistent with Executive Order 13563, this process should be designed to "promote predictability and reduce uncertainty," and should include engagement and coordination with DOE, the Federal Energy Regulatory Commission, State utility regulators, Regional Transmission Organizations, the North American Electric Reliability Corporation and regional electric reliability organizations, other grid planning authorities, electric utilities, and other stakeholders, as appropriate.

3. Make available to the public, including relevant stakeholders, information concerning any anticipated use of authorities: (a) under section 112(i)(3)(B) of the Clean Air Act in the event that additional time to comply with the MATS Rule is necessary for the installation of technology; and (b) under section 113(a) of the Clean Air Act in the event that additional time to comply with the MATS Rule is necessary to address a specific and documented electric reliability issue. This information should describe the process for working with entities with relevant expertise to identify circumstances where electric reliability concerns might justify allowing additional time to comply.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

You are hereby authorized and directed to publish this memorandum in the Federal Register.

BARACK OBAMA.

## §7413. Federal enforcement

### (a) In general

#### (1) Order to comply with SIP

Whenever, on the basis of any information available to the Administrator, the Administrator finds that any person has violated or is in violation of any requirement or prohibition of an applicable implementation plan or permit, the Administrator shall notify the person and the State in which the plan applies of such finding. At any time after the expiration of 30 days following the date on which such notice of a violation is issued, the Administrator may, without regard to the period of violation (subject to section 2462 of title 28)—

(A) issue an order requiring such person to comply with the requirements or prohibitions of such plan or permit,

(B) issue an administrative penalty order in accordance with subsection (d), or

(C) bring a civil action in accordance with subsection (b).

#### (2) State failure to enforce SIP or permit program

Whenever, on the basis of information available to the Administrator, the Administrator finds that violations of an applicable implementation plan or an approved permit program under subchapter V are so widespread that such violations appear to result from a failure of the State in which the plan or permit program applies to enforce the plan or permit program effectively, the Administrator shall so notify the State. In the case of a permit program, the notice shall be made in accordance with subchapter V. If the Administrator finds such failure extends beyond the 30th day after such notice (90 days in the case of such permit program), the Administrator shall give public notice of such finding. During the period beginning with such public notice and ending when such State satisfies the Administrator that it will enforce such plan or permit program (hereafter referred to in this section as "period of federally assumed enforcement"), the Administrator may enforce any requirement or prohibition of such plan or permit program with respect to any person by—

(A) issuing an order requiring such person to comply with such requirement or prohibition,

(B) issuing an administrative penalty order in accordance with subsection (d), or

(C) bringing a civil action in accordance with subsection (b).

#### (3) EPA enforcement of other requirements

Except for a requirement or prohibition enforceable under the preceding provisions of this subsection, whenever, on the basis of any information available to the Administrator, the Administrator finds that any person has violated, or is in violation of, any other requirement or prohibition of this subchapter, section 7603 of this title, subchapter IV–A, subchapter V, or subchapter VI, including, but not limited to, a requirement or prohibition of any rule, plan, order, waiver, or permit promulgated, issued, or approved under those provisions or subchapters, or for the payment of any fee owed to the United States under this chapter (other than subchapter II), the Administrator may—

(A) issue an administrative penalty order in accordance with subsection (d),

(B) issue an order requiring such person to comply with such requirement or prohibition,

(C) bring a civil action in accordance with subsection (b) or section 7605 of this title, or

(D) request the Attorney General to commence a criminal action in accordance with subsection (c).

#### (4) Requirements for orders

An order issued under this subsection (other than an order relating to a violation of section 7412 of this title) shall not take effect until the person to whom it is issued has had an opportunity to confer with the Administrator concerning the alleged violation. A copy of any order issued under this subsection shall be sent to the State air pollution control agency of any State in which the violation occurs. Any order issued under this subsection shall state with reasonable specificity the nature of the violation and specify a time for compli-

under this section with respect to which any Federal land manager has submitted written comments and recommendations, the State shall publish a list of any inconsistency between such redesignation and such recommendations and an explanation of such inconsistency (together with the reasons for making such redesignation against the recommendation of the Federal land manager).

(C) The Administrator shall promulgate regulations not later than six months after August 7, 1977, to assure, insofar as practicable, that prior to any public hearing on redesignation of any area, there shall be available for public inspection any specific plans for any new or modified major emitting facility which may be permitted to be constructed and operated only if the area in question is designated or redesignated as class III.

(2) The Administrator may disapprove the redesignation of any area only if he finds, after notice and opportunity for public hearing, that such redesignation does not meet the procedural requirements of this section or is inconsistent with the requirements of section 7472(a) of this title or of subsection (a) of this section. If any such disapproval occurs, the classification of the area shall be that which was in effect prior to the redesignation which was disapproved.

**(c) Indian reservations**

Lands within the exterior boundaries of reservations of federally recognized Indian tribes may be redesignated only by the appropriate Indian governing body. Such Indian governing body shall be subject in all respect to the provisions of subsection (e).

**(d) Review of national monuments, primitive areas, and national preserves**

The Federal Land Manager shall review all national monuments, primitive areas, and national preserves, and shall recommend any appropriate areas for redesignation as class I where air quality related values are important attributes of the area. The Federal Land Manager shall report such recommendations, within[2] supporting analysis, to the Congress and the affected States within one year after August 7, 1977. The Federal Land Manager shall consult with the appropriate States before making such recommendations.

**(e) Resolution of disputes between State and Indian tribes**

If any State affected by the redesignation of an area by an Indian tribe or any Indian tribe affected by the redesignation of an area by a State disagrees with such redesignation of any area, or if a permit is proposed to be issued for any new major emitting facility proposed for construction in any State which the Governor of an affected State or governing body of an affected Indian tribe determines will cause or contribute to a cumulative change in air quality in excess of that allowed in this part within the affected State or tribal reservation, the Governor or Indian ruling body may request the Administrator to enter into negotiations with the parties involved to resolve such dispute. If requested by

any State or Indian tribe involved, the Administrator shall make a recommendation to resolve the dispute and protect the air quality related values of the lands involved. If the parties involved do not reach agreement, the Administrator shall resolve the dispute and his determination, or the results of agreements reached through other means, shall become part of the applicable plan and shall be enforceable as part of such plan. In resolving such disputes relating to area redesignation, the Administrator shall consider the extent to which the lands involved are of sufficient size to allow effective air quality management or have air quality related values of such an area.

(July 14, 1955, ch. 360, title I, § 164, as added Pub. L. 95–95, title I, § 127(a), Aug. 7, 1977, 91 Stat. 733; amended Pub. L. 95–190, § 14(a)(42), (43), Nov. 16, 1977, 91 Stat. 1402; Pub. L. 101–549, title I, § 108(n), Nov. 15, 1990, 104 Stat. 2469.)

AMENDMENTS

1990—Subsec. (a). Pub. L. 101–549, which directed the insertion of ''The extent of the areas referred to in paragraph (1) and (2) shall conform to any changes in the boundaries of such areas which have occurred subsequent to August 7, 1977, or which may occur subsequent to November 15, 1990.'' before ''Any area (other than an area referred to in paragraph (1) or (2))'', was executed by making the insertion before ''Any area (other than an area referred to in paragraph (1) or (2)'', to reflect the probable intent of Congress.

1977—Subsec. (b)(2). Pub. L. 95–190, § 14(a)(42), inserted ''or is inconsistent with the requirements of section 7472(a) of this title or of subsection (a) of this section'' after ''this section''.

Subsec. (e). Pub. L. 95–190, § 14(a)(43), inserted ''an'' after ''If any State affected by the redesignation of''.

**§ 7475. Preconstruction requirements**

**(a) Major emitting facilities on which construction is commenced**

No major emitting facility on which construction is commenced after August 7, 1977, may be constructed in any area to which this part applies unless—

(1) a permit has been issued for such proposed facility in accordance with this part setting forth emission limitations for such facility which conform to the requirements of this part;

(2) the proposed permit has been subject to a review in accordance with this section, the required analysis has been conducted in accordance with regulations promulgated by the Administrator, and a public hearing has been held with opportunity for interested persons including representatives of the Administrator to appear and submit written or oral presentations on the air quality impact of such source, alternatives thereto, control technology requirements, and other appropriate considerations;

(3) the owner or operator of such facility demonstrates, as required pursuant to section 7410(j) of this title, that emissions from construction or operation of such facility will not cause, or contribute to, air pollution in excess of any (A) maximum allowable increase or maximum allowable concentration for any pollutant in any area to which this part applies more than one time per year, (B) na-

---

[2] So in original. Probably should be ''with''.

tional ambient air quality standard in any air quality control region, or (C) any other applicable emission standard or standard of performance under this chapter;

(4) the proposed facility is subject to the best available control technology for each pollutant subject to regulation under this chapter emitted from, or which results from, such facility;

(5) the provisions of subsection (d) with respect to protection of class I areas have been complied with for such facility;

(6) there has been an analysis of any air quality impacts projected for the area as a result of growth associated with such facility;

(7) the person who owns or operates, or proposes to own or operate, a major emitting facility for which a permit is required under this part agrees to conduct such monitoring as may be necessary to determine the effect which emissions from any such facility may have, or is having, on air quality in any area which may be affected by emissions from such source; and

(8) in the case of a source which proposes to construct in a class III area, emissions from which would cause or contribute to exceeding the maximum allowable increments applicable in a class II area and where no standard under section 7411 of this title has been promulgated subsequent to August 7, 1977, for such source category, the Administrator has approved the determination of best available technology as set forth in the permit.

**(b) Exception**

The demonstration pertaining to maximum allowable increases required under subsection (a)(3) shall not apply to maximum allowable increases for class II areas in the case of an expansion or modification of a major emitting facility which is in existence on August 7, 1977, whose allowable emissions of air pollutants, after compliance with subsection (a)(4), will be less than fifty tons per year and for which the owner or operator of such facility demonstrates that emissions of particulate matter and sulfur oxides will not cause or contribute to ambient air quality levels in excess of the national secondary ambient air quality standard for either of such pollutants.

**(c) Permit applications**

Any completed permit application under section 7410 of this title for a major emitting facility in any area to which this part applies shall be granted or denied not later than one year after the date of filing of such completed application.

**(d) Action taken on permit applications; notice; adverse impact on air quality related values; variance; emission limitations**

(1) Each State shall transmit to the Administrator a copy of each permit application relating to a major emitting facility received by such State and provide notice to the Administrator of every action related to the consideration of such permit.

(2)(A) The Administrator shall provide notice of the permit application to the Federal Land Manager and the Federal official charged with direct responsibility for management of any lands within a class I area which may be affected by emissions from the proposed facility.

(B) The Federal Land Manager and the Federal official charged with direct responsibility for management of such lands shall have an affirmative responsibility to protect the air quality related values (including visibility) of any such lands within a class I area and to consider, in consultation with the Administrator, whether a proposed major emitting facility will have an adverse impact on such values.

(C)(i) In any case where the Federal official charged with direct responsibility for management of any lands within a class I area or the Federal Land Manager of such lands, or the Administrator, or the Governor of an adjacent State containing such a class I area files a notice alleging that emissions from a proposed major emitting facility may cause or contribute to a change in the air quality in such area and identifying the potential adverse impact of such change, a permit shall not be issued unless the owner or operator of such facility demonstrates that emissions of particulate matter and sulfur dioxide will not cause or contribute to concentrations which exceed the maximum allowable increases for a class I area.

(ii) In any case where the Federal Land Manager demonstrates to the satisfaction of the State that the emissions from such facility will have an adverse impact on the air quality-related values (including visibility) of such lands, notwithstanding the fact that the change in air quality resulting from emissions from such facility will not cause or contribute to concentrations which exceed the maximum allowable increases for a class I area, a permit shall not be issued.

(iii) In any case where the owner or operator of such facility demonstrates to the satisfaction of the Federal Land Manager, and the Federal Land Manager so certifies, that the emissions from such facility will have no adverse impact on the air quality-related values of such lands (including visibility), notwithstanding the fact that the change in air quality resulting from emissions from such facility will cause or contribute to concentrations which exceed the maximum allowable increases for class I areas, the State may issue a permit.

(iv) In the case of a permit issued pursuant to clause (iii), such facility shall comply with such emission limitations under such permit as may be necessary to assure that emissions of sulfur oxides and particulates from such facility will not cause or contribute to concentrations of such pollutant which exceed the following maximum allowable increases over the baseline concentration for such pollutants:

| | Maximum allowable increase (in micrograms per cubic meter) |
|---|---|
| Particulate matter: | |
| Annual geometric mean .................... | 19 |
| Twenty-four-hour maximum ............. | 37 |
| Sulfur dioxide: | |
| Annual arithmetic mean .................... | 20 |
| Twenty-four-hour maximum ............. | 91 |
| Three-hour maximum ........................ | 325 |

(D)(i) In any case where the owner or operator of a proposed major emitting facility who has been denied a certification under subparagraph (C)(iii) demonstrates to the satisfaction of the Governor, after notice and public hearing, and the Governor finds, that the facility cannot be constructed by reason of any maximum allowable increase for sulfur dioxide for periods of twenty-four hours or less applicable to any class I area and, in the case of Federal mandatory class I areas, that a variance under this clause will not adversely affect the air quality related values of the area (including visibility), the Governor, after consideration of the Federal Land Manager's recommendation (if any) and subject to his concurrence, may grant a variance from such maximum allowable increase. If such variance is granted, a permit may be issued to such source pursuant to the requirements of this subparagraph.

(ii) In any case in which the Governor recommends a variance under this subparagraph in which the Federal Land Manager does not concur, the recommendations of the Governor and the Federal Land Manager shall be transmitted to the President. The President may approve the Governor's recommendation if he finds that such variance is in the national interest. No Presidential finding shall be reviewable in any court. The variance shall take effect if the President approves the Governor's recommendations. The President shall approve or disapprove such recommendation within ninety days after his receipt of the recommendations of the Governor and the Federal Land Manager.

(iii) In the case of a permit issued pursuant to this subparagraph, such facility shall comply with such emission limitations under such permit as may be necessary to assure that emissions of sulfur oxides from such facility will not (during any day on which the otherwise applicable maximum allowable increases are exceeded) cause or contribute to concentrations which exceed the following maximum allowable increases for such areas over the baseline concentration for such pollutant and to assure that such emissions will not cause or contribute to concentrations which exceed the otherwise applicable maximum allowable increases for periods of exposure of 24 hours or less on more than 18 days during any annual period:

MAXIMUM ALLOWABLE INCREASE
(In micrograms per cubic meter)

| Period of exposure | Low terrain areas | High terrain areas |
|---|---|---|
| 24-hr maximum | 36 | 62 |
| 3-hr maximum | 130 | 221 |

(iv) For purposes of clause (iii), the term "high terrain area" means with respect to any facility, any area having an elevation of 900 feet or more above the base of the stack of such facility, and the term "low terrain area" means any area other than a high terrain area.

(e) **Analysis; continuous air quality monitoring data; regulations; model adjustments**

(1) The review provided for in subsection (a) shall be preceded by an analysis in accordance with regulations of the Administrator, promulgated under this subsection, which may be conducted by the State (or any general purpose unit of local government) or by the major emitting facility applying for such permit, of the ambient air quality at the proposed site and in areas which may be affected by emissions from such facility for each pollutant subject to regulation under this chapter which will be emitted from such facility.

(2) Effective one year after August 7, 1977, the analysis required by this subsection shall include continuous air quality monitoring data gathered for purposes of determining whether emissions from such facility will exceed the maximum allowable increases or the maximum allowable concentration permitted under this part. Such data shall be gathered over a period of one calendar year preceding the date of application for a permit under this part unless the State, in accordance with regulations promulgated by the Administrator, determines that a complete and adequate analysis for such purposes may be accomplished in a shorter period. The results of such analysis shall be available at the time of the public hearing on the application for such permit.

(3) The Administrator shall within six months after August 7, 1977, promulgate regulations respecting the analysis required under this subsection which regulations—

(A) shall not require the use of any automatic or uniform buffer zone or zones,

(B) shall require an analysis of the ambient air quality, climate and meteorology, terrain, soils and vegetation, and visibility at the site of the proposed major emitting facility and in the area potentially affected by the emissions from such facility for each pollutant regulated under this chapter which will be emitted from, or which results from the construction or operation of, such facility, the size and nature of the proposed facility, the degree of continuous emission reduction which could be achieved by such facility, and such other factors as may be relevant in determining the effect of emissions from a proposed facility on any air quality control region,

(C) shall require the results of such analysis shall be available at the time of the public hearing on the application for such permit, and

(D) shall specify with reasonable particularity each air quality model or models to be used under specified sets of conditions for purposes of this part.

Any model or models designated under such regulations may be adjusted upon a determination, after notice and opportunity for public hearing, by the Administrator that such adjustment is necessary to take into account unique terrain or meteorological characteristics of an area potentially affected by emissions from a source applying for a permit required under this part.

(July 14, 1955, ch. 360, title I, §165, as added Pub. L. 95–95, title I, §127(a), Aug. 7, 1977, 91 Stat. 735; amended Pub. L. 95–190, §14(a)(44)–(51), Nov. 16, 1977, 91 Stat. 1402.)

AMENDMENTS

1977—Subsec. (a)(1). Pub. L. 95–190. §14(a)(44), substituted "part;" for "part;".

Subsec. (a)(3). Pub. L. 95–190, §14(a)(45), inserted provision making applicable requirement of section 7410(j) of this title.

Subsec. (b). Pub. L. 95–190, §14(a)(46), inserted "cause or" before "contribute" and struck out "actual" before "allowable emissions".

Subsec. (d)(2)(C). Pub. L. 95–190, §14(a)(47)–(49), in cl. (ii) substituted "contribute" for "contrbute", in cl. (iii) substituted "quality-related" for "quality related" and "concentrations which" for "concentrations, which", and in cl. (iv) substituted "such facility" for "such sources" and "will not cause or contribute to concentrations of such pollutant which exceed" for "together with all other sources, will not exceed".

Subsec. (d)(2)(D). Pub. L. 95–190, §14(a)(50), (51), in cl. (iii) substituted provisions relating to determinations of amounts of emissions of sulfur oxides from facilities, for provisions relating to determinations of amounts of emissions of sulfur oxides from sources operating under permits issued pursuant to this subpar., together with all other sources, and added cl. (iv).

## § 7476. Other pollutants

### (a) Hydrocarbons, carbon monoxide, petrochemical oxidants, and nitrogen oxides

In the case of the pollutants hydrocarbons, carbon monoxide, photochemical oxidants, and nitrogen oxides, the Administrator shall conduct a study and not later than two years after August 7, 1977, promulgate regulations to prevent the significant deterioration of air quality which would result from the emissions of such pollutants. In the case of pollutants for which national ambient air quality standards are promulgated after August 7, 1977, he shall promulgate such regulations not more than 2 years after the date of promulgation of such standards.

### (b) Effective date of regulations

Regulations referred to in subsection (a) shall become effective one year after the date of promulgation. Within 21 months after such date of promulgation such plan revision shall be submitted to the Administrator who shall approve or disapprove the plan within 25 months after such date or[1] promulgation in the same manner as required under section 7410 of this title.

### (c) Contents of regulations

Such regulations shall provide specific numerical measures against which permit applications may be evaluated, a framework for stimulating improved control technology, protection of air quality values, and fulfill the goals and purposes set forth in section 7401 and section 7470 of this title.

### (d) Specific measures to fulfill goals and purposes

The regulations of the Administrator under subsection (a) shall provide specific measures at least as effective as the increments established in section 7473 of this title to fulfill such goals and purposes, and may contain air quality increments, emission density requirements, or other measures.

### (e) Area classification plan not required

With respect to any air pollutant for which a national ambient air quality standard is established other than sulfur oxides or particulate

matter, an area classification plan shall not be required under this section if the implementation plan adopted by the State and submitted for the Administrator's approval or promulgated by the Administrator under section 7410(c) of this title contains other provisions which when considered as a whole, the Administrator finds will carry out the purposes in section 7470 of this title at least as effectively as an area classification plan for such pollutant. Such other provisions referred to in the preceding sentence need not require the establishment of maximum allowable increases with respect to such pollutant for any area to which this section applies.

### (f) PM–10 increments

The Administrator is authorized to substitute, for the maximum allowable increases in particulate matter specified in section 7473(b) of this title and section 7475(d)(2)(C)(iv) of this title, maximum allowable increases in particulate matter with an aerodynamic diameter smaller than or equal to 10 micrometers. Such substituted maximum allowable increases shall be of equal stringency in effect as those specified in the provisions for which they are substituted. Until the Administrator promulgates regulations under the authority of this subsection, the current maximum allowable increases in concentrations of particulate matter shall remain in effect.

(July 14, 1955, ch. 360, title I, §166, as added Pub. L. 95–95, title I, §127(a), Aug. 7, 1977, 91 Stat. 739; amended Pub. L. 101–549, title I, §105(b), Nov. 15, 1990, 104 Stat. 2462.)

AMENDMENTS

1990—Subsec. (f). Pub. L. 101–549 added subsec. (f).

## § 7477. Enforcement

The Administrator shall, and a State may, take such measures, including issuance of an order, or seeking injunctive relief, as necessary to prevent the construction or modification of a major emitting facility which does not conform to the requirements of this part, or which is proposed to be constructed in any area designated pursuant to section 7407(d) of this title as attainment or unclassifiable and which is not subject to an implementation plan which meets the requirements of this part.

(July 14, 1955, ch. 360, title I, §167, as added Pub. L. 95–95, title I, §127(a), Aug. 7, 1977, 91 Stat. 740; amended Pub. L. 101–549, title I, §110(3), title VII, §708, Nov. 15, 1990, 104 Stat. 2470, 2684.)

AMENDMENTS

1990—Pub. L. 101–549, §708, substituted "construction or modification of a major emitting facility" for "construction of a major emitting facility".

Pub. L. 101–549, §110(3), substituted "designated pursuant to section 7407(d) as attainment or unclassifiable" for "included in the list promulgated pursuant to paragraph (1)(D) or (E) of subsection (d) of section 7407 of this title".

## § 7478. Period before plan approval

### (a) Existing regulations to remain in effect

Until such time as an applicable implementation plan is in effect for any area, which plan

---

[1] So in original. Probably should be "of".



ent air quality standard, a design value or other indicator comparable to 0.140 in terms of its relationship to the standard shall be used in lieu of 0.140 for purposes of applying the provisions of subparagraphs (B) and (C).

**(c) References to terms**

(1) Any reference in this subpart to a "Marginal Area", a "Moderate Area", a "Serious Area", a "Severe Area", or an "Extreme Area" shall be considered a reference to a Marginal Area, a Moderate Area, a Serious Area, a Severe Area, or an Extreme Area as respectively classified under this section.

(2) Any reference in this subpart to "next higher classification" or comparable terms shall be considered a reference to the classification related to the next higher set of design values in table 1.

(July 14, 1955, ch. 360, title I, § 181, as added Pub. L. 101–549, title I, § 103, Nov. 15, 1990, 104 Stat. 2423.)

EXEMPTIONS FOR STRIPPER WELLS

Pub. L. 101–549, title VIII, § 819, Nov. 15, 1990, 104 Stat. 2698, provided that: "Notwithstanding any other provision of law, the amendments to the Clean Air Act made by section 103 of the Clean Air Act Amendments of 1990 [enacting this section and sections 7511a to 7511f of this title] (relating to additional provisions for ozone nonattainment areas), by section 104 of such amendments [enacting sections 7512 and 7512a of this title] (relating to additional provisions for carbon monoxide nonattainment areas), by section 105 of such amendments [enacting sections 7513 to 7513b of this title and amending section 7476 of this title] (relating to additional provisions for PM–10 nonattainment areas), and by section 106 of such amendments [enacting sections 7514 and 7514a of this title] (relating to additional provisions for areas designated as nonattainment for sulfur oxides, nitrogen dioxide, and lead) shall not apply with respect to the production of and equipment used in the exploration, production, development, storage or processing of—

"(1) oil from a stripper well property, within the meaning of the June 1979 energy regulations (within the meaning of section 4996(b)(7) of the Internal Revenue Code of 1986 [26 U.S.C. 4996(b)(7)], as in effect before the repeal of such section); and

"(2) stripper well natural gas, as defined in section 108(b) of the Natural Gas Policy Act of 1978 (15 U.S.C. 3318(b)).[.]

except to the extent that provisions of such amendments cover areas designated as Serious pursuant to part D of title I of the Clean Air Act [this part] and having a population of 350,000 or more, or areas designated as Severe or Extreme pursuant to such part D."

**§ 7511a. Plan submissions and requirements**

**(a) Marginal Areas**

Each State in which all or part of a Marginal Area is located shall, with respect to the Marginal Area (or portion thereof, to the extent specified in this subsection), submit to the Administrator the State implementation plan revisions (including the plan items) described under this subsection except to the extent the State has made such submissions as of November 15, 1990.

**(1) Inventory**

Within 2 years after November 15, 1990, the State shall submit a comprehensive, accurate, current inventory of actual emissions from all sources, as described in section 7502(c)(3) of this title, in accordance with guidance provided by the Administrator.

**(2) Corrections to the State implementation plan**

Within the periods prescribed in this paragraph, the State shall submit a revision to the State implementation plan that meets the following requirements—

**(A) Reasonably available control technology corrections**

For any Marginal Area (or, within the Administrator's discretion, portion thereof) the State shall submit, within 6 months of the date of classification under section 7511(a) of this title, a revision that includes such provisions to correct requirements in (or add requirements to) the plan concerning reasonably available control technology as were required under section 7502(b) of this title (as in effect immediately before November 15, 1990), as interpreted in guidance issued by the Administrator under section 7408 of this title before November 15, 1990.

**(B) Savings clause for vehicle inspection and maintenance**

(i) For any Marginal Area (or, within the Administrator's discretion, portion thereof), the plan for which already includes, or was required by section 7502(b)(11)(B) of this title (as in effect immediately before November 15, 1990) to have included, a specific schedule for implementation of a vehicle emission control inspection and maintenance program, the State shall submit, immediately after November 15, 1990, a revision that includes any provisions necessary to provide for a vehicle inspection and maintenance program of no less stringency than that of either the program defined in House Report Numbered 95–294, 95th Congress, 1st Session, 281–291 (1977) as interpreted in guidance of the Administrator issued pursuant to section 7502(b)(11)(B) of this title (as in effect immediately before November 15, 1990) or the program already included in the plan, whichever is more stringent.

(ii) Within 12 months after November 15, 1990, the Administrator shall review, revise, update, and republish in the Federal Register the guidance for the States for motor vehicle inspection and maintenance programs required by this chapter, taking into consideration the Administrator's investigations and audits of such program. The guidance shall, at a minimum, cover the frequency of inspections, the types of vehicles to be inspected (which shall include leased vehicles that are registered in the nonattainment area), vehicle maintenance by owners and operators, audits by the State, the test method and measures, including whether centralized or decentralized, inspection methods and procedures, quality of inspection, components covered, assurance that a vehicle subject to a recall notice from a manufacturer has complied with that notice, and effective implementation and enforcement, including ensuring that any re-

testing of a vehicle after a failure shall include proof of corrective action and providing for denial of vehicle registration in the case of tampering or misfueling. The guidance which shall be incorporated in the applicable State implementation plans by the States shall provide the States with continued reasonable flexibility to fashion effective, reasonable, and fair programs for the affected consumer. No later than 2 years after the Administrator promulgates regulations under section 7521(m)(3) of this title (relating to emission control diagnostics), the State shall submit a revision to such program to meet any requirements that the Administrator may prescribe under that section.

#### (C) Permit programs

Within 2 years after November 15, 1990, the State shall submit a revision that includes each of the following:

(i) Provisions to require permits, in accordance with sections 7502(c)(5) and 7503 of this title, for the construction and operation of each new or modified major stationary source (with respect to ozone) to be located in the area.

(ii) Provisions to correct requirements in (or add requirements to) the plan concerning permit programs as were required under section 7502(b)(6) of this title (as in effect immediately before November 15, 1990), as interpreted in regulations of the Administrator promulgated as of November 15, 1990.

### (3) Periodic inventory

#### (A) General requirement

No later than the end of each 3-year period after submission of the inventory under paragraph (1) until the area is redesignated to attainment, the State shall submit a revised inventory meeting the requirements of subsection (a)(1).

#### (B) Emissions statements

(i) Within 2 years after November 15, 1990, the State shall submit a revision to the State implementation plan to require that the owner or operator of each stationary source of oxides of nitrogen or volatile organic compounds provide the State with a statement, in such form as the Administrator may prescribe (or accept an equivalent alternative developed by the State), for classes or categories of sources, showing the actual emissions of oxides of nitrogen and volatile organic compounds from that source. The first such statement shall be submitted within 3 years after November 15, 1990. Subsequent statements shall be submitted at least every year thereafter. The statement shall contain a certification that the information contained in the statement is accurate to the best knowledge of the individual certifying the statement.

(ii) The State may waive the application of clause (i) to any class or category of stationary sources which emit less than 25 tons per year of volatile organic compounds or oxides of nitrogen if the State, in its submissions under subparagraphs[1] (1) or (3)(A), provides an inventory of emissions from such class or category of sources, based on the use of the emission factors established by the Administrator or other methods acceptable to the Administrator.

#### (4) General offset requirement

For purposes of satisfying the emission offset requirements of this part, the ratio of total emission reductions of volatile organic compounds to total increased emissions of such air pollutant shall be at least 1.1 to 1.

The Administrator may, in the Administrator's discretion, require States to submit a schedule for submitting any of the revisions or other items required under this subsection. The requirements of this subsection shall apply in lieu of any requirement that the State submit a demonstration that the applicable implementation plan provides for attainment of the ozone standard by the applicable attainment date in any Marginal Area. Section 7502(c)(9) of this title (relating to contingency measures) shall not apply to Marginal Areas.

### (b) Moderate Areas

Each State in which all or part of a Moderate Area is located shall, with respect to the Moderate Area, make the submissions described under subsection (a) of this section (relating to Marginal Areas), and shall also submit the revisions to the applicable implementation plan described under this subsection.

#### (1) Plan provisions for reasonable further progress

#### (A) General rule

(i) By no later than 3 years after November 15, 1990, the State shall submit a revision to the applicable implementation plan to provide for volatile organic compound emission reductions, within 6 years after November 15, 1990, of at least 15 percent from baseline emissions, accounting for any growth in emissions after 1990. Such plan shall provide for such specific annual reductions in emissions of volatile organic compounds and oxides of nitrogen as necessary to attain the national primary ambient air quality standard for ozone by the attainment date applicable under this chapter. This subparagraph shall not apply in the case of oxides of nitrogen for those areas for which the Administrator determines (when the Administrator approves the plan or plan revision) that additional reductions of oxides of nitrogen would not contribute to attainment.

(ii) A percentage less than 15 percent may be used for purposes of clause (i) in the case of any State which demonstrates to the satisfaction of the Administrator that—

(I) new source review provisions are applicable in the nonattainment areas in the same manner and to the same extent as required under subsection (e) in the case of Extreme Areas (with the exception that, in applying such provisions, the terms "major source" and "major stationary

---

[1] So in original. Probably should be "subparagraph".

source'' shall include (in addition to the sources described in section 7602 of this title) any stationary source or group of sources located within a contiguous area and under common control that emits, or has the potential to emit, at least 5 tons per year of volatile organic compounds);

(II) reasonably available control technology is required for all existing major sources (as defined in subclause (I)); and

(III) the plan reflecting a lesser percentage than 15 percent includes all measures that can feasibly be implemented in the area, in light of technological achievability.

To qualify for a lesser percentage under this clause, a State must demonstrate to the satisfaction of the Administrator that the plan for the area includes the measures that are achieved in practice by sources in the same source category in nonattainment areas of the next higher category.

**(B) Baseline emissions**

For purposes of subparagraph (A), the term "baseline emissions'' means the total amount of actual VOC or $NO_x$ emissions from all anthropogenic sources in the area during the calendar year 1990, excluding emissions that would be eliminated under the regulations described in clauses (i) and (ii) of subparagraph (D).

**(C) General rule for creditability of reductions**

Except as provided under subparagraph (D), emissions reductions are creditable toward the 15 percent required under subparagraph (A) to the extent they have actually occurred, as of 6 years after November 15, 1990, from the implementation of measures required under the applicable implementation plan, rules promulgated by the Administrator, or a permit under subchapter V.

**(D) Limits on creditability of reductions**

Emission reductions from the following measures are not creditable toward the 15 percent reductions required under subparagraph (A):

(i) Any measure relating to motor vehicle exhaust or evaporative emissions promulgated by the Administrator by January 1, 1990.

(ii) Regulations concerning Reid Vapor Pressure promulgated by the Administrator by November 15, 1990, or required to be promulgated under section 7545(h) of this title.

(iii) Measures required under subsection (a)(2)(A) (concerning corrections to implementation plans prescribed under guidance by the Administrator).

(iv) Measures required under subsection (a)(2)(B) to be submitted immediately after November 15, 1990 (concerning corrections to motor vehicle inspection and maintenance programs).

**(2) Reasonably available control technology**

The State shall submit a revision to the applicable implementation plan to include provisions to require the implementation of reasonably available control technology under section 7502(c)(1) of this title with respect to each of the following:

(A) Each category of VOC sources in the area covered by a CTG document issued by the Administrator between November 15, 1990, and the date of attainment.

(B) All VOC sources in the area covered by any CTG issued before November 15, 1990.

(C) All other major stationary sources of VOCs that are located in the area.

Each revision described in subparagraph (A) shall be submitted within the period set forth by the Administrator in issuing the relevant CTG document. The revisions with respect to sources described in subparagraphs (B) and (C) shall be submitted by 2 years after November 15, 1990, and shall provide for the implementation of the required measures as expeditiously as practicable but no later than May 31, 1995.

**(3) Gasoline vapor recovery**

**(A) General rule**

Not later than 2 years after November 15, 1990, the State shall submit a revision to the applicable implementation plan to require all owners or operators of gasoline dispensing systems to install and operate, by the date prescribed under subparagraph (B), a system for gasoline vapor recovery of emissions from the fueling of motor vehicles. The Administrator shall issue guidance as appropriate as to the effectiveness of such system. This subparagraph shall apply only to facilities which sell more than 10,000 gallons of gasoline per month (50,000 gallons per month in the case of an independent small business marketer of gasoline as defined in section 7625-1 [2] of this title).

**(B) Effective date**

The date required under subparagraph (A) shall be—

(i) 6 months after the adoption date, in the case of gasoline dispensing facilities for which construction commenced after November 15, 1990;

(ii) one year after the adoption date, in the case of gasoline dispensing facilities which dispense at least 100,000 gallons of gasoline per month, based on average monthly sales for the 2-year period before the adoption date; or

(iii) 2 years after the adoption date, in the case of all other gasoline dispensing facilities.

Any gasoline dispensing facility described under both clause (i) and clause (ii) shall meet the requirements of clause (i).

**(C) Reference to terms**

For purposes of this paragraph, any reference to the term "adoption date'' shall be considered a reference to the date of adoption by the State of requirements for the installation and operation of a system for gasoline vapor recovery of emissions from the fueling of motor vehicles.

---

[2] So in original. Probably should be section "7625''.

**(4) Motor vehicle inspection and maintenance**

For all Moderate Areas, the State shall submit, immediately after November 15, 1990, a revision to the applicable implementation plan that includes provisions necessary to provide for a vehicle inspection and maintenance program as described in subsection (a)(2)(B) (without regard to whether or not the area was required by section 7502(b)(11)(B) of this title (as in effect immediately before November 15, 1990) to have included a specific schedule for implementation of such a program).

**(5) General offset requirement**

For purposes of satisfying the emission offset requirements of this part, the ratio of total emission reductions of volatile organic compounds to total increase[3] emissions of such air pollutant shall be at least 1.15 to 1.

**(c) Serious Areas**

Except as otherwise specified in paragraph (4), each State in which all or part of a Serious Area is located shall, with respect to the Serious Area (or portion thereof, to the extent specified in this subsection), make the submissions described under subsection (b) (relating to Moderate Areas), and shall also submit the revisions to the applicable implementation plan (including the plan items) described under this subsection. For any Serious Area, the terms "major source" and "major stationary source" include (in addition to the sources described in section 7602 of this title) any stationary source or group of sources located within a contiguous area and under common control that emits, or has the potential to emit, at least 50 tons per year of volatile organic compounds.

**(1) Enhanced monitoring**

In order to obtain more comprehensive and representative data on ozone air pollution, not later than 18 months after November 15, 1990, the Administrator shall promulgate rules, after notice and public comment, for enhanced monitoring of ozone, oxides of nitrogen, and volatile organic compounds. The rules shall, among other things, cover the location and maintenance of monitors. Immediately following the promulgation of rules by the Administrator relating to enhanced monitoring, the State shall commence such actions as may be necessary to adopt and implement a program based on such rules, to improve monitoring for ambient concentrations of ozone, oxides of nitrogen and volatile organic compounds and to improve monitoring of emissions of oxides of nitrogen and volatile organic compounds. Each State implementation plan for the area shall contain measures to improve the ambient monitoring of such air pollutants.

**(2) Attainment and reasonable further progress demonstrations**

Within 4 years after November 15, 1990, the State shall submit a revision to the applicable implementation plan that includes each of the following:

**(A) Attainment demonstration**

A demonstration that the plan, as revised, will provide for attainment of the ozone na-

tional ambient air quality standard by the applicable attainment date. This attainment demonstration must be based on photochemical grid modeling or any other analytical method determined by the Administrator, in the Administrator's discretion, to be at least as effective.

**(B) Reasonable further progress demonstration**

A demonstration that the plan, as revised, will result in VOC emissions reductions from the baseline emissions described in subsection (b)(1)(B) equal to the following amount averaged over each consecutive 3-year period beginning 6 years after November 15, 1990, until the attainment date:

(i) at least 3 percent of baseline emissions each year; or

(ii) an amount less than 3 percent of such baseline emissions each year, if the State demonstrates to the satisfaction of the Administrator that the plan reflecting such lesser amount includes all measures that can feasibly be implemented in the area, in light of technological achievability.

To lessen the 3 percent requirement under clause (ii), a State must demonstrate to the satisfaction of the Administrator that the plan for the area includes the measures that are achieved in practice by sources in the same source category in nonattainment areas of the next higher classification. Any determination to lessen the 3 percent requirement shall be reviewed at each milestone under subsection (g) and revised to reflect such new measures (if any) achieved in practice by sources in the same category in any State, allowing a reasonable time to implement such measures. The emission reductions described in this subparagraph shall be calculated in accordance with subsection (b)(1)(C) and (D) (concerning creditability of reductions). The reductions creditable for the period beginning 6 years after November 15, 1990, shall include reductions that occurred before such period, computed in accordance with subsection (b)(1), that exceed the 15-percent amount of reductions required under subsection (b)(1)(A).

**(C) NO_x control**

The revision may contain, in lieu of the demonstration required under subparagraph (B), a demonstration to the satisfaction of the Administrator that the applicable implementation plan, as revised, provides for reductions of emissions of VOC's and oxides of nitrogen (calculated according to the creditability provisions of subsection (b)(1)(C) and (D)), that would result in a reduction in ozone concentrations at least equivalent to that which would result from the amount of VOC emission reductions required under subparagraph (B). Within 1 year after November 15, 1990, the Administrator shall issue guidance concerning the conditions under which NO_x control may be substituted for VOC control or may be combined with VOC control in order to maximize the reduction in ozone air pollution. In accord with such guidance,

---

[3] So in original. Probably should be "increased".

a lesser percentage of VOCs may be accepted as an adequate demonstration for purposes of this subsection.

**(3) Enhanced vehicle inspection and maintenance program**

**(A) Requirement for submission**

Within 2 years after November 15, 1990, the State shall submit a revision to the applicable implementation plan to provide for an enhanced program to reduce hydrocarbon emissions and $NO_x$ emissions from in-use motor vehicles registered in each urbanized area (in the nonattainment area), as defined by the Bureau of the Census, with a 1980 population of 200,000 or more.

**(B) Effective date of State programs; guidance**

The State program required under subparagraph (A) shall take effect no later than 2 years from November 15, 1990, and shall comply in all respects with guidance published in the Federal Register (and from time to time revised) by the Administrator for enhanced vehicle inspection and maintenance programs. Such guidance shall include—

(i) a performance standard achievable by a program combining emission testing, including on-road emission testing, with inspection to detect tampering with emission control devices and misfueling for all light-duty vehicles and all light-duty trucks subject to standards under section 7521 of this title; and

(ii) program administration features necessary to reasonably assure that adequate management resources, tools, and practices are in place to attain and maintain the performance standard.

Compliance with the performance standard under clause (i) shall be determined using a method to be established by the Administrator.

**(C) State program**

The State program required under subparagraph (A) shall include, at a minimum, each of the following elements—

(i) Computerized emission analyzers, including on-road testing devices.

(ii) No waivers for vehicles and parts covered by the emission control performance warranty as provided for in section 7541(b) of this title unless a warranty remedy has been denied in writing, or for tampering-related repairs.

(iii) In view of the air quality purpose of the program, if, for any vehicle, waivers are permitted for emissions-related repairs not covered by warranty, an expenditure to qualify for the waiver of an amount of $450 or more for such repairs (adjusted annually as determined by the Administrator on the basis of the Consumer Price Index in the same manner as provided in subchapter V).

(iv) Enforcement through denial of vehicle registration (except for any program in operation before November 15, 1990, whose enforcement mechanism is demonstrated to the Administrator to be more effective than the applicable vehicle registration program in assuring that noncomplying vehicles are not operated on public roads).

(v) Annual emission testing and necessary adjustment, repair, and maintenance, unless the State demonstrates to the satisfaction of the Administrator that a biennial inspection, in combination with other features of the program which exceed the requirements of this chapter, will result in emission reductions which equal or exceed the reductions which can be obtained through such annual inspections.

(vi) Operation of the program on a centralized basis, unless the State demonstrates to the satisfaction of the Administrator that a decentralized program will be equally effective. An electronically connected testing system, a licensing system, or other measures (or any combination thereof) may be considered, in accordance with criteria established by the Administrator, as equally effective for such purposes.

(vii) Inspection of emission control diagnostic systems and the maintenance or repair of malfunctions or system deterioration identified by or affecting such diagnostics systems.

Each State shall biennially prepare a report to the Administrator which assesses the emission reductions achieved by the program required under this paragraph based on data collected during inspection and repair of vehicles. The methods used to assess the emission reductions shall be those established by the Administrator.

**(4) Clean-fuel vehicle programs**

(A) Except to the extent that substitute provisions have been approved by the Administrator under subparagraph (B), the State shall submit to the Administrator, within 42 months of November 15, 1990, a revision to the applicable implementation plan for each area described under part C of subchapter II to include such measures as may be necessary to ensure the effectiveness of the applicable provisions of the clean-fuel vehicle program prescribed under part C of subchapter II, including all measures necessary to make the use of clean alternative fuels in clean-fuel vehicles (as defined in part C of subchapter II) economic from the standpoint of vehicle owners. Such a revision shall also be submitted for each area that opts into the clean fuel-vehicle program as provided in part C of subchapter II.

(B) The Administrator shall approve, as a substitute for all or a portion of the clean-fuel vehicle program prescribed under part C of subchapter II, any revision to the relevant applicable implementation plan that in the Administrator's judgment will achieve long-term reductions in ozone-producing and toxic air emissions equal to those achieved under part C of subchapter II, or the percentage thereof attributable to the portion of the clean-fuel vehicle program for which the revision is to substitute. The Administrator may approve such

revision only if it consists exclusively of provisions other than those required under this chapter for the area. Any State seeking approval of such revision must submit the revision to the Administrator within 24 months of November 15, 1990. The Administrator shall approve or disapprove any such revision within 30 months of November 15, 1990. The Administrator shall publish the revision submitted by a State in the Federal Register upon receipt. Such notice shall constitute a notice of proposed rulemaking on whether or not to approve such revision and shall be deemed to comply with the requirements concerning notices of proposed rulemaking contained in sections 553 through 557 of title 5 (related to notice and comment). Where the Administrator approves such revision for any area, the State need not submit the revision required by subparagraph (A) for the area with respect to the portions of the Federal clean-fuel vehicle program for which the Administrator has approved the revision as a substitute.

(C) If the Administrator determines, under section 7509 of this title, that the State has failed to submit any portion of the program required under subparagraph (A), then, in addition to any sanctions available under section 7509 of this title, the State may not receive credit, in any demonstration of attainment or reasonable further progress for the area, for any emission reductions from implementation of the corresponding aspects of the Federal clean-fuel vehicle requirements established in part C of subchapter II.

**(5) Transportation control**

(A)[4] Beginning 6 years after November 15, 1990, and each third year thereafter, the State shall submit a demonstration as to whether current aggregate vehicle mileage, aggregate vehicle emissions, congestion levels, and other relevant parameters are consistent with those used for the area's demonstration of attainment. Where such parameters and emissions levels exceed the levels projected for purposes of the area's attainment demonstration, the State shall within 18 months develop and submit a revision of the applicable implementation plan that includes a transportation control measures program consisting of measures from, but not limited to, section 7408(f) of this title that will reduce emissions to levels that are consistent with emission levels projected in such demonstration. In considering such measures, the State should ensure adequate access to downtown, other commercial, and residential areas and should avoid measures that increase or relocate emissions and congestion rather than reduce them. Such revision shall be developed in accordance with guidance issued by the Administrator pursuant to section 7408(e) of this title and with the requirements of section 7504(b) of this title and shall include implementation and funding schedules that achieve expeditious emissions reductions in accordance with implementation plan projections.

[4] So in original. No subpar. (B) has been enacted.

**(6) De minimis rule**

The new source review provisions under this part shall ensure that increased emissions of volatile organic compounds resulting from any physical change in, or change in the method of operation of, a stationary source located in the area shall not be considered de minimis for purposes of determining the applicability of the permit requirements established by this chapter unless the increase in net emissions of such air pollutant from such source does not exceed 25 tons when aggregated with all other net increases in emissions from the source over any period of 5 consecutive calendar years which includes the calendar year in which such increase occurred.

**(7) Special rule for modifications of sources emitting less than 100 tons**

In the case of any major stationary source of volatile organic compounds located in the area (other than a source which emits or has the potential to emit 100 tons or more of volatile organic compounds per year), whenever any change (as described in section 7411(a)(4) of this title) at that source results in any increase (other than a de minimis increase) in emissions of volatile organic compounds from any discrete operation, unit, or other pollutant emitting activity at the source, such increase shall be considered a modification for purposes of section 7502(c)(5) of this title and section 7503(a) of this title, except that such increase shall not be considered a modification for such purposes if the owner or operator of the source elects to offset the increase by a greater reduction in emissions of volatile organic compounds concerned from other operations, units, or activities within the source at an internal offset ratio of at least 1.3 to 1. If the owner or operator does not make such election, such change shall be considered a modification for such purposes, but in applying section 7503(a)(2) of this title in the case of any such modification, the best available control technology (BACT), as defined in section 7479 of this title, shall be substituted for the lowest achievable emission rate (LAER). The Administrator shall establish and publish policies and procedures for implementing the provisions of this paragraph.

**(8) Special rule for modifications of sources emitting 100 tons or more**

In the case of any major stationary source of volatile organic compounds located in the area which emits or has the potential to emit 100 tons or more of volatile organic compounds per year, whenever any change (as described in section 7411(a)(4) of this title) at that source results in any increase (other than a de minimis increase) in emissions of volatile organic compounds from any discrete operation, unit, or other pollutant emitting activity at the source, such increase shall be considered a modification for purposes of section 7502(c)(5) of this title and section 7503(a) of this title, except that if the owner or operator of the source elects to offset the increase by a greater reduction in emissions of volatile organic compounds from other operations, units, or

activities within the source at an internal offset ratio of at least 1.3 to 1, the requirements of section 7503(a)(2) of this title (concerning the lowest achievable emission rate (LAER)) shall not apply.

**(9) Contingency provisions**

In addition to the contingency provisions required under section 7502(c)(9) of this title, the plan revision shall provide for the implementation of specific measures to be undertaken if the area fails to meet any applicable milestone. Such measures shall be included in the plan revision as contingency measures to take effect without further action by the State or the Administrator upon a failure by the State to meet the applicable milestone.

**(10) General offset requirement**

For purposes of satisfying the emission offset requirements of this part, the ratio of total emission reductions of volatile organic compounds to total increase emissions of such air pollutant shall be at least 1.2 to 1.

Any reference to "attainment date" in subsection (b), which is incorporated by reference into this subsection, shall refer to the attainment date for serious areas.

**(d) Severe Areas**

Each State in which all or part of a Severe Area is located shall, with respect to the Severe Area, make the submissions described under subsection (c) (relating to Serious Areas), and shall also submit the revisions to the applicable implementation plan (including the plan items) described under this subsection. For any Severe Area, the terms "major source" and "major stationary source" include (in addition to the sources described in section 7602 of this title) any stationary source or group of sources located within a contiguous area and under common control that emits, or has the potential to emit, at least 25 tons per year of volatile organic compounds.

**(1) Vehicle miles traveled**

(A) Within 2 years after November 15, 1990, the State shall submit a revision that identifies and adopts specific enforceable transportation control strategies and transportation control measures to offset any growth in emissions from growth in vehicle miles traveled or numbers of vehicle trips in such area and to attain reduction in motor vehicle emissions as necessary, in combination with other emission reduction requirements of this subpart, to comply with the requirements of subsection [5] (b)(2)(B) and (c)(2)(B) (pertaining to periodic emissions reduction requirements). The State shall consider measures specified in section 7408(f) of this title, and choose from among and implement such measures as necessary to demonstrate attainment with the national ambient air quality standards; in considering such measures, the State should ensure adequate access to downtown, other commercial, and residential areas and should avoid measures that increase or relocate emissions and congestion rather than reduce them.

(B) The State may also, in its discretion, submit a revision at any time requiring employers in such area to implement programs to reduce work-related vehicle trips and miles travelled by employees. Such revision shall be developed in accordance with guidance issued by the Administrator pursuant to section 7408(f) of this title and may require that employers in such area increase average passenger occupancy per vehicle in commuting trips between home and the workplace during peak travel periods. The guidance of the Administrator may specify average vehicle occupancy rates which vary for locations within a nonattainment area (suburban, center city, business district) or among nonattainment areas reflecting existing occupancy rates and the availability of high occupancy modes. Any State required to submit a revision under this subparagraph (as in effect before December 23, 1995) containing provisions requiring employers to reduce work-related vehicle trips and miles travelled by employees may, in accordance with State law, remove such provisions from the implementation plan, or withdraw its submission, if the State notifies the Administrator, in writing, that the State has undertaken, or will undertake, one or more alternative methods that will achieve emission reductions equivalent to those to be achieved by the removed or withdrawn provisions.

**(2) Offset requirement**

For purposes of satisfying the offset requirements pursuant to this part, the ratio of total emission reductions of VOCs to total increased emissions of such air pollutant shall be at least 1.3 to 1, except that if the State plan requires all existing major sources in the nonattainment area to use best available control technology (as defined in section 7479(3) of this title) for the control of volatile organic compounds, the ratio shall be at least 1.2 to 1.

**(3) Enforcement under section 7511d**

By December 31, 2000, the State shall submit a plan revision which includes the provisions required under section 7511d of this title.

Any reference to the term "attainment date" in subsection (b) or (c), which is incorporated by reference into this subsection (d), shall refer to the attainment date for Severe Areas.

**(e) Extreme Areas**

Each State in which all or part of an Extreme Area is located shall, with respect to the Extreme Area, make the submissions described under subsection (d) (relating to Severe Areas), and shall also submit the revisions to the applicable implementation plan (including the plan items) described [6] under this subsection. The provisions of clause (ii) of subsection (c)(2)(B) (relating to reductions of less than 3 percent), the provisions of paragaphs [6] (6), (7) and (8) of subsection (c) (relating to de minimus [7] rule and modification of sources), and the provisions of clause (ii) of subsection (b)(1)(A) (relating to re-

---

[5] So in original. Probably should be "subsections".

[6] So in original. Probably should be "paragraphs".

[7] So in original. Probably should be "de minimis".

ductions of less than 15 percent) shall not apply in the case of an Extreme Area. For any Extreme Area, the terms "major source" and "major stationary source" includes[8] (in addition to the sources described in section 7602 of this title) any stationary source or group of sources located within a contiguous area and under common control that emits, or has the potential to emit, at least 10 tons per year of volatile organic compounds.

**(1) Offset requirement**

For purposes of satisfying the offset requirements pursuant to this part, the ratio of total emission reductions of VOCs to total increased emissions of such air pollutant shall be at least 1.5 to 1, except that if the State plan requires all existing major sources in the nonattainment area to use best available control technology (as defined in section 7479(3) of this title) for the control of volatile organic compounds, the ratio shall be at least 1.2 to 1.

**(2) Modifications**

Any change (as described in section 7411(a)(4) of this title) at a major stationary source which results in any increase in emissions from any discrete operation, unit, or other pollutant emitting activity at the source shall be considered a modification for purposes of section 7502(c)(5) of this title and section 7503(a) of this title, except that for purposes of complying with the offset requirement pursuant to section 7503(a)(1) of this title, any such increase shall not be considered a modification if the owner or operator of the source elects to offset the increase by a greater reduction in emissions of the air pollutant concerned from other discrete operations, units, or activities within the source at an internal offset ratio of at least 1.3 to 1. The offset requirements of this part shall not be applicable in Extreme Areas to a modification of an existing source if such modification consists of installation of equipment required to comply with the applicable implementation plan, permit, or this chapter.

**(3) Use of clean fuels or advanced control technology**

For Extreme Areas, a plan revision shall be submitted within 3 years after November 15, 1990, to require, effective 8 years after November 15, 1990, that each new, modified, and existing electric utility and industrial and commercial boiler which emits more than 25 tons per year of oxides of nitrogen—

(A) burn as its primary fuel natural gas, methanol, or ethanol (or a comparably low polluting fuel), or

(B) use advanced control technology (such as catalytic control technology or other comparably effective control methods) for reduction of emissions of oxides of nitrogen.

For purposes of this subsection, the term "primary fuel" means the fuel which is used 90 percent or more of the operating time. This paragraph shall not apply during any natural gas supply emergency (as defined in title III of the Natural Gas Policy Act of 1978 [15 U.S.C. 3361 et seq.]).

**(4) Traffic control measures during heavy traffic hours**

For Extreme Areas, each implementation plan revision under this subsection may contain provisions establishing traffic control measures applicable during heavy traffic hours to reduce the use of high polluting vehicles or heavy-duty vehicles, notwithstanding any other provision of law.

**(5) New technologies**

The Administrator may, in accordance with section 7410 of this title, approve provisions of an implementation plan for an Extreme Area which anticipate development of new control techniques or improvement of existing control technologies, and an attainment demonstration based on such provisions, if the State demonstrates to the satisfaction of the Administrator that—

(A) such provisions are not necessary to achieve the incremental emission reductions required during the first 10 years after November 15, 1990; and

(B) the State has submitted enforceable commitments to develop and adopt contingency measures to be implemented as set forth herein if the anticipated technologies do not achieve planned reductions.

Such contingency measures shall be submitted to the Administrator no later than 3 years before proposed implementation of the plan provisions and approved or disapproved by the Administrator in accordance with section 7410 of this title. The contingency measures shall be adequate to produce emission reductions sufficient, in conjunction with other approved plan provisions, to achieve the periodic plan reductions required by subsection (b)(1) or (c)(2) and attainment by the applicable dates. If the Administrator determines that an Extreme Area has failed to achieve an emission reduction requirement set forth in subsection (b)(1) or (c)(2), and that such failure is due in whole or part to an inability to fully implement provisions approved pursuant to this subsection, the Administrator shall require the State to implement the contingency measures to the extent necessary to assure compliance with subsections (b)(1) and (c)(2).

Any reference to the term "attainment date" in subsection (b), (c), or (d) which is incorporated by reference into this subsection, shall refer to the attainment date for Extreme Areas.

**(f) NO$_x$ requirements**

(1) The plan provisions required under this subpart for major stationary sources of volatile organic compounds shall also apply to major stationary sources (as defined in section 7602 of this title and subsections (c), (d), and (e) of this section) of oxides of nitrogen. This subsection shall not apply in the case of oxides of nitrogen for those sources for which the Administrator determines (when the Administrator approves a plan or plan revision) that net air quality benefits are greater in the absence of reductions of oxides of nitrogen from the sources concerned.

---

[8] So in original. Probably should be "include".

This subsection shall also not apply in the case of oxides of nitrogen for—

(A) nonattainment areas not within an ozone transport region under section 7511c of this title, if the Administrator determines (when the Administrator approves a plan or plan revision) that additional reductions of oxides of nitrogen would not contribute to attainment of the national ambient air quality standard for ozone in the area, or

(B) nonattainment areas within such an ozone transport region if the Administrator determines (when the Administrator approves a plan or plan revision) that additional reductions of oxides of nitrogen would not produce net ozone air quality benefits in such region.

The Administrator shall, in the Administrator's determinations, consider the study required under section 7511f of this title.

(2)(A) If the Administrator determines that excess reductions in emissions of $NO_x$ would be achieved under paragraph (1), the Administrator may limit the application of paragraph (1) to the extent necessary to avoid achieving such excess reductions.

(B) For purposes of this paragraph, excess reductions in emissions of $NO_x$ are emission reductions for which the Administrator determines that net air quality benefits are greater in the absence of such reductions. Alternatively, for purposes of this paragraph, excess reductions in emissions of $NO_x$ are, for—

(i) nonattainment areas not within an ozone transport region under section 7511c of this title, emission reductions that the Administrator determines would not contribute to attainment of the national ambient air quality standard for ozone in the area, or

(ii) nonattainment areas within such ozone transport region, emission reductions that the Administrator determines would not produce net ozone air quality benefits in such region.

(3) At any time after the final report under section 7511f of this title is submitted to Congress, a person may petition the Administrator for a determination under paragraph (1) or (2) with respect to any nonattainment area or any ozone transport region under section 7511c of this title. The Administrator shall grant or deny such petition within 6 months after its filing with the Administrator.

**(g) Milestones**

**(1) Reductions in emissions**

6 years after November 15, 1990, and at intervals of every 3 years thereafter, the State shall determine whether each nonattainment area (other than an area classified as Marginal or Moderate) has achieved a reduction in emissions during the preceding intervals equivalent to the total emission reductions required to be achieved by the end of such interval pursuant to subsection (b)(1) and the corresponding requirements of subsections (c)(2)(B) and (C), (d), and (e). Such reduction shall be referred to in this section as an applicable milestone.

**(2) Compliance demonstration**

For each nonattainment area referred to in paragraph (1), not later than 90 days after the date on which an applicable milestone occurs (not including an attainment date on which a milestone occurs in cases where the standard has been attained), each State in which all or part of such area is located shall submit to the Administrator a demonstration that the milestone has been met. A demonstration under this paragraph shall be submitted in such form and manner, and shall contain such information and analysis, as the Administrator shall require, by rule. The Administrator shall determine whether or not a State's demonstration is adequate within 90 days after the Administrator's receipt of a demonstration which contains the information and analysis required by the Administrator.

**(3) Serious and Severe Areas; State election**

If a State fails to submit a demonstration under paragraph (2) for any Serious or Severe Area within the required period or if the Administrator determines that the area has not met any applicable milestone, the State shall elect, within 90 days after such failure or determination—

(A) to have the area reclassified to the next higher classification,

(B) to implement specific additional measures adequate, as determined by the Administrator, to meet the next milestone as provided in the applicable contingency plan, or

(C) to adopt an economic incentive program as described in paragraph (4).

If the State makes an election under subparagraph (B), the Administrator shall, within 90 days after the election, review such plan and shall, if the Administrator finds the contingency plan inadequate, require further measures necessary to meet such milestone. Once the State makes an election, it shall be deemed accepted by the Administrator as meeting the election requirement. If the State fails to make an election required under this paragraph within the required 90-day period or within 6 months thereafter, the area shall be reclassified to the next higher classification by operation of law at the expiration of such 6-month period. Within 12 months after the date required for the State to make an election, the State shall submit a revision of the applicable implementation plan for the area that meets the requirements of this paragraph. The Administrator shall review such plan revision and approve or disapprove the revision within 9 months after the date of its submission.

**(4) Economic incentive program**

(A) An economic incentive program under this paragraph shall be consistent with rules published by the Administrator and sufficient, in combination with other elements of the State plan, to achieve the next milestone. The State program may include a nondiscriminatory system, consistent with applicable law regarding interstate commerce, of State established emissions fees or a system of marketable permits, or a system of State fees on sale or manufacture of products the use of which contributes to ozone formation, or any combination of the foregoing or other similar meas-

ures. The program may also include incentives and requirements to reduce vehicle emissions and vehicle miles traveled in the area, including any of the transportation control measures identified in section 7408(f) of this title.

(B) Within 2 years after November 15, 1990, the Administrator shall publish rules for the programs to be adopted pursuant to subparagraph (A). Such rules shall include model plan provisions which may be adopted for reducing emissions from permitted stationary sources, area sources, and mobile sources. The guidelines shall require that any revenues generated by the plan provisions adopted pursuant to subparagraph (A) shall be used by the State for any of the following:

(i) Providing incentives for achieving emission reductions.

(ii) Providing assistance for the development of innovative technologies for the control of ozone air pollution and for the development of lower-polluting solvents and surface coatings. Such assistance shall not provide for the payment of more than 75 percent of either the costs of any project to develop such a technology or the costs of development of a lower-polluting solvent or surface coating.

(iii) Funding the administrative costs of State programs under this chapter. Not more than 50 percent of such revenues may be used for purposes of this clause.

**(5) Extreme Areas**

If a State fails to submit a demonstration under paragraph (2) for any Extreme Area within the required period, or if the Administrator determines that the area has not met any applicable milestone, the State shall, within 9 months after such failure or determination, submit a plan revision to implement an economic incentive program which meets the requirements of paragraph (4). The Administrator shall review such plan revision and approve or disapprove the revision within 9 months after the date of its submission.

**(h) Rural transport areas**

(1) Notwithstanding any other provision of section 7511 of this title or this section, a State containing an ozone nonattainment area that does not include, and is not adjacent to, any part of a Metropolitan Statistical Area or, where one exists, a Consolidated Metropolitan Statistical Area (as defined by the United States Bureau of the Census), which area is treated by the Administrator, in the Administrator's discretion, as a rural transport area within the meaning of paragraph (2), shall be treated by operation of law as satisfying the requirements of this section if it makes the submissions required under subsection (a) of this section (relating to marginal areas).

(2) The Administrator may treat an ozone nonattainment area as a rural transport area if the Administrator finds that sources of VOC (and, where the Administrator determines relevant, $NO_x$) emissions within the area do not make a significant contribution to the ozone concentrations measured in the area or in other areas.

**(i) Reclassified areas**

Each State containing an ozone nonattainment area reclassified under section 7511(b)(2) of this title shall meet such requirements of subsections (b) through (d) of this section as may be applicable to the area as reclassified, according to the schedules prescribed in connection with such requirements, except that the Administrator may adjust any applicable deadlines (other than attainment dates) to the extent such adjustment is necessary or appropriate to assure consistency among the required submissions.

**(j) Multi-State ozone nonattainment areas**

**(1) Coordination among States**

Each State in which there is located a portion of a single ozone nonattainment area which covers more than one State (hereinafter in this section referred to as a "multi-State ozone nonattainment area") shall—

(A) take all reasonable steps to coordinate, substantively and procedurally, the revisions and implementation of State implementation plans applicable to the nonattainment area concerned; and

(B) use photochemical grid modeling or any other analytical method determined by the Administrator, in his discretion, to be at least as effective.

The Administrator may not approve any revision of a State implementation plan submitted under this part for a State in which part of a multi-State ozone nonattainment area is located if the plan revision for that State fails to comply with the requirements of this subsection.

**(2) Failure to demonstrate attainment**

If any State in which there is located a portion of a multi-State ozone nonattainment area fails to provide a demonstration of attainment of the national ambient air quality standard for ozone in that portion within the required period, the State may petition the Administrator to make a finding that the State would have been able to make such demonstration but for the failure of one or more other States in which other portions of the area are located to commit to the implementation of all measures required under this section (relating to plan submissions and requirements for ozone nonattainment areas). If the Administrator makes such finding, the provisions of section 7509 of this title (relating to sanctions) shall not apply, by reason of the failure to make such demonstration, in the portion of the multi-State ozone nonattainment area within the State submitting such petition.

(July 14, 1955, ch. 360, title I, § 182, as added Pub. L. 101–549, title I, § 103, Nov. 15, 1990, 104 Stat. 2426; amended Pub. L. 104–70, § 1, Dec. 23, 1995, 109 Stat. 773.)

REFERENCES IN TEXT

The Natural Gas Policy Act of 1978, referred to in subsec. (e)(3), is Pub. L. 95–621, Nov. 9, 1978, 92 Stat. 3350, as amended. Title III of the Act is classified generally to subchapter III (§ 3361 et seq.) of chapter 60 of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 3301 of Title 15 and Tables.

AMENDMENTS

1995—Subsec. (d)(1)(B). Pub. L. 104–70 amended subpar. (B) generally. Prior to amendment, subpar. (B) read as

follows: "Within 2 years after November 15, 1990, the State shall submit a revision requiring employers in such area to implement programs to reduce work-related vehicle trips and miles traveled by employees. Such revision shall be developed in accordance with guidance issued by the Administrator pursuant to section 7408(f) of this title and shall, at a minimum, require that each employer of 100 or more persons in such area increase average passenger occupancy per vehicle in commuting trips between home and the workplace during peak travel periods by not less than 25 percent above the average vehicle occupancy for all such trips in the area at the time the revision is submitted. The guidance of the Administrator may specify average vehicle occupancy rates which vary for locations within a nonattainment area (suburban, center city, business district) or among nonattainment areas reflecting existing occupancy rates and the availability of high occupancy modes. The revision shall provide that each employer subject to a vehicle occupancy requirement shall submit a compliance plan within 2 years after the date the revision is submitted which shall convincingly demonstrate compliance with the requirements of this paragraph not later than 4 years after such date."

MORATORIUM ON CERTAIN EMISSIONS TESTING REQUIREMENTS

Pub. L. 104–59, title III, §348, Nov. 28, 1995, 109 Stat. 617, provided that:

"(a) IN GENERAL.—The Administrator of the Environmental Protection Agency (hereinafter in this section referred to as the 'Administrator') shall not require adoption or implementation by a State of a test-only I/M240 enhanced vehicle inspection and maintenance program as a means of compliance with section 182 or 187 of the Clean Air Act (42 U.S.C. 7511a; 7512a), but the Administrator may approve such a program if a State chooses to adopt the program as a means of compliance with such section.

"(b) LIMITATION ON PLAN DISAPPROVAL.—The Administrator shall not disapprove or apply an automatic discount to a State implementation plan revision under section 182 or 187 of the Clean Air Act (42 U.S.C. 7511a; 7512a) on the basis of a policy, regulation, or guidance providing for a discount of emissions credits because the inspection and maintenance program in such plan revision is decentralized or a test-and-repair program.

"(c) EMISSIONS REDUCTION CREDITS.—

"(1) STATE PLAN REVISION; APPROVAL.—Within 120 days of the date of the enactment of this subsection [Nov. 28, 1995], a State may submit an implementation plan revision proposing an interim inspection and maintenance program under section 182 or 187 of the Clean Air Act (42 U.S.C. 7511a; 7512a). The Administrator shall approve the program based on the full amount of credits proposed by the State for each element of the program if the proposed credits reflect good faith estimates by the State and the revision is otherwise in compliance with such Act. If, within such 120-day period, the State submits to the Administrator proposed revisions to the implementation plan, has all of the statutory authority necessary to implement the revisions, and has proposed a regulation to make the revisions, the Administrator may approve the revisions without regard to whether or not such regulation has been issued as a final regulation by the State.

"(2) EXPIRATION OF INTERIM APPROVAL.—The interim approval shall expire on the earlier of (A) the last day of the 18-month period beginning on the date of the interim approval, or (B) the date of final approval. The interim approval may not be extended.

"(3) FINAL APPROVAL.—The Administrator shall grant final approval of the revision based on the credits proposed by the State during or after the period of interim approval if data collected on the operation of the State program demonstrates that the credits are appropriate and the revision is in compliance with the Clean Air Act [42 U.S.C. 7401 et seq.].

"(4) BASIS OF APPROVAL; NO AUTOMATIC DISCOUNT.—Any determination with respect to interim or full approval shall be based on the elements of the program and shall not apply any automatic discount because the program is decentralized or a test-and-repair program."

## § 7511b. Federal ozone measures

### (a) Control techniques guidelines for VOC sources

Within 3 years after November 15, 1990, the Administrator shall issue control techniques guidelines, in accordance with section 7408 of this title, for 11 categories of stationary sources of VOC emissions for which such guidelines have not been issued as of November 15, 1990, not including the categories referred to in paragraphs (3) and (4) of subsection (b) of this section. The Administrator may issue such additional control techniques guidelines as the Administrator deems necessary.

### (b) Existing and new CTGS

(1) Within 36 months after November 15, 1990, and periodically thereafter, the Administrator shall review and, if necessary, update control technique guidance issued under section 7408 of this title before November 15, 1990.

(2) In issuing the guidelines the Administrator shall give priority to those categories which the Administrator considers to make the most significant contribution to the formation of ozone air pollution in ozone nonattainment areas, including hazardous waste treatment, storage, and disposal facilities which are permitted under subtitle C of the Solid Waste Disposal Act [42 U.S.C. 6921 et seq.]. Thereafter the Administrator shall periodically review and, if necessary, revise such guidelines.

(3) Within 3 years after November 15, 1990, the Administrator shall issue control techniques guidelines in accordance with section 7408 of this title to reduce the aggregate emissions of volatile organic compounds into the ambient air from aerospace coatings and solvents. Such control techniques guidelines shall, at a minimum, be adequate to reduce aggregate emissions of volatile organic compounds into the ambient air from the application of such coatings and solvents to such level as the Administrator determines may be achieved through the adoption of best available control measures. Such control technology guidance shall provide for such reductions in such increments and on such schedules as the Administrator determines to be reasonable, but in no event later than 10 years after the final issuance of such control technology guidance. In developing control technology guidance under this subsection, the Administrator shall consult with the Secretary of Defense, the Secretary of Transportation, and the Administrator of the National Aeronautics and Space Administration with regard to the establishment of specifications for such coatings. In evaluating VOC reduction strategies, the guidance shall take into account the applicable requirements of section 7412 of this title and the need to protect stratospheric ozone.

(4) Within 3 years after November 15, 1990, the Administrator shall issue control techniques guidelines in accordance with section 7408 of this title to reduce the aggregate emissions of volatile organic compounds and PM–10 into the

follows: "Within 2 years after November 15, 1990, the State shall submit a revision requiring employers in such area to implement programs to reduce work-related vehicle trips and miles traveled by employees. Such revision shall be developed in accordance with guidance issued by the Administrator pursuant to section 7408(f) of this title and shall, at a minimum, require that each employer of 100 or more persons in such area increase average passenger occupancy per vehicle in commuting trips between home and the workplace during peak travel periods by not less than 25 percent above the average vehicle occupancy for all such trips in the area at the time the revision is submitted. The guidance of the Administrator may specify average vehicle occupancy rates which vary for locations within a nonattainment area (suburban, center city, business district) or among nonattainment areas reflecting existing occupancy rates and the availability of high occupancy modes. The revision shall provide that each employer subject to a vehicle occupancy requirement shall submit a compliance plan within 2 years after the date the revision is submitted which shall convincingly demonstrate compliance with the requirements of this paragraph not later than 4 years after such date."

MORATORIUM ON CERTAIN EMISSIONS TESTING REQUIREMENTS

Pub. L. 104–59, title III, §348, Nov. 28, 1995, 109 Stat. 617, provided that:

"(a) IN GENERAL.—The Administrator of the Environmental Protection Agency (hereinafter in this section referred to as the 'Administrator') shall not require adoption or implementation by a State of a test-only I/M240 enhanced vehicle inspection and maintenance program as a means of compliance with section 182 or 187 of the Clean Air Act (42 U.S.C. 7511a; 7512a), but the Administrator may approve such a program if a State chooses to adopt the program as a means of compliance with such section.

"(b) LIMITATION ON PLAN DISAPPROVAL.—The Administrator shall not disapprove or apply an automatic discount to a State implementation plan revision under section 182 or 187 of the Clean Air Act (42 U.S.C. 7511a; 7512a) on the basis of a policy, regulation, or guidance providing for a discount of emissions credits because the inspection and maintenance program in such plan revision is decentralized or a test-and-repair program.

"(c) EMISSIONS REDUCTION CREDITS.—

"(1) STATE PLAN REVISION; APPROVAL.—Within 120 days of the date of the enactment of this subsection [Nov. 28, 1995], a State may submit an implementation plan revision proposing an interim inspection and maintenance program under section 182 or 187 of the Clean Air Act (42 U.S.C. 7511a; 7512a). The Administrator shall approve the program based on the full amount of credits proposed by the State for each element of the program if the proposed credits reflect good faith estimates by the State and the revision is otherwise in compliance with such Act. If, within such 120-day period, the State submits to the Administrator proposed revisions to the implementation plan. has all of the statutory authority necessary to implement the revisions, and has proposed a regulation to make the revisions, the Administrator may approve the revisions without regard to whether or not such regulation has been issued as a final regulation by the State.

"(2) EXPIRATION OF INTERIM APPROVAL.—The interim approval shall expire on the earlier of (A) the last day of the 18-month period beginning on the date of the interim approval, or (B) the date of final approval. The interim approval may not be extended.

"(3) FINAL APPROVAL.—The Administrator shall grant final approval of the revision based on the credits proposed by the State during or after the period of interim approval if data collected on the operation of the State program demonstrates that the credits are appropriate and the revision is otherwise in compliance with the Clean Air Act [42 U.S.C. 7401 et seq.].

"(4) BASIS OF APPROVAL; NO AUTOMATIC DISCOUNT.— Any determination with respect to interim or full approval shall be based on the elements of the program and shall not apply any automatic discount because the program is decentralized or a test-and-repair program."

## § 7511b. Federal ozone measures

### (a) Control techniques guidelines for VOC sources

Within 3 years after November 15, 1990, the Administrator shall issue control techniques guidelines, in accordance with section 7408 of this title, for 11 categories of stationary sources of VOC emissions for which such guidelines have not been issued as of November 15, 1990, not including the categories referred to in paragraphs (3) and (4) of subsection (b) of this section. The Administrator may issue such additional control techniques guidelines as the Administrator deems necessary.

### (b) Existing and new CTGS

(1) Within 36 months after November 15, 1990, and periodically thereafter, the Administrator shall review and, if necessary, update control technique guidance issued under section 7408 of this title before November 15, 1990.

(2) In issuing the guidelines the Administrator shall give priority to those categories which the Administrator considers to make the most significant contribution to the formation of ozone air pollution in ozone nonattainment areas, including hazardous waste treatment, storage, and disposal facilities which are permitted under subtitle C of the Solid Waste Disposal Act [42 U.S.C. 6921 et seq.]. Thereafter the Administrator shall periodically review and, if necessary, revise such guidelines.

(3) Within 3 years after November 15, 1990, the Administrator shall issue control techniques guidelines in accordance with section 7408 of this title to reduce the aggregate emissions of volatile organic compounds into the ambient air from aerospace coatings and solvents. Such control techniques guidelines shall, at a minimum, be adequate to reduce aggregate emissions of volatile organic compounds into the ambient air from the application of such coatings and solvents to such level as the Administrator determines may be achieved through the adoption of best available control measures. Such control technology guidance shall provide for such reductions in such increments and on such schedules as the Administrator determines to be reasonable, but in no event later than 10 years after the final issuance of such control technology guidance. In developing control technology guidance under this subsection, the Administrator shall consult with the Secretary of Defense, the Secretary of Transportation, and the Administrator of the National Aeronautics and Space Administration with regard to the establishment of specifications for such coatings. In evaluating VOC reduction strategies, the guidance shall take into account the applicable requirements of section 7412 of this title and the need to protect stratospheric ozone.

(4) Within 3 years after November 15, 1990, the Administrator shall issue control techniques guidelines in accordance with section 7408 of this title to reduce the aggregate emissions of volatile organic compounds and PM–10 into the

ambient air from paints, coatings, and solvents used in shipbuilding operations and ship repair. Such control techniques guidelines shall, at a minimum, be adequate to reduce aggregate emissions of volatile organic compounds and PM-10 into the ambient air from the removal or application of such paints, coatings, and solvents to such level as the Administrator determines may be achieved through the adoption of the best available control measures. Such control techniques guidelines shall provide for such reductions in such increments and on such schedules as the Administrator determines to be reasonable, but in no event later than 10 years after the final issuance of such control technology guidance. In developing control techniques guidelines under this subsection, the Administrator shall consult with the appropriate Federal agencies.

### (c) Alternative control techniques

Within 3 years after November 15, 1990, the Administrator shall issue technical documents which identify alternative controls for all categories of stationary sources of volatile organic compounds and oxides of nitrogen which emit, or have the potential to emit 25 tons per year or more of such air pollutant. The Administrator shall revise and update such documents as the Administrator determines necessary.

### (d) Guidance for evaluating cost-effectiveness

Within 1 year after November 15, 1990, the Administrator shall provide guidance to the States to be used in evaluating the relative cost-effectiveness of various options for the control of emissions from existing stationary sources of air pollutants which contribute to nonattainment of the national ambient air quality standards for ozone.

### (e) Control of emissions from certain sources

#### (1) Definitions

For purposes of this subsection—

##### (A) Best available controls

The term "best available controls" means the degree of emissions reduction that the Administrator determines, on the basis of technological and economic feasibility, health, environmental, and energy impacts, is achievable through the application of the most effective equipment, measures, processes, methods, systems or techniques, including chemical reformulation, product or feedstock substitution, repackaging, and directions for use, consumption, storage, or disposal.

##### (B) Consumer or commercial product

The term "consumer or commercial product" means any substance, product (including paints, coatings, and solvents), or article (including any container or packaging) held by any person, the use, consumption, storage, disposal, destruction, or decomposition of which may result in the release of volatile organic compounds. The term does not include fuels or fuel additives regulated under section 7545 of this title, or motor vehicles, non-road vehicles, and non-road engines as defined under section 7550 of this title.

##### (C) Regulated entities

The term "regulated entities" means—

(i) manufacturers, processors, wholesale distributors, or importers of consumer or commercial products for sale or distribution in interstate commerce in the United States; or

(ii) manufacturers, processors, wholesale distributors, or importers that supply the entities listed under clause (i) with such products for sale or distribution in interstate commerce in the United States.

#### (2) Study and report

##### (A) Study

The Administrator shall conduct a study of the emissions of volatile organic compounds into the ambient air from consumer and commercial products (or any combination thereof) in order to—

(i) determine their potential to contribute to ozone levels which violate the national ambient air quality standard for ozone; and

(ii) establish criteria for regulating consumer and commercial products or classes or categories thereof which shall be subject to control under this subsection.

The study shall be completed and a report submitted to Congress not later than 3 years after November 15, 1990.

##### (B) Consideration of certain factors

In establishing the criteria under subparagraph (A)(ii), the Administrator shall take into consideration each of the following:

(i) The uses, benefits, and commercial demand of consumer and commercial products.

(ii) The health or safety functions (if any) served by such consumer and commercial products.

(iii) Those consumer and commercial products which emit highly reactive volatile organic compounds into the ambient air.

(iv) Those consumer and commercial products which are subject to the most cost-effective controls.

(v) The availability of alternatives (if any) to such consumer and commercial products which are of comparable costs, considering health, safety, and environmental impacts.

#### (3) Regulations to require emission reductions

##### (A) In general

Upon submission of the final report under paragraph (2), the Administrator shall list those categories of consumer or commercial products that the Administrator determines, based on the study, account for at least 80 percent of the VOC emissions, on a reactivity-adjusted basis, from consumer or commercial products in areas that violate the NAAQS for ozone. Credit toward the 80 percent emissions calculation shall be given for emission reductions from consumer or commercial products made after November 15, 1990. At such time, the Administrator shall divide the list into 4 groups establishing pri-

orities for regulation based on the criteria established in paragraph (2). Every 2 years after promulgating such list, the Administrator shall regulate one group of categories until all 4 groups are regulated. The regulations shall require best available controls as defined in this section. Such regulations may exempt health use products for which the Administrator determines there is no suitable substitute. In order to carry out this section, the Administrator may, by regulation, control or prohibit any activity, including the manufacture or introduction into commerce, offering for sale, or sale of any consumer or commercial product which results in emission of volatile organic compounds into the ambient air.

**(B) Regulated entities**

Regulations under this subsection may be imposed only with respect to regulated entities.

**(C) Use of CTGS**

For any consumer or commercial product the Administrator may issue control techniques guidelines under this chapter in lieu of regulations required under subparagraph (A) if the Administrator determines that such guidance will be substantially as effective as regulations in reducing emissions of volatile organic compounds which contribute to ozone levels in areas which violate the national ambient air quality standard for ozone.

**(4) Systems of regulation**

The regulations under this subsection may include any system or systems of regulation as the Administrator may deem appropriate, including requirements for registration and labeling, self-monitoring and reporting, prohibitions, limitations, or economic incentives (including marketable permits and auctions of emissions rights) concerning the manufacture, processing, distribution, use, consumption, or disposal of the product.

**(5) Special fund**

Any amounts collected by the Administrator under such regulations shall be deposited in a special fund in the United States Treasury for licensing and other services, which thereafter shall be available until expended, subject to annual appropriation Acts, solely to carry out the activities of the Administrator for which such fees, charges, or collections are established or made.

**(6) Enforcement**

Any regulation established under this subsection shall be treated, for purposes of enforcement of this chapter, as a standard under section 7411 of this title and any violation of such regulation shall be treated as a violation of a requirement of section 7411(e) of this title.

**(7) State administration**

Each State may develop and submit to the Administrator a procedure under State law for implementing and enforcing regulations promulgated under this subsection. If the Administrator finds the State procedure is adequate,

the Administrator shall approve such procedure. Nothing in this paragraph shall prohibit the Administrator from enforcing any applicable regulations under this subsection.

**(8) Size, etc.**

No regulations regarding the size, shape, or labeling of a product may be promulgated, unless the Administrator determines such regulations to be useful in meeting any national ambient air quality standard.

**(9) State consultation**

Any State which proposes regulations other than those adopted under this subsection shall consult with the Administrator regarding whether any other State or local subdivision has promulgated or is promulgating regulations on any products covered under this part. The Administrator shall establish a clearinghouse of information, studies, and regulations proposed and promulgated regarding products covered under this subsection and disseminate such information collected as requested by State or local subdivisions.

**(f) Tank vessel standards**

**(1) Schedule for standards**

(A) Within 2 years after November 15, 1990, the Administrator, in consultation with the Secretary of the Department in which the Coast Guard is operating, shall promulgate standards applicable to the emission of VOCs and any other air pollutant from loading and unloading of tank vessels (as that term is defined in section 2101 of title 46) which the Administrator finds causes, or contributes to, air pollution that may be reasonably anticipated to endanger public health or welfare. Such standards shall require the application of reasonably available control technology, considering costs, any nonair-quality benefits, environmental impacts, energy requirements and safety factors associated with alternative control techniques. To the extent practicable such standards shall apply to loading and unloading facilities and not to tank vessels.

(B) Any regulation prescribed under this subsection (and any revision thereof) shall take effect after such period as the Administrator finds (after consultation with the Secretary of the department [1] in which the Coast Guard is operating) necessary to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period, except that the effective date shall not be more than 2 years after promulgation of such regulations.

**(2) Regulations on equipment safety**

Within 6 months after November 15, 1990, the Secretary of the Department in which the Coast Guard is operating shall issue regulations to ensure the safety of the equipment and operations which are to control emissions from the loading and unloading of tank vessels, under section 3703 of title 46 and section 1225 [2] of title 33. The standards promulgated by

---

[1] So in original. Probably should be capitalized.

[2] See References in Text note below.

the Administrator under paragraph (1) and the regulations issued by a State or political subdivision regarding emissions from the loading and unloading of tank vessels shall be consistent with the regulations regarding safety of the Department in which the Coast Guard is operating.

**(3) Agency authority**

(A) The Administrator shall ensure compliance with the tank vessel emission standards prescribed under paragraph (1)(A). The Secretary of the Department in which the Coast Guard is operating shall also ensure compliance with the tank vessel standards prescribed under paragraph (1)(A).

(B) The Secretary of the Department in which the Coast Guard is operating shall ensure compliance with the regulations issued under paragraph (2).

**(4) State or local standards**

After the Administrator promulgates standards under this section, no State or political subdivision thereof may adopt or attempt to enforce any standard respecting emissions from tank vessels subject to regulation under paragraph (1) unless such standard is no less stringent than the standards promulgated under paragraph (1).

**(5) Enforcement**

Any standard established under paragraph (1)(A) shall be treated, for purposes of enforcement of this chapter, as a standard under section 7411 of this title and any violation of such standard shall be treated as a violation of a requirement of section 7411(e) of this title.

**(g) Ozone design value study**

The Administrator shall conduct a study of whether the methodology in use by the Environmental Protection Agency as of November 15, 1990, for establishing a design value for ozone provides a reasonable indicator of the ozone air quality of ozone nonattainment areas. The Administrator shall obtain input from States, local subdivisions thereof, and others. The study shall be completed and a report submitted to Congress not later than 3 years after November 15, 1990. The results of the study shall be subject to peer and public review before submitting it to Congress.

**(h) Vehicles entering ozone nonattainment areas**

**(1) Authority regarding ozone inspection and maintenance testing**

**(A) In general**

No noncommercial motor vehicle registered in a foreign country and operated by a United States citizen or by an alien who is a permanent resident of the United States, or who holds a visa for the purposes of employment or educational study in the United States, may enter a covered ozone nonattainment area from a foreign country bordering the United States and contiguous to the nonattainment area more than twice in a single calendar-month period, if State law has requirements for the inspection and maintenance of such vehicles under the applicable implementation plan in the nonattainment area.

**(B) Applicability**

Subparagraph (A) shall not apply if the operator presents documentation at the United States border entry point establishing that the vehicle has complied with such inspection and maintenance requirements as are in effect and are applicable to motor vehicles of the same type and model year.

**(2) Sanctions for violations**

The President may impose and collect from the operator of any motor vehicle who violates, or attempts to violate, paragraph (1) a civil penalty of not more than $200 for the second violation or attempted violation and $400 for the third and each subsequent violation or attempted violation.

**(3) State election**

The prohibition set forth in paragraph (1) shall not apply in any State that elects to be exempt from the prohibition. Such an election shall take effect upon the President's receipt of written notice from the Governor of the State notifying the President of such election.

**(4) Alternative approach**

The prohibition set forth in paragraph (1) shall not apply in a State, and the President may implement an alternative approach, if—

(A) the Governor of the State submits to the President a written description of an alternative approach to facilitate the compliance, by some or all foreign-registered motor vehicles, with the motor vehicle inspection and maintenance requirements that are—

(i) related to emissions of air pollutants;

(ii) in effect under the applicable implementation plan in the covered ozone nonattainment area; and

(iii) applicable to motor vehicles of the same types and model years as the foreign-registered motor vehicles; and

(B) the President approves the alternative approach as facilitating compliance with the motor vehicle inspection and maintenance requirements referred to in subparagraph (A).

**(5) Definition of covered ozone nonattainment area**

In this section, the term "covered ozone nonattainment area" means a Serious Area, as classified under section 7511 of this title as of October 27, 1998.

(July 14, 1955, ch. 360, title I, §183, as added Pub. L. 101–549, title I, §103, Nov. 15, 1990, 104 Stat. 2443; amended Pub. L. 105–286, §2, Oct. 27, 1998, 112 Stat. 2773.)

REFERENCES IN TEXT

The Solid Waste Disposal Act, referred to in subsec. (b)(2), is title II of Pub. L. 89–272, Oct. 20, 1965, 79 Stat. 997, as amended generally by Pub. L. 94–580, §2, Oct. 21, 1976, 90 Stat. 2795. Subtitle C of the Act is classified generally to subchapter III (§6921 et seq.) of chapter 82 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 6901 of this title and Tables.

Section 1225 of title 33, referred to in subsec. (f)(2), was repealed by Pub. L. 115–282, title IV, §402(e), Dec. 4,

2018, 132 Stat. 4264. See Transitional and Savings Provisions note preceding section 101 of Title 46, Shipping, and section 70011 of Title 46.

### AMENDMENTS

1998—Subsec. (h). Pub. L. 105–286 added subsec. (h).

#### EFFECTIVE DATE OF 1998 AMENDMENT; PUBLICATION OF PROHIBITION

Pub. L. 105–286, §3, Oct. 27, 1998, 112 Stat. 2774, provided that:

"(a) IN GENERAL.—The amendment made by section 2 [amending this section] takes effect 180 days after the date of the enactment of this Act [Oct. 27, 1998]. Nothing in that amendment shall require action that is inconsistent with the obligations of the United States under any international agreement.

"(b) INFORMATION.—As soon as practicable after the date of the enactment of this Act, the appropriate agency of the United States shall distribute information to publicize the prohibition set forth in the amendment made by section 2."

#### TRANSFER OF FUNCTIONS

For transfer of authorities, functions, personnel, and assets of the Coast Guard, including the authorities and functions of the Secretary of Transportation relating thereto, to the Department of Homeland Security, and for treatment of related references, see sections 468(b), 551(d), 552(d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under section 542 of Title 6.

## § 7511c. Control of interstate ozone air pollution

### (a) Ozone transport regions

A single transport region for ozone (within the meaning of section 7506a(a) of this title), comprised of the States of Connecticut, Delaware, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Vermont, and the Consolidated Metropolitan Statistical Area that includes the District of Columbia, is hereby established by operation of law. The provisions of section 7506a(a)(1) and (2) of this title shall apply with respect to the transport region established under this section and any other transport region established for ozone, except to the extent inconsistent with the provisions of this section. The Administrator shall convene the commission required (under section 7506a(b) of this title) as a result of the establishment of such region within 6 months of November 15, 1990.

### (b) Plan provisions for States in ozone transport regions

(1) In accordance with section 7410 of this title, not later than 2 years after November 15, 1990 (or 9 months after the subsequent inclusion of a State in a transport region established for ozone), each State included within a transport region established for ozone shall submit a State implementation plan or revision thereof to the Administrator which requires the following—

(A) that each area in such State that is in an ozone transport region, and that is a metropolitan statistical area or part thereof with a population of 100,000 or more comply with the provisions of section 7511a(c)(2)(A) of this title (pertaining to enhanced vehicle inspection and maintenance programs); and

(B) implementation of reasonably available control technology with respect to all sources of volatile organic compounds in the State covered by a control techniques guideline issued before or after November 15, 1990.

(2) Within 3 years after November 15, 1990, the Administrator shall complete a study identifying control measures capable of achieving emission reductions comparable to those achievable through vehicle refueling controls contained in section 7511a(b)(3) of this title, and such measures or such vehicle refueling controls shall be implemented in accordance with the provisions of this section. Notwithstanding other deadlines in this section, the applicable implementation plan shall be revised to reflect such measures within 1 year of completion of the study. For purposes of this section any stationary source that emits or has the potential to emit at least 50 tons per year of volatile organic compounds shall be considered a major stationary source and subject to the requirements which would be applicable to major stationary sources if the area were classified as a Moderate nonattainment area.

### (c) Additional control measures

#### (1) Recommendations

Upon petition of any State within a transport region established for ozone, and based on a majority vote of the Governors on the Commission [1] (or their designees), the Commission [1] may, after notice and opportunity for public comment, develop recommendations for additional control measures to be applied within all or a part of such transport region if the commission determines such measures are necessary to bring any area in such region into attainment by the dates provided by this subpart. The commission shall transmit such recommendations to the Administrator.

#### (2) Notice and review

Whenever the Administrator receives recommendations prepared by a commission pursuant to paragraph (1) (the date of receipt of which shall hereinafter in this section be referred to as the "receipt date"), the Administrator shall—

(A) immediately publish in the Federal Register a notice stating that the recommendations are available and provide an opportunity for public hearing within 90 days beginning on the receipt date; and

(B) commence a review of the recommendations to determine whether the control measures in the recommendations are necessary to bring any area in such region into attainment by the dates provided by this subpart and are otherwise consistent with this chapter.

#### (3) Consultation

In undertaking the review required under paragraph (2)(B), the Administrator shall consult with members of the commission of the affected States and shall take into account the data, views, and comments received pursuant to paragraph (2)(A).

#### (4) Approval and disapproval

Within 9 months after the receipt date, the Administrator shall (A) determine whether to

---

[1] So in original. Probably should not be capitalized.



2018, 132 Stat. 4264. See Transitional and Savings Provisions note preceding section 101 of Title 46, Shipping, and section 70011 of Title 46.

### AMENDMENTS

1998—Subsec. (h). Pub. L. 105–286 added subsec. (h).

### EFFECTIVE DATE OF 1998 AMENDMENT; PUBLICATION OF PROHIBITION

Pub. L. 105–286, §3, Oct. 27, 1998, 112 Stat. 2774, provided that:

"(a) IN GENERAL.—The amendment made by section 2 [amending this section] takes effect 180 days after the date of the enactment of this Act [Oct. 27, 1998]. Nothing in that amendment shall require action that is inconsistent with the obligations of the United States under any international agreement.

"(b) INFORMATION.—As soon as practicable after the date of the enactment of this Act, the appropriate agency of the United States shall distribute information to publicize the prohibition set forth in the amendment made by section 2."

### TRANSFER OF FUNCTIONS

For transfer of authorities, functions, personnel, and assets of the Coast Guard, including the authorities and functions of the Secretary of Transportation relating thereto, to the Department of Homeland Security, and for treatment of related references, see sections 468(b), 551(d), 552(d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under section 542 of Title 6.

### § 7511c. Control of interstate ozone air pollution

**(a) Ozone transport regions**

A single transport region for ozone (within the meaning of section 7506a(a) of this title), comprised of the States of Connecticut, Delaware, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Vermont, and the Consolidated Metropolitan Statistical Area that includes the District of Columbia, is hereby established by operation of law. The provisions of section 7506a(a)(1) and (2) of this title shall apply with respect to the transport region established under this section and any other transport region established for ozone, except to the extent inconsistent with the provisions of this section. The Administrator shall convene the commission required (under section 7506a(b) of this title) as a result of the establishment of such region within 6 months of November 15, 1990.

**(b) Plan provisions for States in ozone transport regions**

(1) In accordance with section 7410 of this title, not later than 2 years after November 15, 1990 (or 9 months after the subsequent inclusion of a State in a transport region established for ozone), each State included within a transport region established for ozone shall submit a State implementation plan or revision thereof to the Administrator which requires the following—

(A) that each area in such State that is in an ozone transport region, and that is a metropolitan statistical area or part thereof with a population of 100,000 or more comply with the provisions of section 7511a(c)(2)(A) of this title (pertaining to enhanced vehicle inspection and maintenance programs); and

(B) implementation of reasonably available control technology with respect to all sources of volatile organic compounds in the State covered by a control techniques guideline issued before or after November 15, 1990.

(2) Within 3 years after November 15, 1990, the Administrator shall complete a study identifying control measures capable of achieving emission reductions comparable to those achievable through vehicle refueling controls contained in section 7511a(b)(3) of this title, and such measures or such vehicle refueling controls shall be implemented in accordance with the provisions of this section. Notwithstanding other deadlines in this section, the applicable implementation plan shall be revised to reflect such measures within 1 year of completion of the study. For purposes of this section any stationary source that emits or has the potential to emit at least 50 tons per year of volatile organic compounds shall be considered a major stationary source and subject to the requirements which would be applicable to major stationary sources if the area were classified as a Moderate nonattainment area.

**(c) Additional control measures**

**(1) Recommendations**

Upon petition of any State within a transport region established for ozone, and based on a majority vote of the Governors on the Commission[1] (or their designees), the Commission[1] may, after notice and opportunity for public comment, develop recommendations for additional control measures to be applied within all or a part of such transport region if the commission determines such measures are necessary to bring any area in such region into attainment by the dates provided by this subpart. The commission shall transmit such recommendations to the Administrator.

**(2) Notice and review**

Whenever the Administrator receives recommendations prepared by a commission pursuant to paragraph (1) (the date of receipt of which shall hereinafter in this section be referred to as the "receipt date"), the Administrator shall—

(A) immediately publish in the Federal Register a notice stating that the recommendations are available and provide an opportunity for public hearing within 90 days beginning on the receipt date; and

(B) commence a review of the recommendations to determine whether the control measures in the recommendations are necessary to bring any area in such region into attainment by the dates provided by this subpart and are otherwise consistent with this chapter.

**(3) Consultation**

In undertaking the review required under paragraph (2)(B), the Administrator shall consult with members of the commission of the affected States and shall take into account the data, views, and comments received pursuant to paragraph (2)(A).

**(4) Approval and disapproval**

Within 9 months after the receipt date, the Administrator shall (A) determine whether to

---

[1] So in original. Probably should not be capitalized.

approve, disapprove, or partially disapprove and partially approve the recommendations; (B) notify the commission in writing of such approval, disapproval, or partial disapproval; and (C) publish such determination in the Federal Register. If the Administrator disapproves or partially disapproves the recommendations, the Administrator shall specify—

(i) why any disapproved additional control measures are not necessary to bring any area in such region into attainment by the dates provided by this subpart or are otherwise not consistent with the [2] chapter; and

(ii) recommendations concerning equal or more effective actions that could be taken by the commission to conform the disapproved portion of the recommendations to the requirements of this section.

**(5) Finding**

Upon approval or partial approval of recommendations submitted by a commission, the Administrator shall issue to each State which is included in the transport region and to which a requirement of the approved plan applies, a finding under section 7410(k)(5) of this title that the implementation plan for such State is inadequate to meet the requirements of section 7410(a)(2)(D) of this title. Such finding shall require each such State to revise its implementation plan to include the approved additional control measures within one year after the finding is issued.

**(d) Best available air quality monitoring and modeling**

For purposes of this section, not later than 6 months after November 15, 1990, the Administrator shall promulgate criteria for purposes of determining the contribution of sources in one area to concentrations of ozone in another area which is a nonattainment area for ozone. Such criteria shall require that the best available air quality monitoring and modeling techniques be used for purposes of making such determinations.

(July 14, 1955, ch. 360, title I, § 184, as added Pub. L. 101–549, title I, § 103, Nov. 15, 1990, 104 Stat. 2448.)

**§ 7511d. Enforcement for Severe and Extreme ozone nonattainment areas for failure to attain**

**(a) General rule**

Each implementation plan revision required under section 7511a(d) and (e) of this title (relating to the attainment plan for Severe and Extreme ozone nonattainment areas) shall provide that, if the area to which such plan revision applies has failed to attain the national primary ambient air quality standard for ozone by the applicable attainment date, each major stationary source of VOCs located in the area shall, except as otherwise provided under subsection (c), pay a fee to the State as a penalty for such failure, computed in accordance with subsection (b), for each calendar year beginning after the attainment date, until the area is redesignated as

an attainment area for ozone. Each such plan revision should include procedures for assessment and collection of such fees.

**(b) Computation of fee**

**(1) Fee amount**

The fee shall equal $5,000, adjusted in accordance with paragraph (3), per ton of VOC emitted by the source during the calendar year in excess of 80 percent of the baseline amount, computed under paragraph (2).

**(2) Baseline amount**

For purposes of this section, the baseline amount shall be computed, in accordance with such guidance as the Administrator may provide, as the lower of the amount of actual VOC emissions ("actuals") or VOC emissions allowed under the permit applicable to the source (or, if no such permit has been issued for the attainment year, the amount of VOC emissions allowed under the applicable implementation plan ("allowables")) during the attainment year. Notwithstanding the preceding sentence, the Administrator may issue guidance authorizing the baseline amount to be determined in accordance with the lower of average actuals or average allowables, determined over a period of more than one calendar year. Such guidance may provide that such average calculation for a specific source may be used if that source's emissions are irregular, cyclical, or otherwise vary significantly from year to year.

**(3) Annual adjustment**

The fee amount under paragraph (1) shall be adjusted annually, beginning in the year beginning after 1990, in accordance with section 7661a(b)(3)(B)(v) of this title (relating to inflation adjustment).

**(c) Exception**

Notwithstanding any provision of this section, no source shall be required to pay any fee under subsection (a) with respect to emissions during any year that is treated as an Extension Year under section 7511a(a)(5) of this title.

**(d) Fee collection by Administrator**

If the Administrator has found that the fee provisions of the implementation plan do not meet the requirements of this section, or if the Administrator makes a finding that the State is not administering and enforcing the fee required under this section, the Administrator shall, in addition to any other action authorized under this subchapter, collect, in accordance with procedures promulgated by the Administrator, the unpaid fees required under subsection (a). If the Administrator makes such a finding under section 7509(a)(4) of this title, the Administrator may collect fees for periods before the determination, plus interest computed in accordance with section 6621(a)(2) of title 26 (relating to computation of interest on underpayment of Federal taxes), to the extent the Administrator finds such fees have not been paid to the State. The provisions of clauses (ii) through (iii) of section 7661a(b)(3)(C) of this title (relating to penalties and use of the funds, respectively) shall apply with respect to fees collected under this subsection.

---

[2] So in original. Probably should be "this".

 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

Purdon's Pennsylvania Statutes and Consolidated Statutes
  Title 35 P.S. Health and Safety (Refs & Annos)
    Chapter 23. Air Pollution (Refs & Annos)
      Air Pollution Control Act (Refs & Annos)

35 P.S. § 4004

§ 4004. Powers and Duties of the Department of Environmental Protection

Effective: May 14, 2014
Currentness

The department shall have power and its duty shall be to--

(1) Implement the provisions of the Clean Air Act in the Commonwealth.

(2) Enter any building, property, premises or place and inspect any air contamination source for the purpose of investigating an actual or a suspected source of air pollution or for the purpose of ascertaining the compliance or non-compliance with this act, any rule or regulation promulgated under this act or any plan approval, permit or order of the department. In connection with such inspection or investigation, samples of air, air contaminants, fuel, process material or other matter may be taken for analysis, a duplicate of the analytical report shall be furnished promptly to the person who is suspected of causing such air pollution or air contamination.

(3) Have access to, and require the production of, books, papers and records, including, but not limited to, computerized information in a format as the department may reasonably prescribe pertinent to any matter under investigation.

(4) Require the owner or operator of any air contamination source to establish and maintain such records and make such reports and furnish such information, including computerized information in a format as the department may reasonably prescribe.

(5) Require the owner or operator of any air contamination source to install, use and maintain such air contaminant monitoring equipment or methods as the department may reasonably prescribe.

(6) Require the owner or operator of any air contamination source to sample the emissions thereof in accordance with such methods and procedures and at such locations and intervals of time as the department may reasonably prescribe and to provide the department with the results thereof.

(7) Enter upon any property on which an air contamination source may be located and make such tests upon the source as are necessary to determine whether the air contaminants being emitted from such air contamination source are being emitted at a rate in excess of a rate provided for by this act, any rule or regulations promulgated under this act or any plan approval, permit or order of the department or otherwise causing air pollution. Whenever the department determines that a source test is

necessary, it shall give reasonable written or oral notice to the person owning, operating, or otherwise in control of such source, that the department will conduct a test on such source. Thereafter, the person to whom such notice is given shall provide such reasonably safe access to the testing area, and such sampling ports, facilities, electrical power and water as the department shall specify in its notice.

(8) Receive, initiate and investigate complaints, institute and conduct surveys and testing programs, conduct general atmospheric sampling programs, make observations of conditions which may or do cause air pollution, make tests or other determinations at air contamination sources, and assess the degree of abatement required.

(9) (i) Issue orders to any person owning or operating an air contamination source, or owning or possessing land on which such source is located, if such source is introducing or is likely to introduce air contaminants into the outdoor atmosphere in excess of any rate provided for by this act, any rule or regulation promulgated under this act or any plan approval or permit applicable to such source, or at such a level so as to cause air pollution. Any such order may require the cessation of any operation or activity which is introducing air contaminants into the outdoor atmosphere so as to cause air pollution, the reduction of emissions from such air contamination source, modification or repair of such source or air pollution control device or equipment or certain operating and maintenance procedures with respect to such source or air pollution control device or equipment, institution of a reasonable process change, installation of air pollution control devices or equipment, or any or all of said requirements as the department deems necessary. Such orders may specify a time for compliance, require submission of a proposed plan for compliance, and require submission of periodic reports concerning compliance. If a time for compliance is given, the department may, in its discretion, require the posting of a bond in the amount of twice the money to be expended in reaching compliance.

(ii) All department orders shall be in writing, contain therein a statement of the reasons for their issuance, and be served either personally or by certified mail. Within thirty (30) days after service of any such order the person to whom the order is issued or any other person aggrieved by such order may file with the hearing board an appeal setting forth with particularity the grounds relied upon. An appeal to the hearing board of the department's order shall not act as a supersedeas: Provided, however, That upon application and for cause shown, the hearing board may issue such a supersedeas.

(10) Institute, in a court of competent jurisdiction, proceedings to compel compliance with this act, any rule or regulation promulgated under this act or any plan approval, permit or order of the department.

(11) Act as the agent for the board in holding public hearings when so directed by the board.

(12) Institute prosecutions under this act.

(13) Recommend the minimum job qualifications of personnel employed by county and municipal air pollution control agencies hereafter created.

(14) Require the submission of, and consider for approval, plans and specifications of air pollution control equipment, devices or process changes, and inspect such installations or modifications to insure compliance with the plans which have been approved.

(15) Conduct or cause to be conducted studies and research with respect to air contaminants, their nature, causes and effects, and with respect to the control, prevention, abatement and reduction of air pollution and air contamination.

ADD065

Purdon's Pennsylvania Statutes and Consolidated Statutes
Title 35 P.S. Health and Safety (Refs & Annos)
Chapter 23. Air Pollution (Refs & Annos)
Air Pollution Control Act (Refs & Annos)

35 P.S. § 4010.1

§ 4010.1. Enforcement orders

Currentness

(a) The department may issue such orders as are necessary to aid in the enforcement of the provisions of this act. These orders shall include, but shall not be limited to, orders modifying, suspending, terminating or revoking any plan approvals or permits, orders requiring persons to cease unlawful activities or cease operation of a facility or air contamination source which, in the course of its operation, is in violation of any provision of this act, any rule or regulation promulgated under this act or plan approval or permit, order to take corrective action or to abate a public nuisance or an order requiring the testing, sampling or monitoring of any air contamination source or orders requiring production of information. Such an order may be issued if the department finds that any condition existing in or on the facility or source involved is causing or contributing to or is creating a danger of air pollution or if it finds that the permittee or any person is in violation of any provision of this act or of any rule, regulation or order of the department.

(b) The department may, in its order, require compliance with such conditions as are necessary to prevent or abate air pollution or effect the purposes of this act.

(c) An order issued under this section shall take effect upon notice, unless the order specifies otherwise. An appeal to the hearing board of the department's order shall not act as a supersedeas, provided, however, that, upon application and for cause shown, the hearing board may issue such a supersedeas under rules established by the hearing board.

(d) The authority of the department to issue an order under this section is in addition to any remedy or penalty which may be imposed pursuant to this act. The failure to comply with any such order is hereby declared to be a public nuisance.

**Credits**

1960, Jan. 8, P.L. (1959) 2119, § 10.1, added 1992, July 9, P.L. 460, No. 95, § 13, imd. effective.

35 P.S. § 4010.1, PA ST 35 P.S. § 4010.1
Current through 2019 Regular Session Act 91. Some statute sections may be more current, see credits for details.

**End of Document**                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**Environmental Protection Agency**                          **§ 51.1100**

to apply after revocation of the 1997 primary annual $PM_{2.5}$ NAAQS. Control requirements associated with a FIP or approved into the SIP pursuant to obligations arising from CAA section 110(a)(2)(D)(i) and (ii), including 40 CFR 51.123, 51.124, 52.35, 52.36, 52.38 and 52.39, may be modified by the state only if the requirements of §51.123, 51.124, 52.35, 52.36, 52.38 and 52.39, including statewide annual $SO_2$ and annual $NO_X$ emission budgets, continue to be in effect. Any such modification must meet the requirements of CAA section 110(l).

## Subpart AA—Provisions for Implementation of the 2008 Ozone National Ambient Air Quality Standards

SOURCE: 77 FR 30170, May 21, 2012, unless otherwise noted.

### § 51.1100  Definitions.

The following definitions apply for purposes of this subpart. Any term not defined herein shall have the meaning as defined in 40 CFR 51.100.

(a) *1-hour NAAQS* means the 1-hour primary and secondary ozone national ambient air quality standards codified at 40 CFR 50.9.

(b) *1997 NAAQS* means the 1997 8-hour primary and secondary ozone national ambient air quality standards codified at 40 CFR 50.10.

(c) *2008 NAAQS* means the 2008 8-hour primary and secondary ozone NAAQS codified at 40 CFR 50.15.

(d) *1-hour ozone design value* is the 1-hour ozone concentration calculated according to 40 CFR part 50, appendix H and the interpretation methodology issued by the Administrator most recently before the date of the enactment of the CAA Amendments of 1990.

(e) *8-hour ozone design value* is the 8-hour ozone concentration calculated according to 40 CFR part 50, appendix P.

(f) *CAA* means the Clean Air Act as codified at 42 U.S.C. 7401—7671q (2010).

(g) *Attainment area* means, unless otherwise indicated, an area designated as either attainment, unclassifiable, or attainment/unclassifiable.

(h) *Attainment year ozone season* shall mean the ozone season immediately preceding a nonattainment area's maximum attainment date.

(i) *Designation for the 2008 NAAQS* shall mean the effective date of the designation for an area for the 2008 NAAQS.

(j) *Higher classification/lower classification.* For purposes of determining whether a classification is higher or lower, classifications under subpart 2 of part D of title I of the CAA are ranked from lowest to highest as follows: Marginal; Moderate; Serious; Severe; and Extreme.

(k) *Initially designated* means the first designation that becomes effective for an area for the 2008 NAAQS and does not include a redesignation to attainment or nonattainment for the 2008 NAAQS.

(l) *Maintenance area* means an area that was designated nonattainment for a specific NAAQS and was redesignated to attainment for that NAAQS subject to a maintenance plan as required by CAA section 175A.

(m) *Nitrogen Oxides ($NO_X$)* means the sum of nitric oxide and nitrogen dioxide in the flue gas or emission point, collectively expressed as nitrogen dioxide.

(n) *Ozone season* means for each state, the ozone monitoring season as defined in 40 CFR part 58, appendix D, section 4.1(i) for that state.

(o) *Applicable requirements* for an area for anti-backsliding purposes means the following requirements, to the extent such requirements apply to the area pursuant to its classification under CAA section 181(a)(1) for the 1-hour NAAQS or 40 CFR 51.902 for the 1997 ozone NAAQS at the time of revocation of the 1997 ozone NAAQS:

(1) Reasonably available control technology (RACT) under CAA sections 172(c)(1) and 182(b)(2).

(2) Vehicle inspection and maintenance programs (I/M) under CAA sections 182(b)(4) and 182(c)(3).

(3) Major source applicability thresholds for purposes of RACT under CAA sections 172(c)(2), 182(b), 182(c), 182(d), and 182(e).

(4) Reductions to achieve Reasonable Further Progress (RFP) under CAA sections 172(c)(2), 182(b)(1)(A), and 182(c)(2)(B).

421

ADD067

(5) Clean fuels fleet program under CAA section 183(c)(4).

(6) Clean fuels for boilers under CAA section 182(e)(3).

(7) Transportation Control Measures (TCMs) during heavy traffic hours as specified under CAA section 182(e)(4).

(8) Enhanced (ambient) monitoring under CAA section 182(c)(1).

(9) Transportation controls under CAA section 182(c)(5).

(10) Vehicle miles traveled provisions of CAA section 182(d)(1).

(11) NO$_X$ requirements under CAA section 182(f).

(12) Attainment demonstration requirements under CAA sections 172(c)(4), 182(b)(1)(A), and 182(c)(2).

(13) Nonattainment contingency measures required under CAA sections 172(c)(9) and 182(c)(9) for failure to attain the 1-hour or 1997 ozone NAAQS by the applicable attainment date or to make reasonable further progress toward attainment of the 1-hour or 1997 ozone NAAQS.

(14) Nonattainment NSR major source thresholds and offset ratios under CAA sections 172(a)(5) and 182(a)(2).

(15) Penalty fee program requirements for Severe and Extreme Areas under CAA section 185.

(16) Contingency measures associated with areas utilizing CAA section 182(e)(5).

(17) Reasonably available control measures (RACM) requirements under CAA section 172(c)(1).

(p) *CSAPR* means the Cross State Air Pollution Rule codified at 40 CFR 52.38 and part 97.

(q) *CAIR* means the Clean Air Interstate Rule codified at 40 CFR 51.123, 52.35 and part 95.

(r) *NO$_X$ SIP Call* means the rules codified at 40 CFR 51.121 and 51.122.

(s) *Ozone transport region* (OTR) means the area established by CAA section 184(a) or any other area established by the Administrator pursuant to CAA section 176A for purposes of ozone.

(t) *Reasonable further progress* (RFP) means both the emissions reductions required under CAA section 172(c)(2) which EPA interprets to be an average 3 percent per year emissions reductions of either VOC or NO$_X$ and CAA sections 182(c)(2)(B) and (c)(2)(C) and the 15 percent reductions over the first six years of the plan and the following three percent per year average under § 51.1110.

(u) *Rate-of-progress* (ROP) means the 15 percent progress reductions in VOC emissions over the first 6 years required under CAA section 182(b)(1).

(v) *Revocation of the 1-hour NAAQS* means the time at which the 1-hour NAAQS no longer apply to an area pursuant to 40 CFR 50.9(b).

(w) *Revocation of the 1997 ozone NAAQS* means the time at which the 1997 8-hour NAAQS no longer apply to an area pursuant to 40 CFR 50.10(c).

(x) *Subpart 1* means subpart 1 of part D of title I of the CAA.

(y) *Subpart 2* means subpart 2 of part D of title I of the CAA.

(z) *I/M* refers to the inspection and maintenance programs for in-use vehicles required under the 1990 CAA Amendments and defined by subpart S of 40 CFR part 51.

(aa) An area *"Designated nonattainment for the 1-hour ozone NAAQS"* means, for purposes of 40 CFR 51.1105, an area that is subject to applicable 1-hour ozone NAAQS anti-backsliding requirements at the time of revocation of the 1997 ozone NAAQS.

(bb) *Base year inventory* for the nonattainment area means a comprehensive, accurate, current inventory of actual emissions from sources of VOC and NO$_X$ emitted within the boundaries of the nonattainment area as required by CAA section 182(a)(1).

(cc) *Ozone season day emissions* means an average day's emissions for a typical ozone season work weekday. The state shall select, subject to EPA approval, the particular month(s) in the ozone season and the day(s) in the work week to be represented, considering the conditions assumed in the development of RFP plans and/or emissions budgets for transportation conformity.

[77 FR 30170, May 21, 2012, as amended at 80 FR 12312, Mar. 6, 2015]

## § 51.1101   Applicability of part 51.

The provisions in subparts A–X of part 51 apply to areas for purposes of which the 2008 NAAQS to the extent they are not inconsistent with the provisions of this subpart.


**Environmental Protection Agency**                §51.1105

**§51.1102  Classification and nonattainment area planning provisions.**

An area designated nonattainment for the 2008 ozone NAAQS will be classified in accordance with CAA section 181, as interpreted in §51.1103(a), and will be subject to the requirements of subpart 2 of part D of title I of the CAA that apply for that classification.

**§51.1103  Application of classification and attainment date provisions in CAA section 181 to areas subject to §51.1102.**

(a) In accordance with CAA section 181(a)(1), each area designated non-attainment for the 2008 ozone NAAQS shall be classified by operation of law at the time of designation. The classification shall be based on the 8-hour design value for the area at the time of designation, in accordance with Table 1 below. A state may request a higher or lower classification as provided in paragraphs (b) and (c) of this section. For each area classified under this section, the attainment date for the 2008 NAAQS shall be as expeditious as practicable but not later than the date provided in Table 1 as follows:

TABLE 1—CLASSIFICATIONS AND ATTAINMENT DATES FOR 2008 8-HOUR OZONE NAAQS (0.075 PPM) FOR AREAS SUBJECT TO CFR SECTION 51.1102

| Area class | | 8-hour design value (ppm ozone) | Primary standard attainment date (years after the effective date of designation for 2008 primary NAAQS) |
|---|---|---|---|
| Marginal | from | 0.076 | 3 |
| | up to* | 0.086 | |
| Moderate | from | 0.086 | 6 |
| | up to* | 0.100 | |
| Serious | from | 0.100 | 9 |
| | up to* | 0.113 | |
| Severe-15 | from | 0.113 | 15 |
| | up to* | 0.119 | |
| Severe-17 | from | 0.119 | 17 |
| | up to* | 0.175 | |
| Extreme | equal to or above | 0.175 | 20 |

*But not including

(b) A state may request, and the Administrator must approve, a higher classification for any reason in accordance with CAA section 181(b)(3).

(c) A state may request, and the Administrator may in the Administrator's discretion approve, a higher or lower classification in accordance with CAA section 181(a)(4).

(d) The following nonattainment areas are reclassified for the 2008 ozone NAAQS as follows: Serious—Ventura County, CA; Severe—Los Angeles-San Bernardino Counties (West Mojave Desert), Riverside County (Coachella Valley), and Sacramento Metro, CA; Extreme—Los Angeles-South Coast Air Basin, and San Joaquin Valley, CA.

[77 FR 30170, May 21, 2012, as amended at 80 FR 12313, Mar. 6, 2015]

**§51.1104  [Reserved]**

**§51.1105  Transition from the 1997 ozone NAAQS to the 2008 ozone NAAQS and anti-backsliding.**

(a) *Requirements that continue to apply after revocation of the 1997 ozone NAAQS*—(1) *2008 ozone NAAQS nonattainment and 1997 ozone NAAQS nonattainment.* The following requirements apply to an area designated nonattainment for the 2008 ozone NAAQS and also designated nonattainment for the 1997 ozone NAAQS, or nonattainment for both the 1997 and 1-hour ozone NAAQS, at the time of revocation of the respective ozone NAAQS: The area remains subject to the obligation to adopt and implement the applicable requirements of §51.1100(o), for any ozone NAAQS for which it was designated

423

nonattainment at the time of revocation, in accordance with its classification for that NAAQS at the time of that revocation, except as provided in paragraph (b) of this section.

(2) *2008 ozone NAAQS nonattainment and 1997 ozone NAAQS maintenance.* For an area designated nonattainment for the 2008 ozone NAAQS that was redesignated to attainment for the 1997 ozone NAAQS prior to April 6, 2015 (hereinafter a "maintenance area") the SIP, including the maintenance plan, is considered to satisfy the applicable requirements of 40 CFR 51.1100(o) for the revoked NAAQS. The measures in the SIP and maintenance plan shall continue to be implemented in accordance with the terms in the SIP. Any measures associated with applicable requirements that were shifted to contingency measures prior to April 6, 2015 may remain in that form. After April 6, 2015, and to the extent consistent with any SIP for the 2008 ozone NAAQS and with CAA sections 110(l) and 193, the state may request that obligations under the applicable requirements of §51.1100(o) be shifted to the SIP's list of maintenance plan contingency measures for the area.

(3) *2008 ozone NAAQS attainment and 1997 ozone NAAQS nonattainment.* For an area designated attainment for the 2008 ozone NAAQS, and designated nonattainment for the 1997 ozone NAAQS as of April 6, 2015 or for both the 1997 and the 1-hour ozone NAAQS as of the respective dates of their revocations, the area is no longer subject to nonattainment NSR and the state may at any time request that the nonattainment NSR provisions applicable to the area be removed from the SIP. The state may request, consistent with CAA sections 110(l) and 193, that SIP measures adopted to satisfy other applicable requirements of §51.1100(o) be shifted to the SIP's list of maintenance plan contingency measures for the area. The area's approved PSD SIP shall be considered to satisfy the state's obligations with respect to the area's maintenance of the 2008 ozone NAAQS pursuant to CAA section 110(a)(1).

(4) *2008 ozone NAAQS attainment and 1997 ozone NAAQS maintenance.* An area designated attainment for the 2008

ozone NAAQS with an approved CAA section 175A maintenance plan for the 1997 ozone NAAQS is considered to satisfy the applicable requirements of 40 CFR 51.1100(o) through implementation of the SIP and maintenance plan provisions for the area. After April 6, 2015, and to the extent consistent with CAA sections 110(l) and 193, the state may request that obligations under the applicable requirements of 40 CFR 51.1100(o) be shifted to the list of maintenance plan contingency measures for the area. For an area that is initially designated attainment for the 2008 ozone NAAQS and which has been redesignated to attainment for the 1997 ozone NAAQS with an approved CAA section 175A maintenance plan and an approved PSD SIP, the area's approved maintenance plan and the state's approved PSD SIP for the area are considered to satisfy the state's obligations with respect to the area's maintenance of the 2008 ozone NAAQS pursuant to CAA section 110(a)(1).

(b) *Effect of Redesignation or Redesignation Substitute.* (1) An area remains subject to the anti-backsliding obligations for a revoked NAAQS under paragraphs (a)(1) and (2) of this section until either EPA approves a redesignation to attainment for the area for the 2008 ozone NAAQS; or EPA approves a demonstration for the area in a redesignation substitute procedure for a revoked NAAQS. Under this redesignation substitute procedure for a revoked NAAQS, and for this limited anti-backsliding purpose, the demonstration must show that the area has attained that revoked NAAQS due to permanent and enforceable emission reductions and that the area will maintain that revoked NAAQS for 10 years from the date of EPA's approval of this showing.

(2) If EPA, after notice-and-comment rulemaking, approves a redesignation to attainment, the state may request that provisions for nonattainment NSR be removed from the SIP, and that other anti-backsliding obligations be shifted to contingency measures provided that such action is consistent with CAA sections 110(l) and 193. If EPA, after notice and comment rulemaking, approves a redesignation substitute for a revoked NAAQS, the state

**Environmental Protection Agency** §51.1105

may request that provisions for non-attainment NSR for that revoked NAAQS be removed, and that other anti-backsliding obligations for that revoked NAAQS be shifted to contingency measures provided that such action is consistent with CAA sections 110(l) and 193.

(c) *Portions of an area designated non-attainment or attainment for the 2008 ozone NAAQS that remain subject to the obligations identified in paragraph (a) of this section.* Only that portion of the designated nonattainment or attainment area for the 2008 ozone NAAQS that was required to adopt the applicable requirements in §51.1100(o) for purposes of the 1-hour or 1997 ozone NAAQS is subject to the obligations identified in paragraph (a) of this section. Subpart C of 40 CFR part 81 identifies the areas designated nonattainment and associated area boundaries for the 1997 ozone NAAQS at the time of revocation. Areas that are designated nonattainment for the 1997 ozone NAAQS at the time of designation for the 2008 ozone NAAQS may be redesignated to attainment prior to the effective date of revocation of that ozone NAAQS.

(d) *Obligations under the 1997 ozone NAAQS that no longer apply after revocation of the 1997 ozone NAAQS—*(1) *Second 10-year Maintenance plans.* As of April 6, 2015, an area with an approved 1997 ozone NAAQS maintenance plan under CAA section 175A is not required to submit a second 10-year maintenance plan for the 1997 ozone NAAQS 8 years after approval of the initial 1997 ozone NAAQS maintenance plan.

(2) *Determinations of failure to attain the 1997 and/or 1-hour NAAQS.* (i) As of April 6, 2015, the EPA is no longer obligated to determine pursuant to CAA section 181(b)(2) or section 179(c) whether an area attained the 1997 ozone NAAQS by that area's attainment date for the 1997 ozone NAAQS.

(ii) As of April 6, 2015, the EPA is no longer obligated to reclassify an area to a higher classification for the 1997 ozone NAAQS based upon a determination that the area failed to attain the 1997 ozone NAAQS by the area's attainment date for the 1997 ozone NAAQS.

(iii) For the revoked 1-hour and 1997 ozone NAAQS, the EPA is required to

determine whether an area attained the 1-hour or 1997 ozone NAAQS by the area's attainment date solely for anti-backsliding purposes to address an applicable requirement for nonattainment contingency measures and CAA section 185 fee programs. In making such a determination, the EPA may consider and apply the provisions of CAA section 181(a)(5) and former 40 CFR 51.907 in interpreting whether a 1-year extension of the attainment date is applicable under CAA section 172(a)(2)(C).

(e) *Continued applicability of the FIP and SIP requirements pertaining to inter-state transport under CAA section 110(a)(2)(D)(i) and (ii) after revocation of the 1997 ozone NAAQS.* All control requirements associated with a FIP or approved SIP in effect for an area as of April 6, 2015, such as the $NO_X$ SIP Call, the CAIR, or the CSAPR shall continue to apply after revocation of the 1997 ozone NAAQS. Control requirements approved into the SIP pursuant to obligations arising from CAA section 110(a)(2)(D)(i) and (ii), including 40 CFR 51.121, 51.122, 51.123 and 51.124, may be modified by the state only if the requirements of §§51.121, 51.122, 51.123 and 51.124, including statewide $NO_X$ emission budgets continue to be in effect. Any such modification must meet the requirements of CAA section 110(l).

(f) *New source review.* An area designated nonattainment for the 2008 ozone NAAQS and designated nonattainment for the 1997 ozone NAAQS on April 6, 2015 remains subject to the obligation to adopt and implement the major source threshold and offset requirements for nonattainment NSR that apply or applied to the area pursuant to CAA sections 172(c)(5), 173 and 182 based on the highest of: (i) The area's classification under CAA section 181(a)(1) for the 1-hour NAAQS as of the effective date of revocation of the 1-hour ozone NAAQS; (ii) the area's classification under 40 CFR 51.903 for the 1997 ozone NAAQS as of the date a permit is issued or as of April 6, 2015, whichever is earlier; and (iii) the area's classification under §51.1103 for the 2008 ozone NAAQS. Upon removal of nonattainment NSR obligations for a revoked NAAQS under §51.1105(b), the state remains subject to the obligation

425

to adopt and implement the major source threshold and offset requirements for nonattainment NSR that apply or applied to the area for the remaining applicable NAAQS consistent with this paragraph.

[80 FR 12314, Mar. 6, 2015]

### § 51.1106 Redesignation to nonattainment following initial designations.

For any area that is initially designated attainment for the 2008 ozone NAAQS and that is subsequently redesignated to nonattainment for the 2008 ozone NAAQS, any absolute, fixed date applicable in connection with the requirements of this part other than an attainment date is extended by a period of time equal to the length of time between the effective date of the initial designation for the 2008 ozone NAAQS and the effective date of redesignation, except as otherwise provided in this subpart. The maximum attainment date for a redesignated area would be based on the area's classification, consistent with Table 1 in § 51.1103.

[80 FR 12314, Mar. 6, 2015]

### § 51.1107 Determining eligibility for 1-year attainment date extensions for the 2008 ozone NAAQS under CAA section 181(a)(5).

(a) A nonattainment area will meet the requirement of CAA section 181(a)(5)(B) pertaining to 1-year extensions of the attainment date if:

(1) For the first 1-year extension, the area's 4th highest daily maximum 8 hour average in the attainment year is 0.075 ppm or less.

(2) For the second 1-year extension, the area's 4th highest daily maximum 8 hour value, averaged over both the original attainment year and the first extension year, is 0.075 ppm or less.

(b) For purposes of paragraph (a) of this section, the area's 4th highest daily maximum 8 hour average for a year shall be from the monitor with the highest 4th highest daily maximum 8 hour average for that year of all the monitors that represent that area.

[80 FR 12314, Mar. 6, 2015]

### § 51.1108 Modeling and attainment demonstration requirements.

(a) An area classified as Moderate under § 51.1103(a) shall be subject to the attainment demonstration requirement applicable for that classification under CAA section 182(b), and such demonstration is due no later than 36 months after the effective date of the area's designation for the 2008 ozone NAAQS.

(b) An area classified as Serious or higher under § 51.1103(a) shall be subject to the attainment demonstration requirement applicable for that classification under CAA section 182(c), and such demonstration is due no later than 48 months after the effective date of the area's designation for the 2008 ozone NAAQS.

(c) Attainment demonstration criteria. An attainment demonstration due pursuant to paragraph (a) or (b) of this section must meet the requirements of § 51.112; the adequacy of an attainment demonstration shall be demonstrated by means of a photochemical grid model or any other analytical method determined by the Administrator, in the Administrator's discretion, to be at least as effective.

(d) Implementation of control measures. For each nonattainment area, the state must provide for implementation of all control measures needed for attainment no later than the beginning of the attainment year ozone season.

[80 FR 12314, Mar. 6, 2015]

### § 51.1109 [Reserved]

### § 51.1110 Requirements for reasonable further progress (RFP).

(a) *RFP for nonattainment areas classified pursuant to § 51.1103.* The RFP requirements specified in CAA section 182 for that area's classification shall apply.

(1) *Submission deadline.* For each area classified as Moderate or higher pursuant to § 51.1103, the state shall submit a SIP revision no later than 36 months after the effective date of designation as nonattainment for the 2008 ozone NAAQS that provides for RFP as described in paragraphs (a)(2) through (4) of this section.

(2) *RFP requirements for areas with an approved 1-hour or 1997 ozone NAAQS 15*

426

the requirements for creditability, including the need to be enforceable, permanent, quantifiable, and surplus.

(6) *Creditability of out-of-area emissions reductions.* For each area classified as Moderate or higher pursuant to §51.1103, in addition to the restrictions on the creditability of emission control measures listed in §51.1110(a)(5), creditable emission reductions for fixed percentage reduction RFP must be obtained from sources within the nonattainment area.

(7) *Calculation of non-creditable emissions reductions.* The following four categories of control measures listed in CAA section 182(b)(1)(D) are no longer required to be calculated for exclusion in RFP analyses because the Administrator has determined that due to the passage of time the effect of these exclusions would be *de minimis:*

(i) Measures related to motor vehicle exhaust or evaporative emissions promulgated by January 1, 1990;

(ii) Regulations concerning Reid vapor pressure promulgated by November 15, 1990;

(iii) Measures to correct previous RACT requirements; and

(iv) Measures required to correct previous I/M programs.

(b) *Baseline emissions inventory for RFP plans.* For the RFP plans required under this section, at the time of designation for the 2008 ozone NAAQS the baseline emissions inventory shall be the emissions inventory for the most recent calendar year for which a complete triennial inventory is required to be submitted to EPA under the provisions of subpart A of this part. States may use an alternative baseline emissions inventory provided the state demonstrates why it is appropriate to use the alternative baseline year, and provided that the year selected is between the years 2008 to 2012. All states associated with a multi-state nonattainment area must consult and agree on a single alternative baseline year. The emissions values included in the inventory required by this section shall be actual ozone season day emissions as defined by §51.1100(cc).

[80 FR 12314, Mar. 6, 2015]

§ 51.1111 [Reserved]

§ 51.1112 Requirements for reasonably available control technology (RACT) and reasonably available control measures (RACM).

(a) *RACT requirement for areas classified pursuant to §51.1103.* (1) For each nonattainment area classified Moderate or higher, the state shall submit a SIP revision that meets the VOC and NO$_X$ RACT requirements in CAA sections 182(b)(2) and 182(f).

(2) The state shall submit the RACT SIP for each area no later than 24 months after the effective date of designation for the 2008 ozone NAAQS.

(3) The state shall provide for implementation of RACT as expeditiously as practicable but no later than January 1 of the 5th year after the effective date of designation for the 2008 ozone NAAQS.

(b) *Determination of major stationary sources for applicability of RACT provisions.* The amount of VOC and NO$_X$ emissions are to be considered separately for purposes of determining whether a source is a major stationary source as defined in CAA section 302.

(c) *Reasonably Available Control Measures (RACM) requirement.* For each nonattainment area required to submit an attainment demonstration under §51.1108(a) and (b), the state shall submit with the attainment demonstration a SIP revision demonstrating that it has adopted all RACM necessary to demonstrate attainment as expeditiously as practicable and to meet any RFP requirements.

[80 FR 12314, Mar. 6, 2015]

§ 51.1113 Section 182(f) NO$_X$ exemption provisions.

(a) A person or a state may petition the Administrator for an exemption from NO$_X$ obligations under CAA section 182(f) for any area designated nonattainment for the 2008 ozone NAAQS and for any area in a CAA section 184 ozone transport region.

(b) The petition must contain adequate documentation that the criteria in CAA section 182(f) are met.

(c) A CAA section 182(f) NO$_X$ exemption granted for the 1-hour or 1997 ozone NAAQS does not relieve the area from any NO$_X$ obligations under CAA

section 182(f) for the 2008 ozone NAAQS.

[80 FR 12314, Mar. 6, 2015]

**§51.1114 New source review requirements.**

The requirements for nonattainment NSR for the ozone NAAQS are located in §51.165. For each nonattainment area, the state shall submit a nonattainment NSR plan or plan revision for the 2008 ozone NAAQS no later than 36 months after the effective date of the area's designation for the 2008 ozone NAAQS.

[80 FR 12314, Mar. 6, 2015]

**§51.1115 Emissions inventory requirements.**

(a) For each nonattainment area, the state shall submit a base year inventory as defined by §51.1100(bb) to meet the emissions inventory requirement of CAA section 182(a)(1). This inventory shall be submitted no later than 24 months after the effective date of designation. The inventory year shall be selected consistent with the baseline year for the RFP plan as required by §51.1110(b).

(b) For each nonattainment area, the state shall submit a periodic emission inventory of emissions sources in the area to meet the requirement in CAA section 182(a)(3)(A). With the exception of the inventory year and timing of submittal, this inventory shall be consistent with the requirements of paragraph (a) of this section. Each periodic inventory shall be submitted no later than the end of each 3-year period after the required submission of the base year inventory for the nonattainment area. This requirement shall apply until the area is redesignated to attainment.

(c) The emissions values included in the inventories required by paragraphs (a) and (b) of this section shall be actual ozone season day emissions as defined by §51.1100(cc).

(d) The state shall report emissions from point sources according to the point source emissions thresholds of the Air Emissions Reporting Requirements (AERR), 40 CFR part 51, subpart A.

(e) The data elements in the emissions inventory shall be consistent with the detail required by 40 CFR part 51, subpart A. Since only emissions within the boundaries of the nonattainment area shall be included as defined by §51.1100(cc), this requirement shall apply to the emissions inventories required in this section instead of any total county requirements contained in 40 CFR part 51, subpart A.

[80 FR 12314, Mar. 6, 2015]

**§51.1116 Requirements for an Ozone Transport Region.**

(a) *In general.* CAA sections 176A and 184 apply for purposes of the 2008 ozone NAAQS.

(b) *RACT requirements for certain portions of an Ozone Transport Region.* (1) The state shall submit a SIP revision that meets the RACT requirements of CAA section 184(b)(2) for all portions of the state located in an ozone transport region.

(2) The state shall submit the RACT revision no later than 24 months after designation for the 2008 ozone NAAQS and shall provide for implementation of RACT as expeditiously as practicable but no later than January 1 of the 5th year after designation for the 2008 ozone NAAQS.

[80 FR 12314, Mar. 6, 2015]

**§51.1117 Fee programs for Severe and Extreme nonattainment areas that fail to attain.**

For each area classified as Severe or Extreme for the 2008 ozone NAAQS, the state shall submit a SIP revision within 10 years of the effective date of designation that meets the requirements of CAA section 185.

[80 FR 12314, Mar. 6, 2015]

**§51.1118 Suspension of SIP planning requirements in nonattainment areas that have air quality data that meet an ozone NAAQS.**

Upon a determination by EPA that an area designated nonattainment for the 2008 ozone NAAQS, or for any prior ozone NAAQS, has attained the relevant standard, the requirements for such area to submit attainment demonstrations and associated reasonably available control measures, reasonable

West's Pennsylvania Administrative Code
Title 25. Environmental Protection
Part I. Department of Environmental Protection
Subpart C. Protection of Natural Resources
Article III. Air Resources
Chapter 127. Construction, Modification, Reactivation and Operation of Sources
Subchapter B. Plan Approval Requirements

25 Pa. Code § 127.12

§ 127.12. Content of applications.

Currentness

(a) An application for approval shall:

(1) Identify the location of the source and the name, title, address and telephone number of the individual responsible for the operation of the source.

(2) Contain information that is requested by the Department and is necessary to perform a thorough evaluation of the air contamination aspects of the source.

(3) Show that the source will be equipped with reasonable and adequate facilities to monitor and record the emissions of air contaminants and operating conditions which may affect the emissions of air contaminants and that the records are being and will continue to be maintained and that the records will be submitted to the Department at specified intervals or upon request.

(4) Show that the source will comply with applicable requirements of this article and requirements promulgated by the Administrator of the EPA under the Clean Air Act (42 U.S.C.A. §§ 7401--7706).

(5) Show that the emissions from a new source will be the minimum attainable through the use of the best available technology.

(6) Show that the source will not prevent or adversely affect the attainment or maintenance of ambient air quality standards when requested by the Department.

(7) Contain a plan of action for the reduction of emissions during each level specified in Chapter 137 (relating to air pollution episodes), when required by the Department.

(8) Show that the provisions of § 127.43a (relating to municipal notification) have been met. The applicant shall submit a copy of the notification letter and proof that the notice was received.

(9) Contain a plan for dealing with air pollution emergencies, when requested by the Department, or when required by the Clean Air Act.

(10) Show that the source and the air cleaning devices are capable of being and will be operated and maintained in accordance with good air pollution control practices.

(11) Contain a completed compliance review form or reference the most recently submitted compliance review form for facilities submitting a compliance review form on a periodic basis.

(b) The Department will not approve an application which fails to meet the requirements of subsection (a). An approval may be granted with appropriate conditions.

(c) The records, reports or information obtained by the Department or referred to at public hearings shall be available to the public, except as provided in subsection (d).

(d) Upon cause shown by any person that the records, reports or information, or a particular portion thereof, but not emission data, to which the Department has access under the act, if made public, would divulge production or sales figures or methods, processes or production unique to that person or would otherwise tend to affect adversely the competitive position of that person by revealing trade secrets, including intellectual property rights, the Department will consider the record, report or information, or particular portion thereof confidential in the administration of the act. The Department will implement this section consistent with sections 112(d) and 114(c) of the Clean Air Act (42 U.S.C.A. §§ 7412(d) and 7414(c)). Nothing in this section prevents disclosure of the report, record or information to Federal, State or local representatives as necessary for purposes of administration of Federal, State or local air pollution control laws, or when relevant in a proceeding under the act.

**Credits**

Adopted Sept. 11, 1971; Amended Mar. 20, 1972; Amended Mar. 18, 1989; Amended Nov. 26, 1994.

Current through Pennsylvania Bulletin, Vol. 49, Num. 52, dated December 28, 2019

25 Pa. Code § 127.12, 25 PA ADC § 127.12

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

West's Pennsylvania Administrative Code
Title 25. Environmental Protection
Part I. Department of Environmental Protection
Subpart C. Protection of Natural Resources
Article III. Air Resources
Chapter 127. Construction, Modification, Reactivation and Operation of Sources
Subchapter F. Operating Permit Requirements
Permit Applications.

25 Pa. Code § 127.411

§ 127.411. Content of applications.

Currentness

(a) An application for an operating permit shall:

(1) Identify the location of the source and the name, title, address and telephone number of the individual responsible for the operation of the source.

(2) Contain information that is requested by the Department and is necessary to perform a thorough evaluation of the air contamination aspects of the source.

(3) Include the information contained in the plan approval application.

(4) Demonstrate that:

(i) The source is equipped with reasonable and adequate facilities to monitor and record the emissions of air contaminants and the operating conditions which may affect the emissions of air contaminants.

(ii) The records are being and will continue to be maintained.

(iii) The records will be submitted to the Department at specified intervals or upon request.

(5) Demonstrate that the source is complying with applicable requirements of this article and requirements promulgated by the Administrator of the EPA under the Clean Air Act.

(6) Demonstrate that the emissions from a new source are the minimum attainable through the use of the best available technology as required by the plan approval.

(7) Demonstrate that the source is not preventing or adversely affecting the attainment or maintenance of ambient air quality standards when requested by the Department.

(8) Contain a plan of action for the reduction of emissions during each level specified in Chapter 137 (relating to air pollution episodes) when required by the Department.

(9) Demonstrate that the provisions of § 127.413 (relating to municipal notification) have been met. The applicant shall submit a copy of the notification letter and proof that the notice was received.

(10) Contain a plan for dealing with air pollution emergencies, when requested by the Department or when required by the Clean Air Act or the regulations adopted under the act or the Clean Air Act.

(11) Demonstrate that the source and the air cleaning devices are being and will be operated and maintained in accordance with good air pollution control practices.

(12) Contain a completed compliance review form or reference the most recently submitted compliance review form for facilities submitting compliance review forms on a periodic basis.

(b) The Department will not approve an application which fails to meet the requirements of subsection (a).

(c) The records, reports or information obtained by the Department or referred to at public hearings shall be available to the public, except as provided in subsection (d).

(d) Upon cause shown by any person that the records, reports or information, or a particular portion thereof, but not emission data, to which the Department has access under the provisions of the act, if made public, would divulge production or sales figures or methods, processes or production unique to that person or would otherwise tend to affect adversely the competitive position of that person by revealing trade secrets, including intellectual property rights, the Department will consider the record, report or information, or particular portion thereof confidential in the administration of the act. The Department will implement this section consistent with sections 112(d) and 114(c) of the Clean Air Act (42 U.S.C.A. §§ 7412(d) and 7414(c)). Nothing in this section prevents the disclosure of the report, record or information to Federal, State or local representatives as necessary for purposes of administration of Federal, State or local air pollution control laws, or when relevant in any proceeding under the act.

**Credits**
Adopted Nov. 26, 1994.

Current through Pennsylvania Bulletin, Vol. 49, Num. 52, dated December 28, 2019

25 Pa. Code § 127.411, 25 PA ADC § 127.411

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

West's Pennsylvania Administrative Code
Title 25. Environmental Protection
Part I. Department of Environmental Protection
Subpart C. Protection of Natural Resources
Article III. Air Resources
Chapter 127. Construction, Modification, Reactivation and Operation of Sources
Subchapter F. Operating Permit Requirements
Operating Permit Conditions

25 Pa. Code § 127.441

§ 127.441. Operating permit terms and conditions.

Currentness

(a) A permit may contain terms and conditions the Department deems necessary to assure the proper operation of the source.

(b) At a minimum, each permit shall incorporate by reference the emission and performance standards and other requirements of the act, the Clean Air Act or the regulations thereunder.

(c) The operating permit shall incorporate the monitoring, recordkeeping and reporting requirements required by Chapter 139 (relating to sampling and testing) and other monitoring, recordkeeping or reporting requirements of this article and additional requirements related to monitoring, recordkeeping and reporting required by the Clean Air Act and the regulations thereunder including, if applicable, the enhanced monitoring requirements of 40 CFR Part 64 (relating to enhanced monitoring).

(d) The permit shall contain a requirement that the permittee develop an accidental release program consistent with the Clean Air Act and the regulations thereunder.

**Credits**
Adopted Nov. 26, 1994.

Current through Pennsylvania Bulletin, Vol. 49, Num. 52, dated December 28, 2019

25 Pa. Code § 127.441, 25 PA ADC § 127.441

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

West's Pennsylvania Administrative Code
   Title 25. Environmental Protection
      Part I. Department of Environmental Protection
         Subpart C. Protection of Natural Resources
            Article III. Air Resources
               Chapter 127. Construction, Modification, Reactivation and Operation of Sources
                  Subchapter F. Operating Permit Requirements
                     Operating Permit Conditions

25 Pa. Code § 127.442

§ 127.442. Reporting requirements.

Currentness

(a) Each source shall submit reports to the Department containing information the Department may prescribe relative to the operation and maintenance of the source.

(b) At a minimum, each permit shall incorporate by reference the reporting requirements of the act, the Clean Air Act or the regulations thereunder applicable to the source.

**Credits**
Adopted Nov. 26, 1994.

Current through Pennsylvania Bulletin, Vol. 49, Num. 52, dated December 28, 2019

25 Pa. Code § 127.442, 25 PA ADC § 127.442

**End of Document**                                                 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

West's Pennsylvania Administrative Code
  Title 25. Environmental Protection
    Part I. Department of Environmental Protection
    Subpart C. Protection of Natural Resources
      Article III. Air Resources
        Chapter 127. Construction, Modification, Reactivation and Operation of Sources
        Subchapter F. Operating Permit Requirements
          Operating Permit Conditions

25 Pa. Code § 127.444

§ 127.444. Compliance requirements.

Currentness

A person may not cause or permit the operation of a source subject to this article unless the source and air cleaning devices identified in the application for the plan approval and operating permit and the plan approval issued to the source are operated and maintained in accordance with specifications in the application and conditions in the plan approval and operating permit issued by the Department. A person may not cause or permit the operation of an air contamination source subject to this chapter in a manner inconsistent with good operating practices.

**Credits**
Adopted Nov. 26, 1994.

Current through Pennsylvania Bulletin, Vol. 49, Num. 52, dated December 28, 2019

25 Pa. Code § 127.444, 25 PA ADC § 127.444

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

West's Pennsylvania Administrative Code
   Title 25. Environmental Protection
      Part I. Department of Environmental Protection
         Subpart C. Protection of Natural Resources
            Article III. Air Resources
               Chapter 127. Construction, Modification, Reactivation and Operation of Sources
                  Subchapter F. Operating Permit Requirements
                     Operating Permit Modifications

25 Pa. Code § 127.463

§ 127.463. Operating permit revisions to incorporate applicable standards.

Currentness

(a) The Department will require revisions to an operating permit to incorporate applicable standards or regulations promulgated under the Clean Air Act after the issuance of the permit.

(b) The revisions shall occur as expeditiously as practicable, but not later than 18 months after the promulgation of the standards or regulations.

(c) A revision will not be required if the effective date of the standards or regulations is a date after the expiration of the permit term or if less than 3 years remain in the permit term.

(d) A revision issued under this section shall be treated as a permit renewal if it complies with the act and the regulations promulgated thereunder regarding renewals.

(e) Regardless of whether a revision is required under this section, the permittee shall meet the applicable standards or regulations promulgated under the Clean Air Act within the time frame required by standards or regulations.

**Credits**
Adopted Nov. 26, 1994.

Current through Pennsylvania Bulletin, Vol. 49, Num. 52, dated December 28, 2019

25 Pa. Code § 127.463, 25 PA ADC § 127.463

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

West's Pennsylvania Administrative Code
  Title 25. Environmental Protection
    Part I. Department of Environmental Protection
    Subpart C. Protection of Natural Resources
      Article III. Air Resources
        Chapter 127. Construction, Modification, Reactivation and Operation of Sources
          Subchapter G. Title V Operating Permits
            Permit Conditions

25 Pa. Code § 127.512

§ 127.512. Operating permit terms and conditions.

Currentness

(a) Each permit issued to a Title V facility shall, at a minimum, contain the permit terms and conditions required by this section.

(b) The permit shall contain a severability clause to ensure the continued validity of the various permit requirements in the event of a challenge to a portion of the permit.

(c) The permit shall contain provisions stating the following:

(1) The permittee shall comply with conditions of the operating permit. Noncompliance with the permit constitutes a violation of the Clean Air Act and the act and is grounds for one or more of the following:

(i) Enforcement action.

(ii) Permit termination, revocation and reissuance or modification.

(iii) Denial of a permit renewal application.

(2) The need to halt or reduce activity is not a defense. It is not a defense for a permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity to maintain compliance with the conditions of this permit.

(3) The permit may be modified, revoked, reopened and reissued or terminated for cause. The filing of a request by the permittee for a permit modification, revocation and reissuance, or termination, or of a notification of planned changes or anticipated noncompliance does not stay a permit condition.

(4) The permit does not convey property rights of any sort, or an exclusive privilege.

(5) The permittee shall furnish to the Department, within a reasonable time, information that the Department may request in writing to determine whether cause exists for modifying, revoking and reissuing, or terminating the permit or to determine compliance with the permit. Upon request, the permittee shall also furnish to the Department copies of records required to be kept by the permit or, for information claimed to be confidential, the permittee may furnish the records directly to the Administrator of the EPA along with a claim of confidentiality.

(d) The permit shall contain a provision to ensure that a Title V facility pays fees to the Department consistent with Subchapter I (relating to plan approval and operating permit fees).

(e) The permit shall contain a provision stating that a permit revision is not required, under approved economic incentives, marketable permits, emissions trading and other similar programs or processes for changes that are provided for in the permit.

(f) The permit shall contain terms and conditions for reasonably anticipated operating scenarios identified by the source in its application and approved by the Department. The terms and conditions:

(1) Shall require the source, when operating under the permit and contemporaneously with making a change from one operating scenario to another, to record in a permitting log at the permitted facility a record of the scenario under which it is operating.

(2) Shall extend the permit shield described in § 127.516 (relating to permit shield) to the terms and conditions under each operating scenario unless precluded by the Clean Air Act or the regulations thereunder.

(3) Shall ensure that the terms and conditions of each alternative scenario meet the applicable requirements and the requirements of this part.

(g) The permit shall contain terms and conditions, if the permit applicant requests them, for the trading of emissions increases and decreases in the permitted facility, to the extent that the applicable requirements provide for trading the increases and decreases. The terms and conditions:

(1) Shall include the terms required by this article to determine compliance.

(2) Shall extend the permit shield described in § 127.516 to the terms and conditions that allow the increases and decreases in emissions unless precluded by the Clean Air Act and the regulations thereunder.

(3) Shall meet the applicable requirements and requirements of this article.

(h) The permit shall contain emission limits and standards, including those operational requirements and limitations that assure compliance with the applicable requirements at the time of permit issuance.

(i) The permit shall contain a requirement that the permittee develop an accident release program consistent with the Clean Air Act and the regulations thereunder.

(j) Except when precluded by the Clean Air Act, the regulations thereunder or of this title, if the permit contains emission limitations for VOCs or $PM_{10}$ but does not specifically limit the emissions of pollutants regulated under section 112 of the Clean Air Act (42 U.S.C.A. § 7412) the permit shall contain a requirement that the permittee can modify the mixture of pollutants regulated under section 112 which are VOCs or $PM_{10}$ so long as the emission limitations of the permit are not violated. The permittee shall keep a log which identifies the mixture of pollutants regulated under section 112 and report the changes in the mixture of pollutants regulated under section 112 with the next report required to be provided to the Department.

**Credits**

Adopted Nov. 26, 1994.

Current through Pennsylvania Bulletin, Vol. 49, Num. 52, dated December 28, 2019

25 Pa. Code § 127.512, 25 PA ADC § 127.512

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

West's Pennsylvania Administrative Code
Title 25. Environmental Protection
Part I. Department of Environmental Protection
Subpart C. Protection of Natural Resources
Article III. Air Resources
Chapter 129. Standards for Sources
Stationary Sources of NO$_X$ and Vocs

25 Pa. Code § 129.91

§ 129.91. Control of major sources of NO$_x$ and VOCs.

Currentness

(a) This section applies to both the owner and the operator of a major NO$_x$ emitting facility or major VOC emitting facility for which no RACT requirement has been established in §§ 129.51, 129.52, 129.54--129.72, 129.81 and 129.82. This section does not apply to the owner and operator of a major VOC emitting facility for which requirements have been established in § 129.52, Table I (11) (relating to surface coating processes) and §§ 129.101--129.107 (relating to wood furniture manufacturing operations).

(b) The owner and the operator shall, jointly, provide the Department with the following information on or before May 16, 1994.

(1) An identification of each facility including individual sources to which this section applies.

(2) A determination through emission testing of the following:

(i) The total potential to emit and the actual emissions of VOCs for the 1990 calendar year from each source at the facility.

(ii) The total potential to emit and actual emissions of NO$_x$ for the 1990 calendar year from each source at the facility.

(c) Alternative methods which accurately characterize the emissions for the 1990 calendar year may be used to determine potential and actual emissions under subsection (b) if emission test data are not available and the Department has approved the alternative method in writing.

(d) The owner and the operator of a major NO$_x$ emitting facility or major VOC emitting facility shall, jointly, on or before July 15, 1994, provide to the Department and the EPA, Chief, Air Programs Branch, United States EPA, Region III, 841 Chestnut Building, Philadelphia, Pennsylvania 19107 a written proposal for RACT for each source of VOCs and NO$_x$ at the facility. The RACT proposal shall include, at a minimum, the information contained in § 129.92 (relating to RACT proposal requirements).

(e) The Department will approve, deny or modify each RACT proposal.

(f) Upon receipt of notice of the Department's approval of the RACT proposal, the facility shall begin implementation of the measures necessary to comply with the approved or modified RACT proposal. Implementation of the RACT program shall be completed according to the schedule established in the approved RACT program and shall be as expeditious as practicable but no later than May 31, 1995.

(g) Where the installation of a new source, modification or change in operation of an existing source will result in the source or facility meeting the definition of a major $NO_x$ emitting facility or a major VOC emitting facility, the owner and the operator shall jointly submit a RACT proposal to the Department and the EPA that meets the requirements of this section, and complete implementation of the RACT proposal as approved or modified by the Department prior to the installation, modification or change in operation of the existing source.

(h) Except for sources which elect to comply with the presumptive RACT emission limitations in § 129.93 (relating to presumptive RACT emission limitations), the Department will submit each RACT determination to the EPA for approval as a revision to the SIP. A major $NO_x$ emitting facility or major VOC emitting facility shall bear the costs of public hearings and notification required for EPA approval.

(i) Following the implementation of the RACT requirements, the owner and operator of a combustion unit with a rated heat input of 250 million Btus per hour or greater and subject to § 123.51 (relating to monitoring requirements) shall, through the use of a Department approved continuous emission monitoring system, determine the rate of emissions of $NO_x$ from the combustion unit. Following the implementation of the RACT requirements, the owner and operator of a combustion unit with a rated heat input greater than 100 million Btus per hour and not subject to § 123.51, shall, through the use of either a Department approved periodic source testing program or predictive modeling program, determine the rate of emissions of $NO_x$ from the combustion unit unless the owner and operator elects to use a Department approved continuous monitoring system.

(j) Based on the results of the emission monitoring conducted in accordance with subsection (i), the Department will determine the RACT emission limitations for the source and the Department will submit the emission limitations to the EPA as a Federally enforceable permit.

**Credits**
Adopted Jan. 15, 1994; Amended June 10, 2000.

Current through Pennsylvania Bulletin, Vol. 49, Num. 52, dated December 28, 2019

25 Pa. Code § 129.91, 25 PA ADC § 129.91

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

West's Pennsylvania Administrative Code
Title 25. Environmental Protection
Part I. Department of Environmental Protection
Subpart C. Protection of Natural Resources
Article III. Air Resources
Chapter 129. Standards for Sources
Stationary Sources of $NO_X$ and Vocs

25 Pa. Code § 129.92

§ 129.92. RACT proposal requirements.

Currentness

(a) Each RACT proposal shall, at a minimum, include the following information:

(1) A list of each source subject to the RACT requirements.

(2) The size or capacity of each affected source and the types of fuel combusted or the types and quantities of materials processed or produced in each source.

(3) A physical description of each source and its operating characteristics.

(4) Estimates of the potential and actual $NO_x$ and VOC emissions from each affected source and associated supporting documentation.

(5) A RACT analysis which meets the requirements of subsection (b), including technical and economic support documentation for each affected source.

(6) A schedule for completing implementation of the RACT proposal as expeditiously as practicable but not later than May 31, 1995, including interim dates for the issuance of purchase orders, start and completion of process, technology and control technology changes and the completion of compliance testing.

(7) The testing, monitoring, recordkeeping and reporting procedures proposed to demonstrate compliance with RACT.

(8) A plan approval application that meets the requirements of this article if required under § 127.11 (relating to plan approval requirements).

(9) An application for an operating permit amendment or application to incorporate the provisions of the RACT proposal.

(10) Additional information requested by the Department that is necessary for the evaluation of the RACT proposal.

(b) The RACT analysis required under subsection (a)(5) shall include:

(1) A ranking of the available control options for the affected source in descending order of control effectiveness. Available control options are air pollution control technologies or techniques with a reasonable potential for application to the source. Air pollution control technologies and techniques include the application of production process or methods, control systems for VOCs and $NO_x$ and fuel combustion techniques for the control of $NO_x$. The control technologies and techniques shall include existing controls for the source category and technology transfer controls applied to similar source categories.

(2) An evaluation of the technical feasibility of the available control options identified in subsection (b)(1). The evaluation of technical feasibility shall be based on physical, chemical and engineering principles. A determination of technical infeasibility shall identify technical difficulties which would preclude the successful use of the control option on the affected source.

(3) A ranking of the technically feasible control options in order of overall control effectiveness for $NO_x$ or VOC emissions. The list shall present the array of control options and shall include, at a minimum, the following information:

(i) The baseline emissions of VOCs and $NO_x$ before implementation of each control option.

(ii) The estimated emission reduction potential or the estimated control efficiency of each control option.

(iii) The estimated emissions after the application of each control option.

(iv) The economic impacts of each control option, including both overall cost effectiveness and incremental cost effectiveness.

(4) An evaluation of cost effectiveness of each control option consistent with the "OAQPS Control Cost Manual" (Fourth Edition), EPA 450/3-90-006 January 1990 and subsequent revisions. The evaluation shall be conducted in accordance with the following requirements:

(i) The cost effectiveness shall be evaluated in terms of dollars per ton of $NO_x$ or VOC emissions reduction.

(ii) The cost effectiveness shall be calculated on average and incremental bases for each option. Average cost effectiveness is calculated as the annualized cost of the control option divided by the baseline emissions rate minus the control option emission rate, as shown by the following formula:

Average cost effectiveness ($/ton removed) =

Control option total annualized cost ($/yr)

Baseline emission rate - Control option rate (tons/yr)

(iii) For purposes of this paragraph, baseline emission rate represents the maximum emissions before the implementation of the control option. The baseline emissions rate shall be established using either test results or approved emission factors and historic operating data.

(iv) For purposes of this paragraph, the incremental cost effectiveness calculation compares the costs and emission level of a control option to those of the next most stringent option, as shown by the following formula:

Incremental Cost (dollars) per incremental ton removed) =

$$\frac{\text{Control option total annualized cost (\$/yr) - Total annualized cost of next most stringent control option}}{\text{Next most stringent control option emission rate - control option emission rate}}$$

(c) The RACT analysis, including the technical and economic documentation required by subsections (a)(5) and (b), will not be required for the sources which comply with the presumptive RACT emission limitations in § 129.93 (relating to presumptive RACT emission limitations).

**Credits**
Adopted Jan. 15, 1994.

Current through Pennsylvania Bulletin, Vol. 49, Num. 52, dated December 28, 2019

25 Pa. Code § 129.92, 25 PA ADC § 129.92

West's Pennsylvania Administrative Code
Title 25. Environmental Protection
Part I. Department of Environmental Protection
Subpart C. Protection of Natural Resources
Article III. Air Resources
Chapter 129. Standards for Sources
Stationary Sources of $NO_X$ and Vocs

25 Pa. Code § 129.93

§ 129.93. Presumptive RACT emission limitations.

Currentness

(a) The owner and operator of a major $NO_x$ emitting facility listed in this section and subject to § 129.91 (relating to control of major sources of $NO_x$ and VOCs) may elect to comply with the emission limitations of this section as an alternative to developing and implementing a RACT emission limitation on a case-by-case basis.

(b) The owner and operator shall develop and implement the following presumptive RACT emission limitations:

(1) For a coal-fired combustion unit with a rated heat input equal to or greater than 100 million Btu/hour, presumptive RACT shall be the installation and operation of low $NO_X$ burners with separate overfire air.

(2) For a combustion unit with a rated heat input equal to or greater than 20 million Btu/hour and less than 50 million Btu/hour presumptive RACT shall be the performance of an annual adjustment or tuneup on the combustion process. This adjustment shall include, at a minimum, the following:

(i) Inspection, adjustment, cleaning or replacement of fuel-burning equipment, including the burners and moving parts necessary for proper operation as specified by the manufacturer.

(ii) Inspection of the flame pattern or characteristics and adjustments necessary to minimize total emissions of $NO_x$, and to the extent practicable minimize emissions of CO.

(iii) Inspection of the air-to-fuel ratio control system and adjustments necessary to ensure proper calibration and operation as specified by the manufacturer.

(3) For combustion units subject to paragraph (2), the owner and operator of the adjusted equipment shall record each adjustment conducted under the procedures in paragraph (2) in a permanently bound log book or other method approved by the Department. This log shall contain, at a minimum, the following information:

(i) The date of the tuning procedure.

(ii) The name of the service company and technicians.

(iii) The final operating rate or load.

(iv) The final CO and $NO_x$ emission rates.

(v) The final excess oxygen rate.

(vi) Other information required by the applicable operating permit.

(4) For oil, gas and combination oil/gas units subject to paragraph (2), the owner and operator shall maintain records including a certification from the fuel supplier of the type of fuel and for each shipment of distillate oils number 1 or 2, a certification that the fuel complies with ASTM D396-78 "Standard Specifications for Fuel Oils." For residual oils, minimum recordkeeping includes a certification from the fuel supplier of the nitrogen content of the fuel, and identification of the sampling method and sampling protocol.

(5) For oil and gas and combination oil/gas fired units subject to paragraph (2), the owner and operator shall make the annual adjustment in accordance with the EPA document "Combustion Efficiency Optimization Manual for Operators of Oil and Gas-fired Boilers," September 1983 (EPA-340/1-83-023) or equivalent procedures approved in writing by the Department.

(c) For the following source types, presumptive RACT emission limitations are the installation, maintenance and operation of the source in accordance with manufacturers specifications:

(1) Boilers and other combustion sources with individual rated gross heat inputs less than 20 million Btu/hour of operation.

(2) Combustion turbines with individual heat input rates less than 25 million Btu/hour which are used for natural gas distribution.

(3) Internal combustion engines rated at less than 500 bhp (gross) which are set and maintaining 4° retarded relative to standard timing.

(4) Incinerators or thermal/catalytic oxidizers used primarily for air pollution control.

(5) Any fuel-burning equipment, gas turbine or internal combustion engine with an annual capacity factor of less than 5%, or an emergency standby engine operating less than 500 hours in a consecutive 12-month period.

(6) Sources which have been approved as meeting LAER for $NO_x$ emissions since November 15, 1990, with Federally enforceable emission limitations.

(7) Sources which have been approved as meeting BACT for $NO_x$ emissions since November 15, 1990, with Federally enforceable emission limitations. These sources shall, however, meet any more stringent category-wide RACT emission limitation promulgated by EPA or the Department.

**Credits**

Adopted Jan. 15, 1994; Amended Apr. 23, 1994.

Current through Pennsylvania Bulletin, Vol. 49, Num. 52, dated December 28, 2019

25 Pa. Code § 129.93, 25 PA ADC § 129.93

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

ADD093

West's Pennsylvania Administrative Code
  Title 25. Environmental Protection
    Part I. Department of Environmental Protection
      Subpart C. Protection of Natural Resources
        Article III. Air Resources
          Chapter 129. Standards for Sources
          Stationary Sources of NO$_X$ and Vocs

25 Pa. Code § 129.94

§ 129.94. NO$_X$ RACT emission averaging general requirements.

Currentness

(a) The owners and operators of major NO$_x$ emitting facilities may submit a written proposal to the Department as part of an application for operating permits to average emissions to meet the RACT requirements of § 129.91 (relating to control of major sources of NO$_x$ and VOCs). Emission averaging which complies with applicable EPA requirements and is approved as an SIP revision, and which meets the criteria in subsection (b) and is approved by the Department shall satisfy the requirements of § 129.91. The Department will approve, deny or modify each averaging proposal.

(b) The Department will not approve an emission averaging proposal unless the proposal demonstrates compliance with the following requirements to the Department's satisfaction:

  (1) The proposal shall demonstrate that the aggregate emissions achieved through the RACT averaging proposal are less than the sum of emissions that would be achieved by complying with the RACT requirement on a source specific basis.

  (2) The averaging proposal shall include a tons per year emission cap and an emission rate such as pounds/million Btus for each source in the averaging proposal that provide for verification and enforcement of the averaging proposal.

  (3) Emission reductions attributed to the shutdown or curtailment of operation of a source may not be included in an averaging proposal.

  (4) The proposal shall demonstrate that the ambient air quality impact resulting from implementation of the averaging proposal is less than or equivalent to the impact from each source complying with the RACT requirements in § 129.91 and §§ 129.92 and 129.93 (relating to RACT proposal requirements; and presumptive RACT emission limitations) individually. The demonstration shall consider the area of emissions impact and the periods of time of emissions impact except as follows:

    (i) For emission averaging involving sources located within the same nonattainment area, the demonstration shall only consider the periods of time of emissions impact.

(ii) For emission averaging involving sources not located within the same nonattainment area which are located less than 200 kilometers from another source involved in the averaging proposal, the demonstration shall only consider the periods of time of emissions impact.

(5) The proposal shall provide that each source involved in the averaging proposal shall be required to use continuous emission monitors and record emissions following the requirements of Chapter 139 (relating to sampling and testing). The participating sources are required to establish telemetry links between the sources and to provide real time emission data to all sources affected by the averaging proposal. For an averaging proposal involving sources at a single facility, the Department may approve alternate requirements provided the proposal demonstrates that the alternate methodologies are credible, workable, replicable and fully enforceable and adequately quantify emissions from all sources participating in the averaging program.

(c) An averaging proposal shall be approved by the EPA as an SIP revision before the averaging proposal may be implemented.

(d) Every source or facility involved in the approved averaging proposal is in violation of its operating permit when a source or facility subject to the averaging proposal exceeds an emission limitation or averaging requirement established under this section.

(e) Additional emission reductions required under the act or the Clean Air Act or the regulations adopted under either the act or the Clean Air Act shall be in addition to and not a substitute for the emission reductions required by the averaging proposal.

**Credits**
Adopted Jan. 15, 1994.

Current through Pennsylvania Bulletin, Vol. 49, Num. 52, dated December 28, 2019

25 Pa. Code § 129.94, 25 PA ADC § 129.94

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.  2

ADD095

West's Pennsylvania Administrative Code
Title 25. Environmental Protection
Part I. Department of Environmental Protection
Subpart C. Protection of Natural Resources
Article III. Air Resources
Chapter 129. Standards for Sources
Stationary Sources of NO$_X$ and Vocs

25 Pa. Code § 129.95

§ 129.95. Recordkeeping.

Currentness

(a) The owner and operator of a major NO$_x$ emitting facility or a major VOCs emitting facility shall keep records to demonstrate compliance with §§ 129.91--129.94.

(b) The records shall provide sufficient data and calculations to clearly demonstrate that the requirements of §§ 129.91--129.94 are met.

(c) Data or information required to determine compliance shall be recorded and maintained in a time frame consistent with the averaging period of the requirement.

(d) The records shall be retained for at least 2 years and shall be made available to the Department on request.

(e) An owner or operator claiming that a facility is exempt from the RACT requirements of §§ 129.91--129.94, based on the facility's potential to emit, shall maintain records that clearly demonstrate to the Department that the facility or source is not subject to §§ 129.91--129.94.

**Credits**
Adopted Jan. 15, 1994.

Current through Pennsylvania Bulletin, Vol. 49, Num. 52, dated December 28, 2019

25 Pa. Code § 129.95, 25 PA ADC § 129.95

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.   1

ADD096

West's Pennsylvania Administrative Code
  Title 25. Environmental Protection
    Part I. Department of Environmental Protection
      Subpart C. Protection of Natural Resources
        Article III. Air Resources
          Chapter 129. Standards for Sources
            Additional Ract Requirements for Major Sources of NOx and Vocs

25 Pa. Code § 129.96

§ 129.96. Applicability.

Currentness

(a) The $NO_x$ requirements of this section and §§ 129.97--129.100 apply Statewide to the owner and operator of a major $NO_x$ emitting facility and the VOC requirements of this section and §§ 129.97--129.100 apply Statewide to the owner and operator of a major VOC emitting facility that were in existence on or before July 20, 2012, for which a requirement or emission limitation, or both, has not been established in §§ 129.51--129.52c, 129.54--129.63, 129.64--129.69, 129.71--129.75, 129.77, 129.101--129.107 and 129.301--129.310.

(b) The $NO_x$ requirements of this section and §§ 129.97--129.100 apply Statewide to the owner and operator of a $NO_x$ emitting facility and the VOC requirements of this section and §§ 129.97--129.100 apply Statewide to the owner and operator of a VOC emitting facility when the installation of a new source or a modification or change in operation of an existing source after July 20, 2012, results in the source or facility meeting the definition of a major $NO_x$ emitting facility or a major VOC emitting facility and for which a requirement or an emission limitation, or both, has not been established in §§ 129.51--129.52e, 129.54--129.69, 129.71--129.75, 129.77, 129.101--129.107 and 129.301--129.310.

(c) This section and §§ 129.97--129.100 do not apply to the owner and operator of a $NO_x$ air contamination source located at a major $NO_x$ emitting facility that has the potential to emit less than 1 TPY of $NO_x$ or a VOC air contamination source located at a major VOC emitting facility that has the potential to emit less than 1 TPY of VOC.

(d) This section and §§ 129.97--129.100 do not apply to the owner and operator of a facility which is not a major $NO_x$ emitting facility or a major VOC emitting facility on or before January 1, 2017.

**Credits**

Adopted April 23, 2016. Amended Aug. 11, 2018.

Current through Pennsylvania Bulletin, Vol. 49, Num. 52, dated December 28, 2019

25 Pa. Code § 129.96, 25 PA ADC § 129.96

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

West's Pennsylvania Administrative Code
Title 25. Environmental Protection
Part I. Department of Environmental Protection
Subpart C. Protection of Natural Resources
Article III. Air Resources
Chapter 129. Standards for Sources
Additional Ract Requirements for Major Sources of NOx and Vocs

25 Pa. Code § 129.97

§ 129.97. Presumptive RACT requirements, RACT emission limitations and petition for alternative compliance schedule.

Currentness

(a) The owner and operator of a source listed in one or more of subsections (b)--(h) located at a major $NO_x$ emitting facility or major VOC emitting facility subject to § 129.96 (relating to applicability) shall comply with the applicable presumptive RACT requirement or RACT emission limitation, or both, beginning with the specified compliance date as follows, unless an alternative compliance schedule is submitted and approved under subsections (k)--(m) or § 129.99 (relating to alternative RACT proposal and petition for alternative compliance schedule):

(1) January 1, 2017, for a source subject to § 129.96(a).

(2) January 1, 2017, or 1 year after the date the source meets the definition of a major $NO_x$ emitting facility or major VOC emitting facility, whichever is later, for a source subject to § 129.96(b).

(b) The owner and operator of a source specified in this subsection, which is located at a major $NO_x$ emitting facility or major VOC emitting facility subject to § 129.96 shall comply with the following:

(1) The presumptive RACT requirement for a combustion unit with a rated heat input equal to or greater than 20 million Btu/hour and less than 50 million Btu/hour, which is the performance of a biennial tune-up conducted in accordance with the procedures in 40 CFR 63.11223 (relating to how do I demonstrate continuous compliance with the work practice and management practice standards). The biennial tune-up must include, at a minimum, the following:

(i) Inspection and cleaning or replacement of fuel-burning equipment, including the burners and components, as necessary, for proper operation as specified by the manufacturer.

(ii) Inspection of the flame pattern and adjustment of the burner, as necessary, to optimize the flame pattern to minimize total emissions of $NO_x$ and, to the extent possible, emissions of CO.

(iii) Inspection and adjustment, as necessary, of the air-to-fuel ratio control system to ensure proper calibration and operation as specified by the manufacturer.

ADD098

(2) The owner or operator of a combustion unit with an oxygen trim system that maintains an optimum air-to-fuel ratio that would otherwise be subject to a biennial tune-up shall conduct a tune-up of the boiler one time in each 5-year calendar period. The tune-up must include, at a minimum, the following:

(i) Inspection and cleaning or replacement of fuel-burning equipment, including the burners and components, as necessary, for proper operation as specified by the manufacturer.

(ii) Inspection of the flame pattern and adjustment of the burner, as necessary, to optimize the flame pattern to minimize total emissions of $NO_x$ and, to the extent possible, emissions of CO.

(iii) Inspection and adjustment, as necessary, of the air-to-fuel ratio control system to ensure proper calibration and operation as specified by the manufacturer.

(3) The applicable recordkeeping requirements of § 129.100(d), (e) or (f) (relating to compliance demonstration and recordkeeping requirements).

(c) The owner and operator of a source specified in this subsection, which is located at a major $NO_x$ emitting facility or major VOC emitting facility subject to § 129.96 shall install, maintain and operate the source in accordance with the manufacturer's specifications and with good operating practices:

(1) A $NO_x$ air contamination source that has the potential to emit less than 5 TPY of $NO_x$.

(2) A VOC air contamination source that has the potential to emit less than 2.7 TPY of VOC.

(3) A boiler or other combustion source with an individual rated gross heat input less than 20 million Btu/hour.

(4) A combustion turbine with a rated output less than 1,000 bhp.

(5) A stationary internal combustion engine rated at less than 500 bhp (gross).

(6) An incinerator, thermal oxidizer or catalytic oxidizer used primarily for air pollution control.

(7) A fuel-burning unit with an annual capacity factor of less than 5%.

(i) For a combustion unit, the annual capacity factor is the ratio of the unit's heat input (in million Btu or equivalent units of measure) to the unit's maximum rated hourly heat input rate (in million Btu/hour or equivalent units of measure) multiplied by 8,760 hours during a period of 12 consecutive calendar months.

(ii) For an electric generating unit, the annual capacity factor is the ratio of the unit's actual electric output (expressed in MWe/hr) to the unit's nameplate capacity (or maximum observed hourly gross load (in MWe/hr) if greater than the nameplate capacity) multiplied by 8,760 hours during a period of 12 consecutive calendar months.

(iii) For any other unit, the annual capacity factor is the ratio of the unit's actual operating level to the unit's potential operating level during a period of 12 consecutive calendar months.

(8) An emergency standby engine operating less than 500 hours in a 12-month rolling period.

(d) Except as specified under subsection (c), the owner and operator of a combustion unit or other combustion source located at a major VOC emitting facility subject to § 129.96 shall install, maintain and operate the source in accordance with the manufacturer's specifications and with good operating practices for the control of the VOC emissions from the combustion unit or other combustion source.

(e) The owner and operator of a municipal solid waste landfill subject to § 129.96 shall comply with the following applicable presumptive RACT requirement:

(1) For a municipal solid waste landfill constructed on or before May 30, 1991, emission guidelines and compliance times in 40 CFR Part 60, Subpart Cc (relating to emission guidelines and compliance times for municipal solid waste landfills), which are adopted and incorporated by reference in § 122.3 (relating to adoption of standards), and applicable Federal or state plans in 40 CFR Part 62 (relating to approval and promulgation of state plans for designated facilities and pollutants).

(2) For a municipal solid waste landfill constructed after May 30, 1991, New Source Performance Standards in 40 CFR Part 60, Subpart WWW (relating to standards of performance for municipal solid waste landfills), which are adopted and incorporated by reference in § 122.3.

(f) The owner and operator of a municipal waste combustor subject to § 129.96 shall comply with the presumptive RACT requirement of 180 ppmvd $NO_x$ @ 7% oxygen.

(g) Except as specified under subsection (c), the owner and operator of a $NO_x$ air contamination source specified in this subsection, which is located at a major $NO_x$ emitting facility or a VOC air contamination source specified in this subsection, which is located at a major VOC emitting facility subject to § 129.96 may not cause, allow or permit $NO_x$ or VOCs to be emitted from the air contamination source in excess of the applicable presumptive RACT emission limitation:

(1) A combustion unit or process heater:

(i) For a natural gas-fired combustion unit or process heater with a rated heat input equal to or greater than 50 million Btu/hour, 0.10 lb $NO_x$/million Btu heat input.

(ii) For a distillate oil-fired combustion unit or process heater with a rated heat input equal to or greater than 50 million Btu/hour, 0.12 lb $NO_x$/million Btu heat input.

(iii) For a residual oil-fired or other liquid fuel-fired combustion unit or process heater with a rated heat input equal to or greater than 50 million Btu/hour, 0.20 lb $NO_x$/million Btu heat input.

(iv) For a refinery gas-fired combustion unit or process heater with a rated heat input equal to or greater than 50 million Btu/hour, 0.25 lb $NO_x$/million Btu heat input.

(v) For a coal-fired combustion unit with a rated heat input equal to or greater than 50 million Btu/hour and less than 250 million Btu/hour, 0.45 lb $NO_x$/million Btu heat input.

(vi) For a coal-fired combustion unit with a rated heat input equal to or greater than 250 million Btu/hour that is:

(A) A circulating fluidized bed combustion unit, 0.16 lb $NO_x$/million Btu heat input.

(B) A tangentially fired combustion unit, 0.35 lb $NO_x$/million Btu heat input.

(C) Any other type of coal-fired combustion unit, 0.40 lb $NO_x$/million Btu heat input.

(vii) For any other type of solid fuel-fired combustion unit with a rated heat input equal to or greater than 50 million Btu/hour, 0.25 lb $NO_x$/million Btu heat input.

(viii) For a coal-fired combustion unit with a selective catalytic reduction system operating with an inlet temperature equal to or greater than 600°F, 0.12 lb $NO_x$/million Btu heat input. Compliance with this emission limit is also required when by-passing the selective catalytic reduction system.

(ix) For a coal-fired combustion unit with a selective noncatalytic reduction system, the selective noncatalytic reduction system shall be operated with the injection of reagents including ammonia or other $NO_x$-reducing agents when the temperature at the area of the reagent injection is equal to or greater than 1,600°F.

(2) A combustion turbine:

(i) For a combined cycle or combined heat and power combustion turbine with a rated output equal to or greater than 1,000 bhp and less than 180 MW when firing:

(A) Natural gas or a noncommercial gaseous fuel, 42 ppmvd $NO_x$ @ 15% oxygen.

(B) Fuel oil, 96 ppmvd $NO_x$ @ 15% oxygen.

(C) Natural gas or a noncommercial gaseous fuel, 5 ppmvd VOC (as propane) @ 15% oxygen.

(D) Fuel oil, 9 ppmvd VOC (as propane) @ 15% oxygen.

(ii) For a combined cycle or combined heat and power combustion turbine with a rated output equal to or greater than 180 MW when firing:

(A) Natural gas or a noncommercial gaseous fuel, 4 ppmvd $NO_x$ @ 15% oxygen.

(B) Fuel oil, 8 ppmvd $NO_x$ @ 15% oxygen.

(C) Natural gas or a noncommercial gaseous fuel, 2 ppmvd VOC (as propane) @ 15% oxygen.

(D) Fuel oil, 2 ppmvd VOC (as propane) @ 15% oxygen.

(iii) For a simple cycle or regenerative cycle combustion turbine with a rated output equal to or greater than 1,000 bhp and less than 6,000 bhp when firing:

(A) Natural gas or a noncommercial gaseous fuel, 150 ppmvd $NO_x$ @ 15% oxygen.

(B) Fuel oil, 150 ppmvd $NO_x$ @ 15% oxygen.

(C) Natural gas or a noncommercial gaseous fuel, 9 ppmvd VOC (as propane) @ 15% oxygen.

(D) Fuel oil, 9 ppmvd VOC (as propane) @ 15% oxygen.

(iv) For a simple cycle or regenerative cycle combustion turbine with a rated output equal to or greater than 6,000 bhp when firing:

(A) Natural gas or a noncommercial gaseous fuel, 42 ppmvd $NO_x$ @ 15% oxygen.

(B) Fuel oil, 96 ppmvd $NO_x$ @ 15% oxygen.

(C) Natural gas or a noncommercial gaseous fuel, 9 ppmvd VOC (as propane) @ 15% oxygen.

(D) Fuel oil, 9 ppmvd VOC (as propane) @ 15% oxygen.

(3) A stationary internal combustion engine:

(i) For a lean burn stationary internal combustion engine with a rating equal to or greater than 500 bhp fired with:

(A) Natural gas or a noncommercial gaseous fuel, 3.0 grams $NO_x$/bhp-hr.

(B) Natural gas or a noncommercial gaseous fuel, liquid fuel or dual-fuel, 1.0 gram VOC/bhp-hr excluding formaldehyde.

(ii) For a stationary internal combustion engine with a rating equal to or greater than 500 bhp fired with liquid fuel or dual-fuel, 8.0 grams $NO_x$/bhp-hr.

(iii) For a rich burn stationary internal combustion engine with a rating equal to or greater than 500 bhp fired with:

(A) Natural gas or a noncommercial gaseous fuel, 2.0 grams $NO_x$/bhp-hr.

(B) Natural gas or a noncommercial gaseous fuel, 1.0 gram VOC/bhp-hr.

(4) A unit firing multiple fuels:

(i) The applicable RACT multiple fuel emission limit shall be determined on a total heat input fuel weighted basis using the following equation:

$$E_{HIweighted} = \frac{\sum_{i=1}^{n} E_i HI_i}{\sum_{i=1}^{n} HI_i}$$

Where:

$E_{HIweighted}$ = The heat input fuel weighted multiple fuel emission rate or emission limitation for the compliance period, expressed in units of measure consistent with the units of measure for the emission limitation.

$E_i$ = The emission rate or emission limit for fuel i during the compliance period, expressed in units of measure consistent with the units of measure for the emission limitation.

HI$_i$ = The total heat input for fuel i during the compliance period.

n = The number of different fuels used during the compliance period.

(ii) A fuel representing less than 1% of the unit's annual fuel consumption on a heat input basis is excluded when determining the applicable RACT multiple fuel emission limit calculated in accordance with subparagraph (i).

(iii) The determination in subparagraph (i) does not apply to a stationary internal combustion engine that is subject to the RACT emission limits in paragraph (3).

(h) The owner and operator of a Portland cement kiln subject to § 129.96 shall comply with the following applicable presumptive RACT emission limitation:

(1) 3.88 pounds of NO$_x$ per ton of clinker produced for a long wet-process cement kiln as defined in § 145.142 (relating to definitions).

(2) 3.44 pounds of NO$_x$ per ton of clinker produced for a long dry-process cement kiln as defined in § 145.142.

(3) 2.36 pounds of NO$_x$ per ton of clinker produced for:

(i) A preheater cement kiln as defined in § 145.142.

(ii) A precalciner cement kiln as defined in § 145.142.

(i) The requirements and emission limitations of this section supersede the requirements and emission limitations of a RACT permit issued to the owner or operator of an air contamination source subject to one or more of subsections (b)--(h) prior to April 23, 2016, under §§ 129.91--129.95 (relating to stationary sources of NO$_x$ and VOCs) to control, reduce or minimize NO$_x$ emissions or VOC emissions, or both, from the air contamination source unless the permit contains more stringent requirements or emission limitations, or both.

(j) The requirements and emission limitations of this section supersede the requirements and emission limitations of §§ 129.201--129.205, 145.111--145.113 and 145.141--145.146 (relating to additional NO$_x$ requirements; emissions of NO$_x$ from stationary internal combustion engines; and emissions of NO$_x$ from cement manufacturing) unless the requirements or emission limitations of §§ 129.201--129.205, §§ 145.111--145.113 or §§ 145.141--145.146 are more stringent.

(k) The owner or operator of a major NO$_x$ emitting facility or a major VOC emitting facility subject to § 129.96 that includes an air contamination source subject to one or more of subsections (b)--(h) that cannot meet the applicable presumptive RACT requirement or RACT emission limitation without installation of an air cleaning device may submit a petition, in writing, requesting an alternative compliance schedule in accordance with the following:

(1) The written petition shall be submitted to the Department or appropriate approved local air pollution control agency as soon as possible but not later than:

(i) October 24, 2016, for a source subject to § 129.96(a).

(ii) October 24, 2016, or 6 months after the date that the source meets the definition of a major $NO_x$ emitting facility or major VOC emitting facility, whichever is later, for a source subject to § 129.96(b).

(2) The written petition must include:

(i) A description, including make, model and location, of each affected source subject to a RACT requirement or a RACT emission limitation in one or more of subsections (b)--(h).

(ii) A description of the proposed air cleaning device to be installed.

(iii) A schedule containing proposed interim dates for completing each phase of the required work to install the air cleaning device described in subparagraph (ii).

(iv) A proposed interim emission limitation that will be imposed on the affected source until compliance is achieved with the applicable RACT requirement or RACT emission limitation.

(v) A proposed final compliance date that is as soon as possible but not later than 3 years after the written approval of the petition by the Department or the appropriate approved local air pollution control agency. The approved petition shall be incorporated in an applicable operating permit or plan approval.

(l) The Department or appropriate approved local air pollution control agency will review the timely and complete written petition requesting an alternative compliance schedule submitted in accordance with subsection (k) and approve or deny the petition in writing.

(m) Approval or denial under subsection (l) of the timely and complete petition for an alternative compliance schedule submitted under subsection (k) will be effective on the date the letter of approval or denial of the petition is signed by the authorized representative of the Department or appropriate approved local air pollution control agency.

**Credits**
Adopted April 23, 2016. Amended Aug. 11, 2018.

Current through Pennsylvania Bulletin, Vol. 49, Num. 52, dated December 28, 2019

25 Pa. Code § 129.97, 25 PA ADC § 129.97

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

West's Pennsylvania Administrative Code
  Title 25. Environmental Protection
    Part I. Department of Environmental Protection
      Subpart C. Protection of Natural Resources
        Article III. Air Resources
          Chapter 129. Standards for Sources
            Additional Ract Requirements for Major Sources of NOx and Vocs

25 Pa. Code § 129.98

§ 129.98. Facility-wide or system-wide $NO_X$ emissions averaging plan general requirements.

Currentness

(a) The owner or operator of a major $NO_X$ emitting facility subject to § 129.96 (relating to applicability) that includes at least one air contamination source subject to a $NO_X$ RACT emission limitation in § 129.97 (relating to presumptive RACT requirements, RACT emission limitations and petition for alternative compliance schedule) that cannot meet the applicable $NO_X$ RACT emission limitation may elect to meet the applicable $NO_X$ RACT emission limitation in § 129.97 by averaging $NO_X$ emissions on either a facility-wide or system-wide basis using a 30-day rolling average. System-wide emissions averaging must be among sources under common control of the same owner or operator within the same ozone nonattainment area in this Commonwealth.

(b) The owner or operator of each facility that elects to comply with subsection (a) shall submit a written $NO_X$ emissions averaging plan to the Department or appropriate approved local air pollution control agency as part of an application for an operating permit modification or a plan approval, if otherwise required. The application incorporating the requirements of this section shall be submitted by the applicable date as follows:

(1) October 24, 2016, for a source subject to § 129.96(a).

(2) October 24, 2016, or 6 months after the date that the source meets the definition of a major $NO_X$ emitting facility, whichever is later, for a source subject to § 129.96(b).

(c) Each $NO_X$ air contamination source included in the application for an operating permit modification or a plan approval, if otherwise required, for averaging $NO_X$ emissions on either a facility-wide or system-wide basis using a 30-day rolling average submitted under subsection (b) must be an air contamination source subject to a $NO_X$ RACT emission limitation in § 129.97.

(d) The application for the operating permit modification or the plan approval, if otherwise required, for averaging $NO_X$ emissions on either a facility-wide or system-wide basis using a 30-day rolling average submitted under subsection (b) must demonstrate that the aggregate $NO_X$ emissions emitted by the air contamination sources included in the facility-wide or system-wide $NO_X$ emissions averaging plan using a 30-day rolling average are not greater than the $NO_X$ emissions that would be emitted by the group of included sources if each source complied with the applicable $NO_X$ RACT emission limitation in § 129.97 on a source-specific basis.

(e) The owner or operator shall calculate the alternative facility-wide or system-wide $NO_x$ RACT emissions limitation using a 30-day rolling average for the air contamination sources included in the application for the operating permit modification or plan approval, if otherwise required, submitted under subsection (b) by using the following equation to sum the emissions for all of the sources included in the $NO_x$ emissions averaging plan:

$$\left[\sum\nolimits_{i\,=\,1}^{n} Ei_{actual}\right] \leq \left[\sum\nolimits_{i\,=\,1}^{n} Ei_{allowable}\right]$$

Where:

$Ei_{actual}$ = The actual $NO_x$ mass emissions, including emissions during start-ups, shutdowns and malfunctions, for air contamination source i on a 30-day rolling basis.

$Ei_{allowable}$ = The allowable $NO_x$ mass emissions computed using the allowable emission rate limitations for air contamination source i on a 30-day rolling basis specified in § 129.97. If an air contamination source included in an averaging plan is subject to a numerical emission rate limit that is more stringent than the applicable allowable emission rate limitation in § 129.97, then the numerical emission rate limit shall be used for the calculation of the allowable $NO_x$ mass emissions.

n = The number of air contamination sources included in the $NO_x$ emissions averaging plan.

(f) The application for the operating permit modification or a plan approval, if otherwise required, specified in subsections (b)--(e) may include facility-wide or system-wide $NO_x$ emissions averaging using a 30-day rolling average only for $NO_x$ emitting sources or $NO_x$ emitting facilities that are owned or operated by the applicant.

(g) The application for the operating permit modification or a plan approval, if otherwise required, specified in subsections (b)--(f) must include the following information:

(1) Identification of each air contamination source included in the $NO_x$ emissions averaging plan.

(2) Each air contamination source's applicable emission limitation in § 129.97.

(3) Methods for demonstrating compliance and recordkeeping and reporting requirements in accordance with § 129.100 (relating to compliance demonstration and recordkeeping requirements) for each source included in the $NO_x$ emissions averaging plan submitted under subsection (b).

(h) An air contamination source or facility included in the facility-wide or system-wide $NO_x$ emissions averaging plan submitted in accordance with subsections (b)--(g) may be included in only one facility-wide or system-wide $NO_x$ emissions averaging plan.

(i) The Department or appropriate approved local air pollution control agency will issue a modification to the operating permit or a plan approval authorizing the $NO_x$ emissions averaging plan.

(j) The owner or operator of an air contamination source or facility included in the facility-wide or system-wide $NO_x$ emissions averaging plan submitted in accordance with subsections (b)--(h) shall submit the reports and records specified in subsection (g)(3) to the Department or appropriate approved local air pollution control agency on the schedule specified in subsection (g)(3) to demonstrate compliance with § 129.100.

(k) The owner or operator of an air contamination source or facility included in a facility-wide or system-wide $NO_x$ emissions averaging plan submitted in accordance with subsections (b)--(h) that achieves emission reductions in accordance with other emission limitations required under the act or the Clean Air Act, or regulations adopted under the act or the Clean Air Act, that are not $NO_x$ RACT emission limitations may not substitute those emission reductions for the emission reductions required by the facility-wide or system-wide $NO_x$ emissions averaging plan submitted to the Department or appropriate approved local air pollution control agency under subsection (b).

(l) The owner or operator of an air contamination source subject to a $NO_x$ RACT emission limitation in § 129.97 that is not included in a facility-wide or system-wide $NO_x$ emissions averaging plan submitted under subsection (b) shall operate the source in compliance with the applicable $NO_x$ RACT emission limitation in § 129.97.

(m) The owner and operator of the air contamination sources included in a facility-wide or system-wide $NO_x$ emissions averaging plan submitted under subsection (b) shall be liable for a violation of an applicable $NO_x$ RACT emission limitation at each source included in the $NO_x$ emissions averaging plan.

**Credits**

Adopted April 23, 2016.

Current through Pennsylvania Bulletin, Vol. 49, Num. 52, dated December 28, 2019

25 Pa. Code § 129.98, 25 PA ADC § 129.98

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

West's Pennsylvania Administrative Code
  Title 25. Environmental Protection
    Part I. Department of Environmental Protection
      Subpart C. Protection of Natural Resources
        Article III. Air Resources
          Chapter 129. Standards for Sources
            Additional Ract Requirements for Major Sources of NOx and Vocs

25 Pa. Code § 129.99

§ 129.99. Alternative RACT proposal and petition for alternative compliance schedule.

Currentness

(a) The owner or operator of an air contamination source subject to § 129.97 (relating to presumptive RACT requirements, RACT emission limitations and petition for alternative compliance schedule) located at a major $NO_x$ emitting facility or major VOC emitting facility subject to § 129.96 (relating to applicability) that cannot meet the applicable presumptive RACT requirement or RACT emission limitation of § 129.97 may propose an alternative RACT requirement or RACT emission limitation in accordance with subsection (d).

(b) The owner or operator of a $NO_x$ air contamination source with a potential emission rate equal to or greater than 5.0 tons of $NO_x$ per year that is not subject to § 129.97 or §§ 129.201--129.205 (relating to additional $NO_x$ requirements) located at a major $NO_x$ emitting facility subject to § 129.96 shall propose a $NO_x$ RACT requirement or RACT emission limitation in accordance with subsection (d).

(c) The owner or operator of a VOC air contamination source with a potential emission rate equal to or greater than 2.7 tons of VOC per year that is not subject to § 129.97 located at a major VOC emitting facility subject to § 129.96 shall propose a VOC RACT requirement or RACT emission limitation in accordance with subsection (d).

(d) The owner or operator proposing an alternative RACT requirement or RACT emission limitation under subsection (a), (b) or (c) shall:

(1) Submit a written RACT proposal in accordance with the procedures in § 129.92(a)(1)--(5), (7)--(10) and (b) (relating to RACT proposal requirements) to the Department or appropriate approved local air pollution control agency as soon as possible but not later than:

(i) October 24, 2016, for a source subject to § 129.96(a).

(ii) October 24, 2016, or 6 months after the date that the source meets the definition of a major $NO_x$ emitting facility or major VOC emitting facility, whichever is later, for a source subject to § 129.96(b).

ADD110

(2) Be in receipt of an approval issued by the Department or appropriate approved local air pollution control agency in writing through a plan approval or operating permit modification for a RACT proposal submitted under paragraph (1)(ii) prior to the installation, modification or change in the operation of the existing air contamination source that will result in the source or facility meeting the definition of a major $NO_x$ emitting facility or major VOC emitting facility.

(3) Include in the RACT proposal the proposed alternative $NO_x$ RACT requirement or RACT emission limitation or VOC RACT requirement or RACT emission limitation developed in accordance with the procedures in § 129.92(a)(1)--(5) and (b).

(4) Include in the RACT proposal a schedule for completing implementation of the RACT requirement or RACT emission limitation as soon as possible but not later than:

(i) January 1, 2017, for a source subject to § 129.96(a).

(ii) January 1, 2017, or 1 year after the date that the source meets the definition of a major $NO_x$ emitting facility or major VOC emitting facility, whichever is later, for a source subject to § 129.96(b).

(5) Include interim dates in the schedule required under paragraph (4) for the:

(i) Issuance of purchase orders.

(ii) Start and completion of process, technology and control technology changes.

(iii) Completion of compliance testing.

(6) Include in the RACT proposal methods for demonstrating compliance and recordkeeping and reporting requirements in accordance with § 129.100 (relating to compliance demonstration and recordkeeping requirements) for each air contamination source included in the RACT proposal.

(7) Demonstrate to the satisfaction of the Department or the appropriate approved local air pollution control agency that the proposed requirement or RACT emission limitation is RACT for the air contamination source.

(e) The Department or appropriate approved local air pollution control agency will:

(1) Review the timely and complete alternative RACT proposal submitted in accordance with subsection (d).

(2) Approve the alternative RACT proposal submitted under subsection (d), in writing, if the Department or appropriate approved local air pollution control agency is satisfied that the alternative RACT proposal complies with the requirements

ADD111

of subsection (d) and that the proposed alternative requirement or RACT emission limitation is RACT for the air contamination source.

(3) Deny or modify the alternative RACT proposal submitted under subsection (d), in writing, if the proposal does not comply with the requirements of subsection (d).

(f) The proposed alternative RACT requirement or RACT emission limitation and the implementation schedule submitted under subsection (d) will be approved, denied or modified by the Department or appropriate approved local air pollution control agency in accordance with subsection (e) in writing through the issuance of a plan approval or operating permit modification prior to the owner or operator implementing the alternative RACT requirement or RACT emission limitation.

(g) The emission limit and requirements specified in the plan approval or operating permit issued by the Department or appropriate approved local air pollution control agency under subsection (f) supersede the emission limit and requirements in the existing plan approval or operating permit issued to the owner or operator of the source prior to April 23, 2016, on the date specified in the plan approval or operating permit issued by the Department or appropriate approved local air pollution control agency under subsection (f), except to the extent the existing plan approval or operating permit contains more stringent requirements.

(h) The Department will submit each alternative RACT requirement or RACT emission limitation approved under subsection (f) to the Administrator of the EPA for approval as a revision to the SIP. The owner and operator of the facility shall bear the costs of public hearings and notifications, including newspaper notices, required for the SIP submittal.

(i) The owner and operator of a facility proposing to comply with the applicable RACT requirement or RACT emission limitation under subsection (a), (b) or (c) through the installation of an air cleaning device may submit a petition, in writing, requesting an alternative compliance schedule in accordance with the following:

(1) The written petition requesting an alternative compliance schedule shall be submitted to the Department or appropriate approved local air pollution control agency as soon as possible but not later than:

(i) October 24, 2016, for a source subject to § 129.96(a).

(ii) October 24, 2016, or 6 months after the date that the source meets the definition of a major $NO_x$ emitting facility or major VOC emitting facility, whichever is later, for a source subject to § 129.96(b).

(2) The written petition must include:

(i) A description, including make, model and location, of each air contamination source subject to a RACT requirement or RACT emission limitation in one or more of subsections (a)--(c).

(ii) A description of the proposed air cleaning device to be installed.

(iii) A schedule containing proposed interim dates for completing each phase of the required work to install the air cleaning device described in subparagraph (ii).

(iv) A proposed interim emission limitation that will be imposed on the affected air contamination source until compliance is achieved with the applicable RACT requirement or RACT emission limitation.

(v) A proposed final compliance date that is as soon as possible but not later than 3 years after the approval of the petition by the Department or the appropriate approved local air pollution control agency. If the petition is for the replacement of an existing source, the final compliance date will be determined on a case-by-case basis. The approved petition shall be incorporated in an applicable operating permit or plan approval.

(j) The Department or appropriate approved local air pollution control agency will review the timely and complete written petition requesting an alternative compliance schedule submitted in accordance with subsection (i) and approve or deny the petition in writing.

(k) The emission limit and requirements specified in the plan approval or operating permit issued by the Department or appropriate approved local air pollution control agency under subsection (j) supersede the emission limit and requirements in the existing plan approval or operating permit issued to the owner or operator of the source prior to April 23, 2016, on the date specified in the plan approval or operating permit issued by the Department or appropriate approved local air pollution control agency under subsection (j), except to the extent the existing plan approval or operating permit contains more stringent requirements.

(l) Approval or denial under subsection (j) of the timely and complete petition for an alternative compliance schedule submitted under subsection (i) will be effective on the date the letter of approval or denial of the petition is signed by the authorized representative of the Department or appropriate approved local air pollution control agency.

**Credits**

Adopted April 23, 2016. Amended Aug. 11, 2018.

Current through Pennsylvania Bulletin, Vol. 49, Num. 52, dated December 28, 2019

25 Pa. Code § 129.99, 25 PA ADC § 129.99

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

West's Pennsylvania Administrative Code
Title 25. Environmental Protection
Part I. Department of Environmental Protection
Subpart C. Protection of Natural Resources
Article III. Air Resources
Chapter 129. Standards for Sources
Additional Ract Requirements for Major Sources of NOx and Vocs

25 Pa. Code § 129.100

§ 129.100. Compliance demonstration and record-keeping requirements.

Currentness

(a) Except as provided in subsection (c), the owner and operator of an air contamination source subject to a $NO_x$ RACT requirement or RACT emission limitation or VOC RACT requirement or RACT emission limitation, or both, listed in § 129.97 (relating to presumptive RACT requirements, RACT emission limitations and petition for alternative compliance schedule) shall demonstrate compliance with the applicable RACT requirement or RACT emission limitation by performing the following monitoring or testing procedures:

(1) For an air contamination source with a CEMS, monitoring and testing in accordance with the requirements of Chapter 139, Subchapter C (relating to requirements for source monitoring for stationary sources) using a 30-day rolling average, except municipal waste combustors.

(i) A 30-day rolling average emission rate for an air contamination source that is a combustion unit shall be expressed in pounds per million Btu and calculated in accordance with the following procedure:

(A) Sum the total pounds of pollutant emitted from the combustion unit for the current operating day and the previous 29 operating days.

(B) Sum the total heat input to the combustion unit in million Btu for the current operating day and the previous 29 operating days.

(C) Divide the total number of pounds of pollutant emitted by the combustion unit for the 30 operating days by the total heat input to the combustion unit for the 30 operating days.

(ii) A 30-day rolling average emission rate for each applicable RACT emission limitation shall be calculated for an affected air contamination source for each consecutive operating day.

(iii) Each 30-day rolling average emission rate for an affected air contamination source must include the emissions that occur during the entire operating day, including emissions from start-ups, shutdowns and malfunctions.

(2) For a Portland cement kiln with a CEMS, monitoring of clinker production rates in accordance with 40 CFR 63.1350(d) (relating to monitoring requirements).

(3) For a municipal waste combustor with a CEMS, monitoring and testing in accordance with the requirements in Chapter 139, Subchapter C, using a daily average.

(4) For an air contamination source without a CEMS, monitoring and testing in accordance with a Department-approved emissions source test that meets the requirements of Chapter 139, Subchapter A (relating to sampling and testing methods and procedures). The source test shall be conducted one time in each 5-year calendar period.

(b) Except as provided in § 129.97(k) and § 129.99(i) (relating to alternative RACT proposal and petition for alternative compliance schedule), the owner and operator of an air contamination source subject to subsection (a) shall demonstrate compliance with the applicable RACT requirement or RACT emission limitation in accordance with the procedures in subsection (a) not later than:

(1) January 1, 2017, for a source subject to § 129.96(a) (relating to applicability).

(2) January 1, 2017, or 1 year after the date that the source meets the definition of a major $NO_x$ emitting facility or major VOC emitting facility, whichever is later, for a source subject to § 129.96(b).

(c) An owner or operator of an air contamination source subject to this section, §§ 129.96 and 129.97 and § 129.98 (relating to facility-wide or system-wide $NO_x$ emissions averaging plan general requirements) may request a waiver from the requirement to demonstrate compliance with the applicable emission limitation listed in § 129.97 if the following requirements are met:

(1) The request for a waiver is submitted, in writing, to the Department not later than:

(i) October 24, 2016, for a source subject to § 129.96(a).

(ii) October 24, 2016, or 6 months after the date that the source meets the definition of a major $NO_x$ emitting facility or major VOC emitting facility, whichever is later, for a source subject to § 129.96(b).

(2) The request for a waiver demonstrates that a Department-approved emissions source test was performed in accordance with the requirements of Chapter 139, Subchapter A, on or after:

(i) April 23, 2015, for a source subject to § 129.96(a).

(ii) April 23, 2015, or within 12 months prior to the date that the source meets the definition of a major $NO_x$ emitting facility or major VOC emitting facility, whichever is later, for a source subject to § 129.96(b).

(3) The request for a waiver demonstrates to the satisfaction of the Department that the test results show that the source's rate of emissions is in compliance with the source's applicable $NO_x$ emission limitation or VOC emission limitation.

(4) The Department approves, in writing, the request for a waiver.

(d) The owner and operator of an air contamination source subject to this section and §§ 129.96--129.99 shall keep records to demonstrate compliance with §§ 129.96--129.99 in the following manner:

(1) The records must include sufficient data and calculations to demonstrate that the requirements of §§ 129.96--129.99 are met.

(2) Data or information required to determine compliance shall be recorded and maintained in a time frame consistent with the averaging period of the requirement.

(e) Beginning with the compliance date specified in § 129.97(a), the owner or operator of an air contamination source claiming that the air contamination source is exempt from the applicable $NO_x$ emission rate threshold specified in § 129.99(b) and the requirements of § 129.97 based on the air contamination source's potential to emit shall maintain records that demonstrate to the Department or appropriate approved local air pollution control agency that the air contamination source is not subject to the specified emission rate threshold.

(f) Beginning with the compliance date specified in § 129.97(a), the owner or operator of an air contamination source claiming that the air contamination source is exempt from the applicable VOC emission rate threshold specified in § 129.99(c) and the requirements of § 129.97 based on the air contamination source's potential to emit shall maintain records that demonstrate to the Department or appropriate approved local air pollution control agency that the air contamination source is not subject to the specified emission rate threshold.

(g) The owner or operator of a combustion unit subject to § 129.97(b) shall record each adjustment conducted under the procedures in § 129.97(b). This record must contain, at a minimum:

(1) The date of the tuning procedure.

(2) The name of the service company and the technician performing the procedure.

(3) The final operating rate or load.

(4) The final $NO_x$ and CO emission rates.

(5) The final excess oxygen rate.

(6) Other information required by the applicable operating permit.

(h) The owner or operator of a Portland cement kiln subject to § 129.97(h) shall maintain a daily operating log for each Portland cement kiln. The record for each kiln must include:

(1) The total hours of operation.

(2) The type and quantity of fuel used.

(3) The quantity of clinker produced.

(4) The date, time and duration of a start-up, shutdown or malfunction of a Portland cement kiln or emissions monitoring system.

(i) The records shall be retained by the owner or operator for 5 years and made available to the Department or appropriate approved local air pollution control agency upon receipt of a written request from the Department or appropriate approved local air pollution control agency.

**Credits**

Adopted April 23, 2016. Amended Aug. 11, 2018.

Current through Pennsylvania Bulletin, Vol. 49, Num. 52, dated December 28, 2019

25 Pa. Code § 129.100, 25 PA ADC § 129.100

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.  4

ADD117

Respectfully Submitted,


*/s/ Jesse C. Walker*

JESSE C. WALKER
Assistant Counsel
Bureau of Regulatory Counsel
PA Bar No. 317750
Commonwealth of Pennsylvania,
Department of Environmental Protection
P.O. Box 8464
Harrisburg, PA 17105-8464
717-787-7060
jeswalker@pa.gov

Date:  January 24, 2020