# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

No. 19-2562

_____

## SIERRA CLUB,

*Petitioner*,

v.

## UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*
_____

On Petition for Review of Final Agency Action of the
United States Environmental Protection Agency
_____

## JOINT APPENDIX, Vol. II, pp. 26-358
_____

Charles McPhedran
Pa. Bar ID No. 60123
EARTHJUSTICE
1617 John F. Kennedy Blvd., Suite 1130
Philadelphia, PA 19103
(215) 717-4521
cmcphedran@earthjustice.org

Mychal Ozaeta
Cal. Bar ID No. 309851
EARTHJUSTICE
707 Wilshire Blvd., Suite 4300
Los Angeles, CA 90017
(213) 766-1069
mozaeta@earthjustice.org

Zachary M. Fabish
DC Bar ID No. 986127
SIERRA CLUB
50 F Street, NW – 8th Floor
Washington, DC 20001
(202) 675-7917
zachary.fabish@sierraclub.org

*Counsel for Petitioner Sierra Club*

*(Additional Counsel on Following Page)*

**February 25, 2020**

Brandon N. Adkins
Trial Attorney, Environmental Defense
Section
Environment and Natural Resources
Division
U.S. Department of Justice
P.O. Box 7611
Washington D.C. 20044
(202) 616-9174
brandon.adkins@usdoj.gov

*Attorney for Respondent EPA*

Alexandra C. Chiaruttini
Chief Counsel

Robert A. Reiley
Acting Director
Bureau of Regulatory Counsel
PA Bar No. 61319

Jesse C. Walker
Assistant Counsel
Bureau of Regulatory Counsel
PA Bar No. 317750
Commonwealth of
Pennsylvania,
Department of Environmental
Protection
P.O. Box 8464
Harrisburg, PA 17105-8464
(717) 787-7060
jeswalker@pa.gov

*Attorneys for Respondent-
Intervenor Commonwealth of
Pennsylvania, Department of
Environmental Protection*

*Sierra Club v. EPA,* No. 19-2562
Joint Appendix Vol. II – Table of Contents

## MATERIALS APPEARING IN THE ADMINISTRATIVE RECORD

### Proposed Rule and Technical Support Documents

| Document | Excerpted Pages | JA Page |
|---|---|---|
| EPA Proposed Rule, Approval and Promulgation of Air Quality Implementation Plans; Pennsylvania; Regulatory Amendments Addressing Reasonably Available Control Technology Requirements Under the 1997 and 2008 8-Hour Ozone National Ambient Air Quality Standards, 83 Fed. Reg. 11,155 (Mar. 14, 2018), EPA-R03-OAR-2017-0290-0001 (Certified Doc. No. A-1) | All | JA026 |
| EPA, Technical Support Document (#1) for the Pennsylvania State Implementation Plan Revision for Certain Reasonably Available Control Technology Requirements under the 1997 and 2008 8-hour Ozone National Ambient Air Quality Standard (Feb. 22, 2018), EPA-R03-OAR-2017-0290-0017 (Certified Doc. No. A-3) | All | JA034 |
| Appendix B – Comparison NOx State Regulations, EPA-R03-OAR-2017-0290-0017, Appendix B (Certified Doc. No. A-3(b)) | All | JA075 |
| EPA, Technical Support Document (#2)—Cost Effective Analyses for Coal Fired Boilers (Feb. 22, 2018), EPA-R03-OAR-2017-0290-0018 (Certified Doc. No. A-4) | All | JA080 |
| EPA, Air Pollution Cost Control Manual, Section 4—NOx Controls, Chapter 2 (May 2016, rev. Nov. 2017), EPA-R03-OAR-2017-0290-0047 (Certified Doc. No. A-4(h)) | Ch. 2 Title Page, Contents, 2-2 to 2-45 | JA106 |

1

*Sierra Club v. EPA,* No. 19-2562
Joint Appendix Vol. II – Table of Contents

## EPA Guidances and Memorandums

| Document | Excerpted Pages | JA Page |
|---|---|---|
| EPA, December 9, 1976 mem. from Roger Strelow, Assistant Adm'r for Air and Waste Mgmt., to Reg'l Adm'rs, "Guidance for Determining Acceptability of SIP Regulations in Non-Attainment Areas," EPA-R03-OAR-2017-0290-0096 (Certified Doc. No. E-1) | All | JA152 |
| EPA, Mar. 16, 1994 mem. "Cost-Effective Nitrogen Oxides (NOx) Reasonably Available Control Technology (RACT)," EPA-R03-OAR-2017-0290-0099 (Certified Doc. No. E-5) | All | JA157 |
| CAM Technical Guidance Document, B.15 Selective Catalytic Reduction, EPA-R03-OAR-2017-0290-0098 (Certified Doc. No. E-6) | All | JA162 |
| EPA, Alternative Control Techniques Document— NOx Emissions from Utility Boilers (Mar. 1994), EPA-R03-OAR-2017-0290-0097 (Certified Doc. No. E-7) | Front Matter, 1-1 to 1-2, 2-1 to 2-43, 5-1, 5-128 to 5-134 | JA168 |

## State SIP Revision Submittals and Other State Documents

| Document | Excerpted Pages | JA Page |
|---|---|---|
| PADEP, SIP Submittal, Proposed Rulemaking, Additional RACT Requirements for Major Sources of NOx & VOCs, 44 Pa.B. 2,392 (Apr. 19, 2014), EPA-R03-2017-0290-0002 (Certified Doc. No. B-2) | All | JA225 |
| PADEP, RACT II Rule Comment Response Document for the DEP Rulemaking "Additional RACT Requirements for Major Sources of NOx and VOCs", 25 Pa. Code Chapters 121 and 129, 44 Pa.B. 2,392-2404 (April 19, 2014), Environmental Quality Board Regulation #7-485 and Independent Regulatory Review Commission #3052, EPA-R03-OAR-2017-0290-0004 (Certified Doc. No. B-3) | Cover Page, 2–4, 18–61, 79–80, 104–05, 110 | JA238 |

*Sierra Club v. EPA,* No. 19-2562
Joint Appendix Vol. II – Table of Contents

## State SIP Revision Submittals and Other State Documents (cont.)

| Document | Excerpted Pages | JA Page |
|---|---|---|
| PADEP, SIP Submittal, Final Rulemaking, Additional RACT Requirements for Major Sources of NOx & VOCs, 46 Pa.B. 2,036 (Apr. 23, 2016), EPA-R03-OAR-2017-0290-0003 (Certified Doc. No. B-4) | All | JA291 |
| Letter from Patrick McDonnell to Cecil A. Rodrigues regarding supplemental submission (Sept. 22, 2017), EPA-R03-OAR-2017-0290-0019 (Certified Doc. No. B-5) | All | JA320 |
| PADEP, Supplemental Submittal Memorandum, EPA-R03-OAR-2017-0290-0020 (Certified Doc. No. B-6) | All | JA321 |
| Average SCR NOx Rate table, EPA-R03-OAR-2017-0290-0020, Attachment 9 to PADEP's Supplemental SIP Submittal Memorandum (Certified Doc. No. B-6(r)) | All | JA329 |
| Letter from Diana Esher to Joyce Epps (May 18, 2015), EPA-R03-OAR-2017-0290-0020, Attachment 10 to PADEP's Supplemental SIP Submittal Memorandum (Certified Doc. No. B-6(s)) | All | JA330 |

## Public Comments on EPA's Proposal

| Document | Excerpted Pages | JA Page |
|---|---|---|
| Sierra Club Comments Concerning EPA's Proposed Approval (Apr. 13, 2018), EPA-R03-OAR-2017-0290-0045 (Certified Doc. No. C-1) | All | JA331 |
| N.Y. State Dep't of Envtl. Conservation Comments (Apr. 13, 2018), EPA-R03-OAR-2017-0290-0044 (Certified Doc. No. D-20) | All | JA351 |
| Md. Dep't of the Env't Comments, at 1-2 (Apr.13, 2018), (EPA-R03-OAR-2017-0290-0039) (Certified Doc. No. D-22) | All | JA354 |

the RIS 2002–22 endorsement of the NEI 01–01 guidance by providing additional guidance for developing and documenting "qualitative assessments" that are used to provide an adequate basis for a licensee's determination that a digital modification will exhibit a low likelihood of failure to support a conclusion when applying 10 CFR 50.59 that a license amendment is not needed.

The NRC published a notice of opportunity for public comment on this RIS in the **Federal Register** on July 3, 2017 (82 FR 30913). Following that notice, the NRC staff engaged in multiple communications with the public and stakeholders and continued internal discussions about the RIS. As a result of these efforts, the NRC has substantially rewritten the RIS. Due to the extensive nature of these revisions, and in light of this additional opportunity for comment, the NRC is not directly responding to each comment received in the previous comment period. All comments and other communications associated with the previous version of this RIS can be found in ADAMS under Accession No. ML18039A804.

*Proposed Action*

The NRC is requesting public comments on the draft RIS. To the extent that the NRC's revisions have not resolved a comment that was submitted in the previous comment period, the NRC asks that such comments be resubmitted for further consideration. Because of the extensive communication about this RIS, the NRC believes that stakeholders will be able to submit comments quickly. In addition, the NRC seeks to issue this RIS as expeditiously as possible to minimize misunderstandings about the NRC's requirements for digital I&C modifications under 10 CFR 50.59. Therefore, the NRC is publishing the draft RIS with a 15 day comment period. Requests for extension of the comment period may be submitted as described above in the **ADDRESSEES** section.

The NRC is also requesting specific comments on Figure 1 in the attachment of the draft RIS:

• Does Figure 1 clearly explain the engineering evaluation process (as described in Section 4 of the RIS attachment) to determine sufficient dependability, which may be used in performing and documenting a qualitative assessment (as described in Section 3 of the RIS attachment)?

• How could the figure and/or explanatory text in the draft RIS be modified to clarify the relationship between the engineering evaluation and

qualitative assessment approaches described in the draft RIS?

The NRC plans to hold a public meeting to discuss this RIS and the issues associated with clarification of the applicability of the endorsed NEI 01–01 guidance. All comments that are to receive consideration in the final RIS must still be submitted electronically or in writing as indicated in the **ADDRESSES** section of this document. Additional details regarding the meeting will be posted at least 10 days prior to the public meeting on the NRC's Public Meeting Schedule website at *http:// www.nrc.gov/public-involve/public- meetings/index.cfm.* The NRC staff will make a final determination regarding issuance of the RIS after it considers any public comments received in response to this request.

Dated at Rockville, Maryland, this day of March 7, 2018.

For the Nuclear Regulatory Commission.

**Tekia Govan,**

*Project Manager, ROP Support and Generic Communication Branch, Division of Inspection and Regional Support, Office of Nuclear Reactor Regulation.*

[FR Doc. 2018–04958 Filed 3–13–18; 8:45 am]

**BILLING CODE 7590–01–P**

---

# ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Part 52

**[EPA–R03–OAR–2017–0290; FRL–9975–14– Region 3]**

## Approval and Promulgation of Air Quality Implementation Plans; Pennsylvania; Regulatory Amendments Addressing Reasonably Available Control Technology Requirements Under the 1997 and 2008 8-Hour Ozone National Ambient Air Quality Standards

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is proposing rulemaking action on a state implementation plan (SIP) revision submitted by the Commonwealth of Pennsylvania (Pennsylvania or the Commonwealth). This revision consists of regulatory amendments intended to meet certain reasonably available control technology (RACT) requirements under the 1997 and 2008 8-hour ozone national ambient air quality standards (NAAQS). EPA is proposing to approve most parts of the Pennsylvania SIP revision as meeting RACT requirements under the Clean Air

Act (CAA). EPA is also proposing to conditionally approve certain provisions of this SIP revision, based upon Pennsylvania's commitment to submit additional enforceable measures that meet RACT. This action is being taken under the CAA.

**DATES:** Written comments must be received on or before April 13, 2018.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–R03– OAR–2017–0290 at *http:// www.regulations.gov,* or via email to *Spielberger.susan@epa.gov.* For comments submitted at *Regulations.gov,* follow the online instructions for submitting comments. Once submitted, comments cannot be edited or removed from *Regulations.gov.* For either manner of submission, EPA may publish any comment received to its public docket. Do not submit electronically any information you consider to be confidential business information (CBI) or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.* on the web, cloud, or other file sharing system). For additional submission methods, please contact the person identified in the "For Further Information Contact" section. For the full EPA public comment policy, information about CBI or multimedia submissions, and general guidance on making effective comments, please visit *http://www2.epa.gov/dockets/ commenting-epa-dockets.*

**FOR FURTHER INFORMATION CONTACT:** Emlyn Vélez-Rosa, (215) 814–2038, or by email at *velez-rosa.emlyn@epa.gov.*

**SUPPLEMENTARY INFORMATION:** On May 16, 2016, the Pennsylvania Department of Environmental Protection (PADEP) submitted a revision to the Pennsylvania SIP consisting of amendments to regulations in 25 Pa. Code Chapters 121 and 129, to meet certain RACT requirements of the CAA for both the 1997 and 2008 8-hour ozone NAAQS.

## I. Background

The Pennsylvania May 16, 2016 SIP revision submitted by PADEP includes the Pennsylvania regulations in 25 Pa. Code sections 129.96–129.100 titled "Additional RACT Requirements for Major Sources of NO$_X$ and VOCs" (the RACT II Rule) and amendments to 25 Pa. Code section 121.1, including

JA026

related definitions, to be incorporated into the Pennsylvania SIP. These regulatory amendments were adopted by PADEP on April 23, 2016 and effective on the same date upon publication in the Pennsylvania Bulletin. The May 16, 2016 SIP revision was submitted to satisfy certain CAA RACT requirements under both the 1997 and 2008 8-hour ozone NAAQS for specific source categories.

On July 18, 1997 (62 FR 38856), EPA promulgated a standard for ground level ozone based on 8-hour average concentrations (1997 8-hour ozone NAAQS). The 8-hour averaging period replaced the previous 1-hour averaging period, and the level of the NAAQS was changed from 0.12 parts per million (ppm) to 0.08 ppm. On April 30, 2004 (69 FR 23858), EPA designated nonattainment areas under the 1997 8-hour ozone NAAQS. Designations included 16 nonattainment areas in Pennsylvania, with only 2 moderate nonattainment areas, namely Philadelphia-Wilmington-Atlantic City, PA–NJ–MD–DE (the Philadelphia Area) and Pittsburgh-Beaver Valley (the Pittsburgh Area). The remaining 14 areas in Pennsylvania were designated marginal nonattainment areas. *See* 40 CFR 81.339.

On March 12, 2008 (73 FR 16436), EPA strengthened the 8-hour ozone standards, by revising its level to 0.075 ppm averaged over an 8-hour period (2008 8-hour ozone NAAQS). On May 21, 2012, EPA designated most areas in the country for the 2008 8-hour ozone NAAQS, including 5 marginal nonattainment areas in Pennsylvania: Allentown-Bethlehem-Easton, Lancaster, Reading, the Philadelphia Area, and the Pittsburgh Area. *See* 77 FR 30088 and 40 CFR 81.339.

On March 6, 2015 (80 FR 12264), EPA announced its revocation of the 1997 8-hour ozone NAAQS for all purposes and for all areas in the country, effective on April 6, 2015. EPA also determined that certain nonattainment planning requirements continue to be in effect under the revoked standard for nonattainment areas under the 1997 8-hour ozone NAAQS, including RACT. *See* 80 FR 12296 (March 6, 2015).

*A. RACT Requirements for Ozone*

The CAA regulates emissions of nitrogen oxides ($NO_X$) and volatile organic compounds (VOC) to prevent photochemical reactions that result in ozone formation. RACT is an important strategy for reducing $NO_X$ and VOC emissions from major stationary sources within areas not meeting the ozone NAAQS.

Areas designated nonattainment for the ozone NAAQS are subject to the general nonattainment area planning requirements of CAA section 172. Section 172(c)(1) of the CAA provides that SIPs for nonattainment areas must include reasonably available control measures (RACM) for demonstrating attainment of all NAAQS, including emissions reductions from existing sources through adoption of RACT. Further, section 182(b)(2) of the CAA sets forth additional RACT requirements for ozone nonattainment areas classified as moderate or higher nonattainment.

Section 182(b)(2) of the CAA sets forth three distinct requirements regarding RACT for the ozone NAAQS: First, section 182(b)(2)(A) requires states with ozone areas designated moderate or higher to submit a rule (or negative declaration) for each category of VOC sources in the nonattainment area covered by a Control Technique Guideline (CTG) document issued by EPA between November 15, 1990 and the date of attainment for an ozone NAAQS. These rules shall be submitted as SIP revisions within the period set forth by EPA in issuing the relevant CTG document. Second, section 182(b)(2)(B) requires a rule (or negative declaration) for all VOC sources in the nonattainment area covered by any CTG issued before November 15, 1990. And third, section 182(b)(2)(C) requires a rule or rules for implementing RACT for any other major stationary sources of VOCs located in the nonattainment area.

In addition, section 182(f) subjects major stationary sources of $NO_X$ to the same RACT requirements that are applicable to major stationary sources of VOC. EPA has not issued any CTGs for categories of $NO_X$ sources, so the requirement in section 182(f) in essence refers to section 182(b)(2)(C). The ozone RACT requirements under section 182(b)(2) are usually referred to as VOC CTG RACT, non-CTG major VOC RACT, and major $NO_X$ RACT.

Pursuant to section 183(c) of the CAA, EPA must revise and update CTGs and Alternative Control Techniques guidelines (ACTs) as the Administrator determines necessary. EPA's CTGs establish presumptive RACT level control requirements for various source categories. The CTGs usually identify a particular control level which EPA recommends as being RACT. In some cases, EPA has issued ACTs for source categories, which in contrast to the CTGs, only present a range for possible control options but do not identify any particular option as the presumptive norm for what is RACT. States are required to address RACT for the source

categories covered by CTGs through adoption of rules as part of the SIP.

Section 184(b)(1)(B) of the CAA applies the RACT requirements in section 182(b)(2) for moderate nonattainment areas to nonattainment areas classified as marginal and to attainment areas located within ozone transport regions established pursuant to section 184 of the CAA. Section 184(a) of the CAA established by law the current Ozone Transport Region (the OTR) comprised of 12 eastern states, including Pennsylvania. The requirement in section 184(b)(1)(B) is referred to as OTR RACT. A "major source" is defined based on the source's potential to emit (PTE) of $NO_X$, VOC, or both pollutants, and the applicable thresholds differ based on the classification of the nonattainment area in which the source is located. *See* sections 182(c)–(f) and 302 of the CAA.

Since the 1970's, EPA has consistently defined RACT as the lowest emission limit that a particular source is capable of meeting by the application of the control technology that is reasonably available considering technological and economic feasibility. *See* December 9, 1976 memorandum from Roger Strelow, Assistant Administrator for Air and Waste Management, to Regional Administrators, "Guidance for Determining Acceptability of SIP Regulations in Non-Attainment Areas," and also 44 FR 53762 (September 17, 1979).

EPA has provided more substantive RACT requirements through final implementation rules for each ozone NAAQS as well as through guidance. In 2004 and 2005, EPA promulgated an implementation rule for the 1997 8-hour ozone NAAQS in two phases ("Phase 1 of the 1997 Ozone Implementation Rule" and "Phase 2 of the 1997 Ozone Implementation Rule"). *See* 69 FR 23951 (April 30, 2004) and 70 FR 71612 (November 29, 2005), respectively. Particularly, the Phase 2 Ozone Implementation Rule addressed RACT statutory requirements under the 1997 8-hour ozone NAAQS. *See* 70 FR 71652.

On March 6, 2015, EPA issued its final rule for implementing the 2008 8-hour ozone NAAQS ("the 2008 Ozone SIP Requirements Rule"). *See* 80 FR 12264. At the same time, EPA revoked the 1997 8-hour ozone NAAQS, effective on April 6, 2015.[1] The 2008

---

[1] On February 16, 2018, the United States Court of Appeals for the District of Columbia Circuit (D.C. Cir. Court) issued an opinion on the 2008 Ozone SIP Requirements Rule. *South Coast Air Quality Mgmt. Dist. v. EPA*, No. 15–1115 (D.C. Cir. Feb. 16, 2018). The D.C. Cir. Court found certain parts reasonable and denied the petition for appeal on those. In particular, the D.C. Cir. Court upheld the

Ozone SIP Requirements Rule provided comprehensive requirements to transition from the revoked 1997 8-hour ozone NAAQS to the 2008 8-hour ozone NAAQS, as codified in 40 CFR part 51, subpart AA, following revocation. Consistent with previous policy, EPA determined that areas designated nonattainment for both the 1997 and 2008 8-hour ozone NAAQS at the time of revocation, must retain implementation of certain nonattainment area requirements (*i.e.* anti-backsliding requirements) for the 1997 8-hour ozone NAAQS as specified under section 182 of the CAA, including RACT. *See* 40 CFR 51.1100(o). An area remains subject to the anti-backsliding requirements for a revoked NAAQS until EPA approves a redesignation to attainment for the area for the 2008 8-hour ozone NAAQS. There are no effects on applicable requirements for areas within the OTR, as a result of the revocation of the 1997 8-hour ozone NAAQS. Thus, Pennsylvania, as a state within the OTR, remains subject to RACT requirements for both the 1997 ozone NAAQS and the 2008 ozone NAAQS.

In addressing RACT, the 2008 Ozone SIP Requirements Rule is consistent with existing policy and Phase 2 of the 1997 Ozone Implementation Rule. In the 2008 Ozone SIP Requirements Rule, EPA requires RACT measures to be implemented by January 1, 2017 for areas classified as moderate nonattainment or above and all areas of the OTR. EPA also provided in the 2008 Ozone SIP Requirements Rule that RACT SIPs must contain adopted RACT regulations, certifications where appropriate that existing provisions are RACT, and/or negative declarations stating that there are no sources in the nonattainment area covered by a specific CTG source category. In the preamble to the 2008 Ozone SIP Requirements Rule, EPA clarified that states must provide notice and opportunity for public comment on their RACT SIP submissions, even when submitting a certification that the existing provisions remain RACT or a negative declaration. States must submit appropriate supporting information for their RACT submissions, in accordance with the Phase 2 of the 1997 Ozone Implementation Rule. Adequate documentation must support that states have considered control technology that is economically and technologically

feasible in determining RACT, based on information that is current as of the time of development of the RACT SIP.

In addition, in the 2008 Ozone SIP Requirements Rule, EPA clarified that states can use weighted average $NO_X$ emissions rates from sources in the nonattainment area for meeting the major $NO_X$ RACT requirement under the CAA, as consistent with existing policy.[2] EPA also recognized that states may conclude in some cases that sources already addressed by RACT determinations for the 1-hour and/or 1997 8-hour ozone NAAQS may not need to implement additional controls to meet the 2008 ozone NAAQS RACT requirement. *See* 80 FR 12278–12279.

*B. Applicability of RACT Requirements in Pennsylvania*

As indicated earlier, RACT requirements apply to any ozone nonattainment areas classified as moderate or higher (serious, severe or extreme) under CAA sections 182(b)(2) and 182(f). Pennsylvania has outstanding ozone RACT requirements for both the 1997 and 2008 8-hour ozone NAAQS. The entire Commonwealth of Pennsylvania is part of the OTR established under section 184 of the CAA and thus is subject statewide to the RACT requirements of CAA sections 182(b)(2) and 182(f), pursuant to section 184(b).

At the time of revocation of the 1997 8-hour ozone NAAQS (effective April 6, 2015), only two moderate nonattainment areas remained in the Commonwealth of Pennsylvania for this standard, the Philadelphia and the Pittsburgh Areas. As required under EPA's anti-backsliding provisions, these two moderate nonattainment areas continue to be subject to RACT under the 1997 8-hour ozone NAAQS. Given its location in the OTR, the remainder of the Commonwealth is also treated as moderate nonattainment area under the 1997 8-hour ozone NAAQS for any planning requirements under the revoked standard, including RACT. The OTR RACT requirement is also in effect under the 2008 8-hour ozone NAAQS throughout the Commonwealth, since

EPA did not designate any nonattainment areas above marginal for this standard in Pennsylvania. Thus, in practice, the same RACT requirements continue to be applicable in Pennsylvania for both the 1997 and 2008 8-hour ozone NAAQS. RACT must be evaluated and satisfied as separate requirements under each applicable standard.

RACT applies to major sources of $NO_X$ and VOC under each ozone NAAQS or any VOC sources subject to CTG RACT. Which $NO_X$ and VOC sources in Pennsylvania are considered "major" and must be therefore subject to RACT, is dependent on the location of each source within the Commonwealth. Sources located in nonattainment areas would be subject to the "major source" definitions established under the CAA. In the case of Pennsylvania, sources located in any areas outside of moderate or above nonattainment areas, as part of the OTR, shall be treated as if these areas were moderate.

States were required to make RACT SIP submissions for the 1997 8-hour ozone NAAQS by September 15, 2006. PADEP submitted a SIP revision on September 25, 2006, certifying that a number of previously approved VOC CTG and non-CTG RACT rules continued to satisfy RACT under the 1997 8-hour ozone NAAQS for the remainder of Pennsylvania.[3] PADEP has met its obligations under the 1997 8-hour ozone NAAQS for its CTG and non-CTG VOC sources. *See* 82 FR 31464 (July 7, 2017). RACT control measures addressing all applicable CAA requirements under the 1997 8-hour ozone NAAQS have been implemented and fully approved in the jurisdictions of Allegheny County and Philadelphia County in Pennsylvania. *See* 78 FR 34584 (June 10, 2013) and 81 FR 69687 (October 7, 2016).

For the 2008 8-hour ozone NAAQS, states were required to submit RACT SIP revisions by July 20, 2014. On May 16, 2016, PADEP submitted a SIP revision addressing RACT under both the 1997 and 2008 8-hour ozone NAAQS in Pennsylvania. Specifically, the May 16, 2016 SIP submittal intends to satisfy sections 182(b)(2)(C), 182(f), and 184 of the CAA for both the 1997 and 2008 8-hour ozone NAAQS for Pennsylvania's major $NO_X$ and VOC non-CTG sources, except ethylene production plants, surface active agents manufacturing, and mobile equipment repair and refinishing.

---

use of $NO_X$ averaging to meet RACT requirements for 2008 ozone NAAQS. However, the Court also found certain other provisions, not relevant to this action, unreasonable. The D.C. Cir. Court vacated the provisions it found unreasonable.

[2] EPA's $NO_X$ RACT guidance "Nitrogen Oxides Supplement to the General Preamble" (57 FR 55625; November 25, 1992) encouraged states to develop RACT programs that are based on "area wide average emission rates." Additional guidance on area-wide RACT provisions is provided by EPA's January 2001 economic incentive program guidance titled "Improving Air Quality with Economic Incentive Programs," available at *http://www.epa.gov/ttn/oarpg/t1/memoranda/eipfin.pdf*. In addition, as mentioned previously, the D.C. Cir. Court recently upheld the use of $NO_X$ averaging to meet RACT requirements for 2008 ozone NAAQS. *South Coast Air Quality Mgmt. Dist.* v. *EPA*, No. 15–1115 (D.C. Cir. Feb. 16, 2018).

[3] The September 15, 2006 SIP submittal initially included Pennsylvania's certification of $NO_X$ RACT regulations; however, $NO_X$ RACT portions were withdrawn by PADEP on June 27, 2016.

This notice includes EPA's rationale for proposing rulemaking action on the Pennsylvania May 16, 2016 SIP revision for purposes of meeting these RACT requirements under the CAA. EPA prepared two technical support documents (TSDs) in support of this proposed rulemaking action: "Technical Support Document for the Pennsylvania State Implementation Plan Revision for Certain Reasonably Available Control Technology Requirements under the 1997 and 2008 8-Hour Ozone National Ambient Air Quality Standards" and "Technical Support Document for the Pennsylvania State Implementation Plan Revision for Certain Reasonably Available Control Technology Requirements under the 1997 and 2008 8-Hour Ozone National Ambient Air Quality Standards- Cost Effective Analyses for Coal Fired Boilers." For further details on this proposed rulemaking action, please refer to these TSDs, which are included as part of this rulemaking docket and are available online at *www.regulations.gov.*

## II. Summary of SIP Revision and EPA's Evaluation

The RACT II Rule applies statewide to existing major $NO_X$ and/or VOC sources in Pennsylvania, except those subject to other Pennsylvania regulations, as specified in 25 Pa. Code 129.96(a)–(b).[4] All but one of the exempted rules listed in section 129.96(a)–(b) have been previously approved by EPA into the SIP to meet RACT requirements under the CAA. The RACT II Rule exempts all VOC source categories for which PADEP had adopted CTG RACT regulations at the time the RACT II Rule was finalized. In addition, regulations exempted under the RACT II Rule also apply to three non-CTG VOC source categories: (1) Ethylene production plants, (2) surface active agents manufacturing, and (3) mobile equipment repair and refinishing. The RACT II Rule also exempts 25 Pa. Code sections 129.301–129.310, which has not been approved as RACT, although it is approved into the SIP. This regulation establishes $NO_X$ control requirements for glass melting furnaces. Any other $NO_X$ major sources in Pennsylvania are covered by the RACT II Rule.

The RACT II Rule requirements apply to any emissions unit or process at an affected major source having a PTE of 1 ton per year (TPY) or more of $NO_X$ and/or VOC. In the context of the rule, existing major sources are those already

in existence as of July 20, 2012 or any major sources installed or modified after July 20, 2012, which became a major source before January 1, 2017. The RACT II Rule establishes a general compliance date of January 1, 2017, as provided in paragraphs in 129.97(a) and 129.99(d)(4). EPA recognizes that RACT controls under the 1997 8-hour ozone NAAQS were required to be implemented in Pennsylvania by 2009 and that this requirement is past due; however, EPA believes that the May 16, 2016 SIP revision should sufficiently address the pending RACT obligations under the 1997 8-hour ozone NAAQS by addressing the more stringent RACT level of control under the 2008 8-hour ozone NAAQS. The general compliance date of the RACT II Rule is consistent with EPA's required deadline for states to implement RACT controls under the 2008 8-hour ozone NAAQS. *See* 80 FR 12279.

The RACT II Rule permits an affected major source that needs additional time to install an air pollution control device to meet the requirements under the RACT II Rule to petition PADEP for an alternative compliance schedule. The RACT II Rule also allows an owner or operator of a major source to petition an alternative compliance schedule if it needs additional time to install an air pollution control device on an affected emissions unit in order to comply with the RACT II requirements. These provisions allow the owner or operator in this situation to petition in writing for an alternative compliance schedule, by proposing an interim emission limit, and a later compliance date to implement such control device "as soon as possible but not later than 3 years after the written approval of the petition." EPA believes that the language in the rule allows for Pennsylvania's implementation of RACT controls as expeditiously as practicable.

Section 129.97 of the RACT II Rule establishes $NO_X$ and VOC emission limits or operational requirements on certain types of emissions units in the affected major sources which Pennsylvania presumes to meet RACT, thus referred to in the rule as presumptive RACT. Operating requirements apply to smaller emissions units; namely, combustion units with rated heat input equal to or greater than 20 million British Thermal Units per hour (MMBTU/hr) and less than 50 MMBTU/hr, $NO_X$ sources with PTE of less than 5 TPY, VOC sources with PTE of less than 2.7 TPY, combustion units with rated heat input of less than 20 MMBTU/hour, and emergency generators operating less than 500 hours

in a 12-month rolling period. Presumptive RACT $NO_X$ limits are provided for combustion units, process heaters, combustion turbines, stationary internal combustion engines, cement kilns, and municipal waste combustors. Presumptive RACT VOC limits are provided for combustion turbines, stationary internal combustion engines, and municipal solid waste landfills.

In evaluating whether controls and emission limitations meet RACT, EPA generally considers controls that have been achieved in practice by other similar existing sources to be technologically and economically feasible. For that reason, to evaluate PADEP's RACT determinations under the RACT II Rule, EPA reviewed $NO_X$ emissions limits in effect in adjacent OTR states for certain source categories addressed by Pennsylvania's rule.[5] EPA also reviewed and considered guidance documents that have been published to assist states in identifying $NO_X$ RACT level of controls. EPA finds that the $NO_X$ presumptive limits in 25 Pa. Code section 129.97 of the RACT II Rule are comparable to $NO_X$ emission limitations in other states and consistent with EPA's RACT guidance on additional control requirements. EPA finds that the presumptive requirements of the RACT II Rule represent emission limitations achievable through implementation of reasonably available controls. EPA also finds the VOC presumptive limits for combustion turbines and internal combustion engines to be reasonable considering feasibility of available controls. For municipal solid waste landfills, the RACT II Rule incorporates by reference as VOC presumptive limits the federal New Source Performance Standards (NSPS) in 40 CFR part 60, subpart Cc (Subpart Cc) and subpart WWW (Subpart WWW). EPA finds that the NSPS standards represent reasonably achievable $NO_X$ emissions limits based on the operation of reasonably available controls, and, thus, meet RACT for this source category.

EPA further evaluated the $NO_X$ presumptive requirements in 25 Pa. Code section 129.97 of the RACT II Rule that are applicable to large coal-fired boilers. Sources under these requirements would include utility boilers and large industrial boilers, which are a significant $NO_X$ emissions sector in Pennsylvania. The RACT II Rule establishes more rigorous requirements for large coal-fired boilers with certain post-combustion controls

---

[4] In the context of the RACT II Rule, the terms "major $NO_X$ emitting facility" and "major VOC emitting facility," as defined in 25 Pa Code section 121.1, are used to refer to major stationary sources.

[5] EPA evaluated $NO_X$ emission limits in adjacent OTR states because the OTR states are all subject to the same RACT requirements for the 1997 and 2008 ozone NAAQS under CAA section 184.

in place, specifically selective catalytic reduction (SCR), while other coal-fired boilers without these controls in place are the subject of less stringent NO$_X$ emissions limits based on the boiler type. EPA finds that the presumptive limit of 0.12 pounds of NO$_X$ per heat input in million British Thermal Unit (lb/MMBTU) is consistent with the operation of SCR presently installed and reasonably represents RACT for coal-fired boilers with this control in place. EPA evaluated economic feasibility of installing and operating additional post-combustion controls on any large coal-fired boilers in Pennsylvania that to date do not have these controls, in order to determine which RACT control level is reasonable as a basis for PADEP's presumptive requirements for this subset of boilers. EPA finds that Pennsylvania's presumptive RACT determination for coal-fired boilers without post-combustion controls is reasonable, as it is based on the economic infeasibility of retrofitting coal-fired boilers in Pennsylvania. Thus, EPA concludes that PADEP has adequately established for coal-fired boilers NO$_X$ presumptive RACT requirements based on reasonably available controls that therefore represent RACT. For further details, refer to EPA's "Technical Support Document for the Pennsylvania State Implementation Plan Revision for Certain Reasonably Available Control Technology Requirements under the 1997 and 2008 8-Hour Ozone National Ambient Air Quality Standards- Cost Effective Analyses for Coal Fired Boilers."

Pursuant to 25 Pa. Code section 129.97(g)(4), any combustion unit firing multiple fuels and subject to different presumptive limits for each fuel, must comply with a single NO$_X$ or VOC emission limit determined on a total heat input fuel weighted basis for any fuel representing 1% of more of the combustion unit's annual fuel combustion on a heat input basis. EPA finds the RACT II Rule's multiple fuel compliance method practicable and adequate for RACT.

Affected major sources subject to the presumptive requirements of 25 Pa. Code section 129.97 that cannot comply with the applicable presumptive NO$_X$ limits for any given emissions units, may choose one of two alternative compliance options to establish RACT. Such sources may either propose an alternative NO$_X$ emissions limit based on average NO$_X$ emissions from multiple sources or else propose a source-specific emission NO$_X$ or VOC limit.

The NO$_X$ averaging provisions established in 25 Pa. Code section 129.98 allow the owner or operator of an affected major NO$_X$ source that is unable to meet a NO$_X$ presumptive limit for at least one of its emissions unit, to establish an alternative RACT limit by averaging the NO$_X$ emissions from the non-compliant emissions unit and other emissions units. Participating NO$_X$ emissions units can be located either within the same facility (facility-wide averaging) or in another facility but within the same nonattainment area (system-wide averaging). As discussed in the following section, EPA finds that 25 Pa. Code section 129.98 is not sufficient to address RACT for sources seeking averaging, without the specific NO$_X$ averaging provisions for any affected sources being submitted to EPA for SIP approval. Therefore, EPA is proposing to conditionally approve the provisions in 25 Pa. Code section 129.98. Additional discussion and explanation for this conditional approval is provided in the following section III of this notice.

Under 25 Pa. Code section 129.99, the owner or operator of an affected major NO$_X$ and/or VOC source that is unable to meet a presumptive requirement under section 129.97, may propose an alternative RACT emissions limit, based on the feasibility evaluation of reasonably available controls for each emissions unit. The resulting limits are typically unique to the affected emissions unit and achievable through the application of specific controls, therefore referred to as source-specific RACT limits. In addition, an affected major source of NO$_X$ and/or VOC with any emissions unit that is not subject to any presumptive limits or requirements under 25 Pa. Code section 129.97, is required to propose a source-specific RACT limit under 25 Pa. Code section 129.99, similarly based on the evaluation of technologically and economically feasible controls.

Section 129.99 outlines a common procedure for proposing a source-specific RACT limit, whether proposed as an alternative under section 129.99(a) or as required under section 129.99(b)–(c). A written RACT proposal under section 129.99 must be submitted to PADEP or local agency for any affected emissions units with PTE of 5.0 TPY or more of NO$_X$ and/or 2.7 TPY or more of VOC. Source-specific limits determined to be adequate by PADEP or local agency will be approved into federally enforceable permits and then submitted for EPA's review and approval into the SIP to meet RACT. As discussed in the following section, EPA finds that 25 Pa. Code section 129.99 is not approvable

by itself without further information on specific sources and is therefore not approvable as RACT for sources seeking or required to establish an alternative RACT limit. Therefore, EPA is proposing to conditionally approve the provisions in 25 Pa. Code section 129.99. Additional discussion and explanation for this conditional approval is provided in the section III of this notice.

The RACT II Rule contains certain ancillary provisions to ensure RACT level of control for sources that have been previously subject to RACT or are subject to other federally enforceable requirements. Section 129.97(i) of the RACT II Rule provides that the presumptive requirements in section 129.97 will supersede any RACT requirements of a "RACT permit" issued prior April 23, 2016 under 25 Pa. Code sections 129.91–95, unless the RACT permit contains more stringent requirements. "RACT permits" under 25 Pa. Code sections 129.91–95 were submitted by Pennsylvania as SIP revisions and, if determined to meet RACT, were approved by EPA into the Pennsylvania SIP under 40 CFR 52.2020(d). Section 129.99(k) of the RACT II Rule provides that any source-specific requirements approved under section 129.99 will supersede any similar NO$_X$ and/or VOC requirements that have been approved into an existing enforceable permit issued for the affected source prior to April 23, 2016, except to the extent the existing permit requirements are more stringent. Subsequent RACT SIP revisions under section 129.99 must include a demonstration consistent with CAA section 110(l) to supersede any previously SIP approved RACT requirements, and such revisions will be evaluated and acted on by EPA separately. EPA finds that the provisions in sections 129.97(i) and 129.99(k) are approvable, as they adequately ensure that additional SIP revisions establishing RACT for major NO$_X$ and non-CTG VOC sources in Pennsylvania reflect the most stringent level of control for the affected sources.

25 Pa. Code section 129.100 of the RACT II Rule establishes compliance demonstration and recordkeeping requirements for affected sources. Specific monitoring and testing requirements are established for sources complying with presumptive RACT requirements under section 129.97. Recordkeeping requirements are established under section 129.100(d) for any affected sources under the RACT II Rule.

Additional compliance demonstration requirements for NO$_X$ averaging or

source-specific RACT alternative limits will be established by PADEP or the local permitting agency on a source-specific basis, in accordance with sections 129.98 and 129.99, respectively, and consistent with section 129.100. In the case of sources complying with 129.99, such additional compliance demonstration requirements will be submitted to EPA for approval into the SIP, along with the source-specific limits. Because section 129.98 does not contain any similar requirement to submit NO$_X$ averaging provisions for approval into the SIP, EPA finds that the RACT II Rule does not sufficiently establish compliance demonstration requirements for sources choosing to comply with NO$_X$ averaging under section 129.98, without submitting those additional compliance demonstration requirements to EPA for approval in the SIP. EPA is proposing conditional approval of the NO$_X$ averaging provisions in section 129.98, which will address the lack of specific compliance demonstration requirements for sources seeking to comply with these provisions. Additional discussion and explanation for this conditional approval is provided in the section III of this notice.

Any definitions related to the RACT II Rule are codified in 25 Pa. Code section 121.1. The May 16, 2016 SIP revision included amendments to *existing* definitions: "CEMS—continuous emissions monitoring system," "major NO$_X$ emitting facility," "major VOC emitting facility," "stationary internal combustion engine or stationary reciprocating internal combustion engine;" and included *new* definitions for "process heater," "refinery gas," "regenerative cycle combustion cycle combustion turbine," "simple cycle combustion turbine," and "stationary combustion turbine." The definitional changes in 25 Pa. Code section 121.1 are consistent with requirements in the RACT II Rule and are thus approvable under CAA section 110.

EPA finds that the presumptive requirements of 25 Pa. Code section 129.97 represent RACT for the NO$_X$ and VOC source categories affected by these provisions. EPA also finds that the applicability requirements of 25 Pa. Code section 129.96, the compliance demonstration requirements of 25 Pa. Code section 129.100, and the definitions in 25 Pa. Code section 121.1 are necessary to implement the RACT requirements of section 129.97. Thus, EPA finds that these particular provisions of the RACT II Rule are approvable in accordance with requirements in CAA sections 110, 172,

182, and 184 as meeting RACT for the affected major sources of non-CTG VOC and major sources of NO$_X$ under both the 1997 and 2008 8-hour ozone NAAQS. As discussed in the following section, EPA is also proposing conditional approval of 25 Pa. Code sections 129.98 and 129.99.

Additional details of Pennsylvania's SIP submission and EPA's reasoning for proposing approval of this SIP revision can be found in the "Technical Support Document for the Pennsylvania State Implementation Plan Revision for Certain Reasonably Available Control Technology Requirements under the 1997 and 2008 8-Hour Ozone National Ambient Air Quality Standards," prepared for this rulemaking action and available online at *www.regulations.gov* for this rulemaking.

## III. Rationale for Proposing Conditional Approval of Certain Provisions

EPA identified deficiencies in 25 Pa. Code sections 129.98 and 129.99, respectively, that prevent full approval of the RACT II Rule SIP revision. The NO$_X$ averaging provisions in 25 Pa. Code section 129.98 are deficient because they do not clearly specify how to properly establish an alternative RACT limit and do not require the submission of averaging NO$_X$ limits to EPA for SIP approval as RACT. EPA finds that the NO$_X$ averaging provisions, particularly as provided in section 129.98(e), are too vague to establish an adequate alternative RACT limit, without a specific determination for each source and specific inclusion into the Pennsylvania SIP of all permit conditions relevant to implementation of the NO$_X$ alternative limit for each affected source. Although section 129.98 (e) intended to define the alternative NO$_X$ RACT emission limit under a NO$_X$ averaging plan, the equation provided only stipulates that the cumulative *actual* NO$_X$ emissions from the emission units included in the averaging plan must be no greater than the cumulative *allowable* NO$_X$ emissions for those emissions units. Section 129.98(e) also specifies that the alternative NO$_X$ limit must be based on the application of the relevant presumptive NO$_X$ limit (as an emissions rate) under 25 Pa. Code section 129.97 or a more stringent limit and must be expressed as NO$_X$ mass emissions; and it requires compliance with the alternative NO$_X$ limit determined on a 30-day rolling basis. Neither 25 Pa. Code section 129.98(e) nor any other provision in section 129.98 establish how to properly compute the alternative NO$_X$ limit, such that an affected source can consistently establish an alternative limit and the

resulting limit is practically and federally enforceable to meet RACT and in accordance with CAA section 110(a)(2)(A).

The lack of specificity in 25 Pa. Code section 129.98 allows certain unbounded discretion in determining an alternative NO$_X$ RACT limit, which correspondingly results in our inability to determine if such limit would be adequate for RACT for any major source required to meet RACT. Also, this uncertainty prevents consistent implementation of the NO$_X$ averaging provisions and ultimately prevents the adequate enforceability of these provisions as a practical matter. 25 Pa. Code Section 129.98 fails to provide, on its face, a generic mechanism to establish a presumptive alternative NO$_X$ limit.

Further, EPA has long interpreted the RACT requirement of the CAA to mean states must adopt and submit regulations that include emission limitations[6] as applicable to the subject sources. In other words, a state would not fully meet the RACT requirement until it established emissions limitations applicable to the appropriate sets of sources. Hence, the NO$_X$ averaging provisions in section 129.98, even if sufficiently specific, would not be adequate to fully meet RACT in the absence of the submitted RACT emissions limitations for approval into the SIP.[7] Consequently, NO$_X$ averaging alternative limits would need to be established on a source-specific basis, and would need to be submitted to EPA for approval into the SIP.[8]

With respect to 25 Pa. Code section 129.99 for source-specific RACT, EPA finds that the generic process to subsequently establish source-specific RACT emissions limits is deficient, because it lacks a date certain by which Pennsylvania must submit the relevant source-specific RACT SIP revisions to EPA to meet RACT requirements for the 1997 and 2008 ozone NAAQS. According to EPA's longstanding policy, such "generic rule" or process cannot fully satisfy RACT, in the absence of the submitted emission limitations.[9] Thus,

---

[6] The use of the term emissions limitation is not meant to exclude the use of work practice standards or other operation and maintenance requirements that might be determined to be RACT.

[7] EPA's November 7, 1996 Memorandum "Approval Option for Generic RACT Rules Submitted to Meet the non-CTG VOC RACT Requirements and Certain NO$_X$ RACT Requirements."

[8] However, as mentioned previously, the D.C. Cir. Court recently upheld the use of NO$_X$ averaging to meet RACT requirements for 2008 ozone NAAQS. *South Coast Air Quality Mgmt. Dist.* v. *EPA*, No. 15–1115 (D.C. Cir. Feb. 16, 2018).

[9] EPA's November 7, 1996 Memorandum "Approval Option for Generic RACT Rules

EPA cannot fully approve 25 Pa. Code section 129.99 of the RACT II Rule without the submission of all source-specific RACT limits established under these provisions.

Further, EPA finds that the RACT II Rule does not specify compliance demonstration requirements for sources choosing to meet RACT by complying with $NO_X$ averaging under section 129.98. Section 129.100 only establishes recordkeeping requirements for sources complying with $NO_X$ averaging under section 129.98. Section 129.98 requires each source included in the $NO_X$ emissions averaging plan to provide methods for demonstrating compliance and recordkeeping and reporting requirements; however, those requirements are not required to be included into the SIP. Because these additional compliance demonstration requirements would need to be determined on a source-specific basis consistent with the limits and affected sources under a $NO_X$ averaging plan, EPA requires the submission of such requirements for approval into the SIP, in order for the alternative $NO_X$ limits under section 129.98 to be practically and federally enforceable, pursuant to CAA section 110(a)(2)(A).

On September 26, 2017, PADEP submitted a supplemental document to EPA that included PADEP's specific commitments to address the deficiencies in 25 Pa. Code sections 129.98 and 129.99. PADEP committed to submit to EPA, within 12 months of EPA's final rulemaking action, additional SIP revisions that include the portions of enforceable permits containing the terms and conditions relevant for compliance with section 129.98, which would include the alternative $NO_X$ limits as averaging plans and relevant compliance demonstration requirements. PADEP also committed to submit within 12 months of EPA's final rulemaking action, additional source-specific RACT SIP revisions containing source-specific RACT limits approved by PADEP under 25 Pa. Code section 129.99. A copy of PADEP's September 22, 2017 documentation containing these commitments is available in the docket for this rulemaking and online at *www.regulations.gov.*

EPA finds Pennsylvania's commitments adequately address the deficiencies noted in this rulemaking action for 25 Pa. Code sections 129.98 and 129.99 and are a sufficient basis for EPA to propose conditional approval of

these provisions as meeting RACT for sources seeking a $NO_X$ averaging plan or source-specific RACT. Under section 110(k)(4) of the CAA, EPA may conditionally approve a plan based on a commitment from the state to adopt specific enforceable measures within 1 year from the date of approval. If the state fails to adopt and submit the specified measures by the end of 1 year (from the final conditional approval), or fails to submit anything at all, EPA will revert its conditional approval to a disapproval, triggering additional obligations under sections 179 and 110(c) of the CAA.

In this event, EPA will send a letter to the state finding that it had failed to meet its commitment and that the SIP submittal is disapproved. Subsequently, a disapproval notice will be published in the **Federal Register**, and appropriate language will be inserted in the Code of Federal Regulations. EPA's disapproval, effective as of the date of the letter to the state, will trigger a ''clock'' to impose sanctions under section 179(a) and for EPA to issue a federal implementation plan (FIP) under section 110(c)(1). For plan submittals required under Part D, such as ozone RACT, section 179(a) allows for up to 18 months for the state to correct the deficiency that is the subject of a finding or disapproval before EPA is required to impose sanctions. Further, section 110(c)(1) provides for up to 2 years for the state to correct the deficiency, or else additional sanctions apply at this time, and for EPA to approve a new submittal before being obligated to promulgate a FIP. Similarly, if EPA receives a submittal addressing the commitment but determines that the submittal is incomplete, EPA will send a letter to the state making such a finding. As with the failure to submit, the sanctions and FIP clocks will begin as of the date of the finding letter.

In addition, where the state does make a complete submittal by the end of the 1-year period, EPA will have to evaluate that submittal to determine if it may be approved and take final action on the submittal within 12 months after the date EPA determines the submittal is complete. If the submittal does not adequately address the deficiencies that were the subject of the conditional approval, and is therefore not approvable, EPA will go through notice-and-comment rulemaking to disapprove the submittal. The 18-month clock for sanctions and the 2-year clock for a FIP start as of the date of final disapproval. If EPA determines that the rule is approvable, EPA will propose approval of the rule. In either instance, whether EPA finally approves or disapproves the

rule, the conditional approval remains in effect until EPA takes its final action.

By conditionally approving 25 Pa. Code sections 129.98 and 129.99, EPA would ensure that adequate RACT limits are established in addition to or as alternative to the presumptive RACT requirements of 25 Pa. Code section 129.97. Additional compliance demonstration requirements would also be approved into the SIP for sources complying with either 25 Pa. Code section 129.98 or 129.99, which would ensure adequate federal and practical enforceability of any additional RACT limits under the RACT II Rule for compliance with CAA section 110(a)(2)(A). In addition, with EPA's conditional approval of these requirements, EPA would set a specific schedule for producing enforceable RACT measures, resulting in more timely implementation of RACT controls in Pennsylvania than would otherwise occur if EPA was to disapprove these provisions and require a federal plan for control.

Conditional approval of 25 Pa. Code sections 129.98 and 129.99 should not result in the approved portions of the RACT II Rule being any more stringent than anticipated or intended by Pennsylvania. 25 Pa. Code 129.99 requires source-specific RACT to receive EPA approval and required sources complying with these requirements to submit an alternative proposal to PADEP by a date certain which has already passed. In addition, compliance with 25 Pa. Code sections 129.98 and 129.99 is intended in most cases as an alternative option for affected sources that are unable to comply with the established presumptive RACT emissions requirements under section 129.97. The presumptive RACT requirements in section 129.97 remain applicable unless and until a source receives approval of an alternative RACT limit (under 25 Pa. Code sections 129.98 and 129.99) and EPA approves such alternative RACT limits into the Pennsylvania SIP. Further, PADEP's September 22, 2017 commitments confirm PADEP's intention to submit alternative RACT limits under 25 Pa. Code sections 129.98 and 129.99 to EPA for SIP approval. The submission of any alternative RACT requirement approved by Pennsylvania as a SIP revision will not supplant the presumptive RACT requirements for purposes of Federal enforceability unless and until the alternative is fully approved by EPA into the SIP.

In conclusion, EPA is proposing conditional approval under CAA section 110(k)(4) only of 25 Pa. Code sections 129.98 and 129.99 of the RACT II Rule

for the reasons provided above. EPA is also proposing full approval under CAA 110 of the rest of the RACT II Rule included for incorporation in the Pennsylvania SIP through PADEP's May 16, 2016 SIP submittal, as EPA finds that the remainder of the RACT II Rule meets the intended RACT requirements under sections 172, 182, 184 and 110 of the CAA for the 1997 and 2008 ozone NAAQS.

## IV. Proposed Action

EPA's review of the Pennsylvania May 16, 2016 SIP submittal indicates that certain portions of the submittal are adequate to meet RACT requirements under the CAA for both the 1997 and 2008 8-hour ozone NAAQS. EPA is proposing to fully approve into the SIP the provisions in 25 Pa. Code sections 129.96–129.97, and 129.100 of the RACT II Rule and relevant definitions in 25 Pa. Code section 121.1, adopted by Pennsylvania on April 23, 2016, as meeting RACT for the 1997 and 2008 ozone NAAQS. These provisions are adequate to meet the ozone-specific RACT requirements of sections 172, 182(b)(2)(C), 182(f), and 184 of the CAA for both the 1997 and 2008 8-hour ozone NAAQS for specific NO$_X$ and VOC sources in Pennsylvania, and in accordance with section 110.

In addition, EPA is proposing to conditionally approve 25 Pa. Code sections 129.98 and 129.99, as these provisions provide alternative RACT requirements which require further PADEP and EPA action in order to meet RACT requirements under the CAA. The provisions of 25 Pa. Code sections 129.98 and 129.99 will become fully approvable, if PADEP submits to EPA, within 12 months of EPA's final action, additional SIP revisions that include any alternative NO$_X$ averaging limits and source-specific RACT limits adopted under sections 129.98 and 129.99, respectively, as well as any relevant compliance demonstration requirements. Once EPA has determined that PADEP has satisfied this condition, EPA shall remove the conditional nature of its approval and, at that time, the provisions in 25 Pa. Code sections 129.98 and 129.99 will receive a full approval status. Should PADEP fail to meet this condition, the final conditional approval of 25 Pa. Code sections 129.98 and 129.99 will convert to a disapproval. EPA is soliciting public comments on the issues discussed in this document. These comments will be considered before taking final action.

## IV. Incorporation by Reference

In this proposed rule, EPA is proposing to include in a final EPA rule regulatory text that includes incorporation by reference. In accordance with requirements of 1 CFR 51.5, EPA is proposing to incorporate by reference the regulatory provisions of 25 Pa. Code sections 129.96–129.100 of the RACT II Rule and related amendments of 25 Pa Code section 121.1, as adopted by Pennsylvania on April 23, 2016. EPA has made, and will continue to make, these materials generally available through *http://www.regulations.gov* and at the EPA Region III Office (please contact the person identified in the "For Further Information Contact" section of this preamble for more information).

## V. Statutory and Executive Order Reviews

Under the CAA, the Administrator is required to approve a SIP submission that complies with the provisions of the CAA and applicable federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, EPA's role is to approve state choices, provided that they meet the criteria of the CAA. Accordingly, this action merely approves state law as meeting federal requirements and does not impose additional requirements beyond those imposed by state law. For that reason, this proposed action:

• Is not a "significant regulatory action" subject to review by the Office of Management and Budget under Executive Orders 12866 (58 FR 51735, October 4, 1993) and 13563 (76 FR 3821, January 21, 2011);

• is not an Executive Order 13771 (82 FR 9339, February 2, 2017) regulatory action because SIP approvals are exempted under Executive Order 12866.

• does not impose an information collection burden under the provisions of the Paperwork Reduction Act (44 U.S.C. 3501 *et seq.*);

• is certified as not having a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*);

• does not contain any unfunded mandate or significantly or uniquely affect small governments, as described in the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4);

• does not have federalism implications as specified in Executive Order 13132 (64 FR 43255, August 10, 1999);

• is not an economically significant regulatory action based on health or safety risks subject to Executive Order 13045 (62 FR 19885, April 23, 1997);

• is not a significant regulatory action subject to Executive Order 13211 (66 FR 28355, May 22, 2001);

• is not subject to requirements of Section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) because application of those requirements would be inconsistent with the CAA; and

• does not provide EPA with the discretionary authority to address, as appropriate, disproportionate human health or environmental effects, using practicable and legally permissible methods, under Executive Order 12898 (59 FR 7629, February 16, 1994).

In addition, this proposed rule, concerning Pennsylvania's 1997 and 2008 8-hour ozone reasonably available control technology for certain major NOx and VOC sources, does not have tribal implications as specified by Executive Order 13175 (65 FR 67249, November 9, 2000), because the SIP is not approved to apply in Indian country located in the state, and EPA notes that it will not impose substantial direct costs on tribal governments or preempt tribal law.

## List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Incorporation by reference, Intergovernmental relations, Nitrogen dioxide, Ozone, Reporting and recordkeeping requirements, Volatile organic compounds.

Authority: 42 U.S.C. 7401 *et seq.*

Dated: February 23, 2018.

**Cosmo Servidio,**
*Regional Administrator, Region III.*
[FR Doc. 2018–04933 Filed 3–13–18; 8:45 am]

**BILLING CODE 6560–50–P**

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

### 50 CFR Part 17

[Docket No. FWS–R2–ES–2016–0110; FXES11130900000 178 FF09E42000]

RIN 1018–BB79

### Endangered and Threatened Wildlife and Plants; Removing the Black-Capped Vireo From the Federal List of Endangered and Threatened Wildlife; Availability of Post-Delisting Monitoring Plan

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Proposed rule; availability of supplemental information.

**SUMMARY:** We, the U.S. Fish and Wildlife Service (Service), announce the

JA033

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

**DATE:**        2/22/2018

**SUBJECT:**      <u>Technical Support Document</u> for the Pennsylvania State Implementation Plan Revision for Certain Reasonably Available Control Technology Requirements under the 1997 and 2008 8-hour Ozone National Ambient Air Quality Standard

**FROM:**        _____\s_____,
                Emlyn Vélez-Rosa, Environmental Engineer
                Office of Air Program Planning (3AP30)

**TO:**          SIP Docket File: EPA-R03-OAR-2017-0290

**REVIEWED**     _____\s_____,
**BY:**          Susan I. Spielberger, Associate Director
                Office of Air Program Planning (3AP30)

## I.    Affected Regulation

On May 16, 2016, the Pennsylvania Department of Environmental Protection (PADEP) submitted a revision to the Commonwealth of Pennsylvania (Pennsylvania) State Implementation Plan (SIP) consisting of amendments to regulations in 25 Pa. Code chapters 121 and 129 to meet certain reasonably available control technology (RACT) requirements of the Clean Air Act (CAA) for both the 1997 and 2008 8-hour ozone National Ambient Air Quality Standard (NAAQS or standard).  This technical support document (TSD) provides the Environmental Protection Agency's (EPA's) rationale for proposing rulemaking action on Pennsylvania's RACT SIP revision.

## II.    Background

## A.    Ozone NAAQS and RACT Requirements

On July 18, 1997 (62 FR 38856), EPA promulgated a standard for ground level ozone based

JA034

on 8-hour average concentrations. The 8-hour averaging period replaced the previous 1-hour averaging period, and the level of the NAAQS was changed from 0.12 parts per million (ppm) to 0.08 ppm. On April 30, 2004, EPA designated two nonattainment areas in Pennsylvania under the 1997 8-hour ozone NAAQS, namely Philadelphia-Wilmington-Atlantic City, PA-NJ-MD-DE (the Philadelphia Area) and Pittsburgh-Beaver Valley (the Pittsburgh Area). The remaining 14 areas in Pennsylvania were designated marginal nonattainment areas. *See* 69 FR 23858 and 23931*; see also* 40 CFR 81.339.

On March 12, 2008, EPA strengthened the 8-hour ozone standards, by revising its level to 0.075 parts per million (ppm) averaged over an 8-hour period (2008 8-hour ozone NAAQS). On May 21, 2012, EPA designated five marginal nonattainment areas in Pennsylvania for the 2008 8-hour ozone NAAQS: Allentown-Bethlehem-Easton, Lancaster, Reading, the Philadelphia Area, and the Pittsburgh Area. *See* 77 FR 30088.

On March 6, 2015 (80 FR 12264), EPA announced its revocation of the 1997 8-hour ozone NAAQS for all purposes and for all areas in the country, effective on April 6, 2015. EPA has determined that certain nonattainment planning requirements continue to be in effect under the revoked standard for nonattainment areas under the 1997 8-hour ozone NAAQS, including RACT. *See* 80 FR 12296 (March 6, 2015).

The CAA regulates emissions of nitrogen oxides (NOx) and volatile organic compounds (VOC) to prevent photochemical reactions that result in ozone formation. RACT is an important strategy for reducing NOx and VOC emissions from major stationary sources within areas not meeting the ozone NAAQS. Since the 1970's, EPA has consistently defined "RACT" as the lowest emission limit that a particular source is capable of meeting by the application of the control technology that is reasonably available considering technological and economic feasibility.[1]

Section 172(c)(1) of the CAA provides that SIPs for nonattainment areas must include reasonably available control measures (RACM) for demonstrating attainment of all NAAQS, including emissions reductions from existing sources through adoption of RACT. Further, section 182(b)(2) of the CAA sets forth three distinct requirements regarding RACT for the ozone NAAQS: First, section 182(b)(2)(A) requires states to submit a rule (or negative declaration) for each category of VOC sources in the area covered by a control technique Guideline (CTG) document issued by EPA between November 15, 1990 and the date of attainment. These rules shall be submitted as SIP revisions within the period set forth by EPA in issuing the relevant CTG document. Second, section 182(b)(2)(B) requires a rule (or negative

---

[1] *See* December 9, 1976 memorandum from Roger Strelow, Assistant Administrator for Air and Waste Management, to Regional Administrators, "Guidance for Determining Acceptability of SIP Regulations in Non-Attainment Areas," and also 44 FR 53762; September 17, 1979.

declaration) for all VOC sources in the area covered by any CTG issued before November 15, 1990. And third, section 182(b)(2)(C) requires a rule or rules for all other major stationary sources of VOCs that are located in the area. In addition, section 182(f) subjects major stationary sources of NOx to the same RACT requirements applicable to major stationary sources of VOC.[2] EPA has not issued any CTGs for categories of NOx sources, so this requirement in essence refers to section 182(b)(2)(C). The ozone RACT requirements under section 182(b)(2) are usually referred to as VOC CTG RACT, non-CTG VOC RACT, and major NOx RACT.

Section 184(b)(1)(B) of the CAA applies the requirements in section 182(b)(2) to nonattainment areas classified as marginal and attainment areas located within ozone transport regions established pursuant to section 184 of the CAA. Section 184(a) of the CAA established by law the current Ozone Transport Region (OTR) comprised of 12 eastern states, including Pennsylvania. This requirement is referred to as OTR RACT.

EPA's CTGs establish presumptive RACT level control requirements for various source categories; that is, they identify a level of control, which EPA recommends as RACT for the affected source category. In some cases, EPA has issued Alternative Control Techniques guidelines (ACTs) for source categories, which in contrast to the CTGs, only present a range for possible control options but do not identify any particular option as the presumptive norm for what is RACT. EPA has provided more substantive RACT requirements through implementation rules for each ozone NAAQS as well as guidance. For a discussion on EPA's RACT regulatory requirements, see the notice of proposed rulemaking (NPR).

## B.    Ozone RACT Applicability in Pennsylvania

RACT under each ozone NAAQS applies to major sources of NOx and VOC, and must be evaluated and satisfied as separate requirements under the applicable standard. At the time of revocation of the 1997 8-hour ozone NAAQS (effective April 6, 2015), only two moderate nonattainment areas remained in the Commonwealth of Pennsylvania for this standard, the Philadelphia and the Pittsburgh Areas. As required under EPA's anti-backsliding provisions, these two moderate nonattainment areas continue to be subject to RACT under the 1997 8-hour ozone NAAQS.

In addition, the entire Commonwealth of Pennsylvania is part of the OTR established under section 184 of the CAA. Given its location in the OTR, the remainder of the Commonwealth is also treated as a moderate nonattainment area under the 1997 8-hour ozone NAAQS for any

---

[2] A "major source" is defined based on the source's potential to emit (PTE) of NOx or VOC, and the applicable thresholds for RACT differ based on the classification of the nonattainment area in which the source is located. *See* sections 182(c)–(f) and 302 of the CAA.

planning requirements under the revoked standard, including RACT. The OTR RACT requirement is also in effect under the 2008 8-hour ozone NAAQS throughout the Commonwealth, since EPA did not designate any nonattainment areas above marginal for this standard in Pennsylvania. Thus, in effect, the same RACT requirements for moderate nonattainment areas continue to be applicable statewide in Pennsylvania under both the 1997 and 2008 8-hour ozone NAAQS.

RACT applies to major sources of NOx and VOC under each ozone NAAQS or any VOC sources subject to CTG RACT. Which NOx and VOC sources in Pennsylvania are considered "major" and must be therefore subject to RACT, is dependent on the location of each source within the Commonwealth. Sources located in nonattainment areas are subject to the "major source" definitions established under the CAA. In the case of Pennsylvania, sources located in any areas outside of moderate or above nonattainment areas, as part of the OTR, are treated as if these areas were moderate.

In Pennsylvania, the SIP program is implemented primarily by PADEP, but also by local air agencies in Philadelphia County (the City of Philadelphia Air Management Services (AMS)) and Allegheny County, (Allegheny County Health Department (ACHD)). These agencies have implemented numerous RACT regulations and source-specific measures in Pennsylvania to meet the applicable ozone RACT requirements. Statewide RACT controls have been promulgated by PADEP in Pennsylvania Code Title 25- Environmental Resources, Part I- Department of Environmental Protection, Subpart C- Protection of Natural Resources, Article III- Air Resources, (25 Pa. Code) Chapter 129. AMS and ACHD incorporate by reference Pennsylvania regulations, but have also promulgated a number of regulations adopting RACT controls for their own jurisdictions. In addition, AMS and ACHD have submitted separate source-specific RACT determinations as SIP revisions, which have been approved by EPA. *See* 40 CFR 52.2020(d)(1).

States were required to make RACT SIP submissions for the 1997 8-hour ozone NAAQS by September 15, 2006. PADEP submitted a SIP revision on September 25, 2006, certifying that a number of previously approved VOC RACT rules continued to satisfy RACT under the 1997 8-hour ozone NAAQS for the remainder of Pennsylvania.[3] PADEP has met its obligations under the 1997 8-hour ozone NAAQS for its CTG and non-CTG VOC sources. *See* 82 FR 31464 (July 7, 2017). RACT control measures addressing all applicable CAA RACT requirements under the 1997 8-hour ozone NAAQS have been implemented and fully approved in the jurisdictions of Allegheny County and Philadelphia County. *See* 78 FR 34584 (June 10, 2013) and 81 FR 69687 (October 7, 2016).

---

[3] The September 15, 2006 SIP submittal initially included Pennsylvania's certification of NOx RACT regulations; however, NOx RACT portions were withdrawn by PADEP on June 27, 2016.

4

For the 2008 8-hour ozone NAAQS, states were required to submit RACT SIP revisions by July 20, 2014. On May 16, 2016, PADEP submitted a SIP revision addressing RACT under both the 1997 and 2008 8-hour ozone NAAQS in Pennsylvania. PADEP's May 16, 2016 SIP revision intends to address certain outstanding non-CTG VOC RACT, VOC CTG RACT, and major NOx RACT requirements under the CAA for both standards. This TSD discusses EPA's rationale for proposing rulemaking action on the Pennsylvania May 16, 2016 SIP revision for purposes of meeting certain RACT requirements under the CAA.

### III.  Summary of Pennsylvania SIP Revision

The May 16, 2016 SIP revision submitted by PADEP consists of the Pennsylvania regulation in 25 Pa. Code sections 129.96-100 titled "Additional RACT Requirements for Major Sources of NOx and VOCs" (hereafter referred to as the RACT II Rule) and amendments to 25 Pa. Code section 121.1, including related definitions, to be incorporated into the SIP. These revisions were adopted by PADEP on April 23, 2016 and effective on the same date upon publication in the Pennsylvania Bulletin. The RACT II Rule supersedes in part Pennsylvania's regulation in 25 Pa. Code sections 129.91-95 for purposes of meeting certain RACT obligations under 1997 and 2008 ozone NAAQS.

As provided in section 129.96, the RACT II Rule applies statewide to any existing major NOx and/or VOC sources not subject to other Pennsylvania RACT regulations specified in 129.96(a)-(b).[4] RACT II Rule standards, provided in sections 129.96 to 129.99, apply to any emissions unit or process at the affected major source having a potential to emit (PTE) of 1 ton per year (TPY) or more of NOx and/or VOC, whichever is the major pollutant at an affected major source. In the context of the rule, existing major sources are those in existence on July 20, 2012 or any major sources installed of modified after July 20, 2012, which consequently became a major source before January 1, 2017. Affected major sources must comply with all applicable requirements of the RACT II Rule by January 1, 2017. However, the rule allows an affected major source to petition an alternative compliance schedule if the source needs additional time to install an air pollution control device to meet the requirements under the RACT II Rule.

Section 129.97 of the RACT II Rule establishes NOx and VOC emission limits or operational requirements on certain types of emissions units in the affected major sources which Pennsylvania presumed to meet RACT, thus referred to as presumptive RACT. Presumptive RACT NOx and/or VOC limits are provided for combustion units, process heaters, combustion turbines, stationary internal combustion engines, cement kilns, municipal solid waste landfills, and municipal waste combustors (MWCs). Affected major sources that cannot comply with the

---

[4] The terms "major NOx emitting facility" and "major VOC emitting facility" are used to refer to major stationary sources, as defined in 25 Pa. Code section 121.1.

applicable presumptive requirements for any given emissions units, may choose one of two alternative compliance options to establish RACT for that unit through either a NOx emissions averaging plan or a RACT proposal.

The NOx averaging provisions in section 129.98 allow the owner or operator of an affected major NOx source that is unable to meet a NOx presumptive limit for at least one of its emissions unit, to establish an alternative RACT limit by averaging the NOx emissions from the non-compliant emissions unit and any other emissions units also subject to NOx presumptive limits in section 129.97. Participating NOx emission units can be located either within the same facility (facility-wide averaging) or in another facility but within the same nonattainment area (system-wide averaging).[5]

As an alternative, section 129.99 allows the owner or operator of an affected major NOx and/or VOC source that is unable to meet a presumptive limit for at least one of its emissions unit, to propose an alternative RACT emissions limit, based on the feasibility evaluation of reasonably available controls for each particular emissions unit. The resulting limits are typically unique to the affected emissions unit and achievable through the application of specific controls, therefore referred to as source-specific RACT limits. In addition, section 129.99 requires an affected major source of NOx and/or VOC with any emissions unit that is not subject to section 129.97, to propose a source-specific RACT limit under section 129.99, similarly based on the evaluation of controls. Section 129.99 outlines a common procedure for proposing a RACT limit, whether the source has chosen or is required to comply with source-specific RACT under the RACT II Rule. A written RACT proposal under section 129.99 must be submitted to PADEP or local agency for any affected emissions units with PTE of 5.0 TPY or more of NOx and/or 2.7 TPY or more of VOC. Source-specific limits determined to be adequate by PADEP or local agency will be approved into federally enforceable permits and then submitted for EPA's review and approval into the SIP to meet RACT.

Relevant definitions and general compliance requirements were established as part of the RACT II Rule, in 25 Pa. Code section 121.1 and 129.100, respectively.

On September 26, 2017, PADEP submitted a supplemental document that clarified the intended implementation of certain provisions of the RACT II Rule. The supplemental submittal

---

[5] On February 16, 2018, the United States Court of Appeals for the District of Columbia Circuit (D.C. Cir. Court) issued an opinion on the requirements EPA promulgated for implementing the 2008 ozone NAAQS, known as the 2008 Ozone SIP Requirements Rule. *South Coast Air Quality Mgmt. Dist. v. EPA*, No. 15-1115 (D.C. Cir. Feb. 16, 2018). The D.C. Cir. Court found certain parts reasonable and denied the petition for appeal on those. In particular, the D.C. Cir. Court upheld the use of NOx averaging to meet RACT requirements for 2008 ozone NAAQS. However, the Court also found certain other provisions, not relevant to this action, unreasonable. The D. C. Cir. Court vacated the provisions it found unreasonable.

also included PADEP's commitments to submit additional SIP revisions to address certain deficiencies of the RACT II Rule identified by EPA.

## IV. EPA's Evaluation of Pennsylvania RACT II Rule SIP

EPA has evaluated various components of the RACT II Rule for determining approvability and compliance with the CAA RACT requirements and EPA's RACT policy.

### A. Scope of RACT SIP Revision Based on Rule's Applicability

In its transmittal letter, PADEP indicates that the May 16, 2016 SIP revision containing the RACT II Rule was submitted to EPA "to fulfill certain 8-hour ozone RACT requirements for the 1997 and 2008 ozone National Ambient Air Quality Standards and to satisfy requirements of the Clean Air Act for sources located in ozone nonattainment areas and the Ozone Transport Region." EPA has reviewed the applicability of the RACT II Rule to further identify the specific RACT requirements of the CAA addressed by the May 16, 2016 SIP revision.

As provided in section 129.96, the RACT II Rule applies to major sources of NOx and VOC that are not covered by other Pennsylvania rules specified in paragraphs (a) and (b). Table 1 lists those exempted rules and indicates the applicable RACT requirement, based on EPA's approval of such regulation into the SIP.

**Table 1. Exemptions in RACT II Rule Listed in 25 Pa. Code Section 129.96(a)-(b)**

| 25 Pa. Code Section | Title of Regulation | Relevance to RACT (as SIP-approved) |
|---|---|---|
| 129.51. | General. (VOC sources) | Supporting RACT provisions[6] |
| 129.52. | Surface coating processes. | CTG VOC RACT |
| 129.52a. | Control of VOC emissions from large appliance and metal furniture surface coating processes. | CTG VOC RACT (for 2008 ozone NAAQS) |
| 129.52b. | Control of VOC emissions from paper, film and foil surface coating processes. | CTG VOC RACT (for 2008 ozone RACT) |
| 129.52c. | Control of VOC emissions from flat wood paneling surface coating processes. | CTG VOC RACT (for 2008 ozone NAAQS) |
| 129.54. | Seasonal operation of auxiliary incineration equipment. | RACT Correction[7] |
| 129.55. | Petroleum refineries—specific sources. | CTG VOC RACT |

[6] 25 Pa. Code section 129.51 contains compliance demonstration requirements for sources subject to other CTG rules (25 Pa. Code section 129.52, 129.52a, 129.52b, 129.52c, 129.54-129.69, 129.71-129.73 and 129.77).

[7] 25 Pa. Code section 129.54 was approved into the SIP to meet RACT under the 1-hour ozone NAAQS for seasonal operation of auxiliary incineration equipment, but was later revised by PADEP in 1991 to correct deficiencies in Pennsylvania's SIP, pursuant to EPA's requirements in CAA section 182(a)(2)(A). 58 FR 28362 (May 13, 1993).

| 25 Pa. Code Section | Title of Regulation | Relevance to RACT (as SIP-approved) |
|---|---|---|
| 129.56. | Storage tanks greater than 40,000 gallons capacity containing VOCs. | CTG VOC RACT |
| 129.57. | Storage tanks less than or equal to 40,000 gallons capacity containing VOCs. | CTG VOC RACT |
| 129.58. | Petroleum refineries—fugitive sources. | CTG VOC RACT |
| 129.59. | Bulk gasoline terminals. | CTG VOC RACT |
| 129.60. | Bulk gasoline plants. | CTG VOC RACT |
| 129.61. | Small gasoline storage tank control (Stage 1 control). | CTG VOC RACT |
| 129.62. | General standards for bulk gasoline terminals, bulk gasoline plants and small gasoline storage tanks. | CTG VOC RACT |
| 129.63. | Degreasing operations. | CTG VOC RACT |
| 129.64. | Cutback asphalt paving. | CTG VOC RACT |
| 129.65. | Ethylene production plants. | Non-CTG VOC RACT |
| 129.66. | Compliance schedules and final compliance dates. | Supporting RACT provisions [8] |
| 129.67. | Graphic arts systems. | CTG VOC RACT |
| 129.67a. | Control of VOC emissions from flexible packaging printing presses. | CTG VOC RACT (only for 2008 ozone NAAQS) |
| 129.67b. | Control of VOC emissions from offset lithographic printing presses and letterpress printing presses. | CTG VOC RACT (only for 2008 ozone NAAQS) |
| 129.68. | Manufacture of synthesized pharmaceutical products. | CTG VOC RACT |
| 129.69. | Manufacture of pneumatic rubber tires. | CTG VOC RACT |
| 129.71. | Synthetic organic chemical and polymer manufacturing—fugitive sources. | CTG VOC RACT |
| 129.72. | Manufacture of surface active agents. | Non-CTG VOC RACT |
| 129.73. | Aerospace manufacturing and rework. | CTG VOC RACT |
| 129.75. | Mobile equipment repair and refinishing. | Non-CTG VOC RACT |
| 129.77. | Control of emissions from the use or application of adhesives, sealants, primers and solvents. | CTG VOC RACT |
| 129.101- | Wood furniture manufacturing | CTG VOC RACT |

---

[8] 25 Pa Code section 129.66 clarifies new compliance dates for CTG source categories covered by 25 PA code 129.51 and 129.52c, following Pennsylvania's recent amendments to these regulations.  76 FR 31855 (June 2, 2011).

| 25 Pa. Code Section | Title of Regulation | Relevance to RACT (as SIP-approved) |
| --- | --- | --- |
| 129.107 | operations | |
| 129.301-129.310 | Control of NOx emissions from glass melting furnaces | N/A |

All but one of the exempted rules listed in section 129.96(a)-(b) have been previously approved by EPA into the SIP to meet RACT requirements under the CAA.  The RACT II Rule exempts all VOC source categories for which PADEP had adopted CTG RACT regulations at the time the RACT II Rule was finalized.  Regulations exempted under the RACT II Rule also apply to three non-CTG VOC source categories: (1) ethylene production plants, (2) surface active agents manufacturing, and (3) mobile equipment repair and refinishing.  It is worth noting that the RACT II Rule excludes the CTG and non-CTG major VOC source categories for which PADEP has previously adopted regulations to meet 1997 8-hour ozone RACT. Also, some of the excluded CTG regulations were recently adopted by PADEP to meet additional RACT requirements that became applicable under the 2008 8-hour ozone NAAQS.

There is one exempted rule listed in section 129.96(a)-(b) that has not been approved as RACT, although it is approved into the SIP, 25 Pa. Code sections 129.301-129.310.  This regulation establishes NOx control requirements for glass melting furnaces, and is the only exempted rule addressing a major NOx source category.  Therefore, any other NOx major sources in Pennsylvania would be covered by the RACT II Rule.

In summary, the RACT II Rule addresses Pennsylvania RACT for all non-CTG major VOC source categories, except ethylene production plants, surface active agents manufacturing, and mobile equipment repair and refinishing; and all major NOx source categories, except glass melting furnaces.  Therefore, EPA concludes that PADEP's May 16, 2016 SIP submittal intends to satisfy the RACT requirements of sections 182(b)(2)(C), 182(f), and 184 of the CAA under both the 1997 and 2008 8-hour ozone NAAQS for certain source categories.

## B.  Compliance Date and Alternative Compliance Schedules

Pennsylvania's RACT II Rule establishes a general compliance date of January 1, 2017, as provided in paragraphs in 129.97(a) and 129.99(d)(4).  EPA recognizes that RACT controls under the 1997 8-hour ozone NAAQS were required to be implemented in Pennsylvania by 2009 and that this requirement is past due; however, EPA believes that the May 16, 2016 SIP revision should sufficiently address the pending RACT obligations under the 1997 8-hour ozone NAAQS by addressing the more stringent RACT level of control under the 2008 8-hour ozone NAAQS.  The general compliance date of the RACT II Rule is consistent with EPA's required deadline for states to implement RACT controls under the 2008 8-hour ozone NAAQS.  *See* 80 FR 12279.

9

The RACT II Rule also contains separate provisions, in sections 129.97(k)-(m) and 129.99(i)-(l), that provide additional time to an owner or operator of a major source that needs to install an air pollution control device on an affected emissions unit in order to comply with the RACT II limits, under either section 129.97 or section 129.99. These provisions allow the owner or operator in this situation to petition in writing for an alternative compliance schedule.

The process for alternative compliance schedules is outlined in sections 129.97(k)-(m) and 129.99(i)-(l). The written petitions were required to be submitted to PADEP or local agency by October 26, 2014, or 6 months after meeting the major source definition, whichever is latest; followed by approval or denial of such petitions in writing by PADEP or local agency. An alternative compliance schedule petition must include, among other things, a schedule for the installation of the air cleaning device, a proposed interim emission limit, and a proposed final compliance date to implement such control device "as soon as possible but not later than 3 years after the written approval of the petition." The interim emissions limit will be imposed on the affected emissions unit until installation is completed and compliance of the applicable RACT II requirement is achieved. Once approved, the requirements of the petition must be incorporated in an applicable operating permit or plan approval.

EPA acknowledges that it was reasonable for Pennsylvania to believe it would be impractical to presume that all sources would be able to install additional controls timely to meet the rule's January 1, 2017 deadline, given the timing of the RACT II Rule final rulemaking in April 23, 2016. The RACT II Rule only allowed up to nine months (from the time of Pennsylvania's final rulemaking to January 1, 2017) for sources to install and implement additional controls in order to comply with the applicable requirements. EPA has estimated that installation of NOx controls alone can take from five months to over a year depending on the type of control and the type of source being retrofitted, which does not account for any additional time needed for permitting or for any preparation prior the installation.[9] Thus, allowing alternative schedules is reasonable, as long as the source is able to justify that additional time is needed for the installation of additional controls. EPA believes that the language in the rule allows for Pennsylvania's implementation of RACT controls as expeditiously as practicable.

## C. Presumptive RACT Requirements

Section 129.97 of the RACT II Rule establishes operating or emissions limits for different types of emissions units in the affected major sources of NOx and/or VOC. Operating requirements apply to smaller emissions units. Namely, combustion units with rated heat input equal to or greater than 20 million Btu/hour (MMBTU/hr) and less than 50 MMBTU/hr are subject to biennial combustion tune-up, while other smaller emissions units, as specified in

---

[9] "Assessment of Non-EGU NOx Emission Controls, Cost of Controls, and Time for Compliance Final TSD" Table 3, Final Technical Support Document (TSD) for the Cross-State Air Pollution Rule for the 2008 Ozone NAAQS, August 2016. EPA Docket ID No. EPA-HQ-OAR-2015-0500

sections 129.97(c)(1) to (8), are required to be installed, maintained, and operated with manufacturer's specifications and with good operating practices. The remaining smaller emissions units include NOx sources with PTE of less than 5 TPY, VOC sources with PTE of less than 2.7 TPY, combustion units with rated heat input of less than 20 MMBTU/hour, and emergency generators operating less than 500 hours in a 12-month rolling period.

The RACT II Rule also sets forth specific NOx and/or VOC limits for eight source categories designated by type of emissions units: (1) boilers, (2) process heaters, (3) any other (external) combustion units, (4) combustion turbines, (5) stationary internal combustion engines, (6) cement kilns, (7) municipal waste combustors, and (8) municipal solid waste (MSW) landfills. VOC limits are only established for municipal solid waste landfills, combustion turbines, and stationary internal combustion turbines. Tables 3 and 4 summarize applicable presumptive NOx and VOC limits under Pennsylvania's RACT II Rule, respectively.

**Table 3. Presumptive NOx RACT Limits under 25 Pa. Code Section 129.97**

| Source Category | Applicability | NOx RACT Requirement | Applicable Provision |
|---|---|---|---|
| Combustion unit or process heater with rated heat input $\geq$ 50 MMBTU/hr | Fired by natural gas | 0.10 lb/MMBTU | 129.97(g)(1)(i) |
| | Fired by distillate oil | 0.12 lb/MMBTU | 129.97(g)(1)(ii) |
| | Fired by residual oil | 0.20 lb/MMBTU | 129.97(g)(1)(iii) |
| | Fired by refinery gas | 0.25 lb/MMBTU | 129.97(g)(1)(iv) |
| | Fired by any other type of solid fuel | 0.25 lb/MMBTU | 129.97(g)(1)(vii) |
| Coal-fired combustion units | With rated heat input $\geq$ 50 MMBTU/hr, firing any other type of solid fuel-fired | 0.45 lb/MMBTU | 129.97(g)(1)(v) |
| | With rated heat input $\geq$ 250 MMBTU/hr, by firing configuration | For circulating fluidized bed (CFB), 0.16 lb/MMBTU | 129.97(g)(1)(vi) |
| | | For tangentially fired, 0.35 lb/MMBTU | |
| | | Any other type, 0.40 lb/MMBTU | |
| | With selective catalytic reduction system (SCR) operating with an inlet temperature equal to or greater than 600°F | 0.12 lb/MMBTU | 129.97(g)(1)(viii) |
| Combustion Turbine | Combined cycle or combined heat and power combustion turbine with rated output $\geq$ 1000 bhp and < 180 MW | For natural gas or noncommercial gaseous fuel, 42 ppmvd, at 15% $O_2$ | 129.97(g)(2)(i) |
| | | For oil, 96 ppmvd, at 15% $O_2$ | |

JA044

| Source Category | Applicability | NOx RACT Requirement | Applicable Provision |
|---|---|---|---|
| | Combined cycle or combined heat and power combustion turbine with rated output ≥ 180 MW | For natural gas or noncommercial gaseous fuel, 4 ppmvd, at 15% $O_2$<br><br>For oil, 8 ppmvd, at 15% $O_2$ | 129.97(g)(2)(ii) |
| | Simple cycle or regenerative with rated output ≥ 1000 bhp and < 6000 bhp | For natural gas or noncommercial gaseous fuel, 150 ppmvd, at 15% $O_2$<br><br>For oil, 150 ppmvd, at 15% $O_2$ | 129.97(g)(2)(iii) |
| | Simple cycle or regenerative with rated output ≥ 6000 bhp | For natural gas or noncommercial gaseous fuel, 42 ppmvd, at 15% $O_2$<br><br>For oil, 96 ppmvd, at 15% $O_2$ | 129.97(g)(2)(iv) |
| Stationary internal combustion engine | Lean burn with rating ≥ 500 bhp firing natural gas or noncommercial gaseous fuel | 3.0 gram/bhp-hr | 129.97(g)(3)(i) |
| | Rich burn with rating ≥ 500 bhp firing natural gas or noncommercial gaseous fuel | 2.0 gram/bhp-hr | 129.97(g)(3)(iii) |
| | Lean or rich burn with rating ≥ 500 bhp firing liquid fuel or dual fuel | 8.0 gram/bhp-hr | 129.97(g)(3)(ii) |
| Portland cement kilns | Long-wet process | 3.88 lb/ton of clinker produced | 129.97(h)(1) |
| | Dry-wet process | 3.44 lb /ton of clinker produced | 129.97(h)(2) |
| | Pre-heater and pre-calciner cement kilns | 2.36 lb/ton of clinker produced | 129.97(h)(3) |
| Municipal waste combustor | | 180 ppmvd at 7% oxygen | 129.97(f) |

JA045

**Table 4. Presumptive VOC RACT Limits under 25 Pa. Code Section 129.97**

| Source Category | Applicability | VOC RACT Requirement | Applicable Provision |
|---|---|---|---|
| Municipal solid waste landfill | Constructed on or before May 30, 1991 | Compliance with 40 CFR 60, Subpart Cc. | 129.97(e)(1) |
| | Constructed after May 30, 1991 | Compliance with 40 CFR 60, Subpart WWW. | 129.97(e)(2) |
| Combustion Turbine | Combined cycle or combined heat and power combustion turbine with rated output $\geq$ 1000 bhp and < 180 MW | For natural gas or noncommercial gaseous fuel, 5 ppmvd, at 15% $O_2$<br>For oil, 9 ppmvd, at 15% $O_2$ | 129.97(g)(2)(i) |
| | Combined cycle or combined heat and power combustion turbine with rated output $\geq$ 180 MW | For natural gas or noncommercial gaseous fuel and for oil, 2 ppmvd, at 15% $O_2$ | 129.97(g)(2)(ii) |
| | Simple cycle or regenerative with rated output $\geq$ 1000 bhp and < 6000 bhp | For natural gas or noncommercial gaseous fuel and for oil, 9 ppmvd, at 15% $O_2$ | 129.97(g)(2)(iii) |
| | Simple cycle or regenerative with rated output $\geq$ 6000 bhp | For natural gas or noncommercial gaseous fuel and for oil, 9 ppmvd, at 15% $O_2$ | 129.97(g)(2)(iv) |
| Stationary internal combustion engine | Lean burn with rating $\geq$ 500 bhp | For natural gas or noncommercial gaseous fuel, liquid fuel or dual-fuel, 1.0 gram/bhp-hr | 129.97(g)(3)(i) |
| | Rich burn with rating $\geq$ 500 bhp | For natural gas or noncommercial gaseous fuel, 1.0 gram /bhp-hr | 129.97(g)(3)(iii) |

As presented, the majority of presumptive limits in section 129.97 of the RACT II Rule are applicable to NOx emissions from combustion units. According to the National Emissions Inventory (NEI)[10], fuel combustion contributed 72% of NOx emissions from stationary sources in Pennsylvania during 2011. From the fuel combustion sector, utility boilers alone constituted 71% of all NOx emissions reported in 2011. *See* Figures 1 and 2. A summary of NEI data relied on this document is provided in Appendix A.

---

[10] Unless specified otherwise, emissions data in this TSD is from 2011 NEI, version 2.

13

JA046

PADEP has established NOx or VOC emissions limits for some industrial processes:  kilns at cement manufacturing, municipal waste combustors, and municipal waste landfills.  Industrial processes constituted 26% of NOx emissions from Pennsylvania's stationary sources during 2011.  In Pennsylvania, the predominant NOx emitting industrial source categories were oil and gas production, cement manufacturing, glass manufacturing, and lime manufacturing.

**Figure 1. Pennsylvania's 2011 NOx Emissions from Stationary Sources by Sector**





**Figure 2. Pennsylvania's 2011 NOx Emissions from Fuel Combustion Sector**

JA047

The RACT II Rule generally does not specify control technology for affected sources, however, based on our evaluation, we believe the adopted presumptive NOx and VOC emissions limits are reflective of reasonably available controls for each source category.  RACT may require control technologies that have been applied to similar, but not necessarily identical source categories.  Presumptive RACT limits are based on capabilities which are general to an industry, but may not be attainable at every facility.[11]  In addition, EPA generally considers controls that have been achieved in practice by other similar existing sources to be technologically and economically feasible.  For that reason, in evaluating Pennsylvania's presumptive NOx limits, we have reviewed NOx emissions limits in effect at adjacent OTR states for the source categories identified in Pennsylvania's rule.  EPA particularly reviewed regulations that have been adopted as RACT in New York, New Jersey, Connecticut, and Delaware, since these states are adjacent to or nearby Pennsylvania while being located in the OTR.  Appendix B of this TSD provides a summary of NOx limits from each state by source category, as defined in Pennsylvania's RACT II Rule.  EPA's evaluation of the requirements of section 129.97 is provided in the following sections of this document.

### 1.    Presumptive NOx RACT Limits for External Combustion Units

Sections 129.97(g)(1)(i)-(v) and (vii) of the RACT II Rule set forth limits for controlling NOx emissions from any external combustion units and process heaters with heat input rating of 50 MMBTU/hr or greater and combusting different fuels.[12]  This would apply to smaller combustion units, which would include a number of  industrial, commercial and institutional (ICI) boilers as well as process and space heaters.  The industrial boilers generally have heat input ratings ranging from 10 to 250 MMBTU/hr, while institutional and commercial generally range from 0.4 to 12.5 MMBTU/hr.[13]  The RACT II Rule established additional requirements for coal-fired units with heat input rating of 250 MMBTU/hr or greater, which have been evaluated in the following section of this TSD.

The RACT II Rule controls NOx emissions from combustion units firing natural gas, distillate oil, residual oil, coal, refinery gas and any other solid fuel.  In 2011, the majority of NOx emissions from fuel combustion in Pennsylvania resulted from firing coal, natural gas, and distillate oil.  Process heaters in Pennsylvania are used to support petroleum refinery or oil and gas processes.  As expected, the combustion of refinery gas in Pennsylvania was almost exclusive to petroleum refinery process heaters during 2011.  For a summary of Pennsylvania's NOx emissions from fuel combustion, refer to Appendix A of this document.

---

[11] *See* 57 FR 55624 (November 25, 1992).
[12] See definition of "combustion unit" in 25 Pa. Code section 121.1.
[13] From EPA's ACT "NOx Emissions from Industrial/Commercial/Institutional (ICI) Boilers." (EPA-453/R-94-022, *March 1994*)

15

EPA has provided guidance for states to determine RACT for ICI boilers based on the expected NOx emissions levels resulting from the application of different controls. The reduction of NOx emissions from ICI boilers can be accomplished with combustion modification and flue gas treatment techniques or a combination of these. The application of a specific technique will depend on the type of boiler, the characteristic of its primary fuel, and method of firing (i.e., boiler type). NOx emissions from ICI boilers can be controlled by suppressing both thermal and fuel NOx. The combustion modification techniques that are most effective in reducing thermal NOx are particularly those that reduce the temperature of the flame, such as water or steam injection (WI/SI) and recirculating a portion of the flue gas to the burner zone (FGR). Thermal NOx can also be reduced by minimizing the amount of excess oxygen (known as oxygen trim or low excess air) or delaying the mixing of fuel and air (staged air combustion or SCA). The installation of low NOx burners (LNB) is also effective in certain types of boilers. Flue gas treatment controls can reduce NOx in the flue gas, regardless of how it was produced, and are limited to selective non-catalytic reduction (SNCR) and selective catalytic reduction (SCR). Both techniques involve the injection of ammonia or urea in a temperature window of the boiler where NOx reduction occurs to form water and nitrogen. The reaction for the SNCR process must occur at more elevated temperatures, typically between 1600 and 2000 °F, as the reaction takes place without a catalyst. Table 4 summarizes the expected NOx emissions rates from ICI boilers, in lb/MMBTU, after the application of combustion modifications and flue gas controls.

**Table 4. Controlled NOx Emissions Levels from ICI Boilers by Fuel and Control Type**[14]

| Type of NOx Controls | Estimated NOx Control Levels (lb NOx/ MMBTU) | | | | |
|---|---|---|---|---|---|
| | Pulverized Coal | Coal | Residual Oil | Distillate Oil | Natural Gas |
| Combustion Modifications | 0.2-0.93 | 0.05-0.52 | 0.09-0.74 | 0.03-0.33 | 0.02-0.24 |
| Flue Gas Controls | 0.15-0.4 | 0.05-0.30 | - | 0.01-0.10 | 0.01-0.10 |
| RACT II Limits | 0.45 | 0.45 | 0.20 | 0.12 | 0.10 |

EPA also evaluated NOx emissions limits that have been applied in states adjacent to or nearby Pennsylvania, and have been approved as RACT, as summarized in Table 5.[15] EPA finds that the NOx limits in the RACT II Rule as applicable to ICI boilers are comparable to emissions limits from other states.

---

[14] From Tables 2-4, 2-5, and 2-6 of EPA's ACT for ICI Boilers. It is possible that further technological advancements may have been proven to result in lower NOx emissions levels than those reported in EPA's ACT.

[15] Appendix B provides a more detailed summary of other states NOx RACT limits for this source category.

**Table 5.  Summary of States NOx RACT Limits for ICI Boilers**

|  | NOx RACT Emissions Limits (lb NOx/ MMBTU) | | | |
|---|---|---|---|---|
|  | Natural Gas | Distillate Oil | Residual Oil | Coal |
| Other States | 0.05-0.43 | 0.08-0.43 | 0.20-0.43 | 0.08-1.0 |
| RACT II Limits | 0.10 | 0.12 | 0.2 | 0.45 |

States do not typically regulate NOx emissions from other solid fuels other than coal.  During 2011, Pennsylvania sources also combusted wood and wood bark, solid waste, petroleum coke, and fire log.  Combustion of these fuels represented only around 3% of Pennsylvania's total NOx emissions from combustion.  Given the low contribution of these fuels to Pennsylvania's total NOx emissions, we find the NOx presumptive limit of 0.20 lb/MMBTU in section 129.97(g)(1)(vii) within the reasonable range as it is similar to the NOx rates established by Pennsylvania and other OTR states for other fuels and is thus not unreasonable.

The combustion of refinery gas is likely limited in Pennsylvania to process heaters.  Process heaters are heat transfer units in which heat from fuel combustion is transferred predominantly by radiation and secondarily by convection to process fluids contained in tubes.  Process heaters are generally used in heat transfer applications where steam heaters (i.e., boilers) are inappropriate.  These include applications in which heat must be transferred at temperatures in excess of 200 to 400 ºF.  Combustion air is supplied to the burners at a process heater via natural draft (ND) or mechanical draft (MD) systems.  NOx emissions from process heaters are greater for mechanical draft units than for natural draft units, because mechanical draft heater have an air pre-heaters, which increases thermal NOx emissions.  Also, it is expected that higher thermal NOx emissions are generated from oil-fired heaters than natural gas fired heaters.

Most combustion controls are designed for process heaters to reduce thermal and/or fuel NOx emissions.  Post-combustion controls techniques reduce NOx in the flue gas, regardless of the mechanism.  Thermal NOx formation increases with temperature and is the primary source of natural gas and refinery gas fired heaters.  With respect to NOx controls, the following techniques are available and used in process heaters:  LNB, ultra-low NOx burners (ULNB), FGR, SNCR and SCR.  ULNB used staging techniques similar to staged-fuel LNB in addition to FGR.  The reduction efficiency of each control technique varies depending on the process heater application and design, ranging from 50 to 75% reduction.[16]

---

[16] See Table 2-3 EPA-453/R-93-034 (September *1993*).  It is possible that the referenced NOx control technologies may have been proven to be more NOx effective due to further technological advancements after publication of the ACT.

JA050

In the OTR, only the state of New Jersey was found to have an emission limit set specifically applicable for refinery gas, like Pennsylvania.[17]  Other states simply have limits that applied to 'other gas' and therefore could not be definitively compared to Pennsylvania's RACT II Rule. New Jersey adopted a NOx limit of 0.20 lbs/MMBTU that applies to any unit with a heat input rating greater than or equal to 50 MMBTU/hr.  EPA finds Pennsylvania's refinery gas fired limit is comparable to RACT limits in nearby states and is thus reasonable.

EPA finds that the presumptive NOx limits for combustion units and process heaters in sections 129.97(g)(1)(i)-(v) and (vii) are reasonably achievable and should represent RACT for these sources.

### 2.    Presumptive NOx RACT limits for Very Large Coal-Fired Boilers, including Utility Boilers

Sections 129.97(g)(1)(vi), (viii), and (ix) establish NOx presumptive requirements for coal-fired combustion units with heat input rating over 250 MMBTU/hr.  Combustion units of this size would predominantly include utility boilers, but may also include some industrial boilers.  It is worthy to note that coal-fired utility boilers generated the majority of NOx emissions from the fuel combustion sector in Pennsylvania during 2011.[18]  Industrial boilers of heat input rating greater than 250 MMBTU/hr are similar to utility boilers and correspondingly are subject to similar NOx control applications.[19]

Being the most significant NOx emitting source category in Pennsylvania, EPA further evaluated the NOx emissions from any coal-fired boilers in Pennsylvania with heat input rating over 250 MMBTU/hr based on EPA's Air Markets Program Data (AMPD).[20]  In 2011, there was a total of 78 coal-fired boilers with heat input ratings of 250 MMBTU/hr or greater in operation in Pennsylvania, from which the majority were used for electricity generation or cogeneration. Specifically, 52 were coal-fired utility boilers or cogeneration boilers, while only 7 were large industrial boilers.[21]

The RACT II Rule establishes two sets of presumptive NOx requirements for large coal-fired boilers:  the NOx limits in section 129.97(g)(1)(vi) apply based on the boilers' furnaces

---

[17] *See* Table 8, in *NJAC 7:27- 19.7.*
[18] *See* Figure xx of Appendix A.
[19] *See* EPA's ACT for ICI Boilers (EPA-453/R-94-022, March 1994).
[20] The Air Markets Program Data (AMPD) is a web-based application that provides to the public current and historical data collected by EPA as part of Federal emissions trading programs. AMPD is available at https://ampd.epa.gov/ampd/.
[21] Based on 2011 AMPD inventory of Pennsylvania's coal-fired boilers over 250 MMBTU/hr.  The following source categories are reported under AMPD:  Cogeneration, Electric Utility, Small Power Producer, Industrial Boiler and Pulp & Paper Mill.  For the purpose of simplifying this discussion, we have categorized electric utility and small power producer boilers into one group, and industrial boilers and pulp & paper mill boilers into another one.

configuration or boiler type; and the requirements in section 129.97(g)(1)(viii) and (ix) apply only to those boilers that have specific NOx controls in place, SCR or SNCR. We assessed Pennsylvania's coal-fired boilers based on these two features: boiler type and existing controls.

Coal-fired utility boilers or very large ICI boilers have a number of different burner configurations. Each type of burner has specific design characteristics which can influence the NOx emissions levels. Typical configurations include tangentially-fired, wall-fired, cyclone, stoker, and circulating fluidized bed (CFB) combustion. Wall-fired boilers can be subcategorized depending on the design and location of the burners as single-wall, opposed-wall, cell burner, vertical, arch or turbo. CFB combustion is considered a non-conventional boiler. CFB boilers are designed to operate at much lower temperatures and tend to have lower NOx emissions than the conventional types.[22]

Figure 3 below provides a summary of Pennsylvania's very large coal-fired boilers in operation during 2011 by their burner configurations or boiler type. Presumptive NOx limits of 0.35 lb/MMBTU and 0.16 lb/MMBTU were established for tangentially-fired and CFB boilers, respectively. Any other boiler types in this category (i.e., arch, cell burner, and wall-fired) are subject to a higher NOx rate of 0.4 lb/MMBTU. For this evaluation, it is relevant to point that no arch or cell burner boilers remain operational to date in Pennsylvania, based on more recent emissions data (2016).

**Figure 3.  Pennsylvania's Coal-Fired Boilers with 250 MMBTU/hr or Greater by Boiler Type, as of 2011**



---

[22] EPA's ACT Document "NOx Emissions from Utility Boilers," (EPA-453/R-94-023, March 1994).

19

Additional presumptive requirements apply to any large coal-fired boilers in Pennsylvania operating selective catalytic reduction SCR or SNCR as a NOx control. Common NOx emissions control technologies for these boilers can be grouped into two fundamental categories: combustion controls and post-combustion controls (or flue gas treatment). As for other combustion sources, combustion modifications reduce NOx emissions by suppressing NOx formation during the combustion process with a variety of techniques, while post-combustion controls reduce NOx emissions after its formation. Combustion controls for large coal-fired boilers include LNB, FGR and overfire air (OFA). Typical post-combustion controls are SCR and SNCR. Combinations of flue gas treatment controls and combustion controls are often applied to maximize NOx reduction.[23]

Figure 4 below summarizes the NOx controls that were in place in 2011 on Pennsylvania's coal-fired boilers with heat input rating of 250 MMBTU/hr or greater. As presented, the majority of boilers in Pennsylvania have SCR or SNCR (54%) or else have combustion controls (37%). Combustion controls found in these boilers are LNB and/or OFA. Also, all boilers with SCR and the majority of boilers with SNCR also have combustion controls in place (OFA or LNB with OFA). As of 2011, combustion controls were the most common NOx control in place (75%).

**Figure 4. NOx Controls in Place in Pennsylvania's Coal-Fired Boilers with 250 MMBTU/hr or Greater, as of 2011[24]**



---

[23] *Id.*
[24] Several boilers in Pennsylvania are operating ammonia injection as a NOx control, which we believe is similar to SNCR. For simplicity, Figure 4 includes these controls as SNCR.

JA053

Post-combustion controls, such as SCR and SNCR are currently the most-effective NOx control technology for existing and new utility boilers. The SCR process operates by injecting ammonia into the flue gas in the presence of a catalyst at temperatures of around 315 to 698 °F. For most applications, this temperature range makes it necessary to locate the SCR reactor adjacent to the boiler – immediately after the boiler and before the air preheater. An SCR system requires an initial and ongoing supply of catalyst, and a reagent. The reagent can be ammonia or urea. Most facilities to date have used ammonia; however, urea is becoming an increasingly popular reagent due to its inherent safety and the recent availability of systems to convert urea to ammonia on-site. Pennsylvania's NOx presumptive limit in section 129.97(g)(vii) for combustion units with SCR is applicable when the inlet temperature to the control is 600 °F or greater, which EPA finds is consistent with the technical limitations of the SCR.

By contrast, SNCR involves injecting ammonia or urea into the exhaust gases without the presence of a catalyst. The ammonia or urea must be injected into specific high-temperature zones in the upper furnace or convective pass for this method to be effective. Effective injection temperatures for SNCR range from 930 to 1,040 °C (1,700 to 1,900 °F), depending on the reagent used. Ammonia injection is an uncommon control technology, but similar to SNCR. Section 129.97(g)(viii) requires combustion units with an SNCR to operate this control when the temperature at the injection point is equal to or greater than 1,600 °F, which EPA finds is consistent with the technical limitations of the SNCR.

The presumptive NOx emission requirements for coal-fired boilers with SCR and SNCR in place are dependent on the injection temperature, and are therefore not applicable at all times. Because the rates are not applicable at all times, EPA investigated the rates further. However, any affected boiler with SCR or SNCR is also required to comply at all times with the boiler type limits in section 129.97(g)(1)(vi), which in practice would be applicable in any instances where the SCR or SNCR is not in operation. For instance, a coal-fired boiler that has an SCR in place would be subject in practice to two set of RACT NOx limits: (1) The SCR limit of 0.12 lb/MMBTU when the inlet temperature to the control equals to or is greater than 600 °F; and (2) the boiler type limit (0.16, 0.35, or 0.4 lb/MMBTU) at any other times when the inlet temperature to the control is less than 600 °F. EPA finds that this control approach is practical and acceptable to satisfy RACT for boilers with SCR and SNCR, as it ensures applicability of RACT year-round, while requiring the lowest NOx emissions limit considering the technical feasibility of existing NOx controls. In our engineering judgment based upon acknowledged limitations of SCR and SNCR, EPA agrees with PADEP's determination that SCR or SNCR cannot result in lower NOx emission rates at those lower operating temperatures.

Although boilers with SNCR are not subject to a particular NOx emission limit under the RACT II Rule aside from the boiler type limit (0.16, 0.35, or 0.4 lb/MMBTU), we expect

21

additional NOx reductions to be achieved through optimum operation of the SNCR, consistent with the requirement in section 129.97(g)(1)(ix).  Because boilers with SNCR are also required to comply with the boiler type limits in section 129.97(g)(1)(vi) when SNCR is not required to be operated (when injection temperature is less than 1,600 ºF), these boilers remain subject to continuous emission limitations.

EPA has provided guidance to states for developing RACT standards for utility boilers, and has identified NOx emissions rates expected to be achieved on different types of coal-fired boilers based on the different NOx controls.  Industrial coal-fired boilers of similar size are expected to operate and generate similar level of NOx reductions.  A summary of EPA's estimated NOx rates for utility boilers is presented in Table 5.[25]

**Table 5. EPA's Estimated NOx Emissions Levels from Utility Coal-Fired Boilers By NOx Control Technology**

| NOx Control Technology | Estimated NOx Control Level (lb NOx/ MMBTU) | | |
|---|---|---|---|
| | Wall-fired | Tangentially-fired | CFBs |
| SCR on LNB controlled | 0.10-0.20 | 0.05-0.15 | - |
| SCR on uncontrolled | 0.15-0.25 | 0.10-0.15 | - |
| SNCR on LNB controlled | 0.35-0.45 | 0.25-0.35 | - |
| SNCR on uncontrolled | 0.50-0.65 | 0.30-0.40 | 0.03-0.1 |
| LNB+OFA | 0.35-0.55 | 0.30-0.45 | 0.1-0.3 |

The NOx presumptive limit of 0.12 lb/MMBTU for coal-fired boilers with SCR is consistent with the NOx emissions rates that would be expected on all types of boilers with SCR (listed in Table 5), with or without additional combustion modifications.  After examining AMPD data, EPA finds that coal-fired boilers in Pennsylvania with SCR in place have been able to achieve NOx emissions rates as low as 0.107 lb/MMBTU.[26]  Thus, EPA believe the presumptive NOx limit of 0.12 is consistent with the operation of SCR and should reasonably represent RACT as technologically and economically feasible.

In general, Pennsylvania's NOx presumptive rates for coal-fired boilers are comparable to RACT NOx emissions limits established for the different types of boilers in nearby states, as summarized in Table 6.[27]  However, a significant distinction is that the RACT II Rule's most stringent NOx limit for sources with SCR (0.12 lb/MMBTU) is only applicable to a narrow subset of coal-fired boilers in Pennsylvania, rather than being applicable for all boilers.  In

---

[25] EPA's ACT Document "NOx Emissions Document "NOx Emissions from Utility Boilers" (EPA-453/R-94-023; March 1994.  It is possible that further technological advancements may have been proven to result in lower NOx emissions levels than those reported in EPA's ACT.
[26] These rates are on an annual basis, as reported on AMPD during 2011, 2015, and 2016.
[27] Appendix B provides a detailed summary of other states NOx RACT limits for this source category.

JA055

determining the adequacy of Pennsylvania's overall RACT determination for large coal-fired boilers, we must also evaluate the control basis for boiler type presumptive NOx limits in the RACT II Rule.

**Table 6.  Pennsylvania and Other States' NOx RACT Limits for Large Coal-Fired Boilers by Boiler Type**

| Boiler Type | NOx RACT Emissions Limits (lb NOx/ MMBTU) | | | |
|---|---|---|---|---|
| | Wall- Fired | Tangentially-Fired | CFB | Boilers with SCR |
| RACT II Rule | 0.40 | 0.35 | 0.16 | 0.12 |
| Other States | 0.12 - 0.45 | 0.12 - 0.38 | 0.08 - 0.29 | - |

Any large coal-fired boilers in Pennsylvania that do not have in place SCR or SNCR are only subject to one of the first tier presumptive NOx RACT limits under section 129.97(g)(1)(vi), based on its furnace configuration.  In 2011, there was a total of 36 coal-fired boilers in Pennsylvania without either SCR or SNCR, representing roughly half of the coal-fired boilers in Pennsylvania (46%).  We have reason to believe that the boiler type limits in section 129.97(g)(1)(vi) represent the operation of combustion modifications.  PADEP previously required any coal-fired combustion units with heat input rating of 100 MMBTU/hr or greater to meet RACT through the installation and operation of LNB with OFA, and established source-specific NOx limits representative of the operation of these controls for each individual boiler.[28] Thus, LNB with OFA has been in place on the majority of large coal-fired boilers in Pennsylvania.  Consistently, 2011 AMPD emissions data confirms that 75% of boilers had LNB and/or OFA.  Also, Pennsylvania's boiler type NOx limits are consistent with the NOx emissions levels expected to result from combustion modifications for each boiler type.  For these limits to be adequate as RACT, no additional NOx controls beyond combustion controls should be reasonably available (technologically and economically) as RACT for this subset of coal-fired boilers, thus being adequate to require as RACT less stringent NOx levels of control.  We further evaluated Pennsylvania's coal-fired boilers to confirm if this is the basis for PADEP's determination.

In terms of RACT, a control technology is determined to be "reasonable" for a particular source category based on its technical and economic feasibility.  For this reason, EPA evaluated

---

[28] These controls were required under 25 Pa. code section 129.93(b)(1).  Based on EPA's conditional approval of these provisions as RACT, PADEP established specific enforceable NOx emission limitations to be met through the required operation of LNB with OFA, following the procedures in 25 Pa. code section 129.92.  *See* 63 FR 13789 (March 23, 1997) for EPA's conditional approval action; and 73 FR 62891 (October 22, 2008) for EPA's full approval action.  All source-specific RACT limits have been approved into Pennsylvania's SIP, as codified in 40 CFR 52.2020(d)(1).

feasibility of both SCR and SNCR on each of the 36 coal-fired boilers in Pennsylvania without these controls in place as of 2011. The objective of EPA's evaluation was to confirm Pennsylvania's underlying presumption for the coal-fired boilers by determining whether additional NOx controls, specifically SCR or SNCR, should or should not constitute RACT for this subset of boilers. SCR and SNCR are the most effective NOx controls for coal-fired boilers, hence these controls should be considered as RACT for any boilers in Pennsylvania that are either uncontrolled or currently operating combustion controls. In fact, SCR has been determined to be the basis for NOx RACT for utility boilers on nearby states, and PADEP itself has determined it to be RACT for all other large coal-fired boilers in Pennsylvania. Feasibility of additional NOx controls on Pennsylvania's 36 coal-fired boilers would question the adequacy of PADEP's RACT determination for these boilers as LNB with OFA. If either SCR or SNCR are determined to be feasible for the majority, or all, of the 36 coal-fired boilers, it would be reasonable to expect more stringent NOx RACT emissions rates than those required under section 129.97(g)(1)(vi) on all-coal fired boilers in Pennsylvania.

EPA estimated cost-effectiveness of NOx controls for each of the 36 coal-fired boilers individually, based on 2011 emissions and operational data from AMPD and using EPA's Air Pollution Control Cost Manual, both which are publicly available sources of information.[29] We selected 2011 data, since EPA has recommended states to use 2011 as the baseline year for ozone planning purposes.[30] Although, several coal-fired boilers have changed or ceased operations since 2011, and are no longer subject to the coal-fired RACT requirements in section 129.97, EPA ultimately evaluated all 36 boilers without post-combustion controls, because this would have been the universe of sources which PADEP would have evaluated to determine RACT.[31] We have assumed that both SCR and SNCR are technically feasible options for most of the coal-fired boilers, as they have been widely applied as NOx controls for similar coal-fired boilers in Pennsylvania and nearby states. As an exception, we presumed only SNCR is technically feasible for CFB boilers in Pennsylvania, since SCR has not been applied to this type of boilers.

In determining its presumptive NOx RACT limits under the RACT II Rule, PADEP considered controls to be economically reasonable when installed and operated under $2,500 per ton of NOx removed.[32] EPA finds PADEP's cost effectiveness threshold reasonable. Based on our analysis, EPA found that cost-effectiveness of SCR in Pennsylvania boilers ranged from $3,651-$25,238 per ton, while SNCR ranged from $2,217 to $17,594 per ton for conventional

---

[29] *See* Section 4 of EPA's Air Pollution Control Cost Manual, as updated on December 8, 2017, and the cost calculation spreadsheets for SCR and SNCR, all available online at https://www.epa.gov/economic-and-cost-analysis-air-pollution-regulations/cost-reports-and-guidance-air-pollution.
[30] *See* 80 FR 12264 at 12271-12272, March 6, 2015.
[31] Sixteen coal-fired boilers without SCR and SNCR remain operational as of 2016 and were subject to the NOx presumptive boiler type limits in section 129.97(g)(1)(vi).
[32] As provided in PADEP's Comment and Response Document (on Page 24), submitted as part of the May 16, 2016 SIP submittal.

boilers (non-CFBs) and $6,076 to $19,732 per ton for CFB boilers.[33]  Because cost-effectiveness of these controls exceeded $2,500 per ton of NOx removed for the majority of coal-fired boilers in Pennsylvania without these controls in place, it is reasonable to conclude that it would be *economically infeasible* to require the installation and operation of SCR or SNCR on *all* coal-fired boilers in Pennsylvania.  Based on this analysis, EPA concludes that PADEP's RACT II Rule determination for any large coal-fired boilers without post-combustion controls in place is based on the operation of existing controls, in most cases LNB and/or OFA.  Thus, EPA finds that PADEP's determination for this subset of coal-fired boilers is reasonable, considering economic infeasibility of retrofitting these additional controls.  A separate TSD detailing EPA's cost-effective evaluation is available as part of the docket for this rulemaking action.

Although the installation of SCR and SNCR on all other coal-fired boilers in Pennsylvania has resulted from the implementation of other non-RACT regulatory programs, EPA agrees with Pennsylvania's determination that is reasonable to require additional NOx reductions from boilers with post-combustion controls (like SCR or SNCR)  EPA agrees that the operation of an existing SCR or SNCR should be both technically and economically reasonable, even when this may include additional costs for optimizing existing systems, such as additional reagent and catalyst maintenance.  Thus, EPA agrees with Pennsylvania's determination to require lower NOx limits as RACT on those coal-fired boilers with SCR or SNCR.

EPA finds that Pennsylvania's NOx presumptive RACT limits for coal-fired boilers with heat input rating of 250 MMBTU/hr or greater provided in subsections 129.97(g)(1)(vi), 129.97(g)(1)(viii) and 129.97(g)(1)(ix) are based on the consideration of reasonably available controls for the affected boilers.  Therefore, EPA finds these presumptive NOx limits to be collectively adequate as RACT for these sources.

### 3.    Presumptive RACT Limits for Combustion Turbines

Section 129.97(g)(2) of the RACT II Rule contains presumptive NOx and VOC limits for combustion turbines for oil and gas firing, including natural gas and non-commercial gas fuel. Stationary reciprocating internal combustion engines are generally used in a wide variety of applications where mechanical work is performed using shaft power.  Therefore, they can burn a variety of fuels.  In Pennsylvania, most combustion turbines during 2011 burned natural gas, waste process gases, or liquid fuels such as distillate oils (primarily No. 2 fuel oil).

The RACT II Rule sets NOx and VOC limits for combustion turbines based on their operating cycle and the fuel combusted.  These operating cycles are simple cycle, regenerative

---

[33] The installation of SNCR would be economically reasonable only for 5 boilers in Pennsylvania; however, most of these boilers have either retired or are operating additional post-combustion controls since 2011.  These boilers are: Hatfield's Ferry Power Station- Units 1 and 2; Conemaugh- Units 1 and 2; and Brunner Island- Unit 3.

cycle, combined cycle, and combined heat and power. The simple cycle is the most basic operating cycle of combustion turbines, and these types of combustion turbines are typically used for shaft horsepower applications without recovery of exhaust heat, such as in electric utilities for generation of electricity during emergencies or during peak demand periods. A regenerative cycle is a simple cycle combustion turbine with an added heat exchanger. The heat exchanger uses the turbine exhaust gases to heat the combustion air which reduces the amount of fuel required to reach combustor temperatures. A combined cycle combustion turbine is a combustion turbine with a heat recovery steam generator (HRSG) applied at electric utility sites. The combustion turbine drives an electric generator, and the steam from the HRSG drives a steam turbine which also drives an electric generator. Combustion turbine applications include gas and oil industry, emergency power generation facilities, independent electric power producers, electric utilities, and other industrial applications.[34]

The primary pollutants from combustion turbines are NOx, carbon monoxide (CO), and to a lesser extent, VOC. NOx formation is strongly dependent on the high temperatures developed in the combustor. CO and VOC are primarily the result of incomplete combustion. The principal mechanism of NOx formation in combustion turbines firing gas or distillate fuel is thermal NOx, which arises from the thermal dissociation and subsequent reaction of nitrogen and oxygen molecules in the combustion air. The second mechanism, called prompt NOx, is formed from early reactions of nitrogen molecules in the combustion air and hydrocarbon radicals from the fuel. Prompt NOx forms within the flame and is usually negligible when compared to the amount of thermal NOx formed. The combustion of distillate oils also have low levels of fuel-bound nitrogen, with thermal NOx also being the predominant NOx formation mechanism these turbines.

NOx emissions are typically regulated from combustion turbines. Because thermal NOx is primarily a function of combustion temperature, NOx emission rates vary with combustor design. There is no discernable correlation between turbine size and NOx emission levels. Reductions in NOx emissions can be achieved using combustion controls or flue gas treatment. Available combustion controls are water or steam injection and dry low-NOx combustion designs. SCR is the only available flue gas treatment. Controlled NOx emission levels from combustion turbines are typically achieved between 9 and 42 parts per million volume on a dry basis (ppmvd) for natural gas fuel and 18 and 75 ppmvd for distillate oil fuel, although lower emissions may be achieved through the effective operation of SCR.[35]

The RACT II Rule's presumptive NOx limits for combustion turbines vary by size and by fuel. Presumptive NOx limits for simple and regenerative cycle combustion turbines range from

[34] EPA's AP-42: Fifth Edition Compilation of Air Emission Factors, Volume I, Chapter 3, Section 3.1, available online at https://www3.epa.gov/ttnchie1/ap42/ch03/final/c03s01.pdf.
[35] EPA's ACT "NOx Emissions from Stationary Combustion Turbines" (EPA-453/R-93-007, January 1993).

JA059

42 to 150 ppmvd, and for combined cycle or combined heat and power combustion turbine range from 4 to 150 ppmvd, all limits corrected to 15% oxygen. One must note that Pennsylvania's NOx emissions rates are applicable to any gaseous fuel and to any fuel oil, so it is not unreasonable for these rates to be higher than the levels expected based on NOx controls. Most of the NOx limits in the RACT II Rule reflect the application of reasonably available control techniques. The higher NOx limit of 150 ppmvd is limited to fairly small simple and regenerative cycle combustion turbines with output ratings between 1,000 to 6,000 boiler horsepower (bhp) (0.75 to 4.5 megawatts, MW). Pennsylvania's presumptive NOx limits for combustion turbines are also comparable to what other states have determined RACT for this source category. Appendix B provides a summary of other states NOx RACT limits for this source category.

The RACT II Rule also establishes the following VOC limits: 9 ppmvd for simple and regenerative cycle combustion turbines, and limits ranging from 2 to 9 ppmvd for combined cycle or combined heat and power combustion turbine, all limits corrected to 15% oxygen. An oxidation catalyst can be used to reduce VOC emissions to below 10 ppmv.[36] EPA finds Pennsylvania's presumptive VOC limits for combustion turbines are reasonably achievable based on available controls.

EPA finds that the presumptive NOx and VOC limits in section 129.97(g)(2) for combustion turbines are reasonable and should meet RACT, as the rates are comparable to what other states have established as RACT and because they apply limits determined using technologically feasible controls.

### 4.    Presumptive RACT Limits for Stationary Internal Combustion Engines

Section 129.97(g)(3) contains presumptive NOx and VOC limits for stationary internal combustion engines based on the engine type and fuel. Pennsylvania established limits for the combustion of natural gas, noncommercial gaseous fuel, liquid fuel, and both liquid or gas fuels (dual-fuel) at combustion engines.

In general, the primary domestic use of large diesel-fired stationary combustion engines (greater than 600 bhp) is in oil and gas exploration and production. Another frequent application of large diesel-fired stationary combustion engines is electricity generation for both base and standby service. Most natural gas-fired combustion engines are used in the natural gas industry at pipeline compressor and storage stations and at gas processing plants, with sizes for these engines varying greatly from 50 to 11,000 bhp. Dual-fuel engines use a minimum of 5 to 6 percent diesel fuel to ignite the natural gas. Large dual-fuel engines have been used almost

---

[36] *See* Page 3.1-6 of EPA's AP-42: Fifth Edition Compilation of Air Emission Factors, Volume I, Section 3.1.

JA060

exclusively for prime electric power generation.[37]  Pennsylvania is regulating combustion engines with output rating of 500 bhp and above.

The primary pollutants from internal combustion engines are NOx, VOC, CO and particulate matter.  NOx formation is directly related to high pressures and temperatures during the combustion process and of the nitrogen content, if any, of the fuel.  The other pollutants, are primarily the result of incomplete exhaust.  Most NOx emissions from internal combustion engines in Pennsylvania result from natural gas firing.  Other fuels combusted in Pennsylvania during 2011, in order of NOx emissions contribution were distillate oil, diesel/kerosene mix, landfill gas, dual fuel (oil and gas), gasoline, kerosene/naphtha (jet fuel), and liquid petroleum gas (LPG).  All fuels are addressed in the RACT II Rule.

From a NOx control perspective, the most important distinction between different engine models and types of reciprocating engines is whether they are rich-burn or lean-burn.  Rich-burn engines have an air-to-fuel ratio (A/F) operating range that is near stoichiometric or fuel-rich of stoichiometric and as a result the exhaust gas has little or no excess oxygen.  A lean-burn engine has an air-to-fuel operating range that is fuel-lean of stoichiometric; therefore, the exhaust from these engines is characterized by medium to high levels of oxygen.[38]

Available NOx controls for internal combustion engines include combustion modification and post-combustion controls, including SCR, SNCR, and pre-stratified charge (PSC).  PSC is an add-on control technique that facilities combustion of a leaner A/F.  By increasing the air content, PSC acts as a heat sink, and reduces combustion temperatures, therefore, reducing NOx formation rates.  SNCR and SCR are the same technologies used in other types of combustion units.  SNCR can only be applied to rich-burn engines.  Expected NOx emission levels from the application of different NOx control technologies on combustion engines are summarized in Table 9.[39]  Pennsylvania's presumptive NOx limits for combustion turbines are consistent with expected achievable rates reflecting available NOx controls.  Also, Pennsylvania's presumptive limits are comparable to RACT limits established in nearby states.  Appendix B provides a summary of other states NOx RACT limits for this source category.

---

[37] EPA's AP-42: Fifth Edition Compilation of Air Emission Factors, Volume I, Chapter 3, Sections 3.2 and 3.4, available online at https://www3.epa.gov/ttnchie1/ap42/ch03/final/c03s01.pdf.
[38] *Id.*
[39]  EPA's ACT "NOx Emissions from Stationary Internal Combustion Engines" (EPA-453/R-93-032, July 1993*).*

**Table 9.  Expected Range of Controlled NOx Emissions Reduction Levels for Internal Combustion Engines**

| Engine Type or Fuel | Expected Controlled NOx Emissions Levels (gr/bhp-hr) | Most-effective NOx Controls |
|---|---|---|
| Natural Gas- Rich Burn | 0.3 to 15.8 | SNCR, low-emissions combustion (L-E), and pre-stratified charge (PSC) |
| Natural Gas- Lean Burn | 1.7 to 16.8 | SCR and L-E |
| Diesel-Fired[40] | 1.2 to 9.6 | SCR |
| Dual-Fired | 0.8 to 6.8 | SCR; L-E |

The RACT II Rule also establishes a VOC limit of 1.0 gr/bhp-hr for any combustion engine with output rating of 500 bhp of above.  VOC emissions from internal combustion engines are not commonly regulated for RACT purposes.  However, Pennsylvania's presumptive VOC limits for combustion engines are consistent with EPA's more rigorous VOC emissions standards for similar size sources, and thus should be reasonably achievable considering available controls.[41]

EPA finds that the presumptive NOx and VOC limits in section 129.97(g)(3) for combustion turbines are reasonable (given technical feasibility analyzed by EPA) and should meet RACT.

### 5.    Presumptive RACT Limits for Combustion Units Firing Multiple Fuels

Section 129.97(g)(4) of the RACT II Rule requires any combustion unit firing multiple fuels and subject to different presumptive NOx or VOC limits for each fuel, to comply with a single NOx or VOC emission limit that is determined on a total heat input fuel weighted basis.  The following equation was provided to compute a heat input fuel weighted multiple fuel emission limit:

$$E_{HI\ Weighted} = \frac{\sum_{i=1}^{n} E_i \times HI_i}{\sum_{i=1}^{n} HI_i} \;;$$

where $E_i$ is the presumptive limit emissions limit for a particular fuel, or fuel $i$, and $HI_i$ is the total heat input for fuel i during the compliance period, determined for $n$ number of different fuels.

This provision is only applicable for any fuel representing 1% or more of the combustion unit's annual fuel combustion on a heat input basis.  Also, this provision particularly excludes stationary internal combustion engines subject to presumptive limits in 25 Pa. Code section 129.97(g)(3).  EPA does not expect this provision to apply to municipal waste combustors or

---

[40] Diesel fuel is one of distillate fuels, and is found in liquid form in typical conditions.
[41] See EPA's VOC New Source Performance Emissions Standards in 40 CFR 60, subparts IIII and JJJJ.

JA062

cement kilns, as they would not be subject to fuel-based presumptive limits under section 129.97 of the RACT II Rule.

This provision requires an affected emission unit to comply with an emissions rate that is more reflective of the actual operation of the unit, while effectively establishing a numeric emissions limitation that falls between the lowest and the highest of the applicable presumptive limits.

EPA finds the multiple fuel compliance method practicable and adequate for RACT, as it is not a new limit but a method for compliance with presumptive limits and addresses RACT.

### 6.    Presumptive RACT Limits for Municipal Waste Combustors

Section 129.97(f) of the RACT II Rule establishes a NOx presumptive limit of 180 ppmvd at 7% oxygen ($O_2$) for municipal waste combustors.  NOx emissions limits for municipal waste combustors tend to vary by combustor technology.  OTR states have adopted NOx limits for municipal waste combustors ranging from 120 to 372 ppmvd at 7% $O_2$.[42]  In addition, EPA has established new source performance emissions standards (NSPS) of NOx for municipal waste combustor that range from 170 to 380 ppmvd, at 7% $O_2$, depending on the NOx potential emission as well as construction dates of the affected combustor.  Thus, Pennsylvania's NOx presumptive limits are comparable to existing regulations for these sources, are at the lower end of the range of limits set as RACT by neighboring states, and reflect achievable rates set by Pennsylvania based on reasonably available controls.

Therefore, EPA finds that the presumptive NOx limits in section 129.97(f) for municipal waste combustors reasonably represent RACT.

### 7.    Presumptive RACT Limits for Cement Kilns

The RACT II rule establishes in section 129.97 (h) NOx presumptive limits for cement kilns ranging from 2.36 to 3.44 lb per ton of clinker, depending on the type.  EPA has identified that available control technologies have been able to achieve NOx emissions rates from 1.2 to 9.0 lb per ton of clinker on cement kilns.  NOx controls applicable to the cement industry may be grouped in three categories:  process modifications, combustion controls, and NOx reduction controls.[43]  It is worthy to note that many states in the OTR do not have RACT regulations for cement kiln, as most do not have cement kilns operations.  States that do regulate NOx emissions

---

[42] "White Paper on Control Technologies and OTC State Regulations for Nitrogen Oxides (NOx) Emissions from Eight Source Categories," by Stationary & Area Source Committees of Ozone Transport Commission (OTC), February 10, 2017 (hereafter, OTC's NOx White Paper).
http://otcair.org/upload/Documents/Reports/WhitePaper_NOx_Control_04052017.pdf
[43] EPA's "NO$_x$ Control Technologies for the Cement Industry: Final Report" (EPA-457/R-00-002, September 2000).

JA063

from cement kilns have established NOx limits ranging from 1.7 to 6.8 lbs per ton of clinker.[44] Thus, Pennsylvania's NOx presumptive limits are comparable to existing regulations for these sources, are at the lower end of the range of limits set as RACT by neighboring states, and should reflect reasonable achievable rates set by Pennsylvania based on reasonably available controls.

EPA finds that the presumptive NOx limits in section 129.97(h) for cement kilns are based on reasonably available controls and adequately meet RACT.

### 8.    Presumptive RACT Limits for Municipal Waste Landfills

Subsection 129.97(e) of the RACT II Rule establishes VOC RACT for municipal solid waste (MSW) landfills, particularly adopting by reference EPA's NSPS in 40 CFR part 60, subpart Cc and subpart WWW.  The NSPS rules are applicable to any MSW landfills with a design capacity greater than or equal to 2.5 million mega grams and 2.5 million cubic meters.  "Design capacity" refers to the maximum amount of solid waste a landfill can accept, in terms of volume or mass, and as permitted.  Although NSPS regulate MSW landfills in terms of non-methane organic compounds (NMOC), this in effect is the same as controlling directly VOC emissions.[45]

The standards of 40 CFR part 60, subpart Cc apply to those MSW landfills constructed on or before May 30, 1991 emitting 50 mega grams per year or more (approximately 55 TPY) of NMOC.  By contrast, 40 CFR part 60, subpart WWW applies to those MSW landfills constructed after May 30, 1991.  Subpart Cc requires the owner and/operator of an affected landfill to install and operate a gas collection and control system to meet the standards.  *See* 40 CFR section 60.33c.  Subpart WWW requires compliance with the same NMOC emissions standards as in subpart Cc.  *See* 40 CFR section 60.752.  The applicable emissions standards differ based on the underlying control device, as summarized in Table 10.

**Table 10.  RACT Emissions Standards for MSW Landfills, Expressed in NMOC**

| Control Basis | Emissions Standards |
|---|---|
| Any control | Reductions of 98% by weight |
| Open Flare | Operate the control in accordance with 60.18 |
| Enclosed Combustor | Concentration of 20 ppmvd as hexane, at 3% oxygen or less |

Under both NSPS rules, the landfill NMOC emissions rate shall be calculated using the equation provided in 40 CFR section 60.754.  The one difference between the NSPS rules is that

---

[44] OTC's NOx White Paper.

[45] VOC from landfills represents a 0.997 fraction of NMOC.  *See* EPA's September 2008 "Background Information Document for Updating AP-42 Section 2.4 for Estimating Emissions from Municipal Solid Waste Landfills" (EPA/600/R-08-116).

subpart WWW establishes additional operational standards for any MSW landfills constructed after May 30, 1991.  *See* 40 CFR section 60.753.  The operational standards are the following: (a) Operation of the collection system such that gas is collected from each area, cell, or group of cells in the MSW landfill in which solid waste has been in place for 5 or more years if active; or 2 or more years if closed or at final grade; (b) operation of the collection system with negative pressure, except under specified conditions; (c) operation of each interior wellhead in the collection system with a landfill gas temperature less than 55 °C with either a nitrogen level less than 20 percent or an oxygen level less than 5 percent, and (d) operation of the collection system so that the methane concentration is less than 500 parts per million above background at the surface of the landfill.

EPA finds that the standards in NSPS subparts Cc and WWW represent achievable NOx emissions rates through the operation of reasonably available controls, and thus adequately satisfy VOC RACT for MSW landfills, as the NSPS provisions reflect reasonably achievable emissions rates set by Pennsylvania based on technically and economically feasible controls.

### D.  NOx Averaging Plans

Under the RACT II Rule, one of the alternative compliance options to presumptive RACT is the use of NOx averaging plans as provided by section 129.98.  The NOx averaging provisions only apply to NOx emission units in a major source of NOx and/or VOC that are unable to meet NOx presumptive limits specified in section 129.97.  A major source may choose to alternatively comply with RACT by "averaging" NOx emissions with other units on either a facility-wide or system-wide basis using a 30-day rolling average.  In the context of section 129.98, "systems" are considered to be any sources that are under common control of the same owner or operator.  System-wide emissions averaging is only allowed for sources located within the same ozone nonattainment area in the Commonwealth, as provided in 25 Pa. Code subsection 129.98(a).

Under subsection 129.98(c), any other NOx emissions units included in the NOx averaging plan, in addition to the "non-complying" emissions unit, must also be subject to a NOx emissions limit under section 129.97.  Affected sources choosing to comply with NOx averaging must establish an alternative NOx emissions averaging limit that would apply to any emissions units covered under such plan, rather than the individual limits under section 129.97.  Subsection 129.98(e) provides the following equation for determining the alternative NOx RACT emission limit under a NOx averaging plan,

$$\sum_{i=1}^{n} E_{iactual} \leq \sum_{i=1}^{n} E_{iallowable}$$

Where $E_{iactual}$ denotes the actual NOx mass emissions, including emissions during start-ups, shutdowns, and malfunctions, for any emissions unit on a 30-day rolling basis; $E_{iallowable}$ denotes the allowable NOx mass emissions computed on a 30-day rolling basis using the NOx

allowable emissions rate limits specified in section 129.97 for any emissions unit in the plan, or else any other more stringent numerical NOx emissions limit than the limits specified in section 129.97; and *n* represents the number of emission units that are included in the NOx averaging plan. Affected sources were required to submit a NOx averaging plan as part of a permit application by October 24, 2016, or 6 months after the date that the source meets the definition of a major NOx emitting facility, whichever is later.  After PADEP or local agencies reviews and approves the NOx averaging plan, the agency must issue an air quality enforceable permit.

EPA interprets the language in section 129.98 to limit the use of NOx averaging to an owner or operator of a non-compliant emission unit who is able to show that this unit is unable to meet the applicable presumptive limit in section 129.97, and it is an alternative to adopting source-specific limits under section 129.99.  Given the basis of RACT, inability to meet presumptive RACT limits should be based on technical and/or economic infeasibility of controls in place or to be retrofitted at each particular emission unit.  EPA interprets that the presumptive RACT requirements in section 129.97 would remain applicable unless and until a source receives approval of an alternative NOx averaging plan containing an alternative RACT limit.

The geographic applicability of section 129.98 is consistent with EPA's policy and consistent with the D.C. Circuit's recent February 16, 2018 decision finding NOx averaging provisions reasonable for ozone RACT in *South Coast Air Quality Mgmt. Dist. v. EPA*.  Although Pennsylvania's provisions do not restrict the application of NOx averaging to moderate or worse nonattainment areas, this is still aligned with EPA's interpretation of CAA RACT requirements. For Pennsylvania, RACT applies to any moderate or worse nonattainment areas as well as any areas within the OTR, which would include any marginal nonattainment areas as well as any areas not designated nonattainment.  PADEP limited the applicability of system-wide averaging to nonattainment areas.  Pennsylvania has defined "nonattainment area" consistent with EPA's designations in 40 CFR part 81.[46]  In its September 26, 2017 supplemental, PADEP clarified its intention to consider any "unclassifiable/attainment areas" under 40 CFR part 81 as a single nonattainment area, by virtue of being in the OTR.  In accordance with CAA section 184, RACT applies to any areas in the OTR "as if the area was classified as a moderate nonattainment area," so allowing system-wide NOx averaging outside of designated nonattainment areas is still adequate.  PADEP's implementation of section 129.98 is consistent with this interpretation. Also, PADEP's restriction of system-wide averaging to nonattainment areas is consistent with the Court decision in *South Coast Air Quality Mgmt. Dist. v. EPA* (February 16, 2016) and in *NRDC v EPA*, 571 F.3D 1245 (D.C. Circ. 2009), which indicated that RACT-level emissions reductions must occur within a nonattainment area.  Thus, sources within specific nonattainment areas designated under 40 CFR Part 81 may only average with other Pennsylvania sources within the same designated nonattainment area and may not average with sources in areas that are simply within the OTR area of Pennsylvania.

---

[46] *See* 25 Pa. Code section 121.1.

EPA's NOx RACT guidance encourages the use of "averaging" to determine NOx emission rates that ensure RACT-level reductions in nonattainment areas. [47]   The concept of "averaging" results in a bubble or emissions cap equivalent to the cumulative emissions that would be achieved by implementation of RACT control measures on source-specific basis.  Although "averaging" would prevent the direct application of RACT controls on all affected major sources, it should still result in the same level of emissions reductions, and thus has been recognized as an adequate approach to meet RACT by EPA, as long as the reductions from averaging with sources in designated nonattainment areas all occur within the designated nonattainment area.  In the context of Pennsylvania's RACT II Rule, "RACT-level reductions" would be achieved through the implementation of the presumptive limits in section 129.97.

    As part of their RACT SIP submissions, EPA requires states to include a demonstration that the application of "averaging" at sources in nonattainment areas meets NOx RACT requirements.  The RACT II Rule SIP submission did not include the needed demonstration for NOx averaging provisions to meet RACT.  Instead, subsection 129.98(d) requires the owner or operator of the non-compliant emissions unit submitting a NOx averaging plan to include this demonstration as part of its permit application.  Because neither the averaging plan nor the permit application are required to be submitted for SIP approval, EPA finds that this approach is inadequate.  Thus, the RACT II Rule does not satisfy this particular requirement of EPA's policy.  However, as Pennsylvania is committing to submit NOx averaging plans to EPA for SIP approval, EPA is proposing conditional approval of Pennsylvania's NOx averaging regulation.

    Another deficiency of Pennsylvania's NOx averaging provisions is that section 129.98 does not sufficiently specify how to establish and enforce the alternative RACT limit.  The equation in subsection 129.98(e) solely stipulates that the cumulative actual emissions from the emission units included in the averaging plan must be no greater than the cumulative allowable emissions for those emissions units.  Subsection 129.98(e) does not provide how to compute the alternative limit, but only specifies that the limit would be determined using a 30-day rolling average based on the application of the relevant presumptive limit under section 129.97 or a more stringent limit, and that the alternative limit would ultimately be expressed as NOx mass emissions.[48] This lack of specificity in section 129.98 allows certain unbounded discretion in determining an alternative NOx RACT limit, which correspondingly results in our inability to determine if such limit is adequate for RACT.  Also, the uncertainty of subsection 129.98(e) prevents consistent implementation of NOx averaging provisions and ultimately prevents the adequate enforceability of these provisions as a practical matter.

[47]  *See* 80 FR 12279. In the context of the 2008 Ozone Implementation Rule, EPA referred to this as "area wide average emissions rates"
[48] Although PADEP does have a general definition for "allowable emissions" under section 121.1, EPA believes this definition is not relevant in the context of section 129.98, as it refers to an emissions rate applicable to a facility, as opposed to mass emissions applicable to a particular emissions unit, as stipulated by section 129.98(e).

In the September 26, 2017 supplemental document, PADEP explained that this deficiency in the RACT II Rule's NOx averaging provisions resulted from the final amendments of these provisions in response to comments received during the proposal of the rule. The proposed NOx averaging provisions in section 129.98(e) included a different equation to compute the alternative NOx limit, one which was tailored specifically for combustion units. Allowable NOx mass emissions for each emissions unit were to be calculated based on the allowable NOx emission rate limit (in lb/MMBTU) and the actual heat input. In response to public comments, PADEP simplified the equation in section 129.98(e) to allow averaging of NOx emissions for all emission units subject to presumptive NOx limits.

The deficiency of section 129.98 could be corrected by revising section 129.98(e) to further establish how to compute allowable emissions, or by PADEP submitting to EPA the alternative NOx limits under section 129.98 for approval into the SIP. EPA recognizes that the amendment of section 129.98 is less practicable, as it would take additional time and resources, and would further delay implementation of RACT. The submission of alternative NOx limits for approval into the SIP would allow EPA to verify if RACT-level reductions are achieved through implementation of section 129.98, and to determine if each NOx averaging plan, and underlying alternative NOx limit is adequate as RACT.

As part of the September 26, 2017 supplemental document, PADEP committed to submit to EPA as SIP revisions the portions of enforceable permits containing terms and conditions relevant for compliance with section 129.98, which would include the NOx averaging limits and as well as relevant compliance demonstration requirements, which should ensure practical enforceability of the averaging plan as a limit. This commitment addresses the deficiency of section 129.98 and allows EPA to propose conditional approval of these provisions. Under section 110(k)(4) of the CAA, EPA may conditionally approve a plan based on a commitment from the state to adopt specific enforceable measures within 1 year from the date of approval. If the state fails to meet its commitment within the 1-year period, the approval is treated as a disapproval.

### E. Alternative RACT Proposals

Section 129.99 of the RACT II Rule allows or requires sources to propose source-specific RACT emissions limits based on a comprehensive evaluation of additional controls. Section 129.99(a) allows the adoption of source-specific RACT as a second alternative compliance option for sources that cannot meet presumptive RACT. By contrast, sections 129.99(b) and (c) require the adoption of source-specific RACT limits for any emissions units at a major sources subject to the RACT II Rule for which there are no applicable presumptive requirements in section 129.97 and whose PTE exceeds 5 TPY of NOx and/or 2.7 TPY of VOC.

35

Sections 129.99 (d)-(h) outline a common procedure for any source proposing a source-specific emissions limit. PADEP required sources to submit the "alternative RACT proposals" to the appropriate state or local agency by October 24, 2016. Section 129.99(d)(1) incorporates by reference the procedures in 25 Pa. Code 129.92(a)(1)-(5) and (b), establishing the requirements of an alternative RACT proposal. A RACT proposal must include, among other things, the proposed limit/s, relevant compliance methods, an implementation schedule, and a permit application to incorporate these requirements (under 25 Pa. Code chapter 127). Source-specific limits must be proposed based on the evaluation of technical and economic feasibility of all available controls for each emissions unit. Once approved by PADEP or local agency, the source-specific limits and relevant compliance demonstration requirements are adopted into enforceable permits and submitted as a SIP revision for EPA's approval.

Affected sources are required to propose a schedule for implementation of the proposed RACT requirement or emissions limit as soon as possible but not later than January 1, 2017 or six months after meeting the "major source" definition, whichever is later. As discussed earlier, affected sources are also able to petition an alternative compliance deadline if they need to install an air pollution control device to meet the specific requirements under the RACT II Rule.

The language in 25 Pa. Code 129.99 limits the use of source-specific RACT as an alternative compliance option to an owner or operator of a non-compliant emission unit (subject to presumptive RACT), who is able to show that this unit is unable to meet the applicable presumptive limit in section 129.97. For NOx emissions units, source-specific RACT under section 129.99(a) would be an alternative to NOx averaging. Inability to meet presumptive RACT limits should be based on technical and/or economic infeasibility of controls in place or to be retrofitted at each particular emission unit. Thus, presumptive RACT requirements in section 129.97 would remain applicable unless and until a source receives approval of an alternative RACT limit.

EPA finds that the process in section 129.99 for sources to propose source-specific RACT emissions limits and for PADEP to submit such limits as a SIP revision is adequate, with one exception. Section 129.99 does not establish a date certain by which Pennsylvania must submit the relevant source-specific RACT SIP revisions to EPA. PADEP has reported to EPA that approximately 150 major sources have submitted RACT proposals under section 129.99. At this time, PADEP has only provided to EPA source-specific RACT SIP revisions addressing nine major facilities. According to EPA's longstanding policy, a generic rule cannot fully meet RACT under the CAA in the absence of the submitted emission limitations.[49] Thus, EPA cannot fully approve the provisions of section 129.99 of the RACT II Rule without the submission of all source-specific RACT limits approved under these provisions.

---

[49] EPA's November 7, 1996 Memorandum "Approval Option for Generic RACT Rules Submitted to Meet the non-CTG VOC RACT Requirements and Certain NOx RACT Requirements."

As part of the September 26, 2017 supplemental document, PADEP committed to submit within 12 months of EPA's final action, additional source-specific RACT SIP revisions containing source-specific RACT limits approved under section 129.99. PADEP's commitment would correct the deficiency of section 129.99 and allows EPA to propose conditional approval of these provisions. Under section 110(k)(4) of the CAA, EPA may conditionally approve a plan based on a commitment from the state to adopt specific enforceable measures within 1 year from the date of approval. If the state fails to meet its commitment within the 1-year period, the approval is treated as a disapproval.

### F. Superseding Provisions

The RACT II Rule contains "superseding" provisions that in most cases ensure that RACT for major NOx and non-CTG VOC sources continues to be based on the most stringent level of control. Section 129.97(i) of the RACT II Rule provides that the presumptive requirements in section 129.97 will supersede any RACT requirements of a "RACT permit" issued prior April 23, 2016 under 25 Pa. Code sections 129.91-95, unless the RACT permit contains more stringent requirements. Prior to the adoption of the RACT II Rule, Pennsylvania relied on the NOx and VOC control measures in 25 Pa. Code sections 129.91-95 to meet RACT for non-CTG major VOC sources and major NOx sources. The requirements of 25 Pa. Code sections 129.91-95 are in effect and continue to be implemented as RACT.[50] Section 129.92 established a procedure for affected sources to propose source-specific requirements, which were approved into federally enforceable permits, and whose relevant portions were submitted for approval into the SIP. 25 Pa. Code section 129.93 contains presumptive RACT requirements for major sources of NOx, particularly establishing operational standards for combustion units. Section 129.94 contained Pennsylvania's NOx averaging provisions, which required the approval of such NOx averaging plans into federally enforceable permits and the submission of the relevant portions of the permits for approval into the SIP. Hence, "RACT permits" issued under sections 129.91-95, as referred to in section 129.97(i), would have resulted from the implementation of source-specific RACT under section 129.92 and NOx averaging plans under section 129.94, all which were required to be submitted to EPA for approval as SIP revisions. If EPA agreed with Pennsylvania's underlying RACT determinations as satisfying RACT under the CAA, then the corresponding RACT permits, or portions thereof, were also approved by EPA into the SIP under 40 CFR 52.2020(d).

In implementing the provisions in sections 129.97(i), PADEP or the local permitting agency must make a determination for each affected source as to which requirements are more stringent, prior to establishing RACT for the affected source. Such determination would need to be made on a source-specific basis, based on the requirements that have been previously approved into the

---

[50] These requirements were initially approved as RACT for Pennsylvania under the 1-hour ozone NAAQS, and were recertified as RACT under the 1997 8-hour ozone NAAQS only for affected major sources in Philadelphia.

JA070

SIP and that are applicable for each affected source.  In the case that the RACT II Rule presumptive requirement is more stringent than a previously SIP-approved requirement (established under section 129.91-95) for an affected source, PADEP may submit to EPA a SIP revision clarifying which would be the applicable RACT requirement and properly removing the previously approved requirements from the SIP, consistent with CAA section 110(l).  Otherwise, until such a SIP revision is made, the previously SIP-approved RACT requirements will continue to be federally enforceable and necessary for the source to comply with RACT.  Should the RACT II Rule be fully approved by EPA into the SIP, these requirements will also become federally enforceable and the affected source would be required to comply with both requirements.

EPA finds that the language in section 129.97(i) alone cannot supersede the previously approved SIP provisions unless and until PADEP submits an additional SIP revision in accordance with section 110(l) of the CAA.  This is consistent with PADEP's own interpretation of section 129.97(i).  In the preamble to the RACT II Rule final rulemaking, PADEP stated that the provisions in section 129.97(i) were intended to ensure that an affected source is required to comply with the most stringent of the RACT requirements; and that the provisions in 25 Pa. Code sections 129.91-95 continue to apply regardless of the RACT II Rule provisions being in place, so that a major NOx and/or VOC source that has been subject to sections 129.91-95 and is now also subject to section 129.96-100 will be required to comply with both provisions to meet RACT.[51]

Section 129.99(k) of the RACT II Rule provides that any source-specific requirements approved under section 129.99 will supersede any similar NOx and/or VOC requirements that have been approved into an existing enforceable permit issued for the affected source prior to April 23, 2016, except to the extent the existing permit requirements are more stringent. Pursuant to section 129.99(f) and (h), any source-specific RACT requirements adopted under the RACT II Rule must be incorporated into federally enforceable permits and submitted for approval into the SIP.  The provision in section 129.99(k) ensures that any control measures being submitted for SIP approval as source-specific RACT are as stringent if not more stringent than other RACT measures previously approved into the SIP.  Subsequent RACT SIP revisions under section 129.99 must include a demonstration consistent with CAA section 110(l) to supersede any previously SIP approved RACT requirements, and such revisions will be evaluated and acted on by EPA separately.

EPA finds that the provisions in sections 129.97(i) and 129.99(k) are approvable as SIP strengthening measures, as they adequately ensure that additional SIP revisions establishing RACT for major NOx and non-CTG VOC sources in Pennsylvania reflect the most stringent

---

[51] *See* 46 Pa Bulletin 2046, PADEP's April 23, 2016 final rulemaking notice adopting the RACT II Rule; this notice is also included in PADEP's May 16, 2016 SIP revision.

JA071

level of control for the affected sources.

In addition, in an ancillary provision, section 129.97(j) provides that the presumptive requirements of the RACT II Rule supersede the requirements of section 129.201 to 129.205 ("Additional NOx Requirements"), 145.111 to 145.113 ("Interstate Pollution Transport Reduction- Emissions of NOx from Stationary Internal Combustion Engines") and 145.141-145.146 ("Interstate Pollution Transport Reduction- Emissions of NOx from Cement Manufacturing").  These regulations contain Pennsylvania's cap-and-trade provisions addressing interstate transport of NOx emission from boilers, stationary combustion turbines, stationary internal combustion engines, and Portland cement kilns.  EPA has not approved any of these regulations as meeting RACT.  For that reason, section 129.97(j) should not affect Pennsylvania's ability to establish RACT for any major NOx and VOC sources subject to the RACT II Rule.  It appears Pennsylvania may have intended to relieve affected sources from complying with other SIP approved provisions.  If PADEP would like to remove these other previously approved provisions from the SIP, PADEP must submit separate SIP revision requesting their removal and showing compliance with CAA section 110(l).  As the May 16, 2016 SIP revision was submitted to satisfy applicable RACT requirements under the CAA, EPA finds that 129.97(j) does not interfere with the RACT requirements established in the RACT II Rule and as such the provision is ancillary and will not interfere with implementation of RACT within Pennsylvania.

### G. Compliance Demonstration Requirements

Section 129.100 of the RACT II Rule establishes compliance demonstration requirements for affected sources.  Section 129.100(a) applies to sources subject to presumptive RACT requirements in section 129.97.  Emissions units subject to section 129.97 that have a continuous emissions monitoring system (CEMS), must meet the monitoring and testing requirements of 25 Pa. Code chapter 139, subchapter C and must determine compliance on a 30-day rolling average basis, except municipal waste combustors which use a daily average.  Portland cement kilns with a CEMS must follow the monitoring requirements in 40 CFR 63.1350(d).   Any other sources subject to section 129.97 that do not have CEMS, must meet the monitoring and testing requirements of 25 Pa. Code chapter 139, subchapter A, and must conduct testing at least once every five years.

As provided in section 129.100(b), sources subject to presumptive RACT in section 129.97 must comply with those requirements no later than January 1, 2017 or one year after the date that the source meets the definition of a major source, whichever is later.  This excludes sources that have petitioned for alternative compliance schedules.

Section 129.100(c) allows an affected source complying with presumptive RACT to

request a waiver by October 24, 2016, or six months after the date that the source meets the definition of a major source, whichever is later, from the requirement to demonstrate compliance with the applicable limit in section 129.97.

Recordkeeping requirements are established under section 129.100(d) for any affected sources under the RACT II Rule. An affected source must keep sufficient records of data and calculations needed to demonstrate compliance with the applicable requirements of the RACT II Rule.

Compliance demonstration requirements for NOx averaging or source-specific RACT alternative limits will be established by PADEP or local agency on a source-specific basis, consistent with section 129.100. Specifically, section 129.98(g)(3) requires the owner or operator of an affected source subject to 129.98 to specify any compliance demonstration requirements as part of its permit application, in accordance with section 129.100. Section 129.99(d)(6) requires the owner or operator of an affected source subject to 129.99 to submit as part of the RACT proposal any compliance demonstration methods and recordkeeping and reporting requirements, in accordance with section 129.100. Section 129.99 also incorporates by reference the provision in 129.92(a)(7), which requires that the source includes as part of the RACT proposal the testing, monitoring, recordkeeping and reporting procedures proposed to demonstrate compliance. These additional compliance demonstration requirements for sources complying with section 129.98 and 129.99 will be submitted for approval into the SIP, as part of PADEP's commitment to correct deficiencies on these provisions.

EPA finds the provisions of the RACT II Rule to be adequate to ensure enforceable limits for CAA section 110 and thus approvable.

### H. Definitions

Pennsylvania codifies all definitions that are related to chapter 129 (as well as all the other chapters) in section 121.1. The May 16, 2016 SIP revision included for incorporation into the SIP only those definitions in 25 Pa. Code section 121.1 relevant to the RACT II Rule. Section 121.1 was amended to revise the *existing* definitions for "CEMS—continuous emissions monitoring system," "major NOx emitting facility," "major VOC emitting facility," "stationary internal combustion engine or stationary reciprocating internal combustion engine" and to add definitions for "process heater," "refinery gas," "regenerative cycle combustion cycle combustion turbine," "simple cycle combustion turbine," and "stationary combustion turbine."

For Pennsylvania's rules, "major facility" is the same as a "major source" or "major stationary source." For RACT purposes, Pennsylvania relies on its definitions of "major NOx emitting facility" and a "major VOC emitting facility," both based on a facility's overall PTE for each pollutant. The applicable PTE thresholds are different according to the classification of the

nonattainment area where the facility is located.  These thresholds are consistent with the relevant "major stationary source" definitions in sections 182(c)–(f) and 302 of the CAA. Although Pennsylvania does not explicitly define thresholds for major sources in Moderate nonattainment areas, it includes thresholds for any sources "in an area included in an ozone transport region established under section 184," which are lower and consistent with the CAA.

As part of the RACT II Rule amendments, PADEP revised its existing definitions for "major NOx emitting facility" and a "major VOC emitting facility" to clarify that the 25 TPY major source NOx and VOC thresholds no longer apply in Bucks, Chester, Delaware, Montgomery and Philadelphia Counties for applicability of the RACT II Rule.  EPA clarifies that the 25 TPY thresholds were applicable under the 1-hour ozone NAAQS for these particular counties as part of the Philadelphia-Wilmington-Trenton Severe nonattainment area.  However, since the RACT II Rule intends to address RACT requirements for the 1997 and 2008 8-hour ozone standards, the 25 TPY thresholds are no longer relevant given the classification of the areas under both NAAQS at the time of revocation of the later 1997 8-hour ozone NAAQS.  PADEP has retained the 25 TPY thresholds to continue to apply to RACT sources subject to previous 1-hour ozone RACT requirements in those counties.  As indicated earlier, Pennsylvania is subject to anti-backsliding requirements under the 1997 8-hour ozone NAAQS, following its revocation, and continues to be required to meet RACT under this standard.  However, major source thresholds under both the 1997 and 2008 standards are the same for RACT purposes, given that there are no areas under either standard with classifications higher than Moderate.  Thus, EPA is proposing to approve for inclusion into the SIP the amended definitions in 25 Pa. Code section 121.1.

## V.  Recommended Rulemaking Action

EPA finds that Pennsylvania's May 16, 2016 SIP revision containing the RACT II Rule is adequate to meet the intended RACT requirements under the CAA, except for the identified deficiencies in sections 129.98 and 129.99.  Given these deficiencies and pursuant to section 110(k)(4) of the CAA, EPA is recommending the following rulemaking actions on the May 16, 2016 SIP revision.  EPA recommends to fully approve 25 Pa. Code sections 121.1, 129.96, 129.97, and 129.100 included in the May 16, 2016 SIP revision (for inclusion into the Pennsylvania SIP) as meeting certain aspects of major stationary source RACT in CAA 172, 182 and 184 for 1997 ozone and 2008 ozone.  EPA also recommends to conditionally approve 25 Pa. Code 129.98 and 129.99.  This conditional approval is based on the commitment provided by PADEP in its September 26, 2017 supplemental document to submit additional SIP revisions containing alternative RACT emissions limits, and the respective compliance demonstration requirements, established under section 129.98 and section 129.99.  These additional SIP revisions would address the deficiencies identified by EPA in the May 16, 2016 SIP revision.

JA074

**Appendix B- Comparison NOx State Regulations For Sources Covered by Pennsylvania's Presumptive RACT**

**Table 1: Summary of States RACT SIPs**

| | PA | NY | CT | NJ | DE |
|---|---|---|---|---|---|
| EPA's Latest RACT SIP Action | Partial Approval for 1997 RACT (VOC only)<br><br>Approval Pending-1997/2008 RACT | Proposed Approval-2008 RACT SIP<br><br>[EPA-R02-OAR-2017-0459] | Approved 2008 RACT SIP<br><br>[EPA-R01-OAR-2014-0611] | Approved 1997 RACT SIP | Approved 2008 RACT SIP<br><br>[EPA-R03-OAR-2015-0656] |
| State Rules | 25 Pa Code section 129.97 | 6 NYCRR 227-2.4 | 22a-174-22 22a-174-22e (as of June 1, 2018) | NJAC 7:27-19.7 | 7 DE Admin. Code sections 1112, 1142, 1144, 1146, 1148 |

**Table 2. States NOx Limits for Natural Gas Fired Combustion Units or Process Heaters with Rated Heat of 50 MMBTU/hr or Greater**

| Heat Input (MMBtu/hr) | NOx Limits by States (lb NOx/ MMBTU) | | | | |
|---|---|---|---|---|---|
| | PA | NY | CT | NJ | DE |
| Greater than 50 but less than 100 | 0.10 (natural gas) | 0.05 | 0.20 0.43 (varies by firing type) | 0.05 | - |
| 100 | | 0.05 | | 0.10 | 0.20 |
| Greater than 100 | | 0.06; 0.08 (vary by size) | 0.20 (as of June 1, 2018) | 0.10 | 0.20 |
| *State Rule* | *25 Pa Code section 129.97(g)(1)(iv)* | *6 NYCRR 227-2* | *22a-174-22 22a-174-22e* | *NJAC 7:27-19.7, Table 9* | *7 DE Admin. Code 1112* |

\* NY regulates any gaseous fuel as "gas". NY defines Large Boilers as units with heat input > 100 MMBtu/hr and ≤ 250 MMBtu/hr. NY defines Mid-sized Boilers as units with heat input > 25 MMBtu/hr and ≤ 100 MMBtu/hr

\* CT regulates as "gas" any gaseous fuel under 22a-174-22; and any gaseous fuel, except landfill gas or digester gas. under 22a-174-22e.

\* NJ limit applies to natural gas only.  Another limit applies for other gaseous fuels.

\* DE presumably regulates any gaseous fuels as "gas" under section 1112.

\* MD regulates any gaseous fuel.

**Conclusion:  PA's NOx limits for natural gas fired combustion units are comparable to other states; therefore, they are reasonably available and should adequately represent RACT for this NOx source category.**

**Table 3. States NOx Limits for Distillate Oil-Fired Combustion Units or Process Heaters with Rated Heat Input Equal to or Greater than 50 MMBTU/hr**

| Heat Input (MMBtu/hr) | NOx Limits by States (lb NOx/ MMBTU) | | | | |
|---|---|---|---|---|---|
| | PA | NY | CT | NJ | DE |
| Greater than 50 but less than 100 | 0.12 | 0.08 | 0.20 0.30 | 0.08 | N/A |
| 100 | | 0.08 | 0.43 (varies by boiler type) | 0.10 | 0.25; 0.43 (vary by firing type) |
| Greater than 100 | | 0.15; 0.20 (varies by size and boiler type) | 0.20 (as of June 1, 2018) | 0.10 | 0.25; 0.43 (vary by firing type) |
| *State Rule* | *25 Pa Code section 129.97(g)(1)(ii)* | *6 NYCRR 227-2.4* | *22a-174-22 and 22a-174-22e* | *NJAC 7:27-19.7, Table 9* | *7 DE Admin. Code 1112* |

\* NJ and PA regulate distillate oil separately from other types of oil fuel.

**Conclusion:  PA's NOx limits for distillate oil fired combustion units are comparable to other states; therefore, they are reasonably available and should adequately represent RACT for this NOx source category.**

**Table 4. States NOx Limits for Residual Oil-Fired Combustion Units or Process Heaters with Rated Heat of 50 MMBTU/hr or Greater**

| Heat Input (MMBtu/hr) | NOx Limits by States (lb NOx/ MMBTU) | | | | |
|---|---|---|---|---|---|
| | PA | NY | CT | NJ | DE |
| Greater than 50 but less than 100 | 0.20 | 0.20 | 0.25 0.30 | 0.2 | N/A |
| 100 | | 0.20 | 0.43 (vary by firing type) | 0.2 | 0.25; 0.43 (vary by firing type) |
| Greater than 100 | | 0.15; 0.20 (varies by size and boiler type) | 0.25 (as of June 1, 2018) | 0.2 | 0.25; 0.43 (vary by firing type) |
| | *25 Pa Code section 129.97(g)(1)(iii)* | *6 NYCRR 227-2.4* | *22a-174-22 and 22a-174-22e* | *NJAC 7:27-19.7, Table 9* | *7 DE Admin. Code 1112* |

\* PA and CT regulate residual oil separately from other types of oil fuel.

**Conclusion:  PA's NOx limits for residual oil fired combustion units are comparable to other states; therefore, they are reasonably available and should adequately represent RACT for this NOx source category.**

**Table 5. States NOx Limits for Coal-Fired Combustion Units or Process Heaters with Rated Heat Input of 50 MMBTU/hr or Greater but Less than 250 MMBTU/hr**

| Heat Input (MMBtu/hr) | NOx Limits by States (lb NOx/ MMBTU) | | | | |
|---|---|---|---|---|---|
| | PA | NY | CT | NJ | DE |
| Greater than 50 but less than 100 | 0.45 | N/A | 0.29 | 0.38, 0.43, 0.55, 1.0 (varies by boiler type) | N/A |
| 100 | | N/A | 0.30 0.38 0.43 (vary by boiler type) | 0.38, 0.45, 0.6, 1.0 (varies by boiler type) | 0.38; 0.40 (vary by boiler type) |
| Greater than 100 but less than 250 | | 0.08; 0.20 (vary by coal type) | | 0.38, 0.45, 0.6, 1.0 (varies by boiler type) | 0.38; 0.40 (vary by boiler type) |
| *State's Rule* | *25 Pa Code section 129.97(g)(1)(vii)* | *6 NYCRR 227-2.4* | *22a-174-22* | *NJAC 7:27-19.7, Table 8* | |

\* NJ limits include different limits for wet- or dry-bottom coal-fired boilers.

**Conclusion:  PA's NOx limits for small coal-fired combustion units are comparable to other states; therefore, they are reasonably available and should adequately represent RACT for this NOx source category.**

**Table 6. States NOx Limits by Firing Type for Coal-Fired Combustion Units, Including Boilers Serving Electric Generating Units (EGUs), or Process Heaters with Rated Heat Input of 250 MMBTU/hr or Greater**

| Firing Type | NOx Limits by States (lb NOx/ MMBTU) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | PA | NY | CT | | NJ | | DE | |
| | EGU and Non-EGU | EGU and Non-EGU | EGU | Non-EGU | EGU | Non-EGU | EGU | Non-EGU |
| Circulated Fluidized Bed | 0.16 | 0.08 (dry bottom) | 0.29 | | 0.15 (for any) | N/A | 0.125 (for any; 24-hour avg.) | N/A |
| Tangential | 0.35 | 0.12 (dry or wet bottom) | 0.28 (as of June 2018) | 0.38 | | 0.38 (dry) 1.0 (wet) | | 0.38 |
| Wall/Face Fired | 0.40 (for any other) | 0.12 (dry or wet bottom) | | 0.38 | | 0.45 (dry) 1.0 (wet) | | 0.38 |
| Cyclone | | 0.20 (wet bottom) | | 0.43 | | 0.55 (dry) 1.0 (wet) | | N/A |
| Cell Burner | | N/A | | 0.38 | | N/A | | N/A |
| Arch | | N/A | | 0.38 | | N/A | | N/A |
| Stoker | | N/A | | 0.38 | | N/A | | 0.4 |
| *States Rules* | *25 Pa Code section 129.97(g)(1)(vi)* | *6 NYCRR 227-2.4* | *22a-174-22e* | *22a-174-22* | *7:27-19-4; 7:27-19.7* | *7:27-19.7; Table 8* | *DE Reg. 1112 and 1146* | |

\* PA limits do not distinguish from dry or wet bottom, but NEI data indicates there are only dry bottom coal-fired boilers.
\* NY regulates any boilers with heat input rating greater than 100 MMBTU/hr. For boilers with other configurations not addressed in the section 227-2.4, source-specific RACT applies.
\* CT has regulated NOx emissions from any coal-fired boilers based on burner configuration, but then adopted more stringent NOx limits for coal-fired EGU boilers, which will be in effect after June 2018.

JA077

* NJ provides a NOx limit for any coal-fired EGU boilers of any size, regardless of burner configuration. This limit is presented in lb/MW units, and has been converted to lb/MMBTU for this comparison. See http://www.nj.gov/dep/rules/proposals/080408a.pdf at page 52. This limit is also applicable on a 24-hour basis.

* DE adopted NOx limits for EGU boilers, regardless of burner configuration. DE also established NOx limits for ICI coal-fired boilers with heat input rating greater than or equal to 100 MMBTU/hr, for some burner configurations.

**Conclusion:  PA's NOx limits for large coal-fired combustion units are comparable to other states; therefore, they are reasonably available and should adequately represent RACT for this NOx source category.**

**Table 7. States NOx Limits for Combustion Turbines**

| Type | Fuel | NOx Limits by States (ppmvd at 15% $O_2$) | | | | |
|------|------|------|------|------|------|------|
| | | **PA** | **NY** | **CT** | **NJ** | **DE** |
| Simple | Gas | 150 42 (vary by size) (also apply to regenerative cycle units) | 50 | 55 | 25 | 42 |
| | Oil | 150 96 (vary by size) | 100 | 75 | 42 | 88 |
| Combined | Gas | 42 4 (vary by size) | 42 | 42 | 25 | 42 |
| | Oil | 4 8 (vary by size) | 65 | 65 | 42 | 88 |
| *States Rules* | | *25 Pa Code section 129.97(g)(2)* | *6 NYCRR 227-2.4* | *22a-174-22 and 22a-174-22e* | *7:27-19-5* | *DE Reg. 1112 and 1148* |

* Applicability thresholds not provided, but vary per state. PA regulates NOx emissions from significantly smaller combustion turbines than other states. PA established NOx limits for two different size categories; which is an uncommon practice from the majority of states.

* PA regulates regenerative cycle units the same way as simple cycle. PA regulates combustion turbines dedicated to electricity generation the same way as combined cycle units.

* NJ NOx limits are expressed in lb/MMBTU and/or lb/MW-hr, but for this comparison have been converted to ppmvd@15% $O_2$ based on New Jersey's technical support document. (or Regenerative)

* CT has currently other applicable NOx limits for combustion turbines expressed in lb/MMBTU; however, these limits will be superseded in June 2018 by the ppmvd limits listed in the table. For simplicity, only those have been indicated for this comparison.

**Conclusion:  PA's NOx limits for combustion turbines are comparable to other states; therefore, they are reasonably available and should adequately represent RACT for this NOx source category.**

**Table 8. States NOx Limits for Stationary Internal Combustion Engines**

| Type | Fuel | NOx Limits by States (gr/bhp-hr) | | | | |
|------|------|------|------|------|------|------|
| | | PA | NY | CT | NJ | DE |
| Lean | Gas | 3.0 | 1.5; 2.0 (vary by type of gas) | 2.5 | 1.5 | 1.35 |
| Rich | Gas | 2.0 | 1.5; 2.0 (vary by type of gas) | 2.5 | 1.5 | |
| Any | Liquid fuel | 8.0 | 2.3 (distillate oil) | 8.0 | 2.3 | |
| Any | Dual (Gas and Liquid Fuel) | 8.0 | N-A | N-A | 2.3 | |
| *States Rules* | | *25 Pa Code section 129.97(g)(3)* | *6 NYCRR 227-2.4* | *22a-174-22 and 22a-174-22e* | *7:27-19-8* | *DE Reg. 1144* |

\* Applicability varies by state and is determined by the output rating of the engines.  All states regulate engines of nearly the same rating as PA of 500 bhp or greater.  Only NJ regulates smaller engines down to ~200 bhp.

\* DE limits are expressed in lb/MW-hr.  Also, the NOx limits in DE Reg section 1144 are applicable for new sources, based on installation dates. For this comparison, only the limit for existing units was considered.  It also worth to note that these standards were truly established to meet other Federal requirements, which are typically mores stringent (BACT or LAER),

**Conclusion:  PA's NOx limits for stationary internal combustion engines are comparable to other states; therefore, they are reasonably available and should adequately represent RACT for this NOx source category.**

JA079

# UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

## REGION III

### 1650 Arch Street

### Philadelphia, Pennsylvania 19103-2029

**DATE:**       2/22/2018

**SUBJECT:**    **Technical Support Document for the Pennsylvania State Implementation Plan Revision for Certain Reasonably Available Control Technology Requirements under the 1997 and 2008 8-hour Ozone National Ambient Air Quality Standard - Cost Effective Analyses for Coal Fired Boilers**

**FROM:**       Christopher Cripps, Environmental Engineer
Office of Air Program Planning (3AP30)

**TO:**         SIP Docket File: EPA-R03-OAR-2017-0290

**REVIEWED BY:**       \s_____,
Susan I. Spielberger, Associate Director
Office of Air Program Planning (3AP30)

## I. Part I: General

### A. Baseline Data & Data Sources
EPA started with the 2011 inventory data of nitrogen oxides (NOx) and also emissions and operational data for coal-fired boilers reported to EPA's Air Markets Program Data (AMPD) for 2011.  The calendar year 2011 was chosen because this year is the presumptive inventory base year for the 2008 ozone NAAQS.  *See* 80 FR 12264 at 12271-12272 (March 6, 2015).

### B. Scope of Data and Units in APMD:

JA080

The AMPD contains NOx emissions data for emissions units covered under any one or more of the following allocation or cap and trading programs:[1]

The Acid Rain Program under Title IV of the Clean Air Act (CAA) (42 USC 42 U.S.C. 7601 and 7651 *et seq.*) (40 CFR Part 76).

The NOx State Implementation Plan (SIP) Call (40 CFR Part 96, Subparts A to I [2004 Ed.], 63 FR 57356, October, 27, 1998).[2]

The Clean Air Interstate Rule (CAIR) and CAIR FIPs (40 CFR Part 96 and 40 CFR Part 97 including for example subparts AA, BB, EE to II, and EEEE to IIII).

The Cross-State Air Pollution Rule (CSAPR) and CSAPR Update FIPs (40 CFR Part 97, including for example Subparts AAAAA, BBBBB, EEEEE).

The sorts of emissions units include (for example):

Emission units specifically identified in CAA Title IV.

Emission units subject to 40 CFR Part 97 (for examples, refer to §§97.4 or 97.404)

These include:

1    Generally units that, any time on or after January 1, 1995, serves a generator with a nameplate capacity greater than 25 MWe, and

2    Generally units that is not a unit serving a generator with a nameplate capacity greater than 25 MWe but that has a maximum design heat input greater than 250 mmBtu/hr, and

3    Cogeneration units generally those serving a generator with a nameplate capacity greater than 25 MWe.

4    Certain "opt-in" emissions units (refer to subparts I and II to 40 CFR part 97).

EPA has placed, as Attachment AA, this AMPD data in the docket for this rulemaking action in the form of Excel®.  Attachment AA to this document contains the 2011, 2015 and 2016 annual data for coal-fueled emissions units in Pennsylvania.  The basic AMPD data is in the Tabs labeled "Data Dictionary" and "Annual." (The full data set is available only electronically in Excel® format, that is, the full document is in the docket held at the Regional Office in electronic format on a compact disk and on-line at http://www.regulations.gov).  The universe of units in the AMPD includes units combusting fuel oils, natural and other gaseous fuels or both liquid and gaseous fuels; Attachment AA includes only units combusting coal or "coal-refuse" during 2011, 2015 and 2016.  The data included in this file is explained in the following table:[3]

---

[1] Title IV plus the NOx SIP call/CAIR/CSPAR concern either or both SO2 and NOx emissions.  Therefore, only the NOx emissions related data is of concern in this rulemaking.  Only the NOx emissions-related regulatory or statutory provisions are cited.
[2] Amended and superseded by CAIR, 70 FR 25162 (May 12, 2005).
[3] These descriptions are from the "Data Dictionary" Tab of the Excel® file.

| Table I.B.-1 Data Dictionary | |
|---|---|
| *Data Element[4]/Column Heading* | Description |
| *Year* | Year in which data was collected |
| *Month* | Month in which data was collected |
| *Facility Name* | Name of the facility, as reported by representative on Certification of Representation forms or equivalent |
| *ORISPL Code* | EIA-assigned identifier or FACILITY ID assigned by CAMD (if EIA number is not applicable) |
| *Unit ID* | Public identifier used for unit for program identification purposes |
| *Associated Stacks* | Stacks associated with the unit |
| *Source Category* | Source category of the unit |
| *Boiler Type Info* | Type of unit or boiler |
| *Primary Fuel Info* | Primary fuel type information for the year |
| *Secondary Fuel Info* | Secondary fuel type information for the year |
| *Gross Load* | Output measured in Megawatt-hrs |
| *Steam Load* | Output measured in 1000 pounds (lbs) of steam |
| *Capacity Input* | The maximum hourly heat input (mmBtu/hr) associated with a unit |
| *NOx Control Info* | Formatted list of all NOx controls for a unit |
| *NOx Mass (tons)* | Mass of NOx (tons) emitted by a unit |
| *NOx Mass (lbs)* | Mass of NOx (lbs) emitted by a unit |
| *NOx Rate* | Average NOx hourly emissions rate (lbs/mmBtu) for a unit |
| *Total Operation Time* | Sum of hours of operation for this time interval |
| *Heat Input* | Amount of heat (mmBtu) produced by burning fuel for the unit |
| *Heat Rate* (mmBtu/MWh) | The calculation of the heat input divided by the gross load. |

Included in the 2011 inventory of coal-fired boilers over 250 million British Thermal Units per hour (mmBTU/hr) are the following source categories (*Source Category*): Cogeneration, Electric Utility, Small Power Producer, Industrial Boiler and Pulp & Paper Mill.

## C. Separation into Unit Type Sub-categories and by NOx Control Types

For this analysis EPA has extracted the 2011 annual data from Attachment AA to use in the initial analysis of the cost-effectiveness of selective non-catalytic reduction (SNCR) or selective

---

[4] Throughout this document *italic and underlined* terms will identify data elements from EPA's CAMD AMPD.

JA082

catalytic reduction (SCR) on units not equipped with these post-combustion controls.  EPA first separated the circulating fluidized bed boilers (CFB) from the other "conventional" boiler types.

CFBs are a subset of fluidized bed combustion technology which is an integrated technology for reducing both sulfur dioxide (SO2) and NOx during the combustion of coal. These furnaces operate at much lower temperatures and have lower NOx emissions than "conventional" types of utility boilers.[5]  CFBs are inherently different because in a CFB crushed coal in combination with inert material (sand, silica, alumina, or ash) and/or a sorbent (limestone) are maintained in a highly turbulent suspended state by the upward flow of primary air from the windbox located directly below the combustion floor. This fluidized state provides a large amount of surface contact between the air and solid particles, which promotes uniform and efficient combustion at lower furnace temperatures, between 860 and 900 ºC (1,575 and 1,650 ºF) compared to 1,370 and 1,540 ºC (2,500 and 2,800 ºF) for "conventional" coal-fired boilers.[6]  CFBs can be used to burn "coal-refuse."

In a "conventional" boiler air and fuel are combusted in a furnace.  The "walls" of the furnace are formed by multiple, closely-spaced tubes filled with high-pressure water.   The fuel combustion heats the water inside these tubes to generate steam.[7]  The "conventional" types of fossil fuel-fired boilers over 250 mmBTU/hr input capacity in service in 2011 within Pennsylvania include tangentially-fired, dry-bottom wall-fired, arch-firing and cell burner.[8]

For both the "conventional" and FBC types, EPA divided the inventory by the type of NOx controls for a unit (*NOx Control Info*).

> For FBCs, the three NOx controls categories are:
> (1)  those using a NOx reducing reagent (SNCR or "ammonia injection);
> (2) other specified NOx control types  –  "other" or "overfire air;" and
> (3) finally those units <u>without</u> any identified NOx controls.

EPA added a column to the extracted 2011 data titled "Sort Key" and created the following codes to differentiate the different boiler categories and NOx control technologies.

| Table I.C.-1 Sort Codes | |
|---|---|
| Code | Meaning |
| COG-CFB | Cogeneration – CFB with no NOx Control or "Other" NOx Control |
| COG-CFB-AI | Cogeneration – CFB with Ammonia Injection |
| COG-CFB-SNCR | Cogeneration – CFB with SNCR |
| COG-Conv-SNCR | Cogeneration – Conventional with SNCR |

---

[5] Refer to section 2.2 of "Alternative Control Techniques Document – NOx Emissions from Utility Boilers," EPA-453/R-94-023, March 1994, available on-line at https://www3.epa.gov/airquality/ctg_act/199403_nox_epa453_r-94-023_utility_boilers.pdf.
[6] *Ibid.* section 3.3.2.5.
[7] *Ibid.*  section 3.3.1.
[8] Other "conventional" types include "wet-bottom" wall fired, cyclone and stoker.  None of these types were reported as in service in 2011.

JA083

| EGU-CFB | Electric Generating Unit – CFB with no NOx Control or "Other" NOx Control |
|---|---|
| EGU-CFB-AI | Electric Generating Unit – CFB with Ammonia Injection |
| EGU-CFB-SNCR | Electric Generating Unit – CFB with SNCR |
| EGU-CONV | Electric Generating Unit – Conventional without either SNCR or SCR |
| EGU-CONV-SCR | Electric Generating Unit – Conventional with SCR |
| EGU-CONV-SNCR | Electric Generating Unit – Conventional with SNCR |
| Indl/P&P-CFB-SNCR | Industrial or Pulp & Paper – CFB with SNCR |
| Indl/P&P-Conv | Industrial or Pulp & Paper – Conventional without either SNCR or SCR |

The range of annual average NOx hourly emissions rate (_NOx Rate_) in lbs/mmBtu for the PA CFBs ranges from 0.041 to 0.177 lbs/mmBTU for units without ammonia injection (AI) or SNCR; for units with AI or SNCR the range was 0.084 to 0.146 lbs/mmBTU.  In other words, the emission rates for SNCR/AI units are not always less than those units without.

> For "conventional boilers, EPA segregated the inventory into three control categories;
>
> (1) those with SCR,
>
> (2) those with SNCR, and
>
> (3) those with other types of control or without any specified NOx controls.

The range of annual average NOx hourly emissions rate (_NOx Rate_) for the conventional boilers are as follows:

| Type of Control | Lowest NOx Rate | Highest NOx rate |
|---|---|---|
| SNCR | 0.254 | 0.485 |
| SCR | 0.107 | 0.377 |
| Without either SCR or SNCR | 0.241 | 0.480 |

Here again, the ranges overlap; however, units equipped with SCR (or SNCR) will emit at rates higher than practicable minimums if less than the maximum, optimal rates of reagent injection is not used.

The 2011 data sorted into these categories can be found in Attachment AA of this document on Excel® tab titled "Sorted 2011."

## D. Selection of Cost-Estimating Methodology

For the initial analysis EPA elected to use the methodology of chapters 1 "Selective Non-Catalytic Reduction" and 2 "Selective Catalytic Reduction" to the Seventh Edition of EPAs Control Cost Manual (CCM7).  (Hereafter in this document, Chapter 1 "Selective Non-Catalytic Reduction" will be "CCM7 SNCR" and Chapter 2 "Selective Catalytic Reduction" will be "CCM7 SCR.")  EPA chose CCM7 because EPA concurrently released cost estimation

JA084

spreadsheet tools with these chapters of CCM7.  These spreadsheet tools facilitate estimation of the annualized cost of SNCR and SCR controls and the cost-effectiveness given the key characteristics of a given unit.  These key characteristics include the boiler size (MW rating or heat input capacity), type (CFB or not), source category (utility/EGU or industrial), annual heat input or gross load, baseline NOx rate, target NOx reduction percentage, costing data, and other relevant factors.

The CCM 7 tools for SCR and SNCR contain "default" inputs for many factors.  (The CCM 7 SCR tool will be called "CCM7 SCR Tool" and the CCM 7 SNCR Tool will be called "CCM7 SNCR Tool," or just "SCR Tool" and "SNCR Tool, respectively, and "CCM Tools" collectively.)   The CCM 7 tools are set to estimate costs for 2014 dollars; Calendar year 2014 is contemporaneous with PADEPs' proposed rule.[9]

The CCM7 SCR Tool and the CCM7 SNCR Tool plus associated Chapters to Section 4 "NOx Controls" of the EPA Air Pollution Control Cost Manual can be found at https://www.epa.gov/economic-and-cost-analysis-air-pollution-regulations/cost-reports-and-guidance-air-pollution [last accessed December 12, 2017].

## E. CFB and SCR

EPA did not subject CFBs to an analysis of SCR cost-effectiveness.  The EGU ACT "Alternative Control Techniques Document – NOx Emissions from Utility Boilers," EPA-453/R-94-023, March 1994, did not present any information on the use of SCR on CFBs.  EPA queried the AMPD for all CFBs reporting to EPA that were in operation during any year between 2014 through 2016 (inclusive).  This data is presented in electronic format only (in CSV)[10] as Attachment BB to this document.  EPA reviewed the data to see how many units burning coal or coal refuse reported SCR as a NOx control. Of the over 75 different CFB units using coal or coal refuse as a primary fuel, none reported use of SCR.
Therefore, EPA did not consider SCR as being feasible for retrofit on CFBs.

## F. CCM 7 SCR and SNCR Tool Inputs

General Note:  Underlined text or abbreviations indicate to input/output labels or abbreviations used in the CCM 7 Tools.  *Underline & italic* indicate data column headers from the AMPD output spreadsheets.

The CCM (SCR and SNCR) Tools provide a cost-estimating methodology provide a tool to estimate "study-level" costs for SCR and SNCR installations.[11]  For utility/EGU boilers, the methodology is applicable to units serving generators of load capacities greater than or equal to ($\geq$) 25 MW.[12]  The capital costs estimated by the equations in the CCM 7 SNCR and CCM 7

---

[9] 44 Pennsylvania Bulletin, Page 2392, April 19, 2014.
[10] The CSV indicates a comma separated variable text format.
[11] See sections 1.4 of Chapter 1 to Section 4 "NOx Controls" of the EPA AIR POLLUTION CONTROL COST MANUAL and 2.4 of Chapter 2 to Section 4 "NOx Controls" of the EPA AIR POLLUTION CONTROL COST MANUAL.
[12] *Ibid.*

JA085

SCR chapters represent average retrofit costs; costs for new construction are typically 10-30% less than for average retrofits for units of the same size and design. The TCI equations include a retrofit factor (RF). For SCR installations, a retrofit factor of 0.8 should be used for new construction and a retrofit factor of 1 should be used for average retrofits.[13]  (The CCM7 SCR Tool has a required input "Is the SCR for a new boiler or retrofit of an existing boiler?". Selecting "New Construction" sets the RF to 0.8 internally; for retrofits, the user-input RF is used where the user selects "Retrofit" in cell D7 of the spreadsheet tab "Data Inputs." {Examine Cell D24 on Spreadsheet tab "SCR Design Parameters which sets the RF to 0.8 if "New Construction" is selected and the user-input RF otherwise}.)

Likewise, for SNCR installations, the increased cost due to retrofit is minimal; approximately 10–30% of the cost of SNCR applied to a new boiler.[14]  (The CCM7 SNCR Tool also has a required input "Is the SNCR for a new boiler or retrofit of an existing boiler?".  Selecting "New Construction" sets the RF to 0.84 internally (Examine Cell D24 on Spreadsheet tab "SCR Design Parameters which sets the RF to 0.84 if "New Construction" is selected; the user-input RF is used otherwise}; selecting "retrofit" allows the user to input a RF.)

The total project cost or total capital investment (TCI) for SCR and SNCR is based on the approach used by EPA CAMD in the Integrated Planning Model (IPM) version 5.13 (IPM v5.13).[15]  In the costing method for SCR from the IPM, the purchased equipment cost, the direct installation cost, and the indirect installation cost are estimated together.  This is a slight deviation from the Cost Control Manual's standard procedure.

For SNCR installations, the capital cost equations are provided for coal-fired units. Capital cost equations are provided for fluidized bed (FB) (i.e., "CFBs") boiler units and for other boiler types (i.e., non-FB {i.e., "conventional"} boiler units such as cyclone, wall-fired, tangential-fired, etc.).  In general, SNCR units for FB boilers are less expensive than for other boiler types.[16]

## G. Key Data Inputs

The following table indicates some of the key inputs to the CCM7 SCR and CCM7 SNCR Tools.

| Table I.G.-1 Key Data Inputs by Tab and Cell ID | | | |
|---|---|---|---|
| Spreadsheet Tab | Cell in SCR Tool [in SNCR | Data Element [Abbreviation in CCM7 SNCR Tool where different]. | Comments, remarks and/or **EPA assumptions used**. |

[13] Section 2.4 of Chapter 2 to Section 4 "NOx Controls" of the EPA AIR POLLUTION CONTROL COST MANUAL.
[14] Section 1.4 of Chapter 1 to Section 4 "NOx Controls" of the EPA AIR POLLUTION CONTROL COST MANUAL.
[15] See sections 1.4.1 of Chapter 1 to Section 4 "NOx Controls" of the EPA AIR POLLUTION CONTROL COST MANUAL and 2.4.1 of Chapter 2 to Section 4 "NOx Controls" of the EPA AIR POLLUTION CONTROL COST MANUAL.
[16] Section 1.4 of Chapter 1 to Section 4 "NOx Controls" of the EPA AIR POLLUTION CONTROL COST MANUAL.

7

JA086

| | Tool where different] | | |
|---|---|---|---|
| For EGU/utility boilers and industrial boilers (where the same) | | | |
| Data Inputs | B4 | Is the combustion unit a utility or industrial boiler? | Choice of "Utility" or "Industrial." |
| Data Inputs | B5 | Is the SCR [SNCR] for a new boiler or retrofit of an existing boiler? | Choice of "New Construction" or "Retrofit." Always chose **Retrofit.** |
| Data Inputs | D7 | Please enter a retrofit factor between 0.8 and 1.5 based on the level of difficulty. Enter 1 for projects of average retrofit difficulty. | Allows input **only** if "Retrofit" previously chosen. **Assumed 1.0.** |
| Data Inputs | C10 | What is the MW rating at full load capacity (_Bmw_[17])? | Rated capacity. Must be $\geq$ 25. **Estimated – see Section I.K1. below** |
| Data Inputs | C12 | What is the higher heating value (HHV) of the fuel? | Varying this input does not seem to affect the costing for _utility_ boilers. **Assumed 11,814 BTU/lb.** |
| Data Inputs | C14 | What is the estimated actual annual MW output? (_Boutput_) | Estimated or actual if known. **For EGUs entered _Gross Load_.** |
| Data Inputs | C17 | Enter the net plant heat input rate (_NPHR_) | In mmBTU/MW. **Enter _Heat Rate_ where known; otherwise estimated (see Section I.L. below.** |
| Data Inputs | C31 | Number of days the SCR operates (_tSCR_) [Number of days the SNCR operates (_tSNCR_)] | EPA assumed 350 days for both SCR and 365 days for SNCR.[18] |
| Data Inputs | C32 | Number of days the boiler operates (_tplant_) | This is not present in the CCM7 SNCR Tool. EPA assumed 350 days for SCR.[19] |
| Data Inputs | C33 [C32] | Inlet NOx Emissions (_NOxin_) to SCR [to SNCR] | In lbs NOx/mmBTU. **Used _NOx Rate_.** |

---

[17] Throughout this document underlined terms will identify variable names in the CCM7 SCR and SNCR Tools.
[18] The days per year for the SCR and boiler (_tscr_ and _tplant_, entered in Cells C31 and C32 on the "Design Parameters" Tab of the CCM7 SCR Tool, respectively) is used for a limited purpose of "Total System Capacity Factor (_CFtotal_)" (Cell 10 on the "SCR Design Parameters" Tab). _CFtotal_ is equal to (_Boutput/Bmw_) *(tscr/tplant). As long as _tscr_ = _tplant_, the ratio _tscr/tplant_ is equal to 1.000 and does not affect the overall results because is used to compute "Total operating time for the SCR" (_top_) (Cell C11 on the "SCR Design Parameters" Tab). When _tscr/tplant_ is equal to 1.000, _top_ is just equal to _Boutput/Bmw_ from Cells C8 and C9, respectively, on the "SCR Design Parameters" Tab.
[19] See previous footnote.

| Data Inputs | C34 [C33] | NOx Removal Efficiency (EF) provided by vendor | Percent. NB: this cell is not formatted as a percentage but rather the input is entered as the decimal fraction times 100.  That is, 75.3% is entered as 75.3.  **See Section I.K.4. below.** |
|---|---|---|---|
| Data Inputs | I10 | What type of fuel does the unit burn? | **"Coal" was selected.** |
| Data Inputs | J10 | Type of coal burned: | **"Bituminous" was selected.** |
| Data Inputs | C47 [C42] | Select the reagent used | "Urea" or "Ammonia." **Used Ammonia.** |
| Data Inputs | C24 [I31] | Plant Elevation | Feet above sea level.  Does not have any effect for elevations below 500 feet. **Used 500' for SCR Tool and 250' for SNCR Tool.** |
| Data Inputs | None [C6] | Is the boiler a fluid-bed boiler? | Choice of "Yes" or "No". **Chose NO for conventional boilers and Yes for any _Boiler Type Info_ of "_Circulating fluidized bed boiler._"** |
|  | I12 | Enter the sulfur content (%S) = | **Assumed default 2.35%.** |
| Data Inputs | C39 [C40] | Estimated SCR equipment life | **Used 20 years for SNCR and 20 years for SCR.** |
| Data Inputs | C54 [C49] | Annual Interest Rate (i) | Percent.  Enter 7% as "7." **Used 7%.** |
| For Industrial Boilers where different from above: |  |  |  |
| Data Inputs | C10 | What is the maximum heat input rate (QB)? | MMBtu/hour.  **Used _Capacity Input._** |
| Data Inputs | C12 | What is the higher heating value (HHV) of the fuel? | Assumed default 11,814 BTU/lb. |
| Data Inputs | C14 | What is the estimated actual annual fuel consumption?  Actual Annual fuel consumption (Mactual) in lbs/year. | This is computed by Mactual = _Heat Input_ (in mmBTU/ year [yr]) * 10^6 BTU/mmBTU / (11,814 BTU/pound [lb]) |

## H. Basis for Input Selections

### 1. Retrofit factor of 1.0:

For Cells B5 "Is the SCR [SNCR] for a new boiler or retrofit of an existing boiler?" and D7 "Please enter a retrofit factor between 0.8 and 1.5 based on the level of difficulty" on the

Spreadsheet Tab <u>Data Inputs</u>, EPA always chose "Retrofit" because the analysis is concerned with existing boilers and chose a retrofit factor (<u>RF</u>) of 1.0 for an average difficulty.  The initial analysis does not concern unique factors specific to a particular site because the initial analysis concerns the question of whether the presumptive emissions limits are RACT generally; EPA's policy on RACT will allow source or emissions unit specific determinations of RACT to account for the unique technological or economic circumstances of a particular source of emissions unit.  Such a unit specific analysis could use a retrofit factor greater than 1.0 based upon for example site-specific vendor quotes.

### *2. Estimated SCR equipment Life:*
In response to comment that the 30-year book life assumed for retrofits in IPM version v.4.10 is too long, EPA gave a rationale that a 30-year book life for SCR retrofits is consistent with life extension provisions which allow existing units to stay in operation throughout the 2012-2050 modeling horizon, rather than forcing them retire upon reaching a pre-specified expected lifespan.  Refer to Section 7, Documentation Supplement for EPA Base Case v.4.10_FTransport – Updates for Final Transport Rule, May 2011 [EPA-HQ-OAR-2009-0491-4291].

However, in more recent IPM runs, EPA used 15 years for both book life and debt life in the IPM modeling for IPM Base Case v.5.13.  Refer to Table 8-4 "Book Life, Debt Life and Depreciation Schedules for EPA Base Case v. 5.13" in Chapter 8: "Financial Assumptions" of "Power Sector Modeling Platform v.5.13," November 27, 2013.[20]  For this initial analysis 20 years was used as a compromise.

### *3. Estimated SNCR equipment Life:*
A life of 20 years was used.[21]

### *4. Urea or Ammonia Reagent*
The reagent selected was ammonia for SCR.[22]  For SNCR ammonia was also selected.[23]

### *5. Plant Elevation*

---

[20] Refer to https://www.epa.gov/airmarkets/power-sector-modeling-platform-v513.  Documentation for EPA Base Case v.5.13 Using the Integrated Planning Model," EPA # 450R13002, November 2013, available on-line as documentation_for_epa_base_case_v.5.13_using_the_integrated_planning_model.pdf at https://www.epa.gov/sites/production/files/2015-07/documents/documentation_for_epa_base_case_v.5.13_using_the_integrated_planning_model.pdf.  **NB:** Only the cover page through page xii and all of Chapter 8 have been placed in paper format in this docket.  The full document is in the docket in electronic format (on a compact disk in the docket held at the EPA Regional Office and on-line at http://www.regulations.gov).
[21] "Thus, an equipment lifetime of 20 years is assumed for the SNCR system in this analysis."  Section 1.4.2 under "Indirect Annual Costs" of Chapter 1 to the CCM7.
[22] Refer to section 2.1 of Chapter 2 to the CCM7: "Results of a survey of electric utilities that operate SCR systems indicated that about 80 percent use ammonia (anhydrous and aqueous), and the remainder use urea."
[23] Refer to Table 1.2 on page 1-4 Chapter 1 to the CCM7:  No data is given for SNCR systems using urea installed on CFBs; higher NOx reduction potentials are given for coal fired (conventional) boilers.

JA089

EPA used 250' feet in the CCM7 SNCR Tool and 500' in the CCM7 SCR Tool. The range of elevations in Pennsylvania range from tidal regions on the Delaware River at "sea level" to Mount David at 3,213 feet.[24,25]

## 6. Annual Interest Rate

EPA assumed that the estimated control costs are annualized using a 7 percent discount rate which is the discount (interest) rate was used in accordance with OMB guidance in Circular A-94. See docket item EPA-HQ-OAR-2015-0500-0083 "Technical Support Document (TSD) for the Cross-State Air Pollution Rule for the 2008 Ozone NAAQS, Assessment of Non-EGU NOx Emission Controls, Cost of Controls, and Time for Compliance," U.S. Environmental Protection Agency, Office of Air and Radiation, November 2015 in Docket ID No. EPA-HQ-OAR-2015-0500.[26]

## 7. Operating Days per Year

In the CCM7 SCR Tool, on the Data Input Tab, there are the following two inputs in Cells C31 and C32, respectively:

Number of days the SCR operates ($t_{SCR}$)      Cell C31
Number of days the boiler operates ($t_{plant}$)      Cell C32

For RACT the SCR is assumed to be operated year-round and so the same value is inputted into Cells C31 and C32. The ratio of Cell C31 to Cell C32 is used to compute the "Total System Capacity Factor (CFtotal)" in Cell C10 of the SCR Design Parameters Tab. This ratio reflects the assumed percentage of the total operating time that the SCR operates and affects the cost effectiveness in several ways. First, the tons per year reduction is dependent upon this ratio. The lower this ratio is the fewer tons of NOx reduction are projected. Because the annualized capital costs are fixed (once the total installed cost is set and a life in years and discount rate are selected), as the tons/year reduction decreases the cost effectiveness value increases. However, the lesser percentage of the year the SCR is operated the lower the annual reagent cost (a variable operating cost) per year are; less annual operation requires less reagent lowering the reagent costs and lowering the cost effectiveness. Because for RACT the control must be operated year-round the ratio must be 1.0. A value of 350 days per year was used for both.

For SNCR, a value of 365 days was used as the input for "Number of days the SNCR operates ($t_{SNCR}$)" in Cell C31 of the Data Inputs Tab of the CCM7 SNCR Tool. This value is used to compute the "Total System Capacity Factor (CFtotal)" in Cell C10 of the SNCR Design Parameters tab. Unlike the CCM7 SCR Tool computation of "Total System Capacity Factor (CFtotal)" $t_{SNCR}$ is divided by 365 in Cell C10 of the SNCR Design Parameters tab for the computation of "Total System Capacity Factor (CFtotal)." Like the CCM7 SCR Tool, the "Total System Capacity Factor (CFtotal)" greatly affects the projection annual tons/year NOx reduction. Using any value in Cell C31 less than 365 will result in lower projected NOx reductions (because

---

[24] Refer to https://tidesandcurrents.noaa.gov/benchmarks.html?id=8540433 (last accessed August 23, 2017).

[25] Refer to https://egsc.usgs.gov/isb/pubs/booklets/elvadist/elvadist.html (last accessed August 23, 2017).

[26] The full document is in the docket in electronic format (on a compact disk in the docket held at the EPA Regional Office and on-line at http://www.regulations.gov).

JA090

…

the tool will assume the SNCR is not operated every hour the boiler operates) and higher cost effectiveness values.  To reflect year-round operation, a value of 365 was used in Cell C31.

*8. SCR Catalyst Replacement Cost:*
There are two methods to calculate the catalyst replacement cost identified as Method 1 and Method 2.  Method 1 was used for industrial boilers. Method 2 was used for utility boilers.

**J. Relationships between AMPD and the CCM 7 Tool Inputs:[27]**

| Table I.J.—1 Crosswalk between AMPD and the CCM 7 Tool Inputs | | | |
|---|---|---|---|
| AMPD | | CCM7 Tool | |
| *Data Element[28]/Column Heading* | Description | CMM7 Variable name/abbreviation | Spreadsheet tab & Cell ID. |
| *Year* | Year in which data was collected | Not applicable | |
| *Month* | Month in which data was collected | Not applicable | |
| *Facility Name* | Name of the facility, as reported by representative on Certification of Representation forms or equivalent | Not applicable | |
| *ORISPL Code* | EIA-assigned identifier or FACILITY ID assigned by CAMD (if EIA number is not applicable) | Not applicable | |
| *Unit ID* | Public identifier used for unit for program identification purposes | Not applicable | |
| *Associated Stacks* | Stacks associated with the unit | Not applicable | |
| *Primary Fuel Info* | Primary fuel type information for the year | Would be relevant for selecting fuel type. [Only coal fired units subject to this analysis considered only] | See Spreadsheet Tab Data Inputs, Cell F4: What type of fuel does the unit burn? |

---

[27] At this outline level (I.I.) no "I." is used to avoid confusion with a Roman numeral 1.
[28] Throughout this document *italic and underlined* terms will identify data elements from EPA's CAMD AMPD.

JA091

| | | | |
|---|---|---|---|
| *Secondary Fuel Info* | Secondary fuel type information for the year | Not applicable | |
| *Gross Load* | Output measured in Megawatt-hrs | <u>*Gross Load*</u> = <u>Boutput</u> | Spreadsheet tab Data Inputs, Cell C10 What is the estimated actual annual MW output? (<u>Boutput</u>) |
| | But where AMPD does not have <u>*Gross Load*</u> the following estimate can be used:<br><u>Boutput</u>  = <u>*Heat Input*</u>  / <u>*Heat Rate*</u> | | |
| *Capacity Input* | The maximum hourly heat input (mmBtu/hr) associated with a unit | <u>QB</u> = <u>Bmw</u> x <u>NPHR</u> | Spreadsheet tab SCR Design Parameters, cell 6<br>& Spreadsheet tab SCR Design Parameters, cell 6: Maximum Annual Heat Input Rate (<u>QB</u>) |
| *Heat Rate* (mmBtu/MWh) | The calculation of the heat input divided by the gross load. | <u>NPHR</u> | |
| | Because <u>*Heat Rate*</u> corresponds to <u>NPHR</u> and <u>QB</u> = <u>*Capacity Input*</u>, it follows that <u>Bmw</u> can be estimated by<br><u>Bmw</u> = <u>*Capacity Input*</u> / <u>*Heat Rate*</u> | | Spreadsheet tab Data inputs, Cell C10: What is the MW rating at full load capacity (<u>Bmw</u>)? |
| *NOx Mass (tons)* | Mass of NOx (tons) emitted by a unit | Not used in CCM Tools. | |
| *NOx Mass (lbs)* | Mass of NOx (lbs) emitted by a unit | Ditto | |
| | | | |
| *Total Operation Time* | Sum of hours of operation for this time interval | Not input directly into the CCM7 Tools but estimated internally from the <u>Boutput</u> (*Gross Load*) and unit Megawatt rating [or for industrial boilers, from the "What is the maximum heat input rate (<u>QB</u>)," "What is the estimated actual annual fuel consumption?" and "What is the higher heating value (HHV) of the fuel?"] | In the CCM7 Tools, the total operation time of the SCR [or SNCR] Cell C11 on the SCR Design Parameters Spreadsheet tab [C11 on the SNCR Design Parameters Sheet] is determined by multiplying a computed capacity factor by 8,60 hours per year.  This result is multiplied by the NOx reduction per |

| | | | hour to get total NOx reduced. ** |
|---|---|---|---|
| ** Refer to Cells C7 & C8 on the SCR[SNCR] Design Parameters Spreadsheet tab for derivation of the "Total System Capacity Factor ($CF_{total}$) in Cell C10; refer to Cells C11 to C14 for computation of the annual NOx reductions. | | | |
| *Heat Input* | Amount of heat (mmBtu) produced by burning fuel for the unit | Not input directly into the CCM7 Tools.  EPA did use this to estimate Boutput where no *Gross Load* data was available and for industrial boilers to estimate the annual pounds of fuel consumed from the "What is the higher heating value (HHV) of the fuel?" Cell C12 on the Data Inputs Sheet. | |
| *Capacity Input* | The maximum hourly heat input (mmBtu/hr) associated with a unit | QB = *Capacity Input* | Spreadsheet tab Data Inputs Cell C10 Maximum Annual Heat Input Rate (QB) for industrial boilers; For utility boilers, Spreadsheet tab SCR [SNCR] Design Parameters, Cell 6 & |
| Not given | | Mfuel = QB x 1.0^6 x 8760)/HHV | SCR [SNCR] Cell C7 Maximum Annual fuel consumption (Mfuel) |
| Not given | | Mactual / HHV = annual actual heat input = *Heat Input* | Spreadsheet tab Data Inputs, Cell C14. What is the estimated actual annual fuel consumption?  Actual Annual fuel consumption (Mactual) |
| *Source Category* | Source category of the unit | Used to select "Utility" or "Industrial" methodologies. | See Spreadsheet Tab Data Inputs, Cell A4 – "Is the combustion unit a utility or industrial boiler?" |

JA093

| _Boiler Type Info_ | Type of unit or boiler | Used only for the CCM7 SNCR Tool to differentiate CFBs from conventional boilers. | SNCR only: See Spreadsheet Tab Data Inputs, Cell C6 Is the boiler a fluid-bed boiler? |
|---|---|---|---|
| _Gross Load_ | Output measured in Megawatt-hrs | <u>Boutput</u> relevant for only Utility units. | What is the estimated actual annual MW output? (<u>Boutput</u>) |
| _Capacity Input_ | The maximum hourly heat input (mmBtu/hr) associated with a unit | Direct correlation to <u>QB</u> for industrial boilers. | Spreadsheet tab data Inputs, Cell C10. |
| _NOx Rate_ | Average NOx hourly emissions rate (lbs/mmBtu) for a unit | <u>NOx$_{in}$</u> | Inlet NOx Emissions (<u>NOx$_{in}$</u>) to SCR [to SNCR] |
| _Heat Rate_ (mmBtu/MWh) | The calculation of the heat input divided by the gross load. | <u>NPHR</u> relevant for only Utility units. | Enter the net plant heat input rate (<u>NPHR</u>) |

### K. Use of the CCM7 SCR and CCM7 SNCR tools – Estimated Inputs:

Not all of the basic CCM7 tool inputs cannot be pulled directly AMPD data.  But, the CCM7 tools often compute equivalents to AMPD, or, AMPD information can be used to estimate CCM7 Tool inputs.

### 1. Megawatt Ratings:

EPA estimated MW ratings (MW rating at full load capacity (<u>Bmw</u>)) using the _Heat Rate_ and the reported _Capacity Input_ as follows:

Estimated MW rating = _Capacity Input_ / _Heat Rate_

This was done for conventional EGU boilers and for CFB EGU units for which a gross load was available.

Where EPA did not have any _Heat Rate_ (CCM7 tool input _NPHR_ = net plant heat rate, in MMBtu/MWh) data for conventional boilers, EPA used a default of 9.5 for conventional EGU boilers.  Both tools suggest using 10 mmBTU/MW as a default but EPA notes that this factor has a minor effect on cost effectiveness and that most conventional PA units have a reported _Heat Rate_ less than 10.  And 2011 AMPD data indicates most conventional boilers in Pennsylvania did better than 10.0 mmBTU/MWh.

_Gross Load_ - <u>Boutput</u>
If EPA did not have data for _Gross Load_ and hence <u>Boutput</u> EPA estimated this as:

15

Boutput = *Gross Load* = *Heat Input* / *Heat Rate*

This was not done for CFB Small Power Producers source category units for which no *Heat Rate* data was available; that is, EPA did not assume some value. Neither the CCM7 chapters on SNCR and SCR provided any guidance on what assumed value is reasonable for CFBs. Instead, lacking a value EPA evaluated these units by selecting the industrial boiler option. The affected units are Units 1 and 2 at Panther Creek (ORISPL Code = 50776) and Unit 1 at St. Nicholas Cogeneration Project (ORISPL Code = 54634).

For three (Mt. Carmel Cogeneration, Ebensburg Power Company, and Northampton Generating Plant) COGEN units for which EPA had both the *Gross Load* and *Heat Rate* EPA ran the CCM7 SNCR tool for both the "industrial" and "utility" options.

## 2. What is the higher heating value (HHV) of the fuel?

For HHV EPA assumed a default of 11,814 BTU/lb for bituminous coals.

## 3. What is the estimated actual annual fuel consumption?

This is needed for industrial boilers. See Spreadsheet Tab Data Inputs on either CCM7 Tool, Cell C14. EPA estimated this using the AMPD *Heat Input*:

What is the estimated actual annual fuel consumption = *Heat Input* (in mmBTU/yr) * 10^6 BTU/mmBTU / (11814 BTU/lb).

The *Heat Input* is in mmBTU (million BTU) and so must be adjusted by a factor of 1,000,000 BTU/mmBTU (that is 10^6 BTU/mmBTU).

## 4. NOx Removal Efficiency (EF):

### a. Conventional Units:

For units other than the CFBs, EPA concluded that all the units in the AMPD were equipped with at least some form of combustion modification (under *NOx Control Info* in the AMPD) which in most cases was identified as "Low NOx Burner Technology" most with some form of overfire air. (For two conventional units, "Combustion Modification/Fuel Reburning" was specified.) Therefore, the next level of NOx control would be some form of "post-combustion" control such as SCR or SNCR.

EPA was assessing whether or not the following emission limits applicable to coal fired boilers over 250 mmBTU/hr were presumptively RACT:
0.16 lbs NOx/mmBTU for circulating fluidized bed combustion units (CFBs);
0.35 lbs NOx/mmBTU for tangentially fired combustion units; and

0.40 lbs NOx/mmBTU for "any other type of coal-fired combustion unit" (that is not tangentially fired or a CFB).  (Refer to section 129.97(g)(1)(vi) of PA's RACT rule.)

In the case of SCR control, PA set a limit of 0.12 lbs NOx/mmBTU for a coal-fired combustion unit already fitted with a selective catalytic reduction (SCR) system.  As an initial matter, EPA decided to evaluate if SCR (or SNCR) should be required on additional units not equipped with SNCR or SCR.  EPA is proposing to approve Pennsylvania's Department of Environmental Protection's (PADEP's) limit of 0.12 lbs NOx/mmBTU for a coal-fired combustion unit already fitted with a SCR system.  For the SCR case, EPA concludes that the PA rule needed to be evaluated to determine if PA's own SCR limit should have been required on any of those coal-fired units over 250 mmBTU/hr heat input capacity currently equipped only with combustion modifications.

For SNCR, EPA evaluated whether or not a 25% reduction from the reported *NOx Rate* would have been cost effective.  The CCM7 SNCR Tool has a utility which allows a user to input "UNK" for NOx Removal Efficiency (EF) in Cell C33 on the Data Inputs Spreadsheet tab and the tool will compute a reasonable value for EF in Cell C12 of the SNCR Design parameters sheet.[29]  The formula used by the CCM7 SNCR tool to compute EF is:

EF = 22.554* NOxin +16.725, where NOxin is the *NOx Rate* entered in Cell C33 of the Data Inputs Sheet.

EPA did this for all NOx emissions rates of *conventional* units equipped with no SNCR or SCR controls.  The range of percentages ran from 22% to 27%.  If the RACT II presumptive limits from section 129.97(g) of 0.40 lbs NOx/mmBTU for other than tangentially fired and of 0.35 lbs NOx/mmBTU for tangentially fired are input one gets 24.6 and 25.7% respectively.  These results are found on Tab *SNCR UNK Reductions* of Attachment AA to this document.  Because this is a "study-level" evaluation, 25 percent was used for all boilers.

*b. CFBs*:

As discussed in another section of this document, EPA concluded SCR is not likely feasible for CFBs on the basis EPA did not find any coal- or coal-refuse fueled units reporting the use of SCR to AMPD.  As for CFBs using other than SNCR or "ammonia injection" EPA decided to evaluate the cost-effectiveness addition of SNCR to such CFBs.  As an initial matter, EPA assumed a 25% reduction for the NOx Removal Efficiency (EF).  EPA is aware that the CCM7 SCNR Tool allows entry of "UNK" for "NOx Removal Efficiency (EF)" in Cell C33 on the Data Inputs Spreadsheet tab and the tool will compute a reasonable value for EF in Cell C12 of the SNCR Design parameters sheet.

The formula used by the CCM7 SNCR tool to compute EF is:

EF = 22.554* NOxin +16.725, where NOxin is the *NOx Rate* entered in Cell C33 of the Data Inputs Sheet.

---

[29] Examination of in Cell C12 for an input of "UNK" in Cell C33 yields the formula "22.554 x NOxinlet + 16.725."

So the threshold value for <u>NOxin</u> that yields <u>EF</u> = 25% is given by:

<u>NOxin</u> = (25 – 16.725)/22.554 = 0.367 lbs NOx/mmBTU.

EPA notes that all of the PA CFBs have a *<u>NOx Rate</u>*, that is, a <u>NOxin</u> of less than 0.200. EPA compared the cost effectiveness results for 4 CFB units where <u>EF</u> was set at 25% versus an <u>EF</u> computed by the tool with the input in Cell C33 of "UNK." In all 4 cases, the cost effectiveness with <u>EF</u> set at 25% was lower. EPA concludes that using a 25% value for <u>EF</u> will minimize the resulting cost effectiveness in all cases. EPA evaluated four CFB units (those with the highest two or lowest two emission rates) comparing the cost effectiveness assuming a 25% SNCR reduction versus the CCM7 SNCR Tool provided value when "UNK" is entered in Cell C33 of the Data Inputs sheet.

EPA concludes that if the resulting cost effectiveness for an <u>EF</u> of 25% is higher than RACT then the cost effectiveness for a more feasible <u>EF</u> will also be greater than RACT. These results are presented on the *CFB 25pct Tab* of Attachment AA.

<u>*c. Final Inputs for NOx Removal Efficiency (EF):*</u>

Therefore, EPA used the following inputs:

EPA used 25% for the CCM7 SNCR Tool for all units.

For the CCM7 SCR Tool, EPA used the percent reduction required to reduce the *<u>NOx Rate</u>* to 0.12 lbs NOx/mmBTU. EPA entered the NOx Removal Efficiency (<u>EF</u>) as computed using:

<u>EF</u> = [(*<u>NOx Rate</u>* – 0.12) / *<u>NOx Rate</u>*] * 100

**L. Use of the CCM7 SCR and CCM7 SNCR tools – Special Inputs or Procedures**

*Sunbury (ORISPL CODE 3152) Unit 2B:*
This unit had exceptionally low 2011 utilization and no evaluation was performed. Based upon the capacity heat input rating and boiler type, the cost effectiveness results for the other Sunbury Units should be representative for this unit.

*Net Plant Heat rate:*
In some cases, a net plant heat rate was assumed or computed lacking reported data.

*CFBs:*
For CFBs at the Panther Creek (ORISPL Code = 50776) and at St. Nicholas Cogeneration Project (ORISPL Code = 54634) facilities, no gross load was available just the annual heat input. The cost effectiveness values for this facility were evaluated using the "Industrial" boilers methodology.

18

JA097

Several cogeneration units were evaluated using both the "Industrial" and "Utility" boiler methods. These were the three CFB units at Mt. Carmel Cogeneration, Ebensburg Power Company, and Northampton Generating Plantfor which EPA had both the _Gross Load_ and _Heat Rate_ EPA ran the CCM7 SNCR tool for both the "industrial" and "utility" options.

## II. Part II. Inputs and Outputs:

Attachment AA contains the inputs and outputs.  The column headings and information summary is also found on the Tab labeled "Column Headers" in Attachment AA.

**A. Color Coding of and cells:**

1. Column headers colored light gray indicate original APMD output.

   Plain black text and bold black text are as received from AMPD.

   **<span style="color:red">Red text</span>** in the column header cell indicates CCM7 SCR/SNCR Tool inputs.

   **<span style="color:red">Red text</span>** in a cell indicate an assumed or estimated CCM7 SCR/SNCR Tool inputs.

2. Column headers and/or cells colored light green are columns added by EPA with informational data added.

3. Column headers and/or cells colored light blue are cells added by EPA with a formula to compute some value.

   **<span style="color:red">Red text</span>** in the column header indicate CCM7 SCR/SNCR Tool inputs.

4. Column headers and/or cells colored light blue are also cells/columns added by EPA with corresponding CCM7 Tool output.  The text in these output cells are **<span style="color:blue">blue, bold</span>**.

**B. Tabs:**

*Annual Tab*

The Tab "Annual" contains the original AMPD information as received.

*Sorted 2011 Tab*

The "Sorted 2011" Tab is the 2011 inventory parsed by source category, unit type and controls. The "Sort =Key" column contains coding added by EPA to the APMD to allow sorting.

*SCR Tab*

The "SCR" Tab contains the CCM7 SNCR Tool inputs and the results of the SCR analysis for conventional, utility boilers.  The column "Evaluated as" identifies if a unit was evaluated as an "EGU/utility" or as an "Industrial boiler." The output columns of

JA098

| Total Annual Cost (TAC) = | NOx Removed = | Cost Effectiveness = |
|---|---|---|

contain the results from Cells C102 to C104 of the Cost Estimate tab of the CCM7 SCR Tool (Cells C84 to C86 in the CCM7 SNCR Tool).

*EGU SNCR Tab*

This contains the CCM7 SNCR Tool inputs and outputs in the utility boiler source category (other than CFBs).

*IDL CONV SCR Tab*

This contains the CCM7 SCR Tool inputs and outputs in the industrial boiler source category.

*IDL CONV SNCR Tab*

This contains the CCM7 SNCR Tool inputs and outputs in the industrial boiler source category other than CFBs.

*CFB SNCR Tab*

This contains the CCM7 SNCR Tool inputs and outputs for all CFBs in the industrial and utility source categories.

*CFB 25pct Tab*

This contains just the outputs for the four CFBs varying the ER between 25% and the CCM7 SNCR Tool computed value for the four CFB units having either the highest two or lowest two NOx emission rates.  The inputs except for ER are the same as on the CFB SNCR Tab.

## III. Part III RESULTS OF INITIAL COST ANALYSIS

### A. Cost Effectiveness Results -- Conventional Boilers - SCR Control

| Table II.A Cost effectiveness for Conventional Boilers - SCR Control | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Facility Name | ORISPL Code | Unit ID | Source Category | Boiler Type Info | Capacity Input * | Sort Key | Cost Effectiveness | Evaluated as |
| Sunbury | 3152 | 1A | Electric Utility | Arch-fired boiler | 713 | EGU-CONV | **$22,962** | Utility |
| Sunbury | 3152 | 1B | Electric Utility | Arch-fired boiler | 713 | EGU-CONV | **$25,238** | Utility |
| Sunbury | 3152 | 2A | Electric Utility | Arch-fired boiler | 713 | EGU-CONV | **$18,394** | Utility |
| Sunbury | 3152 | 2B | Electric Utility | Arch-fired boiler | 713 | EGU-CONV | **Not evaluated** | |

| Titus | 3115 | 1 | Electric Utility | Tangentially-fired | 900 | EGU-CONV | $20,653 | Utility |
|---|---|---|---|---|---|---|---|---|
| Titus | 3115 | 2 | Electric Utility | Tangentially-fired | 900 | EGU-CONV | $23,385 | Utility |
| Titus | 3115 | 3 | Electric Utility | Tangentially-fired | 900 | EGU-CONV | $20,078 | Utility |
| Sunbury | 3152 | 3 | Electric Utility | Dry bottom wall-fired boiler | 1419 | EGU-CONV | $20,405 | Utility |
| Sunbury | 3152 | 4 | Electric Utility | Dry bottom wall-fired boiler | 1524 | EGU-CONV | $17,253 | Utility |
| Portland | 3113 | 1 | Electric Utility | Tangentially-fired | 1600 | EGU-CONV | $21,946 | Utility |
| Armstrong Power Station | 3178 | 1 | Electric Utility | Dry bottom wall-fired boiler | 2342 | EGU-CONV | $9,054 | Utility |
| Armstrong Power Station | 3178 | 2 | Electric Utility | Dry bottom wall-fired boiler | 2342 | EGU-CONV | $8,208 | Utility |
| Portland | 3113 | 2 | Electric Utility | Tangentially-fired | 2500 | EGU-CONV | $8,443 | Utility |
| Brunner Island, LLC | 3140 | 1 | Electric Utility | Tangentially-fired | 2914 | EGU-CONV | $5,139 | Utility |
| Mitchell Power Station | 3181 | 33 | Electric Utility | Tangentially-fired | 3335 | EGU-CONV | $13,662 | Utility |
| Brunner Island, LLC | 3140 | 2 | Electric Utility | Tangentially-fired | 3507 | EGU-CONV | $4,850 | Utility |
| Hatfield's Ferry Power Station | 3179 | 2 | Electric Utility | Cell burner boiler | 5826.5 | EGU-CONV | $4,036 | Utility |
| Hatfield's Ferry Power Station | 3179 | 1 | Electric Utility | Cell burner boiler | 5911 | EGU-CONV | $3,651 | Utility |
| Brunner Island, LLC | 3140 | 3 | Electric Utility | Tangentially-fired | 7430 | EGU-CONV | $4,669 | Utility |
| Conemaugh | 3118 | 2 | Electric Utility | Tangentially-fired | 8985 | EGU-CONV | $5,510 | Utility |
| Conemaugh | 3118 | 1 | Electric Utility | Tangentially-fired | 9100 | EGU-CONV | $5,667 | Utility |
| G F Weaton | 50130 | 34 | Industrial Boiler | Tangentially-fired | 600 | Indl/P&P-Conv | $11,763 | Industrial |
| G F Weaton | 50130 | 35 | Industrial Boiler | Tangentially-fired | 600 | Indl/P&P-Conv | $13,041 | Industrial |
| P H Glatfelter Company | 50397 | 034 | Pulp & Paper Mill | Dry bottom wall-fired boiler | 490 | Indl/P&P-Conv | $5,215 | Industrial |
| P H Glatfelter Company | 50397 | 035 | Pulp & Paper Mill | Dry bottom wall-fired boiler | 390 | Indl/P&P-Conv | $5,682 | Industrial |

21

| Domtar Paper Company, LLC | 54638 | 040 | Pulp & Paper Mill | Dry bottom wall-fired boiler | 306 | Indl/P&P-Conv | $17,975 | Industrial |
| Domtar Paper Company, LLC | 54638 | 041 | Pulp & Paper Mill | Dry bottom wall-fired boiler | 306 | Indl/P&P-Conv | $18,818 | Industrial |
| * in (mmBtu/hr) | | | | | | | | |

## B. Cost Effectiveness Results -- Conventional Boilers - SNCR Control

| Table II.B Cost effectiveness for Conventional Boilers - SNCR Control | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Facility Name | ORISPL Code | Unit ID | Source Category | Boiler Type Info | Capacity Input * | Sort Key | Cost Effectiveness | Evaluated as |
| Sunbury | 3152 | 1A | Electric Utility | Arch-fired boiler | 713 | EGU-CONV | $15,316 | Utility |
| Sunbury | 3152 | 1B | Electric Utility | Arch-fired boiler | 713 | EGU-CONV | $16,783 | Utility |
| Sunbury | 3152 | 2A | Electric Utility | Arch-fired boiler | 713 | EGU-CONV | $13,209 | Utility |
| Sunbury | 3152 | 2B | Electric Utility | Arch-fired boiler | 713 | EGU-CONV | Not evaluated | |
| Titus | 3115 | 1 | Electric Utility | Tangentially-fired | 900 | EGU-CONV | $15,506 | Utility |
| Titus | 3115 | 2 | Electric Utility | Tangentially-fired | 900 | EGU-CONV | $17,594 | Utility |
| Titus | 3115 | 3 | Electric Utility | Tangentially-fired | 900 | EGU-CONV | $15,038 | Utility |
| Sunbury | 3152 | 3 | Electric Utility | Dry bottom wall-fired boiler | 1419 | EGU-CONV | $11,986 | Utility |
| Sunbury | 3152 | 4 | Electric Utility | Dry bottom wall-fired boiler | 1524 | EGU-CONV | $9,712 | Utility |
| Portland | 3113 | 1 | Electric Utility | Tangentially-fired | 1600 | EGU-CONV | $11,570 | Utility |
| Armstrong Power Station | 3178 | 1 | Electric Utility | Dry bottom wall-fired boiler | 2342 | EGU-CONV | $5,414 | Utility |
| Armstrong Power Station | 3178 | 2 | Electric Utility | Dry bottom wall-fired boiler | 2342 | EGU-CONV | $5,008 | Utility |
| Portland | 3113 | 2 | Electric Utility | Tangentially-fired | 2500 | EGU-CONV | $5,255 | Utility |
| Brunner Island, LLC | 3140 | 1 | Electric Utility | Tangentially-fired | 2914 | EGU-CONV | $3,123 | Utility |

JA101

| Mitchell Power Station | 3181 | 33 | Electric Utility | Tangentially-fired | 3335 | EGU-CONV | **$7,122** | Utility |
|---|---|---|---|---|---|---|---|---|
| Brunner Island, LLC | 3140 | 2 | Electric Utility | Tangentially-fired | 3507 | EGU-CONV | **$2,853** | Utility |
| Hatfield's Ferry Power Station | 3179 | 2 | Electric Utility | Cell burner boiler | 5826.5 | EGU-CONV | **$2,388** | Utility |
| Hatfield's Ferry Power Station | 3179 | 1 | Electric Utility | Cell burner boiler | 5911 | EGU-CONV | **$2,217** | Utility |
| Brunner Island, LLC | 3140 | 3 | Electric Utility | Tangentially-fired | 7430 | EGU-CONV | **$2,478** | Utility |
| Conemaugh | 3118 | 2 | Electric Utility | Tangentially-fired | 8985 | EGU-CONV | **$2,630** | Utility |
| Conemaugh | 3118 | 1 | Electric Utility | Tangentially-fired | 9100 | EGU-CONV | **$2,762** | Utility |
| G F Weaton | 50130 | 34 | Industrial Boiler | Tangentially-fired | 600 | Indl/P&P-Conv | **$8,027** | Industrial |
| G F Weaton | 50130 | 35 | Industrial Boiler | Tangentially-fired | 600 | Indl/P&P-Conv | **$8,395** | Industrial |
| P H Glatfelter Company | 50397 | 34 | Pulp & Paper Mill | Dry bottom wall-fired boiler | 490 | Indl/P&P-Conv | **$4,589** | Industrial |
| P H Glatfelter Company | 50397 | 35 | Pulp & Paper Mill | Dry bottom wall-fired boiler | 390 | Indl/P&P-Conv | **$5,164** | Industrial |
| Domtar Paper Company, LLC | 54638 | 40 | Pulp & Paper Mill | Dry bottom wall-fired boiler | 306 | Indl/P&P-Conv | **$15,000** | Industrial |
| Domtar Paper Company, LLC | 54638 | 41 | Pulp & Paper Mill | Dry bottom wall-fired boiler | 306 | Indl/P&P-Conv | **$15,742** | Industrial |

## C. Cost Effectiveness Results – Non-conventional Boilers - SNCR Control

| Table II.C Cost effectiveness for Circulating Fluidized Bed Boilers - SNCR Control | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Facility Name** | **ORISPL Code** | **Unit ID** | **Source Category** | **Boiler Type Info** | **Capacity Input** | **Sort Key** | **Cost Effectiveness** | **Evaluated as** |
| Colver Power Project | 10143 | AAB01 | Electric Utility | Circulating fluidized bed boiler | 1320 | EGU-CFB-AI | **$6,076** | Utility |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Ebensburg Power Company[Note A] | 10603 | 031 | Cogeneration | Circulating fluidized bed boiler | 860 | COG-CFB | **$9,544** | Utility |
| Ebensburg Power Company[Note A] | 10603 | 031 | Cogeneration | Circulating fluidized bed boiler | 860 | COG-CFB | **$9,610** | Industrial |
| Gilberton Power Company | 10113 | 031 | Cogeneration | Circulating fluidized bed boiler | 520 | COG-CFB | **$19,067** | Industrial |
| Gilberton Power Company | 10113 | 032 | Cogeneration | Circulating fluidized bed boiler | 520 | COG-CFB | **$19,643** | Industrial |
| Kimberly-Clark Tissue Company | 50410 | 035 | Cogeneration | Circulating fluidized bed boiler | 799 | COG-CFB | **$12,648** | Industrial |
| Mt. Carmel Cogeneration[Note A] | 10343 | SG-101 | Cogeneration | Circulating fluidized bed boiler | 624 | COG-CFB | **$7,898** | Utility |
| Mt. Carmel Cogeneration[Note A] | 10343 | SG-101 | Cogeneration | Circulating fluidized bed boiler | 624 | COG-CFB | **$8,103** | Industrial |
| Northampton Generating Plant[Note A] | 50888 | NGC01 | Cogeneration | Circulating fluidized bed boiler | 1425 | COG-CFB-AI | **$9,187** | Utility |
| Northampton Generating Plant[Note A] | 50888 | NGC01 | Cogeneration | Circulating fluidized bed boiler | 1425 | COG-CFB-AI | **$9,032** | Industrial |
| Northeastern Power Company | 50039 | 031 | Electric Utility | Circulating fluidized bed boiler | 750 | EGU-CFB | **$19,732** | Utility |
| Panther Creek Energy Facility | 50776 | 1 | Small Power Producer | Circulating fluidized bed boiler | 600 | EGU-CFB-AI | **$8,468** | Industrial |
| Panther Creek Energy Facility | 50776 | 2 | Small Power Producer | Circulating fluidized bed boiler | 600 | EGU-CFB-AI | **$9,018** | Industrial |
| St. Nicholas Cogeneration Project | 54634 | 1 | Small Power Producer | Circulating fluidized bed boiler | 1300 | EGU-CFB | **$14,002** | Industrial |
| Wheelabrator - Frackville | 50879 | GEN1 | Cogeneration | Circulating fluidized bed boiler | 678 | COG-CFB | **$6,579** | Industrial |

JA103

| WPS Westwood Generation, LLC | 50611 | 031 | Electric Utility | Circulating fluidized bed boiler | 615 | EGU-CFB | **$13,557** | Industrial |
|---|---|---|---|---|---|---|---|---|
| * in (mmBtu/hr) | | | | | | | | |
| Note A: Unit evaluated as both an "Industrial" and "Utility" methods.  Refer to Section I. L. Use of the CCM7 SCR and CCM7 SNCR tools – Special Inputs or Procedures under the heading "*CFBs:*" above. | | | | | | | | |

## D. Special Note Regarding Conemaugh

EPA notes that the results for Units 1 and 2 at the Conemaugh facility (ORISPL CODE 3118) are moot because this facility now has SCR on both units.  The facility reported the use of SCR as a NOx control for both 2015 and 2016.

## IV. Evaluation of More Recent Operating Data

EPA compared facilities reporting emissions to EPA's AMPD for 2015 and 2016 to those reporting emissions for 2011 and found that quite a number of facilities had not reported emissions for both 2015 and 2016.  EPA extracted 2016 data from Tab "Annual" of Attachment AA.  On the Tab "Sorted 2016" of Attachment AA, EPA parsed the 2016 inventory data by source category, unit type and controls.  (The "Sort =Key" column contains coding added by EPA to the APMD to allow sorting.)  EPA compared the units reporting during 2016 to those reporting during 2011 (Tab "2011" of Attachment AA).

EPA found that many units operating in 2011 did not report any 2016 operating data to EPA's AMPD.  EPA likewise examined the 2015 AMPD (available on the Tab "Annual" of Attachment AA but did not prepare a special Tab.

EPA cross checked this information with the U. S. Energy Information Agency (EIA) Form 860 data for 2015 and 2016 (early release, un-validated data) and the PJM ISO information on deactivations.[30],[31]  From the files 3_1_Generator_Y2015.xlsx and 3_1_Generator_Y2016_Early_Release.xlsx EPA extracted only Pennsylvania data from the Tabs "Retired and Canceled."  (EPA notes that the AMPD and EIA data share a common facility identifier: The AMPD "*ORISPL Code*" is the same as the data in the column labeled "Utility ID" in the EIA data.)  Only those units identified under the "Technology" heading as "Conventional

---

[30] EIA Data accessed from https://www.eia.gov/electricity/data/eia860/ 2015 and 2016 Data, downloaded June 9, 2017 and August 24, 2017, respectively.  The full data set is in "ZIP" file format of Excel® file format and has been placed in the docket for this action.  Due to the size of the "ZIP" files (over 15 MB for each of the 2015 and 2016) and their relative availability on-line the full ZIP download has not been posted electronically on-line at http://www.regulations.gov.  For the same reason (over 7 MB each) the full files 3_1_Generator_Y2015.xlsx and 3_1_Generator_Y2016_Early_Release.xlsx have not been posted electronically at Regulations.gov.  Only the extracted Pennsylvania data is posted and on-line at http://www.regulations.gov.  However, these full documents are in the docket held at the EPA Regional Office in electronic format on a compact disk)

[31] PJM data from PJM generator-deactivations.pdf downloaded September 20, 2016.  Updates can be found on-line at http://www.pjm.com/planning/generation-deactivation/gd-summaries.aspx.

JA104

Steam Coal" have been extracted with one exception.[32]  EPA found Portland Unit 1 (*Facility Name* = Portland; *ORISPL Code* = 3113; *Unit ID* = 1) listed as "Petroleum Liquids."[33]

EPA notes that the EIA data contains data for units under 25 MW rating, and EPA has not listed closures of units under 25 MW below.

From these sources EPA concludes that the following units have ceased operation:

| Facility Name | ORISPL Code | Unit ID | Source Category | Boiler Type Info | Capacity Input (mmBtu/hr) | Sort Key | Retirement Data EIA 2015 Month/Yr | Retirement Data EIA 2016 Month/Yr | PJM Actual Deactivation Date | 2011 AMPD | 2015 AMPD | 2016 AMPD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AES Beaver Valley LLC | 10676 | 032 | Cogeneration | Dry bottom wall-fired boiler | 550 | COG-Conv-SNCR | | | | YES | YES | NO |
| AES Beaver Valley LLC | 10676 | 033 | Cogeneration | Dry bottom wall-fired boiler | 550 | COG-Conv-SNCR | | | | YES | NO | NO |
| AES Beaver Valley LLC | 10676 | 034 | Cogeneration | Dry bottom wall-fired boiler | 550 | COG-Conv-SNCR | | | | YES | YES | NO |
| AES Beaver Valley LLC | 10676 | 035 | Cogeneration | Dry bottom wall-fired boiler | 285 | COG-Conv-SNCR | | | | YES | NO | NO |
| Piney Creek Power Plant | 54144 | 031 | Small Power Producer | Circulating fluidized bed boiler | 450 | EGU-CFB-SNCR | No Data | No Data | April 12, 2013 | YES | NO | NO |
| Sunbury | 3152 | 1A | Electric Utility | Arch-fired boiler | 713 | EGU-CONV | July 2014 | July 2014 | July 18, 2014 | YES | NO | NO |
| Sunbury | 3152 | 1B | Electric Utility | Arch-fired boiler | 713 | EGU-CONV | July 2014 | July 2014 | July 18, 2014 | YES | NO | NO |
| Sunbury | 3152 | 2A | Electric Utility | Arch-fired boiler | 713 | EGU-CONV | July 2014 | July 2014 | July 18, 2014 | YES | NO | NO |
| Sunbury | 3152 | 2B | Electric Utility | Arch-fired boiler | 713 | EGU-CONV | July 2014 | July 2014 | July 18, 2014 | YES | NO | NO |
| Titus | 3115 | 1 | Electric Utility | Tangentially-fired | 900 | EGU-CONV | September 2013 | September 2013 | September 1, 2013 | YES | NO | NO |
| Titus | 3115 | 2 | Electric Utility | Tangentially-fired | 900 | EGU-CONV | September 2013 | September 2013 | September 1, 2013 | YES | NO | NO |
| Titus | 3115 | 3 | Electric Utility | Tangentially-fired | 900 | EGU-CONV | September 2013 | September 2013 | September 1, 2013 | YES | NO | NO |
| Sunbury | 3152 | 3 | Electric Utility | Dry bottom wall-fired boiler | 1419 | EGU-CONV | July 2014 | July 2014 | | YES | NO | NO |
| Sunbury | 3152 | 4 | Electric Utility | Dry bottom wall-fired boiler | 1524 | EGU-CONV | July 2014 | July 2014 | | YES | NO | NO |
| Portland | 3113 | 1 | Electric Utility | Tangentially-fired boiler | 1600 | EGU-CONV | June 2014 | | June 1, 2014 | YES | NO | NO |
| Armstrong Power Station | 3178 | 1 | Electric Utility | Dry bottom wall-fired boiler | 2342 | EGU-CONV | September 2012 | September 2012 | September 1, 2012 | YES | NO | NO |
| Armstrong Power Station | 3178 | 2 | Electric Utility | Dry bottom wall-fired boiler | 2342 | EGU-CONV | September 2012 | September 2012 | September 1, 2012 | YES | NO | NO |
| Portland | 3113 | 2 | Electric Utility | Tangentially-fired boiler | 2500 | EGU-CONV | June 2013 | June 2014 | June 1, 2014 | YES | NO | NO |
| Station | 3181 | 33 | Electric Utility | Tangentially-fired | 3335 | EGU-CONV | October 2013? | October 2013 | October 9, 2013 | YES | NO | NO |
| Hatfield's Ferry Power Station | 3179 | 1 | Electric Utility | Cell burner boiler | 5826.5 | EGU-CONV | October 2013 | October 2013 | October 9, 2013 | YES | NO | NO |
| Hatfield's Ferry Power Station | 3179 | 2 | Electric Utility | Cell burner boiler | 5911 | EGU-CONV | October 2013 | October 2013 | October 9, 2013 | YES | NO | NO |
| Elrama | 3098 | 1 | Electric Utility | Dry bottom vertically-fired boiler | 1200 | EGU-CONV-SNCR | March 2014 | March 2014 | June 1, 2012 | YES | NO | NO |
| Elrama | 3098 | 2 | Electric Utility | Dry bottom vertically-fired boiler | 1254 | EGU-CONV-SNCR | March 2014 | March 2014 | June 1, 2012 | YES | NO | NO |
| Elrama | 3098 | 3 | Electric Utility | Dry bottom vertically-fired boiler | 1300 | EGU-CONV-SNCR | March 2014 | March 2014 | June 1, 2012 | YES | NO | NO |
| Elrama | 3098 | 4 | Electric Utility | Dry bottom wall-fired boiler | 1965 | EGU-CONV-SNCR | March 2014 | March 2014 | October 1, 2012 | YES | NO | NO |
| Cromby | 3159 | 1 | Electric Utility | Dry bottom wall-fired boiler | 2114.2 | EGU-CONV-SNCR | May 2011 | May 2011 | May 31, 2011 | YES | NO | NO |
| Eddystone Generating Station | 3161 | 1 | Electric Utility | Tangentially-fired | 3883.1 | EGU-CONV-SNCR | May 2011 | May 2011 | May 31, 2011 | YES | NO | NO |
| Eddystone Generating Station | 3161 | 2 | Electric Utility | Tangentially-fired | 3870.7 | EGU-CONV-SNCR | May 2012 | May 2012 | May 31, 2012 | YES | NO | NO |
| Hatfield's Ferry Power Station | 3179 | 3 | Electric Utility | Cell burner boiler | 5674.8 | EGU-CONV-SNCR | October 2013 | October 2013 | October 9, 2013 | YES | NO | NO |
| G F Weaton | 50130 | 34 | Industrial Boiler | Tangentially-fired | 600 | Indl/P&P-Conv | No Data | No Data | No Data | YES | NO | NO |
| G F Weaton | 50130 | 35 | Industrial Boiler | Tangentially-fired | 600 | Indl/P&P-Conv | No Data | No Data | No Data | YES | NO | NO |

In addition, the two conventional, coal-fired boilers (Units 034 and 035) at the P. H. Glatfelter paper mill (ORISPL CODE 50397) are slated to be replaced by natural gas fired boilers and decommissioned by January 31, 2017.[34]

---

[32] EPA observes that CFB units are apparently classified as "Conventional Steam Coal" on Form 860.

[33] Nor was EPA able to find Piney Creek Power Plant (*Facility Name* = Portland; *ORISPL Code* = 54144; *Unit ID* = 031) in the EIA data, but did find a listing in the PJM data.

[34] NOx and VOC RACT Proposal for the Spring Grove Mill, page 1-2, submitted to PADEP on October 18, 2016.

# Chapter 2
# Selective Catalytic Reduction

John L. Sorrels
Air Economics Group
Health and Environmental Impacts Division
Office of Air Quality Planning and Standards
U.S. Environmental Protection Agency
Research Triangle Park, NC 27711

David D. Randall, Karen S. Schaffner, Carrie Richardson Fry
RTI International
Research Triangle Park, NC 27709

May 2016

[Note:    As of November 2017, this chapter reflects the change in recommended interest rate in order to conform to the updated (Seventh Edition) of the cost estimation chapter in the EPA Air Pollution Control Cost Manual.]

## CONTENTS

2. Selective Catalytic Reduction ............................................................................................. 2
  2.1  Introduction .................................................................................................................. 2
  2.2  Process Description .................................................................................................... 10
        2.2.1  Reduction Chemistry, Reagents, and Catalyst ................................................. 11
        2.2.2  SCR Performance Parameters ........................................................................... 16
        2.2.3  SCR System Configurations ............................................................................. 29
        2.2.4  SCR System Primary Equipment ..................................................................... 35
        2.2.5  SCR System Auxiliary Equipment .................................................................. 42
        2.2.6  Other Considerations ........................................................................................ 45
  2.3  Design Parameters ..................................................................................................... 50
        2.3.1  Boiler Heat Input .............................................................................................. 51
        2.3.2  Heat Rate Factor ............................................................................................... 52
        2.3.3  System Capacity Factor .................................................................................... 52
        2.3.4  Inlet $NO_x$ and Stack $NO_x$ .............................................................................. 54
        2.3.5  $NO_x$ Removal Efficiency ................................................................................ 54
        2.3.6  $NO_x$ Removal Rates ....................................................................................... 54
        2.3.7  Actual and Normalized Stoichiometric Ratios ................................................ 55
        2.3.8  Flue Gas Flow Rate .......................................................................................... 55
        2.3.9  Space Velocity and Area Velocity ................................................................... 56
        2.3.10  Theoretical $NO_x$ Removal Efficiency ........................................................... 57
        2.3.11  Catalyst Volume ............................................................................................. 58
        2.3.12  SCR Reactor Dimensions ............................................................................... 59
        2.3.13  Estimating Reagent Consumption and Tank Size ........................................... 61
  2.4  Cost Analysis ............................................................................................................. 62
        2.4.1  Total Capital Investment .................................................................................. 64
        2.4.2  Total Annual Costs ........................................................................................... 72
  2.5  Example Problem #1 – Utility Boiler ........................................................................ 79
        2.5.1  Design Parameter Example #1 .......................................................................... 81
        2.5.2  Cost Estimation Example .................................................................................. 84
  2.6  Example Problem #2 – Industrial Boiler ................................................................... 87
        2.6.1  Design Parameter Example #2 .......................................................................... 88
        2.6.2  Cost Estimation Example #2 ............................................................................. 92
  References ........................................................................................................................... 96

# 2. SELECTIVE CATALYTIC REDUCTION

## 2.1    Introduction

Selective catalytic reduction (SCR) has been applied to stationary source fossil fuel–fired combustion units for emission control since the early 1970s and is currently being used in Japan, Europe, the United States, and other countries. In the U.S. alone, more than 1,000 SCR systems have been installed on a wide variety of sources in many different industries, including utility and industrial boilers, process heaters, gas turbines, internal combustion engines, chemical plants, and steel mills [1]. Other sources include fluid catalytic cracking units (FCCUs), ethylene cracker furnaces, nitric acid plants, catalyst manufacturing processes, nitrogen fixation processes, and solid/liquid or gas waste incinerators [2, 3]. In the U.S., SCR has been installed on more than 300 coal-fired power plants ranging in size from <100 MWe to 1,400 MWe [1, 4]. Other combustion sources with large numbers of SCR retrofits include more than 50 gas-fired utility boilers ranging in size from 147 MWe to 750 MWe, more than 50 industrial boilers and process heaters (both field-erected and packaged units), and more than 650 combined cycle gas turbines [1]. SCR can be applied as a stand-alone $NO_x$ control or with other technologies, including selective non-catalytic reduction (SNCR)[1] and combustion controls such as low $NO_x$ burner (LNB) and flue gas recirculation (FGR) [2].

SCR is typically implemented on stationary source combustion units requiring a higher level of $NO_x$ reduction than achievable by selective noncatalytic reduction (SNCR) or combustion controls. Theoretically, SCR systems can be designed for $NO_x$ removal efficiencies up close to 100 percent (%). In practice, commercial coal-, oil-, and natural gas–fired SCR systems are often designed to meet control targets of over 90%. However, the reduction may be less than 90% when SCR follows other NOx controls such as LNB or FGR that achieve relatively low emissions on their own. The outlet concentration from SCR on a utility boiler rarely is less than 0.04 lb/MMBtu [1].[2] In comparison, SNCR units typically achieve approximately 25 to 75% reduction efficiencies [5].

Either ammonia or urea may be used as the $NO_x$ reduction reagent in SCR systems. Urea is generally converted to ammonia before injection. Results of a survey of electric utilities that operate SCR systems indicated that about 80 percent use ammonia (anhydrous and aqueous), and the remainder use urea [4]. A survey of coal-fired power plants that control $NO_x$ emissions using either SCR or SNCR found anhydrous ammonia use exceeds aqueous ammonia use by a ratio of 3 to 1. Nearly half of these survey respondents also indicated that price is their primary consideration in the choice of reagent; safety is the primary consideration for about 25 percent of the operators [6].

SCR capital costs vary by the type of unit controlled, the fuel type, the inlet NOx level, the outlet $NO_x$ design level, and reactor arrangement. Capital costs also rose between 2000 and 2010 (at least for utility boiler applications), even after scaling all data to 2011 dollars. For a

---

[1] A hybrid SNCR/SCR system was demonstrated at the AES Greenidge Power Plant in 2006. However, no hybrid SNCR/SCR systems are currently known to be operating as of February 2016.

[2] Data in the Clean Air Markets Division (CAMD) database also suggest SCR units rarely achieve emissions less than 0.04 lb/MMBtu.

small number of early SCR retrofits on utility boilers prior to 2000, the average costs were about $100/kW, in 2011 dollars, and there was little scatter in the data. From 2000 to 2007, the SCR costs for 32 utility boilers ranged from about $100/kW to $275/kW (2011$), and a slight economy of scale was evident (i.e., using a regression equation, costs ranged from about $200/kW for a 200 MW unit to $160/kW for an 800 MW unit). For 2008 to 2011, the average SCR costs exhibited great variability and again a modest economy of scale was evident (i.e., about $300/kW for a 200 MW unit to $250/kW for an 800 MW unit; 2011$). For eight utility boilers either installed in 2012 or projected to be installed by 2014, the SCR costs ranged from about $270/kW to $570/kW, in 2011$; generating capacity for these units ranged from 400 MW to 800 MW [7b]. Typical operation and maintenance costs are approximately 0.1 cents per kilowatt-hour (kWh) [7a, 8]. Table 2.1a provides capital cost estimates for electric utility boilers, and Table 2.1b presents capital cost estimates for SCR applications of various sizes in several other industry source categories.

The procedures for estimating costs presented in this report are based on cost data for SCR retrofits on existing coal-, oil-, and gas-fired boilers for electric generating units larger than 25 MWe (approximately 250 MMBtu/hr). Thus, this report's procedure estimates costs for typical retrofits of such boilers. The methodology for utility boilers also has been extended to large industrial boilers by modifying the capital cost equations and power consumption (electricity cost) equations to use the heat input capacity of the boiler instead of electric generating capacity.[3] The procedures to estimate capital costs are not directly applicable to sources other than utility and industrial boilers. Procedures to estimate annual costing elements other than power consumption are the same for SCR units in any application. The cost for SCR as part of a new plant often is likely to be less than the cost for retrofit plant. Appropriate factors to estimate the cost of a new plant SCR have been included. In addition, the cost procedures in this report reflect individual SCR applications. Retrofitting multiple boilers with SCR can allow for some economies of scale for installation, thus yielding some reduction in capital costs per SCR application. The cost methodology incorporates certain approximations; consequently, it should be used to develop study-level accuracy (±30%) cost estimates of SCR applications. Such accuracy in the cost methodology is consistent with the accuracy of the cost estimates for the other control measures found in this Cost Manual as stated in Section 1.

In the cement industry, pilot tests in the 1970s and 1990s showed SCR could be a feasible control technology for cement kilns. Building on that experience, SCRs were first installed in Europe in 2001. Today, SCR has been successfully implemented at seven European cement plants in Solnhofer, Germany (operated from 2001 until 2006), Bergamo, Italy (2006), Sarchi, Italy (2007), Mergelstetten, Germany (2010), Rohrdorf, Germany (2011), Mannersdorf, Austria (2012), and Rezatto, Italy (2015). [94, 98, 99]. As of 2015, there is only one cement plant in the U.S. has installed an SCR. This SCR began operation in 2013 and is installed after an electrostatic precipitator. The control efficiency for the system is reported to be about 80%, which is consistent with SCR applications on European kilns. SCRs have not seen widespread use in the U.S. cement industry mainly due to industry concerns regarding potential problems caused by high-dust levels and catalyst deactivation by high $SO_3$ concentrations from pyritic sulfur found in the raw materials used by U.S. cement plants. The $SO_3$ could react with calcium

---

[3] "Industrial" boilers as a term used in the Control Cost Manual is meant to cover not only industrial but also commercial and institutional (or ICI) boilers, unless noted otherwise.

JA109

oxide in the flue gas to form calcium sulfate and with ammonia to form ammonium bisulfate. The calcium sulfate could deactivate the catalyst, while the ammonium bisulfate could cause catalyst plugging. There have been concerns expressed about the potential for catalyst poisoning by sodium, potassium, and arsenic trioxide. Finally, other concerns expressed are that dioxins and furans may form in the SCR due to combustion gases remaining at temperatures between 450°F and 750°F. These and other concerns regarding the implementation of SCR to the cement industry are discussed in detail in "Alternative Control Techniques Document Update – NOx Emissions from New Cement Kilns" [94]. Due to the small number of SCRs installed at cement plants, information on capital and operating costs for SCRs at cement plants is limited. The installation and operating costs for the SCR installed at the U.S. plant in 2013 are not publicly available at this time. In general, we expect the capital and operating costs would be higher than for low-dust applications due to the need to install catalyst cleaning equipment for SCR systems installed in high-dust configurations and for heating the flue gas in low-dust, tail-end configurations.

JA110

**Table 2.1a: Summary of SCR Cost Data for Utility Boilers**

| Source Category | Unit Size | Fuel Type | Capital Cost | | | $ Year | Comments | Reference |
|---|---|---|---|---|---|---|---|---|
| | | | Min | Avg | Max | | | |
| Electric Generating Units | NA[a] | NA | $55/kW | | $140/kW | <2000$[b] | Retrofit costs. | [9] |
| | ~300-1,400 MW | NA | ~$70/kW | | ~$120/kW | <2000$[b] | Retrofit costs. Six boilers. No economy of scale. | [9] |
| | 150–1,000 MW | Coal | $80/kWnet | | $160/kWnet | 2002$ | Retrofit costs. Author of referenced document scaled original costs to 2002 dollars. More than 20 boilers. Little to no economy of scale. | [10] |
| | NA | Coal | $60/kW | $100kW | $200/kW | <2004$[b] | Retrofit costs | [11] |
| | <300 MW | Coal | | $167/kW | $186/kW | <2004$ | Costs for 26 boilers. | [12] |
| | 301–600 MW | Coal | | $148/kW | $192/kW | <2004$ | Costs for 15 boilers. | [12] |
| | 601–900 MW | Coal | | $124/kW | $221/kW | <2004$ | Costs for 22 boilers. | [12] |
| | >900 MW | Coal | | $118/kW | $195/kW | <2004$ | Costs for 9 boilers. | [12] |
| | 100–399 MW | Coal | $70/kW | $123/kW | ~$175/kW | <2004$[b] | Costs for 5 boilers. | [13] |
| | 400–599 MW | Coal | $73/kW | $103/kW | ~$160/kW | <2004$[b] | Costs for 8 boilers. | [13] |
| | 600–899 MW | Coal | $56/kW | $81/kW | ~$100/kW | <2004$[b] | Costs for 9 boilers. | [13] |
| | >900 MW | Coal | ~$80/kW | $117/kW | ~$190/kW | <2004$[b] | Costs for 10 boilers. | [13] |
| | 191 MW | Coal | | $149/kW | | 2006$ | Retrofit costs. | [14] |
| | ~100 MW-~800MW | NA | ~$125/kW | $275/kW | ~$440/kW | 2008$ | Retrofit costs for 15 boilers installed in 2008 to 2010. Most costs between $200/kW and $350/kW. Slight economy of scale—regression average about $340/kW for 100 MW to $250/kW for 800 MW. | [7a] |
| | ~400 MW to ~800 MW | NA | ~$270/kW | ~$420/kW | ~560/kW | 2011$ | Retrofit costs for 8 boilers either installed in 2012 or projected to be installed by 2014. | [7b] |

[a] Not Available.

[b] Year of reference.

JA111

**Table 2.1b: Summary of SCR Cost Data for Miscellaneous Industrial Sources**

| Source Category | Unit Size | Fuel Type | Capital Cost: average (range) | $ Year | Actual, Vendor Quote, or Estimated? | Comments | Reference |
|---|---|---|---|---|---|---|---|
| Industrial-Commercial Boilers | 350 MMBtu | Coal | NA ($10,000–$15,000/MMBtu/hr) | 1999$ | Estimated | Retrofit costs. Authors of referenced document estimated the low end of the range assuming a cost of about $100/kW for a 100 MW (1000 MMBtu/hr) utility boiler and assuming that economies of scale would be greater for utility boilers than for industrial boilers (so that the cost for a 350 MMBtu/hr industrial boiler would be comparable to or greater than the cost for a 1000 MMBtu/hr utility boiler on a $/MMBtu basis). | [15] |
| | 100–1,000 MMBtu/hr | Coal | NA ($7,300–$14,600/MMBtu/hr) | 1999$ | Estimated | Retrofit costs. Generally costs available for one boiler with each type of fuel. Authors of referenced document estimated costs for other sizes assuming ratio of small-to-large $/MMBtu costs are related to ratio of large to small heat inputs raised to the 0.3 power. | [16] |
| | 100–1,000 MMBtu/hr | Oil | NA ($5,550–$11,100/MMBtu/hr) | 1999$ | Estimated | | [16] |
| | 100–1,000 MMBtu/hr | Gas | NA ($4,010–$8,010/MMBtu/hr) | 1999$ | Estimated | | [16] |
| | 100 MMBtu/hr | Gas | NA ($7,500/MMBtu/hr) | 1999$[b] | Vendor | Cited source in reference [15] is an unpublished letter from a vendor. | [15] |
| | 350 MMBtu | Oil, Gas, or Wood | NA ($4,000–$6,000/MMBtu/hr) | 1999$ | Estimated | | [17] |
| | 57 MMBtu/hr | Wood | NA (>$560,000 and $9,500/MMBtu/hr) | 1999$[c] | Actual/Estimate | Costs for a new boiler. | [15] |
| | 321 MMBtu/hr | Wood | NA ($1,980/MMBtu/hr) | 2006$ | Likely Estimated | | [18] |

JA112

| Source Category | Unit Size | Fuel Type | Capital Cost: average (range) | $ Year | Actual, Vendor Quote, or Estimated? | Comments | Reference |
|---|---|---|---|---|---|---|---|
| Petroleum Refining – Steam Boilers | 650 MMBtu/hr | Gas or refinery fuel gas | NA ($3,100–$25,800/MMBtu) | 2004$ [c] | Estimated | Retrofit costs. Equipment costs based on range of costs found in literature search (references were not provided). Installation costs estimated using factors from the Control Cost Manual for thermal and catalytic incinerators. | [19] |
| Petroleum Refining – Process Heaters | 350 MMBtu/hr | Gas/refinery fuel gas | NA ($3,100–$25,800/MMBtu) | 2004$ [c] | Estimated | Same comment as above. | [19] |
| | 350 MMBtu/hr | Refinery oil | NA ($3,100–$25,800/MMBtu) | 2004$ [c] | Estimated | Same comment as above. | [19] |
| | 10 MMBtu/hr | Gas or refinery fuel gas/NG combo | $19,200/MMBtu ($12,000–$26,500/MMBtu) | 1999[b] | Vendor/ Estimated | Costs are based primarily on quotes from two vendors (and additional discussions). Authors of the referenced report added costs for fan, motor, and ductwork costs based on procedures in the Control Cost Manual. | [20] |
| | 50 MMBtu/hr | Gas or refinery fuel gas/NG combo | $5,140/MMBtu ($4,020–$6,280/MMBtu) | 1999[b] | Vendor/ Estimated | Same comment as above. | [20] |
| | 75 MMBtu/hr | Gas or refinery fuel gas/NG combo | $4,190/MMBtu ($3,440–$4,950/MMBtu) | 1999[b] | Vendor/ Estimated | Same comment as above. | [20] |
| | 150 MMBtu/hr | Gas or refinery fuel gas/NG combo | $2,730/MMBtu ($2,570–$2,880/MMBtu) | 1999[b] | Vendor/ Estimated | Same comment as above. | [20] |
| | 350 MMBtu/hr | Gas or refinery fuel gas/NG combo | $1,550/MMBtu ($1,520–$1,570/MMBtu) | 1999[b] | Vendor/ Estimated | Same comment as above. | [20] |

JA113

| Source Category | Unit Size | Fuel Type | Capital Cost: average (range) | $ Year | Actual, Vendor Quote, or Estimated? | Comments | Reference |
|---|---|---|---|---|---|---|---|
| | 68 MMBtu/hr (Two 32 MMBtu/hr) | Refinery fuel gas | NA ($22,100/MMBtu) | 1991 | Actual | Retrofit costs. | [15] |
| Petroleum Refining – FCCU | 70,000 barrels/stream day (bbl/stream day) | NA | NA ($9.0 million) | 2004$[c] | Vendor | Estimated cost by vendor (for 90% reduction). | [3] |
| | 27,000 bbl/stream day | NA | NA ($8-$12 million) | 2009 | Estimated | | [21] |
| | <20,000 - >100,000 bbl/stream day | NA | NA (order of magnitude range; low end higher than two entries above) | 2005 to 2010 | Actual | Costs reported by 6 petroleum refining companies for 7 FCCUs in responses to EPA ICR. One new, 6 retrofits. | [22] |
| | NA | NA | NA ($20 million) | 2006 | Actual | Approximate average cost for SCR retrofits at several refineries | [23] |
| Portland Cement (dry kilns) | 1.09 million short tpy clinker | NA | NA ($6.9 per short ton clinker) | 2006[a] | Estimated | Retrofit cost. Estimate based primarily on SCR procedures for boilers in fifth edition of the Control Cost Manual. Clinker capacity obtained from the second reference. | [24,25] |
| | 1.13 million short tpy clinker | NA | NA ($5.9 per short ton clinker) | 2006[a] | Estimated | Same comment as above. | [24,25] |
| | 2.16 million short tpy clinker | NA | NA ($3.9 per short ton clinker) | 2006[a] | Estimated | Same comment as above. | [24,25] |

JA114

| Source Category | Unit Size | Fuel Type | Capital Cost: average (range) | $ Year | Actual, Vendor Quote, or Estimated? | Comments | Reference |
|---|---|---|---|---|---|---|---|
| | 1.4 million short tpy clinker | NA | NA ($5.9 per short ton clinker) | 2004 | Not clear | Retrofit cost for European kiln. Cost in euros converted to dollars assuming a ratio of $1.3/euro. | [26] |
| | 1.055 million tpy clinker | NA | NA ($4.4 per short ton clinker) | 2004 | Estimated | Cost for new kiln. | [27] |
| | 1.095 million short tpy clinker | NA | NA ($4.4 per short ton clinker) | 2011 | Estimated | Cost for new kiln. Cost based on quote for the SCR equipment, and standard installation factors from the Control Cost Manual for other types of control devices. | [28] |
| Portland Cement (wet kilns) | 0.3 million short tpy clinker | NA | NA ($17.5 per short ton clinker) | 2006[a] | Estimated | Retrofit costs for 4 kilns. Rated clinker production capacity obtained from the second reference. | [24,29] |
| | 0.320 million short tpy clinker | | NA ($15.6-$16.6 per short ton clinker) | 2006[a] | Estimated | Retrofit costs for 3 kilns. Rated clinker production capacity obtained from second reference. | [24,25] |
| Gas Turbine, Simple Cycle | NA | Gas | NA ($50-$70/kW) | 1999$[a] | Vendor | Retrofit costs. | [15] |
| | 80 MW | Gas | NA ($51/kW) | 1999$[a] | Vendor | Retrofit cost, excluding balance of plant costs. | [15] |
| | 2 MW | Gas | NA ($237/kW) | 1999$[a] | Vendor | Retrofit cost. | [15] |
| | 12 MW | Gas | NA ($167/kW) | 1999$[b] | Vendor | Retrofit cost. | [15] |
| Internal Combustion Engine | 1,800 hp | Diesel (No. 2 fuel oil) | NA ($0.18 million) | 1994 | Actual | New cost. | [15] |

[a] Year of reference.
[b] Year analysis was conducted (assumed vendor contacts were made that year).
[c] Commission year of the SCR.

JA115

## 2.2    Process Description

Like SNCR, the SCR process is based on the chemical reduction of the $NO_x$ molecule. The primary difference between SNCR and SCR is that SCR employs a metal-based catalyst with activated sites to increase the rate of the reduction reaction. The primary components of the SCR include the ammonia storage and delivery system, ammonia injection grid, and the catalyst reactor [2]. A nitrogen-based reducing agent (reagent), such as ammonia or urea-derived ammonia, is injected into the post-combustion flue gas. The reagent reacts selectively with the flue gas $NO_x$ within a specific temperature range and in the presence of the catalyst and oxygen to reduce the $NO_x$ into molecular nitrogen ($N_2$) and water vapor ($H_2O$).

The use of a catalyst results in two primary advantages of the SCR process over SNCR. The main advantage is the higher $NO_x$ reduction efficiency. In addition, SCR reactions occur within a lower and broader temperature range. However, the decrease in reaction temperature and increase in efficiency is accompanied by a significant increase in capital and operating costs. The capital cost increase is mainly due to the large volumes of catalyst required for the reduction reaction. Operating costs for SCR consist mostly of replacement catalyst and ammonia reagent costs, and while historically, the catalyst replacement cost has been the largest cost, the reagent cost has become the most substantial portion of operating costs for most SCR [7b].[4]

Figure 2.1 shows a simplified process flow schematic for SCR. Reagent is injected into the flue gas downstream of the combustion unit and economizer through an injection grid mounted in the ductwork. The reagent is generally diluted with compressed air or steam to aid in injection. The reagent mixes with the flue gas, and both components enter a reactor chamber containing the catalyst. As the hot flue gas and reagent diffuse through the catalyst and contact activated catalyst sites, $NO_x$ in the flue gas chemically reduces to nitrogen and water. The heat of the flue gas provides energy for the reaction. The nitrogen, water vapor, and any other flue gas constituents then flow out of the SCR reactor. More detail on the SCR process and equipment is provided in the following sections.

There are several different locations downstream of the combustion unit where SCR systems can be installed. Flue gas temperature and constituents vary with the location of the SCR reactor chamber. SCR reactors located upstream of the particulate control device and the air heater ("high-dust" configuration) have higher temperatures and higher levels of particulate matter. An SCR reactor located downstream of the air heater, particulate control devices, and flue gas desulfurization (FGD) system ("low-dust" or "tail-end" configuration) is essentially dust- and sulfur-free but its temperature is generally below the acceptable range. In this case, reheating of the flue gas may be required, which significantly increases the SCR operational costs. Section 2.2.3 discusses the various SCR system configurations.

---

[4]   Several cost analyses in recent years have shown the largest operating cost is for reagent usage rather than for catalyst costs. For example, for the Navajo Generating Station in Arizona, a 2010 BART analysis report on an 812 MW gross coal-fired unit estimates annual operating costs for ammonia reagent of $1,035,000 (based on $465/ton) and for catalyst replacement of $672,000 (based on $8,000/m$^3$) [30].

*Chapter 2 – Selective Catalytic Reduction*



**Figure 2.1: SCR Process Flow Diagram [31, 32]**

**2.2.1   Reduction Chemistry, Reagents, and Catalyst**

The reducing agent employed by the majority of SCR systems is gas-phase ammonia ($NH_3$) because it readily penetrates the catalyst pores. The ammonia, either in anhydrous or aqueous form, is vaporized before injection by a vaporizer. Within the appropriate temperature range, the gas-phase ammonia then decomposes into free radicals, including $NH_3$ and $NH_2$. After a series of reactions, the ammonia radicals come into contact with the $NO_x$ and reduce it to $N_2$ and $H_2O$. Since $NO_x$ includes both NO and $NO_2$, the overall reactions with ammonia are as follows:

$$2NO + 2NH_3 + \frac{1}{2}O_2 \xrightarrow{catalyst} 2N_2 + 3H_2O \qquad (2.1a)$$

$$2NO_2 + 4NH_3 + O_2 \xrightarrow{catalyst} 3N_2 + 6H_2O \qquad (2.1b)$$

The equations indicate that one mole of $NH_3$ is required to remove one mole of NO and two moles of $NH_3$ are required to remove one mole of $NO_2$.  However, Equation 2.1a is the

*Chapter 2 – Selective Catalytic Reduction*

predominant reaction because 90 to 95% of $NO_x$ in flue gas from combustion units is NO. Hence, about one mole of $NH_3$ is required to remove one mole of $NO_x$. The catalyst lowers the required activation energy for the reduction reaction and increases the reaction rate. In the catalytic reaction, activated sites on the catalyst rapidly adsorb ammonia and gas-phase NO to form an activated complex. The catalytic reaction, represented by Equations 2.1a and 2.1b, results in nitrogen and water, which are then desorbed to the flue gas. The site at which the reaction occurs is then reactivated via oxidation.

The high temperature of the flue gas converts the ammonia to free radicals and provides the activation energy for the reaction. The reaction also requires excess oxygen, typically 2–4%, to achieve completion. $NO_x$ reduction with ammonia is exothermic, resulting in the release of heat. However, because the $NO_x$ concentration in the flue gas at the inlet of the SCR is typically 0.01–0.02% by volume, the amount of heat released is correspondingly small. Thermodynamic equilibrium is not a limiting factor in $NO_x$ reduction if the flue gas is within the required temperature range [33].

<u>Reagent</u>

The SCR system can use either aqueous or anhydrous ammonia for the reduction reaction, and some plants use urea-to-ammonia reagent systems where aqueous ammonia is produced onsite (often called onsite urea-derived ammonia production or "ammonia-on-demand"). Anhydrous ammonia is nearly 100% pure ammonia. It is a gas at normal atmospheric temperature; therefore, it must be transported and stored under pressure. Anhydrous ammonia is classified as a hazardous material and often requires special permits as well as additional procedures for transportation, handling and storage.

SCR applications using aqueous ammonia generally transport and store it at a concentration of 29.4% ammonia in water, although some applications use a 19% solution [33]. The use of aqueous ammonia reduces transport and storage problems related to safety. In addition, certain locations may not require permits for concentrations less than 28%. Aqueous ammonia, however, requires more storage capacity than anhydrous ammonia and also requires shipping costs for the water solvent in the solution. Although the 29.4% solution has substantial vapor pressure at normal air temperatures, a vaporizer is generally required to provide sufficient ammonia vapor to the SCR system. Table 2.2 gives the properties of anhydrous ammonia and the properties of a 29.4% aqueous ammonia solution.

The type of reagent used affects both the capital costs and annual costs. Anhydrous ammonia typically has the lowest capital and operating costs, excluding highly site-dependent permitting and risk management planning and implementation costs. Urea systems have the highest capital costs due to the complexity of the processing equipment. Aqueous ammonia systems tend to have the highest operating costs, primarily because of the cost for transportation. Urea systems have the highest energy consumption costs because the energy needed to hydrolyze or decompose urea tends to be higher than the energy needed to vaporize aqueous ammonia. Although the price per ton of anhydrous ammonia is higher than the price per ton of urea, the cost per ton of $NO_x$ removed is higher for urea due to urea's much higher molecular weight. For example, one SCR supplier estimated capital costs for a 130 lb/hr ammonia system to be $280,000 for anhydrous ammonia, $402,000 for 19% aqueous ammonia, and $750,000 for urea [34]. Another reference reported that the equipment cost for urea is generally twice the

JA118

equipment cost for anhydrous ammonia [35]. According to one reference, the total SCR system cost is 2-5% higher when using a urea reagent system instead of an anhydrous ammonia system [10]. Relative to anhydrous ammonia, one reference estimated annual operating costs for 19% aqueous ammonia are 50% higher, costs for 29% aqueous ammonia are 33 percent higher, and costs for urea are 25% higher [36]. Another reference stated that as a general rule, operating costs for urea systems are about 50 percent more than the operating costs for anhydrous ammonia [35]. One reference estimated energy costs for an unspecified application to be $167,000 for a urea system, $73,000 to $117,000 for aqueous ammonia systems, and $16,000 for anhydrous ammonia [37].

This presentation is valid for anhydrous or aqueous ammonia; the capital cost procedures are based on the typical mix of systems actually in operation, while the procedures for estimating annual costs apply to any ammonia system (the examples in section 2.5 illustrate the procedures for a system using 29% aqueous ammonia as the reagent).

**Table 2.2: Ammonia Reagent Properties**

| Property | Anhydrous Ammonia [38,39] | Aqueous Ammonia |
|---|---|---|
| Liquid or gas at normal air temperature | Liquid at high pressure; gas at atmospheric pressure | Liquid |
| Concentration of reagent normally supplied | 99.5% (by weight) | 29.4% (by weight of $NH_3$) |
| Molecular weight of reagent | 17.03 | 17.03 (as $NH_3$) |
| Ratio of ammonia to solution | 99.5% (by weight of $NH_3$) | 29.4% (by weight of $NH_3$) |
| Density of liquid at 60°F | 5.1 lb/gal | 7.5 lb/gal |
| Vapor pressure at 80°F | 153 psia | 14.6 psia [39, p. 3] |
| Flammability limits in air | 16–25% $NH_3$ (by volume) | 16–25% $NH_3$ (by volume) |
| Short-term exposure limit | 35 ppm | 35 ppm |
| Odor | Pungent odor at 5 ppm or more | Pungent odor at 5 ppm or more |
| Acceptable materials for storage | Steel tank, rated for at least 250 psig pressure (no copper or copper-based alloys, etc.) | Steel tank, rated for at least 25 psig pressure (no copper or copper-based alloys, etc.) |

Catalyst

SCR catalysts are composed of active metals or ceramics with a highly porous structure. Within the pores of the catalyst are activated sites. These sites have an acid group on the end of the compound structure where the reduction reaction occurs. As stated previously, after the reduction reaction occurs, the site reactivates via rehydration or oxidation. Over time, however, the catalyst activity decreases, requiring replacement, washing/cleaning, rejuvenation, or regeneration of the catalyst. Catalyst designs and formulations are generally proprietary. Both the catalyst material and configuration determine the properties of the catalyst.

Originally, SCR catalysts were precious metals such as platinum (Pt). In the late 1970s, Japanese researchers used base metals consisting of vanadium (V), titanium (Ti), and tungsten (W), which significantly reduced catalyst cost. In the 1980s, metal oxides such as titanium oxide ($TiO_2$), zirconium oxide ($ZrO_2$), vanadium pentoxide ($V_2O_5$), and silicon oxide ($SiO_2$) were employed to broaden the reaction temperature range. Zeolites, crystalline alumina silicates, were also introduced for high temperature (675–1000°F; 360–540°C) applications; however, zeolites

JA119

tended to be cost prohibitive. From 1980 to 2008, the cost of catalyst has dropped from approximately $34,000/m$^3$ to a range of $5,000 to $6,000/m$^3$ (costs are in 2011$) [7b].[5]  This reference also reported that catalyst prices remained in the approximate range of $5,000 to $6,000/m$^3$ through 2012.

Improvements to the catalyst formulations over time have decreased unwanted side reactions such as sulfur oxide conversions ($SO_2$ to $SO_3$) and increased the resistance to flue gas poisons, and newer catalysts can oxidize metallic mercury (Hg) into ionic forms (for easy removal downstream in wet scrubbers and wet electrostatic precipitators [ESPs]) [40]. Improved catalyst designs have also increased catalyst activity, surface area per unit volume, and the temperature range for the reduction reaction. As a consequence, there is a corresponding decrease in the required catalyst volumes and an increase in the catalyst operating life. For coal-fired boiler applications, SCR catalyst vendors typically guarantee the catalyst for an operating life ranging from 8,000 to 24,000 hours [1]. Applications using oil and natural gas have a longer operating life, typically greater than 32,000 hours [41]. In addition, operating experience indicates that actual catalyst deactivation rates are lower than the design specifications [33]. The latest demands on catalyst technology for both higher and lower sulfur coal-fired boilers include design $NO_x$ removal of 90%; control of residual $NH_3$ to 2 ppm (i.e., ammonia slip); guarantees for $SO_2$ oxidation to less than 1%, and in many cases, to less than 0.5%; being able to withstand washing/cleaning and regeneration procedures; and guarantees for mercury oxidation [37].

Catalyst formulations include single component, multi-component, or active phase with a support structure. Most catalyst formulations contain additional compounds or supports to give thermal and structural stability or to increase surface area [42]. Catalyst configurations are generally ceramic honeycomb and pleated metal plate (monolith) designs in a fixed-bed reactor, which provide high surface area to volume ratio. Pellet catalysts in fluidized beds are also available. Pellets have greater surface area than honeycombs or pleated plates but are more susceptible to plugging. This limits the use of pellets to clean-burning fuels such as natural gas.

Catalyst elements placed in a frame form a catalyst module. The modules stack together in multiple layers to create a reactor bed of the total required catalyst volume. A typical module is 3.3 ft × 6.6 ft in area (1 m × 2 m) and 3.3 ft (1 m) in height. A crane hoists the large catalyst modules into the reactor from either the interior or exterior of the reactor, depending on the reactor design.

Catalysts greatly accelerate the $NO_x$ reduction reaction rate, but some catalysts have more favorable properties for a given application. Performance requirements that drive the choice of catalyst include reaction temperature range, flue gas flow rate, fuel source, catalyst activity and selectivity, $SO_2$ oxidation, and catalyst operating life. In addition, the design must consider the cost of the catalyst, including disposal costs [33]. In the past, the initial charge of catalyst costs accounted for 20% or more of the capital costs for an SCR system [33], however, as catalyst unit cost has declined over time, this catalyst cost is a smaller percentage of the capital costs [7].

The catalyst layers may be washed/cleaned, rejuvenated, or regenerated to extend the catalyst life as catalyst activity declines, or they may be replaced. Generally, less than one layer

---

[5] An earlier reference shows that from 1980 to 2006, the cost of catalyst dropped by 75% from approximately $16,000/m$^3$ to less than $4,000/m$^3$ [37]. These costs are for the cost year reported and are not adjusted for escalation to current year.

of catalyst is replaced per year for fixed bed designs. Most SCR manufacturers offer a disposal service, in which either the catalyst is reactivated (i.e., rejuvenated or regenerated) for reuse or its components are recycled for other uses [42]. If the catalyst cannot be recycled or reused, the facility operator must dispose of the spent catalyst in an approved landfill. In the United States, most catalyst formulations are not considered hazardous waste [42].

Catalyst cleaning typically means the removal of physical restrictions to the catalyst (i.e., blinding layers and large particle ash [LPA]), rejuvenation means the removal of poisons without replenishing catalytically active compounds in the catalyst, and regeneration typically means the removal of poisons and the restoration of catalytic activity by restoring catalyst active ingredients [43]. These activities may occur online/in-situ or offline, and may occur onsite or offsite [43]. The catalyst layers may be removed and transported to the cleaning, rejuvenation, or regeneration site. Online catalyst cleaning with soot blowers or sonic horns is conducted on a regular basis to remove ash or particles (soot blowers and sonic horns are discussed below) [44]. Water-based cleaning can also be conducted to remove physical materials that plug or blind the catalyst [45].

Use of rejuvenated and regenerated catalyst has increased since the late 1990s, and for some applications, can be considered equivalent to new catalyst [46]. For rejuvenation processes, the focus is on removal of blinding materials and catalyst poisons [43, 47]. Rejuvenation processes may cause the catalyst to lose structural integrity and mechanical strength [43]. Today, regeneration processes focus on increasing the longevity of the catalyst by maintaining its mechanical strength (both compressive and bonding) and improving its activity or performance [43, 47]. The catalyst layer may be washed in a series of baths that remove ash and particulate, remove poisons, and add chemicals or various metals used in the original catalyst manufacturing [45, 47]. Moisture must also be removed from the catalyst because it reduces the strength of the catalyst [47]. Because regeneration may cause catalyst to lose mechanical strength, recalcination may also be conducted to ensure catalyst impregnation and that catalyst mechanical strength is regained [43, 45, 47]. Improvements to the catalyst activity relative to certain reactions can be made using a regeneration process (e.g., impregnating other chemicals in the catalyst to reduce the conversion of $SO_2$ to $SO_3$, or to increase the oxidation of Hg over the conversion rate of the original catalyst while maintaining the same catalyst activity for $NO_x$) [47]. Damage to the catalyst can occur during operation of the SCR or during transport of the catalyst for rework, so a thorough inspection of the modules is conducted along with replacement or repair of any damaged elements [44].

Benefits for regenerated catalysts include the following: lower regeneration cost per layer as compared to new replacement cost [1]; no catalyst cost [1]; disposal cost savings [1]; full restoration of original catalytic activity [McMahon Feb 2006 for Platts]; same deactivation rate as a new catalyst in the same SCR installation, i.e., comparable equipment life as new catalyst [McMahon Feb 2006 for Platts]; lower $SO_2$ oxidation for some catalysts (i.e., $SO_2/SO_3$ conversions is no higher than the new catalyst guarantee) [50]; removal of physical restrictions, including fly ash plugging, large particle ash, and blinding layers [43]; and no physical damage to the catalyst and no loss of structural integrity [43].

Use of regenerated catalysts reduces catalyst replacement cost and minimizes the need to dispose of spent catalyst [48]. It is estimated that a typical 500-MW coal-fired power plant will

*Chapter 2 – Selective Catalytic Reduction*

spend approximately $2,000,000[6] on a single layer of new catalyst [48]. The cost for regenerated catalyst for this same facility would be approximately $1,000,000 for a single layer of catalyst [48]. Disposal costs when replacing a spent catalyst could be $50,000–$200,000 per layer, and these costs are avoided with regenerated catalysts [48]. Regenerated catalyst typically costs 40 percent less than new catalyst [48-50].

**2.2.2   SCR Performance Parameters**

The rate of the reduction reaction determines the amount of $NO_x$ removed from the flue gas. The major design and operational factors that affect the $NO_x$ removal performance of SCR are similar to those presented in Chapter 1, SNCR. The factors discussed previously for SNCR include the following:

- Reaction temperature range;
- Residence time available in the optimum temperature range;
- Degree of mixing between the injected reagent and the combustion gases;
- Molar ratio of injected reagent to inlet $NO_x$;
- Inlet $NO_x$ concentration level; and
- Ammonia slip.

The majority of the discussion regarding SNCR design and operational factors is valid for the SCR process, except for small variations due to the use of a catalyst and the reaction chamber being separate from the combustion unit. Additional design and operational factors to consider that are specific to the SCR process include the following:

- Catalyst activity;
- Catalyst selectivity;
- Pressure drop across the catalyst;
- Ash management (i.e., mitigating large particle ash (LPA) impacts on the catalyst) and dust loading;
- Catalyst pitch;
- $SO_2$ and $SO_3$ concentrations in gas stream;
- Catalyst deactivation; and
- Catalyst management.

The major differences between SNCR and SCR are discussed below.

<u>Temperature</u>

The $NO_x$ reduction reaction is effective only within a given temperature range. The use of a catalyst in the SCR process lowers the temperature range required to maximize the $NO_x$ reduction reaction. At temperatures below the specified range, the reaction kinetics decrease and ammonia passes through the boiler (ammonia slip), but there is little effect on nitrous oxide

---

[6] Cost year not available; data are from 2008 article [Reference 48].

JA122

($N_2O$) formation. At temperatures above the specified range, $N_2O$ formation increases and catalyst sintering and deactivation occurs, but little ammonia slip occurs.

In an SCR system, the optimum temperature depends on both the type of catalyst used in the process and the flue gas composition. For the majority of commercial catalysts (metal oxides), the operating temperatures for the SCR process range from 480°F to 800°F (250–430°C) [46]. Figure 2.2 is a graph of the $NO_x$ removal efficiency as a function of temperature for a typical metal oxide catalyst [46]. The figure shows that the rate of $NO_x$ removal increases with temperature up to a maximum between 700°F and 750°F (370–400°C). As the temperature increases above 750°F (400°C), the reaction rate and resulting $NO_x$ removal efficiency begin to decrease.



**Figure 2.2: $NO_x$ Removal versus Temperature [46]**

As flue gas temperature approaches the optimum, the reaction rate increases and less catalyst volume achieves the same $NO_x$ removal efficiency. Figure 2.3 shows the change in the required catalyst volume versus temperature [51]. There is approximately a 40% decrease in the required catalyst volume as flue gas temperature increases from 600°F (320°C) to the optimum range, 700–750°F (370–400°C). This decrease in catalyst volume also results in a significant decrease in capital cost for the SCR system. Less catalyst also results in a decrease in annual operation and maintenance costs. For example, the system pressure drop would be lower, which would reduce the additional electricity needed to run the ID fan. The net effect on catalyst replacement costs is uncertain; although the volume of catalyst replaced would be smaller, deactivation may occur more frequently since the quantity of materials in the emission stream responsible for plugging and poisoning would not be reduced.

The relationships between flue gas temperature, catalyst volume, and $NO_x$ removal are complicated functions of the catalyst formulation and configuration. The physical and chemical properties of each catalyst are optimized for different operating conditions. For a given catalyst formulation, the required catalyst volume or temperature range can even change from one manufacturer of the catalyst to another. Therefore, the selection of the catalyst is critical to the operation and performance of the SCR system.



**Figure 2.3: Change in Catalyst Volume vs. Temperature [51]**

Because the optimum temperature window of the SCR process is lower than that of SNCR, the reagent injection into a reactor chamber occurs downstream of the combustion unit, rather than inside the combustion unit. As discussed previously, there are several options for the location of the SCR reactor. The flue gas temperature at each of these locations is different. Most designs install the reactor downstream of the economizer and prior to the air preheater, where the flue gas is at the appropriate temperature for metal oxide–based catalysts. Reheating of the flue gas may be required for reactors located downstream of the air preheater. Reheating significantly increases SCR operational costs. This continues to be true despite natural gas prices that are relatively low on an historical basis.[7]

---

[7] A case study of tail-end SCR indicated that the cost of natural gas for flue gas reheating was about 60% of the variable annual operation and maintenance costs (i.e., sum of natural gas, electricity, and reagent costs) when the unit cost of natural gas was $8/1,000 sft³ [52]. If the natural gas unit cost were $5/1,000 sft³, then the natural gas cost for flue gas reheating would have been more than 40% of the variable annual operation and maintenance costs.

*Chapter 2 – Selective Catalytic Reduction*

Boiler operation at reduced loads decreases the gas flow rate. At reduced gas flow rates, the economizer outlet gas temperature decreases because boiler heat transfer surfaces absorb more heat from the flue gas. Typical SCR systems tolerate temperature fluctuations of ±200°F (±93°C) [33]. At low boiler loads, however, the temperature can decrease below the optimum range. For example, a coal-fired utility boiler has an economizer exit flue gas temperature of 690°F (370°C) at 100% load, but only 570°F (300°C) at 50% load [33]. For low-load operations, an economizer bypass can be used to raise the flue gas temperature. An economizer bypass diverts part of the hot flue gas from within the economizer through a bypass duct and mixes it with the relatively cooler flue gas exiting the economizer. An economizer feedwater bypass also raises the flue gas temperature. The use of an economizer bypass results in less energy transfer to the feedwater for steam generation; consequently, there is a small reduction in boiler efficiency. Lower boiler efficiencies require more fuel to be burned to meet the required boiler steam output.

Residence Time and Space Velocity

Residence time is the time the reactants are within the reactor. Higher residence times generally result in higher $NO_x$ removal rates. Temperature also affects the required residence time. The required residence time decreases as the temperature approaches the optimum temperature for the reduction reaction. Residence time is often expressed as space velocity, the inverse of residence time. The space velocity of a reactor is experimentally determined from the measured flue gas flow rate divided by the superficial volume of the catalytic reactor. The $NO_x$ removal efficiency increases with decreasing space velocity (i.e., increasing catalyst volume) for a given flue gas flow rate.

The optimal residence time for an SCR system is a function of the number of active catalyst sites available for the reduction reaction and the gas flow rates within those active sites (interstitial flow rate). The "area velocity" is a parameter used by SCR vendors that relates the number of sites and the interstitial flow rate to residence time. The area velocity is defined as the space velocity divided by the catalyst pore surface area (specific surface area). For coal-fired boilers, typical specific surface areas range from 90 to 3,800 square feet per cubic feet ($ft^2/ft^3$) (300–1,200 square meters per cubic meters [$m^2/m^3$]) [33]. Increasing the catalyst specific surface area increases the $NO_x$ removal for a given flue gas flow rate. This can be accomplished by either increasing the catalyst volume, which increases the reactor size, or increasing the pore space of the catalyst, which generally increases the catalyst cost.

Degree of Mixing

The reagent must be dispersed and mixed throughout the flue gas to ensure sufficient contact between the reactants. Mixing is performed by an injection system that injects pressurized gas-phase ammonia into the flue gas. The injection system controls the spray angle, velocity, and direction of the injected reagent. Some systems inject the ammonia with a carrier fluid, such as steam or air, to increase penetration into the flue gas. Injection systems are application specific. Numeric modeling of the flue gas and reagent flow optimizes the design of the injection system (see Section 2.2.6).

Mixing of the flue gas and ammonia occurs before entering the SCR reactor. If mixing is not adequate, the $NO_x$ reduction is inefficient. SCR designs must incorporate adequate duct

JA125

length between the ammonia injection and the reactor inlet to allow for mixing. Mixing patterns can be improved by

- Installation of static mixers upstream of the reactor;
- Increasing the energy imparted to the injected fluids;
- Increasing the number of injectors and/or injection zones; and
- Modifying the nozzle design to improve the reagent distribution, spray angle, and direction.

Stoichiometric Ratio Factor

The stoichiometric ratio factor (the moles of reagent injected per mole of $NO_x$ removed) defines the quantity of reagent needed to achieve the targeted $NO_x$ reduction. Theoretically, based on reaction equations 2.1(a) and (b), one mole of NO can be removed with one mole of ammonia and one mole of $NO_2$ can be removed with two moles of ammonia. Since $NO_x$ is mostly comprised of NO (approximately 95%), the theoretical stoichiometric ratio for $NO_x$ is close to 1.05 mole of ammonia per mole of $NO_x$. Hence, SCR systems typically employ a stoichiometric ratio of 1.05 moles of ammonia per mole of $NO_x$ [33]. This assumption of an almost one-to-one linear relationship between the quantity of reagent and the $NO_x$ removed is good up to about 85% $NO_x$ reduction [46]. Above 85%, the removal efficiency begins to level off and more than the theoretical amount of ammonia is required for additional $NO_x$ removal because of reaction rate limitations. Because capital and operating costs depend on the quantity of reagent consumed, the stoichiometric ratio factor is an important design parameter that is determined by the SCR designer.

Inlet $NO_x$ Concentration

The concentration of the reactants also affects the reaction rate of the $NO_x$ reduction process. In general, higher inlet $NO_x$ inlet concentrations result in higher $NO_x$ removal efficiencies due to reaction kinetics [33]. However, $NO_x$ concentrations higher than approximately 150 parts per million (ppm) generally do not result in increased performance. Low $NO_x$ inlet levels result in decreased $NO_x$ removal efficiencies because the reaction rates are slower, particularly in the last layer of catalyst [33]. The percent removal efficiency achieved is dependent on the inlet NOx concentration, so that SCR that follow other NOx controls such as LNB or FGR may achieve an efficiency less than 90%. In general, though, SCR achieves greater removal efficiencies than SNCR on sources with low inlet $NO_x$ levels, such as natural gas–fired boilers.

For a given $NO_x$ removal efficiency, higher $NO_x$ levels at the SCR inlet require more catalyst volume. For example, to achieve 90% $NO_x$ removal requires 10% more catalyst at an inlet $NO_x$ level of 1.7 lb/MMBtu versus an inlet $NO_x$ level of 0.8 lb/MMBtu [53].

Ammonia Slip

Ammonia slip refers to the excess reagent passing through the reactor. Ammonia in the flue gas causes a number of problems, which were discussed in Chapter 1, SNCR, including health effects, visibility of the stack effluent, salability of the fly ash, and formation of

JA126

ammonium sulfates. Limits on acceptable ammonia slip, imposed by either regulatory limits or design requirements, place constraints on SCR performance.

Ammonia slip does not remain constant as the SCR system operates but increases as the catalyst activity decreases. Properly designed SCR systems, which operate close to the theoretical stoichiometry and supply adequate catalyst volume, maintain low ammonia slip levels, approximately less than 2 ppm [1]. While ammonia slip levels in operating permits are typically in the range of 2 to 10 ppm, in actual practice lower slip levels are achieved, and the slip levels approach permitted levels only when the catalyst is near the end of its service life [1]. Ammonia slip increases with the NSR ratio.[8] Ammonia slip monitoring instruments are commercially available and are in place and operating at a number of coal-fired units. Facilities typically install ammonia slip monitors between the SCR and the air heater and may measure at one or several points. These systems monitor ammonia slip and help the unit maintain slip levels of 2–3 ppmv or less. The capital cost for one ammonia slip monitoring instrument is estimated to be $40,000 for a single measurement point and up to $70,000 in capital cost for three measurement points [54]. Another method for quantifying ammonia slip is to determine the ammonia concentration in collected fly ash [55].

Raw materials at some cement kilns contain constituents that release ammonia to the kiln gas stream when heated to high temperature. Some cement plants have ammonia in the kiln exhaust gas without injecting any ammonia into the gas stream. Therefore, the ammonia slip from unreacted ammonia injected for SCR is difficult to differentiate from the natural fluctuations in ammonia in the stack gas. For this reason, it is important to understand the level of raw material derived ammonia emissions when designing an SCR control system for cement kilns [94].

Catalyst Activity

Catalyst activity is a measure of how much the catalyst accelerates the $NO_x$ reduction reaction rate. A higher catalyst activity results in a faster reaction rate and more $NO_x$ removal. Catalyst activity is a function of many variables, including catalyst composition and structure, diffusion rates, mass transfer rates, gas temperature, and gas composition [56]. As the catalyst activity decreases, the $NO_x$ reduction reaction rate also decreases. This results in lower $NO_x$ removal and higher ammonia slip levels.

The following equation describes the deactivation of the catalyst activity, *K,* with time, *t* [57]:

$$K = K_o e^{(-t/\tau)}$$

(2.2)

where $K_o$ is the original catalyst activity and $\tau$ is the catalyst operating life time constant. Figure 2.4 shows a typical catalyst deactivation curve based on Equation 2.2. As the catalyst activity decreases, the $NO_x$ removal efficiency is usually kept constant by injecting more ammonia, thereby increasing the ammonia slip. When the ammonia slip reaches the maximum

---

[8] Lewandowski, D. *Design of Thermal Oxidation Systems for Volatiles Organic Compounds.*

*Chapter 2 – Selective Catalytic Reduction*

design or permitted level, the catalyst or a catalyst layer must be cleaned, rejuvenated, or regenerated, or new catalyst must be installed.

Catalyst Reaction Selectivity

SCR favors the $NO_x$ reduction reaction over competing reactions if the reactants are at the appropriate temperature and oxygen is present. However, competing reactions still occur, and the catalyst accelerates these reactions as well. Each catalyst has different chemical reaction selectivity properties. In general, catalysts promote the formation of two undesirable compounds, sulfur trioxide ($SO_3$) and nitrous oxide ($N_2O$). $SO_3$ is formed by the oxidation of $SO_2$ to $SO_3$, which occurs both during combustion of sulfur-containing fuel and over the catalyst.  In cement plant applications, the fuel sulfur is incorporated into the clinker, however, pyritic sulfur contained in some raw materials is oxidized and released into the kiln gas stream [94]. Sulfur oxides ($SO_x$) are regulated under the 1990 Clean Air Act. $SO_3$ reacts with ammonia in the flue gas to form ammonia sulfates. Ammonium sulfur salts deposit on the catalyst and on downstream equipment such as the air preheaters. $SO_3$ and ammonium sulfate formation is primarily a concern for higher sulfur coals. Additional costs for air preheater modifications are included in the cost analysis when the sulfur content of fuel is greater than 2 percent or the $SO_2$ content of the fuel is greater than or equal to 3 lb/mmBtu. Increasing the number of catalyst layers, while increasing $NO_x$ removal efficiency, can also lead to an increase in the conversion of $SO_2$ to $SO_3$.[9]  In addition, $SO_3$ emissions cause "blue plume" from the unit and have become an emissions concern. Newer catalysts, however, have been developed that limit the formation of $SO_3$ [37], and these catalysts are now commonly used in SCR installations in the U.S. $N_2O$ is both an ozone depleter and a greenhouse gas. $N_2O$ has a global warming potential (GWP) of 298 as compared to carbon dioxide ($CO_2$).[10]

---

[9] U.S. EPA. Federal Implementation Plan (FIP) proposal for the Four Corners Power Plant. 77 FR 51620 (August 24, 2012). Correspondence between U.S. EPA and Hitachi Power Systems America.

[10] It should be noted that EPA issued a final rule on November 29, 2013 that changed the GWP of $N_2O$ to 298 (from 310) as part of a notice of data availability concerning the Mandatory Greenhouse Gas Rule. The November 29, 2013 notice can be found in the Federal Register at http://www.gpo.gov/fdsys/pkg/FR-2013-11-29/pdf/2013-27996.pdf .

JA128



**Figure 2.4: Typical Catalyst Deactivation per Equation 2.2 with $K_O = 24.12$; $\tau = 55,000$**

Pressure Loss

     The flue gas pressure decreases as the flue gas flows across the catalyst. The decrease in pressure is a function of the length of the catalyst and the catalyst configuration. Deposition of fly ash and other particulates on the catalyst over time increases this pressure drop across the catalyst. The flue gas pressure can be increased by installing new draft fans or by upgrading existing fans. To minimize the pressure loss across the catalyst, the SCR reactor ductwork can be expanded and flow rectifiers and turning vanes can be installed. Pressure loss is of greater concern in turbine applications, which rely on air flow rather than heat transfer to generate power.

     Pressure loss may also be an issue in cement kiln SCR applications as the dust loading in cement kilns can be in excess of 80 g/Nm³ [94]. In addition, cement dust can be sticky, creating residue buildups that can be difficult to remove, and generally result in higher pressure loss than observed in other industrial operations. As such, it may require additional catalyst cleaning and catalysts with larger pitch [94].

Ash Management and Dust Loading

Ash and dust loading in the SCR catalyst may occur from both fuel combustion (e.g. coal) and raw materials (e.g., cement raw materials) from the process. The amount of ash or dust loading varies depending on fuel used, source type, and raw material feeds to the process. These particulates can mask and block the catalyst surface and inhibit the SCR NOx reduction

efficiency.  One source indicates dust loading of 6.7 gr/dscf for a coal-fired boiler (PRB), dust loading of 4.2 to 15.5 gr/dscf for a typical long wet cement kiln, and 20.1 to 40.2 gr/dscf for a typical PH/PC cement system [111].  One cement industry preheater kiln in Europe has a dust loading of 35.0 gr/dscf (80 g/m$^3$) [94].

<u>Catalyst Pitch</u>

Catalyst pitch is a term used with honeycomb and metal plate catalyst, and it affects the flue gas velocity in interstitial spaces [33]. As shown in Figure 2.5, pitch (represented as p) is the width of the catalyst cell plus the cell wall thickness, *a*. For a given flow rate, wider pitch will result in lower interstitial gas velocities. Appropriate catalyst pitch is important to ensure that ash will not deposit and bridge over catalyst cells and pores. Plugging of the catalyst reduces the effective surface area by decreasing the number of active sites available for the NO$_x$ reduction reaction.

For high-dust applications, such as cement kilns and coal-fired boilers, catalysts with larger openings or pitch should be used to reduce the potential for catalyst plugging. However, the wider pitch reduces the surface area per unit volume, and may necessitate additional catalyst volume to meet emissions limits for NO$_x$ and ammonia slip.



**Figure 2.5: Pitch for a Honeycomb Catalyst Configuration**

<u>SO$_2$ and SO$_3$ Concentrations in Gas Streams</u>

Sulfur in the fuel forms SO$_2$ during combustion in the boiler, i.e., boiler conversion rate, and some of the SO$_2$ is further oxidized to SO$_3$ within the boiler. In a coal-fired boiler, approximately 0.5 to 1.5 percent of SO$_2$ is converted to SO$_3$ at typical combustion temperatures, however, as the temperature drops more SO$_3$ can be formed.[11]  Additional SO$_3$ is formed when SO$_2$ passes through the SCR catalyst (i.e., SCR conversion rate).  SCR catalysts can be designed for ranges of conversion such as 0.2 to 0.8 percent per catalyst layer (for 3 layers of catalyst, this would result in conversion of 0.6 to 2.4 percent).  SO$_3$ will combine with water to form sulfuric acid (H$_2$SO$_4$) or sulfuric acid mist.  Concentrations of SO$_3$ and H$_2$SO$_4$ of 6 to 10 ppm can cause a visible plume, or a blue plume.  [Moretti August 2006]

---

[11] Another source indicates that the amount of SO$_3$ is approximately 0 to 0.2 percent of the total SOx from the combustion process.  [Ehrnschwender Aug 2008]

Catalyst Deactivation

Catalysts lose their activity over time for various reasons. The primary mechanisms for catalyst deactivation and surface area loss are discussed below.

**Poisoning** – Certain fuel constituents that are released during combustion act as catalyst poisons. Catalyst poisons include calcium oxide, magnesium oxide, potassium, sodium, arsenic, chlorine, fluorine, and lead. These constituents deactivate the catalyst by diffusing into active pore sites and occupying them. Catalyst poisoning represents the main cause of catalyst deactivation. The water soluble alkali compounds are known to react with active catalyst sites rendering them inert. The form of the alkali metals is important as water soluble alkali metals have been found to be more detrimental to catalyst activity.

Arsenic is a concern for boilers that reinject fly ash or burn coals that have moderate to high arsenic content with a free lime (CaO) concentration in the ash of less than 2 percent. Some facilities have found it useful to inject limestone into the furnace. The calcium oxide reacts with arsenic to form calcium arsenate, which affectively removes the arsenic from the gas stream thereby preventing it from binding to catalyst and rendering them inactive [96]. The activity of poisoned catalysts may be restored by rejuvenation or regeneration.

In cement kilns, both the raw materials and the fuels can contain compounds that poison catalysts, including inorganic compounds of potassium, sodium, and chlorine. Alkali metal compounds in the raw materials have relatively low melting points and upon reaching the combustion zone of the kiln will readily volatize. Although these compounds are also found in coal-fired boilers, they may be present in higher concentrations in cement kiln exhausts [94]. Catalyst poisoning by phosphorus, chromium, and lead compounds is believed to be a lesser concern for cement kilns than for coal-fired boilers [94]. These compounds are expected to be present in lower concentrations in cement kiln exhaust gases than is typical of coal-fired boilers [24, 94]. Arsenic poisoning is not expected to be an issue for cement plants because the high concentration of CaO should react with any arsenic in the exhaust gas before it reaches the SCR catalyst [96, 111]. However, high CaO levels combined with high sulfur concentrations can result in the formation of $CaSO_4$ in cement kilns, which can reduce catalyst activity through masking [94].

**Thermal Sintering** – High flue gas temperatures within the SCR reactor cause sintering, a permanent loss of catalyst activity due to a change in the pore structure of the catalyst. Thermal sintering can occur at temperatures as low as 450°F (230°C). The amount of thermal sintering depends on the composition and structure of the catalyst. Newer catalyst materials are less susceptible to thermal sintering, which increases their operating life.

**Blinding, Plugging, and Fouling** – Ammonia-sulfur salts, fly ash, and other particulate matter in the flue gas cause blinding, plugging, or fouling of the catalyst. The particulate matter deposits on the surface and in the active pore sites of the catalyst. This results in a decrease of the number of sites available for $NO_x$ reduction and an increase in flue gas pressure loss across the catalyst.

**Erosion** – Impingement of particulate matter and high interstitial gas velocities erode the catalyst material. Catalysts with hardened leading edges or increased structural strength are less

JA131

*Chapter 2 – Selective Catalytic Reduction*

susceptible to erosion. However, increasing catalyst strength through hardening reduces the number of active pore sites.

**Aging** – Catalyst aging is a change in the physical and chemical properties of the catalyst pores that occurs over time.

A number of measures can be taken to decrease the rate of deactivation and deterioration of the catalyst. These measures are discussed below.

**Catalyst Formulation** – Each catalyst formulation has different physical and chemical properties. Catalyst formulations with the following properties will have decreased deactivation:

- Increased activity per unit volume;
- Greater thermal resistance;
- Chemical and physical resistance to poisons;
- Wider thermal operating range;
- Greater structural strength and hardened leading edges; and
- Lower interstitial velocities (i.e., wider catalyst pitch).

To obtain the optimal catalyst formulation and SCR design for an application, the catalyst supplier and SCR vendor should be informed of the fuel and raw material constituents, such as sulfur, chlorine, fluorine, alkali metals, lead, arsenic, and trace metals. The SCR must be designed to operate for the full range of values for the constituent concentrations, therefore, the ranges of these data should be provided to the catalyst supplier. These constituents can be determined by chemical analyses. The associated analytical data can then be used to modify the catalyst composition, determine the appropriate catalyst volume, predict catalyst regeneration and replacement schedules, and design the SCR reactor components.

**Soot Blowers and Sonic Horns** – Deposits on the surface of the catalyst can be dislodged by soot blowers, which are generally installed between each catalyst layer and operated on a periodic basis, such as once a week. For some higher dust SCR systems, e.g., in the cement industry, more frequent and even continuous catalyst cleaning may be needed. A sonic horn is another option that prevents accumulation of ash deposits on the catalyst surface. A sonic horn may operate at a typical frequency of 10 seconds every 10 minutes [37].

**Turning Vanes and Rectifier Grids** – Particulate matter can be removed from the flue gas by gas-flow turning vanes and flow rectifier grids near the front of the catalyst layer. Particles impact the surface of the vanes or grid and fall out of the flue gas stream. In addition to removing particles, turning vanes and flow rectifier grids decrease the linear velocity of the flue gas and align its vector with the flow path of the catalyst.

Catalyst Management Plan

Catalyst deactivation is an inherent part of the SCR process. As the catalyst activity decreases with time, the $NO_x$ reduction reaction rate decreases and ammonia slip increases. When the ammonia slip level reaches the design limit, the catalyst must be replaced with regenerated catalyst or new catalyst must be added. The catalyst life is the time the catalyst activity for a given catalyst volume (layer volume) maintains ammonia slip below the design

JA132

limit. Currently, vendor-guaranteed life for a catalyst layer in coal-fired applications is typically three years [51], and actual catalyst layer lifetimes in such applications are often in the 5 to 7 year range, depending on the condition of untreated flue gas [33]. Gas- and oil-fired applications experience even longer catalyst layer lifetimes.

A catalyst management plan (CMP), as described in a "saw-toothed" graphic shown in Figure 2.6, schedules periodic replacement of catalyst to maintain ammonia slip limits (this CMP has a maximum ammonia slip design value of 2 ppm [58]). In the past, CMP descriptions focused mainly on the catalyst replacement schedules; however, today, a CMP is a comprehensive catalyst management strategy that incorporates both SCR equipment management and catalyst management, along with attention to changes in regulatory requirements. This more comprehensive approach is needed with the move to year-round operation of SCRs for facilities that operate continuously. While operation of SCR for compliance with the $NO_x$ SIP Call (1998) requirements typically called for ozone season operation only, year round operation is necessary to comply with more recent regulations (e.g., The Clean Air Interstate Rule (CAIR), 1999 Regional Haze Rule, an Ozone Transport Commission (OTC) initiative, and state rules such as the North Carolina (NC) Clean Smokestacks Rule that took effect in 2009 and the Texas requirements for the Houston area), to generate $NO_x$ credits, or to comply with settlement agreements with the U.S. EPA and Department of Justice. Continuous, ongoing collection and documentation of data on plant loading and cycling, fuel demands and variation, and ongoing $NO_x$ performance and $SO_2$ conversion, which can then be compared to catalyst activity data, is conducted to create the plant operating history. Some companies have developed computer software that collects these data and optimizes the costs for catalyst replacement options. In general, an annual SCR system inspection is conducted on the catalyst, the reactor, and the complete $NH_3$ storage and injection system. Inspection of the catalyst includes a physical inspection along with catalyst sampling and analysis on a bench-scale reactor for activity, $SO_2$ to $SO_3$ conversion rate, and pressure drop for each catalyst layer. Annual ammonia injection grid (AIG) tuning and optimization is also conducted to ensure uniform flow rate/velocity and uniform $NH_3/NO_x$ molar distribution. Poor distribution of the $NH_3/NO_x$ decreases the $NO_x$ reduction and increases the $NH_3$ slip [59]. In situ measurements of the catalyst activity have been developed, where NO analyzers installed before and after the catalyst layer and a small supplemental ammonia controller allow increases in the $NH_3/NO_x$ ratio and measurement of inlet and outlet $NO_x$ samples, contained to a small area of the catalyst. In situ catalyst activity measurements may be important for year-round operation of SCR units [60].

JA133



**Figure 2.6: Typical Catalyst Management Plan [61]**

Most CMPs call for the SCR reactor design to provide two or more layers filled with catalyst and one or more empty or spare catalyst layers (often called "2:1" design). When the initial catalyst layers deactivate to the point where ammonia slip reaches the maximum design value, the facility typically adds catalyst to the empty layer. Catalyst addition is managed so that the total catalyst activity of all the layers (the two or three older catalyst layers plus the new catalyst layers) is sufficient to meet the ammonia slip requirement for a relatively long period of time. As the catalyst continues to deactivate, ammonia slip begins to rise again. When ammonia slip again reaches the maximum design value, one of the older catalyst layers is removed and replaced. The catalyst analysis data identifies which layer should be replaced. With advances in catalyst regeneration, part of a comprehensive CMP is determining whether the catalyst can be regenerated or whether new catalyst must be used. Before a regeneration process is planned, the process should be prequalified on a catalyst sample. If additional catalyst capabilities are needed, review of recent catalyst technology advances for newer catalysts that achieve mercury reductions, lower $SO_2$ conversion rates, and lower load and temperature operation is advised, although some regeneration processes may offer improvements with these catalyst capabilities as well. Typically, the addition and replacement of catalyst layers is coordinated with plant outage periods if at all possible, and outage frequency should be considered in conjunction with the risk considerations for replacing sooner rather than later [59]. There would likely be additional costs

or impacts (e.g., due to lost generation or production) if a facility is unable to coordinate with planned unit outages.

In the past, catalyst cost was a significant portion of the annual cost of operating an SCR system. Under the latest operating approaches that involve using a CMP, only a fraction of the total catalyst inventory, rather than the entire volume, is replaced at any one time. This distributes the catalyst replacement costs more evenly over the lifetime of the system, and use of regenerated catalyst may also reduce the overall annual costs [59]. For applications with higher dust loading, such as the dust loading typical for cement kilns, the catalyst management plan may include more frequent catalyst replacement and regeneration schedules than would be typical for low-dust applications.

### 2.2.3    SCR System Configurations

Electric utility and large industrial boiler applications implement several different SCR system configurations, including high-dust, low-dust, and tail-end arrangements. In a 1997 report, the SCR configurations were reported as 88% high-dust SCR, 6% low-dust, and 6% tail-end [62].[12] More recently for the U.S., it was reported that most SCR configurations are high dust, only one facility has a low-dust SCR, and no tail-end SCR operate in the U.S. [52]. High-dust is generally considered the most economical and straightforward design provided sufficient space is available to construct the SCR close to the economizer and air pre-heater. Boiler units with space constraints must consider low-dust and tail-end SCR designs. SCR configurations for gas turbine applications depend on the type of engine cycle, such as combined-cycle or simple cycle. The various configurations for boilers and gas-fired turbines are discussed below. In addition, there are two different SCR reactor designs, full SCR and in-duct SCR, which are also discussed.

<u>High-Dust SCR</u>

Figure 2.7 shows a high-dust SCR system for coal-fired boiler applications. The SCR reactor location is downstream of the economizer and upstream of the air heater and particulate control devices. The flue gas temperature in this location is usually within the optimal temperature window for $NO_x$ reduction reactions using metal oxide catalysts. In this configuration, however, the flue gas contains particulates when it enters the SCR reactor.

Coal-fired boilers generally use a vertical SCR reactor, where the flue gas flows downward through the catalyst. The reactor generally contains multiple layers of catalyst. The volume of catalyst required varies with each installation, as discussed previously. Soot blowers or sonic horns are installed to remove particulates from the catalyst surfaces. For designs that use a honeycomb catalyst, the catalyst pitch is typically about 7–9 mm (compared with 3–4 mm for gas-fired boilers) to allow easy passage of ash particles without deposition and ease of cleaning with soot blowers or sonic horns. To obtain uniform gas flow and remove particulates, high-dust SCR designs usually include turning vanes and a flow-rectifying grid in the ductwork prior to the reactor. High-dust SCR typically require 3 or 4 layers of catalyst [52].

---

[12] In a 2006 report, one utility/vendor reported that of their 24 SCRs, 71% were high-dust, 4% were low-dust, and 25% were tail-end [63]. These data are from a single vendor; the data above in the text represent multiple vendors.

A hopper at the bottom of the SCR reactor collects ash and particulates separated from the flue gas stream. The hopper outlet connects to the plant fly ash handling system for periodic removal of the accumulated ash. Flue gas exits the reactor via an opening at the top of the hopper and is directed to the air heater inlet. Some designs eliminate the need for hoppers by keeping flue gas velocities high enough in these areas that fly ash remains entrained in the flue gas.

Natural gas–and distillate oil–fired boilers generate flue gas that is relatively free of dust and $SO_2$ (for low-sulfur oil). Consequently, SCR systems for these boilers place the reactor upstream of the air heater, in the high-dust SCR configuration.



**Figure 2.7: High-Dust SCR Arrangement [42]**

<u>Low-Dust SCR</u>

Coal-fired units with an ESP located upstream of the air heater (hot-side ESP) typically use a low-dust SCR configuration. Figure 2.8 shows a low dust configuration, which locates the SCR reactor downstream of the ESP. In this location, the flue gas is relatively dust free. The ash removed by the ESP typically contains arsenic, alkali metals, and other constituents that are detrimental to catalyst performance and life.

A low-dust SCR system increases catalyst life by mitigating concentrations of particulates and catalyst poisons in the SCR reactor. In addition, low-dust SCR configurations do not need ash hoppers. For designs employing honeycomb catalyst, the catalyst pitch can be reduced to approximately 4–7 mm, resulting in lower catalyst volume. Low-dust SCR typically

JA136

requires only 2 layers of catalyst [52]. Longer catalyst life, lower catalyst volume, and the elimination of the ash hopper mean lower costs for low-dust SCR compared to high-dust configurations. The only disadvantage of low-dust SCR is the temperature drop of the flue gas as it flows through the ESP. Flue gas temperatures generally do not decrease to the point where reheating is required. However, an increase in the size of the existing economizer bypass duct may be required to maintain the flue gas temperature within the optimal range.

In the low-dust SCR installed at a U.S. cement kiln in 2013, the gas stream passes through a hot electrostatic precipitator to remove the majority of the dust prior to entering the SCR. The gas stream exiting the SCR may then pass through a second, more efficient particulate control device to remove the remaining particulate to acceptable emissions rates.



**Figure 2.8: Low-Dust SCR Arrangement [42]**

Tail-End SCR

The tail-end SCR configuration places the SCR reactor downstream of all air pollution control equipment installed on a unit. Figure 2.9 depicts a tail-end system for a plant with a particulate control device and a wet FGD system. The air pollution control equipment removes most flue gas constituents detrimental to SCR catalysts before the flue gas enters the SCR reactor. The tail-end SCR configuration is often a technically feasible alternative for situations where the high-dust SCR configuration is impractical [100].

Because the flue gas temperature at the tail end is below the range required for the $NH_3/NO_x$ reaction, the flue gas must be reheated. Tail-end SCR systems use oil- or natural gas–fired duct burners or steam coil gas heaters for reheating. Some of the energy used to reheat the gas is recovered in a recuperating gas-to-gas heater. Some use catalysts specially designed for

temperatures between 300 – 550ºF and low pressure drops, which lowers the costs flue gas reheating [103, 106, 107].

A tail-end system may have higher capital and operating costs than the other SCR systems because of the additional equipment and operational costs associated with flue gas reheating and heat recovery. However, these costs are in part offset by reductions in catalyst costs. . Tail-end units require less catalyst because they can use catalysts with smaller pitch and higher surface area per unit volume. Tail-end SCR typically require only 2 layers of catalyst [52], although some use four half-layers of catalyst to allow for greater flexibility for catalyst replacement [101]. In addition, because there is less fly ash, catalyst poisons, and $SO_2$ in the flue gas for tail-end units, the catalyst lifetime is significantly increased and less expensive catalyst may be used [52]. Some sources have reported catalyst lifetimes for tail-end SCRs to be over 100,000 hours [52, 100, 101]. The tail-end SCRs may also have longer lifetimes due to the lower operating temperatures and lower levels of dust and $SO_3$.

Tail-end SCRs have been used since the late 1980s and were initially used on coal-fired power plants. They are currently used at a variety of different applications in Europe, Japan, and the U.S., including power plants, incinerators, refinery crackers, cement plants, and ethylene crackers [100, 101]. They have been installed on units burning a wide range of fuels, including fuels of variable composition, such as biomass (including wood waste and chicken litter), hazardous waste, municipal waste, and wastewater sludge [104, 105]. They are often easier and less complex to install than the high-dust and low-dust SCR configurations for retrofit situations and can be installed with less disruption to production. The tail-end SCR configuration has been used in many retrofits of existing power plants in Europe. In some situations, particularly where combustion units have space constraints, the capital cost for retrofitting high-dust SCRs may be higher than for tail-end SCR [52]. Modular tail-end SCR systems are also available that are designed to be installed with minimal plant disruption [102].

One other major advantage of the tail-end SCR configuration is that its preheater enables the SCR to operate independently of the combustion unit. This arrangement enables greater operating flexibility, allowing the combustion unit to operate in a wider range of operating loads and fuel types [100]. Because tail-end units follow the ESP and wet scrubber, the flue gas has cooled and must be reheated to an appropriate temperature for the $NO_x$ reaction to occur in the SCR. For tail-end units, the flue gas is typically sent through a gas-gas heat exchanger and then to either a natural gas-fired duct burner or steam coil to heat to the appropriate SCR operating temperature. Most tail-end SCR in Europe use steam coil reheating, which has advantages over a duct burner such as lower operating cost, no increase in flue gas flow rate from combustion byproducts, and no moisture condensation on the SCR catalyst.[13]

[13]  A case study for a tail-end SCR achieving 84 percent $NO_x$ removal efficiency on a 600 MW boiler burning bituminous coal indicated annual reheating cost for steam coil of $2.5 million/yr and for natural gas burner of $12 million/yr (2008$) (assuming approximately $4/1000 lb steam and $8/1000 sft$^3$ natural gas) [52]. For comparison, the annual reheating cost for natural gas burner would be $7.8 million/yr (assuming approximately $5/1000 sft$^3$ natural gas).



**Figure 2.9: Tail-end SCR Arrangement [42]**

<u>Gas Turbines</u>

Natural gas–fired turbine applications frequently use SCR technology for post-combustion $NO_x$ control. There are two basic gas turbine configurations: combined cycle (cogeneration cycle) and simple cycle. The majority of SCR systems are installed as combined cycle applications. As shown in Figure 2.10, a typical combined-cycle SCR design places the reactor chamber within a cavity of the heat recovery steam generator system (HRSG), between the superheater and the evaporator. The flue gas temperature in this area is within the operating range for base metal catalysts. Most new HRSG units include a cavity designed to accommodate an SCR reactor. However, older HRSG units may not have sufficient space to house the SCR reactor within the HRSG. In these cases, a low-temperature SCR reactor may be installed after the HRSG. The high temperature SCRs used on simple-cycle turbines are generally not retrofitted to combined cycle turbines equipped with HRSG due to lack of space between the turbine and the HRSG [95, 96, 97]. Simple-cycle applications of SCR place the reactor chamber directly at the turbine exhaust, where the flue gas temperature is in the range of 850°F to 1000°F (450–540°C). This requires the use of a high-temperature catalyst such as zeolite [42].



**Figure 2.10: SCR Arrangement for a Combined-Cycle Gas Turbine [42]**

Cement Kilns

SCR systems applied to cement kilns can have "tail-end", "low-dust", or "high-dust" configurations. Because of the potential for catalyst plugging, the "high-dust" configuration on cement kilns require catalyst cleaning mechanisms. The "low dust" and "tail-end" configurations avoid the costs of catalyst cleaning systems.  Currently, three "high-dust" SCR systems[14], three "low-dust" SCRs[15], and one "tail-end" SCR[16] are known. The "high-dust" SCRs reportedly achieve control efficiencies of approximately 80% with inlet dust loading of up to 100 g/m$^3$. The "low-dust" SCRs are reported to have dust loadings less than 20 mg/m$^3$, while the inlet dust loading for the "tail-end" SCR is reported to be less than 10 g/m$^3$ [94, 98, 99]

SCR Reactor Designs

The reactor design affects the capital and operating costs of the SCR system and the CMP. There are two different types of SCR reactors: full SCR and in-duct SCR. Full SCR designs house the catalyst in a separate reactor chamber. The boiler flue gas must be ducted from the economizer outlet to the SCR reactor, then to the air heater inlet. A separate reactor allows a large volume of catalyst to be installed in layers, which increases NO$_x$ reduction and catalyst lifetime. It also increases the duct length available for the mixing of reactants before entering the

---

[14] The first "high-dust" configuration SCR was installed on a preheater cement kiln at the Solnhofer Zementwerkes in Germany in 2001 and operated until 2006. Two other "high-dust" SCRs have been installed on preheater cement kilns at the Cementeria di Monselice plant in Bergamo, Italy in 2006 and the Mergelstetten plant in Germany in 2010.

[15] "Low-dust" configuration SCRs have been installed at the Sarche plant in Italy (2007), the Mannersdorf plant in Austria (2012), and the Joppa plant in the USA (2013). The Mannersdorf SCR is installed on a preheater cement kiln, while the Joppa SCR is installed on a long dry kiln. Both plants use an electrostatic precipitator to reduce particulate emissions entering the SCR. The Sarchi SCR is installed on a small Polysius Lepol kiln with no particulate controls, but low dust loading (reportedly less than 15 g/m$^3$).

[16] The Rohrdorf plant in Germany installed a "tail-end" SCR in 2011 on a preheater kiln.

reactor chamber. However, a separate reactor requires a large amount of space adjacent the boiler to install the reactor and ductwork. The additional ductwork often necessitates upgrades to the draft fan system.

In-duct (inline) SCR systems house the reactor within the plant's existing ductwork rather than in a separate reactor chamber. The ductwork is generally enlarged to provide sufficient room for the catalyst. In-duct systems save on costs for the ductwork, reactor chamber, and induced draft (ID) fan. In-duct designs limit catalyst volume and mixing length; therefore, they are commonly used in conjunction with other $NO_x$ control technologies [41]. Catalyst erosion is generally higher for in-duct systems. Installation and maintenance of in-duct systems typically require more boiler outages. Natural gas–fired boilers, which have low catalyst volumes, frequently employ in-duct systems. Coal-fired boilers frequently employ full SCR reactors but may apply in-duct SCR reactors where space limitations restrict the installation of a full reactor [41]. Cement kilns have also used full scale SCR reactors, rather than in-duct SCRs. The SCRs used for cement kilns have typically consisted of multiple catalyst layers and extensive catalyst cleaning systems. For example, the SCR systems installed at the Solnhofen cement plant in Germany and the Cementeria di Monselice plant in Italy used reactors with six catalyst layers, although only three layers were in use at a time [94].

### 2.2.4  SCR System Primary Equipment

The majority of SCR designs use Thermal DeNOx®, an ammonia-based $NO_x$ reduction system developed and patented by Exxon Research and Engineering Company in 1975. An SCR system consists of five basic steps:

- Receive and store the ammonia (or the urea reactant, followed by onsite ammonia production);
- Vaporize the ammonia and mix it with air;
- Inject the ammonia/air mixture at appropriate locations;
- Mix the ammonia/air with flue gas; and
- Diffuse the reactants into the catalyst and reduce the $NO_x$.

Although the basic steps in an SCR system are similar for all configurations, the system design and equipment specifications are somewhat different. A discussion of the SCR system design and equipment is given below for an ammonia reagent, high-dust, full reactor SCR for a 120 MW (approximately 1,200 MMBtu/hr) coal-burning utility boiler. These discussions are also pertinent to industrial applications. For example, cement kilns operating in the high-dust configuration would also require catalyst cleaning equipment [94]. The SCR process steps, related auxiliary equipment, and the potential impacts of SCR operation on existing plant equipment are also discussed. Simplified system flow schematics are presented in Figure 2.1 and Figure 2.7, and a list of equipment is presented in Table 2.3.

**Table 2.3: Major Equipment List for an SCR Application**

| Item | Description/Size |
|---|---|
| SCR reactors (1–2) | Vertical flow type, 805,000 acfm capacity, 44 ft × 44 ft × 31 ft. high (excluding outlet duct and hoppers), equipped with 9,604 ft³ of ceramic honeycomb catalyst, insulated casing, soot blowers or sonic horns, hoppers, and hoisting mechanism for catalyst replacement |
| Anhydrous ammonia tank (1 or more) | Horizontal tank, 250 psig design pressure, storage tanks 15,000 gal, 34-ton storage capacity |
| Air compressor (2) | Centrifugal type, rated at 3,200 acfm and 30 hp motor |
| Vaporizers (2) | Electrical type, rated at 80 kW |
| Mixing chamber | Carbon steel vessel for mixing or air and ammonia |
| Ammonia injection grid | Stainless steel construction, piping, valves and nozzles |
| Ammonia supply piping | Piping for ammonia unloading and supply, carbon steel pipe: 1.0-inch diameter, with valves and fittings |
| Soot blowing steam | Steam supply piping for the reactor soot-piping blowers, 2-inch diameter pipe with an on-off control valve and drain and vent valved connections |
| Air ductwork | Ductwork between air blowers, mixing chamber, and ammonia injection grid, carbon steel, 14-inch diameter, with two isolation butterfly dampers and expansion joints |
| Flue gas ductwork | Ductwork modifications to install the SCR modifications reactors, consisting of insulated duct, static mixers, turning vanes, and expansion joints |
| Economizer bypass | Ductwork addition to increase flue gas temperature during low loads consisting of insulated duct, flow control dampers, static mixers, turning vanes, expansion joints, and an opening in the boiler casing |
| Ash handling | Extension of the existing fly ash handling modifications system: modifications consisting of twelve slide gate valves, twelve material handling valves, one segregating valve, and ash conveyor piping |
| Induced draft fans | Centrifugal type, 650,000 acfm at 34 inches water gauge (in. w.g.) and 4,000 hp motor |
| Controls and instrumentation | Stand-alone, microprocessor-based controls for the SCR system with feedback from the plant controls for the unit load, $NO_x$ emissions, etc., including $NO_x$ analyzers, air and ammonia flow monitoring devices, ammonia sensing and alarming devices at the tank area, and other miscellaneous instrumentation |
| Electrical supply | Electrical wiring, raceway, and conduit to connect the new equipment and controls to the existing plant supply systems |
| Electrical equipment | System service transformer OA/FA/-60 Hz, 1,000/1,250 kVA (65°C) |
| Foundations | Foundations for the equipment and ductwork/piping, as required |
| Structural steel | Steel for access to and support of the SCR reactors and other equipment, ductwork, and piping |

Reagent Production, Storage, and Vaporization

As discussed previously, one of several reagents may be used in an SCR system, including anhydrous ammonia, aqueous ammonia, or urea. In the past, reagents have typically been purchased and stored before vaporization and use in the SCR. Ammonia (both anhydrous and aqueous) is the type of reagent most often used in SCR systems. Of about 230 utility boilers for which reagent type was reported in response to a survey in 2009, about 80 percent used

ammonia, and 20 percent used urea [4]. Urea reagent is mostly used in SNCR systems [65], however, U.S. cement plants typically use 19% aqueous ammonia for SNCR systems and likely would use the same reagent for SCR applications.  Another option that some facilities have recently adopted is to produce ammonia onsite from urea feedstock. The onsite ammonia production system may reduce or eliminate ammonia shipping, handling, and onsite storage. Load following by the onsite ammonia production system is extremely important for the proper operation of the SCR.

Several of the pros and cons of each ammonia system are shown in Table 2.4. In general, anhydrous ammonia is the least costly reagent; however, plant personnel and community safety, permitting, and other hazard planning concerns associated with its use may make this option less attractive and add to its cost. Aqueous ammonia is typically higher cost, given the energy required to vaporize or decompose the reagent, although some facilities have chosen this option over anhydrous ammonia to avoid some of the safety and planning concerns for anhydrous ammonia [37]. In general, as ammonia consumption increases, onsite urea-derived ammonia production is the most economical, while for lower consumption rates, aqueous ammonia may be the preferred economic option. For year-round operation, onsite urea-derived ammonia systems become economically competitive with 29% aqueous ammonia for plants around 800 MW and larger. For ozone season operation, onsite urea-derived ammonia systems become competitive with 29% aqueous ammonia at a plant size of 1,300 MW and larger [65]. The total cost of an SCR system with an onsite urea-derived ammonia system is approximately 2 to 5% more than an SCR system based on anhydrous $NH_3$ [10]. Another source reported a capital cost of $24 million for its onsite urea-derived ammonia system for a 1,300 MW unit delivering approximately 7,000 lb/hr $NH_3$, with a total capital investment of $175 million for the SCR system (not including the ammonia system) [66].

**Table 2.4: Comparison of Ammonia Delivery Systems [65]**

| Measure | Anhydrous NH₃ | Aqueous 19% NH₃ | Aqueous 29% NH₃ | Urea-derived NH₃ |
|---|---|---|---|---|
| Risk level | Highest safety, hazard, permitting, and regulatory issues | Lower safety, hazard, permitting, and regulatory issues | Lower safety, hazard, permitting, and regulatory issues | Lowest safety, hazard, permitting, regulatory issues |
| Energy | Lowest energy use | High energy use | Medium energy use | Not known |
| Product deliveries | Fewest product deliveries | Large number of product deliveries | Medium number of product deliveries | Not applicable |
| Capital cost | Low capital cost | Low capital cost | Low capital cost | Highest capital cost |
| Annual cost | Lowest annual cost | High annual cost | Medium annual cost | Medium annual cost |

Aqueous ammonia is typically available as a 19–29.4% solution in water. Anhydrous ammonia is nearly 100% pure ammonia and stored as a liquid under pressure. Table 2.2 presents the properties of aqueous (29%) and anhydrous ammonia.

If facilities receive anhydrous or aqueous ammonia from offsite, it is received via a tank-truck or rail car and pumped into one or more storage tanks. Ammonia is typically stored as a liquid in horizontal cylindrical tanks. An aqueous ammonia tank is an enclosed tank rated for only slightly elevated pressure, while an anhydrous ammonia tank is a pressure vessel rated for at least 250 pounds per square inch gauge (psig). An anhydrous ammonia tank can be filled to only about 85% of its total volume to allow for a vapor space above the liquid level. The tanks are

equipped with level and temperature indicators; a manway, vent, and access ladder; and other appurtenances. The applicability of heat tracing, insulation, and seismic design criteria are determined based on site-specific conditions. The tank should be mounted on a concrete pad and surrounded by a spill containment structure such as a dike.

SCR applications on large boilers generally require one to five tanks with volumes ranging from 10,000 to 20,000 gallons per tank to maintain sufficient volume for 1–3 weeks of SCR operations. The ammonia storage tank may be sized for 3–30 days of storage. The high end of the range would be used in conservative design practice. Alternatively, if ammonia distributors are located nearby and considered reliable, the plant owner might opt for a smaller tank, sized for fewer days of ammonia storage.

Aqueous ammonia is vaporized by pumping it to a vessel where it mixes with hot air. The air from the dilution air fan is heated in an electric heater or other heat exchanger (e.g., steam). In most aqueous ammonia applications, the ammonia-air mixture leaves the vaporizer vessel at about 300°F (150°C). The vaporization energy required for aqueous ammonia is much greater than that required for anhydrous ammonia because the water in the aqueous ammonia solution also must be vaporized.

If anhydrous ammonia is used, it is fed to the electrical vaporizer by gravity, and the vaporized gas is returned to the storage tank vapor space. Vapor is drawn from the vapor space and piped to the ammonia/air mixer. Alternatively, liquid anhydrous ammonia may be pumped to a vaporizer and piped to the ammonia/air mixer.

Ammonia (aqueous or anhydrous), diluted with air at a ratio of about 20:1 (air:$NH_3$), is transported to the ammonia injection grid. The high proportion of air helps ensure good mixing of air and ammonia and keeps the mixture below the flammable limit.

<u>Onsite Urea-Derived Ammonia Production</u>

Use of onsite ammonia production systems for feed into SCR reactors has increased, mostly as a result of safety concerns [37]. Several process types can produce ammonia from urea, including (1) systems that hydrolyze an aqueous urea solution to form ammonia and carbon dioxide (and water); (2) systems that melt solid urea and mix the liquor with steam, where it reacts the melted urea across a catalyst to form ammonia, carbon dioxide, and water vapor; and (3) systems that atomize an aqueous urea solution in a decomposition chamber containing a hot air stream or flue gas stream at 800–1200°F (430–650°C) to form ammonia and isocyanic acid (NHCO) [37]. The capital costs of these systems vary with design [37]. Urea feedstock is available in solid form or as urea solution in deionized water [65]. Almost all urea-to-ammonia systems use solid urea [65]. Urea-to-ammonia systems typically include dry urea unloading equipment, storage silo, dissolving tank using deionized water, feed tanks, feed pumps, a solution heater, and a hydrolyzing reactor or decomposition chamber, depending on the type of process used [65]. Descriptions of two types of these systems are provided.

One of the urea-derived ammonia production systems converts urea by thermal hydrolysis to ammonia, carbon dioxide, and water vapor. As shown in Figure 2.11, the system consists of urea storage, handling, and dissolvers; a reactor feed tank; circulation; feed pump; condensate skids; a hydrolysis reactor; and ammonia flow control units. In the urea solution preparation, dry urea is fed batch-wise from delivery trucks directly to the dissolver along with

deionized water, and the urea solution is stored. In the solution feed and control system, urea solution is transferred to the reactor feed tank, and the feed pump meters the urea solution to the reactor, which is heated using steam. The hydrolysis reactor is a kettle-reboiler type heat exchanger that operates at 80 psig and at a temperature in the range of 280 to 310°F (140–150°C). The urea-to-ammonia reaction occurs in two steps: the first reaction produces ammonium carbamate ($NH_4COONH_2$) from urea and water, and the ammonium carbamate breaks down into carbon dioxide and ammonia in the presence of heat. The temperature of the reactor drives the rate of ammonia production. Trace amounts of formaldehyde are present when formaldehyde-conditioned urea is used as feedstock; operating the hydrolysis reactor at a pH of 9 or higher limits formation of urea formaldehyde polymeric resins that can deposit on the reactor [67].

One of the urea-derived ammonia production systems decomposes urea to generate ammonia that is fed to the AIG, as shown in Figure 2.12. The system consists of a blower, decomposition chamber, urea storage, chemical pumping system, and process controls. In the urea storage and pumping system, dry urea from the storage tank is mixed in a solution tank with water and transferred to an aqueous urea solution storage tank. Filtered ambient air is fed into the decomposition chamber through the use of a blower with automatic dampers to control discharge flow and pressure. In the chamber, a burner is fired downstream of the dampers, and an aqueous urea solution that is supplied by the storage and pumping system is sprayed into the post combustion gases by injectors. The decomposition occurs under a specific temperature and residence time, with the decomposition temperature ranging from 600 to 1000°F (320–540°C), and the urea is decomposed to ammonia and isocyanic acid. The outlet ammonia stream from the decomposition chamber feeds into the AIG system for the SCR [68].



**Figure 2-11: Urea-Derived Ammonia Production System Using U2A system [65]**

Used by permission of R. Salib of URS Washington Division (formerly Washington Group International).



**Figure 2.12: Urea-Derived Ammonia Production System Using NO$_x$ ULTRA System [68]**

**Used by permission of K.R. Dougherty of Fuel Tech, Inc.**

<u>Ammonia Injection</u>

For aqueous, anhydrous, or urea-derived ammonia, the ammonia-air mixture is directed through a flow-balancing skid to the AIG, where it is injected under pressure. The flow-balancing skid consists of flow meters and manual valves to adjust the flow to each part of the AIG.

The AIG consists of a network of pipes or lances connected in parallel and perforated with several holes or nozzles. The lances are placed in a grid formation across the width and height of the ductwork. The lances and holes are sized to distribute the ammonia uniformly into the flue gas. The spray angle and velocity of the injection control the trajectory of the ammonia. Injectors are subject to high temperatures and flue gas impingement, which cause erosion, corrosion, and degradation of structural integrity. Therefore, injectors are generally constructed of stainless steel and designed to be replaceable. Multiple injection zones may be used to increase the distribution of ammonia.

The ammonia can be injected with a low- or high-energy system. A low-energy system uses little or no pressurized air while a high-energy system uses large amounts of compressed air or steam to inject and vigorously mix the solution with the flue gas. AIG systems in large boilers typically use high-energy systems. High-energy systems are more expensive to build and operate because they require a larger compressor and a more robust injection system, and consume more electric power.

Uniform distribution and mixing with flue gas is critical to maintain desired low levels of ammonia slip. Cold gas flow modeling and numerical flow modeling are generally performed for the AIG and SCR system to ensure uniform mixing and dispersion before the gases enter the SCR reactor. If duct length is inadequate to ensure thorough mixing or results from the model study indicate poor gas mixing characteristics, devices such as turning vanes or static gas mixers may be added.

An essential part of an AIG system is the controller used to regulate ammonia injection. Boiler load, inlet $NO_x$, and inlet gas temperatures set the feed-forward signal to establish the base ammonia injection rate. A feedback signal measuring the SCR outlet $NO_x$ concentration is used to trim the base ammonia injection rate.

Although not necessarily required to achieve high $NO_x$ removal efficiencies and low ammonia slip, most SCR installations today employ some type of static mixer to achieve good $NH_3/NO$ mixing [37]. Static mixers provide a more uniform flux of $NO_x$ and more uniform temperature and mixing of $NH_3$ and $NO$ [37]. For example, achieving 90% $NO_x$ removal and a 2-ppm ammonia slip typically requires $NH_3/NO$ uniformity less than 5% and perhaps as low as 3%, as measured on a root mean square basis, and static mixers enable the SCR to achieve these levels [37]. The costs for static mixers vary (e.g., a 500 MW unit may have an installed cost of $750,000 and an additional 1 in. w.g. of flue gas pressure drop) [37]. One specific type of static mixer is the Delta Wing™ mixer, which consists of an obstruction in the duct, usually a stationary disk or triangular plate, oriented at a slant to the flow direction. The Delta Wing mixer creates large vortices downstream of the device, which promotes mixing to a more homogenous gas. The ammonia injection nozzles are located in the vortex zone immediately downstream of the mixer [69]. The Delta Wing mixer costs for installing a new SCR typically are less than $500,000 and include the capital costs for the mixer and the modeling necessary to determine the location for maximum mixing effects. For an existing SCR that was installed without a static mixer, the costs to install the Delta Wing mixer, including capital, modeling, and other retrofit costs, could be up to $1,000,000 [70].

Another approach that may help retain good $NH_3/NO$ uniformity is to conduct an annual tuning of the AIG, which can improve the $NH_3/NO$ mixing (reduces $NH_3/NO$ "unmixedness" by 2–5% on a root mean square basis) [37]. Data have shown that the ability of the AIG to achieve good mixing can decline over time and that annual tuning can return the AIG to startup or near-startup mixing uniformity [37]. Annual AIG tuning can cost from $30,000 to $50,000 depending on the unit size [37]. Depending on the type of mixer used, annual tuning may not be necessary, because some static mixers combine gas mixing and reagent injection in one application, with no moving parts in the gas stream; this type of mixer avoids much tuning during startup and commissioning and for annual maintenance [71].

Use of static mixers and annual tuning can either increase the $NO_x$ efficiency at the same ammonia slip level or extend the catalyst life at the same $NO_x$ removal efficiency [37]. Extending the catalyst life can significantly reduce operating costs, even after accounting for the outsourced tuning costs [37].

JA147

*Chapter 2 – Selective Catalytic Reduction*

Catalytic Reduction of NO$_x$

The catalytic reduction of NO$_x$ in the SCR reactor occurs when the NO$_x$ and ammonia in the flue gas contact the catalyst layers. The catalyst itself is the key component of the SCR system. The catalyst composition, type (honeycomb, corrugated, or plate), and physical properties affect performance, reliability, catalyst quantity required, and cost. However, because the SCR system supplier and catalyst supplier must guarantee catalyst life and performance, most catalyst characteristics are selected by the SCR system supplier.

**2.2.5    SCR System Auxiliary Equipment**

SCR Inlet and Outlet Ductwork

In retrofit installations, new ductwork is required to integrate the SCR system with the existing equipment. In high-dust SCR systems for utility and industrial boilers, the reactor is located between the economizer outlet and the air heater inlet. In low-dust SCR systems for utility and industrial boilers, the SCR reactor is located between the outlet duct of the particulate control device and the air heater inlet duct. In tail-end SCR systems for utility and industrial boilers, the ductwork tie-ins are downstream of the FGD system and also require the integration of the flue gas reheating equipment.

See Section 2, Generic Equipment and Devices and Chapter 1, Hoods, Ductwork, and Stacks, for more details.

SCR Bypass Duct

Low-load boiler operations can decrease the temperature at the SCR reactor inlet below the SCR operating range. In addition, startup and shutdown of the boiler causes drastic temperature fluctuations. For these operating conditions, an SCR bypass may (but not necessarily) be required to route the flue gas around the reactor chamber. The bypass prevents catalyst poisoning and fouling during periods when flue gas stream conditions do not meet design specifications for proper SCR operation. The bypass system also must include zero-leakage dampers to prevent flue gas leakage from poisoning and fouling the catalyst while the SCR is not operating. A bypass system may also be considered for seasonal operation of the SCR system, such as for boilers that would require NO$_x$ control during the ozone season (typically May to September), but not at other times of the year.

An SCR bypass may be needed for cement plant applications. During periods of startup and shutdown, the operating temperatures and constituents in the kiln gases may affect SCR operating conditions and may cause catalyst plugging or damage.

It should be noted that operational routines can be applied during SCR startup and shutdown that could preclude the need for a bypass, however, particularly for SCRs that operate year round [56]. Also, a Haldor Topsoe paper indicates that a bypass is not recommended for reasons including:  complicated flue gas duct work, increased risk of dust depositing in horizontal parts, dust precipitation around dampers, and erosion of louver-type dampers that may

result.[17]  In fact, many of the SCRs being built in the late 2000's for compliance with the Clean Air Interstate Rule (CAIR) do not include bypasses.[18]  Recently built coal fired power plants in Germany are designed without any SCR bypasses, according to a report by a major engineering services firm.[19]

<u>Soot Blower or Sonic Horn</u>

In coal-fired boilers, soot blowers are usually installed in the SCR reactor to remove particulates that may mask or block active catalyst surfaces and gas passages. Soot blowing helps maintain acceptable flue gas pressure drop in the SCR reactor by keeping the catalyst gas passages free of particulate. Soot blowers also keep the air heater gas passages open and thereby reduce system pressure drop. This is especially true for SCR retrofits where the air heater plate spacing is generally narrow, making it more susceptible to fouling or clogging by ammonia-sulfur salts.

Retractable rake-type soot blowers that use steam or air for blowing are used in SCR designs. The soot blowers are typically located above each catalyst layer. Soot blowing is usually performed on one catalyst layer or part of one catalyst layer at a time. Soot blowing of all the catalyst layers takes 30 minutes to 2 hours, but is usually done infrequently. In European SCR installations, soot blowing is done approximately once or twice a week [72]. Traveling-rake steam soot blowers can have installed costs of $120,000–$160,000 [37].

Use of sonic horns has risen as an alternative to soot blowers [37]. Sonic horns require less preventive maintenance than soot blowers, but they are susceptible to moisture and fly ash, which cause plugging of the horn [37]. Sonic horns also cannot damage catalyst through either high-pressure operation or steam leaks, as can occur with soot blowers [37]. The capital cost for sonic horns can be $40,000–$100,000 for each catalyst layer, depending on the size of the unit [37]. Sonic horn operating costs have been reported from $1/day to <$4/day for each catalyst layer, compared with approximately $41/day for conventional soot blowers [37]. Although sonic horns may have some advantages over soot blowers, the demand for high NOx removal efficiency requires extremely clean catalyst and thus the best cleaning system (regardless of cost); therefore, higher costs for soot blowers are justified for many applications [37].

For high dust loadings, the cement industry also reports use of soot blowers using heated, dry compressed air and use of sonic horns [94].  Improvements to cement dust cleaning for high dust loading and sticky dust have been made by changing the geometry and operating parameters of the dust blowers [112].

<u>Large Particle Ash (LPA) Equipment</u>

A significant concern for utility and industrial boiler SCR operation that was not evident in early applications is the role of the accumulation of LPA, also referred to as "popcorn ash," on

[17] Jenson-Holm, Hans, Lindenhoff, Peter, and Safronov, Sergey.  SCR Design Issues in Reduction of NOx Emissions from Thermal Power Plants.  Haldor Topsoe A/S, Russia Power, 2007.
[18] Rutherford, Scott. Cormetech, Inc. Coal-Fired Applications in the U.S. – Challenges and Strategies for Successful Operation and Emissions Compliance. VGB Workshop, "Flue Gas Cleaning 2007". May 22-23, 2007, Vienna, Austria. Available on the Internet at http://www.cormetech.com/brochures/2007_VGB_Conference_Paper.pdf .
[19] Nielsen, Flemming Skovgaard, Danesi, Paolo, and Radhakrishnan, M.V.  Modern Boiler Design, BWE.  January 2012.

catalyst surfaces of high-dust SCR applications. LPA is defined as particles that are 4–7 mm in characteristic dimension and large enough to lodge in the openings of grid- or plate-type catalysts [37]. It is estimated that up to half of SCR units on coal-fired utility boilers are affected by LPA [8]. LPA is not an issue for natural gas-fired applications.

The cause or mechanism by which LPA is formed is unknown. A survey of 32 utility boiler operators found 23 had experienced significant plugging of catalyst modules, but there was no clear correlation of design or operating characteristics (e.g., coal type, boiler or reactor design, SCR cleaning method, or catalyst geometry) with either significant LPA problems or the lack of problems. Without knowledge of how LPA is generated, many facilities mitigate its impacts by removing some of the LPA from the flue gas before it reaches the catalyst. The most common mitigation method is the use of screens and/or baffles between the economizer exit and the SCR reactor that provide a barrier to the LPA and divert it to an ash hopper. This approach was used by operators of 21 of the 23 surveyed boilers that experienced LPA problems, and the other 2 were considering adding such equipment. Some of the 9 boilers that were not equipped with screens also had flow or deflector baffles. The frequency of economizer ash hopper evacuation has been suggested as a key variable affecting catalyst blockage. Increasing this frequency would be a low-cost operating change, but the survey of utility boiler operators did not show a correlation between evacuation frequency and catalyst blockage levels [73].

The survey report also identified the following recommendations for effective use of screens: (1) orient the screen at an angle to the flue gas flow, or use pleats; (2) maintain at least 50% to 60% open flow area; (3) conduct CFD or physical flow modeling and design the duct and screen to keep flue gas velocity below 50 actual ft/s (or preferably <45 actual ft/s) and eliminate peaks in velocity; and (4) use active cleaning systems. The open flow area and velocity recommendations are intended to minimize erosion of the screen material by fly ash, which was found to be significant regardless of the screen material used at the surveyed facilities [73]. The low velocity may also encourage LPA to drop out of the flue gas [37]. LPA screens can be modular to allow replacement, coated or uncoated depending on velocity, and rigid or flexible [37].

Capital costs for a simple rigid screen can be $200,000–$500,000 for an erosion-tolerant design for high flue-gas velocity and exotic construction material [37]. The installed cost of screens for two SCRs on twin boilers that collectively generate 745 MW was $600,000 in 2004 [74]. A redesign and replacement of this screen along with CFD flow modeling in 2009 cost $806,000 [75, 76]. Operating costs can be a 1-in. w.g. pressure drop and require an additional $150,000 every 2 years to replace eroded screen panels. The costs associated with LPA mitigation methods can be recovered by avoiding an outage, by not accelerating an outage, and by maintaining clean catalyst [37].

Another option for LPA mitigation involves the use of targeted in-furnace injection, which models injections strategies to reduce $SO_3$ formation, and also minimizes slag and fouling. This slag and fouling control also reduces LPA formation. A suspended slurry of magnesium hydroxide ($Mg(OH)_2$) is used to change the slag formation by traveling into a furnace, becoming superheated and subsequently forming very small particles of magnesium oxide ($MgO$). The performance of targeted injection, and associated reduction of LPA, has been established in a case study on a 600 MW opposed wall-fired unit, where successful control of LPA has been

demonstrated for more than six years. After successfully implementing the targeted in-furnace injection, the facility was able to remove their pre-existing LPA screens [77].

Economizer Bypass Duct

Although the SCR reaction occurs within a temperature window of 600–750°F (320–400°C), the catalyst for a given application is designed for a somewhat narrower range: the economizer outlet temperature at normal boiler operating load. Maintaining the flue gas temperature within the required window is essential for optimizing the $NO_x$ reduction reaction. When the economizer outlet flue gas temperature decreases because the plant is operating at reduced loads, the temperature can be raised using an economizer bypass.

The economizer bypass duct generally has a modulating damper to regulate the amount of hot bypass gas flow to be mixed with the cooler economizer outlet flue gas. The lower the boiler load, the more this damper opens, thus admitting more hot gas. The economizer outlet duct also needs a modulating damper to provide enough backpressure to allow the required volume of gas to flow through the bypass. The main design considerations for an economizer bypass involve maintaining the optimum gas temperature and ensuring uniform mixing of the two gas streams prior to entering the SCR reactor.

Upgraded or New Induced Draft (ID) Fan

The new ductwork and the SCR reactor's catalyst layers decrease the flue gas pressure. To maintain the same flow rate through the duct work, additional energy is required. The existing ID fan may be unable to provide the required increase in static pressure. In such cases, an upgraded or new ID fan is installed. This is also true for cement kiln applications due to the high dust loading and high pressure drop across the SCR. The existing fan and motor foundation may also need modification. Replacement involves installation of a new fan or booster fan. In all cases, additional electric power for the ID fan is needed to overcome the additional pressure drop through the SCR system. Based on typical values for the pressure drop through the additional duct work and the catalyst layers, the additional electric power needed (i.e., the heat rate penalty) is equivalent to approximately 0.3% of the plant's electric output for SCR on a utility boiler. Refer to Equations 2.57 and 2.58 for estimates of the total additional electric power needs for the ID fan as well as other equipment in the SCR system.

**2.2.6   Other Considerations**

Fuel Source

Utility and industrial boilers use coal, distillate oil, residual oil, natural gas, and a variety of other fuels such as biomass (e.g., wood, bark). The fuel type and grade affects the SCR design, and therefore, the capital costs of the SCR system. Fuels with high heating value have higher gas flow rates, which in turn increase the required SCR reactor size and catalyst volume. Coal-fueled applications are more costly than oil- and natural gas–fired boilers, due to their higher flue gas flow rates [53].

The quantity of nitrogen, fly ash, and pollutants in the flue gas stream varies according to the type and grade of the fuel. This affects the volume of catalyst required, as well as the catalyst design, composition, and rate of deactivation. Coal flue gas contains a greater amount of fly ash,

JA151



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
Office of Air and Waste Management
Washington, D.C. 20460

December 9, 1976

**MEMORANDUM**

SUBJECT:  Guidance for determining Acceptability of
          SIP Regulations in Non-attainment Areas

FROM:     Roger Strelow, Assistant Administrator
          for Air and Waste Management

MEMO TO:  Regional Administrators, Regions I-X

The basis for fully approving state-submitted SIP regulations continues to be demonstrated attainment and maintenance of all national ambient air quality standards as expeditiously as practicable. If the plan demonstrates attainment and maintenance, EPA is required to approve the state regulations. EPA cannot disapprove them because they are too stringent or because EPA Considers them not stringent enough (for example, because they are less stringent than a comparable Federal regulation or because they control fewer sources than controlled by Federal regulations), providing the overall SIP shows attainment and maintenance as quickly or quicker than any other available control strategy. If the state plan shows attainment and maintenance, Federal regulations may be revoked at the time of approval.

Especially for oxidant, carbon monoxide, and particulate matter (in areas dominated by urban fugitive dust), control measures required to attain the standards may be technically impossible or socially or economically unacceptable within a short time frame. In this situation, EPA still cannot disapprove state regulations because they are "too stringent," and industry cannot successfully challenge an approval on the ground that the requirements are technologically or economically infeasible. On the other hand, EPA must disapprove the state regulations if they are not stringent enough. The test for approvability of individual regulations is whether they require, at a minimum, all reasonably available controls on a source as expeditiously as practicable. This memorandum seeks to provide guidance as to how to ascertain if state regulations meet these minimum requirements. The use of any given level of control which fails to assure attainment should only be considered to be an interim measure. As control technology improves and as new control measures become

— 2 —

feasible for an area, it will be necessary for the SIP to be periodically revised to include these measures until attainment and maintenance can be demonstrated.

## 1. Reasonably Available Control Measures

### a. Stationary Sources

With respect to individual point sources and area sources with defined emission points (i.e., those amenable to the application of "classical" control equipment), reasonably available control technology (RACT) defines the lowest emission limit that a particular source is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility. Thus, RACT encompasses stringent, or even "technology forcing," requirement that goes beyond simple "off-the-shelf" technology. As noted, RACT is the minimum EPA can accept in non-attainment state plans.

The determination of RACT and the corresponding emission rate, ensuring the proper application and operation of RACT, may vary from source to source due to source configuration, retrofit feasibility, operation procedures, raw materials, and other technical or economic characteristics of an individual source or group of sources. In order to assist the Regions in determining the impact of these variables on RACT, OAQPS is continuing to develop RACT guidance materials (see attached status report). This material describes what can be accomplished with good technology and defines things that should be considered in establishing an emission limit for a specific source of that type. In determining RACT for an individual source or group of sources, the control agency, using the available guidance, should select the best available controls, deviating from those controls only where local conditions are such that they cannot be applied there and imposing even tougher controls where conditions allow. For example, the best available control for a boiler burning coal and bark at a pulp mill is multiclone followed by an electrostatic precipitator (ESP), the two control devices having an overall collection efficiency of 99.5%. However, in areas where the bark or similar fuel has a high salt content as a result of the logs being floated in the estuary portion of the river, it may be that the technological and economic

---

* As stated at the outset of this memorandum, the test for approving the entire control strategy — and for EPA thus not having to promulgate any measures — continues to be demonstrated attainment and maintenance of the NAAQS.

— 3 —

problems of installing and operating a large, corrosion resistant ESP may prove unreasonable. More technological and economically feasible controls consisting of a multiclone and ,wet collector designed to withstand the corrosive conditions, and perhaps functioning more effectively on a salt fume than an ESP, depending on the pressure drop employed, may constitute RACT under the conditions cited. In every case RACT should represent the toughest controls considering technological and economic feasibility that can be applied to a specific situation. Anything less than this is by definition less than RACT and not acceptable for areas where it is not possible to demonstrate attainment

As a further assistance to the Regions in defining RACT for the more difficult or the far from textbook situations, OAQPS's Emission Standards and Engineering Division (ESED) will establish a consulting group to support the Regions. This group will include ESED staff but will also include technical expertise from OE and the Regional Offices. In specific instances, the National Air Pollution Control Techniques Advisory Committee (NAPCTAC) may be asked to assist in a RACT determination. The consulting group is being established as a service to the Regions and it should not be looked at as a clearinghouse for regional RACT determinations. These decisions are yours to make. The group is designed to help you as needed on the most difficult cases.

### b. Mobile and Area Sources
As with point sources, measures which constitute reasonably available controls for mobile sources and area sources with undefined emission points may represent relatively stringent requirements which in many situations forces the application of measures not previously adopted or implemented in a given area. These measures include vehicle inspection and maintenance, transportation control and land use measures, certain controls on fugitive and reentrained dust, and other measures which may influence customary life styles. They do not include clearly un- reasonable measures such as substantial gasoline rationing. Moreover, what may be reasonable in one area may be un- reasonable in another. For example, while it may be reasonable as a transportation control measure to quickly reduce the number of cars permitted to enter the central business district in a city with a good mass transit system, it would not be reasonable to do this on the same timetable in a city with a poor mass transit system.

– 4 –

## 2. Documentation

In those situations where the State's control strategy can- not demonstrate attainment it will be necessary for the State to document that their control strategy represents the application of reasonably available control measures to all available source categories. The Region should not approve a control strategy that does not contain sufficient documentation to show that the required control measures are the toughest that are reasonably available for the sources in the area covered by the control strategy.

## 3. Replacement of Federal Regulation

In some areas the SIPS already contain EPA regulations representing reasonably available controls that generally reflect a national definition of reasonably available controls for that source category and that were arrived at by EPA after proposal and public hearing, (e.g., Stage I and I1 gasoline marketing regulations in 16 AQCRs; transportation control measures in 28 AQCRs).

In these situations there is inherently less flexibility in the definition by the state of reasonably available controls and specific justification will be needed before EPA could ap- prove a regulation which exempts significantly more sources, or which imposes controls significantly less stringent, than the Federal regulations. This justification should document the specific case-by-case economic. technical or other factors which cause the state's regulations, although significantly different from the Federal regulation, to include all that is reasonable for a specific area. (The state regulation would still have to con- form to the criteria outlined for defining reasonable control measures.) Such justification must be provided not only as a basis for approval of the state regulations, but also to protect the enforceability of comparable Federal and state regulations in other areas. In the absence of acceptable justification, the state regulation exempting some sources can be approved as far as it goes and the Federal regulation should remain in effect to cover sources for which the state's regulation does not apply. Of course, nothing should preclude a state from adopting and this Agency approving a regulation which requires more control than the Federally promulgated regulation.

Since it is the Agency's objective to encourage the states to develop and implement regulations to replace EPA regulations, the Agency may approve state regulations that are only marginally different from the Federal regulations without

– 5 –

the detailed justification noted above if, in the Regional
Administrator's judgment, the impact on emissions differs
imperceptibly (less than 5% in cases where it is possible to
quantify the difference) from that of the Federal regulations
and there is no significant threat of undermining EPA
activities elsewhere in the nation. When determining if a state
regulation is environmentally equivalent to the Federal
regulation, EPA can only look at the particular measure being
implemented. In other words, it would be unacceptable to
approve a measure requiring significantly less control than
the corresponding Federal measure on the basis that other
control measures implemented in the same area are
significantly more stringent than the comparable Federal
measures. In areas where attainment cannot be demonstrated,
all reasonable measures on all source categories are needed.

To further encourage states to replace EPA regulations,
reasonable additional time generally may be granted to com- ply
with replacement regulations providing the new compliance
dates (effective dates) are not clearly excessive. We cannot
expect a state to adopt regulations which depend upon the prior
Federal regulations to alert sources to the steps needed for
control, except in those cases where the state regulation is
substantially identical to the Federal regulation which it
replaces. On the other hand, granting of additional time must
be done with care so as not to undermine the action-forcing
role of firm deadlines in EPA efforts elsewhere. The use of a
"good faith efforts" test will be appropriate in some
circumstances

## 4. Conclusion

In concluding, I would like to reiterate the fact that the
air quality standards are not being attained in many of these
RACT areas. Therefore, we cannot relax the intensity of the air
pollution control effort. We should ensure that all sources
contributing to the nonattainment situation are required to
implement restrictive available control measures even if it
requires significant sacrifices.

cc:`Mr. Tuerk, Mr. Barber, Mr. Legro, Mr. Bonine, Mr. Hidinger.

March 16, 1994


<u>MEMORANDUM</u>

SUBJECT:    Cost-Effective Nitrogen Oxides (NOx) Reasonably
            Available Control Technology (RACT)

FROM:       D. Kent Berry, Acting Director
            Air Quality Management Division (MD-15)

TO:         Director, Air, Pesticides and Toxics
               Management Division, Regions I and IV
            Director, Air and Waste Management Division,
               Region II
            Director, Air, Radiation and Toxics Division,
               Region III
            Director, Air and Radiation Division,
               Region V
            Director, Air, Pesticides and Toxics Division,
               Region VI
            Director, Air and Toxics Division,
               Regions VII, VIII, IX, and X


       This memorandum provides guidance for determining NOx RACT
[required by section 182(f) of the Clean Air Act (Act)] as it
relates to nonutility sources and utility boilers which were not
addressed by the Environmental Protection Agency's (EPA's)
previous guidance.  The document entitled, "State Implementation
Plans; Nitrogen Oxides Supplement to the General Preamble; Clean
Air Act Amendments of 1990 Implementation of Title I; Proposed
Rule," (NOx supplement) (November 25, 1992, 57 FR 55625)
identifies emission rates that presumptively meet the NOx RACT
requirement for tangential and dry bottom wall-fired utility
boilers.  The guidance goes on to state that, for other major NOx
sources, EPA expects that NOx RACT will be set at levels that are
"comparable" to the levels specified for tangential and dry
bottom wall-fired utility boilers.  The guidance states that:
"Comparability shall be determined on the basis of several
factors including, for example, cost, cost-effectiveness, and
emission reductions."  This memorandum primarily addresses <u>one</u> of
the factors in a NOx RACT determination--cost effectiveness--and
provides guidance on how to determine which control techniques
are of "comparable cost-effectiveness for NOx RACT."  In
addition, this memorandum provides limited discussion of other
factors, including emission reductions.

2

It should also be noted that, in certain areas, States may require $NO_x$ controls based on advanced control technologies; i.e., control technologies that reduce emissions beyond RACT or title IV (acid rain) requirements.  For example, advanced controls would be required as part of a serious ozone nonattainment area's 1994 State implementation plan if modeling found such controls to be necessary to provide for expeditious attainment of the ozone national ambient air quality standards. In order to avoid or minimize potentially incremental or repetitive control requirements, States and regulated sources should consider in advance the implications of all relevant requirements.

In general, the actual cost, emission reduction, and cost-effectiveness levels that an individual source will experience in meeting the NOx RACT requirements will vary from unit to unit and from area to area.  These factors will differ from unit to unit because the sources themselves vary in age, condition, and size, among other considerations.  The EPA's general RACT guidance urges States to judge the feasibility of imposing specific controls based on the economic and technical circumstances of the particular unit being regulated.  In many cases, these factors are not the same in all States since the specific NOx RACT emission limitations and averaging times will differ from State to State.  The EPA's presumptive NOx RACT levels for certain utility boilers are based on capabilities and problems which are general to the industry on a national basis.  States may adopt statewide NOx RACT levels which are more stringent than the EPA levels based on statewide industry conditions.  For these reasons, a single cost, emission reduction, or cost-effectiveness figure cannot fully describe the NOx RACT requirement.  Thus, the information provided in this memorandum does not prescribe a single cost-effectiveness figure, but rather provides additional guidance which States may use as they make NOx RACT determinations.

For NOx RACT, cost effectiveness is a figure in dollars per ton of NOx emissions reductions per year.  In order to clarify the "comparable cost-effectiveness for NOx RACT" referred to in the NOx supplement, EPA reviewed the December 1992 EPA/Northeast States for Coordinated Air Use Management (NESCAUM) report (EPA/NESCAUM report) on utility boilers entitled, "Evaluation and Costing of NOx Controls for Existing Utility Boilers in the NESCAUM Region" (EPA 453/R-92-010).  This report identifies various NOx control technologies for existing utility boilers and their associated costs, cost effectiveness, and emission reductions.  As described below, EPA has extracted from the report the cost effectiveness of controls that are expected to meet the EPA's presumptive NOx RACT for tangential and dry bottom wall-fired utility boilers at least cost.  These cost figures generally define the "comparable cost-effectiveness for NOx RACT" referred to in the NOx supplement.

3

The November 1992 NOx supplement to the General Preamble specifies the following areawide presumptive NOx RACT emission limits (lbs NOx per million Btu determined on a rolling 30-day average) for utility boilers:

        Coal:     tangential--0.45    wall--0.50
        Gas/Oil:  tangential--0.20    wall--0.30

Technologies available to meet these NOx RACT levels are described in section 4 of the EPA/NESCAUM report.  Section 5 of that report describes the cost algorithm used, which includes consideration of process capital equipment, total plant cost and investment, fixed and variable operating cost, total capital requirement and consumable costs.  The cost-effectiveness figures in the report are based on data from different geographic regions and represent a variety of averaging times.  The EPA believes the data are appropriate to use with respect to the EPA presumptive NOx RACT 30-day rolling average or to a daily average.

As described in tables 1-4 and 1-5 of the EPA/NESCAUM report, the combustion-modification technologies available to meet EPA's presumptive NOx RACT levels show a range of cost effectiveness of about $160 to $5100 per ton; and the post-combustion technologies, excluding selective catalytic reduction, show a range of about $320 to $5200 per ton.  These are national estimates based on constant 1991 (1st quarter) dollars.  Some States may need to make regional adjustments to this range to reflect prevailing installation and operating labor costs which are higher or lower than the national average.  The data indicate that some coal burning wall-fired boilers can meet EPA's presumptive NOx RACT levels by application of low NOx burners at a cost effectiveness as low as $160 per ton.  The data also indicate that certain tangentially-fired utility boilers may approach a cost-effectiveness level of $1300 per ton in order to meet the EPA presumptive NOx RACT levels.  Application of selective catalytic reduction to utility boilers does not appear necessary in order to meet the EPA presumptive NOx RACT levels.

In determining the NOx RACT comparable cost-effectiveness level, EPA believes that it is appropriate to focus on the <u>range</u> of cost effectiveness.  The range is appropriate due to the variability of the actual cost effectiveness that is expected from unit to unit.  Therefore, NOx technologies with a cost-effectiveness range that overlaps the $160 to $1300 range should, at a minimum, be considered by States in the development of their NOx RACT requirements.

In some cases, States will need to consider a broader cost-effectiveness range.  For example, where States adopt NOx RACT requirements that are more stringent than the EPA's presumptive RACT, the associated control technologies may result in higher cost-effectiveness figures and, thus, States should expect to

4

apply a broader cost-effectiveness range.  In addition, since the EPA's presumptive RACT levels are expected to be met by a majority of (but not all) sources, States should expect some sources to experience higher cost-effectiveness levels in order to meet the NOx RACT requirements.

While cost effectiveness, as described above, is an important consideration, it must be noted that other factors should be integrated into a RACT analysis.  For example, emission reductions and environmental impact should be considered. Regarding emission reductions, a comparison of uncontrolled NOx emission levels (from the EPA/NESCAUM report) with EPA's presumptive RACT levels indicates that the utility boilers are expected to achieve emission reductions of about 30 to 50 percent.  If control technologies in the $160 to $1300 range are inadequate to achieve emission reductions in the 30 to 50 percent range, then the State should consider alternate technologies which achieve those reduction levels.  For example, if a RACT analysis indicates that a cost effectiveness of $2000 per ton is necessary to achieve emission reductions in the 30 to 50 percent range, the State may need to adopt that requirement in order to achieve comparable emission reductions, consistent with EPA's guidance.

The environmental impact of various control technologies should be included in the RACT determination in some cases.  For example, sources that operate intermittently, but whose peak operating times coincide with the peak ozone periods, should be considered separately from sources with relatively constant year-round emissions.  In addition, where an otherwise acceptable control technology might significantly increase carbon monoxide (CO) emissions in a CO nonattainment area, the State should consider alternate technologies.

Questions concerning this memorandum can be addressed to John Silvasi at (919) 541-5666; questions on specific technologies and costs can be addressed to Bill Neuffer at (919) 541-5435.

5

**bcc:  NOx Work Group**

**OAQPS:AQMD:OCMPB:DOUG GRANO:JKING:EXT. 3292:3/2/94**
**DISK:  GRANO.JK        FILE:  COSTCOMP.J14**

## B.15  SELECTIVE CATALYTIC REDUCTION[28,29,30]

### B.15.1 Background

Selective catalytic reduction (SCR) is an add-on $NO_x$ control technology for process gas streams with significant oxygen ($O_2$) content.  An SCR consists of a catalyst surface, reactor housing and support, ammonia ($NH_3$) system (storage tank, vaporizer, injection grid, dilution air system, and control system), CEMS, and control system.  The control efficiency achieved for $NO_X$ ranges from approximately 70 to 90 percent depending on the application.  In SCR, $NH_3$ is injected into the inlet gas stream upstream of the catalyst bed; in the catalyst bed, the $NH_3$ reacts with $NO_x$ in the presence of $O_2$ to form nitrogen ($N_2$) and water ($H_2O$).  The $NO_X$ reduction efficiency is controlled by the ratio of $NH_3$ injected to the amount of $NO_x$ in the gas stream ($NH_3/NO_x$), the catalyst material and condition, the space velocity, and the catalyst bed operating temperature.  Increasing the $NH_3/NO_x$ ratio increases the level of $NO_x$ emission reduction but may also result in higher $NH_3$ slip levels.  (Ammonia slip occurs when too much $NH_3$ is injected and the unreacted portion is emitted in the outlet stream from the SCR.)  In general, the outlet concentration of $NH_3$ from the SCR should be held to less than 5 ppmv.  Side reactions may produce ammonium sulfate and ammonium bisulfate byproducts when $SO_3$ is also present; $SO_2$ in the process gas stream oxidizes to $SO_3$ in some catalysts.  These byproducts may cause plugging and corrosion of downstream equipment.  The load applied to the process unit (e.g., gas turbine or some stationary internal combustion engines) affects both the exhaust temperature and the $NO_x$ emission levels from the process, and various exhaust temperature and $NO_x$ swings may pose problems for the SCR unit.  The complexity of the $NH_3$ injection control system increases with fluctuations in load.

The catalyst is arranged in a series of two to four beds or layers.  Catalysts may include base-metal oxides, precious metals, or zeolite.  Optimum operating temperatures for SCR units using a base-metal oxides catalyst range from 600° to 750°F, depending on catalyst type; operating temperatures for platinum catalysts are lower than this range.  Zeolite catalysts require an operating temperature of 600° to 900°F, and as high as 1100°F.  Typically, the optimum performance of each SCR catalyst lies within a narrow temperature range of ±50°F.  Below this range, catalyst activity is reduced and $NH_3$ slip increases.  Above the range, $NH_3$ may be oxidized to form $NO_x$, which is counter to the control device purpose.

As catalyst activity declines, additional catalyst should be installed; as deactivation continues, the catalyst can be replaced one layer at a time.  Sufficient catalyst volume must be provided to allow for inevitable catalyst deactivation.  Catalyst deactivation may average up to 20 percent over a two-year period depending on the application.  The use of fuels other than natural gas may mask or poison the catalyst.  If diesel or other fuels are used, a bed guard upstream of the catalyst bed should be used to collect heavy hydrocarbons that would deposit on or mask the catalyst.  Zeolite catalyst is recommended for diesel fuel processes to minimize masking and poisoning and to limit $NH_3$ byproduct side reactions.  Soot blowing, vacuuming, or superheated steam application may be conducted periodically to remove particulate or masking from the catalyst.

*Review DRAFT*

Space velocity (gas flow rate divided by the catalyst bed volume) is an indicator of residence time in the catalyst bed. Lower space velocities give higher residence times and higher $NO_x$ reduction rates.

B.15.2 <u>Indicators of SCR Performance</u>

The primary indicators of SCR performance are outlet $NO_x$ concentration, $NH_3/NO_x$ ratio, catalyst bed inlet temperature, and the catalyst activity. Other parameters that can indicate SCR performance include the outlet $NH_3$ concentration, catalyst bed outlet temperature, inlet gas flow rate, sulfur content of the fuel combusted, and the pressure differential across the catalyst bed. Table B-15 lists these indicators and illustrates potential monitoring options for SCR.

<u>Outlet $NO_x$ concentration</u>. The most direct single indicator of the performance of a SCR is the $NO_x$ concentration at the outlet of the unit.

<u>$NH_3/NO_x$ ratio ($NH_3$ injection rate)</u>. The $NH_3$ injection rate should increase or decrease with changes in inlet $NO_x$ levels due to varying process load. With increasing $NH_3/NO_x$ ratio, the $NO_x$ level and the $NH_3$ slip remain fairly constant and the SCR reduces $NO_x$ emissions; however, above a certain value or ratio, the $NH_3$ slip begins to increase. Limiting the amount of $NH_3$ slip is important to limit $NH_3$ emissions from the SCR and to suppress reactions of the additional $NH_3$ with $SO_2$ and $SO_3$, if present, to form ammonia salt byproducts.

<u>Catalyst bed inlet temperature</u>. The temperature at the inlet to the catalyst bed provides a good indication of catalytic reduction performance because it indicates that the gas stream is at sufficient temperature to initiate reduction of $NO_x$ on the catalyst. Too high of an inlet temperature (i.e., of the process gas stream) may cause $NO_x$ generation in the SCR rather than $NO_x$ reductions.

<u>Catalyst activity</u>. Catalyst deactivation will result in increases in $NO_x$ emissions and $NH_3$ emissions (ammonia slip). Catalyst activity should be check periodically and/or the catalyst or portion of the catalyst should be replaced periodically.

<u>Outlet $NH_3$ concentration</u>. $NH_3$ in the outlet stream is an indicator that too much $NH_3$ is being injected or that reduction of $NO_x$ is not occurring on the catalyst.

<u>Catalyst bed outlet temperature</u>. The bed outlet temperature provides an indication that reduction is occurring on the bed. Maintaining the operating temperature in the catalyst bed is crucial in avoiding $NO_x$ generation at high temperatures. In general, lower operating temperatures mean lower $NO_x$ emissions, to a minimum temperature below which $NO_x$ reduction does not occur. Increases in the operating temperature of the SCR may cause an increase in $NO_x$ generation rather than $NO_x$ reductions. Also, there is a maximum temperature above which the catalyst begins to sinter; monitoring the bed outlet temperature will ensure that the temperature within the bed does not exceed its working limit.

*Review DRAFT*

Inlet gas flow rate (Space velocity).  Control efficiency is a function of the space velocity (similar to residence time), and space velocity is a function of the gas flow rate.  As flow rate increases, the space velocity increases and control efficiency declines.  Decreases in flow rate typically mean an increase in control efficiency.

Sulfur content of fuel.  Processes that use sulfur-containing fuels should include a limit on the sulfur content.  Higher sulfur content may result in increased formation of ammonia salt byproducts.

Pressure differential across catalyst bed.  An increase in pressure differential over time may provide an indication that particulate matter (PM) is  accumulating on the catalyst bed. Periodic blowing, vacuuming, or steaming of the bed is necessary to remove accumulated PM.

B.15.3 Illustrations

The following illustration presents an example of compliance assurance monitoring for SCR:

15a:  Catalyst bed temperature, outlet $NH_3$ concentration, and catalyst activity.

B.15.4 Bibliography

Case: 19-2562    Document: 52-2    Page: 145    Date Filed: 02/25/2020

TABLE B-15.  SUMMARY OF PERFORMANCE INDICATORS FOR SCRs

| | | | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|---|
| | | **Approach No.** | 1 | 2 | 3 | 4 | 5 |
| | | **Illustration No.** | | 15a | | | |
| | | **Example CAM Submittals** | | | | | |
| **Parameters** | **Performance indication** | **Comment** | | | | | |
| **Primary Indicators of Performance** | | | | | | | |
| Outlet $NO_X$ concentration | Direct measure of outlet concentration.  Best single indicator of SCR performance. | | X | | | | |
| $NH_3/NO_X$ ratio ($NH_3$ injection rate) | Amount of $NH_3$ injection should be stoichiometrically based on $NO_X$ concentration in the inlet stream.  Want to maximize the ratio without increasing $NH_3$ slip. | | | | X | X | X |
| Catalyst bed inlet temperature | Indicator that bed inlet is of sufficient temperature to initiate reduction.  Also an indicator that bed inlet temperature is not too high for catalyst longevity.  High temperatures encourage generation of $NO_X$ rather than a reduction in $NO_X$. | | | | X | X | X |
| Catalyst activity | Periodic check of catalyst activity gives an indication of catalyst fouling or masking.  Must periodically clean and/or replace catalyst to ensure reduction is occurring. | | | X | X | | |
| **Other Performance Indicators** | | | | | | | |
| Outlet $NH_3$ concentration | Indicator that $NH_3$ injection rate is too high.  Must adjust to reduce $NH_3$ slip. | | | X | | | |
| Catalyst bed outlet temperature | Indicator of the level of reduction that is occurring in the catalyst bed and that temperature does not exceed design limits of catalyst.  Too high a temperature may encourage generation of $NO_X$ rather than a reduction in $NO_X$. | | X | X | X | X | |
| Pressure differential across catalyst bed | Indicator of bed fouling or plugging.  Increase in pressure differential indicates that bed is becoming fouled or plugged.  Changes in pressure differential are likely to be gradual. | | | | | | X |
| Comments:  None. | | | | | | | |

*Review DRAFT*

CAM ILLUSTRATION
No. 15a.  SELECTIVE CATALYTIC REDUCTION FOR NO$_X$ CONTROL

## 1.  APPLICABILITY

1.1   Control Technology:  Selective catalytic reduction [065]
1.2   Pollutants
      Primary:  Nitrogen oxides (NO$_X$)
      Other:     Nitric acid (HNO$_3$), ammonia (NH$_3$)
1.3   Process/Emission units:  Gas turbines, internal combustion engines (ICE), process heaters, nitric acid production units, and boilers

## 2.  MONITORING APPROACH DESCRIPTION

2.1   Indicators Monitored:  Catalyst bed temperature, outlet NH$_3$ concentration in flue gas (NH$_3$ slip causes ammonia salt fouling of the catalyst), and catalyst activity.
2.2   Rationale for Monitoring Approach
      • Catalyst bed temperature:  Indication that the reaction is occurring in the catalyst bed; too high a bed temperature may generate NO$_X$ rather than reduce NO$_X$.
      • Outlet NH$_3$ concentration:  Indication of NO$_X$ reduction or indication that NH$_3$ feed is too high; fouling of the catalyst is caused by ammonia salt byproducts, the formation of which can be avoided by limiting ammonia slip and limiting fuel sulfur content.
      • Catalyst activity:  Indication of the catalyst's ability to promote the reaction between NO$_X$ and NH$_3$.
2.3   Monitoring Location
      • Catalyst bed temperature:  Outlet to the catalyst bed.
      • Outlet NH$_3$ concentration:  NH$_3$ monitored at outlet duct of catalyst bed.
      • Catalyst activity:  Removal of a small portion of catalyst for testing.
2.4   Analytical Devices Required:  Thermocouples or other temperature instrumentation, NH$_3$ CEMS (other methods and instruments may be unit-specific).
2.5   Data Acquisition and Measurement System Operation
      • Frequency of measurement:
        – Catalyst bed temperature:  Measure continuously.
        – Outlet NH$_3$ concentration:  Measure continuously.
        – Catalyst activity:  Measure periodically.
      • Reporting units:
        – Catalyst bed temperature:  Degrees Celsius or Fahrenheit (C or F).
        – Outlet NH$_3$ concentration:  Parts per million by volume (ppm$_v$) NH$_3$.
        – Catalyst activity:  Percent active compared with new catalyst (or other as appropriate).
      • Recording process:
        – Catalyst bed temperature:  recorded automatically on strip chart or data acquisition system.

*Review DRAFT*

    – Outlet $NH_3$ concentration:  recorded automatically on strip chart or data acquisition system.

    – Catalyst activity:  manually recorded in SCR maintenance log.

2.6   Data Requirements

- Baseline catalyst bed temperature, outlet $NH_3$ concentration, and catalyst activity measurements concurrent with emission test.
- Historical plant records of catalyst bed temperature, outlet $NH_3$ concentrations, and catalyst activity measurements.

2.7   Specific QA/QC Procedures

- Calibrate, maintain, and operate instrumentation using procedures that take into account manufacturer's recommendations.

2.8   References: _____

## 3. COMMENTS

None.

| United States | Office of Air Quality | EPA-453/R-94-023 |
|---|---|---|
| Environmental Protection | Planning and Standards | March 1994 |
| Agency | Research Triangle Park NC 27711 | |
| Air | | |



# Alternative Control Techniques Document -- NOx Emissions from Utility Boilers



EPA-453/R-94-023

# Alternative Control
# Techniques Document--
# NO$_X$ Emissions from Utility Boilers

Emission Standards Division

U. S. ENVIRONMENTAL PROTECTION AGENCY
Office of Air and Radiation
Office of Air Quality Planning and Standards
Research Triangle Park, NC 27711

March 1994

JA170

## ALTERNATIVE CONTROL TECHNIQUES DOCUMENTS

This report is issued by the Emission Standards Division, Office of Air Quality Planning and Standards, U. S. Environmental Protection Agency, to provide information to State and local air pollution control agencies.  Mention of trade names and commercial products is not intended to constitute endorsement or recommendation for use.  Copies of this report are available--as supplies permit--from the Library Services Office (MD-35), U. S. Environmental Protection Agency, Research Triangle Park, North Carolina 27711 ([919] 541-2777) or, for a nominal fee, from the National Technical Information Service, 5285 Port Royal Road, Springfield, VA 22161 ([800] 553-NTIS).

## 1.0  INTRODUCTION

The 1990 Amendments (1990 Amendments) to the Clean Air Act
amended title I of the Clean Air Act (ACT) by adding a new
subpart 2 to part D of section 103.  The new subpart 2
addresses ozone nonattainment areas.  Section 183 (c) of the
new subpart 2 provides that:

> [w]ithin 3 years after the date of the
> enactment of the [CAAA], the Administrator
> shall issue technical documents which identify
> alternative controls for all categories of
> stationary sources of...oxides of nitrogen
> which emit, or have the potential to emit
> 25 tons per year or more of such pollutant.

These documents are to be subsequently revised and updated as
the Administrator deems necessary.

Fossil fuel-fired utility boilers have been identified as a
category of stationary sources that emit more than 25 tons of
nitrogen oxides ($NO_x$) per year.  This alternative control
techniques (ACT) document provides technical information for
State and local agencies to use in developing and implementing
regulatory programs to control $NO_x$ emissions from fossil
fuel-fired utility boilers.  Additional ACT documents are
being or have been developed for other stationary source
categories.

The information provided in this ACT document has been
compiled from previous EPA documents, literature searches, and
contacts with utility boiler manufacturers, individual utility
companies, engineering and construction firms, control

JA172

equipment vendors, and Federal, State, and local regulatory agencies. A summary of the findings from this study is presented in chapter 2.0. Descriptions of fossil fuel-fired utility boilers are given in chapter 3.0. A discussion of uncontrolled and baseline $NO_x$ emissions from utility boilers is presented in chapter 4.0. Alternative $NO_x$ control techniques and expected levels of performance are discussed in chapter 5.0. Chapter 6.0 discusses costs and cost effectiveness of each $NO_x$ control technique. Chapter 7.0 discusses the environmental and energy impacts associated with $NO_x$ control techniques. Information used to derive the costs of each $NO_x$ control technology is contained in appendix A.

JA173

## 2.0  SUMMARY

The purpose of this document is to provide technical
information that State and local agencies can use to develop
strategies for reducing nitrogen oxides ($NO_x$) emissions from
fossil fuel-fired utility boilers.  This chapter presents a
summary of the information contained in this document,
including uncontrolled and controlled $NO_x$ emissions data,
alternative control techniques (ACT's), capital and annual
costs, cost effectiveness, and secondary environmental and
energy impacts associated with the various $NO_x$ control
techniques.  Section 2.1 presents a summary of fuel use in
utility boilers, section 2.2 presents an overview of $NO_x$
formation, and section 2.3 describes utility boiler types and
uncontrolled $NO_x$ emission levels.  Section 2.4 gives an
overview of ACT's.  The performance and costs of $NO_x$ controls
for coal-fired boilers is presented in section 2.5.  The
performance and costs of $NO_x$ controls for natural gas- and
oil-fired boilers is given in section 2.6.  Secondary
environmental impacts of $NO_x$ controls are summarized in
section 2.7.

### 2.1  SUMMARY OF FUEL USE IN UTILITY BOILERS

As of year-end 1990, the operable capacity of U. S. electric
power plants totaled approximately 690,000 megawatts (MW).  Of
this, coal-fired generating capacity accounted for
approximately 43 percent, or 300,000 MW.  Coal that is fired
in utility boilers can be classified by different ranks, i.e.,
anthracite, bituminous, subbituminous, and lignite.  Each rank
of coal has specific characteristics which can influence $NO_x$

JA174

emissions.   These characteristics include heating value,
volatile matter, and nitrogen content.

As of year-end 1990, natural gas- and oil-fired boilers
accounted for approximately 28 percent of the total U. S.
generating capacity.  Of this, natural gas-fired generating
capacity accounted for about 17 percent (120,000 MW) and oil-
fired units, the remaining 11 percent (77,000 MW).  The term
"fuel oil" covers a broad range of petroleum products--from a
light petroleum fraction (similar to kerosene) to a heavy
residue.  However, utility boilers typically fire No. 6 oil
(residual oil).

## 2.2  OVERVIEW OF $NO_x$ FORMATION

The formation of $NO_x$ from a specific combustion device is
determined by the interaction of chemical and physical
processes occurring within the furnace.  The three principal
$NO_x$ forms are "thermal" $NO_x$, "prompt" $NO_x$, and "fuel" $NO_x$.
Thermal and fuel $NO_x$ account for the majority of the $NO_x$
formed in coal- and oil-fired utility boilers; however, the
relative contribution of each of the total $NO_x$ formed depends
on the combustion process and fuel characteristics.  Natural
gas contains virtually no fuel nitrogen; therefore, the
majority of the $NO_x$ in these boilers is thermal $NO_x$.

Thermal $NO_x$ results from the oxidation of atmospheric
nitrogen in the high-temperature, post-flame region of a
combustion system.  The major factors that influence thermal
$NO_x$ formation are temperature, concentrations of oxygen and
nitrogen, and residence time.  If the temperature or the
concentration of oxygen or nitrogen can be reduced quickly
after combustion, thermal $NO_x$ formation can be suppressed or
quenched.

Prompt $NO_x$ is formed in the combustion system through the
reaction of hydrocarbon fragments and atmospheric nitrogen.
As opposed to the slower formation of thermal $NO_x$, prompt $NO_x$
is formed rapidly and occurs on a time scale comparable to the
energy release reactions (i.e., within the flame).  Thus, it
is not possible to quench prompt $NO_x$ formation as it is for

JA175

thermal $NO_x$ formation. However, the contribution of prompt $NO_x$ to the total $NO_x$ emissions of a system is rarely large.

The oxidation of fuel-bound nitrogen (fuel $NO_x$) is the principal source of $NO_x$ emissions from combustion of coal and some oils. All indications are that the oxidation of fuel-bound nitrogen compounds to $NO_x$ is rapid and occurs on a time scale comparable to the energy release reactions during combustion. The primary technique for controlling the formation of fuel $NO_x$ is delayed mixing of fuel and air so as to promote conversion of fuel-bound nitrogen to $N_2$ rather than $NO_x$. As with prompt $NO_x$, fuel $NO_x$ formation cannot be quenched as can thermal $NO_x$.

The formation of thermal, prompt, and fuel $NO_x$ in combustion systems is controlled by modifying the combustion gas temperature, residence time, and turbulence (sometimes referred to as the "three T's"). Of primary importance are the localized conditions within and immediately following the flame zone where most combustion reactions occur. In utility boilers, the "three T's" are determined by factors associated with boiler and burner design, fuel characteristics, and boiler operating conditions.

2.3 DESCRIPTION OF BOILER TYPES AND UNCONTROLLED $NO_x$
    EMISSIONS

The various types of fossil fuel-fired utility boilers include tangentially-fired, single and opposed wall-fired, cell burner, cyclone, stoker, and fluidized bed combustion (FBC). Each type of furnace has specific design characteristics which can influence $NO_x$ emissions levels. These include heat release rate, combustion temperatures, residence times, combustion turbulence, and oxygen levels.

As mentioned, $NO_x$ emission rates are a function of various design and operating factors. Pre-new source performance standards (NSPS) boilers were not designed to minimize $NO_x$ emission rates; therefore, their $NO_x$ emissions are indicative of uncontrolled emission levels. Boilers subject to the subpart D or Da NSPS have some type of $NO_x$ control and their

JA176

$NO_x$ emissions are considered to be baseline emissions. To
define uncontrolled $NO_x$ emissions for the pre-NSPS boilers,
emissions data from various databases and utility retrofit
applications were examined. To define baseline $NO_x$ emissions
for the subpart D and Da boilers, the NSPS limits as well as
emissions data from various databases were examined.

Table 2-1 summarizes the uncontrolled and baseline $NO_x$
emission levels from conventional utility boilers. The $NO_x$
levels are presented as a range and a typical level. The
typical level reflects the mode, or most common value, of the
$NO_x$ emissions data in the various databases for the different
types of boilers.

The range reflects the $NO_x$ emissions expected on a short-
term basis for most boilers of a given fuel and boiler type.
However, the actual $NO_x$ emissions from a specific boiler may
be outside this range due to unit-specific design and
operating conditions. Additionally, averaging time has an
important impact on defining $NO_x$ levels. The achievable
emission limit for a boiler increases as the averaging time
decreases. For example, a boiler that can achieve a
particular $NO_x$ limit on a 30-day basis may not be able to
achieve that same limit on a 24-hour basis.

The tangential boilers are designed with vertically stacked
nozzles in the furnace corners that inject stratified layers
of fuel and air into relatively low-turbulence areas. This
creates fuel-rich regions in an overall fuel-lean environment.
The fuel ignites in the fuel-rich region before the layers are
mixed in the highly turbulent center fireball. Local peak
temperatures and thermal $NO_x$ are lowered by the off-
stoichiometric combustion conditions. Fuel $NO_x$ formation is
suppressed by the delayed mixing of fuel and air, which allows
fuel-nitrogen compounds a greater residence time in a fuel-
rich environment.

Tangential boilers typically have the lowest $NO_x$ emissions
of all conventional utility boiler types. As shown in
table 2-1, the coal-fired, pre-NSPS tangential boilers have

2-4

TABLE 2-1. UNCONTROLLED/BASELINE NO$_x$ EMISSION LEVELS FROM CONVENTIONAL FOSSIL FUEL-FIRED UTILITY BOILERS

| Fuel type | Boiler type | NO$_x$ emissions[a] (lb/MMBtu) | | |
|---|---|---|---|---|
| | | Pre-NSPS[b] | Subpart D[c] | Subpart Da[c] |
| Coal | Tangential | 0.4-1.0 (0.7) | 0.3-0.7 (0.6) | 0.3-0.5 (0.5) |
| | Wall, dry | 0.6-1.2 (0.9) | 0.3-0.7 (0.6) | 0.3-0.6 (0.5) |
| | Wall, wet | 0.8-1.6 (1.2) | NA[d] | NA |
| | Cell | 0.8-1.8 (1.0) | NA | NA |
| | Vertical, dry | 0.6-1.2 (0.9) | NA | NA |
| | Cyclone | 0.8-2.0 (1.5) | NA | NA |
| | Stoker | ND[e] | ND | 0.3-0.6 (0.5) |
| Oil | Tangential | 0.2-0.4 (0.3) | 0.2-0.3 (0.25) | 0.2-0.3 (0.25) |
| | Wall | 0.2-0.8 (0.5) | 0.2-0.3 (0.25) | 0.2-0.3 (0.25) |
| | Vertical | 0.5-1.0 (0.75) | NA | NA |
| Natural gas | Tangential | 0.1-0.9 (0.3) | 0.1-0.2 (0.2) | 0.1-0.2 (0.2) |
| | Wall, single | 0.1-1.0 (0.5) | 0.1-0.2 (0.2) | 0.1-0.2 (0.2) |
| | Wall, opposed | 0.4-1.8 (0.9) | 0.1-0.2 (0.2) | 0.1-0.2 (0.2) |

[a] NO$_x$ emission levels shown are the expected range from tables 4-2, 4-3, and 4-4. The typical NO$_x$ level is shown in parentheses.

[b] Pre-NSPS levels are uncontrolled NO$_x$ emissions.

[c] Subpart D and subpart Da levels are baseline emissions (i.e., boilers have some types of NO$_x$ controls). The typical NO$_x$ level is shown in parentheses.

[d] NA = Not applicable since there are no boilers in this category.

[e] Data not available.

JA178

$NO_x$ emissions in the range of 0.4 to 1.0 pound per million British thermal unit (lb/MMBtu), with typical $NO_x$ emissions of 0.7 lb/MMBtu. For the tangential boilers subject to subpart D standards, the $NO_x$ emissions are in the range of 0.3 to 0.7 lb/MMBtu with typical $NO_x$ emissions of 0.6 lb/MMBtu. The $NO_x$ emissions for the subpart Da boilers are in the range of 0.3 to 0.5 lb/MMBtu, with typical $NO_x$ emissions of 0.5 lb/MMBtu.

The oil-fired, pre-NSPS tangential boilers have $NO_x$ emissions in the range of 0.2 to 0.4 lb/MMBtu (0.3 lb/MMBtu typical). For the boilers subject to subpart D and Da standards, the $NO_x$ emissions are in the range of 0.2 to 0.3 lb/MMBtu with typical emissions of 0.25 lb/MMBtu. The $NO_x$ emissions from the natural gas-fired, pre-NSPS tangential boilers range from 0.1 to 0.9 lb/MMBtu (0.3 lb/MMBtu typical). For the boilers subject to subpart D and Da standards, the $NO_x$ emissions are in the range of 0.1 to 0.2 lb/MMBtu with typical emissions of 0.2 lb/MMBtu.

The various types of wall-fired boilers include single, opposed, and cell burner. Single wall-fired boilers have several rows of burners mounted on one wall of the boiler, while opposed wall-fired boilers have multiple rows of burners mounted on the two opposing walls. Cell-burner units have two or three vertically-aligned, closely-spaced burners, mounted on opposing walls of the furnace. Single, opposed, and cell burners boilers all have burners that inject a fuel-rich mixture of fuel and air into the furnace through a central nozzle. Additional air is supplied to the burner through surrounding air registers. Of these types of wall-fired boilers, the cell burner is the most turbulent and has the highest $NO_x$ emissions.

Table 2-1 presents the ranges and typical $NO_x$ emissions for wall-fired boilers. For the pre-NSPS, dry-bottom, wall-fired boilers firing coal, the $NO_x$ emissions are in the range of 0.6 to 1.2 lb/MMBtu with typical $NO_x$ emissions of 0.9 lb/MMBtu. The range of $NO_x$ emissions for these boilers subject to

2-6

subpart D and subpart Da are in the range of 0.3 to
0.7 lb/MMBtu and 0.3 to 0.6 lb/MMBtu, respectively. The
typical $NO_x$ emissions for the subpart D, wall-fired boilers
are 0.6 lb/MMBtu, while 0.5 lb/MMBtu is typical for the
subpart Da boilers.

The pre-NSPS, wet-bottom, wall-fired boilers firing coal
have $NO_x$ emissions in the range of 0.8 to 1.6 lb/MMBtu with
typical $NO_x$ emissions of 1.2 lb/MMBtu. The pre-NSPS cell-type
boiler has $NO_x$ emissions in the range of 0.8 to 1.8 lb/MMBtu
with typical $NO_x$ emissions of 1.0 lb/MMBtu.

The $NO_x$ emissions for the oil-fired pre-NSPS wall boilers
are in the range of 0.2 to 0.8 lb/MMBtu with typical $NO_x$
emissions of 0.5 lb/MMBtu. The natural gas-fired pre-NSPS
single wall-fired boilers have $NO_x$ emissions in the range of
0.1 to 1.0 lb/MMBtu with typical $NO_x$ levels of 0.5 lb/MMBtu.
The opposed wall, pre-NSPS boilers firing natural gas ranged
from 0.4 to 1.8 lb/MMBtu with typical $NO_x$ of 0.9 lb/MMBtu.

Vertical-fired boilers have burners that are oriented
downward from the top, or roof, of the furnace. They are
usually designed to burn solid fuels that are difficult to
ignite. The $NO_x$ emissions from these boilers are shown on
table 2-1 and range from 0.6 to 1.2 lb/MMBtu. The typical $NO_x$
emissions from these boilers are 0.9 lb/MMBtu. The vertical
oil-fired boilers have $NO_x$ emissions in the range of 0.5 to
1.0 lb/MMBtu with typical $NO_x$ level of 0.75 lb/MMBtu.

Another type of utility boiler is the cyclone furnace.
Cyclone furnaces are wet-bottom and fire the fuel in a highly
turbulent combustion cylinder. Table 2-1 shows the range (0.8
to 2.0 lb/MMBtu) and typical $NO_x$ level (1.5 lb/MMBtu) for
these boilers. There have not been any wet-bottom wall-fired,
cell, cyclone, or vertical boilers built since the subpart D
or subpart Da standards were established.

Stoker boilers are designed to feed solid fuel on a grate
within the furnace and remove the ash residual. The $NO_x$
emissions from these boilers are in the range of 0.3 to
0.6 lb/MMBtu with typical $NO_x$ levels of 0.5 lb/MMBtu.

JA180

Fluidized bed combustion is an integrated technology for reducing both sulfur dioxide ($SO_2$) and $NO_x$ during the combustion of coal. These furnaces operate at much lower temperatures and have lower $NO_x$ emissions than conventional types of utility boilers. While larger FBC units may be feasible, at this time the largest operating unit is 203 MW. Table 2-2 gives the $NO_x$ emissions for the FBC using combustion controls to limit $NO_x$ formation, and also when using selective noncatalytic reduction (SNCR). The $NO_x$ emissions from FBC without SNCR are in the range of 0.1 to 0.3 lb/MMBtu with typical $NO_x$ levels of 0.2 lb/MMBtu. The $NO_x$ emissions from FBC with SNCR are in the range of 0.03 to 0.1 lb/MMBtu with typical $NO_x$ levels of 0.07 lb/MMBtu.

2.4  OVERVIEW OF ALTERNATIVE CONTROL TECHNIQUES

Alternative control techniques for reducing $NO_x$ emissions from new or existing fossil fuel-fired utility boilers can be grouped into one of two fundamentally different methods-- combustion controls and post-combustion controls (flue gas treatment). Combustion controls reduce $NO_x$ formation during the combustion process and include methods such as operational modifications, flue gas recirculation (FGR), overfire air (OFA), low $NO_x$ burners (LNB), and reburn. The retrofit feasibility, $NO_x$ reduction potential, and costs of combustion controls are largely influenced by boiler design and operating characteristics such as firing configuration, furnace size, heat release rate, fuel type, capacity factor, and the condition of existing equipment. Flue gas treatment controls reduce $NO_x$ emissions after its formation and include SNCR and selective catalytic reduction (SCR).

Operational modifications involve changing certain boiler operational parameters to create conditions in the furnace that will lower $NO_x$ emissions. Burners-out-of-service (BOOS) consists of removing individual burners from service by stopping the fuel flow. The air flow is maintained through the idle burners to create a staged-combustion atmosphere within the furnace. Low excess air (LEA) involves operating

2-8

TABLE 2-2. $NO_x$ EMISSION LEVELS FROM FLUIDIZED BED
COMBUSTION BOILERS

| Classification | $NO_x$ emissions[a] (lb/MMBtu) |
|---|---|
| Combustion controls only | 0.1-0.3 (0.2) |
| With SNCR[b] | 0.03-0.1 (0.07) |

[a]$NO_x$ emissions shown are the expected ranges from table 4-5. The typical $NO_x$ level is shown in parentheses.

[b]Fluidized bed boilers with SNCR reduction for $NO_x$ control as original equipment.

JA182

the boiler at the lowest level of excess air possible without
jeopardizing good combustion. And, biased firing (BF)
involves injecting more fuel to some burners and reducing the
amount of fuel to other burners to create a staged-combustion
environment. To implement these operational modifications,
the boiler must have the flexibility to change combustion
conditions and have excess pulverizer capacity (for coal
firing). Due to their original design type or fuel
characteristics, some boilers may not be amenable to the
distortion of the fuel/air mixing pattern imposed by BOOS and
BF. Also, some boilers may already be operating at the lowest
excess air level.

Flue gas recirculation is a flame-quenching strategy in
which the recirculated flue gas acts as a diluent to reduce
combustion temperatures and oxygen concentrations in the
combustion zone. This method is effective for reducing
thermal $NO_x$ and is used on natural gas- and oil-fired boilers.
Flue gas recirculation can also be combined with operational
modifications or other types of combustion controls on natural
gas- and oil-fired boilers to further reduce $NO_x$ emissions.
Flue gas recirculation is used on coal-fired boilers for steam
temperature control but is not effective for $NO_x$ control on
these boilers.

Overfire air is another technique for staging the combustion
process to reduce the formation of $NO_x$. Overfire air ports
are installed above the top row of burners on wall and
tangential boilers. The two types of OFA for tangential
boilers are close-coupled overfire air (CCOFA) and separated
overfire air (SOFA). The CCOFA ports are incorporated into
the main windbox whereas the SOFA ports are installed above
the main windbox using separate ducting. The two types of OFA
for wall-fired boilers are analogous to the tangential units.
Conventional OFA has ports above the burners and utilizes the
air from the main windbox. Advanced OFA has separate ductwork
above the main windbox and, in some cases, separate fans to
provide more penetration of OFA into the furnace.

2-10

JA183

Low $NO_x$ burners are designed to delay and control the mixing of fuel and air in the main combustion zone. Lower combustion temperatures and reducing zones are created by the LNB which lower thermal and fuel $NO_x$. Low $NO_x$ burners can sometimes be fitted directly into the existing burner opening; however, there may be instances where changes to the high-pressure waterwall components may be required. Low $NO_x$ burners have been applied to both tangentially- and wall-fired boilers in new and retrofit applications. While tangential boilers have "coal and air nozzles" rather than "burners" as in wall-fired boilers, the term "LNB" is used in this document for both tangential and wall applications.

Retrofit applications must have compatible and adequate ancillary equipment, such as pulverizers and combustion control systems, to minimize carbon monoxide and unburned carbon emissions and to optimize the performance of the LNB. The NSPS subpart D and subpart Da standards have been met with LNB on new boilers; however, they tend to have larger furnace volumes than pre-NSPS boilers which results in lower $NO_x$ emissions.

Low $NO_x$ burners and OFA can be combined in some retrofit applications provided there is sufficient height above the top row of burners. However, there is limited retrofit experience with combining LNB and OFA in wall-fired boilers in the United States. There is more experience in retrofitting LNB and OFA in tangential boilers since most LNB for these boilers use some type of OFA (either CCOFA or SOFA). Some new boilers subject to subpart Da standards have used a combination of LNB and OFA to meet the $NO_x$ limits. Low $NO_x$ burners can also be combined with operational modifications and flue gas treatment controls to further reduce $NO_x$ emissions.

Reburn is a $NO_x$ control technology that involves diverting a portion of the fuel from the burners to a second combustion area (reburn zone) above the main combustion zone. Completion air (or OFA) is then added above the reburn zone to complete fuel burnout. The reburn fuel can be either natural gas, oil,

JA184

or pulverized coal; however, most of the experience is with natural gas reburning. There are many technical issues in applying reburn, such as maintaining acceptable boiler performance when a large amount of heat input is moved from the main combustion zone to a different area of the furnace. Utilizing all the carbon in the fuel is also an issue when pulverized coal is the reburn fuel.

Reburn can be applied to most boiler types and is the only known combustion $NO_x$ control technique for cyclone boilers although flue gas treatment controls may be effective on these boilers. There are only four full-scale demonstrations of reburn retrofit on coal-fired boilers in the United States, two of which have been on cyclone boilers, one on a tangentially-fired boiler, and one on a wall-fired boiler. All of these installations are on boilers smaller than 200 MW. There is one full-scale reburn + LNB project on a 150 MW wall-fired boiler. To date, there have not been any reburn installations on new boilers.

A similar technology is natural gas co-firing which consists of injecting and combusting natural gas near or concurrently with the main fuel (coal, oil, or natural gas). There is one full-scale application of natural gas co-firing on a 400 MW tangential, coal-fired boiler reported in this document.

Two commercially available flue gas treatment technologies for reducing $NO_x$ emissions from existing fossil fuel utility boilers are SNCR and SCR. Selective noncatalytic reduction involves injecting ammonia ($NH_3$) or urea into the flue gas to yield elemental nitrogen and water. By-product emissions of SNCR are $N_2O$ and $NH_3$ slip. The $NH_3$ or urea must be injected into specific high-temperature zones in the upper furnace or convective pass for this method to be effective. If the flue gas temperature at the point of $NH_3$ or urea injection is above the SNCR operating range, the injected reagent will oxidize to form $NO_x$. If the flue gas temperature is below the SNCR operating range, the reagent does not react with $NO_x$ and is emitted to the atmosphere as $NH_3$. Ammonia emissions must be

2-12

JA185

minimized because $NH_3$ is a pollutant and can also react with sulfur oxides in the flue gas to form ammonium salts, which can deposit on downstream equipment such as air heaters.

The other flue gas treatment method, SCR, involves injecting $NH_3$ into the flue gas in the presence of a catalyst. Selective catalytic reduction promotes the reactions by which $NO_x$ is converted to elemental nitrogen and water at lower temperatures than required for SNCR. The SCR reactor can be placed before the air preheater (hot-side SCR) or after the air preheater (cold-side SCR). The catalyst may be made of precious metals (platinum or palladium), base metal oxides (vanadium/titanium are most common), or zeolites (crystalline aluminosilicate compounds). The performance of the SCR system is influenced by the flue gas temperature and moisture, fuel sulfur and ash content, $NH_3/NO_x$ ratio, $NO_x$ concentration at the SCR inlet, oxygen level, flue gas flow rate, space velocity, and catalyst condition. While SCR has been applied to some natural gas- and oil-fired boilers in the United States (primarily California), its use in the United States on coal has been limited to slip-stream applications. Several full-scale utility coal-fired SCR systems are currently under construction on new boilers.

Flue gas treatment controls can be combined with combustion controls to achieve additional $NO_x$ reduction. Conceivably, either SNCR or SCR could be used with LNB; however, there is only one application of SNCR + LNB in the United States on a coal-fired boiler and it is in the early stages of demonstration. When combining LNB with SCR or SNCR, the design of the system is critical if the two $NO_x$ control technologies are to achieve maximum reduction. In some cases, LNB can be designed to achieve the majority of the $NO_x$ reduction, with SNCR or SCR used to "trim" the $NO_x$ to the desired level.

JA186

2.5   SUMMARY OF PERFORMANCE AND COSTS OF $NO_x$ CONTROLS FOR
      COAL-FIRED UTILITY BOILERS

2.5.1  <u>Performance of $NO_x$ Controls</u>

   A summary of $NO_x$ emissions from coal-fired boilers with
combustion $NO_x$ controls is given in table 2-3.   The table
includes the $NO_x$ reduction potential, typical uncontrolled $NO_x$
levels, expected controlled $NO_x$ levels for pre-NSPS boilers,
and typical baseline $NO_x$ levels for NSPS boilers.   The typical
uncontrolled $NO_x$ levels for the pre-NSPS boilers are based on
actual retrofit applications, published information, the
National Utility Reference File (NURF), the EPA's AP-42
emission factors, and utility-supplied data.   For the NSPS
boilers, the typical baseline levels were derived from $NO_x$
emission data from boilers with $NO_x$ controls as original
equipment.   The typical uncontrolled $NO_x$ level for a specific
boiler may differ from those shown in table 2-3.   Therefore,
the expected controlled $NO_x$ emission level should be adjusted
accordingly.   The expected controlled $NO_x$ levels were
determined by applying the range of $NO_x$ reduction potential
(percent) to the typical uncontrolled $NO_x$ level.

   Operational modifications have been shown to reduce $NO_x$
emissions by 10-20 percent from pre-NSPS tangential boilers
from uncontrolled $NO_x$ levels of 0.7 lb/MMBtu to approximately
0.55 to 0.65 lb/MMBtu.   Pre-NSPS wall-fired boilers with
uncontrolled $NO_x$ emissions of 0.9 lb/MMBtu may be reduced to
0.7 to 0.8 lb/MMBtu with operational modifications.   Post-NSPS
boilers may be originally designed to operate with LEA as part
of the overall $NO_x$ control strategy; therefore, additional
reductions with operational modifications may only reduce $NO_x$
marginally.   There were no data available concerning the
effectiveness of operational controls on these boilers.

   Emissions data from two pre-NSPS boilers indicate that
retrofit of OFA can reduce $NO_x$ emissions from such boilers by
20 to 30 percent.   Based on these data, pre-NSPS tangential
boilers with retrofit OFA are expected to have controlled $NO_x$
emissions of 0.50 to 0.55 lb/MMBtu.   Corresponding wall-fired

2-14

**TABLE 2-3.  EXPECTED NO$_X$ EMISSIONS FROM COAL-FIRED BOILERS WITH COMBUSTION CONTROLS**

| Control technology | NO$_X$ reduction potential (%)[a] | Pre-NSPS boilers NO$_X$ level (lb/MMBtu) | | NSPS boilers NO$_X$ levels (lb/MMBtu) | Applicable boiler designs |
| | | Typical uncontrolled level[b] | Expected controlled level[c] | Typical baseline level[c] | |
|---|---|---|---|---|---|
| Operational Modifications (BOOS, LEA, BF) | 10-20 | T=0.70 W=0.90 | T=0.55-0.65 W=0.70-0.80 | -- | Some wall and tangential boilers that have operational flexibility. |
| OFA | 20-30 | T=0.70 W=0.90 | T=0.50-0.55 W=0.60-0.70 | -- | Some wall and tangential boilers with sufficient furnace height above top row of burners. |
| LNB[d] | T=35-45 W=40-50 Ce=50-55 | T=0.70 W=0.90 Ce=1.0 | T=0.40-0.45 W=0.45-0.55 Ce=0.45-0.50 | T=0.35-0.50[e] W=0.25-0.50[e] | Most wall and tangential boilers, except slagging units. |
| LNB + AOFA[f] | T=40-50 W=50-60 Ce=50-60 | T=0.70 W=0.90 Ce=1.0 | T=0.35-0.40 W=0.35-0.45 Ce=0.40-0.50 | T=0.35-0.50[e] W=0.40-0.55[e] | Some wall and tangential boilers with sufficient furnace height above top row of burners. |
| Reburn | 50-60 | T=0.70 W=0.90 Cy = 1.5 | T=0.30-0.35 W=0.35-0.45 Cy=0.60-0.75 | -- | Most boiler types with sufficient furnace height above top row of burners. |

[a] NO$_X$ reduction potential based on data presented in Chapter 5.0.

[b] Typical levels based on data presented in Chapter 4.0.  T = tangential, W = wall, Ce = cell, and Cy = cyclone.

[c] Controlled NO$_X$ level based on typical NO$_X$ level and data presented in Chapter 5.0.  The expected NO$_X$ emissions should be adjusted according to the actual uncontrolled NO$_X$ level for a specific boiler by the NO$_X$ reduction potential.

[d] Tangential low NO$_X$ burners incorporate close-coupled overfire air.

[e] Post-NSPS boilers with NO$_X$ controls as original or retrofit equipment.

[f] Tangential low NO$_X$ burners incorporate separated overfire air.

-- = Not applicable.

2-15

boilers with uncontrolled $NO_x$ levels of 0.9 lb/MMBtu are
expected to have controlled $NO_x$ emissions of 0.60 to
0.70 lb/MMBtu with OFA. However, not all pre-NSPS boilers
have enough furnace height above the top row of burners to
accommodate OFA ports.

Some NSPS boilers have OFA as part of the original $NO_x$
control equipment. One application of OFA on a subpart Da
boiler was shown to reduce $NO_x$ by approximately 25 percent;
however, OFA and the original LNB did not reduce $NO_x$ to the
NSPS limit and the LNB had to be replaced. Another
application of OFA on a subpart D boiler reduced $NO_x$ by
approximately 20 percent to the NSPS limit. There are no data
available concerning the effectiveness of retrofitting OFA on
a NSPS boiler.

With retrofit LNB (including CCOFA) on pre-NSPS tangential
boilers, the controlled $NO_x$ emissions are expected to be
reduced by 35 to 45 percent to 0.40 to 0.45 lb/MMBtu from an
uncontrolled level of 0.7 lb/MMBtu. With LNB on wall-fired
boilers, the $NO_x$ emissions are expected to be reduced by 40 to
50 percent to 0.45 to 0.55 lb/MMBtu from an uncontrolled level
of 0.9 lb/MMBtu. The cell boilers are also expected to
average 0.45 to 0.50 lb/MMBtu with LNB (50 to 55 percent
reduction) from an uncontrolled level of 1.0 lb/MMBtu.
Results from 18 retrofit applications were used to estimate
the effectiveness of LNB.

Some post-NSPS boilers were designed with LNB to meet the
subpart D and subpart Da standards and the $NO_x$ emissions are
in the range of 0.35 to 0.50 lb/MMBtu for tangential boilers
and 0.25 to 0.50 lb/MMBtu for wall boilers. Results from 22
new applications were used to estimate the effectiveness of
LNB.

For the pre-NSPS tangential boilers with retrofit LNB + OFA,
the controlled $NO_x$ emissions are expected to be reduced by 40
to 50 percent to 0.35 to 0.40 lb/MMBtu from an uncontrolled
level of 0.7 lb/MMBtu. Wall-fired boilers with uncontrolled
$NO_x$ of 0.9 lb/MMBtu are expected to be reduced to 0.35 to

2-16

0.45 lb/MMBtu (50 to 60 percent reduction) with LNB + AOFA.
Cell-fired boilers are expected to average 0.40 to
0.50 lb/MMBtu (50 to 60 percent reduction) from an
uncontrolled level of 1.0 lb/MMBtu. The effectiveness of
LNB + OFA is based on 11 retrofit applications.

Some post-NSPS boilers were designed with LNB + AOFA to meet
the subpart D and subpart Da standards and the $NO_x$ emissions
range from 0.25 to 0.50 lb/MMBtu for tangential and 0.40 to
0.55 lb/MMBtu for wall boilers. As a retrofit control, the
combination of LNB + AOFA may be applicable to only the
boilers with sufficient furnace height and volume to
accommodate the additional air ports. The effectiveness of
LNB + AOFA on new boilers is based on results from two
applications.

With reburn retrofit on pre-NSPS tangential boilers, the $NO_x$
emissions are expected to be 0.30 to 0.35 lb/MMBtu. For the
wall-fired boilers, the $NO_x$ emissions are expected to be 0.35
to 0.45 lb/MMBtu, whereas the $NO_x$ emissions are is expected to
be 0.6 to 0.75 lb/MMBtu for cyclone boilers. These emission
rates are based on limited data from four reburn retrofit
projects on pre-NSPS boilers less than 200 MW in size. Based
on these data, 50 to 60 percent reduction is estimated for all
boiler types. One natural gas co-firing application on a
450 mw coal-fired boiler yielded only 20 to 30 percent $NO_x$
reduction. There are no NSPS boilers in operation with reburn
as original or retrofit equipment. However, it is estimated
that these boilers can achieve approximately the same
reduction (50 to 60 percent) as pre-NSPS boilers since they
may have large furnace volumes and should be able to
accommodate the reburn and completion air ports above the top
row of burners.

As shown in table 2-4, applying SNCR to pre-NSPS tangential
boilers is expected to reduce $NO_x$ emissions by 30 to
60 percent to 0.30 to 0.50 lb/MMBtu. For wall-fired boilers,
the $NO_x$ emissions are expected to average 0.35 to
0.65 lb/MMBtu with SNCR. It is estimated that the range of

JA190

## TABLE 2-4.    EXPECTED $NO_x$ EMISSIONS FROM COAL-FIRED UTILITY BOILERS WITH FLUE GAS TREATMENT CONTROLS

| Control technology | $NO_x$ reduction potential[a] (%) | Pre-NSPS boilers $NO_x$ level (lb/MMBtu) | | NSPS boilers $NO_x$ levels (lb/MMBtu) | Applicable boiler designs |
| | | Typical uncontrolled level[b] | Expected controlled level[c] | Expected controlled level[d] | |
|---|---|---|---|---|---|
| SNCR | 30-60 | T=0.70 W=0.90 Ce=1.0 Cy=1.5 | T=0.30-0.50 W=0.35-0.65 Ce=0.40-0.70 Cy=0.6-1.10 | T=0.20-0.35 W=0.25-0.40 FBC=0.03-0.10 | Applicable to most boiler designs. Must have sufficient residence time at correct temperature (870-1,040 °C). |
| SCR | 75-85[f] | T=0.70 W=0.90 Ce=1.0 Cy=1.5 | T=0.10-0.20 W=0.15-0.25 Ce=0.15-0.25 Cy=0.25-0.40 | T=0.10-0.15 W=0.10-0.15 | Applicable to most boiler designs. Hot-side SCR best used on low sulfur fuel and low fly ash applications. Cold-side SCR can be used on high sulfur, high ash applications if equipped with upstream FGD. |
| LNB + SNCR | 50-80[f] | T=0.70 W=0.90 Ce=1.0 | T=0.15-0.35 W=0.20-0.45 Ce=0.20-0.50 | T=0.20-0.35 W=0.25-0.40 | Same as SNCR and LNB alone |
| LNB + AOFA + SCR | 85-95[f] | T=0.70 W=0.90 Ce=1.0 | T=0.05-0.10 W=0.05-0.10 Ce=0.05-0.15 | T=0.10-0.15 W=0.10-0.15 | Same as SCR and LNB + AOFA alone |

[a]$NO_x$ reduction based on data presented in Chapter 5.0.

[b]Typical uncontrolled levels based upon data presented in Chapter 4.0.  T = tangential, W = wall, Ce = cell, Cy = cyclone, and FBC = fluidized bed combustion.

[c]Controlled $NO_x$ level based on the typical $NO_x$ level and data presented in Chapter 5.0.  The expected $NO_x$ emissions should be adjusted according to the actual uncontrolled $NO_x$ level for a specific boiler by the $NO_x$ reduction potential.

[d]Controlled levels for flue gas treatment as original or retrofit equipment.

2-18

controlled $NO_x$ emissions from the cell and cyclone boilers
retrofit with SNCR would be 0.40 to 0.70 lb/MMBtu and 0.60 to
1.10 lb/MMBtu, respectively.  However, SNCR has not been
applied to any cell and cyclone boilers at this time.  The
predicted effectiveness of SNCR for pre-NSPS boilers is based
on three full-scale applications on coal-fired boilers (two
wall-fired and one vertical-fired).  There are no data
available from any conventional NSPS utility boilers with SNCR
as original or retrofit equipment.  However, the same $NO_x$
reduction (30 to 60 percent) is expected on these boilers as
on pre-NSPS boilers.

The FBC boilers designed with SNCR as original equipment
have $NO_x$ emissions 50 to 80 percent lower than FBC boilers
without SNCR and have emissions in the range of 0.03 to
0.10 lb/MMBtu.  This is based on results from seven original
applications of SNCR on FBC boilers.

The remaining flue gas treatment control, SCR, has had very
limited application on coal firing in the United States.
However, SCR is being used in Japan and Germany on a number of
coal-fired utility boilers.  Primary concerns associated with
transfer of foreign SCR performance data to the U.S. are the
higher sulfur and alkali contents in many U.S. coals, both of
which may act as catalyst poisons and thereby reduce catalyst
activity and lifetime.  The predicted effectiveness of SCR is
75 to 85 percent, which is based on data from three pilot-
scale applications in the U.S.  By retrofitting SCR on
pre-NSPS boilers, the estimated $NO_x$ emissions from tangential
and wall boilers would be 0.10 to 0.20 lb/MMBtu and 0.15 to
0.25 lb/MMBtu, respectively.  Predicted emissions from cell
and cyclone boilers would be 0.15 to 0.25 lb/MMBtu and 0.25 to
0.40 lb/MMBtu, respectively.  Since there are no full-scale
applications on coal in the United States, the expected ranges
of $NO_x$ reduction and $NO_x$ emissions are estimated.

The combination of LNB + SNCR is estimated to reduce $NO_x$
emissions by 50 to 80 percent; however, this combination of
controls has only been applied to one coal-fired boiler and

JA192

the results indicate approximately 70 percent reduction. For
the pre-NSPS tangential boilers, the $NO_x$ emissions are
expected to be in the range of 0.15 to 0.35 lb/MMBtu. The $NO_x$
emissions from the pre-NSPS wall boilers are expected to be in
the range of 0.20 to 0.45 lb/MMBtu. For the cell boilers, the
$NO_x$ emissions are expected to be in the range of 0.20 to
0.50 lb/MMBtu. For the NSPS boilers, the $NO_x$ reduction from
LNB + SNCR is expected to be the same as SNCR alone (30 to
60 percent from the NSPS levels) since these boilers already
have LNB as original equipment. However, there are no
applications of LNB + SNCR as original equipment on new
boilers yet.

By combining LNB + AOFA + SCR, it is estimated that 85 to
95 percent $NO_x$ reduction can be achieved on pre-NSPS boilers.
For these boilers, the $NO_x$ emissions are expected to be in the
range of 0.05 to 0.15 lb/MMBtu, depending on boiler type. For
the NSPS boilers, the $NO_x$ reduction are expected to be the
same as for SCR alone (75 to 85 percent from NSPS levels),
since these boilers may already have LNB + AOFA as original
equipment. However, there are no applications of LNB + AOFA +
SCR as original equipment in operation on new boilers at this
time. This combination of controls has not been applied to
existing pre-NSPS boilers either; therefore, these reductions
and controlled levels are estimates only and have not been
demonstrated.

## 2.5.2   Costs of $NO_x$ Controls

The estimated costs for controlling $NO_x$ emissions are based
on data from utilities, technology vendors, and published
literature. The actual costs for both new and retrofit cases
depend on a number of boiler-specific factors, and a
particular $NO_x$ control technology may not be applicable to
some individual boilers. The costs presented here are meant
to provide general guidance for determining costs for similar
situations. The costs are presented in 1991 dollars.
However, cost indices for 1992 dollars are only 0.85 percent

2-20

JA193

lower than 1991 dollars; therefore, the values in this section are indicative of the 1991-1992 timeframe.

Table 2-5 presents a summary of the cost effectiveness of various $NO_x$ controls applied to coal-fired utility boilers. The costs presented are for LNB, LNB + AOFA, reburn, SNCR, SCR, LNB + SNCR, and LNB + AOFA + SCR applied to both tangential and wall boilers. Costs for reburn, SNCR, and SCR are given for cyclone boilers, and costs for SNCR are given for FBC boilers. The costs are based on various factors as described in chapter 6. The cost estimates for SNCR are for a low-energy, urea-based SNCR system as they were found to be comparable in cost to a high-energy $NH_3$-based SNCR system.

For tangential boilers, the cost effectiveness ranges from a low of $100 per ton for LNB (a new 600 MW baseload boiler) to a high of $12,400 per ton for LNB + AOFA + SCR (a 100 MW peaking boiler and a 2-year catalyst life). The retrofit of LNB or LNB + AOFA is estimated to result in the least cost per ton of $NO_x$ removed for the tangential boilers. The cost effectiveness for LNB ranges from $100 to $1,800 per ton. The cost effectiveness for LNB + AOFA ranges from $170 to $3,300 per ton. The primary cause of the higher cost effectiveness values is boiler duty cycle (i.e., capacity factor). The retrofit of SCR or LNB + AOFA + SCR is estimated to be the highest cost per ton of $NO_x$ removed. The cost effectiveness for SCR ranges from $1,580 to $12,200 per ton. The cost effectiveness for LNB + AOFA + SCR ranges from $1,500 to $12,400 per ton.

Figure 2-1 shows the $NO_x$ control cost effectiveness for a 300 MW baseload tangential boiler. As shown, LNB and LNB + AOFA have the lowest cost effectiveness for controlled $NO_x$ levels of 0.35 to 0.45 lb/MMBtu. The large variation in reburn cost effectiveness (on this and other figures in the section) is driven primarily by the fuel price differential between natural gas and coal ($0.50 to $2.50/MMBtu). The cost effectiveness of individual control techniques increases as the controlled $NO_x$ emissions decrease.

JA194

TABLE 2-5.    SUMMARY OF $NO_x$ CONTROL COST EFFECTIVENESS FOR COAL-FIRED UTILITY BOILERS (1991 DOLLARS)

| Boiler firing type | $NO_x$ control technology | Cost Effectiveness ($/ton)[a] | | | | |
|---|---|---|---|---|---|---|
| | | 100 MW (peaking)[b] | 100 MW (baseload)[c] | 300 MW (cycling)[d] | 300 MW (baseload) | 600 MW (baseload) |
| Tangential | LNB[e] | 1,120-1,800 | 220-350 | 280-440 | 140-220 | 100-170 |
| | LNB + AOFA | 2,060-3,300 | 400-630 | 460-730 | 230-370 | 170-260 |
| | Reburn | 3,870-5,930 | 970-3,030 | 1,150-3,220 | 720-2,790 | 620-2,680 |
| | SNCR | 2,600-2,960 | 860-1,160 | 900-1,210 | 670-970 | 600-910 |
| | SCR | 9,470-12,200 | 1,970-2,490 | 3,140-4,160 | 1,690-2,210 | 1,580-2,100 |
| | LNB + SNCR | 2,420-2,530 | 590-700 | 660-770 | 410-520 | 340-450 |
| | LNB + AOFA + SCR | 9,990-12,400 | 2,020-2,490 | 3,120-4,040 | 1,650-2,110 | 1,500-1,970 |
| Wall | LNB | 2,000-3,200 | 380-620 | 470-750 | 240-380 | 180-280 |
| | LNB + AOFA | 3,420-5,470 | 660-1,050 | 750-1,200 | 380-610 | 270-430 |
| | Reburn | 3,010-4,600 | 750-2,360 | 900-2,500 | 560-2,170 | 480-2,080 |
| | SNCR | 2,160-2,470 | 760-1,070 | 800-1,100 | 620-920 | 560-870 |
| | SCR | 7,540-9,650 | 1,580-1,990 | 2,500-3,300 | 1,360-1,760 | 1,270-1,670 |
| | LNB + SNCR | 2,750-2,860 | 650-760 | 740-850 | 450-560 | 370-480 |
| | LNB + AOFA + SCR | 9,250-11,100 | 1,870-2,230 | 2,760-3,480 | 1,460-1,820 | 1,300-1,600 |
| Cyclone | Reburn | 1,810-2,770 | 460-1,420 | 540-1,510 | 340-1,300 | 290-1,250 |
| | SNCR | 1,460-1,780 | 620-940 | 650-960 | 540-850 | 510-820 |
| | SCR | 4,670-5,940 | 1,010-1,260 | 1,560-2,040 | 870-1,110 | 810-1,050 |

[a]Cost effectiveness based on data presented in Chapter 6.0.
[b]Peaking = 10% capacity factor.
[c]Baseload = 65% capacity factor.
[d]Cycling = 30% capacity factor.
[e]Incorporates close-coupled overfire air.

2-22

JA195



Figure 2-1.  NOx control cost effectiveness for coal-fired tangential boilers.

JA196

For wall boilers, the cost effectiveness ranges from a low
of $180 per ton for LNB (a new 600 MW baseload boiler) to a
high of $11,100 for LNB + AOFA + SCR (a 100 MW peaking boiler
and a 2-year catalyst life). Typically, the retrofit of LNB
or LNB + AOFA is estimated to result in the lowest cost per
ton of $NO_x$ removed for the wall boilers. The cost
effectiveness for LNB ranges from $180 to $3,200 per ton. The
cost effectiveness for LNB + AOFA ranges from $270 to $5,470
per ton. The retrofit of SCR or LNB + AOFA + SCR is estimated
to have the highest cost per ton of $NO_x$ removed. The cost
effectiveness of SCR ranges from $1,290 to $9,650 per ton.
The cost effectiveness of LNB + AOFA + SCR ranges from $1,300
to $11,100 per ton.

Figure 2-2 shows the $NO_x$ control cost effectiveness for a
300 MW baseload wall boiler. As shown, LNB and LNB + AOFA
have the lowest cost effectiveness for controlled $NO_x$ levels
of 0.35 to 0.55 lb/MMBtu. Reburn is also cost effective if
the price of the reburn fuel is economical.

Estimated cost effectiveness for reburn, SNCR, and SCR for
cyclone boilers are also shown in table 2-5. The retrofit of
reburn and SNCR has the lowest estimated cost per ton of $NO_x$
removed whereas retrofitting SCR has the highest. The cost
effectiveness of reburn ranges from $290 to $2,770 per ton and
the cost effectiveness of SNCR ranges from $510 to $1,780 per
ton. The cost effectiveness of SCR ranges from $810 to $5,940
per ton. Figure 2-3 shows the $NO_x$ control cost effectiveness
for a 300 MW baseload cyclone boiler. The large variation in
SNCR cost effectiveness is driven primarily by the variability
in chemical costs and $NO_x$ reductions among individual boilers.

The cost effectiveness for SNCR applied to FBC boilers is
given in table 2-6 and ranges from a low of $1,500 per ton
(200 MW baseload) to a high of $5,400 per ton (50 MW cycling).

In all cases, the factor having the greatest potential
impact on the cost effectiveness of $NO_x$ controls is boiler
capacity factor. Depending on the control technology, the
cost effectiveness associated with reducing $NO_x$ emission from

2-24

2-25



Figure 2-2.   $NO_x$ control cost effectiveness for coal-fired wall boilers



Figure 2-3.  NOₓ control cost effectiveness for coal-fired cyclone boilers.

JA199

TABLE 2-6.   SUMMARY OF NO$_x$ CONTROL COST EFFECTIVENESS FOR FBC BOILERS
(1991 DOLLARS)

| Boiler firing type | NO$_x$ control technology | Cost Effectiveness ($/ton)[a] | | | | |
|---|---|---|---|---|---|---|
| | | 50 MW (cycling)[b] | 50 MW (baseload)[c] | 100 MW (cycling) | 100 MW (baseload) | 200 MW (baseload) |
| FBC | SNCR | 5,100-5,400 | 2,800-3,100 | 3,550-3,850 | 2,000-2,300 | 1,500-1,800 |

[a]Cost effectiveness based on data presented in Chapter 6.0.

[b]Cycling = 30% capacity factor.

[c]Baseload = 65% capacity factor.

2-27

a peaking-duty boiler (10 percent capacity factor) is 2 to 5 times higher than for a baseload boiler (65 percent capacity factor).  Other significant factors influencing control technology cost effectiveness are the economic life of the control system, the boiler size, and the uncontrolled $NO_x$ level.

2.6   SUMMARY OF PERFORMANCE AND COSTS OF $NO_x$ CONTROLS FOR NATURAL GAS- AND OIL-FIRED UTILITY BOILERS

2.6.1   Performance of $NO_x$ Controls

A summary of $NO_x$ emissions from natural gas- and oil-fired boilers with retrofit combustion controls is given in table 2-7.  The table includes the $NO_x$ reduction potential for each technology, typical uncontrolled $NO_x$ levels, and expected controlled $NO_x$ levels.  These data are based on actual retrofit applications, published literature, NURF, the EPA's AP-42 emission factors, and information obtained from utilities.  The typical uncontrolled $NO_x$ level for a specific boiler may differ from those shown in table 2-7.  Therefore, the expected controlled $NO_x$ emission level should be adjusted accordingly.  The expected controlled $NO_x$ levels were determined by applying the range of $NO_x$ reduction potential (percent) to the typical uncontrolled $NO_x$ level.

For pre-NSPS tangential boilers, the uncontrolled $NO_x$ level of 0.30 lb/MMBtu is expected to be reduced to 0.15 to 0.20 lb/MMBtu (30 to 50 percent reduction) with operational modifications such as BOOS + LEA.  Corresponding pre-NSPS wall-fired boilers with uncontrolled $NO_x$ emissions of 0.50 lb/MMBtu are expected to be reduced to 0.25 to 0.35 lb/MMBtu with operational modifications.  Data was not available for operational controls on boilers subject to subpart D and subpart Da standards; however, it is estimated that these boilers may achieve approximately the same reduction (30 to 50 percent) as the pre-NSPS boilers.  The effectiveness of operational controls are based on eight retrofit applications.

2-28

## TABLE 2-7. EXPECTED NO$_x$ EMISSIONS FROM NATURAL GAS- AND OIL-FIRED UTILITY BOILERS WITH COMBUSTION CONTROLS

| Control technology[a] | NO$_x$ reduction potential[b] (%) | Pre-NSPS Boilers NO$_x$ level (lb/MMBtu) | | NSPS Boilers NO$_x$ level (lb/MMBtu) | Applicable boiler designs |
|---|---|---|---|---|---|
| | | Typical uncontrolled level[c] | Expected controlled level[d] | Typical baseline level[e] | |
| Operational Modifications (LEA + BOOS) | 30-50 | Gas and Oil: T=0.3 W=0.5 | Gas and Oil: T=0.15-0.20 W=0.25-0.35 | Oil: T,W=0.15-0.25 Gas: T,W=0.10-0.20 | Most boilers that have operational flexibility. |
| FGR | 45-55 | Gas and Oil: T=0.3 W=0.5 | Gas and Oil: T=0.15-0.20 W=0.25-0.30 | Oil: T,W=0.10-0.25 Gas: T,W=0.10-0.20 | Most wall and tangential boilers. |
| OFA | 20-45 | Gas and Oil: T=0.3 W=0.5 | Gas and Oil: T=0.20-0.30 W=0.30-0.45 | Oil: T,W=0.15-0.25 Gas: T,W=0.10-0.20 | Most wall and tangential boilers. |
| LNB | 30-50 | Gas and Oil: T=0.3 W=0.5 | Gas and Oil: T=0.15-0.20 W=0.25-0.35 | Oil: T,W=0.10-0.25 Gas: T,W=0.10-0.20 | Most wall and tangential boilers. |
| LNB + OFA (or BOOS) | 40-50 | Gas and Oil: T=0.3 W=0.5 | Gas and Oil: T=0.15-0.20 W=0.25-0.30 | Oil: T,W=0.10-0.25 Gas: T,W=0.10-0.20 | Most wall and tangential boilers with sufficient furnace height. |
| Combination Controls[f] | 60-90 | Gas and Oil: T=0.3 W=0.5 | Gas and Oil: T=0.05-0.15 W=0.05-0.20 | Oil: T,W=0.05-0.25 Gas: T,W=0.05-0.20 | Most wall and tangential boilers. |
| Reburn[g] | 50-60 | Oil: T=0.3 W=0.5 | Oil: T=0.10-0.20 W=0.20-0.25 | Oil: T=0.10-0.25 W=0.10-0.25 | Some boiler designs with large furnace volumes and sufficient furnace height. |

[a]BOOS = burners-out-of-service, LEA = low excess air, FGR = flue gas recirculation, OFA = overfire air, LNB = low NO$_x$ burners.
[b]NO$_x$ reduction based on data presented in chapter 5.
[c]Typical uncontrolled levels based on data presented in chapter 4. T = tangential and W = wall.
[d]Controlled NO$_x$ level based on typical NO$_x$ level and data presented in chapter 5. The expected NO$_x$ emissions should be adjusted according to the actual uncontrolled NO$_x$ level for a specific boiler.
[e]Post-NSPS boilers with NO$_x$ controls as original or retrofit equipment.
[f]Combination of FGR + BOOS or OFA; LNB + FGR + BOOS (or OFA).
[g]Limited experience abroad on gas/oil and nonexistent experience in U. S. Percent reduction based on coal-fired experience.

2-29

JA202

The pre-NSPS tangential boilers are expected to reduce $NO_x$ from an uncontrolled level of 0.30 lb/MMBtu to a controlled $NO_x$ level of 0.15 to 0.20 lb/MMBtu with FGR (45 to 55 percent reduction). Corresponding wall-fired boilers are expected to have controlled $NO_x$ emissions of 0.25 to 0.30 lb/MMBtu with FGR. The post-NSPS boilers are expected to achieve the same percent reduction as the pre-NSPS boilers (45 to 55 percent). The effectiveness of FGR is based on two retrofit applications.

With retrofit OFA on pre-NSPS tangential boilers, the controlled $NO_x$ emissions are expected to be 0.15 to 0.30 lb/MMBtu and the wall-fired boilers are expected to be 0.30 to 0.45 lb/MMBtu. Some post-NSPS boilers may be designed or retrofitted with OFA to meet the subpart D and subpart Da standards and are expected to be in the range of 0.10 to 0.25 lb/MMBtu depending on fuel. However, OFA is typically combined with other combustion modifications such as LEA rather than used alone. The estimated percent reduction is based on four applications of OFA + LEA on pre-NSPS boilers.

With retrofit LNB on pre-NSPS tangential boilers, the controlled $NO_x$ emissions are expected to be 0.15 to 0.20 lb/MMBtu and the wall-fired boilers are expected to be 0.25 to 0.35 lb/MMBtu (30 to 50 percent reduction). Some post-NSPS wall and tangential boilers may be designed with LNB to meet the subpart D and subpart Da standards and are in the range of 0.10 to 0.25 lb/MMBtu depending on fuel. Results from six pre-NSPS retrofit applications were used to estimate the effectiveness of LNB.

By combining FGR + BOOS (or OFA) + LNB on pre-NSPS tangential and wall boilers, the controlled $NO_x$ emissions are expected to be 0.05 to 0.20 lb/MMBtu. Some post-NSPS boilers may be designed with FGR + BOOS + LNB that meet the subpart D and subpart Da standards and are in the range of 0.05 to 0.25 lb/MMBtu. These results are based on two pre-NSPS boilers.

2-30

With reburn on pre-NSPS tangential and wall boilers firing oil, the $NO_x$ emissions are estimated to be 0.10 to 0.20 lb/MMBtu and 0.20 to 0.25 lb/MMBtu, respectively. However, reburn experience on oil-fired boilers is very limited and the expected controlled emissions are estimated. There are no post-NSPS oil-fired boilers with reburn as original equipment. The effectiveness of reburn on oil-fired boilers is based on the coal-fired experience and is estimated to be 50 to 60 percent reduction.

Table 2-8 presents a summary of expected $NO_x$ emissions from natural gas- and oil-fired boilers with flue gas treatment alone and combined with combustion controls. For pre-NSPS tangential boilers with SNCR, the expected controlled $NO_x$ level is expected to be 0.20 to 0.25 lb/MMBtu, whereas the range for wall-fired boilers is 0.30 to 0.40 lb/MMBtu (25 to 40 percent). These results are based on two SNCR application on oil boilers and ten SNCR applications on natural gas boilers. For post-NSPS boilers with SNCR, the expected controlled $NO_x$ level is 0.10 to 0.25 lb/MMBtu retrofit depending on boiler type. However, there are no data from post-NSPS boilers with SNCR, nor are there data from post-NSPS boilers designed with SNCR as original equipment. Therefore, these reductions and controlled levels are estimated.

For pre-NSPS tangential boilers, the expected controlled $NO_x$ is 0.03 to 0.10 lb/MMBtu with retrofit SCR. The expected controlled $NO_x$ for wall-fired boilers is 0.05 to 0.10 lb/MMBtu. For post-NSPS boilers, the expected controlled $NO_x$ levels is 0.05 to 0.25 lb/MMBtu depending on boiler type. These results are based on one pilot-scale and one full-scale application. There are no data from post-NSPS boilers with retrofit SCR, nor are there data from post-NSPS boilers designed with SCR as original equipment. Therefore, these reductions and controlled levels are estimates only.

The combination of LNB + SNCR is estimated to reduce $NO_x$ emissions by 70 to 80 percent and data from one application of LNB + OFA + SNCR on a coal-fired boiler shows 70-85 percent

2-31

TABLE 2-8.    EXPECTED $NO_x$ EMISSIONS FROM NATURAL GAS- AND OIL-FIRED UTILITY
BOILERS WITH FLUE GAS TREATMENT CONTROLS

| Control technology[a] | $NO_x$ reduction potential[b] (%) | Pre-NSPS boilers $NO_x$ level (lb/MMBtu) | | NSPS boilers $NO_x$ level (lb/MMBtu) | Applicable boiler designs |
|---|---|---|---|---|---|
| | | Typical uncontrolled level[c] | Expected controlled level[d] | Expected controlled level[e] | |
| SNCR[f] | 25-40 | Gas and Oil: T=0.30 W=0.50 | Gas and Oil: T=0.20-0.25 W=0.30-0.40 | Oil: T,W=0.15-0.25 Gas: T,W=0.10-0.20 | Applicable to most boiler designs; however, must have sufficient residence time in convective pass at correct temperature. |
| SCR[g] | 80-90 | Gas and Oil: T=0.30 W=0.50 | Gas and Oil: T=0.03-0.10 W=0.05-0.10 | Oil: T,W=0.05-0.25 Gas: T,W=0.03-0.20 | Applicable to most boiler designs. Hot-side SCR best used on low sulfur fuel and low fly ash applications. Cold-side SCR can be used on high sulfur, high ash applications, if equipped with upstream FGD. |
| LNB + SNCR[g] | 70-80 | Gas and Oil: T=0.30 W=0.50 | Gas and Oil: T=0.05-0.10 W=0.10-0.15 | Oil: T,W=0.10-0.25 Gas: T,W=0.05-0.20 | Same as SNCR and LNB's alone. |
| LNB + AOFA + SCR[g] | 85-95 | Gas and Oil: T=0.30 W=0.50 | Gas and Oil: T=0.02-0.10 W=0.03-0.10 | Oil: T,W=0.05-0.25 Gas: T,W=0.05-0.20 | Same as SCR and LNB + AOFA alone. |

[a] SNCR = Selective noncatalytic reduction, SCR = Selective catalytic reduction, LNB = Low $NO_x$ burners, and AOFA = Advanced overfire air.
[b] $NO_x$ reduction based upon data presented in chapter 5.0.
[c] Typical uncontrolled levels based on data presented in chapter 4.0.  T = tangential, W = wall.
[d] Controlled $NO_x$ level based on typical $NO_x$ level and data presented in chapter 5.0.  The expected $NO_x$ emissions should be adjusted according to the actual uncontrolled $NO_x$ level for a specific boiler by the $NO_x$ reduction potential.
[e] Controlled levels for flue gas treatment controls as original or retrofit equipment.
[f] No SNCR applications on boilers above 200 MW.
[g] Limited or no full-scale installations in U. S.; therefore, these are estimated reduction levels.

2-32

reduction across the load range. For pre-NSPS tangential boilers, the $NO_x$ emissions are expected to be in the range of 0.05 to 0.10 lb/MMBtu. For pre-NSPS wall-fired boilers, the $NO_x$ emissions are expected to be 0.01 to 0.15 lb/MMBtu. There are no data from post-NSPS boilers with LNB + SNCR as original or retrofit equipment; therefore, these reductions and are estimated controlled levels.

By combining LNB + AOFA + SCR, it is estimated that 85 to 95 percent $NO_x$ reduction can be achieved. The $NO_x$ emissions are expected to be in the range of 0.02 to 0.1 lb/MMBtu and the post-NSPS boilers are expected to be in the range of 0.05 to 0.25 lb/MMBtu. This control technology combination has not yet been applied to existing or new boilers; therefore, these reductions and controlled levels are estimates.

2.6.2 Costs of $NO_x$ Controls

Table 2-9 presents a summary of the cost effectiveness of various $NO_x$ controls applied to natural gas- and oil-fired utility boilers. The costs presented are for LEA + BOOS, LNB, LNB + AOFA, reburn, SNCR, SCR, LNB + SNCR, and LNB + AOFA + SCR applied to both tangential and wall boilers. The costs are based on the various factors described in chapter 6.

For tangential boilers, the cost effectiveness ranges from a low of $70 per ton for LEA + BOOS (a new 600 MW baseload boiler) to a high of $16,900 per ton for LNB + AOFA + SCR (100 MW oil-fired peaking boiler and a 3-year catalyst life). The retrofit of LEA + BOOS or LNB is estimated to have the lowest cost per ton of $NO_x$ removed for the tangential boilers. The cost effectiveness value of LEA + BOOS ranges from $70 to $500 per ton. The cost effectiveness value for LNB ranges from $250 to $4,200 per ton. The retrofit of SCR or LNB + AOFA + SCR is estimated to have the highest cost per ton of $NO_x$ removed. The cost effectiveness value of SCR ranges from $1,530 to $11,700 per ton for natural gas-fired units and from $1,800 to $14,700 per ton for oil-fired units. The cost effectiveness of LNB + AOFA + SCR ranges from $1,650 to

TABLE 2-9.   SUMMARY OF NO$_x$ CONTROL COST EFFECTIVENESS FOR NATURAL
GAS- AND OIL-FIRED UTILITY BOILERS (1991 DOLLARS)

| Boiler firing type | NO$_x$ control technology | Cost effectiveness ($/ton)[a] | | | | |
|---|---|---|---|---|---|---|
| | | 100 MW (peaking)[b] | 100 MW (baseload)[c] | 300 MW (cycling)[d] | 300 MW (baseload) | 600 MW (baseload) |
| Tangential | LEA+BOOS | 230-500 | 100-360 | 90-350 | 80-340 | 70-340 |
| | LNB | 2,620-4,190 | 500-810 | 640-1,020 | 330-520 | 250-400 |
| | LNB+AOFA | 4,810-7,690 | 930-1,480 | 1,060-1,700 | 540-860 | 380-620 |
| | Reburn[e] | 8,480-12,800 | 2,320-6,690 | 2,720-7,080 | 1,800-6,170 | 1,580-5,940 |
| | SNCR | 7,090-7,450 | 1,820-2,180 | 1,940-2,300 | 1,260-1,620 | 1,070-1,430 |
| | SCR (natural gas) | 10,800-11,700 | 2,310-2,470 | 3,150-3,470 | 1,740-1,900 | 1,530-1,690 |
| | SCR (oil) | 12,200-14,700 | 2,580-3,040 | 3,690-4,600 | 2,010-2,480 | 1,800-2,260 |
| | LNB+SNCR | 5,830-5,990 | 1,260-1,370 | 1,430-1,540 | 810-920 | 640-750 |
| | LNB+AOFA+SCR (natural gas) | 13,400-14,200 | 2,750-2,900 | 3,640-3,930 | 1,960-2,100 | 1,650-1,800 |
| | LNB+AOFA+SCR (Oil) | 14,700-16,900 | 3,010-3,400 | 4,130-4,970 | 2,210-2,690 | 1,900-2,330 |

JA207

TABLE 2-9.  SUMMARY OF $NO_x$ CONTROL COST EFFECTIVENESS FOR NATURAL
GAS- AND OIL-FIRED UTILITY BOILERS (1991 DOLLARS)
(CONCLUDED)

| Boiler firing type | $NO_x$ control technology | Cost effectiveness ($/ton)[a] | | | | |
|---|---|---|---|---|---|---|
| | | 100 MW (peaking)[b] | 100 MW (baseload)[c] | 300 MW (cycling)[d] | 300 MW (baseload) | 600 MW (baseload) |
| Wall Firing | LEA+BOOS | 140-300 | 60-220 | 50-210 | 50-200 | 40-200 |
| | LNB | 3,600-5,750 | 690-1,110 | 840-1,340 | 430-680 | 310-500 |
| | LNB+AOFA | 6,160-9,850 | 1,180-1,900 | 1,350-2,160 | 680-1,090 | 480-770 |
| | Reburn[e] | 5,080-7,690 | 1,390-4,010 | 1,630-4,250 | 1,080-3,700 | 946-3,560 |
| | SNCR | 4,470-4,850 | 1,310-1,690 | 1,380-1,760 | 980-1,350 | 860-1,240 |
| | SCR (natural gas) | 6,700-7,200 | 1,460-1,550 | 1,960-2,150 | 1,100-1,200 | 970-1,070 |
| | SCR (oil) | 7,550-8,940 | 1,620-1,900 | 2,280-2,830 | 1,270-1,540 | 1,130-1,410 |
| | LNB+SNCR | 5,200-5,310 | 1,130-1,250 | 1,290-1,400 | 740-850 | 590-700 |
| | LNB+AOFA+SCR (natural gas) | 10,500-11,000 | 2,150-2,240 | 2,740-2,910 | 1,470-1,560 | 1,200-1,290 |
| | LNB+AOFA+SCR (oil) | 11,300-12,700 | 2,300-2,560 | 3,030-3,540 | 1,620-1,870 | 1,350-1,610 |

[a]Cost effectiveness based on percent reductions given in chapter 6.0.

[b]Peaking = 10% capacity factor.

[c]Baseload = 65% capacity factor.

[d]Cycling = 30% capacity factor.

[e]Oil-fired boilers only.

2-35

JA208

$14,200 per ton for natural gas-fired units and from $1,900 to
$16,900 per ton for oil-fired units. Figure 2-4 shows the $NO_x$
control cost effectiveness for a 300 MW baseload tangential
boiler. As shown, LEA + BOOS and LNB have the lowest cost
effectiveness value for controlled $NO_x$ emissions of 0.1 to
0.2 lb/MMBtu. For controlled $NO_x$ emissions of less than
0.1 lb/MMBtu the cost effectiveness increases.

For the wall boilers, the cost effectiveness ranges from a
low of $40 per ton for LEA + BOOS (a new 600 MW baseload
boiler) to a high of $12,700 per ton for LNB + AOFA + SCR
(100 MW oil-fired peaking boiler and a 3-year catalyst life).
The retrofit of LEA + BOOS or LNB is estimated to have the
lowest cost per ton of $NO_x$ removed for the wall boilers. The
cost effectiveness of LEA + BOOS ranges from $40 to $300 per
ton. The cost effectiveness of LNB ranges from $300 to $5,800
per ton. The retrofit of SCR or SCR + LNB + AOFA is estimated
to be the highest cost per ton of $NO_x$ removed. The cost
effectiveness of SCR ranges from $970 to $7,200 per ton for
natural gas-fired units and from $1,130 to $8,940 per ton for
oil-fired units. Figure 2-5 shows the $NO_x$ control cost
effectiveness for a 300 MW baseload wall boiler. As shown,
LEA + BOOS and LNB have the lowest cost effectiveness for
controlled $NO_x$ emissions of 0.25 to 0.35 lb/MMBtu. For
controlled $NO_x$ emissions of less than 0.25 lb/MMBtu, the cost
effectiveness increases.

The effects of various plant parameters (e.g., capacity
factor, economic life, boiler size, uncontrolled $NO_x$ levels)
on the cost effectiveness of individual $NO_x$ controls are
similar to those for coal-fired boilers. Due to lower
uncontrolled $NO_x$ levels, the cost effectiveness of applying
controls to oil- and natural gas-fired boilers is higher than
for coal-fired boilers.

2.7  SUMMARY OF IMPACTS OF $NO_x$ CONTROLS

2.7.1  Impacts from Combustion $NO_x$ Controls

Combustion $NO_x$ controls suppress both thermal and fuel $NO_x$
formation by reducing the peak flame temperature and by

2-36



Figure 2-4. NOx control cost effectiveness for natural gas- and oil-fired tangential boilers.

2-37

JA210



Figure 2-5. NOx control cost effectiveness for natural gas- and oil-fired wall boilers.

2-38

JA211

delaying the mixing of fuel with the combustion air. However, this can result in a decrease in boiler efficiency for several reasons. For coal-fired boilers, an increase in carbon monoxide (CO) emissions and unburned carbon (UBC) levels, as well as changes in the thermal profile and heat transfer characteristics of the boiler, may result from combustion controls. For natural gas- and oil-fired boilers, CO emissions could also increase, although adverse effects are infrequently reported from these boilers. The effects from combustion $NO_x$ controls are influenced by boiler design and operational characteristics such as furnace type, fuel type, condition of existing equipment, and age.

Table 2-10 summarizes the impacts from combustion $NO_x$ controls on fossil fuel-fired utility boilers. Based on limited data, the CO emissions increase on most installations with use of operational modifications on coal-fired boilers and decrease on natural gas and oil boilers. There were no reported effects on UBC levels or boiler efficiency with the use of operational modifications.

Overfire air on one coal-fired boiler resulted in a 5 to 85 parts per million (ppm) decrease in CO emissions from uncontrolled levels. The level of CO emissions with OFA on the natural gas- and oil-fired boilers ranged from 26-830 ppm. The UBC level for coal-fired boilers increased approximately two- to three-fold with OFA and the boiler efficiency decreased by 0.4 to 0.7 percentage points.

Low $NO_x$ burners retrofit on coal-fired boilers resulted in an increase of both CO and UBC for most applications, and the boiler efficiency decreased by 0.5 to 1.5 percentage points. For natural gas- and oil-fired boilers, the controlled level of CO was 1 to 220 ppm. There were no reported effects on boiler efficiency for these boilers.

The combination of LNB and OFA on coal-fired boilers resulted in a slight increase in both CO and UBC. The boiler efficiency decreased by 0.2 to 0.9 percentage points. There

JA212

TABLE 2-10.   SUMMARY OF IMPACTS FROM COMBUSTION $NO_x$ CONTROLS
ON FOSSIL FUEL-FIRED UTILITY BOILERS

| Control technology | Fuel | Carbon monoxide | Unburned carbon | Boiler efficiency |
|---|---|---|---|---|
| BOOS, LEA, BF | Coal | One application showed increase of 40-250 ppm. | No reported effects. | No reported effects. |
| | Gas/Oil | 2 applications showed decreases of 100-150 ppm. | No reported effects for oil-firing. | No reported effects. |
| OFA | Coal | One application showed decrease of 5-85 ppm. | Range increased from 2.3-5.2% to 7.1-10.2%. | Decreased by 0.4-0.7 percentage points. |
| | Gas/Oil | Controlled levels of 26-830 ppm. | No reported effects for oil-firing. | No reported effects. |
| LNB | Coal | Ranged increased from 12-60 ppm to 15-86 ppm. | Range increased from 1-7.4% to 1.6-9.0%. | Decreased by 0.5-1.5 percentage points. |
| | Gas/Oil | Controlled levels of 1-220 ppm. | No reported effects for oil-firing. | No reported effects. |
| LNB + OFA | Coal | Range increased from 12-30 ppm to 20-45 ppm. | Range increased from 0.4-5% to 0.3-6.8%. | Decreased by 0.2-0.9 percentage points. |
| | Gas/Oil | No reported effects. | No reported effects for oil-firing. | No reported effects. |
| Reburn | Coal | Range increased from 60-94 ppm to 50-132 ppm | Range increased from 2.5-23% to 1.5-28%. | Decreased by 0.5-1.5 percentage points |
| | Oil | No data | No data | No data |

were no reported effects on the natural gas- and oil-fired boilers with LNB and OFA.

With reburn applied to coal-fired boilers, both CO and UBC increased and the boiler efficiency decreased by 0.5 to 1.5 percentage points. There were no data available for reburn applied to oil-fired boilers.

2.7.2 Impacts from Flue Gas Treatment Controls

Flue gas treatment controls remove $NO_x$ by a reaction of injected $NH_3$ or urea in the upper furnace or the convective pass or by a reaction of $NH_3$ in the presence of a catalyst at lower temperatures. These controls can produce unreacted reagents in the form of $NH_3$ slip which can be emitted into the atmosphere or can be adsorbed onto the fly ash. The $NH_3$ slip can also react with sulfur trioxide ($SO_3$) from firing coal or oil and deposit as ammonium sulfate compounds in downstream equipment. Nitrous oxide ($N_2O$) emissions are typically higher on boilers with urea-based SNCR systems. Very limited data are available; however, $NH_3$-based SNCR may yield $N_2O$ levels equal to 4 percent of the $NO_x$ reduced and urea-based SNCR may yield $N_2O$ levels of 7 to 25 percent of the $NO_x$ reduced. Flue gas treatment controls also require additional energy to run pumps, heaters, auxiliary process equipment, and to overcome any additional pressure drop due to the catalyst beds or from downstream equipment that may be plugged. The additional pressure drop from downstream equipment plugging could ultimately affect unit availability.

Table 2-11 summarizes the impacts from SNCR and SCR systems. Increases of CO emissions due to the urea-based SNCR system have been reported since urea ($NH_2CONH_2$) has CO bound in each molecule injected. If that CO is not oxidized to $CO_2$, then CO will pass through to the stack. Ammonia-based SNCR does not contain bound CO, so use of $NH_3$ as an SNCR reagent would not increase stack emissions of either CO or $CO_2$. The $NH_3$ slip for these fossil fuel-fired boilers ranged from 10 to 110 ppm. For FBC, the CO emissions were in the range of 10 to 110 ppm and $NH_3$ slip was in the range of 20 to 30 ppm.

JA214

TABLE 2-11.    SUMMARY OF IMPACTS FROM FLUE GAS TREATMENT CONTROLS ON
FOSSIL FUEL-FIRED UTILITY BOILERS

| Application | Control technology | Carbon monoxide | Ammonia slip | Other possible effects |
|---|---|---|---|---|
| Conventional utility boiler | $NH_3$-based SNCR | Little or no effect. | 10-110 ppm | Nitrous oxide is a possible by-product. |
| | Urea-bases SNCR | Possible increase[a] | 10-110 ppm | Ammonium sulfate compounds may deposit in downstream equipment causing air heater pluggage that degrades unit performance and corrodes air heater baskets. |
| Fluidized bed combustion | $NH_3$-based SNCR | 10-110 ppm | 20-30 ppm | Minor energy losses due to pumps, heaters, and control systems. |
| Fluidized Bed Combustion | Urea-based SNCR | Data not available. | Data not available. | May elevate levels of $NH_3$ in the fly ash and scrubber by-products, creating disposal problems at $NH_3$ slip level above 2 ppm. |
| Coal & Oil Pilot-Scale | SCR | Data not available. | <20 ppm | Ammonium sulfate compounds may deposit in downstream equipment. |
| Gas/Oil Full-Scale | SCR | Data not available. | 10-40 ppm | Losses due to energy required to overcome catalyst bed pressure drop. |
| | | | | May elevate levels of $NH_3$ in the fly ash, creating disposal problems. |

[a]CO data from one application reported increase of 60 to 80 ppm from uncontrolled level.

JA215

Limited data were available for installation of SCR in the United States. There were no data for SCR on CO emissions from the pilot- or full-scale applications. The $NH_3$ slip for the pilot-scale SCR application on coal and oil was less than 20 ppm. The $NH_3$ slip for one full-scale SCR application on natural gas and oil was in the range of 10 to 40 ppm.

JA216

## 5.0  $NO_x$ EMISSION CONTROL TECHNIQUES

This chapter describes the methods of reducing nitrogen oxide ($NO_x$) emissions from new and existing fossil fuel-fired utility boilers.  All of the methods can be grouped into one of two fundamentally different techniques--combustion controls and post-combustion controls (flue gas treatment).

Combustion controls reduce $NO_x$ emissions by suppressing $NO_x$ formation during the combustion process while post-combustion controls reduce $NO_x$ emissions after its formation. Combustion controls are the most widely used method of controlling $NO_x$ formation in utility boilers.  Several combustion controls can be used simultaneously to further reduce $NO_x$ emissions.  Flue gas treatment methods can often achieve greater $NO_x$ control than combustion controls, but have not been applied to many utility boilers in the United States. Combinations of flue gas treatment controls and combustion controls can be applied to maximize $NO_x$ reduction; however, there are even fewer U. S. applications of this type.  The types of $NO_x$ controls currently available for fossil fuel-fired utility boilers are presented in table 5-1.

This chapter describes $NO_x$ control technologies for fossil fuel-fired utility boilers, factors affecting the performance of these controls, and levels of performance for these controls.  Section 5.1 presents controls for coal-fired boilers.  Section 5.2 presents combustion controls for natural gas- and oil-fired boilers.  Section 5.3 presents post-combustion flue gas treatment controls.

JA217

### 5.3.2.2  Factors Affecting Performance

5.3.2.2.1  Coal-fired boilers.  The performance of an SCR system is influenced by six factors:  flue gas temperature, fuel sulfur content, $NH_3/NO_x$ ratio, $NO_x$ concentration at the SCR inlet, space velocity, and catalyst condition.

Temperature greatly affects the performance of SCR systems, and, as discussed earlier, each type of SCR catalyst has an optimum operating temperature range.  Below this range, $NO_x$ reduction does not occur, or occurs too slowly, which results in $NH_3$ slip.  Above the optimum temperature, the $NH_3$ is oxidized to $NO_x$, which decreases the $NO_x$ reduction efficiency.  The optimum temperature will depend on the type of catalyst material being used.

The second factor affecting the performance of SCR is the sulfur content of the fuel.  Approximately 1 to 4 percent of the sulfur in the fuel is converted to $SO_3$.  The $SO_3$ can then react with ammonia to form ammonium sulfate salts, which deposit and foul downstream equipment.  As can be seen in figure 5-46, the conversion of $SO_2$ to $SO_3$ is temperature dependent, with higher conversion rates at the higher temperatures.[125]  The temperature-sensitive nature of $SO_2$ to $SO_3$ conversion is especially important for boilers operating at temperatures greater than 370 °C (700 °F) at the economizer outlet.  Potential reaction equations for ammonium sulfate salts are:[126]

$$NH_3 \text{ (gas)} + SO_3 \text{ (gas)} + H_2O \text{ (gas)} \rightarrow NH_4HSO_4 \text{ (liquid)} \qquad (5\text{-}24)$$

$$NH_4HSO_4 \text{ (liquid)} + NH_3 \text{ (gas)} \rightarrow (NH_4)_2 SO_4 \text{ (solid)} \qquad (5\text{-}25)$$

$$2 NH_3 \text{ (gas)} + SO_3 \text{ (gas)} + H_2O \text{ (gas)} \rightarrow (NH_4)_2 SO_4 \text{ (solid)} \quad (5\text{-}26)$$

With the use of medium- to high-sulfur coals, the concentration of $SO_3$ will likely be higher than experienced in most SCR applications to date.  This increase in $SO_3$ concentration has the potential to affect ammonium sulfate salt formation.  However, there is insufficient SCR

JA218



Figure 5-46.  Effect of temperature on conversion
of $SO_2$ to $SO_3$.[125]

JA219

application experience with medium- to high-sulfur coals to know the nature of the effects. Applications of SCR with medium- to high-sulfur coals may need to incorporate ways to minimize the impacts of ammonium sulfate salt formation and deposition.

The third factor affecting SCR performance is the ratio of $NH_3$ to $NO_x$. For $NO_x$ reduction efficiencies up to approximately 80 percent, the $NH_3$-$NO_x$ reaction follows approximately 1:1 stoichiometry. To achieve greater $NO_x$ removal, it is necessary to inject excess $NH_3$, which results in higher levels of $NH_3$ slip.

The fourth factor affecting SCR performance is the concentration of $NO_x$ at the SCR inlet. The $NO_x$ reduction is relatively unchanged with SCR for inlet $NO_x$ concentrations of 150 to 600 ppm.[127] However, at inlet concentrations below 150 ppm, the reduction efficiencies decrease with decreasing $NO_x$ concentrations.[128]

The fifth factor affecting SCR performance is the gas flow rate and pressure drop across the catalyst. Gas flow through the reactor is expressed in terms of space velocity and area velocity. Space velocity ($hr^{-1}$) is defined as the inverse of residence time. It is determined by the ratio of the amount of gas treated per hour to the catalyst bulk volume. As space velocity increases, the contact time between the gas and the catalyst decreases. As the contact time decreases, so does $NO_x$ reduction. Area velocity (ft/hr) is related to the catalyst pitch and is defined as the ratio of the volume of gas treated per hour to the apparent surface area of the catalyst. At lower area velocities, the $NO_x$ in the flue gas has more time to react with $NH_3$ on the active sites on the catalyst; at higher area velocities, the flue gas has less time to react.[129]

The sixth factor affecting SCR performance is the condition of the catalyst material. As the catalyst degrades over time or is damaged, $NO_x$ removal decreases. Catalyst can

JA220

be deactivated from wear resulting from attrition, cracking,
or breaking over time, or from fouling by solid particle
deposition in the catalyst pores and on the surface.
Similarly, catalyst can be deactivated or "poisoned" when
certain compounds (such as arsenic, lead, and alkali oxides)
react with the active sites on the catalyst. Poisoning
typically occurs over the long term, whereas fouling can be
sudden. When the maximum temperature for the catalyst
material is exceeded, catalysts can be thermally stressed or
sintered, and subsequently deactivated. As the catalyst
degrades by these processes, the $NH_3/NO_x$ ratio must be
increased to maintain the desired level of $NO_x$ reduction.
This can result in increased levels of $NH_3$ slip. However, the
greatest impact of degradation is on catalyst life. Because
the catalyst is a major component in the cost of SCR, reducing
the life of the catalyst has a serious impact on the cost.

The top layer of catalyst is typically a "dummy" layer of
catalyst used to straighten the gas flow and reduce erosion of
subsequent catalyst layers. A metal grid can also be used as
a straightening layer. The dummy layer is made of inert
material that is less expensive than active catalyst
material.[130] Active catalyst material can be replaced as
degradation occurs in several different ways in order to
maintain $NO_x$ removal efficiency. First, all the catalyst may
be replaced at one time. Second, extra catalyst may be added
to the reactor, provided extra space has been designed into
the reactor housing for this purpose. Third, part of the
catalyst may be periodically replaced, which would extend the
useful life of the remaining catalyst.

5.3.2.2 <u>Oil and natural gas-fired boilers</u>. The
factors affecting the performance of SCR on coal-fired boilers
are generally applicable to natural gas- and oil-firing.
However, the effect may not be as severe on the natural
gas- and oil-fired applications.

JA221

The six factors affecting SCR performance on coal-fired boilers were: flue gas temperature, fuel sulfur content, $NH_3/NO_x$ ratio, $NO_x$ concentration at the SCR inlet, space velocity, and catalyst condition. Of these, the fuel sulfur content will not be as much a factor in natural gas and oil firing applications because these fuels do not contain as much sulfur as coal. Therefore, there will not be as much $SO_3$ in the flue gas to react with excess ammonia and deposit in downstream equipment.

Another parameter which will not have as much impact in natural gas- or oil-fired boilers is the condition of the catalyst material. The SCR catalyst material can still be damaged by sintering or poisoned by certain compounds. However, since natural gas- and oil-fired boilers do not have as much fly ash as coal-fired boilers, the pores in the catalyst will not plug as easily and the surface of the catalyst would not be scoured or eroded due to the fly ash particles.

5.3.2.3 <u>Performance of Selective Catalytic Reduction</u>. Table 5-16 presents the results from pilot-scale SCR installations at two coal-fired boilers and one oil-fired boiler. The SCR pilot plants are equal to approximately 1 to 2 MW and process a slip-stream of flue gas from the boiler. Each pilot plant contained two different catalysts that were evaluated simultaneously. As of 1993, these pilot plants had been operating 2-3 years.

For the coal-fired SCR demonstration projects, the results indicate that 75-80 percent $NO_x$ reduction has been achieved with ammonia slip of less than 20 ppm. The lower $NO_x$ reduction and higher $NH_3$ slip for the oil-fired demonstration at the Oswego site were measured at higher-than-design space velocities. Note that these results are pilot facilities in which operating and process parameters can be carefully controlled.

To date, there are no full-scale SCR applications on oil- or coal-firing. However, as shown in table 5-16, Southern JA222

## TABLE 5-16.   PERFORMANCE OF SCR ON U. S. UTILITY BOILERS

| Utility | Unit | Fuel Type | SCR Type[a] | $NH_3$ slip (ppm) | $NH_3$ to-$NO_x$ ratio | Reduction in $NO_x$ emissions[b] (%) | Reference |
|---------|------|-----------|----------|-----------|----------|----------|-----------|
| PILOT-SCALE SYSTEMS | | | | | | | |
| NY State Elec. & Gas | Kintigh | Coal | Cold | <1 <br> <1 | 0.8 <br> 0.8 | 80[c] <br> 80[d] | 131 |
| Tennessee Valley Authority | Shawnee | Coal | Hot | 1-7[e] <br> 2-20[f] | 0.8 <br> 0.8 | 75-80[e] <br> 75-80[f] | 132 |
| Niagara Mohawk | Oswego | Oil | Hot | Up to 20[g] <br> Up to 50[h] | 0.8 <br> 0.8 | 75-80[g] <br> 60-80[h] | 133 |
| FULL-SCALE SYSTEMS | | | | | | | |
| Southern California Edison | Huntington Beach 2 | Gas | Hot | 10-40 | -- | 90 | 134 |

[a]Type:  Cold = Cold-side, post-FGD SCR, after air preheater; and Hot = Hot-side, high-dust SCR, before air preheater

[b]Results are given for two different catalysts.

[c]Space velocity = 6,990 $hr^{-1}$; catalyst exposure time = 7,800 hours

[d]Space velocity = 8,940 $hr^{-1}$; catalyst exposure time = 2,400 hours.

[e]Space velocity = 3,240 $hr^{-1}$; catalyst exposure time = 3,600 to 14,000 hours.

[f]Space velocity = 2,200 $hr^{-1}$; catalyst exposure time = 1,500 to 7,700 hours.

[g]Space velocity = 4,350 to 17,400 $hr^{-1}$;

[h]Space velocity = 6,900 to 27,400 $hr^{-1}$;

-- = Data not available.

California Edison has a commercial size installation of SCR on their gas-fired Huntington Beach Unit 2 boiler. The $NO_x$ reduction reported was approximately 90 percent with the highest level of $NH_3$ slip at 40 ppm.

The effect of catalyst exposure time and space velocity on catalyst performance was also examined for each of the pilot-scale demonstrations. Figures 5-47a and 5-47b show $NO_x$ removal and $NH_3$ slip as a function of $NH_3/NO_x$ ratio for two catalysts in a cold-side, post-FGD SCR demonstration at the Kintigh site.[130] The results show no change in the activity of either the extruded catalyst after 7,800 hours of operation or the replacement composite catalyst after 2,400 hours of operation. Each catalyst controlled $NO_x$ emissions by 80 percent at an $NH_3/NO_x$ ratio of 0.8 with a corresponding $NH_3$ slip of < 1 ppm.[131]

Figures 5-48a and 5-48b show performance results for two catalysts in the high-dust SCR demonstration at the Shawnee site.[132] The figures show a decrease in catalyst activity and an increase in residual $NH_3$ with increasing hours of operation for both catalysts. This deterioration in catalyst activity is more pronounced for the zeolite catalyst as shown in figure 5-48b.[132]

Figures 5-49a and 5-49b show the performance results for the two catalysts evaluated in the SCR application on the oil-fired boiler at the Oswego plant.[133] In each figure, the curves show the effect of space velocity on $NO_x$ reduction as a function of $NH_3/NO_x$ ratio. The effect of space velocity on $NH_3$ slip is also shown in the figures. The results show the expected decrease in $NO_x$ reduction and increase in $NH_3$ slip at the higher space velocity for both catalysts. The effect is more pronounced on the V/Ti catalyst.[133]

5.3.3  Selective Noncatalytic Reduction and Combustion Controls

5.3.3.1  Process Description. Combustion controls such as LNBs and OFA may be used in combination with SNCR to reduce

JA224

# PROPOSED RULEMAKING

## ENVIRONMENTAL QUALITY BOARD

### [ 25 PA. CODE CHS. 121 AND 129 ]

### Additional RACT Requirements for Major Sources of NO$_x$ and VOCs

The Environmental Quality Board (Board) proposes to amend Chapters 121 and 129 (relating to general provisions; and standards for sources) to read as set forth in Annex A. The proposed rulemaking would amend Chapter 129 to adopt presumptive reasonably available control technology (RACT) requirements and RACT emission limitations for certain major stationary sources of oxides of nitrogen (NO$_x$) and volatile organic compound (VOC) emissions.

The proposed rulemaking would revise § 121.1 (relating to definitions) to add or amend "CEMS—continuous emissions monitoring system," "process heater" and "stationary internal combustion engine" to support the proposed amendments to Chapter 129.

The proposed rulemaking will be submitted to the United States Environmental Protection Agency (EPA) upon final-form publication for approval as a revision to the Commonwealth's State Implementation Plan (SIP).

This proposed rulemaking is given under Board order at its meeting of November 19, 2013.

#### A. Effective Date

This proposed rulemaking will be effective upon final-form publication in the *Pennsylvania Bulletin*.

#### B. Contact Persons

For further information, contact Kirit Dalal, Chief, Division of Air Resource Management, P. O. Box 8468, Rachel Carson State Office Building, Harrisburg, PA 17105-8468, (717) 772-3436; or Robert "Bo" Reiley, Assistant Counsel, Bureau of Regulatory Counsel, Rachel Carson State Office Building, P. O. Box 8464, Harrisburg, PA 17105-8464, (717) 787-7060. Information regarding submitting comments on this proposed rulemaking appears in Section J of this preamble. Persons with a disability may use the Pennsylvania AT&T Relay Service, (800) 654-5984 (TDD users) or (800) 654-5988 (voice users). This proposed rulemaking is available electronically on the Department of Environmental Protection's (Department) web site at www.dep.state.pa.us (DEP Search/Keyword: Public Participation).

#### C. Statutory Authority

The proposed rulemaking is authorized under section 5(a)(1) of the Air Pollution Control Act (act) (35 P. S. § 4005(a)(1)), which grants the Board the authority to adopt rules and regulations for the prevention, control, reduction and abatement of air pollution in this Commonwealth, and section 5(a)(8) of the act, which grants the Board the authority to adopt rules and regulations designed to implement the provisions of the Clean Air Act (CAA) (42 U.S.C.A. §§ 7401—7671q).

#### D. Background and Purpose

The EPA is required under section 109 the CAA (42 U.S.C.A. § 7409) to set National Ambient Air Quality Standards (NAAQS) for six criteria pollutants of which ozone is one. The NAAQS are established by the EPA as the maximum concentrations in the atmosphere for specific air contaminants to protect public health and welfare.

Ozone is a highly reactive gas which at sufficient concentrations can produce a wide variety of harmful effects. At elevated concentrations, ozone can adversely affect human health, vegetation, materials, economic values, and personal comfort and well-being. It can cause damage to important food crops, forests, livestock and wildlife. Repeated exposure to ozone pollution may cause a variety of adverse health effects for healthy people and those with existing conditions including difficulty in breathing, chest pains, coughing, nausea, throat irritation and congestion. It can worsen bronchitis, heart disease, emphysema and asthma, and reduce lung capacity. Asthma is a significant and growing threat to children and adults. High levels of ozone also affect animals in ways similar to humans.

The EPA promulgated primary and secondary NAAQS for photochemical oxidants under section 109 of the CAA at 36 FR 8186 (April 30, 1971). These were set at an hourly average of 0.08 parts per million (ppm) total photochemical oxidants not to be exceeded more than 1 hour per year. The EPA announced a revision to the then-current 1-hour standard at 44 FR 8202 (February 8, 1979). The final rulemaking revised the level of the primary 1-hour ozone standard from 0.08 ppm to 0.12 ppm and set the secondary standard identical to the primary standard. This revised 1-hour standard was subsequently reaffirmed at 58 FR 13008 (March 9, 1993).

Section 110 of the CAA (42 U.S.C.A. § 7410) gives states primary responsibility for achieving the NAAQS. The principal mechanism at the state level for complying with the CAA is the SIP. A SIP includes the regulatory programs, actions and commitments a state will carry out to implement its responsibilities under the CAA. Once approved by the EPA, a SIP is legally enforceable under both Federal and state law.

Section 182 of the CAA (42 U.S.C.A. § 7511a) requires that, for areas that exceed the NAAQS for ozone, states shall develop and implement a program that mandates that certain major stationary sources develop and implement a RACT program. RACT is defined as the lowest emissions limitation that a particular source is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility. See 44 FR 53762 (September 17, 1979).

Under section 182(f)(1) of the CAA and section 184(b)(2) of the CAA (42 U.S.C.A. § 7511c(b)(2)), these RACT requirements are applicable to all sources in this Commonwealth that emit or have a potential to emit greater than 100 tons per year of NO$_x$. Under sections 182(b)(2) and 184(b)(2) of the CAA, the RACT requirement are applicable to all sources in this Commonwealth that emit or have a potential to emit greater than 50 tons per year of VOCs. NO$_x$ and VOC controls are required Statewide because of the Commonwealth's inclusion in the Northeast Ozone Transport Region. See section 184(a) of the CAA. Additionally, because the five-county Philadelphia area was designated as severe ozone nonattainment for the 1-hour standard, sources of greater than 25 tons per year of either pollutant are required to implement RACT under section 182(d) of the CAA. The Commonwealth's RACT regulations in §§ 129.91—129.95 (relating to sta-

tionary sources of $NO_x$ and VOCs) were implemented for the 1-hour ozone standard. These regulations were effective January 15, 1994.

The EPA concluded in 1997 that revisions to the current primary standard to provide increased public health protection were appropriate at this time to protect public health with an adequate margin of safety. See 62 FR 38856 (July 18, 1997). Further, the EPA determined that it was appropriate to establish an 8-hour primary standard of 0.08 ppm. See 62 FR 38856. The EPA designated 37 counties in this Commonwealth as 8-hour ozone nonattainment areas for the 1997 8-hour ozone NAAQS at 69 FR 23858, 23931 (April 30, 2004).

The EPA lowered the 8-hour standard from 0.08 ppm to 0.075 ppm at 73 FR 16436 (March 27, 2008). The EPA made designations for the 2008 8-hour ozone standards on April 30, 2012, with an effective date of July 20, 2012. See 77 FR 30160 (May 21, 2012). The EPA designated all or portions of Allegheny, Armstrong, Beaver, Berks, Bucks, Butler, Carbon, Chester, Delaware, Fayette, Lancaster, Lehigh, Montgomery, Northampton, Philadelphia, Washington and Westmoreland Counties as nonattainment for the 2008 8-hour ozone NAAQS. See 77 FR 30088, 30143 (May 21, 2012). Therefore, the Commonwealth must submit a SIP revision to demonstrate how it will attain and maintain the 2008 8-hour ozone standard in the nonattainment areas.

A re-evaluation of what measures constitute RACT is a requirement to be fulfilled each time a NAAQS is promulgated, as happened in 1997 and 2008 for ozone. According to the EPA's Final Rule to Implement the 8-Hour Ozone NAAQS, areas classified as "moderate" nonattainment or higher must submit a demonstration, as a revision to the SIP, that their current rules fulfill 8-hour ozone RACT requirements for all Control Techniques Guidelines (CTG) categories and all major, non-CTG sources. See 70 FR 71612 (November 29, 2005).

According to this implementation rule, demonstrations can be made with either a new RACT determination or a certification that previously-required RACT controls represent RACT for the 8-hour ozone NAAQS. The certification should be accompanied by appropriate supporting information, such as consideration of information received during the public comment period. The RACT SIP revision submittal is in addition to the 8-hour ozone attainment demonstration plan for the area, which will also be a revision to the Commonwealth's SIP. The RACT SIP revision was required to be submitted to the EPA by September 15, 2006.

The Commonwealth submitted a SIP revision in September 2006 certifying that RACT determinations made for the 1-hour ozone standard in 1994 under §§ 129.91—129.95 were RACT for the 8-hour standard, including for those sources where a determination was made that "no controls" continued to represent RACT for the 1-hour ozone standard. However, the EPA informally indicated to the Department that based on NRDC v. EPA, 571 F.3d 1245 (July 10, 2009), a reanalysis rather than certification is necessary for sources for which the Department previously determined that "no controls" represented RACT for the 1-hour ozone standard.

As a result of the EPA's decision, the Department conducted a generic RACT analysis of those sources where a "no controls" decision was previously made under §§ 129.91—129.95 for the 1-hour ozone standard to determine if additional controls would represent RACT for the 8-hour ozone NAAQS. That generic analysis identified

source categories looking at size and fuel type; identified available feasible $NO_x$ or VOC, or both, control options for each type of existing source; estimated emission reduction potential for each control technology; identified costs for technologies, using appropriate updates; evaluated cost-effectiveness per EPA guidance, for both uncontrolled and controlled sources (combinations of technologies); and chose emission limit achievable by cost-effective technologies using benchmark cost/ton.

Based on this analysis, the Board determined that additional cost-effective controls represent RACT for the 8-hour ozone NAAQS. There are nine source categories that will be affected by this proposed rulemaking: combustion units; boilers; process heaters; turbines; engines; municipal solid waste landfills; municipal waste combustors; cement kilns; and other sources that are not regulated elsewhere under Chapter 129.

All together this proposed rulemaking would affect the owners and operators of approximately 810 individual sources at 192 major facilities throughout this Commonwealth. Under this proposed rulemaking, the Board anticipates that the total $NO_x$ emission reductions will be approximately 158,421 tons per year.

The Board determines that this proposed rulemaking will fulfill requirements for re-evaluation and be less resource intensive than imposing case-by-case analysis for affected facilities in the covered categories. As more fully discussed in Section E of this preamble, the Board proposes a compliance option hierarchy where the owner or operator of a subject source that cannot meet the presumptive RACT emission limitations and requirements under proposed § 129.97 (relating to presumptive RACT requirements), RACT emission limitations and petition for alternative compliance schedule) may apply for facility-wide/system-wide $NO_x$ emissions averaging under proposed § 129.98 (relating to facility-wide or system-wide $NO_x$ emissions averaging RACT operating permit modification general requirements) or an alternative case-by-case RACT determination under proposed § 129.99 (relating to alternative RACT proposal and petition for alternative compliance schedule).

The Board determines that the requirements under this proposed rulemaking are reasonably necessary to attain and maintain the 8-hour ozone NAAQS.

E. Summary of Regulatory Requirements

§ 121.1. Definitions

The proposed rulemaking would revise § 121.1 to add or amend "CEMS—continuous emissions monitoring system," "process heater" and "stationary internal combustion engine" to support the proposed amendments to Chapter 129.

§ 129.96. Applicability

Under proposed subsection (a), the proposed regulation would apply Statewide to the owner and operator of a major $NO_x$ emitting facility or a major VOC emitting facility, or both, that was in existence on or before July 20, 2012.

Under proposed subsection (b), the proposed regulation would apply Statewide to the owner and operator of a $NO_x$ emitting facility or VOC emitting facility, or both, when the installation of a new source or a modification or change in operation of an existing source after July 20, 2012, results in the source or facility meeting the definition of a major $NO_x$ emitting facility or a major VOC

emitting facility and for which a requirement or an emission limitation, or both, has not been established in §§ 129.51—129.52c, 129.54—129.69, 129.71—129.73, 129.75, 129.77, 129.101—129.107 and 129.301—129.310.

### § 129.97. Presumptive RACT requirements, RACT emission limitations and petition for alternative compliance schedule

Under proposed subsection (a), the owner and operator of a source listed in one or more of subsections (b)—(h) located at a major $NO_x$ emitting facility or major VOC emitting facility, or both, shall comply with the applicable presumptive RACT requirement or RACT emission limitation, or both, beginning with the specified compliance date, unless an alternative compliance schedule is submitted and approved under subsections (k)—(m) or § 129.99.

Under proposed subsection (b), the owner and operator of the listed combustion units that are located at a major $NO_x$ emitting facility or major VOC emitting facility, or both, shall comply with the presumptive RACT requirement applicable to that source, which includes, among other things, inspection and adjustment requirements.

Under proposed subsection (c), the owner and operator of a source listed in this subsection located at a major $NO_x$ emitting facility or major VOC emitting facility, or both, shall comply with the applicable presumptive RACT requirement, which includes, among other things, the operation of the source in accordance with the manufacturer's specifications and good engineering practices.

Under proposed subsection (d), the owner and operator of a combustion unit or other combustion source located at a major VOC emitting facility subject to § 129.96 (relating to applicability) shall comply with the presumptive RACT requirement of good engineering practices for the control of the VOC emissions from the combustion unit or other combustion source.

Under proposed subsection (e), the owner and operator of a municipal solid waste landfill subject to § 129.96 shall comply with the applicable presumptive RACT requirement identified under paragraphs (1) and (2).

Under proposed subsection (f), the owner and operator of a municipal waste combustor subject to § 129.96 shall comply with the applicable presumptive RACT requirement identified under paragraphs (1) and (2).

Under proposed subsection (g), the owner and operator of a $NO_x$ air contamination source listed in this subsection located at a major $NO_x$ emitting facility or a VOC air contamination source listed in this subsection located at a major VOC emitting facility, or both, subject to § 129.96 may not cause, allow or permit $NO_x$ or VOCs, or both, to be emitted from the air contamination source for which the source is major in excess of the applicable RACT emission limitation under paragraphs (1)—(4).

Under proposed subsection (h), the owner and operator of a Portland cement kiln subject to § 129.96 shall comply with the applicable presumptive RACT emission limitation under paragraphs (1)—(3).

Under proposed subsection (i), among other things, the requirements and emission limitations of this proposed section would supersede the requirements and emission limitations of a RACT permit issued to the owner or operator of an air contamination source subject to one or more of subsections (b)—(h) prior to the effective date of adoption of this proposed rulemaking except to the extent the RACT permit contains more stringent requirements or emission limitations, or both.

Under proposed subsection (j), among other things, the requirements and emission limitations of this section do not supersede the requirements and emission limitations of §§ 129.201—129.205, 145.111—145.113 and 145.141—145.146 (relating to additional $NO_x$ requirements; emissions of $NO_x$ from stationary internal combustion engines; and emissions of $NO_x$ from cement manufacturing) except to the extent this section contains more stringent requirements or emission limitations, or both.

Under proposed subsection (k), the owner or operator of a major $NO_x$ emitting facility or a major VOC emitting facility, or both, subject to § 129.96 that includes an air contamination source subject to one or more of subsections (b)—(h) that cannot meet the applicable RACT requirement or RACT emission limitation without installation of an air cleaning device may submit a petition, in writing, requesting an alternative compliance schedule in accordance with paragraphs (1) and (2).

Under proposed subsection (l), the Department or appropriate approved local air pollution control agency would review the timely and complete written petition requesting an alternative compliance schedule submitted in accordance with subsection (k) and approve or deny the petition in writing.

Under proposed subsection (m), approval or denial under subsection (l) of the timely and complete petition for an alternative compliance schedule submitted under subsection (k) would be effective on the date the letter of approval or denial of the petition is signed by the authorized representative of the Department or appropriate approved local air pollution control agency.

### § 129.98. Facility-wide or system-wide $NO_x$ emissions averaging RACT operating permit modification general requirements

Under proposed subsection (a), the owner or operator of a major $NO_x$ emitting facility that includes an air contamination source subject to a $NO_x$ RACT requirement or $NO_x$ RACT emission limitation in § 129.97 that cannot meet the applicable $NO_x$ RACT requirement or $NO_x$ RACT emission limitation may elect to meet the applicable $NO_x$ RACT requirement or $NO_x$ RACT emission limitation in § 129.97 by averaging $NO_x$ emissions on either a facility-wide or system-wide basis using a 30-day rolling average. System-wide emissions averaging must be among sources under common control of the same owner or operator in this Commonwealth.

Under proposed subsection (b), the owner or operator of each facility that elects to comply with subsection (a) shall submit an operating permit modification that incorporates the requirements of this section for averaging $NO_x$ emissions on either a facility-wide or system-wide basis using a 30-day rolling average to the Department or appropriate approved local air pollution control agency by the applicable date in paragraphs (1) and (2).

Under proposed subsection (c), each $NO_x$ emitting source included in the operating permit modification for averaging $NO_x$ emissions on either a facility-wide or system-wide basis using a 30-day rolling average submitted under subsection (b) must be an air contamination source subject to a $NO_x$ RACT emission limitation in § 129.97.

Under proposed subsection (d), the operating permit modification for averaging $NO_x$ emissions on either a facility-wide or system-wide basis using a 30-day rolling average submitted under subsection (b) must demonstrate that the aggregate $NO_x$ emissions emitted by the air contamination sources included in the facility-wide or

system-wide NO$_x$ emissions averaging RACT operating permit modification using a 30-day rolling average are not greater than 90% of the sum of the NO$_x$ emissions that would be emitted by the group of included sources if each source complied with the applicable NO$_x$ RACT requirement or NO$_x$ RACT emission limitation in § 129.97 on a source-specific basis.

Under proposed subsection (e), the owner or operator shall calculate the alternative facility-wide or system-wide NO$_x$ RACT emissions limitation using a 30-day rolling average for the air contamination sources included in the operating permit modification submitted under subsection (b) by using the equation in this subsection to sum the emissions for all of the sources included in the operating permit modification.

Under proposed subsection (f), the operating permit modification specified in subsections (b)—(e) may include facility-wide or system-wide averaging emissions using a 30-day rolling average only for NO$_x$ emitting sources or NO$_x$ emitting facilities that are owned or operated, or both, by the applicant.

Under proposed subsection (g), the operating permit modification specified in subsections (b)—(f) must include the information identified under paragraphs (1)—(3).

Under proposed subsection (h), an air contamination source or facility, or both, included in the facility-wide or system-wide NO$_x$ emissions averaging RACT operating permit modification may be included in only one facility-wide or system-wide NO$_x$ emissions averaging RACT proposal.

Under proposed subsection (i), the Department or appropriate approved local air pollution control agency will issue a modification to the operating permit.

Under proposed subsection (j), the owner or operator of an air contamination source or facility, or both, included in the facility-wide or system-wide NO$_x$ emissions averaging RACT operating permit modification shall submit the reports and records specified in subsection (g)(3) to the Department or appropriate approved local air pollution control agency to demonstrate compliance with § 129.100 (relating to compliance demonstration and recordkeeping requirements).

Under proposed subsection (k), the owner or operator of an air contamination source or facility, or both, included in a facility-wide or system-wide NO$_x$ emissions averaging RACT operating permit modification that achieves emission reductions in accordance with other emission limitations required under the act or the CAA, or regulations adopted under the act or the CAA, that are not NO$_x$ RACT emission limitations may not substitute those emission reductions for the emission reductions required by the facility-wide or system-wide NO$_x$ emissions averaging RACT operating permit modification.

Under proposed subsection (l), the owner or operator of an air contamination source subject to a NO$_x$ emission limitation in § 129.97 that is not included in a facility-wide or system-wide NO$_x$ emissions averaging RACT operating permit modification submitted under subsection (b) shall operate the source in compliance with the applicable NO$_x$ emission limitation in § 129.97.

Under proposed subsection (m), the owner and operator of an air contamination source included in a facility-wide or system-wide NO$_x$ emissions averaging RACT operating permit modification submitted under subsection (b) shall be liable for a violation of the operating permit modifica-

tion or this section at that source or other source in the operating permit modification.

§ 129.99. Alternative RACT proposal and petition for alternative compliance schedule

Under proposed subsection (a), the owner or operator of an air contamination source that cannot meet the applicable presumptive RACT requirement or RACT emission limitation of § 129.97 or participate in either a facility-wide or system-wide NO$_x$ emissions averaging RACT operating permit modification under § 129.98 may propose an alternative NO$_x$ RACT emission limitation or VOC RACT emission limitation, or both, in accordance with subsection (d).

Under proposed subsection (b), the owner or operator of a NO$_x$ air contamination source with a potential emission rate equal to or greater than 5.0 tons of NO$_x$ per year that is not subject to § 129.97 or §§ 129.201—129.205 located at a major NO$_x$ emitting facility subject to § 129.96 shall propose a NO$_x$ RACT emission limitation in accordance with subsection (d).

Under proposed subsection (c), the owner or operator of a VOC air contamination source with a potential emission rate equal to or greater than 2.7 tons of VOC per year that is not subject to § 129.97 located at a major VOC emitting facility subject to § 129.96 shall propose a VOC RACT emission limitation in accordance with subsection (d).

Under proposed subsection (d), the owner or operator proposing an alternative RACT emission limitation under subsection (a), (b) or (c) shall comply with all of the proposal requirements under paragraphs (1)—(7).

Under proposed subsection (e), the Department or appropriate approved local air pollution control agency will review and approve, modify or deny the application as indicated under paragraphs (1)—(3).

Under proposed subsection (f), the proposed alternative RACT emission limitation must be approved, denied or modified by the Department or appropriate approved local air pollution control agency through the issuance of a plan approval or operating permit modification prior to the owner or operator implementing the alternative RACT emission limitation.

Under proposed subsection (g), the emission limit and requirements specified in the plan approval or operating permit under subsection (f) supersedes the emission limit and requirements in the existing plan approval or operating permit issued to the owner or operator of the source except to the extent the existing plan approval or operating permit contains more stringent requirements.

Under proposed subsection (h), the Department will submit each approved alternative RACT emission limitation to the EPA for approval as a revision to the SIP. The owner and operator of the facility will bear the costs of public hearings and notification required for EPA SIP approval.

Under proposed subsection (i), the owner and operator of a facility proposing to comply with the applicable RACT emission limitation under subsection (a), (b) or (c) through the installation of an air cleaning device may submit a petition, in writing, requesting an alternative compliance schedule in accordance with paragraphs (1) and (2).

Under proposed subsection (j), the Department or appropriate approved local air pollution control agency will review the written petition requesting an alternative

compliance schedule submitted in accordance with subsection (h) and approve or deny the petition in writing.

Under proposed subsection (k), the emission limit and requirements specified in the plan approval or operating permit issued by the Department or appropriate approved local air pollution control agency under subsection (j) supersede the emission limit and requirements in the existing plan approval or operating permit, except to the extent the existing plan approval or operating permit contains more stringent requirements.

Under proposed subsection (l), approval or denial under subsection (j) of the timely and complete petition for an alternative compliance schedule submitted under subsection (i) will be effective on the date the letter of approval or denial of the petition is signed by the authorized representative of the Department or appropriate approved local air pollution control agency.

### § 129.100. Compliance demonstration and recordkeeping requirements

Under proposed subsection (a), the owner and operator of an air contamination source subject to the requirements of this proposed regulation shall demonstrate compliance with the applicable RACT requirement or RACT emission limitation by performing the monitoring or testing procedures under paragraphs (1) and (2), except as provided in subsection (c).

Under proposed subsection (b), the owner and operator of an air contamination source subject to subsection (a) shall demonstrate compliance with the applicable RACT requirement or RACT emission limitation in accordance with the procedures in subsection (a) not later than the applicable time frames under paragraphs (1) and (2).

Under proposed subsection (c), an owner or operator of an air contamination source subject to this section and §§ 129.96—129.98 may request a waiver from the requirement to demonstrate compliance with the applicable emission limitation listed in § 129.97 if the requirements under paragraphs (1)—(4) are met.

Under proposed subsection (d), the owner and operator of an air contamination source subject to this section and §§ 129.96—129.99 shall keep records to demonstrate compliance with §§ 129.96—129.99 as set forth in paragraphs (1)—(3).

Under proposed subsection (e), the owner or operator of an air contamination source claiming that the air contamination source is exempt from the applicable $NO_x$ emission rate threshold specified in § 129.99(b) and the requirements of § 129.97 based on the air contamination source's potential to emit shall maintain records that demonstrate to the Department or appropriate approved local air pollution control agency that the air contamination source is not subject to the specified emission rate threshold.

Under proposed subsection (f), the owner or operator of an air contamination source claiming that the air contamination source is exempt from the applicable VOC emission rate threshold specified in § 129.99(c) and the requirements of § 129.97 based on the air contamination source's potential to emit shall maintain records that demonstrate to the Department or appropriate approved local air pollution control agency that the air contamination source is not subject to the specified emission rate threshold.

Under proposed subsection (g), the owner or operator of a combustion unit subject to § 129.97(b)(1) shall record each adjustment conducted under the procedures in § 129.97(b)(1) in a permanently bound log book or other method approved by the Department or appropriate approved local air pollution control agency. This log book must contain, at a minimum, the information in paragraphs (1)—(6).

Under proposed subsection (h), the owner or operator of an oil-fired, gas-fired or combination oil-fired and gas-fired unit subject to § 129.97(b)(2) shall maintain records including a certification from the fuel supplier of the type of fuel. For each shipment of residual oil, the record must include the items in paragraphs (1) and (2).

Under proposed subsection (i), the owner or operator of a Portland cement kiln subject to § 129.97(h) shall maintain a daily operating log for each Portland cement kiln. The record for each kiln must include the items in paragraphs (1)—(4).

### F. Benefits, Costs and Compliance

#### Benefits

Reduced ambient concentrations of ground-level ozone would reduce the incidences of hospital admissions for respiratory ailments including asthma and improve the quality of life for citizens overall. While children, the elderly and those with respiratory problems are most at risk, even healthy individuals may experience increased respiratory ailments and other symptoms when they are exposed to high levels of ambient ground-level ozone while engaged in activities that involve physical exertion.

The proposed rulemaking may create economic opportunities for $NO_x$ and VOC emission control technology innovators, manufacturers and distributors through an increased demand for new or improved equipment. In addition, the owners and operators of regulated facilities may be required to install and operate an emissions monitoring system or equipment necessary for an emissions monitoring method to comply with the rulemaking, thereby creating an economic opportunity for the emissions monitoring industry.

#### Compliance Costs

Compliance costs will vary for each facility depending on which compliance option is chosen by the owners and operators of a facility. The proposed rulemaking would include a provision for the owner and operator of an affected facility that cannot meet the applicable $NO_x$ RACT or VOC RACT emission limitation to elect to meet the applicable $NO_x$ RACT requirement or $NO_x$ RACT emission limitation in § 129.97 by averaging $NO_x$ emissions on either a facility-wide or system-wide basis using a 30-day rolling average or submit a case-specific RACT proposal for an alternative emission limitation to the Department for approval.

Under these provisions, the owner or operator shall demonstrate to the Department's satisfaction that it is economically or technically infeasible to meet the applicable proposed $NO_x$ RACT or VOC RACT emission limitation. These provisions may minimize compliance costs to the owner or operator of an affected facility.

Emission limitations established by regulation will not require the submission of applications for amendments to existing operating permits. These requirements will be incorporated as applicable requirements at the time of permit renewal, if less than 3 years remain in the permit term.

*Compliance Assistance Plan*

The Department will continue to work with the Small Business Assistance Program to aid the facilities less able to handle permitting matters with in-house staff. Through increased preapplication meetings with facilities, the Department is targeting the benefit to industry and the Department for faster review of permit applications.

*Paperwork Requirements*

The proposed rulemaking will not increase the paperwork that is already generated during the normal course of business operations.

G. *Pollution Prevention*

The Pollution Prevention Act of 1990 (42 U.S.C.A. §§ 13101—13109) established a National policy that promotes pollution prevention as the preferred means for achieving state environmental protection goals. The Department encourages pollution prevention, which is the reduction or elimination of pollution at its source, through the substitution of environmentally friendly materials, more efficient use of raw materials and the incorporation of energy efficiency strategies. Pollution prevention practices can provide greater environmental protection with greater efficiency because they can result in significant cost savings to facilities that permanently achieve or move beyond compliance. The proposed RACT requirements would allow the Department and approved local air pollution control agencies to maintain or increase the reductions of $NO_x$ and VOC emissions from the regulated sources in this Commonwealth, sustain the gains made in healthful air quality and ensure continued protection of the environment and the public health and welfare of the citizens of this Commonwealth.

H. *Sunset Review*

These regulations will be reviewed in accordance with the sunset review schedule published by the Department to determine whether they effectively fulfill the goals for which they were intended.

I. *Regulatory Review*

Under section 5(a) of the Regulatory Review Act (71 P. S. § 745.5(a)), on April 7, 2014, the Department submitted a copy of this proposed rulemaking and a copy of a Regulatory Analysis Form to the Independent Regulatory Review Commission (IRRC) and to the Chairpersons of the House and Senate Environmental Resources and Energy Committees. A copy of this material is available to the public upon request.

Under section 5(g) of the Regulatory Review Act, IRRC may convey any comments, recommendations or objections to the proposed rulemaking within 30 days of the close of the public comment period. The comments, recommendations or objections must specify the regulatory review criteria which have not been met. The Regulatory Review Act specifies detailed procedures for review, prior to final publication of the rulemaking, by the Department, the General Assembly and the Governor of comments, recommendations or objections raised.

J. *Public Comments*

Interested persons are invited to submit written comments, suggestions or objections regarding the proposed rulemaking to the Board. Comments, suggestions or objections must be received by the Board by June 30, 2014. In addition to the submission of comments, interested persons may also submit a summary of their comments to the Board. The summary may not exceed one page in length and must also be received by the Board by June 30, 2014. The one-page summary will be distributed to the Board and available publicly prior to the meeting when the final-form rulemaking will be considered.

Comments including the submission of a one-page summary of comments may be submitted to the Board online, by mail or express mail as follows. Comments may be submitted online to the Board by accessing the Board's Regulatory Comment System at http://www.ahs.dep.pa.gov/RegComments. If an acknowledgement of comments submitted online is not received by the sender within 2 business days, the comments should be retransmitted to the Board to ensure receipt. Written comments should be mailed to the Environmental Quality Board, P. O. Box 8477, Harrisburg, PA 17105-8477. Express mail should be sent to the Environmental Quality Board, Rachel Carson State Office Building, 16th Floor, 400 Market Street, Harrisburg, PA 17101-2301. Comments submitted by facsimile will not be accepted.

K. *Public Hearings*

The Board will hold three public hearings for the purpose of accepting comments on this proposed rulemaking. The hearings will be held at 1 p.m. on the following dates:

| | |
|---|---|
| May 27, 2014 | Department of Environmental Protection<br>Southwest Regional Office<br>Waterfront Conference Rooms A and B<br>400 Waterfront Drive<br>Pittsburgh, PA 15222 |
| May 28, 2014 | Department of Environmental Protection<br>Southeast Regional Office<br>Delaware and Schuylkill Conference Rooms<br>2 East Main Street<br>Norristown, PA 19401 |
| May 29, 2014 | Department of Environmental Protection<br>Rachel Carson State Office Building<br>Conference Room 105<br>400 Market Street<br>Harrisburg, PA 17105 |

Persons wishing to present testimony at a hearing are requested to contact the Environmental Quality Board, P. O. Box 8477, Harrisburg, PA 17105-8477, (717) 787-4526 at least 1 week in advance of the hearing to reserve a time to present testimony. Oral testimony is limited to 10 minutes for each witness. Witnesses are requested to submit three written copies of their oral testimony to the hearing chairperson at the hearing. Organizations are limited to designating one witness to present testimony on their behalf at each hearing.

Persons in need of accommodations as provided for in the Americans with Disabilities Act of 1990 should contact the Board at (717) 787-4526 or through the Pennsylvania AT&T Relay Service at (800) 654-5984 (TDD) or (800) 654-5988 (voice users) to discuss how the Board may accommodate their needs.

E. CHRISTOPHER ABRUZZO,
*Chairperson*

**Fiscal Note:** 7-485. No fiscal impact; (8) recommends adoption.

Annex A

## TITLE 25. ENVIRONMENTAL PROTECTION
## PART I. DEPARTMENT OF ENVIRONMENTAL PROTECTION
### Subpart C. PROTECTION OF NATURAL RESOURCES
### ARTICLE III. AIR RESOURCES
### CHAPTER 121. GENERAL PROVISIONS

§ 121.1. Definitions.

The definitions in section 3 of the act (35 P. S. § 4003) apply to this article. In addition, the following words and terms, when used in this article, have the following meanings, unless the context clearly indicates otherwise:

\*    \*    \*    \*    \*

*CEMS—Continuous emissions monitoring system—* [ **For purposes of Chapter 127, Subchapter E, all** ] **All** of the equipment that may be required to meet the data acquisition and availability requirements [ **of Chapter 127, Subchapter E to** ] **established under the act or Clean Air Act to monitor, measure, calculate,** sample, condition, analyze and provide a **permanent** record of emissions **from an affected unit** on a continuous basis.

\*    \*    \*    \*    \*

*Process*—A method, reaction or operation in which materials are handled or whereby materials undergo physical change—that is, the size, shape, appearance, temperature, state or other physical property of the material is altered—or chemical change—that is, a substance with different chemical composition or properties is formed or created. The term includes all of the equipment, operations and facilities necessary for the completion of the transformation of the materials to produce a physical or chemical change. There may be several processes in series or parallel necessary to the manufacture of a product.

***Process heater—***

**(i) An enclosed device using controlled flame, that is not a boiler, the primary purpose of which is to transfer heat to a process material or to a heat transfer material for use in a process unit.**

**(ii) The term does not include an enclosed device that meets either of the following circumstances:**

**(A) Has the primary purpose of generating steam.**

**(B) In which the material being heated is in direct contact with the products of combustion, including:**

**(I) A furnace.**

**(II) A kiln.**

**(III) An unfired waste heat recovery heater.**

**(IV) A unit used for comfort heat, space heat or food preparation for onsite consumption.**

**(V) An autoclave.**

*Project*—A physical change in or change in the method of operation of an existing facility, including a new emissions unit.

\*    \*    \*    \*    \*

*Stationary internal combustion engine—* [ **For purposes of § 129.203 (relating to stationary internal**

**combustion engines), an** ] **An** internal combustion engine of the reciprocating type that is either attached to a foundation at a facility or is designed to be capable of being carried or moved from one location to another and is not a mobile air contamination source.

\*    \*    \*    \*    \*

### CHAPTER 129. STANDARDS FOR SOURCES
## ADDITIONAL RACT REQUIREMENTS FOR MAJOR SOURCES OF NO$_x$ AND VOCs

(*Editor's Note*: Sections 129.96—129.100 are new and printed in regular type to enhance readability.)

§ 129.96. Applicability.

(a) This section and §§ 129.97—129.100 apply Statewide to the owner and operator of a major NO$_x$ emitting facility or a major VOC emitting facility, or both, that was in existence on or before July 20, 2012, for which a requirement or emission limitation, or both, has not been established in §§ 129.51—129.52c, 129.54—129.69, 129.71—129.73, 129.75, 129.77, 129.101—129.107 and 129.301—129.310.

(b) This section and §§ 129.97—129.100 apply Statewide to the owner and operator of a NO$_x$ emitting facility or VOC emitting facility, or both, when the installation of a new source or a modification or change in operation of an existing source after July 20, 2012, results in the source or facility meeting the definition of a major NO$_x$ emitting facility or a major VOC emitting facility and for which a requirement or an emission limitation, or both, has not been established in §§ 129.51—129.52c, 129.54—129.69, 129.71—129.73, 129.75, 129.77, 129.101—129.107 and 129.301—129.310.

§ 129.97. Presumptive RACT requirements, RACT emission limitations and petition for alternative compliance schedule.

(a) The owner and operator of a source listed in one or more of subsections (b)—(h) located at a major NO$_x$ emitting facility or major VOC emitting facility, or both, subject to § 129.96 (relating to applicability) shall comply with the applicable presumptive RACT requirement or RACT emission limitation, or both, beginning with the specified compliance date as follows, unless an alternative compliance schedule is submitted and approved under subsections (k)—(m) or § 129.99 (relating to alternative RACT proposal and petition for alternative compliance schedule).

(1) _____ , (*Editor's Note*: The blank refers to the date 1 year after the effective date of adoption of this proposed rulemaking.) for a source subject to § 129.96(a).

(2) _____ , (*Editor's Note*: The blank refers to the date 1 year after the effective date of adoption of this proposed rulemaking.) or 1 year after the date the source meets the definition of a major NO$_x$ emitting facility or major VOC emitting facility, whichever is later, for a source subject to § 129.96(b).

(b) The owner and operator of a source in this subsection located at a major NO$_x$ emitting facility or major VOC emitting facility, or both, subject to § 129.96 shall comply with the following:

(1) Except as specified in paragraph (2), the presumptive RACT requirement for a combustion unit with a rated heat input equal to or greater than 20 million Btu/hour and less than 50 million Btu/hour, which is the performance of an annual adjustment to or tune-up of the combustion process. The adjustment must include, at a minimum, the following:

(i) Inspection, adjustment, cleaning or replacement of fuel-burning equipment, including the burners and moving parts necessary for proper operation as specified by the manufacturer.

(ii) Inspection and adjustment of the flame pattern or characteristics necessary to minimize total emissions of $NO_x$ and, to the extent possible, emissions of CO.

(iii) Inspection and adjustment of the air-to-fuel ratio control system necessary to ensure proper calibration and operation as specified by the manufacturer.

(2) The presumptive RACT requirement for an oil-fired, gas-fired or combination oil-fired and gas-fired combustion unit with a rated heat input equal to or greater than 20 million Btu/hour and less than 50 million Btu/hour, which is the performance of all adjustments consistent with the EPA document "Combustion Efficiency Optimization Manual for Operators of Oil and Gas-fired Boilers (EPA-340/1-83-023)," September 1983 or as amended.

(3) The applicable recordkeeping requirements of § 129.100(d) or (e) (relating to compliance demonstration and recordkeeping requirements).

(c) The owner and operator of a source in this subsection located at a major $NO_x$ emitting facility or major VOC emitting facility, or both, subject to § 129.96 shall comply with the following presumptive RACT requirement, which is the installation, maintenance and operation of the source in accordance with the manufacturer's specifications and good engineering practices:

(1) A boiler or other combustion source with an individual rated gross heat input less than 20 million Btu/hour.

(2) A combustion turbine with a rated output less than 1,000 bhp.

(3) An internal combustion engine rated at less than 500 bhp (gross).

(4) An incinerator, thermal oxidizer or catalytic oxidizer used primarily for air pollution control.

(5) A unit of fuel-burning equipment, a gas turbine or an internal combustion engine with an annual capacity factor of less than 5%.

(6) An emergency standby engine operating less than 500 hours in a 12-month rolling period.

(d) The owner and operator of a combustion unit or other combustion source located at a major VOC emitting facility subject to § 129.96 shall comply with the presumptive RACT requirement of good engineering practices for the control of the VOC emissions from the combustion unit or other combustion source.

(e) The owner and operator of a municipal solid waste landfill subject to § 129.96 shall comply with the following applicable presumptive RACT requirement:

(1) For a municipal solid waste landfill constructed on or before May 30, 1991, emission guidelines and compliance times in 40 CFR Part 60, Subpart Cc (relating to emission guidelines and compliance times for municipal solid waste landfills), which are adopted and incorporated by reference in § 122.3 (relating to adoption of standards), and applicable Federal or state plans in 40 CFR Part 62 (relating to approval and promulgation of state plans for designated facilities and pollutants).

(2) For a municipal solid waste landfill constructed after May 30, 1991, new source performance standards in 40 CFR Part 60, Subpart WWW (relating to standards of performance for municipal solid waste landfills), which are adopted and incorporated by reference in § 122.3.

(f) The owner and operator of a municipal waste combustor subject to § 129.96 shall comply with the following applicable presumptive RACT requirement:

(1) For a municipal waste combustor constructed on or before September 20, 1994, the emission guidelines and compliance times in 40 CFR Part 60, Subpart Cb (relating to emissions guidelines and compliance times for large municipal waste combustors that are constructed on or before September 20, 1994), which are adopted and incorporated by reference in § 122.3, and applicable Federal or state plans in 40 CFR Part 62.

(2) For a municipal waste combustor constructed after September 20, 1994, or for a municipal waste combustor that commenced a modification or reconstruction after June 19, 1996, the new source performance standards in 40 CFR Part 60, Subpart Eb (relating to standards of performance for large municipal waste combustors for which construction is commenced after September 20, 1994 or for which modification or reconstruction is commenced after June 19, 1996), which are adopted and incorporated by reference in § 122.3.

(g) The owner and operator of a $NO_x$ air contamination source in this subsection located at a major $NO_x$ emitting facility or a VOC air contamination source in this subsection located at a major VOC emitting facility, or both, subject to § 129.96 may not cause, allow or permit $NO_x$ or VOCs, or both, to be emitted from the air contamination source for which the source is major in excess of the applicable RACT emission limitation:

(1) A combustion unit or process heater:

(i) For a natural gas-fired combustion unit or process heater with a rated heat input equal to or greater than 50 million Btu/hour, 0.08 lb $NO_x$/million Btu heat input.

(ii) For a distillate oil-fired combustion unit or process heater with a rated heat input equal to or greater than 50 million Btu/hour, 0.12 lb $NO_x$/million Btu heat input.

(iii) For a residual oil-fired combustion unit or process heater with a rated heat input equal to or greater than 50 million Btu/hour, 0.20 lb $NO_x$/million Btu heat input.

(iv) For a refinery gas-fired combustion unit or process heater with a rated heat input equal to or greater than 50 million Btu/hour, 0.25 lb $NO_x$/million Btu heat input.

(v) For a coal-fired combustion unit with a rated heat input equal to or greater than 50 million Btu/hour and less than 250 million Btu/hour, 0.45 lb $NO_x$/million Btu heat input.

(vi) For a coal-fired combustion unit with a rated heat input equal to or greater than 250 million Btu/hour that is:

(A) A circulating fluidized bed combustion unit, 0.20 lb $NO_x$/million Btu heat input.

(B) A tangentially fired combustion unit, 0.35 lb $NO_x$/million Btu heat input.

(C) Another combustion unit, 0.40 lb $NO_x$/million Btu heat input.

(2) A combustion turbine:

(i) For a combined cycle or combined heat and power combustion turbine with a rated output equal to or greater than 1,000 bhp and less than 180 MW when firing:

**PROPOSED RULEMAKING**

(A) Natural gas or a noncommercial gaseous fuel, 42 ppmvd $NO_x$ @ 15% oxygen.

(B) Fuel oil, 75 ppmvd $NO_x$ @ 15% oxygen.

(C) Natural gas or a noncommercial gaseous fuel, 2 ppmvd VOC (as propane) @ 15% oxygen.

(D) Fuel oil, 2 ppmvd VOC (as propane) @ 15% oxygen.

(ii) For a combined cycle or combined heat and power combustion turbine with a rated output equal to or greater than 180 MW when firing:

(A) Natural gas or a noncommercial gaseous fuel, 4 ppmvd $NO_x$ @ 15% oxygen.

(B) Fuel oil, 8 ppmvd $NO_x$ @ 15% oxygen.

(C) Natural gas or a noncommercial gaseous fuel, 2 ppmvd VOC (as propane) @ 15% oxygen.

(D) Fuel oil, 2 ppmvd VOC (as propane) @ 15% oxygen.

(iii) For a simple cycle or regenerative cycle combustion turbine with a rated output equal to or greater than 1,000 bhp when firing:

(A) Natural gas or a noncommercial gaseous fuel, 42 ppmvd $NO_x$ @ 15% oxygen.

(B) Fuel oil, 75 ppmvd $NO_x$ @ 15% oxygen.

(C) Natural gas or a noncommercial gaseous fuel, 9 ppmvd VOC (as propane) @ 15% oxygen.

(D) Fuel oil, 9 ppmvd VOC (as propane) @ 15% oxygen.

(3) A stationary internal combustion engine:

(i) For a lean burn stationary internal combustion engine with a rating equal to or greater than 500 bhp fired with:

(A) Natural gas, 3.0 grams $NO_x$/bhp-hr.

(B) Natural gas, liquid fuel or dual-fuel, 0.4 gram VOC/bhp-hr.

(ii) For a stationary internal combustion engine with a rating equal to or greater than 500 bhp fired with liquid fuel or dual-fuel, 8.0 grams $NO_x$/bhp-hr.

(iii) For a rich burn stationary internal combustion engine with a rating equal to or greater than 500 bhp fired with:

(A) Natural gas, 2.0 grams $NO_x$/bhp-hr.

(B) Natural gas, 1.0 gram VOC/bhp-hr.

(4) A unit firing multiple fuels simultaneously:

(i) The applicable RACT multiple fuel emission limit shall be determined on a total heat input fuel weighted basis using the following equation:

$$E_{HIweighted} = \frac{\sum_{i=1}^{n} E i H i}{\sum_{i=1}^{n} H I i}$$

where:

$E_{HIweighted}$ = The heat input fuel weighted multiple fuel emission rate or emission limitation for the compliance period, expressed in units of measure consistent with the units of measure for the emission limitation.

$E_i$ = The emission rate or emission limit for fuel i during the compliance period, expressed in units of measure consistent with the units of measure for the emission limitation.

$HI_i$ = The total heat input for fuel i during the compliance period.

n = The number of different fuels used during the compliance period.

(ii) A fuel representing less than 1% of the unit's annual fuel consumption on a heat input basis is excluded when determining the applicable RACT multiple fuel emission limit calculated in accordance with subparagraph (i).

(iii) The determination in subparagraph (i) does not apply to a stationary internal combustion engine that is subject to the RACT emission limits in paragraph (3).

(h) The owner and operator of a Portland cement kiln subject to § 129.96 shall comply with the following applicable presumptive RACT emission limitation:

(1) 3.88 pounds of $NO_x$ per ton of clinker produced for a long wet-process cement kiln as defined in § 145.142 (relating to definitions).

(2) 3.44 pounds of $NO_x$ per ton of clinker produced for a long dry-process cement kiln as defined in § 145.142.

(3) 2.36 pounds of $NO_x$ per ton of clinker produced for:

(i) A preheater cement kiln as defined in § 145.142.

(ii) A precalciner cement kiln as defined in § 145.142.

(i) The requirements and emission limitations of this section supersede the requirements and emission limitations of a RACT permit issued to the owner or operator of an air contamination source subject to one or more of subsections (b)—(h) prior to _____ , (*Editor's Note*: The blank refers to the effective date of adoption of this proposed rulemaking.) under §§ 129.91—129.95 (relating to stationary sources of $NO_x$ and VOCs) to control, reduce or minimize $NO_x$ emissions or VOC emissions, or both, from the air contamination source except to the extent the RACT permit contains more stringent requirements or emission limitations, or both.

(j) The requirements and emission limitations of this section do not supersede the requirements and emission limitations of §§ 129.201—129.205, 145.111—145.113 and 145.141—145.146 (relating to additional $NO_x$ requirements; emissions of $NO_x$ from stationary internal combustion engines; and emissions of $NO_x$ from cement manufacturing) except to the extent this section contains more stringent requirements or emission limitations, or both, for the owner or operator of a major $NO_x$ emitting facility subject to § 129.96 to control, reduce or minimize $NO_x$ emissions from an air contamination source subject to §§ 129.201—129.205, §§ 145.111—145.113 or §§ 145.141—145.146.

(k) The owner or operator of a major $NO_x$ emitting facility or a major VOC emitting facility, or both, subject to § 129.96 that includes an air contamination source subject to one or more of subsections (b)—(h) that cannot meet the applicable RACT requirement or RACT emission limitation without installation of an air cleaning device may submit a petition, in writing, requesting an alternative compliance schedule in accordance with the following:

(1) The written petition shall be submitted to the Department or appropriate approved local air pollution control agency as soon as possible but not later than:

(i) _____ , (*Editor's Note*: The blank refers to the date 6 months after the effective date of adoption of this proposed rulemaking.) for a source subject to § 129.96(a).

(ii) _____ , (*Editor's Note*: The blank refers to the date 6 months after the effective date of adoption of this proposed rulemaking.) or 6 months after the date that the

source meets the definition of a major $NO_x$ emitting facility, whichever is later, for a source subject to § 129.96(b).

(2) The written petition must include:

(i) A description, including make, model and location, of each affected source subject to a RACT requirement or a RACT emission limitation in one or more of subsections (b)—(h).

(ii) A description of the proposed air cleaning device to be installed.

(iii) A schedule containing proposed interim dates for completing each phase of the required work to install the air cleaning device described in subparagraph (ii).

(iv) A proposed interim emission limitation that will be imposed on the affected source until compliance is achieved with the applicable RACT requirement or RACT emission limitation.

(v) A proposed final compliance date that is as soon as possible but not later than _____ (*Editor's Note*: The blank refers to the date 3 years after the effective date of adoption of this proposed rulemaking.).

(l) The Department or appropriate approved local air pollution control agency will review the timely and complete written petition requesting an alternative compliance schedule submitted in accordance with subsection (k) and approve or deny the petition in writing.

(m) Approval or denial under subsection (l) of the timely and complete petition for an alternative compliance schedule submitted under subsection (k) will be effective on the date the letter of approval or denial of the petition is signed by the authorized representative of the Department or appropriate approved local air pollution control agency.

## § 129.98. Facility-wide or system-wide $NO_x$ emissions averaging RACT operating permit modification general requirements.

(a) The owner or operator of a major $NO_x$ emitting facility subject to § 129.96 (relating to applicability) that includes an air contamination source subject to a $NO_x$ RACT requirement or $NO_x$ RACT emission limitation in § 129.97 (relating to presumptive RACT requirements, RACT emission limitations and petition for alternative compliance schedule) that cannot meet the applicable $NO_x$ RACT requirement or $NO_x$ RACT emission limitation may elect to meet the applicable $NO_x$ RACT requirement or $NO_x$ RACT emission limitation in § 129.97 by averaging $NO_x$ emissions on either a facility-wide or system-wide basis using a 30-day rolling average. System-wide emissions averaging must be among sources under common control of the same owner or operator in this Commonwealth.

(b) The owner or operator of each facility that elects to comply with subsection (a) shall submit an operating permit modification that incorporates the requirements of this section for averaging $NO_x$ emissions on either a facility-wide or system-wide basis using a 30-day rolling average to the Department or appropriate approved local air pollution control agency by the applicable date as follows:

(1) _____ , (*Editor's Note*: The blank refers to the date 6 months after the effective date of adoption of this proposed rulemaking.) for a source subject to § 129.96(a).

(2) _____ , (*Editor's Note*: The blank refers to the date 6 months after the effective date of adoption of this proposed rulemaking.) or 6 months after the date that the

source meets the definition of a major $NO_x$ emitting facility, whichever is later, for a source subject to § 129.96(b).

(c) Each $NO_x$ emitting source included in the operating permit modification for averaging $NO_x$ emissions on either a facility-wide or system-wide basis using a 30-day rolling average submitted under subsection (b) must be an air contamination source subject to a $NO_x$ RACT emission limitation in § 129.97.

(d) The operating permit modification for averaging $NO_x$ emissions on either a facility-wide or system-wide basis using a 30-day rolling average submitted under subsection (b) must demonstrate that the aggregate $NO_x$ emissions emitted by the air contamination sources included in the facility-wide or system-wide $NO_x$ emissions averaging RACT operating permit modification using a 30-day rolling average are not greater than 90% of the sum of the $NO_x$ emissions that would be emitted by the group of included sources if each source complied with the applicable $NO_x$ RACT requirement or $NO_x$ RACT emission limitation in § 129.97 on a source-specific basis.

(e) The owner or operator shall calculate the alternative facility-wide or system-wide $NO_x$ RACT emissions limitation using a 30-day rolling average for the air contamination sources included in the operating permit modification submitted under subsection (b) by using the following equation to sum the emissions for all of the sources included in the operating permit modification:

$$\left[ \sum\nolimits_{i=1}^{n} \text{Ri}_{actual} * H_i \right] \leq \left[ \sum\nolimits_{i=1}^{n} \text{Ri}_{allowable} * H_i \right] * 0.9$$

Where:

$\text{Ri}_{actual}$ = The daily actual $NO_x$ emission rate for air contamination source i, lb/mmbtu, using a 30-day rolling average.

$\text{Ri}_{allowable}$ = The applicable $NO_x$ emission rate limitation for air contamination source i, lb/mmBtu, specified in § 129.97.

$H_i$ = The daily actual heat input for air contamination source i, mmBtu, using a 30-day rolling average.

n = The number of air contamination sources included in the operating permit modification.

0.9 = The 90% limit specified under subsection (d).

(f) The operating permit modification specified in subsections (b)—(e) may include facility-wide or system-wide averaging emissions using a 30-day rolling average only for $NO_x$ emitting sources or $NO_x$ emitting facilities that are owned or operated, or both, by the applicant.

(g) The operating permit modification specified in subsections (b)—(f) must include the following information:

(1) Identification of each air contamination source included in the $NO_x$ emissions averaging RACT operating permit modification.

(2) Each air contamination source's applicable emission limitation in § 129.97.

(3) Methods for demonstrating compliance and recordkeeping and reporting requirements in accordance with § 129.100 (relating to compliance demonstration and recordkeeping requirements) for each source included in the $NO_x$ emissions averaging RACT operating permit modification submitted under subsection (b).

(h) An air contamination source or facility, or both, included in the facility-wide or system-wide $NO_x$ emissions averaging RACT operating permit modification sub-

**PROPOSED RULEMAKING**

mitted in accordance with subsections (b)—(g) may be included in only one facility-wide or system-wide $NO_x$ emissions averaging RACT proposal.

(i) The Department or appropriate approved local air pollution control agency will issue a modification to the operating permit.

(j) The owner or operator of an air contamination source or facility, or both, included in the facility-wide or system-wide $NO_x$ emissions averaging RACT operating permit modification submitted in accordance with subsections (b)—(h) shall submit the reports and records specified in subsection (g)(3) to the Department or appropriate approved local air pollution control agency on the schedule specified in subsection (g)(3) to demonstrate compliance with § 129.100.

(k) The owner or operator of an air contamination source or facility, or both, included in a facility-wide or system-wide $NO_x$ emissions averaging RACT operating permit modification submitted in accordance with subsections (b)—(h) that achieves emission reductions in accordance with other emission limitations required under the act or the Clean Air Act, or regulations adopted under the act or the Clean Air Act, that are not $NO_x$ RACT emission limitations may not substitute those emission reductions for the emission reductions required by the facility-wide or system-wide $NO_x$ emissions averaging RACT operating permit modification submitted to the Department or appropriate approved local air pollution control agency under subsection (b).

(l) The owner or operator of an air contamination source subject to a $NO_x$ emission limitation in § 129.97 that is not included in a facility-wide or system-wide $NO_x$ emissions averaging RACT operating permit modification submitted under subsection (b) shall operate the source in compliance with the applicable $NO_x$ emission limitation in § 129.97.

(m) The owner and operator of an air contamination source included in a facility-wide or system-wide $NO_x$ emissions averaging RACT operating permit modification submitted under subsection (b) shall be liable for a violation of the operating permit modification or this section at that source or other source in the operating permit modification.

### § 129.99. Alternative RACT proposal and petition for alternative compliance schedule.

(a) The owner or operator of an air contamination source subject to § 129.97 (relating to presumptive RACT requirements, RACT emission limitations and petition for alternative compliance schedule) located at a major $NO_x$ emitting facility or major VOC emitting facility, or both, subject to § 129.96 (relating to applicability) that cannot meet the applicable presumptive RACT requirement or RACT emission limitation of § 129.97 or participate in either a facility-wide or system-wide $NO_x$ emissions averaging RACT operating permit modification under § 129.98 (relating to facility-wide or system-wide $NO_x$ emissions averaging RACT operating permit modification general requirements) may propose an alternative $NO_x$ RACT emission limitation or VOC RACT emission limitation, or both, in accordance with subsection (d).

(b) The owner or operator of a $NO_x$ air contamination source with a potential emission rate equal to or greater than 5.0 tons of $NO_x$ per year that is not subject to § 129.97 or §§ 129.201—129.205 (relating to additional $NO_x$ requirements) located at a major $NO_x$ emitting facility subject to § 129.96 shall propose a $NO_x$ RACT emission limitation in accordance with subsection (d).

(c) The owner or operator of a VOC air contamination source with a potential emission rate equal to or greater than 2.7 tons of VOC per year that is not subject to § 129.97 located at a major VOC emitting facility subject to § 129.96 shall propose a VOC RACT emission limitation in accordance with subsection (d).

(d) The owner or operator proposing an alternative RACT emission limitation under subsection (a), (b) or (c) shall:

(1) Submit a written RACT proposal in accordance with the procedures in § 129.92(a)(1)—(5), (7)—(10) and (b) (relating to RACT proposal requirements) to the Department or appropriate approved local air pollution control agency as soon as possible but not later than:

(i) _____ , (*Editor's Note*: The blank refers to the date 6 months after the effective date of adoption of this proposed rulemaking.) for a source subject to § 129.96(a).

(ii) _____ , (*Editor's Note*: The blank refers to the date 6 months after the effective date of adoption of this proposed rulemaking.) or 6 months after the date that the source meets the definition of a major $NO_x$ emitting facility or major VOC emitting facility, or both, whichever is later, for a source subject to § 129.96(b).

(2) Be in receipt of an approval issued by the Department or appropriate approved local air pollution control agency in writing through a plan approval or operating permit modification for a RACT proposal submitted under paragraph (1)(ii) prior to the installation, modification or change in the operation of the existing air contamination source that will result in the source or facility meeting the definition of a major $NO_x$ emitting facility or major VOC emitting facility, or both.

(3) Include in the RACT proposal the proposed alternative $NO_x$ RACT emission limitation or VOC RACT emission limitation developed in accordance with the procedures in § 129.92(a)(1)—(5) and (b).

(4) Include in the RACT proposal a schedule for completing implementation of the RACT emission limitation as soon as possible but not later than:

(i) _____ , (*Editor's Note*: The blank refers to the date 1 year after the effective date of adoption of this proposed rulemaking.) for a source subject to § 129.96(a).

(ii) _____ , (*Editor's Note*: The blank refers to the date 1 year after the effective date of adoption of this proposed rulemaking.) or 1 year after the date that the source meets the definition of a major $NO_x$ emitting facility or major VOC emitting facility, or both, whichever is later, for a source subject to § 129.96(b).

(5) Include interim dates in the schedule required under paragraph (4) for the:

(i) Issuance of purchase orders.

(ii) Start and completion of process, technology and control technology changes.

(iii) Completion of compliance testing.

(6) Include in the RACT proposal methods for demonstrating compliance and recordkeeping and reporting requirements in accordance with § 129.100 (relating to compliance demonstration and recordkeeping requirements) for each air contamination source included in the RACT proposal.

(7) Demonstrate to the satisfaction of the Department or the appropriate approved local air pollution control agency that the proposed emission limitation is RACT for the air contamination source.

(e) The Department or appropriate approved local air pollution control agency will:

(1) Review the timely and complete alternative RACT proposal submitted in accordance with subsection (d).

(2) Approve the alternative RACT proposal submitted under subsection (d), in writing, if the Department or appropriate approved local air pollution control agency is satisfied that the alternative RACT proposal complies with the requirements of subsection (d) and that the proposed alternative emission limitation is RACT for the air contamination source.

(3) Deny or modify the alternative RACT proposal submitted under subsection (d), in writing, if the proposal does not comply with the requirements of subsection (d).

(f) The proposed alternative RACT emission limitation and the implementation schedule submitted under subsection (d) will be approved, denied or modified by the Department or appropriate approved local air pollution control agency in accordance with subsection (e) in writing through the issuance of a plan approval or operating permit modification prior to the owner or operator implementing the alternative RACT emission limitation.

(g) The emission limit and requirements specified in the plan approval or operating permit issued by the Department or appropriate approved local air pollution control agency under subsection (f) supersede the emission limit and requirements in the existing plan approval or operating permit issued to the owner or operator of the source prior to _____ , (*Editor's Note*: The blank refers to the effective date of adoption of this proposed rulemaking.) on the date specified in the plan approval or operating permit issued by the Department or appropriate approved local air pollution control agency under subsection (f), except to the extent the existing plan approval or operating permit contains more stringent requirements.

(h) The Department will submit each alternative RACT emission limitation approved under subsection (f) to the Administrator of the EPA for approval as a revision to the SIP. The owner and operator of the facility shall bear the costs of public hearings and notification required for EPA SIP approval.

(i) The owner and operator of a facility proposing to comply with the applicable RACT emission limitation under subsection (a), (b) or (c) through the installation of an air cleaning device may submit a petition, in writing, requesting an alternative compliance schedule in accordance with the following:

(1) The written petition requesting an alternative compliance schedule shall be submitted to the Department or appropriate approved local air pollution control agency as soon as possible but not later than:

(i) _____ , (*Editor's Note*: The blank refers to the date 6 months after the effective date of adoption of this proposed rulemaking.) for a source subject to § 129.96(a).

(ii) _____ , (*Editor's Note*: The blank refers to the date 6 months after the effective date of adoption of this proposed rulemaking.) or 6 months after the date that the source meets the definition of a major NOₓ emitting facility, whichever is later, for a source subject to § 129.96(b).

(2) The written petition must include:

(i) A description, including make, model and location, of each air contamination source subject to a RACT requirement or a RACT emission limitation in one or more of subsections (a)—(c).

(ii) A description of the proposed air cleaning device to be installed.

(iii) A schedule containing proposed interim dates for completing each phase of the required work to install the air cleaning device described in subparagraph (ii).

(iv) A proposed interim emission limitation that will be imposed on the affected air contamination source until compliance is achieved with the applicable RACT requirement or RACT emission limitation.

(v) A proposed final compliance date that is as soon as possible but not later than _____ (*Editor's Note*: The blank refers to the date 3 years after the effective date of adoption of this proposed rulemaking.).

(j) The Department or appropriate approved local air pollution control agency will review the timely and complete written petition requesting an alternative compliance schedule submitted in accordance with subsection (h) and approve or deny the petition in writing.

(k) The emission limit and requirements specified in the plan approval or operating permit issued by the Department or appropriate approved local air pollution control agency under subsection (j) supersede the emission limit and requirements in the existing plan approval or operating permit issued to the owner or operator of the source prior to _____ , (*Editor's Note*: The blank refers to the effective date of adoption of this proposed rulemaking.) on the date specified in the plan approval or operating permit issued by the Department or appropriate approved local air pollution control agency under subsection (j), except to the extent the existing plan approval or operating permit contains more stringent requirements.

(l) Approval or denial under subsection (j) of the timely and complete petition for an alternative compliance schedule submitted under subsection (i) will be effective on the date the letter of approval or denial of the petition is signed by the authorized representative of the Department or appropriate approved local air pollution control agency.

## § 129.100. Compliance demonstration and record-keeping requirements.

(a) Except as provided in subsection (c), the owner and operator of an air contamination source subject to a NOₓ emission limitation or VOC emission limitation, or both, listed in § 129.97 (relating to presumptive RACT requirements, RACT emission limitations and petition for alternative compliance schedule) shall demonstrate compliance with the applicable RACT requirement or RACT emission limitation by performing the following monitoring or testing procedures:

(1) For an air contamination source with a CEMS, monitoring and testing in accordance with the requirements of Chapter 139, Subchapter C (relating to requirements for source monitoring for stationary sources) using a 30-day rolling average.

(2) For an air contamination source without a CEMS, monitoring and testing in accordance with a Department-approved emissions source test that meets the requirements of Chapter 139, Subchapter A (relating to sampling and testing methods and procedures).

(b) The owner and operator of an air contamination source subject to subsection (a) shall demonstrate compliance with the applicable RACT requirement or RACT emission limitation in accordance with the procedures in subsection (a) not later than:

(1) _____ , (*Editor's Note*: The blank refers to the date 1 year after the effective date of adoption of this proposed rulemaking.) for a source subject to § 129.96(a) (relating to applicability).

(2) _____ , (*Editor's Note*: The blank refers to the date 1 year after the effective date of adoption of this proposed rulemaking.) or 1 year after the date that the source meets the definition of a major $NO_x$ emitting facility or major VOC emitting facility, or both, whichever is later, for a source subject to § 129.96(b).

(c) An owner or operator of an air contamination source subject to this section, §§ 129.96 and 129.97 and § 129.98 (relating to facility-wide or system-wide $NO_x$ emissions averaging RACT operating permit modification general requirements) may request a waiver from the requirement to demonstrate compliance with the applicable emission limitation listed in § 129.97 if the following requirements are met:

(1) The request for a waiver is submitted, in writing, to the Department not later than:

(i) _____ , (*Editor's Note*: The blank refers to the date 6 months after the effective date of adoption of this proposed rulemaking.) for a source subject to § 129.96(a).

(ii) _____ , (*Editor's Note*: The blank refers to the date 6 months after the effective date of adoption of this proposed rulemaking.) or 6 months after the date that the source meets the definition of a major $NO_x$ emitting facility or major VOC emitting facility, or both, whichever is later, for a source subject to § 129.96(b).

(2) The request for a waiver demonstrates that a Department-approved emissions source test was performed in accordance with the requirements of Chapter 139, Subchapter A, on or after:

(i) _____ , (*Editor's Note*: The blank refers to the date within 12 months prior to the effective date of adoption of this proposed rulemaking.) for a source subject to § 129.96(a).

(ii) _____ , (*Editor's Note*: The blank refers to the date within 12 months prior to the effective date of adoption of this proposed rulemaking.) or within 12 months prior to the date that the source meets the definition of a major $NO_x$ emitting facility or major VOC emitting facility, or both, whichever is later, for a source subject to § 129.96(b).

(3) The request for a waiver demonstrates to the satisfaction of the Department that the test results show that the source's rate of emissions is in compliance with the source's applicable $NO_x$ emission limitation or VOC emission limitation, or both.

(4) The Department approves, in writing, the request for a waiver.

(d) The owner and operator of an air contamination source subject to this section, §§ 129.96—129.98 and § 129.99 (relating to alternative RACT proposal and petition for alternative compliance schedule) shall keep records to demonstrate compliance with §§ 129.96—129.99 in the following manner:

(1) The records shall include sufficient data and calculations to demonstrate that the requirements of §§ 129.96—129.99 are met.

(2) Data or information required to determine compliance shall be recorded and maintained in a time frame consistent with the averaging period of the requirement.

(3) The records shall be retained for 5 years and made available to the Department or appropriate approved local air pollution control agency upon written request.

(e) The owner or operator of an air contamination source claiming that the air contamination source is exempt from the applicable $NO_x$ emission rate threshold specified in § 129.99(b) and the requirements of § 129.97 based on the air contamination source's potential to emit shall maintain records that demonstrate to the Department or appropriate approved local air pollution control agency that the air contamination source is not subject to the specified emission rate threshold.

(f) The owner or operator of an air contamination source claiming that the air contamination source is exempt from the applicable VOC emission rate threshold specified in § 129.99(c) and the requirements of § 129.97 based on the air contamination source's potential to emit shall maintain records that demonstrate to the Department or appropriate approved local air pollution control agency that the air contamination source is not subject to the specified emission rate threshold.

(g) The owner or operator of a combustion unit subject to § 129.97(b)(1) shall record each adjustment conducted under the procedures in § 129.97(b)(1) in a permanently bound log book or other method approved by the Department or appropriate approved local air pollution control agency. This log book must contain, at a minimum:

(1) The date of the tuning procedure.

(2) The name of the service company and the technician performing the procedure.

(3) The final operating rate or load.

(4) The final $NO_x$ and CO emission rates.

(5) The final excess oxygen rate.

(6) Other information required by the applicable operating permit.

(h) The owner or operator of an oil-fired, gas-fired or combination oil-fired and gas-fired unit subject to § 129.97(b)(2) shall maintain records including a certification from the fuel supplier of the type of fuel. For each shipment of residual oil, the record must include:

(1) A certification of the nitrogen content of the fuel.

(2) Identification of the sampling method and sampling protocol used to determine the nitrogen content of the fuel.

(i) The owner or operator of a Portland cement kiln subject to § 129.97(h) shall maintain a daily operating log for each Portland cement kiln. The record for each kiln must include:

(1) The total hours of operation.

(2) The type and quantity of fuel used.

(3) The quantity of clinker produced.

(4) The date, time and duration of a start-up, shutdown or malfunction of a Portland cement kiln or emissions monitoring system.

[Pa.B. Doc. No. 14-815. Filed for public inspection April 18, 2014, 9:00 a.m.]

———



## pennsylvania
### DEPARTMENT OF ENVIRONMENTAL PROTECTION

**Bureau of Air Quality**

# COMMENT AND RESPONSE DOCUMENT

# ADDITIONAL RACT REQUIREMENTS FOR MAJOR SOURCES OF NO$_X$ AND VOCs

25 *Pa. Code* Chapters 121 and 129
44 Pa.B. 2392-2404 (April 19, 2014)
Environmental Quality Board Regulation #7-485
(Independent Regulatory Review Commission #3052)

This page intentionally left blank.

## Introduction

### Additional RACT Requirements for Major Sources of NOx and VOCs

On April 19, 2014, the Environmental Quality Board (Board, EQB) published a notice of public hearings and comment period for a proposed rulemaking concerning revisions to 25 *Pa. Code* Chapters 121 and 129 (relating to general provisions; and standards for sources).

The proposed rulemaking would amend Chapter 129 to adopt presumptive reasonably available control technology (RACT) requirements and RACT emission limitations for major stationary sources of oxides of nitrogen ($NO_x$) and volatile organic compound (VOC) emissions in existence on or before July 20, 2012.  In addition, the proposed rulemaking would amend § 121.1 (relating to definitions) to revise four existing definitions and add five definitions to support the amendments to Chapter 129.  Emissions of $NO_x$ and VOCs are precursors to the formation of ground-level ozone, a criteria air pollutant.  High concentrations of ground-level ozone air pollution are a serious threat to public health and welfare.  This rulemaking is reasonably required to attain and maintain the health- and welfare-based 8-hour ozone National Ambient Air Quality Standards (NAAQS) in this Commonwealth and to satisfy related Clean Air Act (CAA) (42 U.S.C.A. §§ 7401—7671q) requirements.

The proposed rulemaking will be effective upon publication in the *Pennsylvania Bulletin* as a final-form regulation.  The final-form regulation will be submitted to the United States Environmental Protection Agency (EPA) as a revision to the State Implementation Plan (SIP).

**Public Comment Period and Public Hearings**

Notice of the public comment period on the proposed RACT amendments was published in the Pennsylvania Bulletin on April 19, 2014 (44 Pa.B. 2392). The EQB's public comment period opened on April 19, 2014, and closed on June 30, 2014, for a 73-day public comment period.

Three public hearings were held on the proposed rulemaking as follows:

| | |
|---|---|
| May 27, 2014<br>1 p.m. | Department of Environmental Protection<br>Southwest Regional Office<br>Waterfront Conference Rooms A and B<br>400 Waterfront Drive<br>Pittsburgh, PA 15222-4745 |
| May 28, 2014<br>1 p.m. | Department of Environmental Protection<br>Southeast Regional Office<br>Delaware and Schuylkill Conference Rooms<br>2 East Main Street<br>Norristown, PA 19401 |
| May 29, 2014<br>1 p.m. | Department of Environmental Protection<br>Rachel Carson State Office Building<br>Conference Room 105<br>400 Market Street<br>Harrisburg, PA 17105 |

This document summarizes the comments received during the Board's public comment period. Each public comment is listed with an identifying commentator number for each commentator that made the comment. A list of the commentators, including name and affiliation (if any) can be found on pages 5–17 of this document. The Board invited each commentator to prepare a one-page summary of the commentator's comments. Sixteen one-page summaries were submitted to the Board for this rulemaking. Twenty-five persons presented testimony during the public hearings. The House and Senate Environmental Resources and Energy Committees did not submit comments on the proposal.

Copies of all comments received by the Board are posted on the web site of the Independent Regulatory Review Commission (IRRC) at http://www.irrc.state.pa.us. Search by Regulation # 7-485 or IRRC # 3052.

**Acronyms used in this Comment/Response Document**

APCA – Pennsylvania Air Pollution Control Act
BAT – Best Available Technology
BACT – Best Available Control Technology
BAQ – Bureau of Air Quality
CAA – Federal Clean Air Act
CAIR – Clean Air Interstate Rule
CFB – Circulating Fluidized Bed
CSAPR – Cross-State Air Pollution Rule
CTG – Control Techniques Guideline
EGU – Electric Generating Unit
EMAP – Environmental Management Assistance Program
EPA – United States Environmental Protection Agency
EQB – Environmental Quality Board
GP – General Permit
HAP – Hazardous Air Pollutant
HHV – Higher Heating Value
IRRC – Independent Regulatory Review Commission
LAER – Lowest Achievable Emission Rate
LHV – Lower Heating Value
LLP – Lithographic Printing and Letterpress Printing
MACT – Maximum Achievable Control Technology
MMBtu – Million British Thermal Units
NESHAP – National Emission Standards for Hazardous Air Pollutants
NSPS – New Source Performance Standards
NSR – New Source Review
OAQPS – Office of Air Quality Planning and Standards
OTR – Ozone Transport Region
PADEP – Pennsylvania Department of Environmental Protection
RACT – Reasonably Available Control Technology
RICE – Reciprocating Internal Combustion Engines
SIP – State Implementation Plan
TPY – Tons Per Year
TSD – Technical Support Document

# COMMENTS AND RESPONSES

## *General Comments*

**1.  Comment:**  Based on the U.S. Environmental Protection Agency's (EPA) comments, it does not appear that the proposed regulation will be viable as a SIP revision.  We recommend that the EQB meet with the EPA to gain a thorough understanding of their concerns and how to successfully address them. In the final-form regulation submittal, the EQB should explain how the revised regulation addresses each issue raised in the EPA comments and constitutes a viable SIP revision. (134)

**Response:**  The final-form regulation has been revised to address concerns raised by the EPA. The Department of Environmental Protection's staff met with representatives from EPA Region III on October 8, 2014, to discuss the EPA's comments and to seek clarification regarding the proposed RACT regulation published in the Pennsylvania Bulletin on April 19, 2015.  The preamble for the EPA's final rule entitled *Implementation of the 2008 National Ambient Air Quality Standards for Ozone: State Implementation Plan Requirements* (80 Fed. Reg. 12264, March 6, 2015) provides additional guidance concerning the RACT requirements for the National Ambient Air Quality Standards (NAAQS) for ozone.  Detailed responses to the EPA comments can be found in the responses to comments numbered 13, 55, 61, 90, 100, 123, 124, 130, 134, 135, 152, 153, 154, 158, 161, 162, 163, and 191.

**2.  Comment:**  DEP has found an appropriate balance between reducing emissions and providing an economic path forward for Pennsylvania's electric generators while simultaneously preserving grid reliability. The proposal represents an opportunity to achieve lower emissions while preserving and maintaining one of the Commonwealth's core industries – electric power production. (84, 93, 105, 110)

**Response:** The Department appreciates the commentators' support of the proposed RACT rulemaking.

**3.  Comment:**  The commentators support the Department's decision in the proposal to provide compliance flexibility to the regulated sources. (84, 105, 114, 127)

**Response:** The Department appreciates the commentators' support of the proposed rulemaking.

**4.  Comment:** The proposal demonstrates the intent to balance the efficiency of presumptive RACT emission limits and standards with averaging and case-by-case provisions. (110)

**Response:** The Department agrees that the proposed rulemaking includes provisions that provide flexibility for compliance demonstrations.

**5.  Comment:**  The increase of smog pollutants will be a negative influence on controlling climate change.  (4, 69, 70, 116)

**Response:**  Based on current ambient air monitoring data and the implementation of federal and state measures that reduce ozone precursor emissions, an increase in "smog pollutants" is not expected.  The implementation of the RACT final-form regulation will provide reductions of both potential and actual $NO_x$ and VOC emissions from major $NO_x$ and VOC emitting facilities.  The final rulemaking establishes RACT requirements and does not address climate change directly.

**6.  Comment:**  The new RACT standards are not going to result in reduced smog pollution and help Delaware County, Centre County, and other Pennsylvania Counties improve their air safety grade from "F."  (72, 79, 80, 116)

**Response:** The Department disagrees.  The final rulemaking, which applies statewide, includes emission limitations for $NO_x$ or VOCs that are achievable using technologies that are reasonably available and will also ensure continued attainment and maintenance of the 1997 and 2008 ozone standards.  For example, the final-form regulation will require that the owners and operators of any combustion unit equipped with a selective catalytic reduction (SCR) system that is operating with an inlet temperature equal to or greater than 600°F shall meet a $NO_x$ emission limit of 0.12 lb $NO_x$/million Btu.  Compliance with this emission limit will also be required when by-passing the SCR system.  The more stringent $NO_x$ emission limitation for coal-fired units equipped with SCR systems will reduce $NO_x$ emissions from the electric generation sector to approximately 59,000 tons of actual $NO_x$ emissions. It is also important to note that $NO_x$ emissions have declined significantly in Pennsylvania, especially from coal-fired electric generating units—$NO_x$ emissions decreased from approximately 192,004 tons in 2000 to 119,025 tons of $NO_x$ emissions in 2013.  The final-form regulation will result in further reductions in actual $NO_x$ emissions from one of the largest sources of $NO_x$ emissions in the DEP emissions inventory.  Please also see the Response to Comment 9.

**7.  Comment:** The proposed rulemaking will weaken current emissions limits. Regulatory and policy changes will add ozone and other criteria pollutants to some of the most overburdened communities in the Commonwealth.  (1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 56, 57, 58, 59, 60, 61, 62, 67, 68, 70, 73, 75, 76, 77, 78, 80, 81, 88, 89, 91, 96, 98, 99, 100, 101, 103, 113, 116)

**Response:** The Department disagrees that the proposed rulemaking would have weakened existing emissions limits.  The final rulemaking strengthens the RACT requirements from what was established under §§ 129.91—129.95 for the 1-hour ozone standard.  The final-form RACT regulation sets forth emission limitations for $NO_x$ or VOCs that are achievable using technologies that are reasonably available to achieve and maintain the 8-hour ozone standards.

Additionally, the actual $NO_x$ emissions from the coal-fired electric generating sector in Pennsylvania for the year 2013 were 119,025 tons, of which 92,728 tons were from coal-fired EGUs that are not scheduled for retirement or for fuel-switching.  The expected future $NO_x$ emissions from these EGUs, based on 2013 production rates and the $NO_x$ emission limitations set forth in the final-form regulation, are 59,039 tons per year.  This is an anticipated reduction of

approximately 36% in actual emissions from the coal-fired EGU sector as a result of the final-form limitations. [(92,728 tons − 59,039 tons) / 92,728 tons x 100 = 36 %]

In addition, the final-form regulation specifically provides under § 129.97(i) and (j) that the more stringent limitation or requirement applies to the owner or operator of a facility subject to the regulation.

**8. Comment:** $NO_x$ and VOC limits should be set that are in line with existing, available, feasible technology, to protect public health and welfare. (64, 65, 67, 71, 72, 80, 90, 92, 106)

**Response:** The term "RACT—Reasonably Available Control Technology" is defined in § 121.1 (relating to definitions) as the lowest emission limit for VOCs or $NO_x$ that a particular source is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility. The final-form RACT regulation, which addresses the 1997 and 2008 ozone NAAQS, includes emission limitations for $NO_x$ or VOCs that are achievable using control technologies that are reasonably available considering technological and economic feasibility.

The EPA has proposed to adopt a more protective ozone NAAQS, ranging from 65 to 70 parts per billion (ppb), with an expected promulgation date in October 2015; the EPA also requested comments on retaining the existing 2008 ozone standard (75 ppb) or lowering the standard to 60 ppb. See 79 FR 75234 (December 17, 2014). If the EPA promulgates a more protective ozone NAAQS in October 2015, the Clean Air Act requires a reevaluation of RACT programs for the implementation, maintenance and enforcement of the new standard.

**9. Comment:** For the class of the largest $NO_x$-emitting sources, the representations of "Anticipated Effect on Emissions" are overstatements in contrast with the much more common-sense approach of comparing the proposed emission limitation with current actual emissions. The latter comparison demonstrates that the proposed RACT requirements are no substantial improvement with respect to controlling $NO_x$ emissions from large coal-fired power plants. (79)

**Response:** The Department disagrees that the representation of "anticipated effect on emissions" should be based on a comparison of the emissions expected as a result of implementation of the presumptive RACT requirements and RACT emission limitations with current actual emissions. The amount of $NO_x$ and VOC emission reductions achieved as a result of the application of RACT-level control is determined on the basis of the source's potential to emit before and after the application of RACT-level control. The proposed and final RACT rulemakings establish presumptive RACT requirements and RACT emission limitations for $NO_x$ or VOCs that are achievable and sustainable during the expected life of the affected unit using technologies that are both technically and economically feasible. Implementation of the final rulemaking presumptive RACT requirements and RACT emission limitations will reduce the amount of ozone precursor emissions that the owner and operator of a facility subject to the final-form provisions in §§ 129.96—129.100 would be legally allowed to emit to the atmosphere.

The anticipated reductions in the amount of potential $NO_x$ emissions beyond current RACT potential to emit (allowable) emissions as a result of implementation of the final rulemaking RACT requirements and RACT emission limitations are presented in Table 1. As shown in column E of Table 1, the anticipated percent reduction in the potential $NO_x$ emissions from coal-fired boilers (EGUs) equipped with selective catalytic reduction (SCR) control technology is approximately 75%.

Table 1. Anticipated Reductions in the Amount of Potential $NO_x$ Emissions by Source Type

| | A | B | C | D | E |
|---|---|---|---|---|---|
| | | | | B - C | [(B - C)/B] x 100 = % |
| Source Type | Number of Units Subject to RACT II* for $NO_x$ Emissions | Current $NO_x$ Potential to Emit (TPY) | RACT II* $NO_x$ Potential to Emit (TPY) | Reduction in Potential $NO_x$ Emissions (TPY) | Percent Reduction in Potential $NO_x$ Emissions (TPY) |
| Boilers, except EGUs with SCR | 257 | 246,453 | 176,304 | 70,149 | 28% |
| EGUs (Boilers) with SCR | 12 | 186,474 | 47,501 | 138,972 | 75% |
| Engines | 393 | 46,705 | 26,110 | 20,596 | 44% |
| Turbines | 148 | 59,743 | 35,837 | 23,906 | 40% |
| **Total** | **810** | **539,375** | **285,752** | **253,623** | **47%** |

*RACT II refers to §§ 129.96—129.100

Reductions in actual $NO_x$ emissions from coal-fired boilers or electric generating units (EGUs) are also anticipated as a result of the implementation of the final-form RACT requirements and RACT emission limitations. The actual $NO_x$ emissions from coal-fired EGUs in Pennsylvania for the year 2013 were 119,025 tons. The actual 2013 $NO_x$ emissions from coal-fired boilers (EGUs) that are not scheduled for retirement or for fuel-switching were 92,728 tons. The expected $NO_x$ emissions from coal-fired boilers (EGUs) that are not scheduled for retirement or fuel-switching, based on 2013 production rates and the $NO_x$ emission limitations set forth in the final-form regulation, are 59,039 tons per year. This is an anticipated reduction in actual emissions of approximately 36% from this sector.
[(92,728 tons − 59,039 tons) / 92,728 tons x 100 = 36 %]

**10. Comment:** This proposed regulation is not RACT. It does not accomplish reasonably available control technology (RACT), but maintains a status quo that does not meet the Federal Clean Air Act test of reducing air pollution emissions for nitrogen oxides and VOCs (volatile organic chemicals) "… as expeditiously as practicable". The proposed regulation allows higher limit (132,000 tons $NO_x$) than what is already emitted (93,000 tons $NO_x$). Power plants will be

ALLOWED to increase emissions, while the purpose of RACT is to decrease emissions. (116)

**Response:**  The Department disagrees that the proposed rulemaking provisions are not RACT. The evaluation or reevaluation of what constitutes RACT-level control for affected sources is a requirement that must be fulfilled each time the EPA promulgates a new NAAQS as was the case in 1979 for the 1-hour ozone standard and in 1997 for the 8-hour ozone standard; reevaluation of RACT is also required when the EPA revises a NAAQS as was the case in 2008 for the 8-hour ozone standard.  The proposed rulemaking addresses the RACT requirements for the 8-hour ozone NAAQS promulgated in 1997 and 2008.  The final rulemaking will be applicable to the owners and operators of major sources of $NO_x$ or VOC emissions (precursors to ozone formation) in existence in this Commonwealth on or before July 20, 2012 – the effective date of the EPA's designations and classifications for the 2008 ozone NAAQS.  See 77 FR 30088 (May 21, 2012).

The Department agrees that the purpose of RACT is to decrease ozone precursor emissions. However, the amount of $NO_x$ or VOC emission reductions achieved as a result of the application of RACT-level control is determined on the basis of the source's potential to emit before and after the application of RACT-level control, not on comparison with a source's current actual emissions.  The proposed and final RACT rulemakings establish presumptive RACT requirements and RACT emission limitations for $NO_x$ or VOCs that are achievable and sustainable during the expected life of the affected unit using technologies that are both technically and economically feasible.  Implementation of the final-form regulation presumptive RACT requirements and RACT emission limitations will reduce the amount of $NO_x$ and VOC emissions that the owner and operator of a facility subject to final-form §§ 129.96—129.100 would be legally allowed to emit to the atmosphere.

In response to comments and the EPA's March 6, 2015, Ozone NAAQS Implementation Rule, the DEP conducted additional reviews of historical emissions data for coal-fired EGUs equipped with selective catalytic reduction (SCR) technology.  The DEP determined that the $NO_x$ limit specified in § 129.97(g)(1)(viii) should be revised.  Subparagraph 129.97(g)(1)(viii) specifies that the owner and operator of any combustion unit equipped with an SCR system that is operating with an inlet temperature equal to or greater than 600°F shall meet a $NO_x$ emission limit of 0.12 lb $NO_x$/million Btu.  Compliance with this emission limit is also required when by-passing the SCR system.  The DEP acknowledges that the $NO_x$ RACT limit in the final rulemaking is not the lowest achievable emissions rate (LAER) for this technology.  However, the EPA has indicated in the preamble for the final rule approving a SIP revision for Wisconsin's $NO_x$ RACT Rule that:

> "RACT limits are not meant to be the lowest achievable emissions rate.  The Nitrogen Oxides Supplement to the General Preamble for the Implementation of Title I of the Clean Air Act Amendments of 1990 addresses the issue of an acceptable emission limit. *See* section 4.6 *RACT for Certain Electric Utility Boilers* (57 FR 55626), "The EPA expects States, to the extent practicable, to demonstrate that the variety of emission controls adopted are consistent with the most effective level of combustion modification reasonably available for its individual affected sources.""

See 75 FR 64155, 64157 (October 19, 2010). The Department's reevaluation of the NO$_x$ RACT limit for coal-fired EGUs, taking into consideration cost-effectiveness and technological feasibility, is consistent with the approach outlined in the preamble of the October 19, 2010, EPA rule approving Wisconsin's RACT SIP revision.

Please see the response to Comment 9 for a discussion of the anticipated reductions in the amount of potential NO$_x$ emissions beyond current RACT potential to emit (allowable) emissions as a result of implementation of the final rulemaking RACT requirements and RACT emission limitations, as well as a discussion of anticipated reductions in actual emissions from the coal-fired boilers (EGUs) sector.

**11. Comment:** Additional support and analysis is needed in the regulatory analysis form (RAF) and Preamble to justify the proposed regulation. (107, 114, 115, 117, 119, 122)

**Response:** The Department disagrees that there is insufficient information in either the preamble or RAF of the proposed rulemaking to justify the regulation. Both of these documents are replete with substantive information related to emissions data, cost-effectiveness numbers, public health information, statutory requirements, small business information, and other types of analyses to demonstrate that this regulation is legally required, is in the public interest, is economically and technologically feasible, and will reduce NO$_x$ and VOC emissions. The estimates included in the RAF for the proposed and the final rulemakings are based on the information available to the Department. The presumptive RACT emission limitations were established based on cost-effectiveness of available control technology and are not based on the total number of affected units or number of total units requiring control. The RAF and preamble for the final rulemaking contain additional information to support the final-form RACT regulation.

**12. Comment:** DEP should withdraw the proposed rulemaking until it can address comments and prepare a revised RAF. (107, 115, 117)

**Response:** The Department disagrees. The estimates included in the RAF for the proposed and final rulemakings are based on the information available to the Department. Both of these documents are replete with substantive information related to emission data, cost-effectiveness numbers, public health information, statutory requirements, small business information, and other types of analyses to demonstrate that this regulation is legally required, is in the public interest, is economically and technologically feasible, and will reduce emissions. The presumptive RACT emission limitations were established based on cost-effectiveness of available control technology and not based on the total number of affected units or number of total units requiring control. The Department reviewed the comments received on the proposed rulemaking. Where appropriate, the Department revised the final-form regulation in response to comments. The Department does not believe that there is a need to withdraw the rulemaking; reevaluation of RACT will be required if the EPA promulgates a more protective ozone NAAQS in October 2015.

**13. Comment:** The EPA therefore strongly cautions PA DEP not to rigidly apply a benchmark as low as $2,500 per ton to exclude consideration of technically feasible controls. Rather, Pennsylvania needs to consider a broader range of cost-effectiveness to see if some level of additional control falls within that range. Based on Wisconsin's analysis, PA DEP should consider raising its cost-effectiveness "benchmark" like Wisconsin and New York after considering and evaluating thoroughly the states' analysis mentioned above. (113, 133)

**Response:** The Department did not establish a bright-line cost-effectiveness threshold to determine RACT. DEP initially used minimum cost-effectiveness thresholds of $1,500 and $3,000 per ton of $NO_x$ and VOC controlled, respectively, in 1990 dollars, for the implementation of RACT requirements for the 1979 1-hour ozone NAAQS in §§ 129.91—129.95. These cost-effectiveness thresholds were consistent with thresholds used at that time by other states for RACT determinations for the 1979 1-hour ozone NAAQS as well.

DEP used the Bureau of Labor Statistics (BLS) Consumer Price Index (CPI) to adjust $1,500 in 1990 dollars to $2,500 in 2010 dollars. When extrapolated into 2014 dollars, this figure is approximately $2,750. DEP used a $NO_x$ emission cost-effectiveness upper bound of $2,800 per ton $NO_x$ controlled for the RACT determinations for the final-form regulation.

Even with an additional 25% margin, the upper bound cost-effectiveness threshold would not be any greater than $3,500 per ton $NO_x$ controlled. Similarly for VOC, the upper-bound cost-effectiveness threshold would not be any greater than $7,000 per ton VOC controlled. Applying these new thresholds does not have an effect on the add-on control technology decisions for the presumptive RACT requirements established in the final rulemaking. The RACT limits included in the final-form regulation are comparable to emission limits included in other states' RACT regulations as well.

It should be further noted that Wisconsin's SIP-approved RACT regulations in 2010 were based on a $NO_x$ cost-effectiveness benchmark of $2,500 per ton controlled. EPA Region 5 stressed that the dollar-per-ton factor should be weighed in combination with the actual limits adopted by a state to determine RACT levels. See 75 FR 64157, 64160. The revised $NO_x$ RACT limit of 0.12 lb $NO_x$/MMBtu in Pennsylvania's final RACT rulemaking is consistent with RACT limits adopted for coal-fired boilers in other states including New York, New Jersey and Delaware.

**14. Comment:** Given that $NO_x$ is actually the more significant ozone precursor in the Northeast U.S., especially considering sources such as coal-fired power plants located in Pennsylvania and other upwind states, the $NO_x$ cost-effectiveness threshold should be as high, if not higher, than the VOC cost-effectiveness threshold. (113)

**Response:** The Department disagrees. The major facility thresholds for VOC and $NO_x$ emissions are 50 and 100 tons per year, respectively. In 2012, point sources in Pennsylvania emitted 165,771 tons of $NO_x$, but only 19,382 tons of VOCs. The VOC emissions represent 11% of the combined $NO_x$ and VOC total emissions. Because fewer VOCs are emitted from point sources compared to $NO_x$ emissions, the cost per ton of VOC controlled is greater than the cost of $NO_x$ controls. Therefore, it is appropriate that the VOC cost-effectiveness benchmark is higher than the $NO_x$ cost-effectiveness benchmark.

Please see the Response to Comment 13 for an explanation of how the Department developed the cost-effectiveness thresholds.

**15. Comment:** RAF Section (19) states: "...developing a precise estimate of compliance costs ... is not possible...". A detailed source-specific RACT cost estimate is imperative, such an analysis would likely show significantly higher costs. (111)

**Response:** The RAF reflects the costs associated with compliance with the presumptive RACT emission limitations. This is a generic cost analysis for a given source category and may not exactly reflect actual costs incurred by owners or operators of individual affected sources in the given source category. However, the owner or operator of any affected source that cannot meet a presumptive RACT emission limitation may propose, to the DEP or local air pollution control program, an alternative emission limitation determined on a case-by-case basis. The proposal for an alternative RACT emission limitation must include a detailed cost analysis on a source-specific basis. The alternative RACT emission limitation would be based on the cost-effectiveness of control for the specific source. As a result, there is no way to predict what type of alternative limit a facility owner or operator may choose for its source. The case-by-case option is a built-in flexibility provided under the regulation that gives the affected facility owners and operators options to comply cost-effectively with the regulation. Nevertheless, the Department has completed a robust analysis of the costs associated with compliance with the presumptive RACT emission limitations that shows compliance costs as a general matter are reasonable.

**16. Comment:** The RAF states that the compliance costs are $114 million. $NO_x$ and VOCs must be controlled separately in lean burn engines. DEP should reevaluate the number of impacted sources, associated cost and technical feasibility of controls. (118)

**Response:** The estimates for the number of affected units included in the RAF for the proposed and final rulemakings are based on the information available to the Department. The presumptive RACT requirements and RACT emission limitations set forth in the proposed and final rulemakings were established based on cost-effectiveness of reasonably available control technology for each pollutant for each type of source and not based on the total number of affected units or number of total units requiring control.

The Department reevaluated the number of total units requiring control as a result of revisions to emission limitations set forth in § 129.97 from proposed to final rulemaking. The number of turbines requiring additional control has dropped from 64 to 17 primarily due to the final rulemaking setting forth a presumptive RACT emission limitation of 150 ppmvd $NO_x$ @ 15% oxygen for simple cycle or regenerative cycle turbines with a rated output equal to or greater than 1,000 bhp and less than 6,000 bhp. Subsection 129.97(g) is revised from proposed to final rulemaking to establish a presumptive $NO_x$ RACT emission limitation of 150 ppmvd $NO_x$ @ 15% oxygen for a simple cycle or regenerative cycle turbine with a rated output equal to or greater than 1,000 bhp and less than 6,000 bhp in final-form § 129.97(g)(2)(iii). Proposed § 129.97(g)(2)(iii) is revised to § 129.97(g)(2)(iv) in the final-form rulemaking.

The Department also reevaluated the control costs due to revisions of presumptive RACT emission limitations from proposed to final rulemaking. Table 2 calculates the anticipated total cost of controls based on the number of units requiring additional controls to achieve the level of $NO_x$ emission reductions required under final-form §§ 129.96—129.100. For the purposes of Table 2, no additional control is needed for boilers (EGUs) with SCR since these units already have the control installed. Therefore, there is no cost of control to be calculated for these sources as a result of the implementation of the final-form rulemaking. The control costs in Column C have been included in the final-form rulemaking RAF under question 19.

Table 2. Total Cost of Control for Units Requiring Additional Control
for $NO_x$ Emissions under §§ 129.96—129.100

| Source Type | A<br>Number of Units Subject to RACT II* for $NO_x$ Emissions | B<br>Number of Units Requiring Additional Control for $NO_x$ Emissions under RACT II* | C<br>Total Cost of Control for Units Requiring Additional Control for $NO_x$ Emissions under RACT II* |
|---|---|---|---|
| Boilers except EGUs with SCR | 257 | 34 | $ 39,206,476 |
| EGUs (Boilers) with SCR | 12 | 0 | N/A |
| Engines | 393 | 28 | $ 25,941,478 |
| Turbines | 148 | 17 | $ 16,357,447 |
| **Total** | **810** | **79** | **$ 81,505,401** |

*RACT II refers to §§ 129.96—129.100

**17. Comment:** RACT is one of several upcoming regulatory requirements that will reduce $NO_x$ emissions in the Commonwealth. Some of these requirements are overlapping or will achieve reductions through different methods. Achieving $NO_x$ reductions in an overly prescriptive manner in RACT can counter efforts to achieve cost-effective compliance with the other regulations. (84, 105, 130)

**Response:** While the DEP agrees that the RACT final rulemaking will reduce $NO_x$ emissions in Pennsylvania, the Department disagrees with the commentator's position that implementation of RACT will counter compliance with other regulations. The DEP is obligated to reevaluate RACT whenever the EPA promulgates a NAAQS and RACT-level control must be applied statewide in the Commonwealth. The Department believes that the final rulemaking contains appropriate presumptive RACT requirements and emission limitations for purposes of attaining and maintaining the current ozone standards. RACT will be reevaluated by the DEP for Pennsylvania if the EPA adopts a more protective ozone NAAQS in October 2015. In addition, the owner or operator of any affected source that cannot meet a presumptive RACT emission limitation may propose an alternative limit determined on a case-by-case basis. Moreover,

subsections 129.97(i) and (j) provide that the more stringent provisions related to a $NO_x$ or VOC reduction applies to affected facilities. Alternatively, any other more stringent provisions are subsumed under the Title V Operating Permit. Compliance is therefore streamlined.

**18. Comment:** The proposed rulemaking significantly underestimates the number of affected units that would require installation of $NO_x$ or VOC control technology. Approximately 150 units operated by natural gas transmission companies would be affected by the rulemaking; this exceeds the PA DEP estimate for all affected units statewide. The rulemaking would have significant impact on natural gas transmission company operations, including many requirements to install control technology and associated costs that are significantly under-estimated by PA DEP. (107, 115, 117, 118)

**Response:** The estimates for the number of affected units included in the RAF for the proposed and final rulemakings are based on the information available to the Department. The presumptive RACT emission limitations were established based on cost-effectiveness of available control technology and not based on the total number of affected units or number of total units requiring control.

The Department reevaluated the number of total units requiring controls as a result of revisions to emission limitations set forth in the final-form regulation. The number of turbines requiring control has dropped from 64 to 17 primarily due to the final-form regulation setting forth a presumptive RACT emission limitation of 150 ppmvd $NO_x$ @ 15% oxygen for simple cycle or regenerative cycle turbines with a rated output equal to or greater than 1,000 bhp and less than 6,000 bhp. Subsection 129.97(g) is revised from proposed to final rulemaking to establish a presumptive $NO_x$ RACT emission limitation of 150 ppmvd $NO_x$ @ 15% oxygen for a simple cycle or regenerative cycle turbine with a rated output equal to or greater than 1,000 bhp and less than 6,000 bhp in final-form § 129.97(g)(2)(iii). Proposed § 129.97(g)(2)(iii) is revised to § 129.97(g)(2)(iv) in the final-form regulation.

**19. Comment:** DEP did not provide a cost basis for making RACT control decisions and did not provide the technological and economic basis for determining presumptive RACT and economic feasibility per ton removed. (107, 114, 115, 117, 119, 121, 122, 126)

**Response:** The Department disagrees. The basis for the determination of presumptive RACT requirements is included in the preamble and the RAF of the proposed and final rulemakings. Both of these documents are replete with substantive information related to emissions data, cost-effectiveness numbers, public health information, statutory requirements, small business information, and other types of analyses to demonstrate that this regulation is legally required, is in the public interest, is economically and technologically feasible, and will reduce emissions.

**20. Comment:** Polluters should help to pay for the costs of climate change & respiratory problems due to bad air. (67)

**Response:** The Department defines the term "RACT—Reasonably Available Control Technology" in § 121.1 as the lowest emission limit for VOCs or $NO_X$ that a particular source is capable of meeting by the application of control technology that is reasonably available

considering technological and economic feasibility." The final rulemaking sets forth RACT-level emission limitations for $NO_x$ or VOCs that are achievable using technologies that are reasonably available based on the costs associated with achieving reductions of ozone precursor emissions. The emission limitations and requirements set forth in this final-form regulation will substantially reduce emissions of ozone precursors. The final-form rulemaking is not designed to address the cost of climate change. However, the DEP covers the cost of certain climate change-related activities using civil penalties collected by the Department for violations of the CAA, Air Pollution Control Act (APCA) and regulations adopted under the acts.

### § 129.96.  Applicability

**21. Comment:** While a number of existing regulations are referenced in the applicability section, there is no clarifying statement of prior presumptive RACT requirements that were promulgated under §§ 129.91—129.95. It isn't until almost the end of § 129.97 that those regulations are superseded. It may be clearer to address all the applicability pieces under § 129.96 instead of having it split up so much.  (97, 109)

**Response:** The Department disagrees. Sections 129.91—129.95 are not superseded by the final-form regulation. The affected owners and operators of major VOC and $NO_x$ emitting facilities will be subject to §§ 129.91—129.95 and §§ 129.96—129.100. Subsection 129.97(i) is intended to ensure that an owner or operator complies with the more stringent of either the RACT requirements contained in a RACT permit issued by the DEP under §§ 129.91—129.95 and the presumptive RACT requirements established in the final rulemaking. Subsections 129.97(i) and (j) specifically provide that the more stringent provisions apply whether that provision is under the final-form regulation, some other regulation, or a previously issued permit. These safeguards prevent backsliding from the most stringent applicable requirements.

**22. Comment:** The proposed rulemaking reasonably excludes very small sources of $NO_x$ and VOCs.  (102, 110)

**Response:** The Department agrees. Section 129.96 is revised from proposed to final rulemaking to set forth a de minimis threshold for the affected owner and operator with a source that has the potential to emit less than 1 ton per year of $NO_x$ or VOCs. Section 129.97 is revised from proposed to final rulemaking to set forth a generic presumptive requirement in § 129.97(c)(1) and (2) for the affected owner and operator of a source with the potential to emit less than either 5 tons of $NO_x$ per year or 2.7 tons of VOC per year, respectively.

Please note that the requirement in proposed § 129.97(c)(1) is provided in final-form § 129.97(c)(3) and the requirements in proposed § 129.97(c)(2), (3), (4), (5) and (6) are revised and set forth in final-form § 129.97(c)(4), (5), (6), (7) and (8), respectively.

**23. Comment:** It is arbitrary and capricious to heavily regulate trivial emission units in the same manner as significant units. The same thresholds for non-combustion units should be applied to combustion units. The regulations should have a lower size threshold for which RACT does not apply, such as 10 MMBTU/hr, or state clearly that the ≤ 20 MMBTU/hr presumptive RACT

requirements do not need to be demonstrated, nor have any record keeping requirements. (119, 121)

**Response:** The Department disagrees that lower size thresholds expressed as heat input in MMBtu/hr are appropriate. Potential and actual emissions vary with fuel type and combustion methodology, even for units with the same heat input rating. Applicability thresholds expressed in tons per year provide a standard that can be used across all emission categories. The final rulemaking covers a broad spectrum of source categories. Given the diversity of sources subject to the final-form regulation, it is more appropriate to have one applicability threshold than to have several different thresholds. Regulations developed for only one source category or type tend to have applicability thresholds expressed in units of minimum source size that are appropriate for each regulation.

In order to minimize the number of case-by-case determinations that may be submitted to the Department under § 129.99, § 129.96 is revised from proposed to final rulemaking to set forth a de minimis threshold for the affected owner and operator with a source that has the potential to emit less than 1 ton per year of $NO_x$ or VOCs. Section 129.97 is revised from proposed to final rulemaking to set forth a generic presumptive requirement in § 129.97(c)(1) and (2) for the affected owner and operator of a source with the potential to emit less than either 5 tons of $NO_x$ per year or 2.7 tons of VOC per year, respectively.

The generic applicable presumptive requirement is the installation, maintenance, and operation of the source in accordance with the manufacturer's specifications and with good operating practices. In the proposed rulemaking, these emission thresholds for generic presumptive requirements were applicable only to sources undergoing case-by-case determinations.

Please note that the requirement in proposed § 129.97(c)(1) is provided in final-form § 129.97(c)(3) and the requirements in proposed § 129.97(c)(2), (3), (4), (5) and (6) are renumbered and set forth in final-form § 129.97(c)(4), (5), (6), (7) and (8), respectively.

**24. Comment:** The preamble should clearly indicate that the proposed rulemaking only applies to major sources of $NO_x$ and VOCs. (107, 115, 117, 118)

**Response:** The Department agrees that the $NO_x$ RACT requirements only apply to the owners and operators of major $NO_x$ emitting facilities and the VOC RACT requirements only apply to the owners and operators of major VOC emitting facilities. The $NO_x$ requirements of final-form §§ 129.96—129.100 apply Statewide to the owner and operator of a major $NO_x$ emitting facility and the VOC requirements of §§ 129.96—129.100 apply Statewide to the owner and operator of a major VOC emitting facility. Section 129.96 has been amended in the final-form regulation to clarify the applicability.

**25. Comment:** As far as new sources are concerned, DEP should consider specifying that any sources that have undergone BACT, BAT permitting, or LAER permitting after July 20, 2012, have established presumptive BACT limits in their plan approvals which supersede the requirements of §§ 129.97—129.100. The requirement for sources with recent plan approvals to

go through a RACT exercise is nothing more than wasted effort on the part of the permittee and the Department. (109, 122)

**Response:** The final rulemaking RACT requirements are applicable only to the owners and operators of major $NO_x$ emitting facilities or major VOC emitting facilities that were <u>in existence</u> in this Commonwealth on or before July 20, 2012 – the effective date of the EPA's designations and classifications for the 2008 ozone NAAQS. See 77 FR 30088 (May 21, 2012). New sources as defined in § 121.1 that are subject to lowest achievable emission rate (LAER), best available control technology (BACT), or best available technology (BAT) requirements and are constructed after July 20, 2012, are not subject to the final-form RACT regulation. The Department disagrees that LAER, BACT, or BAT requirements supersede the requirements of the final RACT rulemaking, which applies solely to the owners and operators of existing major $NO_x$ or VOC emitting sources. The evaluation or reevaluation of what constitutes RACT-level control for affected existing sources is a requirement that must be fulfilled each time the EPA promulgates a new NAAQS as was the case in 1979 for the 1-hour ozone standard and in 1997 for the 8-hour ozone standard or revises a NAAQS as was the case in 2008 for the 8-hour ozone standard. The final-form regulation addresses the RACT requirements for the 8-hour ozone NAAQS promulgated in 1997 and revised in 2008 and is applicable to the owners and operators of subject sources in existence on or before July 20, 2012. Sources that have undergone BACT or LAER evaluation must be evaluated to verify compliance with the RACT requirements set forth in the final rulemaking. In accordance with § 129.99, the owner or operator may opt to propose an alternative RACT limitation on a case-by-case basis that includes the previously determined BACT or LAER limitations as the alternative limitation for RACT compliance.

**26. Comment:** Maintenance and operation of sources that have been approved within the past 5 years as LAER or BACT for $NO_x$ should be presumptive RACT for these sources. (109, 122)

**Response:** The evaluation or reevaluation of what constitutes RACT for affected sources is a requirement that must be fulfilled each time the EPA promulgates a new NAAQS as was the case in 1979 for the 1-hour ozone standard and in 1997 for the 8-hour ozone standard or revises a NAAQS as was the case in 2008 for the 8-hour ozone standard. The final rulemaking addresses the RACT requirements for the 8-hour ozone NAAQS promulgated in 1997 and revised in 2008 and is applicable to the owners and operators of subject sources in existence on or before July 20, 2012. Sources that have undergone BACT or LAER evaluation must be evaluated to verify compliance with the RACT requirements set forth in the final rulemaking. In accordance with § 129.99, the owner or operator may opt to propose an alternative RACT limitation on a case-by-case basis that includes the previously determined BACT or LAER limitations as the alternative limitation for RACT compliance.

**27. Comment:** The owner and operator of an affected source may choose, without precondition, among the compliance options. (125)

**Response:** The Department agrees in part with the commentator that the owner and operator of an affected source may choose the compliance option. Therefore, the language in proposed § 129.99(a) specifying that the owner or operator shall demonstrate that they cannot participate in

either a facility-wide or system-wide NO$_x$ emissions averaging RACT operating permit modification under § 129.98 is deleted from final-form § 129.99(a).

The Department disagrees, however, that there are no conditions pertaining to the election of compliance options. Subsection 129.98(a) has been revised from proposed to final rulemaking to clarify that the owner or operator of a major NO$_x$ emitting facility subject to § 129.96 that includes at least one source subject to a NO$_x$ RACT emission limitation in § 129.97 that cannot meet the applicable NO$_x$ RACT emission limitation may elect to meet the applicable NO$_x$ RACT emission limitation in § 129.97 by averaging NO$_x$ emissions on either a facility-wide or system-wide basis using a 30-day rolling average. System-wide emissions averaging must be among sources under common control of the same owner or operator within the same ozone nonattainment area in this Commonwealth. The source that cannot meet the applicable NO$_x$ RACT emission limitation must be included in the emissions averaging plan so that its excess emissions can be averaged with the emissions from sources that are emitting below their limit.

The owner and operator may include other sources in the emissions averaging plan to meet the applicable NO$_x$ RACT emission limitation in § 129.97 on a 30-day rolling average as long as the other sources meet the requirement of § 129.98(c), which specifies that each NO$_x$ air contamination source included in the application for an operating permit modification or a plan approval, if otherwise required, for averaging NO$_x$ emissions on either a facility-wide or system-wide basis using a 30-day rolling average submitted under subsection 129.98(b) must be an air contamination source subject to a NO$_x$ RACT emission limitation in § 129.97. Further, as specified in final-form § 129.98(a), sources which are included in a system-wide averaging plan must be under common control of the same owner or operator within the same ozone nonattainment area in this Commonwealth.

The Department agrees that owners and operators of affected sources should not have to demonstrate that they cannot participate in either a facility-wide or system-wide NO$_x$ emissions averaging plan before proposing an alternative RACT requirement or RACT emission limitation. Consequently, § 129.99(a) has been revised in the final-form regulation to specify that the owner or operator of an air contamination source subject to § 129.97 located at a major facility subject to § 129.96 that cannot meet the applicable presumptive RACT requirement or RACT emission limitation of § 129.97 may propose an alternative RACT requirement or RACT emission limitation in accordance with § 129.99(d). The owner or operator of an affected source would have to demonstrate that the affected source cannot comply with the applicable standard in § 129.97 as part of the application for a case-by-case determination under § 129.99(a).

The Department agrees in part that the owner and operator may use multiple compliance options, but only one compliance option may be used at a time to demonstrate compliance for an individual source. The owner and operator of an individual affected source may demonstrate compliance for that source in one of three ways: first, with the applicable presumptive RACT requirement or emission limitation in § 129.97; secondly, either by participating in an emissions averaging plan under § 129.98 or by submitting a request for a case-by-case RACT determination under § 129.99.

**28. Comment:** The commentators suggest that the applicability thresholds be raised. Some suggested alternatives would be: set the de minimis level at 40 tpy for both $NO_x$ and VOCs (the thresholds at which New Source Review is triggered for a modification); set the de minimis level based on actual emissions rather than potential emissions, with a caveat that RACT compliance (either presumptive RACT or submittal of a case-by-case analysis) would be triggered in the event that annual emissions exceed that threshold; or adopt the de minimis thresholds that other states have included (e.g., 10 tpy PTE for Maine (see 06-096 CMR 138 section (1)(B)). (93, 122)

**Response:** The Department disagrees. A de minimis level of 40 tons per year is significantly greater than current levels considered to be de minimis in Pennsylvania. Using 40 tons per year as a de minimis level would constitute backsliding from most case-by-case determinations issued under §§ 129.91—129.95 and approved by the EPA as revisions to the Commonwealth's SIP. In addition, the Department cannot show that installation and operation of additional $NO_x$ or VOC control technologies are cost prohibitive at an uncontrolled emission level of 40 tons per year for all sources.

In order to minimize the number of case-by-case determinations that may be submitted under § 129.99, § 129.96 is revised from proposed to final rulemaking to set forth a de minimis threshold for the affected owner and operator with a source that has the potential to emit less than 1 ton per year of $NO_x$ or VOCs. Section 129.97 is revised from proposed to final rulemaking to set forth a generic presumptive requirement in § 129.97(c)(1) and (2) for the affected owner and operator of a source with the potential to emit less than either 5 tons of $NO_x$ per year or 2.7 tons of VOC per year, respectively. Therefore, the Department does not believe that a de minimis level of 40 tons per year is appropriate or approvable as a SIP revision.

Please note that the requirement proposed § 129.97(c)(1) is provided in final-form § 129.97(c)(3); the proposed requirements in § 129.97(c)(2), (3), (4), (5) and (6) are renumbered and set forth in final-form § 129.97(c)(4), (5), (6), (7) and (8), respectively.

**29. Comment:** Subsections 129.96(a) and (b) list circumstances when the additional RACT standards are not applicable "… and for which a requirement or emission limitation, or both, has not been established in §§ 129.51— 129.52c…." However, there are other exemptions within the body of the regulation, such as subsection 129.97(i) which allows a prior RACT permit to remain effective "…to the extent the RACT permit contains more stringent requirements or emission limitations, or both." We found similar exceptions in subsections 129.97(j), 129.99(g) and (k), and 129.100(a). We recommend that the regulation include in § 129.96 a full list of exceptions by reference so that the reader can readily determine whether the additional RACT requirements apply to their source. (134)

**Response:** Subsections 129.96(a) and (b) reference other sections of Chapter 129, which have been incorporated into the Commonwealth's SIP as meeting RACT for the covered sources. These SIP-approved provisions include §§ 129.51—129.52c, 129.54—129.69, 129.71—129.73, 129.75, 129.77, 129.101—129.107 and 129.301—129.310. An affected owner and operator of a major $NO_x$ emitting facility or a major VOC emitting facility that was in existence on or before July 20, 2012, with a source that is subject to the requirements set forth in one or more of the

provisions of §§ 129.51—129.52c, 129.54—129.69, 129.71—129.73, 129.75, 129.77, 129.101—129.107 and 129.301—129.310 would not also be subject to the requirements of §§ 129.96— 129.100 for that source.

Subsections 129.97(i) and (j), 129.99(g) and (k), and 129.100(a) of the final-form regulation do not exempt an affected owner and operator from the applicability of the requirements set forth in final-form §§ 129.96–129.100. Subsections 129.97(i) and (j) and 129.99(g) and (k) refer to instances where a more stringent RACT limit already applies to the affected owner and operator of a source subject to final-form §§ 129.96–-129.100. The exceptions in subsections 129.97(i) and (j) and 129.99(g) and (k) provide that previously issued plan approval or operating permit requirements will continue to apply if the previously issued requirements are more stringent than the requirements set forth in final-form §§ 129.96— 129.100. The exception in subsection 129.100(a) provides that an affected owner or operator may request a waiver from the requirement to demonstrate compliance with the applicable emission limitation listed in § 129.97, if the requirements set forth under § 129.100(c) are met.

These instances are not exceptions to RACT applicability. In addition, it is not feasible to define all exemptions in only one section. Therefore, the Department believes that the final rulemaking adequately explains which sources are subject to regulation under the final rulemaking.

**30. Comment:** The intent of the regulation appears to be to regulate $NO_x$ emissions from major sources of $NO_x$ and VOC emissions from major sources of VOCs. The proposed language, however, makes this interpretation difficult to glean. We suggest the following amendments to § 129.96 Applicability: (a) *[This section and] The NOx requirements and/or limitations of* §§ 129.97-129.100 apply Statewide to the owner and operator of a major NOx emitting facility *and the VOC requirements and for limitations of §§ 129.97-129.100 apply Statewide to the owner and operator of* [or] a major VOC emitting facility *[, or both,]* that was in existence on or before July 20, 2012, for which a requirement or emission limitation, or both, has not been established in §§ 129.51-129.52c, 129.54-129.69, 129.71-129.73, 129.75,129.77,129.101-129.107 and 129.301-129.310. Similar amendments would apply to (b) as well as § 129.97. (109)

**Response:** The Department agrees that the $NO_x$ RACT requirements are applicable only to the owners and operators of major $NO_x$ emitting facilities and the VOC RACT requirements are applicable only to the owners and operators of major VOC emitting facilities. The $NO_x$ requirements of §§ 129.96—129.100 apply Statewide to the owner and operator of a major $NO_x$ emitting facility and the VOC requirements of §§ 129.96—129.100 apply Statewide to the owner and operator of a major VOC emitting facility. The final-form regulation was amended to clarify the applicability for the owners and operators of $NO_x$ and VOC emitting facilities.

**31. Comment:** As proposed, § 129.96 trips the requirements for both $NO_x$ and VOC controls even when a unit may only be major for one of the contaminants. Why was a common approach taken to $NO_x$ and VOC instead of identifying VOC emission sources of concern and addressing those separately from the $NO_x$ sources? The most likely result of this blending is a lot of effort being spent for really small gains. (97, 109)

**Response:** The Department agrees that the $NO_x$ RACT requirements are applicable only to the owners and operators of major $NO_x$ emitting facilities and the VOC RACT requirements are applicable only to the owners and operators of major VOC emitting facilities. The $NO_x$ requirements of §§ 129.96—129.100 apply Statewide to the owner and operator of a major $NO_x$ emitting facility and the VOC requirements of §§ 129.96–129.100 apply Statewide to the owner and operator of a major VOC emitting facility. The final-form regulation has been amended to clarify the applicability so that § 129.96 does not trip the requirements for both $NO_x$ and VOC controls when the facility is major for only $NO_x$ or only VOC.

**32. Comment:** Our understanding of EPA policy is that those sources that have already installed air pollution control equipment as a result of previous RACT are not required to install additional controls absent new information indicating otherwise. See, e.g., 70 Fed. Reg. 71612, 71655 (Nov. 29, 2005); *NRDC v. U.S. EPA*, 571 F.3d 1245, 1253-55 (D.C. Cir. 2008). The Department should amend the proposed § 129.96 to exclude $NO_x$ and VOC sources that have already undergone RACT review and have resulting $NO_x$ and/or VOC limits or restrictions, unless new information indicates that a new RACT analysis is justified. (114, 119)

**Response:** The Department believes that the commentator is referring to *NRDC* v. *EPA,* 571 F.3d 1245 (D.C. Cir. 2009), decided by the D.C. Circuit Court in 2009, not 2008. The evaluation or reevaluation of what constitutes RACT-level control for affected sources is a requirement that must be fulfilled each time the EPA promulgates a new NAAQS as was the case in 1979 for the 1-hour ozone standard and in 1997 for the 8-hour ozone standard or revises a NAAQS as was the case in 2008 for the 8-hour ozone standard. The final rulemaking addresses the RACT requirements for the 8-hour ozone NAAQS promulgated in 1997 and revised in 2008. The final-form rulemaking requirements are applicable to the owners and operators of subject sources in existence on or before July 20, 2012, and to owners and operators of subject sources when the installation of a new source or a modification or change in operation of an existing source after July 20, 2012, results in the source or facility meeting the definition of a major NOx emitting facility or a major VOC emitting facility.

The EPA's Phase 2 Rule certification provision allows states to certify that the control measures approved as RACT under the 1-hour ozone standard also satisfy the RACT requirements under the 8-hour ozone standard <u>absent information indicating it should not be approved</u> (emphasis added). See 70 FR 71612, 71652 and 71655 (November 29, 2005). This approach adequately ensures that RACT determinations will take into account advances in technology.

The Department reviewed all available information, including Federal regulations and RACT regulations from various states. This review showed that a new RACT analysis is justified. The Department believes that the presumptive RACT requirements and emission limitations included in the final-form regulation are appropriate. Should an affected owner or operator not be able to comply with the presumptive requirement or emission limitation, the owner or operator may propose an alternative RACT emission limitation under § 129.99(a) based on the source's potential to emit $NO_x$ or VOCs.

**33. Comment:** Section 129.96 also fails to exclude sources where a requirement or emission limitation, or both, has been established by Federal regulatory programs that are not reflected in

these state regulations.  In practice, this leads to some illogical results.  For example, the proposed rulemaking would exclude VOC storage tanks subject to §§ 129.56 and 129.57 where there is a requirement or emission limitation or both, but it would fail to exclude VOC storage tanks that are currently regulated by 40 CFR Part 60 Subpart Kb.  Depending on the capacity and vapor pressure of the vessel, these standards can include requirements more restrictive than § 129.56 or § 129.57.  The proposed rulemaking should exclude sources that are subject to Federal regulations that have imposed a requirement or limitation, including those sources subject to 40 CFR Part 60 Subpart Kb.  (114, 119, 121, 134)

**Response:** In the vast majority of cases, VOC emitting storage tanks subject to 40 CFR Part 60, Subpart Kb are also subject to § 129.56 or § 129.57.  The applicability of final-form § 129.96 would exclude VOC emitting storage tanks subject to §§ 129.56 and 129.57 where there is a requirement or emission limitation from the RACT requirements.  In addition, § 129.96 is revised from proposed to final rulemaking to set forth a de minimis threshold for the affected owner and operator with a source that has the potential to emit less than 1 ton per year of $NO_x$ or VOCs.  Section 129.97 is revised from proposed to final rulemaking to set forth a generic presumptive requirement in § 129.97(c)(1) and (2) for the affected owner and operator of a source with the potential to emit less than either 5 tons of $NO_x$ per year or 2.7 tons of VOC per year, respectively.

**34. Comment:**  Section 129.97(c)(1) doesn't have a lower bound for applicability.  It would theoretically catch every boiler or other combustion source (which is very broad) with a heat input rating of less than 20 MMBTU/hr.  The cost benefit of regulating the smallest end of this range is questionable.  In particular, very small engines, including those associated with maintenance equipment, portable pumps and small generators should be expressly excluded from regulatory coverage under this provision.  Section 129.97(d) should limit applicability.  (97, 134)

**Response:** The Department disagrees that lower size thresholds expressed as heat input in MMBtu/hr are appropriate.  Potential and actual emissions vary with fuel type and combustion methodology, even for units with the same heat input rating.  Applicability thresholds expressed in tons per year provide a standard that can be used across all emission categories.  The final rulemaking covers a broad spectrum of source categories.  Given the diversity of sources subject to the final-form regulation, it is more appropriate to have one applicability threshold than to have several different thresholds.  Regulations developed for only one source category or type tend to have applicability thresholds expressed in units of minimum source size that are appropriate for each regulation.

In order to minimize the number of case-by-case determinations that may be submitted under § 129.99, § 129.96 is revised from proposed to final rulemaking to set forth a de minimis threshold for the affected owner and operator with a source that has the potential to emit less than 1 ton per year of $NO_x$ or VOCs.  Section 129.97 is revised from proposed to final rulemaking to set forth a generic applicable presumptive requirement in § 129.97(c)(1) and (2) for the affected owner and operator of a source with the potential to emit less than either 5 tons of $NO_x$ per year or 2.7 tons of VOC per year, respectively.

The generic applicable presumptive requirement is the installation, maintenance, and operation of the source in accordance with the manufacturer's specifications and with good operating practices. In the proposed rulemaking, these emission thresholds for generic presumptive requirements were applicable only to the owners and operators of sources undergoing case-by-case determinations.

Please note that the requirement proposed in § 129.97(c)(1) is provided in final-form § 129.97(c)(3). The requirements proposed in § 129.97(c)(2), (3), (4), (5) and (6) are renumbered and set forth in final-form § 129.97(c)(4), (5), (6), (7) and (8), respectively.

**35. Comment:** Why doesn't § 129.97(d) also include NO$_x$ sources? (134)

**Response:** Subsection 129.97(d) addresses presumptive VOC requirements for combustion units at major VOC facilities. NO$_x$ emission limitations for combustion units at major NO$_x$ facilities are addressed in § 129.97(g)(1).

**36. Comment:** The combustion turbine threshold should be 50 MMBtu/hr (higher heating value or HHV) or 6,000 horsepower. Please refer to the EPA Docket for Subpart KKKK (OAR – 2004 – 0490) for documentation and discussion of why a 50 MMBtu/hr (HHV) size threshold is appropriate for combustion turbines. See subparagraphs 129.97(g)(2)(i) and (g)(2)(iii). To alleviate the potential for numerous case-by-case RACT analyses, the commentators recommend changing the 1000 hp trigger threshold to 50 MMBtu/hr (HHV) (reference EPA Docket OAR-2004-0490). The proposed RACT levels found in clauses 129.97(g)(2)(i)(A) and (B) assume dry low NO$_x$ or water/steam injection emissions capabilities which are not commercially available on many combustion turbines <50 MMBtu/hr (HHV) or 6,000 horsepower. (107, 111, 115, 117, 129)

**Response:** Subsection 129.97(g) is revised from proposed to final rulemaking to establish a presumptive NO$_x$ RACT emission limitation of 150 ppmvd NO$_x$ @ 15% oxygen for a simple cycle or regenerative cycle turbine with a rated output equal to or greater than 1,000 bhp and less than 6,000 bhp in final-form § 129.97(g)(2)(iii). This requirement is consistent with 40 CFR Part 60, Subpart KKKK. The owners and operators of turbines unable to meet the requirements established in final-form § 129.97(g)(2)(iii) may elect to propose a case-by-case RACT emission limitation. However, since it is expected that turbines rated greater than 1,000 bhp and less than 6,000 bhp will be able to meet the presumptive requirement of 150 ppmvd NO$_x$ @ 15% oxygen without the addition of new dry low NO$_x$ or water/steam injection, the Department does not anticipate a significant number of turbine owners and operators requiring a case-by-case alternative RACT emission limitation for these sources.

**37. Comment:** What is the applicability to engines used by third parties on site? (114)

**Response:** The RACT requirements are applicable to all subject engines, including engines used by third parties, located at major NO$_x$ emitting facilities or major VOC emitting facilities that were in existence on or before July 20, 2012.

**38. Comment:** Several commentators believe that since they are subject to more stringent requirements under other programs (such as Maximum Achievable Control Technology (MACT), National Emission Standards for Hazardous Air Pollutants (NESHAP) and New Source Performance Standards (NSPS)) they should be exempt from the RACT requirements. The Department should exempt emergency generators and other sources with applicable Federally mandated $NO_x$ and VOC control requirements from RACT requirements. Additional exemptions are needed to accommodate facilities that are already subject to more stringent requirements or have already completed a RACT process. (104, 119, 134)

**Response:** The Department disagrees. An evaluation or reevaluation of what constitutes RACT for affected sources is required under Section 182 of the CAA for existing major $NO_x$ emitting or existing major VOC emitting facilities each time the EPA promulgates or revises a NAAQS. The final rulemaking addresses the RACT requirements for the 8-hour ozone NAAQS promulgated in 1997 and revised in 2008. RACT applies to the owners and operators of existing major stationary sources of $NO_x$ and VOC in ozone nonattainment areas. RACT for covered categories is required statewide and not just in designated ozone nonattainment areas in Pennsylvania because the state is located in the Northeast Ozone Transport Region established under Section 184 of the CAA.

Section 182(b)(2) (42 U.S.C.A. §7511a(b)(2)) requires that the Commonwealth implement RACT for each category of existing VOC sources in the area covered by a Control Techniques Guidelines (CTG) document issued by the Administrator between November 15, 1990, and the date of attainment of the area, as well as for all existing VOC sources in the area covered by any CTG issued before November 15, 1990, and all other major stationary sources of VOCs that are located in the area. Under CAA sections 182(f)(1) and 184(b)(2) (42 U.S.C.A. § 7511a(f)(1) and § 7511c(b)(2)), RACT requirements are applicable to all existing major sources of $NO_x$ in this Commonwealth.

The MACT and NESHAP requirements apply to the control of emissions of hazardous air pollutants (HAP) as required under section 112 of the CAA (42 U.S.C.A. §7412). Many HAPs are also VOCs, but not all VOCs are HAPs. Oxides of nitrogen are also not HAP. Therefore the owner and operator of an existing major source subject to MACT/NESHAP requirements for the control of HAP emissions may also be subject to RACT requirements for the control of $NO_x$ and VOC emissions. It is important to mention that the EPA's Implementation Rule for the 2008 ozone NAAQS provides additional guidance. The EPA recently finalized the agency's "proposed approach for VOC sources subject to MACT standards, such that states would be allowed to streamline their RACT analysis by including an assessment of the MACT controls and how they relate to VOC RACT considerations. This approach is consistent with the EPA's current policy." (80 FR 12279, March 6, 2015).

Therefore, no additional exemptions are warranted to accommodate the owners and operators of facilities that are already subject to more stringent requirements or have already completed a RACT process.

**39. Comment:** The commentator requests clarification regarding applicability of $NO_x$ RACT regulations to temporary engines. RACT operating requirements and/or emission limits for all

internal combustion engines at major sources of NO$_x$ and VOC should not apply to engines which are onsite for temporary periods of time. (130)

**Response:** The RACT requirements are applicable to all engines, including temporary engines, located at major NO$_x$ emitting facilities or major VOC emitting facilities that were in existence on or before July 20, 2012.

**40. Comment:** Proposed § 129.97(i) states that the requirements and emission limits of this section supersede the requirements and emission limitations of a RACT permit issued to an owner operator prior to the effective date of adoption of this proposed rulemaking, except to the extent that the RACT permit contains more stringent requirements or emission limitations, or both. What happens in the event that an existing RACT permit has a higher limit but a shorter averaging time than the proposed RACT requirements or conversely, in the event that an existing RACT permit has a lower limit but a longer averaging time than the proposed RACT requirements? The RACT regulations should be revised to clarify how existing RACT permits are to be handled to avoid potentially overlapping and conflicting requirements between existing RACT plans and the new provisions. (130)

**Response:** The owner or operator of an affected source shall comply with all applicable requirements, including the current requirements of the operating permit. Subsection 129.97(i) is intended to ensure that an owner or operator complies with the more stringent of the RACT requirements contained in a RACT permit issued under §§ 129.91—129.95 or the presumptive RACT requirements in the final-form regulation. In the event that an existing RACT permit has either a higher limit but a shorter averaging time than the final-form RACT requirements or a lower limit but a longer averaging time than the final-form RACT requirements, then the owner or operator shall comply with both the existing RACT permit requirements and the final rulemaking RACT requirements. However, both sets of requirements could be streamlined in the Title V Operating Permit to avoid any potential confusion.

**41. Comment:** Subsection 129.99(b) fails to exempt de minimis sources (below 5 tpy NOx and below 2.7 tpy VOC). (109, 114)

**Response:** In order to minimize the number of case-by-case determinations that may be submitted under § 129.99, § 129.96 is revised from proposed to final rulemaking to set forth a de minimis threshold for the affected owner and operator with a source that has the potential to emit less than 1 ton per year of NO$_x$ or VOCs. Section 129.97 is revised from proposed to final rulemaking to set forth a generic presumptive requirement in § 129.97(c)(1) and (2) for the affected owner and operator of a source with the potential to emit less than either 5 tons of NO$_x$ per year or 2.7 tons of VOC per year, respectively.

The generic applicable presumptive requirement is the installation, maintenance, and operation of the source in accordance with the manufacturer's specifications and with good operating practices. In the proposed rulemaking, these emission thresholds for generic presumptive requirements were applicable only to the owners and operators of sources undergoing case-by-case determinations.

Please note that the requirement proposed in § 129.97(c)(1) has been revised and set forth in final-form § 129.97(c)(3). The requirements proposed in § 129.97(c)(2), (3), (4), (5) and (6) are renumbered and set forth in final-form § 129.97(c)(4), (5), (6), (7) and (8), respectively.

**42. Comment:** The commentators object to the Department reopening post-RACT 1 [§§ 129.91—129.95] construction permitting decisions that included NO$_x$ and or VOC control requirements/applying new RACT requirements to sources already subject to MACT, NESHAP and new source performance standards (NSPS) requirements. The commentators recommend removing the requirements of § 129.99(b) as this is a redo of RACT 1 and would probably yield the same results. (119, 121)

**Response:** The evaluation or reevaluation of what constitutes RACT for affected sources is a requirement that must be fulfilled each time the EPA promulgates a new NAAQS, as was the case in 1979 for the 1-hour ozone standard and in 1997 for the 8-hour ozone standard, or revises a NAAQS, as was the case in 2008 for the 8-hour ozone standard. The final rulemaking addresses the RACT requirements for the 8-hour ozone NAAQS promulgated in 1997 and revised in 2008 and is applicable to the owners and operators of subject sources in existence on or before July 20, 2012 – the effective date of the EPA's designations and classifications for the 2008 ozone NAAQS. See 77 FR 30088 (May 21, 2012).

The EPA's Phase 2 Rule certification provision allows states to certify that the control measures approved as RACT under the 1-hour ozone standard also satisfy the RACT requirements under the 8-hour ozone standard <u>absent information indicating it should not be approved</u> (emphasis added). See 70 FR 71612, 71652 and 71655 (November 29, 2005). This approach adequately ensures that RACT determinations will take into account advances in technology.

The Department reviewed all available information, including Federal regulations and RACT regulations from various states. This review showed that additional reductions and requirements are appropriate. The Department believes that the presumptive RACT requirements and emission limitations included in the final rulemaking are appropriate. Should the owner or operator not be able to comply with the presumptive RACT requirement or emission limitation, the owner or operator may propose an alternative RACT emission limitation under § 129.99(a) based on the source's potential to emit NO$_x$ or VOCs.

**43. Comment:** Does § 129.99(b) apply to boilers using fuels other than those listed in § 129.97? (114)

**Response:** Proposed § 129.97(g) has been amended in the final rulemaking to address the firing of non-traditional liquid and solid fuels in combustion units. However, if a presumptive RACT limitation has not been established in § 129.97 for any other combustion unit, then the owner or operator shall propose an alternative RACT emission limitation, to the Department or approved local air pollution control agency, as set forth under § 129.99(b) based on the source's potential to emit.

**44. Comment:** Does § 129.99(c) apply to combustion sources only or to all VOC sources? (114)

**Response:** Section 129.99(c) is not limited to combustion sources. The owner or operator of any VOC air contamination source with a potential emission rate equal to or greater than 2.7 tons of VOC per year that is not subject to § 129.97 and is located at a major VOC emitting facility subject to § 129.96 shall propose a VOC RACT emission limitation.

## § 121.1. Definitions

**45. Comment:** All definitions should match Federal definitions. The proposed new definition for "stationary source internal combustion engine" opens up application to the entirety of air quality regulations. It appears the Pennsylvania definition has always included portable (not mobile) internal combustion engines. The definition should be the same as the EPA's reciprocating internal combustion engines (RICE) rule (40 CFR 63, Subpart ZZZZ). Add definitions consistent with Federal definitions: "capacity factor" in 40 CFR 72, "combustion turbine" in 40 CFR 60 NSPS, and "stationary internal combustion engine" in NSPS IIII and JJJJ and NESHAPS ZZZZ. (97, 104, 107, 109, 115, 117, 118, 119, 121, 129, 130, 134)

**Response:** The final-form rulemaking contains definitions consistent with Federal regulations. Definitions for "regenerative cycle combustion turbine," "simple cycle combustion turbine" and "stationary combustion turbine" are added to § 121.1 in the final-form regulation. The definition of "stationary internal combustion engine" is revised to include the term "stationary reciprocating internal combustion engine."

Final-form § 129.97(c)(7)(i) establishes that the "annual capacity factor" for a combustion unit is the ratio of the unit's heat input (in million Btu or equivalent units of measure) to the unit's maximum rated heat input (in million Btu or equivalent units of measure) times 8,760 hours during a period of 12 consecutive calendar months. The "annual capacity factor" for an electric generating unit is established in final-form § 129.97(c)(7)(ii) as the ratio of the unit's actual electric output (expressed in mwe/hr) to the unit's nameplate capacity (or maximum observed hourly gross load (in mwe/hr) if greater than the nameplate capacity) times 8,760 hours during a period of 12 consecutive calendar months. Final-form § 129.97(c)(7)(iii) specifies that for any other unit, the "annual capacity factor" is the ratio of the unit's actual operating level to the unit's potential operating level during a period of 12 consecutive calendar months.

**46. Comment:** Clarify that new definitions contained in the proposed rulemaking, such as "process unit" and "stationary internal combustion engine" are consistent with Federal definitions so that there is no confusion or additional regulation placed on sources without adequate opportunity for review. (119)

**Response:** The final-form regulation contains definitions consistent with Federal regulations. The term "process unit" is in common use across various source categories and does not need to be defined in the final-form RACT regulation.

**47. Comment:** The definition for "stationary internal combustion engine" and "process heater" should be the same as the Federal RICE rules and not include non-road (portable) engines. (97, 104, 107, 109, 115, 117, 118, 119, 121, 129, 130)

**Response:** The final-form regulation contains a definition for "stationary internal combustion engine" that is consistent with the Federal RICE regulations and a definition for "process heater" that is consistent with the Federal Boiler MACT regulations.

**48. Comment:** The following terms should be defined: "furnace," "kiln," and "individual heat input rating." Under § 129.97(d), the phrase "other combustion source" is vague. It is unclear whether the phrase "other combustion source" is an unnecessary redundancy or if sources other than combustion units are encompassed in this term. (93, 109, 119, 121, 122, 128, 130, 134)

**Response:** The Department disagrees; the terms "furnace," "kiln" and "individual heat input rating" are in common use across various source categories, and definitions for these terms are not needed in the final-form RACT regulation. The term "combustion source" has been in use since the RACT regulations codified at 25 Pa. Code §§ 129.91—129.95 were promulgated by the EQB in 1994.

**49. Comment:** The proposed definition for "CEMS" states, "All of the equipment that may be required to meet the data acquisition and availability requirements ... to monitor, measure, calculate, sample, condition, analyze and provide a *permanent* (emphasis added) record of emissions from an affected unit on a continuous basis." This contradicts the records retention requirement of 5 years. (108, 112, 128, 134)

**Response:** The Department agrees. The word "permanent" was deleted from the final-form definition of CEMS.

 The final-form definition reads as follows:

> *CEMS—Continuous emissions monitoring system*—All of the equipment that may be required to meet the data acquisition and availability requirements established under the act or Clean Air Act to monitor, measure, calculate, sample, condition, analyze and provide a record of emissions from an affected unit on a continuous basis.

**50. Comment:** In §§ 129.97(g)(2)(i)(A), (g)(2)(i)(C), (g)(2)(iii)(A), and (g)(2)(iii)(C), what is a noncommercial gaseous fuel? A definition was not found in the regulation. Did the emission values proposed take into consideration the emissions capabilities of all gases that would fall into the "noncommercial gaseous fuel" category? (111, 134)

**Response:** The term "noncommercial fuel" is already defined in § 121.1 as follows:

> *Noncommercial fuel*—A gaseous or liquid fuel generated as a byproduct or waste product which is not specifically produced and manufactured for sale. A mixture of noncommercial and a commercial fuel oil where at least 50% of the heat content is derived from the noncommercial fuel portion is considered a noncommercial fuel.

The Department examined the emissions from natural gas-fired engines and turbines. Based on the Department's engineering judgment, the emissions profile for landfill gas is comparable to the emissions profile for natural gas. The Department included noncommercial gaseous fuel

with the presumptive $NO_x$ RACT emission limitations for natural gas in order to include engines and turbines that fire gaseous fuels with emission characteristics similar to natural gas. However, the owner or operator of any affected source subject to a presumptive RACT requirement or RACT emission limitation in § 129.97 that cannot meet the applicable presumptive RACT requirement or RACT emission limitation may submit a proposal under § 129.99 for an alternative limit determined on a case-by-case basis.

**51. Comment:** The commentator recommends including definitions of "malfunction," "start-up," and "shutdown" in relation to proposed § 129.97(h). (112)

**Response:** The Department disagrees. The presumptive $NO_x$ RACT emission limitations for Portland cement kilns are applicable at all times, including start-up, shutdown, and malfunction (SSM). Therefore, the Department does not see a need to define the terms start-up, shutdown, or malfunction solely for the purposes of § 129.97(h) for cement kilns—there are no exceptions for SSM events.

**52. Comment:** Section 129.97(c)(3) should read "A stationary internal combustion engine ... " Please add the word "stationary." (122, 134)

**Response:** The Department agrees and has incorporated the requested change in the final rulemaking. Proposed § 129.97(c)(3) has been revised and set forth in final-form § 129.97(c)(5) and reads as follows:

> A stationary internal combustion engine rated at less than 500 bhp (gross).

**53. Comment:** Define "refinery gas" as "gas produced at a refinery which produces petroleum products, including gasoline, from refinery units." (126, 130, 134)

**Response:** The Department agrees. The term "refinery gas" has been added to § 121.1 in the final rulemaking and is defined as follows:

> *Refinery gas*—Gas produced at a refinery which produces petroleum products, including gasoline, from refinery units.

**54. Comment:** The term "air contamination sources" is broadly defined and becomes problematic when used in subsections 129.99(b) and (c). Does it apply to each individual piece of equipment or a grouping of equipment? (114)

**Response:** The term "air contamination source" is defined in Section 3 of the Air Pollution Control Act (APCA), 35 P.S. § Section 4003, as follows:

> "Air contamination source." Any place, facility or equipment, stationary or mobile, at, from or by reason of which there is emitted into the outdoor atmosphere any air contaminant.

See also the definition of "air contamination source" set forth in § 121.1, as follows:

*Air contamination source*—Any place, facility or equipment, stationary or mobile, at, from or by reason of which there is emitted into the outdoor atmosphere any air contaminant.

Any amendments to the definition in § 121.1 would require a legislative amendment to the APCA.

The applicability threshold values set forth in subsections 129.99(b) and (c) in the final-form regulation were determined as generic potential emission levels below which the application of add-on emission control technology is not economically feasible.

**55. Comment:** Proposed § 129.98(b) refers to an "operating permit modification" that has two interpretations, as proposed: that which is submitted by the owner or operator and that which is issued by PA DEP. Neither use comports with the definition of "modification" in existing § 121.1. At a minimum, the word "application" or "proposal" should be added after "modification" wherever this section refers to that document which is submitted by the owner or operator. (133)

**Response:** The Department agrees. Section 129.98 has been revised in the final-form regulation to replace the term "operating permit modification" with the term "averaging plan" where appropriate. The averaging plan will be incorporated into the operating permit through the use of an operating permit modification procedure or Plan Approval, when necessary.

### *§ 129.97.  Presumptive RACT requirements, RACT emission limitations and petition for alternative compliance schedule.*

**56. Comment:** The commentator supports the form and level of the presumptive emission limits included in the proposed rulemaking as they are consistent with Ohio's. (129)

**Response:** The Department appreciates the commentator's support of the proposed RACT regulation.

**57. Comment:** The Board is right not to establish presumptive limits for source categories that are relatively rare and for which RACT cannot be readily determined without a close review of the particular source. It would not be equitable or efficient for the Board to establish presumptive RACT requirements for these sources. (102)

**Response:** The Department agrees. Those categories containing a limited number of sources include iron and steel industries, coke oven batteries, lime kilns and refractory brick kilns.

**58. Comment:** RACT limits apply only during normal operations. (112, 127, 128, 130)

**Response:** The Department disagrees. The presumptive RACT emission limitations are applicable at all times, including start-up, shutdown, and malfunction.

**59. Comment:** In § 129.97, several subsections reference "a source in this subsection." It would be clearer to state "a source described in this subsection." (134)

**Response:** The Department agrees. In § 129.97 of the final-form regulation, the wording of the subsections has been clarified to read, "a source <u>SPECIFIED</u> in this subsection."

**60. Comment:** Subsection 129.97(a) states that sources listed in subsections (b)—(h) "located at a major NO$_x$ emitting facility or major VOC emitting facility, or both, subject to § 129.96 shall comply. …" This phrase or portions of it are unnecessarily repeated in most of the following subsections (b)—(h). (134)

**Response:** The Department agrees that the proposal was unnecessarily repetitive. As a result, certain modifications have been made from proposed to final rulemaking to reduce or eliminate that repetition.

**61. Comment:** The commentators feel that the proposed regulations are less stringent than those that similarly-situated Mid-Atlantic States, including New Jersey, are proposing. The commentators request that the Board explain how the final regulation will ensure that Pennsylvania is adequately addressing emissions under its jurisdiction so that Pennsylvania is properly meeting its pollution control responsibilities to other states. (65, 72, 80, 90, 94, 95, 101, 113, 123, 133, 134)

**Response:** The Department reviewed and considered RACT regulations from similarly-situated Mid-Atlantic States, including New Jersey, during the development of the proposed and final rulemakings. Source categories in Pennsylvania are diverse, with numerous sources having varying characteristics differing from those of the other Mid-Atlantic States. The Department evaluated these source categories and determined that the presumptive RACT requirements included in the final-form regulation are appropriate. This approach is consistent with the EPA guidance provided in the March 16, 1994, memorandum from D. Kent Berry, Acting Director, Air Quality Management Division (MD-15), to the EPA Regional Air Directors, as follows:

> *"In general, the actual cost, emission reduction, and cost-effectiveness levels that an individual source will experience in meeting the NO$_x$ RACT requirements will vary from unit to unit and from area to area. These factors will differ from unit to unit because the sources themselves vary in age, condition, and size, among other considerations. The EPA's general RACT guidance urges States to judge the feasibility of imposing specific controls based on the economic and technical circumstances of the particular unit being regulated. In many cases, these factors are not the same in all States since the specific NO$_x$ RACT emission limitations and averaging times will differ from State to State."* See Memorandum, Cost-Effective Nitrogen Oxides (NOx) Reasonably Available Control Technology (RACT), March 16, 1994, D. Kent Berry, Acting Director, Air Quality Management Division (MD-15).

In response to comments and the EPA's March 6, 2015, Ozone NAAQS Implementation Rule, the DEP conducted additional reviews of historical emissions data for coal-fired EGUs equipped with SCR technology. DEP determined that the NO$_x$ limit specified in § 129.97(g)(1)(viii) should be revised. Subparagraph 129.97(g)(1)(viii) specifies that any combustion unit equipped with a selective catalytic reduction (SCR) system that is operating with an inlet temperature equal to or greater than 600°F must meet a NO$_x$ emission limit of 0.12 lb NO$_x$/million Btu. Compliance with this emission limit is also required when by-passing the SCR system. The DEP

acknowledges that the $NO_x$ RACT limit in the final rulemaking is not the lowest achievable emissions rate (LAER) for this technology. However, the EPA has indicated in the preamble for the final rule approving a SIP revision for Wisconsin's $NO_x$ RACT Rule that: "RACT limits are not meant to be the lowest achievable emissions rate." The EPA also stated that "reductions necessary for attainment may vary from nonattainment area to nonattainment area and will often require greater reductions than RACT level reductions." See 75 FR 64155, 64157. Therefore, certain states may adopt more stringent "beyond RACT" requirements to address nonattainment.

On May 18, 2015, the U.S. Environmental Protection Agency (EPA) Region III Air Protection Division Director, Diana Esher, sent a letter to DEP stating that the 0.12 lb/MMBTU heat input $NO_x$ limit for coal-fired EGUs "is consistent with what the agency has "previously approved for RACT in other nearby Ozone Transport Commission states such as Delaware, Maryland and New Jersey."" The EPA also indicated that based on its review of data for EGUs in Pennsylvania including Bruce Mansfield, Cheswick, Homer City and Keystone, "a limit of the 0.12 lb/MMBTU NOx heat input appears to be achievable by Pennsylvania EGUs with SCR."

**62. Comment:** Section 129.97(c) appears to establish an absolute obligation for relevant sources to be maintained and operated in accordance with both manufacturer's specifications and good engineering practices. However, in many cases, existing sources are components of complex process systems, integrated operations, or are specialized and custom designed, such that the equipment-specific manufacturer's specifications do not exist or are no longer relevant or applicable, and indeed can be inconsistent with "good engineering practice." Even more simply, with respect to older sources, manufacturer's specifications may no longer even be available. Therefore, the regulation should be revised to require operation and maintenance of regulated sources in accordance with good engineering practice, which, in appropriate circumstances, would include operation in accordance with manufacturer's specifications. (104, 107, 114, 115, 118, 119, 121, 122, 126, 129, 134)

**Response:** It should be noted that the existing presumptive RACT requirements codified in 25 *Pa. Code* § 129.93 specify the installation, maintenance and operation of the source in accordance with manufacturer's specifications; this provision, which has been implemented since 1995, is also approved by the EPA in the Commonwealth's SIP. In addition, an affected owner or operator that is not able to comply with the applicable presumptive RACT requirements and emission limitations set forth in the final-form regulation may opt to determine RACT requirements on a case-by-case basis under § 129.99.

However, subsections 129.97(c) and (d) have been revised in the final-form regulation to replace the term "good engineering practices" with the term "good operating practices." The word "engineering" refers to design, whereas the word "operating" refers to operation. Since this final rulemaking is applicable to the owners and operators of existing operating sources, it is more appropriate to regulate operating practices. In addition, this language is consistent with the SIP-approved permit compliance requirements found in 25 *Pa. Code* § 127.444 (relating to compliance requirements).

**63. Comment:** Exemptions for start-up and shutdown periods and regularly scheduled maintenance activities should be included in the proposed rulemaking. (112, 127, 128, 130, 134)

**Response:** The Department disagrees. The presumptive RACT emission limitations are applicable at all times, including start-up, shutdown, malfunction, and maintenance activities. Moreover, on May 22, 2015, the EPA Administrator Gina McCarthy signed a final action to ensure states have plans in place that are fully consistent with the Clean Air Act (CAA) and recent court decisions concerning start-up, shutdown and malfunction operations. *See e.g., Sierra Club et al. v. Jackson*, No. 3:10-cv-04060–CRB (N.D. Cal.). Exemptions from emission limits during periods of start-up, shutdown and malfunction exist in a number of state rules, some of which were adopted and approved into SIPs by the EPA many years ago. Recent court decisions have held that under the CAA, such exemptions are not allowed in SIPs.

**64. Comment:** Change "good engineering practices" to "good operating practices." (129)

**Response:** The Department agrees. Subsections 129.97(c) and (d) have been revised in the final-form regulation to replace the term "good engineering practices" with the term "good operating practices." The word "engineering" refers to design, whereas the word "operating" refers to operation. Since this final rulemaking is applicable to the owners and operators of existing operating sources, it is more appropriate to regulate operating practices. In addition, this language is consistent with the SIP-approved permit compliance requirements found in § 127.444.

**65. Comment:** Subsection 129.97(g) provides sufficient clarity on the applicability issue but then misapplies the threshold applicability requirement to the source rather than the facility. Does § 129.97(g) apply to the source or the facility? (109, 134)

**Response:** Subsection 129.97(g) has been revised in the final-form regulation to clarify that the RACT requirements are applicable to the owner and operator of subject sources located at a major facility.

**66. Comment:** The commentator recommends a VOC RACT requirement of "good engineering practices for the control of VOC emissions from the combustion unit or... source." If not, then a 9 ppm VOC (as propane) limit for the existing fleet of combustion sources should be added. (111)

**Response:** Subsections 129.97(g)(2)(i)(C) and 129.97(g)(2)(i)(D) have been revised in the final-form regulation to establish presumptive RACT emission limitations of 5 and 9 ppmvd VOC @ 15% oxygen (as propane) for combined cycle turbines or combined heat and power combustion turbines with a rated output equal to or greater than 1,000 bhp and less than 180 MW firing natural gas or a noncommercial gaseous fuel and firing fuel oil, respectively.

**67. Comment:** Proposed subsection 129.97(d) suffers from deficiencies in regulatory clarity. For example, subsections 129.97(c) and (d) are not, on their face, mutually exclusive, yet, those provisions should not properly be applied simultaneously to the same sources. In both cases the presumptive RACT ends up the same (good engineering practices). Subsection 129.97(d) should be revised to limit applicability to sources exceeding certain size thresholds. (97, 104, 107, 115, 117, 134)

**Response:** The Department agrees that subsections 129.97(c) and (d) should not be applied simultaneously to the same sources. Section 129.97 is revised in the final-form regulation to set forth a generic presumptive requirement in § 129.97(c)(1) and (2) for the affected owner and operator of a source with the potential to emit less than either 5 tons of $NO_x$ per year or 2.7 tons of VOC per year, respectively.

Subsection 129.97(d) has been revised in the final-form regulation to clarify that except as specified under subsection 129.97(c), the owner and operator of a combustion unit or other combustion source located at a major VOC emitting facility subject to § 129.96 shall install, maintain and operate the source in accordance with the manufacturer's specifications and with good operating practices for the control of VOC emissions from the combustion unit or other combustion source. Subsection 129.97(d) does not specify a size threshold, but would not apply to the owner and operator of a VOC emitting source subject to § 129.97(c).

Please note that the requirement in proposed § 129.97(c)(1) has been provided in final-form § 129.97(c)(3). The requirements proposed in § 129.97(c)(2), (3), (4), (5) and (6) are renumbered and set forth in final-form § 129.97(c)(4), (5), (6), (7) and (8), respectively.

**68. Comment:** Federal RICE and turbine rules provide justification for rulemaking requirements such as a higher applicability threshold for turbines subject to a 42 PPMV $NO_x$ standard and appropriate VOC standards for lean burn engines. Federal standards should be used as a basis to define technical limits, with turbine limits applicable at 75% of rated load and higher, and lean burn RICE limits applicable at 90% of rated load and higher. (107, 115)

**Response:** The Department disagrees that turbine and engine $NO_x$ limits should be applicable only at or above a certain rated load or that the Federal standards should be used as the sole basis to define technical limits. The requirements set forth under 40 CFR Part 60, Subpart JJJJ and 40 CFR Part 60, Subpart KKKK express the conditions (e.g. source load) under which the source must be tested to demonstrate compliance with the Federal emission limitations. However, Federal emission limitations for engines and turbines are applicable under all load conditions. The owner or operator is required to show compliance with the presumptive $NO_x$ emission limits contained in the final-form regulation through the use of CEMS or through monitoring and testing in accordance with a Department-approved emissions source test that meets the requirements of Chapter 139, Subchapter A (relating to sampling and testing methods and procedures), which may specify load conditions under which the source is to be tested.

Subsection 129.97(g) is revised in the final-form regulation to establish a presumptive $NO_x$ RACT emission limitation of 150 ppmvd $NO_x$ @ 15% oxygen for a simple cycle or regenerative cycle turbine with a rated output equal to or greater than 1,000 bhp and less than 6,000 bhp in final-form § 129.97(g)(2)(iii). This requirement is consistent with 40 CFR Part 60, Subpart KKKK. Proposed § 129.97(g)(2)(iii) is revised to § 129.97(g)(2)(iv) in the final-form regulation. Subsection 129.97(g)(3)(i)(B) is revised from proposed to final rulemaking to revise the VOC RACT emission limitation from 0.4 gram VOC/bhp-hr to 1.0 gram VOC/bhp-hr, excluding formaldehyde, for a lean burn stationary internal combustion engine with a rating equal to or greater than 500 bhp when fired with natural gas or a noncommercial gaseous fuel, liquid fuel or

dual-fuel. This requirement is consistent with new source performance standards codified in 40 CFR Part 60, Subpart JJJJ.

**69. Comment:** The VOC emission standards for engines and turbines should be deleted, or replaced with a compliance option based on good combustion practices. (107, 111, 115, 117, 118)

**Response:** The Department disagrees. The VOC emission standards should not be deleted or replaced with a compliance option based on good combustion practices for either engines or turbines. For engines, the use of certain control devices, such as non-selective catalytic reduction (NSCR), are feasible for the purposes of VOC RACT. Additionally, Federal regulations such as 40 CFR Part 60, Subpart JJJJ, also have VOC emission limitation requirements. Many turbines currently have SIP-approved case-by-case RACT determinations established under 25 *Pa. Code* §§ 129.91—129.95 for VOC emissions that include numerical emission limitations. The Department, after further review of available emissions data, believes that the VOC RACT emission limitations for turbines established in the final-form regulation are appropriate. The owner or operator may be able to achieve compliance without add-on controls through the application of "good combustion practices."

Subsection 129.97(g)(3)(i)(B) is revised in the final-form regulation to establish a RACT emission limitation of 1.0 gram VOC/bhp-hr, excluding formaldehyde, for lean burn stationary internal combustion engines with a rating equal to or greater than 500 bhp fired with natural gas or a noncommercial gaseous fuel, liquid fuel or dual-fuel. This requirement is consistent with the Federal Standards of Performance for Stationary Spark Ignition Internal Combustion Engines codified in 40 CFR Part 60, Subpart JJJJ; the standards are also adopted and incorporated by reference in 25 *Pa. Code* Chapter 122 (relating to national standards of performance for new stationary sources).

Subsections 129.97(g)(2)(i)(C) and 129.97(g)(2)(i)(D) have been revised in the final-form regulation to establish presumptive RACT emission limitations of 5 and 9 ppmvd VOC @ 15% oxygen (as propane) for combined cycle turbines or combined heat and power combustion turbines with a rated output equal to or greater than 1,000 bhp and less than 180 MW firing natural gas or a noncommercial gaseous fuel and firing fuel oil, respectively.

In addition, the owner or operator of any affected source that cannot meet a presumptive RACT emission limitation may propose an alternative limit under § 129.99(a); the alternative limits will be established by the Department or local air pollution control agency on a case-by-case basis.

**70. Comment:** In § 129.97(g)(3), there appears to be some disparity between the combustion turbine and the reciprocating engine proposed requirements. The proposed combustion turbine level of 42 ppm on natural gas is ~four times lower than the RACT level for a lean burn reciprocating engine and ~two times lower than a rich burn engine. Uncontrolled combustion turbines are close to the proposed RACT levels for reciprocating engines. With reciprocating engines far outnumbering gas turbines in Pennsylvania does it make sense, from an environmental and/or cost impact basis, to have a RACT for combustion turbines, especially small combustion turbines? The RACT compliance cost analysis conducted by the agency is not

detailed enough to determine if the RACT emissions level proposed for combustion turbines is cost effective.  (111, 134)

**Response:**  The Department disagrees with the comparison of emission rates for engines to turbines.  They are different combustion technologies and are considered to be different source types for the purposes of RACT determinations.  Therefore, the Department disagrees that presumptive RACT requirements and emission limitations should not be established for turbines.  The number of turbines subject to RACT requirements in Pennsylvania justifies the establishment of presumptive RACT emission limitations for turbines in order to minimize the number of applications for case-by-case RACT determinations.

Presumptive RACT emission limitations are implemented for each source category based on reasonably available control technology determinations and associated emissions data.  In addition, the owner or operator of any affected source that cannot meet a presumptive RACT emission limitation may propose an alternative limit under § 129.99(a); the alternative limits will be established by the Department or local air pollution control agency on a case-by-case basis.

**71. Comment:**  Emission limits should consider technology limitations at reduced load, consistent with Federal regulations.  (107, 115, 117, 118)

**Response:** The Department disagrees that the final-form rulemaking emission limitations are not consistent with Federal regulations related to reduced loads.  The requirements set forth under 40 CFR Part 60, Subpart JJJJ and 40 CFR Part 60, Subpart KKKK express the conditions (e.g. source load) under which the source must be tested to demonstrate compliance with the Federal emission limitations.  However, Federal emission limitations for engines and turbines are applicable under all load conditions.  The owner or operator is required to show compliance with the presumptive $NO_x$ emission limits contained in the final rulemaking through the use of CEMS or through monitoring and testing in accordance with a Department-approved emissions source test that meets the requirements of Chapter 139, Subchapter A, which may specify load conditions under which the source is to be tested.

**72. Comment:** The commentator recommends that the regulation address the use of multiple fuels consistent with the Boiler MACT.  In accordance with the Boiler MACT, units that combust 90 percent by volume or more of a specified fuel are not considered as a dual-fuel unit and are appropriately categorized as the corresponding single fuel unit.  (126)

**Response:** The Department disagrees.  The final-form rulemaking retains the equation that was proposed in § 129.97(g)(4) to determine the applicable RACT multiple fuel emission limit on a total heat input fuel weighted basis for a unit firing multiple fuels.  However, based on the EPA's Implementation Rule for the 2008 ozone NAAQS, "states would be allowed to streamline their RACT analysis by including an assessment of the MACT controls and how they relate to VOC RACT considerations. This approach is consistent with the EPA's current policy." See 80 FR 12279 (March 6, 2015).

**73. Comment:**  While § 129.97(g) addresses a multitude of fuels, some commentators believe further direction is needed for units that use dual fuels, use different fuels at different times, or

use landfill gas rather than natural gas.  We ask the EQB to review the list of fuels and add more categories of fuels where appropriate and also provide further direction on what category a dual fuel-fired source falls into.  (134)

**Response:**  Subsection 129.97(g) has been revised in the final rulemaking to clarify the use of multiple fuels.  The presumptive RACT emission limitations are applicable only to sources identified in final-form paragraphs 129.97(g)(1)—(3).  Paragraph 129.97(g)(4) sets forth an equation to determine the applicable RACT multiple fuel emission limit on a total heat input fuel weighted basis for a unit firing multiple fuels.  The owner and operator of any other combustion source firing multiple fuels would be subject to the case-by-case RACT requirements under § 129.99.

The Department established presumptive levels applicable to landfill gas-fired internal combustion engines in § 129.97(g)(3) of the final-form regulation.  Landfill gas-fired engines will be subject to the same emission limitations established for natural gas-fired engines in § 129.97(g)(3)(i)(A) and (iii)(A).

**74. Comment:**  The Board should clarify the presumptive RACT requirement of paragraph 129.97(g)(4) for units firing multiple fuels simultaneously.  The Board should clarify that paragraph 129.97(g)(4) does not apply to a source that happens to fire multiple fuels but does not otherwise fall within a source category under paragraphs 129.97(g)(1)—(3) or another source category for which a presumptive RACT limit would apply, and is not intended to cover a source that would be subject to a case-by-case determination under subsection 129.99(b) were it to fire just one fuel type.  The regulation addresses units burning multiple fuels during the compliance period, not necessarily "simultaneously."  (102, 109)

**Response:**  Paragraph 129.97(g)(4) has been revised from proposed to final rulemaking to clarify the use of multiple fuels.  The presumptive RACT emission limitations are applicable only to sources identified in paragraphs 129.97(g)(1)—(3).  Paragraph 129.97(g)(4) addresses units firing multiple fuels.  Any other combustion source firing multiple fuels would be subject to the case-by-case RACT requirements of § 129.99.

**75. Comment:**  In RAF Question 12, the EQB states that the proposed regulations are "similar to regulations already adopted by Wisconsin and New York and approved by the EPA."  However, Delaware (Delaware comments, page 3) and Connecticut (Connecticut comments, page 2) both commented that New York has in place significantly more stringent emissions limits than Pennsylvania.  The EQB should either support or amend its response to RAF Question 12.  (134)

**Response:**  The Department reviewed and considered RACT regulations from various states when evaluating what constitutes reasonably available control technology for the types of sources affected by the final rulemaking.  Source categories in Pennsylvania are diverse with numerous individual sources having varying characteristics.  The Department evaluated these source categories and determined that the presumptive RACT requirements and emission limitations included in the final-form regulation are appropriate.

Due to variability in source type, combustion characteristics, unit size, fuel usage, operating conditions, and source age, there are differences between the final-form regulation and the New York RACT regulations in terms of emission limits, exceptions, size cutoffs, etc. For example, New York determined that combined cycle combustion turbines operated after July 1, 2014, should undergo case-by-case analysis due to limited numbers of this source type in New York. As New York noted in their Regulatory Impact Statement, "Because of the limited number of sources and the wide range of available control technologies, the [NY] Department was not able to identify a presumptive $NO_x$ RACT emission limit for combined cycle combustion turbines."

However, due to the large number of these sources operating in Pennsylvania, the Department was able to determine presumptive $NO_x$ RACT emission limitations for different categories of combined cycle combustion turbines, including large combustion turbines that will likely be required to use SCR control to meet the applicable $NO_x$ RACT emission limitation. The basis for the determination of the presumptive RACT requirements and emission limitations is included in the preamble and the RAF for the final rulemaking. Both of these documents are replete with substantive information related to emission data, cost-effectiveness numbers, public health information, statutory requirements, small business information, and other types of analyses to demonstrate that this regulation is legally required, is in the public interest, is economically and technologically feasible, and will reduce emissions.

This approach is consistent with the EPA guidance provided in the March 16, 1994, memorandum from D. Kent Berry, Acting Director, Air Quality Management Division (MD-15), to the EPA Regional Air Directors, as follows:

> "In general, the actual cost, emission reduction, and cost-effectiveness levels that an individual source will experience in meeting the $NO_x$ RACT requirements will vary from unit to unit and from area to area. These factors will differ from unit to unit because the sources themselves vary in age, condition, and size, among other considerations. The EPA's general RACT guidance urges States to judge the feasibility of imposing specific controls based on the economic and technical circumstances of the particular unit being regulated. In many cases, these factors are not the same in all States since the specific $NO_x$ RACT emission limitations and averaging times will differ from State to State." See Memorandum, Cost-Effective Nitrogen Oxides (NOx) Reasonably Available Control Technology (RACT), March 16, 1994, D. Kent Berry, Acting Director, Air Quality Management Division (MD-15).

The determinations of what add-on control technologies are reasonably available to meet the presumptive RACT requirements and emission limitations included in the final-form regulation are consistent with the determinations of what add-on control technologies are reasonably available to meet the presumptive RACT requirements in New York. The RACT emission limits included in the final-form regulation are comparable to emission limits included in other states' RACT regulations, including New York and Wisconsin.

In response to comments and the EPA's March 6, 2015, Ozone NAAQS Implementation Rule, the DEP conducted additional reviews of historical emissions data for coal-fired EGUs equipped with SCR technology. The DEP determined that the $NO_x$ limit specified in § 129.97(g)(1)(viii) should be revised. Subparagraph 129.97(g)(1)(viii) specifies that any combustion unit equipped

with a selective catalytic reduction (SCR) system that is operating with an inlet temperature equal to or greater than 600°F must meet a NO$_x$ emission limit of 0.12 lb NO$_x$/MMBtu. Compliance with this emission limit is also required when by-passing the SCR system. The DEP acknowledges that the NO$_x$ RACT limit in the final rulemaking is not the lowest achievable emissions rate (LAER) for this technology. However, the EPA has indicated in the preamble for the final rule approving a SIP revision for Wisconsin's NO$_x$ RACT Rule that: "RACT limits are not meant to be the lowest achievable emissions rate." The EPA also stated that "reductions necessary for attainment may vary from nonattainment area to nonattainment area and will often require greater reductions than RACT level reductions." See 75 FR 64155, 64157. Therefore, certain states may adopt more stringent "beyond RACT" requirements for attainment purposes.

On May 18, 2015, the U.S. Environmental Protection Agency (EPA) Region III Air Protection Division Director, Diana Esher, sent a letter to DEP stating that the 0.12 lb/MMBtu heat input NO$_x$ limit for coal-fired EGUs "is consistent with what the agency has "previously approved for RACT in other nearby Ozone Transport Commission states such as Delaware, Maryland and New Jersey."" The EPA also indicated that based on its review of data for EGUs in Pennsylvania including Bruce Mansfield, Cheswick, Homer City and Keystone, "a limit of the 0.12 lb/MMBTU NO$_x$ heat input appears to be achievable by Pennsylvania EGUS with SCR."

- **§ 129.97(b) and § 129.97(g)(1).  Combustion units**

**76. Comment:**  Does subsection 129.97(b) provide alternative compliance options or does it apply simultaneously with subsections 129.97(c)—(h)?  (134)

**Response:**  Subsection 129.97(b) does not apply simultaneously with subsections 129.97(c)—(h).  Subsection 129.97(b) only applies to combustion units with a rated heat input equal to or greater than 20 million Btu/hour and less than 50 million Btu/hour.

**77. Comment:**  Under paragraph 129.97(b)(1), it is not clear how an adjustment under subparagraph (i) relating to "fuel burning equipment, including the burners" is a different requirement than subparagraph (ii) relating to the "flame pattern" and subparagraph (iii) relating to the "air to fuel ratio."  (134)

**Response:**  Paragraph 129.97(b)(1) has been revised from proposed to final rulemaking to specify that the applicable requirement for the owner and operator of a combustion unit with a rated heat input equal to or greater than 20 million Btu/hour and less than 50 million Btu/hour is a biennial tune-up conducted in accordance with the procedures described in 40 CFR 63.11223. The inspection and adjustment of the fuel burning equipment, including the burners and components, the flame pattern, and the air to fuel ratio are separate and distinct components of the tune-up procedures described in 40 CFR 63.11223.

**78. Comment:**  As written, subparagraph 129.97(b)(1)(i) could be satisfied by just an inspection. Is that the intent?  (134)

**Response:**  Yes, subparagraph 129.97(b)(1)(i) may be satisfied by just an inspection. Subparagraph 129.97(b)(1)(i) has been revised from proposed to final rulemaking to clarify that

cleaning or replacement of fuel-burning equipment, including the burners and components, is done as necessary for proper operation as specified by the manufacturer. Paragraph 129.97(b)(1) has been revised from proposed to final rulemaking to specify that the applicable requirement for the owner and operator of a combustion unit with a rated heat input equal to or greater than 20 million Btu/hour and less than 50 million Btu/hour is a biennial tune-up conducted in accordance with the procedures described in 40 CFR 63.11223.

**79. Comment:**  As written, subparagraphs 129.97(b)(1)(ii) and (iii) would require an adjustment in all circumstances. What if an adjustment is not needed?  (134)

**Response:  S**ubparagraphs 129.97(b)(1)(i)—(iii) have been revised in the final-form regulation to clarify that the adjustments are done as necessary to optimize the flame pattern.  Paragraph 129.97(b)(1) has been revised from proposed to final rulemaking to specify that the applicable requirement for the owner and operator of a combustion unit with a rated heat input equal to or greater than 20 million Btu/hour and less than 50 million Btu/hour is a biennial tune-up conducted in accordance with the procedures described in 40 CFR 63.11223.  The biennial tune-up performed to comply with paragraph 129.97(b)(1) must include, at a minimum, the inspections set forth in subparagraphs 129.97(b)(1)(i)—(iii).

**80. Comment:** Subsection 129.97(b) purports to establish standards applicable to sources located at major $NO_x$ or VOC emitting facilities, and specifies distinct control measures under paragraphs 129.97(b)(1) and (2).  However, the same regulatory provision fails to clarify that paragraphs 129.97(b)(1) and (2) should constitute alternative compliance options, and should not apply simultaneously to affected sources.  Does the site have the option of complying with either paragraph 129.97(b)(1) or paragraph 129.97(b)(2), or is compliance with both required?  (104, 114, 134)

**Response:** The applicable requirements of paragraphs 129.97(b)(1) and (2) have been clarified in the final-form regulation.  The owner and operator of an affected combustion unit which is located at a major $NO_x$ emitting facility or major VOC emitting facility subject to § 129.96 shall comply with the applicable requirements in paragraph 129.97(b)(1) or paragraph 129.97(b)(2). Paragraph 129.97(b)(1) has been revised from proposed to final rulemaking to remove the reference to the requirements in paragraph (2) and to specify that the applicable requirement for the owner and operator of a combustion unit with a rated heat input equal to or greater than 20 million Btu/hour and less than 50 million Btu/hour is a biennial tune-up conducted in accordance with the procedures described in 40 CFR 63.11223.  The biennial tune-up performed to comply with paragraph 129.97(b)(1) must include, at a minimum, the inspections set forth in subparagraphs 129.97(b)(1)(i)—(iii).

Paragraph 129.97(b)(2) has been revised from proposed to final rulemaking to remove the requirements that applied only to an oil-fired, a gas-fired or a combination oil-fired and gas-fired combustion unit with a rated heat input equal to or greater than 20 million Btu/hour and less than 50 million Btu/hour.  Additionally, the reference to the 1983 EPA document has been removed. Final-form paragraph 129.97(b)(2) specifies that the owner or operator of a combustion unit with an oxygen trim system that maintains an optimum air-to-fuel ratio that would otherwise be subject to a biennial tune-up shall conduct a tune-up of the boiler one time in each 5-year

calendar period.  The tune-up performed to comply with paragraph 129.97(b)(2) must include, at a minimum, the inspections set forth in subparagraphs 129.97(b)(2)(i)—(iii).

**81. Comment:** Subsection 129.97(b) is formulated in a somewhat convoluted fashion. It appears that the proposed rulemaking is attempting to regulate solid fueled boilers in subsection 129.97(b)(1) and all other boilers in subsection 129.97(b)(2), and in addition references a very old (1983) EPA document (EPA-340/1-83-023) as a reference for the non-solid fuel boilers. This document is outdated.  (109, 114, 134)

**Response:**  The applicable requirements of paragraphs 129.97(b)(1) and (2) have been clarified in the final-form regulation.  Please see the Response to Comment 80.

**82. Comment:**  The commentators recommend that DEP modify § 129.97(b) to have one rule for tune-ups regardless of the fuel combusted, that that rule mirror the existing boiler MACT requirements, and that those requirements be listed in the rule, as opposed to referencing an external document.  The referenced document was developed to address 1983 and earlier boiler designs, not modern boilers and control systems. In addition, the cited document, "Combustion Efficiency Optimization Manual for Operators of Oil and Gas-fired Boilers," is not readily available on the PA DEP or EPA websites.  (109, 132)

**Response:** Paragraph 129.97(b)(1) has been revised from proposed to final rulemaking to specify that the applicable requirement for the owner and operator of a combustion unit with a rated heat input equal to or greater than 20 million Btu/hour and less than 50 million Btu/hour is a biennial tune-up conducted in accordance with the procedures described in 40 CFR 63.11223. The biennial tune-up performed to comply with paragraph 129.97(b)(1) must include, at a minimum, the inspections set forth in subparagraphs 129.97(b)(1)(i)—(iii).

Paragraph 129.97(b)(2) has been revised  in the final-form regulation to remove the requirements that applied only to an oil-fired, a gas-fired or a combination oil-fired and gas-fired combustion unit with a rated heat input equal to or greater than 20 million Btu/hour and less than 50 million Btu/hour.  The reference to the 1983 EPA document has been removed.  Final-form paragraph 129.97(b)(2) specifies that for the owner and operator of a combustion unit with an oxygen trim system that maintains an optimum air-to-fuel ratio that would otherwise be subject to a biennial tune-up, the applicable requirement is a tune-up conducted one time in each 5-year calendar period.  The tune-up performed to comply with paragraph 129.97(b)(2) must include, at a minimum, the inspections set forth in subparagraphs 129.97(b)(2)(i)—(iii).

**83. Comment:**  The proposed rulemaking requires minimization of $NO_x$ and CO emissions which is inconsistent with the boiler MACT rule.  Recommend modify this provision to mirror the boiler MACT requirements.  Also state that a periodic tune-up conducted in accordance with boiler MACT satisfies § 129.99 in the year in which it is conducted.  (109)

**Response:**  The applicable requirements of paragraphs 129.97(b)(1) and (2) have been clarified in the final-form regulation.  Please see the Response to Comment 82.

**84. Comment:** We request the Department eliminate the proposed annual maintenance on natural gas units stated in paragraph 129.97(b)(1) as this required maintenance is not expected to result in any reduction of emissions and will add unnecessary recordkeeping burden. The EQB should explain why an annual tune-up is needed and reasonable. (118, 134)

**Response:** The Department agrees. The applicable requirements of paragraphs 129.97(b)(1) and (2) have been clarified in the final-form regulation. Please see the Responses to Comments 80 and 82.

**85. Comment:** We request the Department eliminate the proposed annual maintenance on natural gas units stated in 129.97(b)(1) as this required maintenance is not expected to result in any reduction of emissions and will add unnecessary recordkeeping burden. We further request that the Department allow maintenance and inspection of combustion heaters using the manufacturer's recommendations or the company's site specific maintenance and inspection plan. If the Department includes a requirement for other natural gas-fired units we ask that the requirement to "operate and maintain equipment in a manner consistent with safety and good air pollution control practices for minimizing emissions" be used in place of required annual maintenance. (104, 107, 114, 115, 118, 119, 121, 122, 129)

**Response:** The Department disagrees that the requirement to "operate and maintain equipment in a manner consistent with safety and good air pollution control practices for minimizing emissions" can be used in place of required annual maintenance for the natural gas units subject to § 129.97(b)(1). However, the applicable requirements of paragraphs 129.97(b)(1) and (2) have been clarified in the final-form regulation. Please see the Responses to Comments 80 and 82.

**86. Comment:** In § 129.97(b)(1), please denote either HHV or LHV after the MMBtu/hr in the final-form rulemaking. We assume the intent was HHV and base some of our other comments on such assumption. (111)

**Response:** Federal regulations for combustion units do not specify higher heating value (HHV) or lower heating value (LHV) for applicability purposes. The final rulemaking is consistent with the Federal regulations. Generally, HHV is used for determine applicability for Federal and state regulations.

**87. Comment:** The reference to "flame pattern" is not applicable to all combustion sources. The commentator has seen instances where combustion unit language has made its way into a combustion turbine permit rendering an irrelevant and impossible-to-comply-with permit condition. (111)

**Response:** The Department agrees that the requirements for combustion units referencing "flame pattern" are not applicable to all combustion sources, including turbines. The presumptive RACT requirement set forth in § 129.97(b)(1) for the owner and operator of a combustion unit with a rated heat input equal to or greater than 20 million Btu/hour and less than 50 million Btu/hour is a biennial tune-up conducted in accordance with the procedures described

in 40 CFR 63.11223.  The biennial tune-up performed to comply with paragraph 129.97(b)(1) must include, at a minimum, the inspections set forth in subparagraphs 129.97(b)(1)(i)—(iii).

The term "combustion unit" is defined in § 121.1 as "a stationary equipment used to burn fuel primarily for the purpose of producing power or heat by <u>indirect heat transfer</u> [emphasis added]." While turbines are combustion sources, they produce power by direct heat transfer and are not combustion units by definition.  Therefore, the tune-up requirement is not applicable to combustion turbines.  In addition, this tune-up requirement should not appear as an applicable permit requirement for combustion turbines.

**88. Comment:** The language at § 129.97(b)(1) should be modified to match § 129.93(b)(2). (121)

**Response:**  The Department disagrees that the language at § 129.97(b)(1) should be modified to match § 129.93(b)(2).  The detail of the requirements included in combustion unit inspection procedures have increased since the promulgation of § 129.93(b)(2) in January 1994. The final-form regulation requirements are written to address the updated RACT requirements and procedures.  The presumptive RACT requirement of paragraph 129.97(b)(1) has been revised in the final-form regulation to set forth that the affected owner and operator of a combustion unit with a rated heat input equal to or greater than 20 million Btu/hour and less than 50 million Btu/hour shall conduct a biennial tune-up in accordance with the procedures described in 40 CFR 63.11223.  The biennial tune-up performed to comply with paragraph 129.97(b)(1) must include, at a minimum, the inspections set forth in subparagraphs 129.97(b)(1)(i)—(iii).  Should the owner or operator not be able to comply with the presumptive requirement or emission limitation, the owner or operator may propose an alternative $NO_x$ RACT emission limitation under § 129.99(a) based on the source's potential to emit $NO_x$.

**89. Comment:**  The commentator objects to incorporating by reference as a presumptive RACT requirement at § 129.97(c)(1) (and other locations in the proposed rulemaking) that, " ... the operation and maintenance of the source in accordance with the manufacturer's specifications and good engineering practices."  This will arbitrarily incorporate by reference an untold number of new requirements (manufacturer's specifications) that are not known to and not reviewed by the Department and in the case of many units, especially older units or units that do not come with specifications, may not be known to the operator.  Additionally, manufacturing specifications may be incorrect and arbitrary in themselves and not in keeping with good engineering practices.  Uncertainty is not desirable for either the regulated industries or the DEP. The Department should provide a list of presumptive good engineering practices.  (97, 107, 115, 117, 119, 121, 132, 134)

**Response:**  It should be noted that the presumptive RACT requirement included in § 129.93 requires the installation, maintenance and operation of the source in accordance with manufacturer's specifications.  This requirement has been implemented since January 1994.  In addition, the owner or operator may opt to determine RACT requirements on a case-by-case basis in place of presumptive RACT requirements.

In the final-form regulation, the term "good engineering practices" has been replaced with "good operating practices." "Engineering" refers to design, whereas "operating" refers to operation. Since the requirements of this final rulemaking are for existing operating sources, it is more appropriate to regulate operating practices. In addition, this language is consistent with the permit compliance requirements found in 25 Pa. Code § 127.444.

**90. Comment**: The commentators recommend that the presumptive RACT requirements for coal-fired boilers should be established based on actual emission levels achieved in practice while operating with post-combustion controls, such as selective catalytic reduction (SCR) or selective non-catalytic reduction (SNCR). The RACT regulations should require the use of SCR or other control device(s) continuously to minimize $NO_x$ pollution. (1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 48, 49, 50, 51, 52, 53, 54, 55, 56, 58, 59, 60, 61, 62, 63, 64, 65, 66, 68, 70, 71, 72, 73, 75, 76, 77, 78, 79, 80, 81, 88, 89, 90, 91, 94, 96, 98, 99, 100, 101, 103, 106, 113, 116, 123, 133)

**Response:** The Department disagrees that the presumptive RACT requirements for coal-fired boilers should be established based solely on the lowest actual emission levels achieved in practice by some of the affected units while operating with post-combustion controls. The proposed and final RACT rulemakings establish presumptive emission limitations for $NO_x$ or VOCs that are achievable and sustainable during the expected life of the affected unit using technologies that are both technically and economically feasible. Implementation of the final rulemaking presumptive RACT requirements and RACT emission limitations will reduce the amount of ozone precursor emissions that the owner and operator of a facility subject to the final-form provisions in §§ 129.96—129.100 would be legally allowed to emit to the atmosphere.

Design limitations of the existing SCR and SNCR control technology installed on the affected coal-fired boilers dictate the operating parameters that are reasonably achievable. However, based on consideration of comments received during the public comment period and on the evaluation of $NO_x$ emissions data for coal-fired boilers for a 5-year period, the final-form regulation addresses the use of installed SCR or SNCR equipment in § 129.97(g)(1)(viii) and § 129.97(g)(1)(ix). Further, the $NO_x$ emission limit for CFB combustion units in § 129.97(g)(1)(vi)(A) is revised from the proposed 0.20 lb $NO_x$/million Btu heat input to 0.16 lb $NO_x$/million Btu heat input in the final-form regulation.

Currently, there are six coal-fired power plants with 15 coal-fired EGUs in Pennsylvania that are not scheduled for retirement or fuel-switching from coal to natural gas. Of these six facilities, five plants with 12 EGUs are equipped with SCR control technology. The sixth plant is authorized to burn natural gas as well as coal. Upon reevaluation of the $NO_x$ emissions data from the coal-fired EGUs equipped with SCR, the Department concluded that a $NO_x$ emission limit of 0.12 lb/MMBtu was achievable with operation of SCR when an inlet temperature of 600°F is reached. This limit accounts for the design limitations of the existing SCR systems. In addition, compliance with this emission limit is also required when by-passing the SCR system.

Final-form subparagraph 129.97(g)(1)(viii) establishes an emission limitation for a combustion unit equipped with SCR control technology as follows:

(viii)  For a combustion unit with a selective catalytic reduction system operating with an inlet temperature equal to or greater than 600°F, 0.12 lb $NO_x$/million Btu heat input. Compliance with this emission limit is also required when by-passing the selective catalytic reduction system.

EGU flue gas temperature is directly affected by boiler load.  EGU flue gas temperatures must be at or above a minimum operating temperature to allow for the injection of ammonia since adequate catalyst bed temperatures are needed to sustain the catalytic reaction for $NO_x$ control. The injection of ammonia below a minimum operating temperature would not achieve the required levels of $NO_x$ emissions reduction and would likely create excessive ammonia "slip." The excessive ammonia slip would then increase the amount of additional ammonium compounds, such as ammonium bisulfate.

Ammonium bisulfate is a sticky, corrosive liquid that forms at lower flue gas temperatures. Deposition of ammonium bisulfate can reduce EGU operational capabilities by plugging the boiler's air heater.  Because a plugged air heater limits the capacity of the boiler, it also limits the amount of ammonia that can be injected.  This then limits the amount of $NO_x$ emissions that can be reduced.  The plugged air heater also increases the amount of ammonia slip.  This operating condition can ultimately result in excessive system back pressure that requires the boiler to be taken out of service to allow water washing of the air heater.  Additionally, higher ammonia slip could contribute to additional $PM_{2.5}$ concentrations.

While the minimum operating temperature varies depending on the type of SCR system, typically for the SCR to function at its target efficiency rate and optimize the control of $NO_x$ emissions, the temperature of the EGU flue gas entering the SCR must be no less than 600°F. When the EGU flue gas temperature falls below 600°F, less efficient $NO_x$ emission reduction occurs along with increased ammonia slip and increased potential for air heater fouling leading to unscheduled outages.

Similarly, the minimum operating temperature for SNCR systems is typically 1600°F and operating the SNCR system at a temperature below 1600°F would likely result in excessive ammonia slip with a significant negative impact on the ability of the systems to achieve $NO_x$ emission reductions.

Final-form subparagraph 129.97(g)(1)(ix) establishes an emission limitation for a combustion unit with a selective non-catalytic reduction (SNCR) system as follows:

(ix)  For a combustion unit with a selective non-catalytic reduction system, the selective non-catalytic reduction system shall be operated with the injection of reagents including ammonia or other $NO_x$-reducing agents, when the temperature at the area of the reagent injection is equal to or greater than 1600°F.

Circulating fluidized bed (CFB) combustion units are typically controlled by SNCR systems. In Pennsylvania, most CFB combustion units burn coal refuse such as anthracite culm and bituminous gob. Due to significant variability in coal refuse and design of combustion units, the $NO_x$ emissions from these units are widely varied. $NO_x$ emissions from certain combustion units not equipped with any SNCR system are comparable to $NO_x$ emissions from other units equipped with and operating SNCR systems. Upon reevaluation of the $NO_x$ emission data from CFB boilers, the Department concluded that a $NO_x$ emission limit of 0.16 lb/MMBtu is achievable. The owner and operator of a CFB combustion unit subject to § 129.97(g)(1)(vi)(A) shall achieve the emission limitation of 0.16 lb/MMBtu $NO_x$ emission level at all times and additionally, if the combustion unit is equipped with SNCR, the SNCR must be in operation with the injection of reagents including ammonia or other $NO_x$-reducing agents, when the temperature at the area of the reagent injection is 1600°F or greater.

The $NO_x$ emission limit for CFBs has been lowered from the proposed 0.20 lb $NO_x$/million Btu heat input to 0.16 lb $NO_x$/million Btu heat input in final-form § 129.97(g)(1)(vi)(A) as follows:

 (g)  The owner and operator of a $NO_x$ air contamination source specified in this subsection, which is located at a major $NO_x$ emitting facility or a VOC air contamination source specified in this subsection, which is located at a major VOC emitting facility subject to § 129.96 may not cause, allow or permit $NO_x$ or VOCs to be emitted from the air contamination source in excess of the applicable presumptive RACT emission limitation:

 (1)  A combustion unit or process heater:
…
    (vi)  For a coal-fired combustion unit with a rated heat input equal to or greater than 250 million Btu/hour that is:

    (A)  A circulating fluidized bed combustion unit, 0.16 lb $NO_x$/million Btu heat input.
…

The Department further believes that continuous operation of existing SCR and SNCR control technology installed on the combustion units subject to final-form §§ 129.97(g)(1)(vi)(A), 129.97(g)(1)(viii) and 129.97(g)(1)(ix) cannot be required, due to changing market conditions and deployment of electric generating capacity. The onset of lower natural gas prices and additional regulatory obligations has spurred an industry-wide shift in the operation of coal-fired electric generating units (EGUs) from high capacity factor base load operation to variable modes of operation. Variable modes of operation include load following and minimum load operations. The increase in time spent in variable modes of operation rather than in high capacity factor base load operation is reflected in recent monthly coal-fired generation data. Because of potential increased operation of lower cost natural gas-fired EGUs, the deployment of renewable sources of electric generation and the availability of increased nuclear electric-generating capacity following the adoption of the EPA's Clean Power Plan, coal-fired plants are increasingly likely over the next several years to be operated only to provide load balancing electric generation. It is also very difficult to compare future operation of coal-fired EGUs with recent historical operations because the coal that is currently being burned possesses different characteristics than the coal that was burned in the prior years. Therefore, due to the design limitations of the SCR

and SNCR control technology and the minimum operating temperatures required for efficient operation and optimized $NO_x$ emission reduction, operation of the existing SCR and SNCR controls below the minimum designed temperature cannot be required in the final rulemaking.

**91. Comment:** The proposed rulemaking fails to set strict $NO_x$ emission limits for coal-fired EGUs. SCR can reduce $NO_x$ emissions to as low as 0.05 lb/MMBtu. The RACT limit should be 0.05 lb/MMBTU $NO_x$. (103, 116)

**Response:** The Department disagrees that the presumptive RACT emission limitation for coal-fired EGUs should be established at 0.05 lb $NO_x$/MMBtu in the final-form regulation. There are specific operating conditions that may allow SCR to achieve $NO_x$ emissions as low as 0.05 lb $NO_x$/MMBtu on a very limited basis, but typical operating conditions for combustion units in Pennsylvania are not conducive to a presumptive RACT emission limitation of 0.05 lb $NO_x$/MMBtu. The final-form regulation sets forth emission limitations for $NO_x$ or VOCs that are achievable using technologies that are reasonably available. The emission limitations and requirements set forth in this final-form regulation will reduce emissions of ozone precursors. Please also see the Response to Comment 90.

**92. Comment:** In developing a State-wide rule, the EQB should consider worst-case costs, including the cost of installing SCRs since not all units in the state currently have SCRs. The EQB should finalize its proposed limit of 0.40 lb $NO_x$/MMBtu for large units (over 250 MMBtu /hr). (131)

**Response:** The Department acknowledges that not all combustion units in the state are equipped with SCR control technology. The Department considered the costs of installing control technology as part of its evaluation of what constitutes reasonably available control technology for the final rulemaking. Please also see the Response to Comment 90. The final-form regulation limit in § 129.97(g)(1)(vi)(C) for any other type of coal-fired combustion unit with a rated heat input equal to or greater than 250 million Btu/hour remains 0.40 lb $NO_x$/MMBtu.

**93. Comment:** Coal-fired EGUs with existing SCR controls cannot continue to inject ammonia into the catalyst bed at operating rates below 60-65% load, due to inadequate catalyst bed temperatures needed to sustain the catalytic reaction for $NO_x$ control. By way of specific example, a coal-fired EGU equipped with SCR may be able to achieve $NO_x$ emission rates approaching 0.1 lb/MMBtu at full load conditions; however, the same unit operating at a load below 65% will emit $NO_x$ at a rate closer to 0.3-0.35 lb/MMBtu. (125)

**Response:** The Department acknowledges that coal-fired EGU flue gas temperature is directly affected by boiler load. EGU flue gas temperatures must be at or above a minimum operating temperature to allow for the injection of ammonia since adequate catalyst bed temperatures are needed to sustain the catalytic reaction for $NO_x$ control. The injection of ammonia below a minimum operating temperature would not achieve the required levels of $NO_x$ emissions reduction and would likely create excessive ammonia "slip." Please also see the Response to Comment 90.

**130. Comment:** Utilities should not be allowed to average their NOx emissions over their entire fleet of power plants in addition to allowing them to average these emissions over 30 days rather than the 1-hour or 8-hour standards. Peaking units should not be allowed to average their $NO_x$ emissions over 30 days rather than 24 hours or less. (1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 56, 58, 59, 60, 61, 62, 63, 65, 66, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 88, 90, 91, 95, 96, 98, 99, 100, 113, 116, 123, 133)

**Response:** The Department disagrees. A 30-day rolling averaging period is appropriate to accommodate operation at varying load and operating conditions. The 30-day rolling averages for combustion units are determined on an operating day basis by taking the total emissions during each 30-day rolling period and dividing by the total heat input during the same 30-day rolling period. Therefore, there is no difference in impact of the 30-day rolling average for peaking units as compared to other units.

A 30-day rolling limit addresses problems that are faced by certain owners and operators, including variability in fuel (such as in waste coal combustors), emission spikes during start-up and shutdown of the emission source, and emissions during malfunctions. Due to these unavoidable circumstances, which are not indicative of normal operation, it would not be appropriate for the owners and operators of utilities using $NO_x$ CEMS to monitor the emissions from the source to be required to show compliance with the presumptive $NO_x$ RACT emission limitations over a 1-hour or 8-hour averaging period. The 30-day rolling average will require that the owners and operators operate below the allowable standard in order to account for the occasional higher emissions. A 30-day rolling average has been approved by the EPA to demonstrate compliance with the short-term RACT limitations in SIP revisions submitted by certain states including Wisconsin and New York. Wisconsin's RACT regulations include emissions averaging on a 30-day rolling basis for determining compliance. Wisconsin described such a period as short term and noted that this approach would allow averaging of the typical variations in emission levels from a single unit. See 75 FR 64155 (October 19, 2010) for Wisconsin; 78 FR 41846 (July 12, 2013) for New York.

In a recent court decision from the 9th Circuit Court of Appeals, the court stated in *Nat'l Parks Conservation Ass'n v. EPA*, No. 12-73710 (9th Cir. 2015) that, "EPA also properly set emissions limits for Corette [a coal-fired power plant] on a 30-day rolling average. EPA's reasoned disagreement on this topic with PPL Montana's comment reflects its conclusion on a highly scientific question—the variance in emissions calculations that occurs when annualized rates are translated into thirty-day rolling averages—precisely the kind of question justifying deference to EPA's discretion. See *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1177–78 (9th Cir. 2004)." Similarly, the Department is setting a 30-day rolling average in order to accommodate variances in hourly or daily emission calculations. With these variances accommodated, the Department is able to set emission limitations at a lower level.

Additionally, the EPA supports the use of area-wide emissions averaging in the preamble to the final rule for Implementation of the 2008 National Ambient Air Quality Standards for Ozone: State Implementation Plan Requirements. See 80 FR 12264, 12280 (March 6, 2015). The EPA states on page 12280 that: "The EPA's existing policy recognizes that states can meet $NO_x$

RACT requirements by submitting as part of their $NO_x$ RACT SIP submittal a demonstration that the weighted average $NO_x$ emission rate from sources in the nonattainment area subject to RACT achieves RACT-level reductions." The EPA also states, "Consistent with previous guidance, the EPA continues to believe that RACT can be met on average by a group of sources within a nonattainment area rather than at each individual source. Therefore, states can show that SIP provisions for these sources meet the ozone RACT requirement using the averaging approach." The emissions averaging provision set forth in § 129.98 is consistent with the EPA's final rule for Implementation of the 2008 National Ambient Air Quality Standards for Ozone: State Implementation Plan Requirements.

**131. Comment:** Emissions averaging is guaranteed to create "hot-spotting" somewhere in PA. (116)

**Response:** The Department disagrees that emissions averaging will create "hot-spotting." The system-wide averaging provision set forth in § 129.98(a) has been revised from proposed to final rulemaking as follows: "System-wide emissions averaging must be among sources under common control of the same owner or operator <u>within the same ozone nonattainment area</u> [emphasis added] in this Commonwealth." This clarification should assure that the emissions averaging occurs among units under common control in the same ozone nonattainment area.

Additionally, the EPA supports the use of area-wide emissions averaging in the preamble to the final rule for Implementation of the 2008 National Ambient Air Quality Standards for Ozone: State Implementation Plan Requirements. See 80 FR 12264, 12280 (March 6, 2015). The EPA states on page 12280 that: "The EPA's existing policy recognizes that states can meet $NO_x$ RACT requirements by submitting as part of their $NO_x$ RACT SIP submittal a demonstration that the weighted average $NO_x$ emission rate from sources in the nonattainment area subject to RACT achieves RACT-level reductions." The EPA also states, "Consistent with previous guidance, the EPA continues to believe that RACT can be met on average by a group of sources within a nonattainment area rather than at each individual source. Therefore, states can show that SIP provisions for these sources meet the ozone RACT requirement using the averaging approach." The emissions averaging provision set forth in § 129.98 is consistent with the EPA's final rule for Implementation of the 2008 National Ambient Air Quality Standards for Ozone: State Implementation Plan Requirements. As a result, the concern related to "hot-spotting" is minimized.

**132. Comment**: Individual sources should be required to provide accurate - not averaged emission levels. (55)

**Response:** Subsection 129.100(a) has been revised in the final-form regulation to set forth comprehensive requirements for measuring compliance with established emissions limitations. For the demonstration of compliance with the emissions averaging plan, the owner or operator of affected sources is required to include actual emissions from individual sources. In addition, the owner or operator is required to provide actual emissions from each source to the Department's emission inventory. This information is publicly available.

Clean Air Act Amendments." See 80 FR 12282. With a January 1, 2017, RACT implementation deadline, the 6-months deadline for the submittal of alternatives to the presumptive RACT requirements and limitations is reasonable.

The Department agrees with the commentators that the compliance deadline for an approved alternative RACT should be submitted with the RACT proposal and included this requirement in proposed § 129.99(d)(4). Section 129.99(i)(2)(v) has been revised in the final-form regulation to specify that the written petition include a proposed final compliance date that is as soon as possible but not later than 3 years after the approval of the petition. If the petition is for the replacement of an existing source, the final compliance date will be determined on a case-by-case basis.

**183. Comment:** The case-by-case RACT proposal submittal date should be 1 year, not 6 months. (121)

**Response:** The Department disagrees with the commentator that applicants should have 1 year after the effective date of the final rulemaking to submit an alternative RACT proposal. The case-by-case RACT proposals for the existing RACT requirements set forth in § 129.91 were required to be submitted by the affected owners and operators by July 15, 1994, which was 6 months after the effective date of § 129.91. See 24 Pa.B. 467 (January 15, 1994). The 6-month time frame set forth in final-form § 129.99(d)(1) for the submission of alternative RACT proposals is consistent with existing Department regulations. RACT must be implemented by January 1, 2017, for the 2008 ozone NAAQS. See 80 FR 12282.

**184. Comment:** Modify § 129.100(e) and (f) to both start as follows: "Beginning with the compliance date specified in § 129.97(a)..." The requested changes would allow source owners or operators subject to one or more presumptive $NO_x$ RACT limits to eliminate their applicability to those limits by becoming a minor source of $NO_x$ and/or VOC emissions. (129)

**Response:** The Department agrees. Subsections 129.100(e) and (f) have been revised consistent with the commentator's recommendation.

- ### § 129.100(d) - § 129.100(i).  Recordkeeping

**185. Comment:** Section 129.100 contains compliance demonstration and recordkeeping requirements for sources subject to part or all of this proposed rulemaking. However, there doesn't seem to be any direction for a source only subject to work practice standards (such as the vague good engineering practices requirement). What is their compliance demonstration method? What records is a site required to keep in order to meet this requirement? (97, 134)

**Response:** Section 127.444 requires sources to operate in a manner consistent with good operating practices. The owners and operators of sources subject to § 129.97 are already subject to § 127.444. The Title V Operating Permit includes the appropriate recordkeeping and reporting requirements to demonstrate compliance with all applicable requirements.

It should be noted that the presumptive RACT requirements included in § 129.93 require the installation, maintenance and operation of the source in accordance with manufacturer's specifications. This requirement has been implemented since 1995. In addition, the owner or operator may opt to determine RACT requirements and emission limitations on a case-by-case basis under § 129.99 in place of the presumptive RACT requirements and emission limitations set forth in § 129.97.

**186. Comment:** Proposed § 129.100(g) requires the owner or operator of a combustion unit with a rated heat input between 20 million Btu/hour and 50 million Btu/hour to record each adjustment conducted under certain procedures in "a permanently-bound log book or other method approved by the Department." This is outdated. DEP should leave it to the operator how best to record the information. Allow for records to be maintained in any reasonable format, including computerized records. (108, 122, 134)

**Response:** The Department agrees with the commentators. Subsection 129.100(b) has been revised in the final-form regulation to specify that the owner or operator of a combustion unit subject to § 129.97(b) shall record each adjustment conducted under the procedures in § 129.97(b). The final rulemaking does not specify how the records shall be maintained or in what format—this approach allows affected owners or operators to use existing recordkeeping requirements and procedures.

**187. Comment:** The commentator feels that carbon monoxide (CO) should not be included in the log book. At a minimum the CO emissions requirement should be removed as CO is not part of the proposed $NO_x$ and VOC RACT. (111, 112)

**Response:** The Department disagrees. The applicable requirements of paragraphs 129.97(b)(1) and (2) have been clarified in the final-form regulation. The owner and operator of an affected combustion unit which is located at a major $NO_x$ emitting facility or major VOC emitting facility subject to § 129.96 shall comply with the applicable requirements in paragraph 129.97(b)(1) or paragraph 129.97(b)(2). Paragraph 129.97(b)(1) has been revised in the final rulemaking to remove the reference to the requirements in paragraph (2) and to specify that the applicable requirement for the owner and operator of a combustion unit with a rated heat input equal to or greater than 20 million Btu/hour and less than 50 million Btu/hour is a biennial tune-up conducted in accordance with the procedures described in 40 CFR 63.11223. The biennial tune-up performed to comply with paragraph 129.97(b)(1) must include, at a minimum, the inspections set forth in subparagraphs 129.97(b)(1)(i)—(iii). The requirements codified under 40 CFR 63.11223 specify that CO emissions are to be included in the record. In addition, CO emissions are recorded as a surrogate for VOC emissions.

Paragraph 129.97(b)(2) has been revised from proposed to final rulemaking to remove the requirements that applied only to an oil-fired, a gas-fired or a combination oil-fired and gas-fired combustion unit with a rated heat input equal to or greater than 20 million Btu/hour and less than 50 million Btu/hour. Additionally, the reference to the 1983 EPA document has been removed. Final-form paragraph 129.97(b)(2) specifies that the owner or operator of a combustion unit with an oxygen trim system that maintains an optimum air-to-fuel ratio that would otherwise be subject to a biennial tune-up shall conduct a tune-up of the boiler one time in each 5-year

NO$_x$ emitting facility subject to § 129.96 shall propose a NO$_x$ RACT requirement or RACT emission limitation in accordance with subsection (d).

**198. Comment:** The commentators recommend that the Department further outline the case-by-case process, as well as update and define dollar-per-ton cost thresholds against which case-by-case RACT petitions will be required to rank technology options. DEP provided similar detail in the first RACT implementation program in 1994 and, for example, could include implementation guidance and a reference to the updated EPA cost manual. (84, 105, 121)

**Response:** The Department did not establish a bright-line cost-effectiveness threshold to determine RACT-level control for proposed §§ 129.96—129.100. For the determination of presumptive NO$_x$ RACT emission limitations, DEP generally used a NO$_x$ emission cost-effectiveness upper-bound of $2,800 per ton NO$_x$ controlled. However, the cost-effectiveness thresholds used for presumptive RACT emission limitations may not be appropriate for case-by-case determinations. Prior to the implementation of the final-form RACT regulation, the Department may prepare additional guidance (e.g. fact sheets, frequently asked questions sheets, etc.) for alternative RACT proposals and petitions for alternative compliance schedule, if necessary.

The procedures for applying for an alternative RACT proposal (case-by-case) and for submitting a petition for alternative compliance schedule are set forth in § 129.99.

**199. Comment:** The proposed rulemaking should not impose the costs of the SIP amendment process on the owners and operators of sources for which the EPA is not setting presumptive RACT requirements. It is not appropriate to require an owner/operator to bear the costs of public hearings and notifications for case-by-case proposals. (102, 110)

**Response:** The Department disagrees. The Department established presumptive RACT requirements and RACT emission limitations in the proposed rulemaking for several different source categories with a large number of emission units. These presumptive RACT requirements and RACT emission limitations are set forth to meet the Commonwealth's obligations under the APCA, the CAA and regulations issued under the CAA to attain and maintain the ozone NAAQS. The ozone NAAQS are annual standards set by the EPA to protect public health and welfare year-round. While the EPA is not directly setting the presumptive RACT requirements and RACT emission limitations set forth in the proposed rulemaking, the final rulemaking provisions will be submitted to the EPA as a revision to the Commonwealth's SIP upon final-form publication in the *Pennsylvania Bulletin*. Upon approval by the EPA as a revision to the Commonwealth's SIP, the presumptive RACT requirements and RACT emission limitations will become Federally-enforceable elements of the SIP. An affected owner and operator of a source that cannot meet the applicable presumptive RACT requirement or RACT emission limitation in § 129.97 may propose an alternative RACT requirement or emission limitation under § 129.99(a) in accordance with § 129.99(d). The affected owner and operator of a source subject to § 129.99(b) or (c) shall propose an alternative RACT requirement or RACT emission limitation in accordance with § 129.99(d). Consistent with the case-by-case process established under §§ 129.91—129.95 and the publication requirement set forth in § 129.91(h), the owner and operator

# RULES AND REGULATIONS

## Title 25—ENVIRONMENTAL PROTECTION

### ENVIRONMENTAL QUALITY BOARD
### [ 25 PA. CODE CHS. 121 AND 129 ]
### Additional RACT Requirements for Major Sources of NO<sub>x</sub> and VOCs

The Environmental Quality Board (Board) amends Chapters 121 and 129 (relating to general provisions; and standards for sources) to read as set forth in Annex A. The final-form rulemaking amends Chapter 129 to adopt presumptive reasonably available control technology (RACT) requirements and RACT emission limitations for certain major stationary sources of oxides of nitrogen (NO<sub>x</sub>) and volatile organic compound (VOC) emissions. The final-form rulemaking also provides for a petition process for an alternative compliance schedule, a facility-wide or system-wide NO<sub>x</sub> emissions averaging plan provision, an alternative RACT proposal petition process, and compliance demonstration and recordkeeping requirements.

The final-form rulemaking also amends § 121.1 (relating to definitions) to revise or add terms to support the final-form amendments to Chapter 129.

This order was adopted by the Board at its meeting of November 17, 2015.

### A. *Effective Date*

This final-form rulemaking will be effective upon publication in the *Pennsylvania Bulletin*.

This final-form rulemaking will be submitted to the United States Environmental Protection Agency (EPA) for approval as a revision to the Commonwealth's State Implementation Plan (SIP) upon publication.

### B. *Contact Persons*

For further information, contact Kirit Dalal, Chief, Division of Air Resource Management, Bureau of Air Quality, 12th Floor, Rachel Carson State Office Building, P. O. Box 8468, Harrisburg, PA 17105-8468, (717) 772-3436; or Robert "Bo" Reiley, Assistant Director, Bureau of Regulatory Counsel, 9th Floor, Rachel Carson State Office Building, P. O. Box 8464, Harrisburg, PA 17105-8464, (717) 787-7060. Persons with a disability may use the Pennsylvania AT&T Relay Service, (800) 654-5984 (TDD users) or (800) 654-5988 (voice users). This final-form rulemaking is available on the Department of Environmental Protection's (Department) web site at www.dep.pa.gov (select "Public Participation," then "Environmental Quality Board (EQB)").

### C. *Statutory Authority*

This final-form rulemaking is authorized under section 5(a)(1) of the Air Pollution Control Act (act) (35 P.S. § 4005(a)(1)), which grants the Board the authority to adopt rules and regulations for the prevention, control, reduction and abatement of air pollution in this Commonwealth, and section 5(a)(8) of the act, which grants the Board the authority to adopt rules and regulations designed to implement the Clean Air Act (CAA) (42 U.S.C.A. §§ 7401—7671q).

### D. *Background and Summary*

The EPA is required under section 109 of the CAA (42 U.S.C.A. § 7409) to set National Ambient Air Quality Standards (NAAQS) for six criteria pollutants, of which ground-level ozone is one. The NAAQS are established by the EPA as the maximum concentrations in the ambient atmosphere for specific air contaminants to protect public health and welfare.

Ozone is a highly reactive gas which at sufficient concentrations can produce a wide variety of harmful effects. At elevated concentrations, ground-level ozone can adversely affect human health, vegetation, materials, economic values, and personal comfort and well-being. It can cause damage to important food crops, forests, livestock and wildlife. Repeated exposure to ozone pollution may cause a variety of adverse health effects for healthy people and those with existing conditions including difficulty breathing, chest pains, coughing, nausea, throat irritation and congestion. It can worsen bronchitis, heart disease, emphysema and asthma, and reduce lung capacity. Asthma is a significant and growing threat to children and adults. High levels of ground-level ozone also affect animals in ways similar to humans.

The EPA promulgated primary and secondary NAAQS for photochemical oxidants under section 109 of the CAA at 36 FR 8186 (April 30, 1971). These were set at an hourly average of 0.08 parts per million (ppm) total photochemical oxidants not to be exceeded more than 1 hour per year. The EPA announced a revision to the then-current 1-hour standard at 44 FR 8202 (February 8, 1979). The EPA final rule revised the level of the primary 1-hour ozone standard from 0.08 ppm to 0.12 ppm and set the secondary standard identical to the primary standard. This revised 1-hour standard was subsequently reaffirmed at 58 FR 13008 (March 9, 1993).

Section 110 of the CAA (42 U.S.C.A. § 7410) gives states primary responsibility for achieving the NAAQS. The principal mechanism at the state level for complying with the CAA is the SIP. A SIP includes the regulatory programs, actions and commitments a state will carry out in implementing its responsibilities under the CAA. Once approved by the EPA, a SIP is legally enforceable under both Federal and state law.

Section 182 of the CAA (42 U.S.C.A. § 7511a) requires that, for areas that exceed the NAAQS for ozone, states shall develop and implement a program that mandates that certain major stationary sources develop and implement a RACT program. RACT is defined as the lowest emissions limitation that a particular source is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility. See 44 FR 53762 (September 17, 1979).

Under section 182(f)(1) of the CAA and section 184(b)(2) of the CAA (42 U.S.C.A. § 7511c(b)(2)), these RACT requirements are applicable to all sources in this Commonwealth that emit or have a potential to emit greater than 100 tons per year (tpy) of NO<sub>x</sub>. Under sections 182(b)(2) and 184(b)(2) of the CAA, these RACT requirements are applicable to all sources in this Commonwealth that emit or have a potential to emit greater than 50 tpy of VOCs. NO<sub>x</sub> and VOC controls are required Statewide because of the Commonwealth's inclusion in the Northeast Ozone Transport Region. See section 184(a) of the CAA. Additionally, because the five-county Philadelphia area was designated as severe ozone nonattainment for

the 1-hour standard, sources of greater than 25 tpy of either pollutant are required to implement RACT under section 182(d) of the CAA. The Commonwealth's RACT regulations in §§ 129.91—129.95 (relating to stationary sources of $NO_x$ and VOCs) were implemented for the 1-hour ozone standard. These regulations became effective January 15, 1994.

The EPA concluded that revisions to the current primary standard to provide increased public health protection were appropriate at this time to protect public health with an adequate margin of safety. See 62 FR 38856 (July 18, 1997). Further, the EPA determined that it was appropriate to promulgate primary and secondary ozone standards at a level of 0.08 ppm averaged over 8 hours. See 62 FR 38856. The EPA lowered the 8-hour standard from 0.08 ppm to 0.075 ppm at 73 FR 16436 (March 27, 2008).

The EPA designated 37 counties in this Commonwealth as 8-hour ozone nonattainment areas for the 1997 8-hour ozone NAAQS at 69 FR 23858, 23931 (April 30, 2004). The EPA published final designations and classifications for the 2008 8-hour ozone standards at 77 FR 30088 (May 21, 2012) with an effective date of July 20, 2012. The following nonattainment areas were classified as "marginal" ozone nonattainment areas: Allentown-Bethlehem-Easton (Carbon, Lehigh and Northampton Counties); Lancaster (Lancaster County), Philadelphia-Wilmington-Atlantic City (the Pennsylvania areas include Bucks, Chester, Delaware, Montgomery and Philadelphia Counties); Pittsburgh-Beaver Valley (Allegheny, Armstrong, Beaver, Butler, Fayette, Washington and Westmoreland Counties); and the Reading area (Berks County); the remainder of this Commonwealth was designated "Unclassifiable/Attainment." See 77 FR 30088, 30142. The Commonwealth must ensure that these areas attain the 2008 ozone standard by July 20, 2015, and that they continue to maintain the standard thereafter. The Department will seek an extension of the July 2015 8-hour ozone NAAQS attainment date for the five-county Philadelphia Area (Bucks, Chester, Delaware, Montgomery and Philadelphia Counties) due to several violating monitors in Maryland and New Jersey, and for the seven-county Pittsburgh-Beaver Valley Area (Allegheny, Armstrong, Beaver, Butler, Fayette, Washington and Westmoreland Counties).

A re-evaluation of what measures constitute RACT is a requirement to be fulfilled each time a NAAQS is promulgated or revised, as happened in 1997 and 2008 for ozone. According to the EPA's final rule to implement the 8-hour ozone NAAQS at 70 FR 71612 (November 29, 2005), areas classified as "moderate" nonattainment or higher must submit a demonstration, as a revision to the SIP, that their current rules fulfill 8-hour ozone RACT requirements for all Control Techniques Guidelines (CTG) categories and all major, non-CTG sources.

According to this implementation rule, demonstrations can be made with either a new RACT determination or a certification that previously-required RACT controls represent RACT for the 8-hour ozone standard. The certification should be accompanied by appropriate supporting information, such as consideration of information received during the public comment period. The RACT SIP revision submittal is in addition to the 8-hour ozone attainment demonstration plan for the area, which will also be a revision to the Commonwealth's SIP. The RACT SIP revision was required to be submitted to the EPA by September 15, 2006.

The Commonwealth submitted a SIP revision in September 2006 certifying that RACT determinations made for the 1-hour ozone standard from 1995 to 2006 under §§ 129.91—129.95 were still RACT for the 8-hour standard, including for those sources where a determination was made that "no controls" continued to represent RACT for the 1-hour ozone standard. However, the EPA informally indicated to the Department that based on *NRDC v. EPA*, 571 F.3d 1245 (July 10, 2009), a reanalysis rather than certification is necessary for sources for which the Department previously determined that "no controls" represented RACT for the 1-hour ozone standard.

As a result of the EPA's decision, the Department conducted a generic RACT analysis of those existing sources for which a RACT determination was previously made under §§ 129.91—129.95 for the 1-hour ozone standard to evaluate whether the RACT determination under §§ 129.91—129.95 would represent RACT-level control for the 8-hour ozone standards or if new or additional add-on control technology would represent RACT-level control for the 8-hour ozone NAAQS. That generic analysis identified existing affected source categories by size and fuel type; identified available feasible $NO_x$ or VOC control options for each type of existing source; estimated emission reduction potential for each control technology; identified costs for technologies, using appropriate updates; evaluated cost-effectiveness per EPA guidance for uncontrolled and controlled sources (combinations of technologies); and projected what type of control technology might be applied to each affected source. The Department evaluated technically feasible emission controls for cost-effectiveness and economic feasibility. Based on this analysis, the Board determined that additional cost-effective controls represent RACT for the 8-hour ozone NAAQS. There are nine source categories that are affected by this final-form rulemaking: combustion units; boilers; process heaters; turbines; engines; municipal solid waste landfills; municipal waste combustors; cement kilns; and other sources that are not regulated elsewhere under Chapter 129.

All together, this final-form rulemaking affects the owners and operators of approximately 810 individual sources at 192 major facilities throughout this Commonwealth. Under this final rulemaking, the Board anticipates that the total potential $NO_x$ emission reductions will be approximately 253,623 tpy. The amount of $NO_x$ and VOC emission reductions achieved as a result of the application of RACT-level control is determined on the basis of the source's potential to emit before and after the application of RACT-level control.

The Board determines that this final-form rulemaking fulfills the requirements for re-evaluation of RACT-level control for the 1997 and 2008 ozone NAAQS and is less resource intensive than imposing case-by-case analysis for affected facilities in the covered categories, as was done under §§ 129.91—129.95. As more fully discussed in Section E of this preamble, the Board finalized a suite of compliance options. The owner and operator of an individual affected source may demonstrate compliance for that source in one of three ways: first, with the applicable presumptive RACT requirement or emission limitation under § 129.97 (relating to presumptive RACT requirements, RACT emission limitations and petition for alternative compliance schedule); second, either by participating in the emissions averaging plan under § 129.98 (relating to facility-wide or system-wide $NO_x$ emissions averaging plan general requirements) or by submitting a request for an alternative case-by-case RACT determina-

tion under § 129.99 (relating to alternative RACT proposal and petition for alternative compliance schedule).

The Board determines that the requirements under this final-form rulemaking are reasonably necessary to attain and maintain the 8-hour ozone NAAQS.

The Air Quality Technical Advisory Committee (AQTAC) was briefed on the final-form rulemaking and public comments on November 7, 2014. The AQTAC recommended that the preamble to the final-form rulemaking include the clarifications for the following sections: § 129.96(c) (relating to applicability) and § 129.97(c)—applicability to sources emitting less than 1 ton; and § 129.100(a) (relating to compliance demonstration and recordkeeping requirements)—calculations for the 30-day rolling average. Following its discussion on November 7, 2014, the AQTAC voted 11-5-0 (yes; no; abstain) to concur with the Department's recommendation to move the final-form rulemaking forward to the Board for consideration. The draft final-form rulemaking was discussed with the Small Business Compliance Advisory Committee (SBCAC) on January 28, 2015. The SBCAC voted 6-2-0 to concur with the Department's recommendation to forward the final-form rulemaking to the Board. The final-form rulemaking was discussed with the Citizens Advisory Council (CAC), Policy and Regulatory Oversight Committee on February 20, 2015, and May 12, 2015. The Policy and Regulatory Oversight Committee recommended that the CAC concur with the Department's recommendation to move the final-form rulemaking forward to the Board. However, the CAC tabled consideration of the final-form rulemaking at its March 17, 2015, and May 20, 2015, meetings. The CAC considered the final-form rulemaking at its September 15, 2015, meeting. The CAC raised several concerns and recommendations that were considered by the Department. The CAC supported the adoption of the final-form rulemaking and unanimously voted to concur with advancing it to the Board for action.

E. *Summary of Final-Form Rulemaking and Changes from Proposed to Final-Form Rulemaking*

§ *121.1. Definitions*

The final-form rulemaking amends § 121.1 by revising the terms "CEMS—continuous emissions monitoring system," "major $NO_x$ emitting facility," "major VOC emitting facility" and "stationary internal combustion engine or stationary reciprocating internal combustion engine" and by adding the terms "process heater," "refinery gas," "regenerative cycle combustion turbine," "simple cycle combustion turbine" and "stationary combustion turbine."

The final-form rulemaking made clarifying changes to "CEMS—continuous emissions monitoring system" and "stationary internal combustion engine or stationary reciprocating internal combustion engine."

In addition, under the final-form rulemaking the definitions of "major $NO_x$ emitting facility" and "major VOC emitting facility" are amended. The 25 tpy major source $NO_x$ and VOC thresholds do not apply in Bucks, Chester, Delaware, Montgomery and Philadelphia Counties for sources that would be subject to §§ 129.96—129.100. For the purposes of this final-form rulemaking, the 100-tpy threshold applies for major $NO_x$ emitting sources and the 50-tpy threshold applies for major VOC emitting sources in those counties. However, the existing 25-tpy major source $NO_x$ and VOC thresholds continue to apply to RACT sources subject to §§ 129.91—129.95 in those counties.

§ *129.96. Applicability*

Under subsection (a), the $NO_x$ requirements of the final-form rulemaking apply Statewide to the owner and operator of a major $NO_x$ emitting facility and the VOC requirements apply Statewide to the owner and operator of a major VOC emitting facility that were in existence on or before July 20, 2012, for which a requirement or emission limitation, or both, has not been established in §§ 129.51—129.52c, 129.54—129.69, 129.71—129.73, 129.75, 129.77, 129.101—129.107 and 129.301—129.310.

Under subsection (b), the $NO_x$ requirements of the final-form rulemaking apply Statewide to the owner and operator of a $NO_x$ emitting facility and the VOC requirements apply Statewide to the owner and operator of a VOC emitting facility when the installation of a new source or a modification or change in operation of an existing source after July 20, 2012, results in the source or facility meeting the definition of a major $NO_x$ emitting facility or a major VOC emitting facility and for which a requirement or an emission limitation, or both, has not been established in §§ 129.51—129.52c, 129.54—129.69, 129.71—129.73, 129.75, 129.77, 129.101—129.107 and 129.301—129.310.

Under subsections (a) and (b), the final-form rulemaking was clarified to ensure that it applies Statewide to the owner and operator of a major $NO_x$ emitting facility or a major VOC emitting facility that was in existence on or before July 20, 2012. That is, the $NO_x$ requirements apply Statewide to the owner and operator of a major $NO_x$ emitting facility and the VOC requirements apply Statewide to the owner and operator of a major VOC emitting facility.

Subsection (c) was added to provide that the requirements do not apply to the owner and operator of a $NO_x$ air contamination source located at a major $NO_x$ emitting facility that has the potential to emit less than 1 tpy of $NO_x$ or of a VOC air contamination source located at a major VOC emitting facility that has the potential to emit less than 1 tpy of VOC. This change addresses one of the concerns raised by the AQTAC at its November 7, 2014, meeting.

Subsection (d) was added to provide that the requirements do not apply to the owner and operator of a facility which is not a major $NO_x$ emitting facility or a major VOC emitting facility on or before January 1, 2017.

§ *129.97. Presumptive RACT requirements, RACT emission limitations and petition for alternative compliance schedule*

Under subsection (a), the owner and operator of a source listed in one or more of subsections (b)—(h) located at a major $NO_x$ emitting facility or major VOC emitting facility subject to § 129.96 shall comply with the applicable presumptive RACT requirement or RACT emission limitation beginning with the specified compliance date, unless an alternative compliance schedule is submitted and approved under subsections (k)—(m) or § 129.99.

Under subsection (b), the owner and operator of a listed combustion unit that is located at a major $NO_x$ emitting facility or major VOC emitting facility subject to § 129.96 shall comply with the applicable presumptive RACT requirement for that source, which includes, among other things, inspection and adjustment requirements.

The applicable requirements of paragraphs (1) and (2) have been clarified in the final-form rulemaking. The owner and operator of an affected combustion unit which is located at a major $NO_x$ emitting facility or major VOC

emitting facility subject to § 129.96 shall comply with the applicable requirements in paragraph (1) or (2).

Paragraph (1) has been amended to delete the reference to the requirements in paragraph (2) and to specify that the applicable requirement for the owner and operator of a combustion unit with a rated heat input equal to or greater than 20 million British thermal units (Btu)/hour and less than 50 million Btu/hour is a biennial tune-up conducted in accordance with the procedures described in 40 CFR 63.11223 (relating to how do I demonstrate continuous compliance with the work practice and management practice standards). The biennial tune-up performed to comply with this paragraph must include, at a minimum, the inspections in subparagraphs (i)—(iii).

Paragraph (2) has been amended to delete the requirements that applied only to an oil-fired, a gas-fired or a combination oil-fired and gas-fired combustion unit with a rated heat input equal to or greater than 20 million Btu/hour and less than 50 million Btu/hour. Additionally, the reference to the 1983 EPA document has been deleted. Paragraph (2) specifies that the owner or operator of a combustion unit with an oxygen trim system that maintains an optimum air-to-fuel ratio that would otherwise be subject to a biennial tune-up shall conduct a tune-up of the boiler one time in each 5-year calendar period. The tune-up performed to comply with this paragraph must include, at a minimum, the inspections in subparagraphs (i)—(iii).

Under subsection (c), the owner and operator of a source listed in this subsection located at a major $NO_x$ emitting facility or major VOC emitting facility subject to § 129.96 shall comply with the applicable presumptive RACT requirement, which includes, among other things, the operation of the source in accordance with the manufacturer's specifications and good operating practices.

In subsection (c), "good engineering practices" has been amended to "good operating practices" and air contamination sources that have the potential to emit less than 5 tpy of $NO_x$ or the potential to emit less than 2.7 tpy of VOC have been added to the list of sources for which the owner and operator shall install, maintain and operate in accordance with the manufacturer's specifications and with good operating practices. Additionally, language regarding the annual capacity factors that must be used for certain units has been added.

Under subsection (d), the owner and operator of a combustion unit or other combustion source located at a major VOC emitting facility subject to § 129.96 shall install, maintain and operate the source in accordance with the manufacturer's specifications and with good operating practices for the control of the VOC emissions from the combustion unit or other combustion source.

Under subsection (d), "good engineering practices" has been amended to "good operating practices" and clarifying changes were made to ensure that the owner and operator of an affected VOC facility shall install, maintain and operate the source in accordance with specified requirements.

Under subsection (e), the owner and operator of a municipal solid waste landfill subject to § 129.96 shall comply with the applicable presumptive RACT requirement identified under paragraph (1) or (2). No changes were made from proposed to final-form rulemaking.

Under subsection (f), the owner and operator of a municipal waste combustor subject to § 129.96 shall comply with the presumptive RACT requirement of 180 parts per million, volumetric dry (ppmvd) $NO_x$ @ 7% oxygen.

Under subsection (f), the applicable requirement for a municipal waste combustor was revised from the proposed requirement of the applicable Federal standards to the final-form rulemaking requirement of 180 ppmvd $NO_x$ @ 7% oxygen.

Under subsection (g), except as specified under subsection (c), the owner and operator of a $NO_x$ air contamination source listed in this subsection located at a major $NO_x$ emitting facility or of a VOC air contamination source listed in this subsection located at a major VOC emitting facility subject to § 129.96 may not cause, allow or permit $NO_x$ or VOCs to be emitted from the air contamination source in excess of the applicable presumptive RACT emission limitation under paragraphs (1)—(4).

Under subsection (g), a number of minor clarifications were made regarding grammar and the types of fuels used with certain air contamination sources.

In addition to these clarifications, a number of substantive changes were made to the RACT limitations under subsection (g) between proposed and final-form rulemaking.

For instance, under subsection (g)(1)(i), the presumptive RACT emission limitation for natural gas-fired combustion units or process heaters with a rated heat input equal to or greater than 50 million Btu/hour was changed from 0.08 to 0.10 lb $NO_x$/million Btu heat rate.

Under subsection (g)(1)(vi)(A), the presumptive RACT emission limitation for a circulating fluidized bed (CFB) combustion unit was changed from 0.20 to 0.16 lb $NO_x$/million Btu heat input.

Under subsection (g)(2)(i)(B) and (D), the presumptive RACT emission limitation for certain combustion units when firing fuel oil was changed from 75 to 96 ppmvd $NO_x$ @ 15% oxygen and from 2 to 9 ppmvd VOC (as propane) @ 15% oxygen, respectively.

Under subsection (g)(2)(i)(C), the presumptive RACT emission limitation for certain combustion units when firing natural gas or noncommercial gaseous fuel was changed from 2 to 5 ppmvd VOC (as propane) @ 15% oxygen.

Under final-form subsection (g)(2)(iv), proposed subsection (g)(2)(iii), the rated output for an affected simple cycle or regenerative cycle combustion turbine was increased from equal to or greater than 1,000 bhp to equal to or greater than 6,000 bhp. Furthermore, under subsection (g)(2)(iv)(B), the presumptive RACT emission limitation for these turbines that burn fuel oil was changed from 75 to 96 ppmvd $NO_x$ @ 15% oxygen.

Under subsection (g)(3)(i)(B), the presumptive RACT emission limitation for a lean burn stationary internal combustion engine with a rating equal to or greater than 500 bhp that burns natural gas or a noncommercial gaseous fuel, liquid fuel or dual-fuel was revised from 0.4 to 1.0 gram VOC/bhp-hr excluding formaldehyde.

The following subparagraphs were added to subsection (g)(1) in the final-form rulemaking: subparagraph (vii)—the presumptive RACT emission limitation for any other type of solid fuel-fired combustion unit with a rated heat input equal to or greater than 50 million Btu/hr is 0.25 lb $NO_x$/million Btu heat input; subparagraph (viii)—the presumptive RACT emission limitation for a coal-fired combustion unit with a selective catalytic reduction (SCR)

system operating with an inlet temperature equal to or greater than 600°F is 0.12 lb $NO_x$/million Btu heat input and compliance with this limit is also required when by-passing the SCR system; and subparagraph (ix)—the presumptive RACT requirement for a coal-fired combustion unit with a selective noncatalytic reduction (SNCR) system is that the SNCR system shall be operated with the injection of reagents including ammonia or other $NO_x$-reducing agents, when the temperature at the area of the reagent injection is equal to or greater than 1,600°F.

Subsection (g)(2)(iii) was added in the final-form rulemaking. A presumptive RACT emission limitation was added for a simple cycle or regenerative cycle combustion turbine with a rated output equal to or greater than 1,000 bhp and less than 6,000 bhp: clause (A)—when firing natural gas or a noncommercial gaseous fuel is 150 ppmvd $NO_x$ @ 15% oxygen; clause (B)—when firing fuel oil is 150 ppmvd $NO_x$ @ 15% oxygen; clause (C)—when firing natural gas or a noncommercial gaseous fuel is 9 ppmvd VOC (as propane) @ 15% oxygen; and clause (D)—when firing fuel oil is 9 ppmvd VOC (as propane) @ 15% oxygen. Proposed subsection (g)(2)(iii) has been renumbered as final-form subsection (g)(2)(iv).

Under subsection (h), the owner and operator of a Portland cement kiln subject to § 129.96 shall comply with the applicable presumptive RACT emission limitation under paragraphs (1)—(3). No changes were made from proposed to final-form rulemaking.

Under subsection (i), among other things, the requirements and emission limitations of this section supersede the requirements and emission limitations of a RACT permit issued to the owner or operator of an air contamination source subject to one or more of subsections (b)—(h) prior to April 23, 2016, under §§ 129.91—129.95 to control, reduce or minimize $NO_x$ emissions or VOC emissions, or both, from an air contamination source unless the permit contains more stringent requirements or emission limitations, or both. Minor clarifying changes were made from proposed to final-form rulemaking.

Under subsection (j), among other things, the requirements and emission limitations of this section supersede the requirements and emission limitations of §§ 129.201—129.205, 145.111—145.113 and 145.141—145.146 (relating to additional $NO_x$ requirements; emissions of $NO_x$ from stationary internal combustion engines; and emissions of $NO_x$ from cement manufacturing) unless the requirements or emission limitations of §§ 129.201—129.205, §§ 145.111—145.113 or §§ 145.141—145.146 are more stringent. Minor clarifying changes were made from proposed to final-form rulemaking.

Under subsection (k), the owner or operator of a major $NO_x$ emitting facility or a major VOC emitting facility subject to § 129.96 that includes an air contamination source subject to one or more of subsections (b)—(h) that cannot meet the applicable presumptive RACT requirement or RACT emission limitation without installation of an air cleaning device may submit a petition, in writing, requesting an alternative compliance schedule in accordance with paragraphs (1) and (2).

Minor clarifying changes were made to subsection (k) from proposed to final-form rulemaking. Additionally, subsection (k)(2)(v) was revised from proposed to final-form rulemaking to specify that the written petition must include a proposed final compliance date that is as soon as possible but not later than 3 years after the written approval of the petition by the Department or the appro-

priate approved local air pollution control agency. Further, the approved petition shall be incorporated in an applicable operating permit or plan approval. The proposed rulemaking specified under paragraph (2)(v) that the proposed final compliance date be as soon as possible but not later than the date 3 years after the effective date of adoption of the proposed rulemaking.

Under subsection (l), the Department or appropriate approved local air pollution control agency will review a timely and complete written petition requesting an alternative compliance schedule submitted in accordance with subsection (k) and approve or deny the petition in writing. No changes were made from proposed to final-form rulemaking.

Under subsection (m), approval or denial under subsection (l) of the timely and complete petition for an alternative compliance schedule submitted under subsection (k) will be effective on the date the letter of approval or denial of the petition is signed by the authorized representative of the Department or appropriate approved local air pollution control agency. No changes were made from proposed to final-form rulemaking.

### § 129.98. Facility-wide or system-wide $NO_x$ emissions averaging plan general requirements

Under subsection (a), the owner or operator of a major $NO_x$ emitting facility subject to § 129.96 that includes at least one air contamination source subject to a $NO_x$ RACT emission limitation in § 129.97 that cannot meet the applicable $NO_x$ RACT emission limitation may elect to meet that applicable $NO_x$ RACT emission limitation in § 129.97 by averaging $NO_x$ emissions on either a facility-wide or system-wide basis using a 30-day rolling average. System-wide emissions averaging must be among sources under common control of the same owner or operator within the same ozone nonattainment area in this Commonwealth.

Under proposed subsection (a), there was no requirement that system-wide averaging be conducted within the same ozone nonattainment area. The final-form rulemaking requires that system-wide emissions averaging must be among sources under common control of the same owner or operator. The averaging must be conducted within the same ozone nonattainment area in this Commonwealth. The Department interprets this provision to allow emissions averaging in areas designated as unclassifiable/attainment for the ozone NAAQS.

Under subsection (b), the owner or operator of each facility that elects to comply with subsection (a) shall submit a written $NO_x$ emissions averaging plan to the Department or appropriate approved local air pollution control agency as part of an application for an operating permit modification or a plan approval, if otherwise required. The application incorporating the requirements of this section shall be submitted by the applicable date in paragraph (1) or (2). Only minor clarifying changes were made between proposed and final-form rulemaking.

Under subsection (c), each $NO_x$ air contamination source included in the application for an operating permit modification or a plan approval, if otherwise required, for averaging $NO_x$ emissions on either a facility-wide or system-wide basis using a 30-day rolling average submitted under subsection (b) must be an air contamination source subject to a $NO_x$ RACT emission limitation in § 129.97. Only minor clarifying changes were made between proposed and final-form rulemaking.

Under subsection (d), the application for the operating permit modification or the plan approval, if otherwise

required, for averaging NO$_x$ emissions on either a facility-wide or system-wide basis using a 30-day rolling average submitted under subsection (b) must demonstrate that the aggregate NO$_x$ emissions emitted by the air contamination sources included in the facility-wide or system-wide NO$_x$ emissions averaging plan using a 30-day rolling average are not greater than the NO$_x$ emissions that would be emitted by the group of included sources if each source complied with the applicable NO$_x$ RACT emission limitation in § 129.97 on a source-specific basis. The proposed "not greater than 90% of the sum" provision was deleted from this final-form rulemaking.

Under subsection (e), the owner or operator shall calculate the alternative facility-wide or system-wide NO$_x$ RACT emissions limitation using a 30-day rolling average for the air contamination sources included in the application for the operating permit modification or plan approval, if otherwise required, submitted under subsection (b) by using the equation in this subsection to sum the emissions for all of the sources included in the NO$_x$ emissions averaging plan.

Under subsection (e), the equation used in the NO$_x$ emissions averaging plan was modified. Emissions from start-ups, shutdowns and malfunctions shall be included as well as the most stringent numerical emission rate applicable to each air contamination source in the calculations. The more stringent numerical emission rate limit will include a limit established in the CAA, the act, regulations adopted under these acts, a plan approval, operating permit, consent decree, consent order and agreement, Department order or the SIP.

Under subsection (f), the application for the operating permit modification or a plan approval, if otherwise required, specified in subsections (b)—(e) may include facility-wide or system-wide NO$_x$ emissions averaging using a 30-day rolling average only for NO$_x$ emitting sources or NO$_x$ emitting facilities that are owned or operated by the applicant. Only minor clarifying changes were made between proposed and final-form rulemaking.

Under subsection (g), the application for the operating permit modification or a plan approval, if otherwise required, specified in subsections (b)—(f) must include the information identified under paragraphs (1)—(3). Only minor clarifying changes were made between proposed and final-form rulemaking.

Under subsection (h), an air contamination source or facility included in the facility-wide or system-wide NO$_x$ emissions averaging plan submitted in accordance with subsections (b)—(g) may be included in only one facility-wide or system-wide NO$_x$ emissions averaging plan. Only minor clarifying changes were made between proposed and final-form rulemaking.

Under subsection (i), the Department or appropriate approved local air pollution control agency will issue a modification to the operating permit or a plan approval authorizing the NO$_x$ emissions averaging plan. Only minor clarifying changes were made between proposed and final-form rulemaking.

Under subsection (j), the owner or operator of an air contamination source or facility included in the facility-wide or system-wide NO$_x$ emissions averaging plan submitted in accordance with subsections (b)—(h) shall submit the reports and records in subsection (g)(3) to the Department or appropriate approved local air pollution control agency on the schedule specified in subsection (g)(3) to demonstrate compliance with § 129.100. Only minor clarifying changes were made between proposed and final-form rulemaking.

Under subsection (k), the owner or operator of an air contamination source or facility included in a facility-wide or system-wide NO$_x$ emissions averaging plan submitted in accordance with subsections (b)—(h) that achieves emission reductions in accordance with other emission limitations required under the act or the CAA, or regulations adopted under the act or the CAA, that are not NO$_x$ RACT emission limitations may not substitute those emission reductions for the emission reductions required by the facility-wide or system-wide NO$_x$ emissions averaging plan submitted to the Department or appropriate approved local air pollution control agency under subsection (b). Only minor clarifying changes were made between proposed and final-form rulemaking.

Under subsection (l), the owner or operator of an air contamination source subject to a NO$_x$ RACT emission limitation in § 129.97 that is not included in a facility-wide or system-wide NO$_x$ emissions averaging plan submitted under subsection (b) shall operate the source in compliance with the applicable NO$_x$ RACT emission limitation in § 129.97. Only minor clarifying changes were made between proposed and final-form rulemaking.

Under subsection (m), the owner and operator of the air contamination sources included in a facility-wide or system-wide NO$_x$ emissions averaging plan submitted under subsection (b) shall be liable for a violation of an applicable NO$_x$ RACT emission limitation at each source included in the NO$_x$ emissions averaging plan. Only minor clarifying changes were made between proposed and final-form rulemaking.

### § 129.99. Alternative RACT proposal and petition for alternative compliance schedule

Under subsection (a), the owner or operator of an air contamination source subject to § 129.97 located at a facility subject to § 129.96 that cannot meet the applicable presumptive RACT requirement or RACT emission limitation of § 129.97 may propose an alternative RACT requirement or RACT emission limitation in accordance with subsection (d). Only minor clarifying changes were made between proposed and final-form rulemaking.

Under subsection (b), the owner or operator of a NO$_x$ air contamination source with a potential emission rate equal to or greater than 5.0 tons of NO$_x$ per year that is not subject to § 129.97 or §§ 129.201—129.205 located at a major NO$_x$ emitting facility subject to § 129.96 shall propose a NO$_x$ RACT requirement or RACT emission limitation in accordance with subsection (d). Only minor clarifying changes were made between proposed and final-form rulemaking.

Under subsection (c), the owner or operator of a VOC air contamination source with a potential emission rate equal to or greater than 2.7 tons of VOC per year that is not subject to § 129.97 located at a major VOC emitting facility subject to § 129.96 shall propose a VOC RACT requirement or RACT emission limitation in accordance with subsection (d). Only minor clarifying changes were made between proposed and final-form rulemaking.

Under subsection (d), the owner or operator proposing an alternative RACT requirement or RACT emission limitation under subsection (a), (b) or (c) shall comply with all of the RACT proposal requirements specified under paragraphs (1)—(7).

Under subsection (d), the deadline for completing the implementation of the RACT requirement or limitation was changed between proposed and final-form rulemaking

to not later than January 1, 2017, which is the Federal implementation requirement date for RACT for the 2008 8-hour ozone standard.

Under subsection (e), the Department or appropriate approved local air pollution control agency will review the timely and complete alternative RACT proposal submitted in accordance with subsection (d) as specified in paragraph (1) and approve, deny or modify the alternative RACT proposal as indicated under paragraph (2) or (3). Only minor clarifying changes were made between proposed and final-form rulemaking.

Under subsection (f), the proposed alternative RACT requirement or RACT emission limitation and the implementation schedule submitted under subsection (d) will be approved, denied or modified by the Department or appropriate approved local air pollution control agency in accordance with subsection (e) in writing through the issuance of a plan approval or operating permit modification prior to the owner or operator implementing the alternative RACT requirement or RACT emission limitation. Only minor clarifying changes were made between proposed and final-form rulemaking.

Under subsection (g), the emission limit and requirements specified in the plan approval or operating permit issued under subsection (f) supersede the emission limit and requirements in the existing plan approval or operating permit issued to the owner or operator of the source prior to April 23, 2016, on the date specified in the plan approval or operating permit issued by the Department or appropriate approved local air pollution control agency under subsection (f), except to the extent the existing plan approval or operating permit contains more stringent requirements. No changes were made between proposed and final-form rulemaking.

Under subsection (h), the Department will submit each alternative RACT requirement or RACT emission limitation approved under subsection (f) to the EPA for approval as a revision to the SIP. The owner and operator of the facility shall bear the costs of public hearings and notifications required for the SIP submittal. Only minor clarifying changes were made between proposed and final-form rulemaking.

Under subsection (i), the owner and operator of a facility proposing to comply with the applicable RACT requirement or RACT emission limitation under subsection (a), (b) or (c) through the installation of an air cleaning device may submit a petition, in writing, requesting an alternative compliance schedule in accordance with paragraphs (1) and (2).

Subsection (i)(2)(v) is revised from proposed to final-form rulemaking to specify that the written petition must include a proposed final compliance date that is as soon as possible but not later than 3 years after the written approval of the petition. If the petition is for the replacement of an existing source, the final compliance date will be determined on a case-by-case basis. The proposed rulemaking specified under subsection (i)(2)(v) that the proposed final compliance date be as soon as possible but not later than the date 3 years after the effective date of adoption of the proposed rulemaking.

Under subsection (j), the Department or appropriate approved local air pollution control agency will review the timely and complete written petition requesting an alternative compliance schedule submitted in accordance with subsection (i) and approve or deny the petition in writing. Only minor clarifying changes were made between proposed and final-form rulemaking.

Under subsection (k), the emission limit and requirements specified in the plan approval or operating permit issued by the Department or appropriate approved local air pollution control agency under subsection (j) supersede the emission limit and requirements in the existing plan approval or operating permit issued to the owner or operator of the source prior to April 23, 2016, on the date specified in the plan approval or operating permit issued by the Department or appropriate approved local air pollution control agency under subsection (j), except to the extent the existing plan approval or operating permit contains more stringent requirements. No changes were made between proposed and final-form rulemaking.

Under subsection (l), approval or denial under subsection (j) of the timely and complete petition for an alternative compliance schedule submitted under subsection (i) will be effective on the date the letter of approval or denial of the petition is signed by the authorized representative of the Department or appropriate approved local air pollution control agency. No changes were made between proposed and final-form rulemaking.

§ 129.100. Compliance demonstration and recordkeeping requirements

Under subsection (a), the owner and operator of an air contamination source subject to a requirement in § 129.97 shall demonstrate compliance with the applicable RACT requirement or RACT emission limitation by performing the monitoring or testing procedures under paragraph (1) or (2), except as provided in subsection (c).

Under subsection (a)(1)—(4), the monitoring and testing requirements have been amended from proposed to final-form rulemaking for all affected air contamination sources.

Under subsection (b), except as provided in §§ 129.97(k) and 129.99(i), the owner and operator of an air contamination source subject to subsection (a) shall demonstrate compliance with the applicable RACT requirement or RACT emission limitation in accordance with the procedures in subsection (a) not later than the applicable time frame under paragraph (1) or (2).

Under subsection (b), the compliance demonstration date was changed between proposed and final-form rulemaking to not later than January 1, 2017, which is the Federal implementation requirement date for RACT.

Under subsection (c), an owner or operator of an air contamination source subject to this section and §§ 129.96—129.98 may request a waiver from the requirement to demonstrate compliance with the applicable emission limitation in § 129.97 if the requirements under paragraphs (1)—(4) are met. Only minor clarifying changes were made between proposed and final-form rulemaking.

Under subsection (d), the owner and operator of an air contamination source subject to this section and §§ 129.96—129.99 shall keep records to demonstrate compliance with §§ 129.96—129.99 as set forth in paragraphs (1) and (2). No changes were made between proposed and final-form rulemaking.

Under subsection (e), beginning with the compliance date specified in § 129.97(a), the owner or operator of an air contamination source claiming that the air contamination source is exempt from the applicable $NO_x$ emission rate threshold specified in § 129.99(b) and the requirements of § 129.97 based on the air contamination source's potential to emit shall maintain records that demonstrate to the Department or appropriate approved local air


pollution control agency that the air contamination source is not subject to the specified emission rate threshold. Only minor clarifying changes were made between proposed and final-form rulemaking.

Under subsection (f), beginning with the compliance date specified in § 129.97(a), the owner or operator of an air contamination source claiming that the air contamination source is exempt from the applicable VOC emission rate threshold specified in § 129.99(c) and the requirements of § 129.97 based on the air contamination source's potential to emit shall maintain records that demonstrate to the Department or appropriate approved local air pollution control agency that the air contamination source is not subject to the specified emission rate threshold. Only minor clarifying changes were made between proposed and final-form rulemaking.

Under subsection (g), the owner or operator of a combustion unit subject to § 129.97(b) shall record each adjustment conducted under the procedures in § 129.97(b). This record must contain, at a minimum, the information in paragraphs (1)—(6). Only minor clarifying changes were made between proposed and final-form rulemaking.

Proposed subsection (h), providing a requirement for the owner or operator of an oil-fired, gas-fired or combination oil-fired and gas-fired unit subject to § 129.97(b)(2) to maintain records of the type of fuel, was deleted in the final-form rulemaking.

Under final-form subsection (h), proposed subsection (i), the owner or operator of a Portland cement kiln subject to § 129.97(h) shall maintain a daily operating log for each Portland cement kiln. The record for each kiln must include the items in paragraphs (1)—(4).

Under final-form subsection (i), records shall be retained by the owner or operator for 5 years and made available to the Department or appropriate approved local air pollution control agency upon receipt of a written request from the Department or the appropriate approved local air pollution control agency.

F. *Summary of Major Comments and Responses*

*General comments*

A commentator stated that the proposed rulemaking is not RACT. It does not accomplish RACT, but maintains a status quo that does not meet the CAA test of reducing air pollution emissions for $NO_x$ and VOCs (volatile organic chemicals) ". . . as expeditiously as practicable." The proposed rulemaking would have allowed higher limit (132,000 tons $NO_x$) than what is already emitted. Power plants would have been allowed to increase emissions, while the purpose of RACT is to decrease emissions.

The Board disagrees that the proposed rulemaking was not RACT. The evaluation or re-evaluation of what constitutes RACT-level control for affected sources is a requirement that must be fulfilled each time the EPA promulgates a new NAAQS as was the case in 1979 for the 1-hour ozone standard and in 1997 for the 8-hour ozone standard; re-evaluation of RACT is also required when the EPA revises a NAAQS as was the case in 2008 for the 8-hour ozone standard. The proposed rulemaking addressed the RACT requirements for the 8-hour ozone NAAQS promulgated in 1997 and 2008. The final-form rulemaking is applicable to certain owners and operators of major sources of $NO_x$ or VOC emissions (precursors to ozone formation) in existence on or before July 20, 2012, the effective date of the EPA's designations and classifications for the 2008 ozone NAAQS. See 77 FR 30088.

The Board agrees that the purpose of RACT is to decrease ozone precursor emissions. However, the amount of emission reductions achieved as a result of the application of RACT-level control is determined on the basis of the source's potential to emit before and after the application of RACT-level control, not on a comparison with a source's current actual emissions. The final-form rulemaking establishes presumptive RACT requirements and RACT emission limitations for $NO_x$ or VOCs that are achievable and sustainable during the expected life of the affected unit using technologies that are technically and economically feasible. Implementation of the final-form rulemaking presumptive RACT requirements and RACT emission limitations will reduce the amount of $NO_x$ and VOC emissions that the owner and operator of a facility subject to §§ 129.96—129.100 would be legally allowed to emit to the atmosphere.

In response to comments and the EPA's Ozone NAAQS Implementation Rule published at 80 FR 12264 (March 6, 2015), the Department conducted additional reviews of historical emissions data for coal-fired electric generating units (EGU) equipped with SCR technology. The Department determined that the $NO_x$ limit specified in § 129.97(g)(1)(viii) should be revised. Section 129.97(g)(1)(viii) specifies that any combustion unit equipped with an SCR system that is operating with an inlet temperature equal to or greater than 600°F must meet a $NO_x$ emission limit of 0.12 lb $NO_x$/million Btu. Compliance with this emission limit is also required when by-passing the SCR system. The Department acknowledges that the $NO_x$ RACT limit in the final-form rulemaking is not the lowest achievable emissions rate for this technology. However, the EPA has indicated in the preamble for the final rule approving a SIP revision for Wisconsin's $NO_x$ RACT Rule that:

> RACT limits are not meant to be the lowest achievable emission rates. The Nitrogen Oxides Supplement to the General Preamble for the Implementation of Title I of the Clean Air Act Amendments of 1990 addresses the issue of an acceptable emission limit. See section 4.6 RACT for Certain Electric Utility Boilers (57 FR 55626), "The EPA expects States, to the extent practicable, to demonstrate that the variety of emission controls adopted are consistent with the most effective level of combustion modification reasonably available for its individual affected sources."

See 75 FR 64155, 64157 (October 19, 2010). The Department's re-evaluation of the $NO_x$ RACT limit for coal-fired EGUs, taking into consideration cost-effectiveness and technological feasibility, is consistent with the approach outlined in the preamble of the rulemaking published at 75 FR 64155 approving Wisconsin's RACT SIP revision.

The final-form RACT rulemaking will reduce the amount of pollution that is currently allowed to be emitted through implementation of more stringent limitations. No facility owner or operator will be allowed to increase their emissions. The final-form RACT rulemaking sets forth emission limitations for $NO_x$ or VOCs that are achievable using technologies that are reasonably available. For example, upon re-evaluation of the $NO_x$ emissions data from coal-fired EGUs equipped with SCR, the Board concluded that a $NO_x$ emission limit of 0.12 lb/MMBtu heat input is achievable with operation of the SCR when an inlet temperature of 600°F is reached. The Board also concluded that a $NO_x$ emission limit of

**RULES AND REGULATIONS**

0.16 lb/MMBtu heat input is achievable for CFB combustion units. The final-form rulemaking has been amended accordingly.

Potential $NO_x$ emission reductions beyond current RACT allowable emissions are presented as follows. For 257 boilers, the potential $NO_x$ emissions reduction is 70,149 tpy or a 28% reduction. For 12 EGUs equipped with SCR systems, the potential $NO_x$ emissions reduction is 138,972 tpy or a 75% reduction. For 393 engines, the potential $NO_x$ emissions reduction is 20,596 tpy or a 44% reduction. For 148 turbines, the potential $NO_x$ emissions reduction is 23,906 tpy or a 40% reduction. In total for 810 air contamination sources, the potential $NO_x$ emissions reduction is 253,623 tpy or a 47% reduction.

Reductions in actual $NO_x$ emissions from coal-fired boilers or EGUs are also anticipated as a result of the implementation of the final-form RACT requirements and RACT emission limitations. The actual $NO_x$ emissions from coal-fired EGUs in this Commonwealth for 2013 were 119,025 tons. The actual 2013 $NO_x$ emissions from coal-fired EGUs that are not scheduled for retirement or for fuel-switching were 92,728 tons. The expected $NO_x$ emissions from coal-fired EGUs that are not scheduled for retirement or fuel-switching, based on 2013 production rates and the $NO_x$ emission limitations in the final-form rulemaking, are 59,039 tpy. This is an anticipated reduction in actual emissions of approximately 36% [[(92,728 tons − 59,039 tons) / 92,728 tons} × 100 = 36%] from this sector.

A commentator cautioned the Department not to rigidly apply a benchmark as low as $2,500 per ton to exclude consideration of technically feasible controls. Rather, the Commonwealth needs to consider a broader range of cost effectiveness to see if some level of additional control falls within that range. Based on Wisconsin's analysis, the Department should consider raising its cost-effectiveness "benchmark" like Wisconsin and New York after considering and evaluating thoroughly the states' analyses.

The Board did not establish a bright-line cost effectiveness threshold to determine RACT. The Board initially used minimum cost-effectiveness thresholds of $1,500 and $3,000 per ton of $NO_x$ and VOC controlled, respectively, in 1990 dollars, for the implementation of RACT requirements for the 1979 1-hour ozone NAAQS in §§ 129.91—129.95. These cost-effectiveness thresholds were consistent with thresholds used at that time by other states for RACT determinations for the 1979 1-hour ozone NAAQS as well. The Board used the United States Bureau of Labor Statistics Consumer Price Index to adjust $1,500 in 1990 dollars to $2,500 in 2010 dollars. When extrapolated into 2014 dollars, this figure is approximately $2,750. The Board used a $NO_x$ emission cost-effectiveness upper-bound of $2,800 per ton $NO_x$ controlled.

Even with an additional 25% margin, the upper-bound cost-effectiveness threshold would not be any greater than $3,500 per ton $NO_x$ controlled. Similarly for VOC, the upper-bound cost-effectiveness threshold would not be any greater than $7,000 per ton VOC controlled. Applying these new thresholds does not have an effect on the add-on control technology decisions for the presumptive RACT requirements established in the final-form rulemaking. The RACT limits included in the final-form rulemaking are comparable to emission limits included in other states' RACT regulations.

It should be noted that Wisconsin's SIP-approved RACT regulations in 2010 were based on a $NO_x$ cost-effectiveness benchmark of $2,500 per ton controlled.

Commentators believed that the proposed rulemaking would weaken current emissions limits. Regulatory and policy changes will add ozone and other criteria pollutants to some of the most overburdened communities in this Commonwealth.

The Board disagrees because the final-form rulemaking does not weaken existing emissions limits. The final-form RACT rulemaking includes emission limitations for $NO_x$ or VOCs that are achievable using technologies that are reasonably available.

Following the adoption and implementation of the final-form rulemaking, $NO_x$ emissions from the electric generating sector in this Commonwealth are expected to be reduced from 119,025 tpy, based on 2013 production rates, to 59,039 tpy. The actual $NO_x$ emissions from coal-fired EGUs in this Commonwealth for 2013 were 119,025 tons. The actual 2013 $NO_x$ emissions from coal-fired EGUs that are not scheduled for retirement or for fuel-switching were 92,728 tons. The expected $NO_x$ emissions from coal-fired EGUs that are not scheduled for retirement or fuel-switching, based on 2013 production rates and the $NO_x$ emission limitations in the final-form rulemaking, are 59,039 tpy.

In addition, the final-form rulemaking specifically provides under § 129.97(i) and (j) that the more stringent limitation or requirement applies to the owner or operator of a facility subject to the regulation.

A commentator represented that for the class of the largest $NO_x$-emitting sources, the representations of "Anticipated Effect on Emissions" are overstatements in contrast with the much more common sense approach of comparing the proposed emission limitation with current actual emissions. The latter comparison demonstrates that the proposed RACT requirements are no substantial improvement with respect to controlling $NO_x$ emissions from large coal-fired power plants.

The Board disagrees that the representation of "anticipated effect on emissions" should be based on a comparison of the emissions expected as a result of implementation of the presumptive RACT requirements and RACT emission limitations with current actual emissions. The amount of $NO_x$ and VOC emission reductions achieved as a result of the application of RACT-level control is determined on the basis of the source's potential to emit before and after the application of RACT-level control. Implementation of the final-form rulemaking presumptive RACT requirements and RACT emission limitations will reduce the amount of ozone precursor emissions that the owner and operator of a facility subject to §§ 129.96—129.100 would be legally allowed to emit to the atmosphere. Further, the final-form rulemaking revises the $NO_x$ emission limit for CFB combustion units in § 129.97(g)(1)(vi)(A) from 0.20 lb $NO_x$/million Btu heat input to 0.16 lb $NO_x$/million Btu heat input. The final-form rulemaking also addresses the use of installed SCR or SNCR equipment in § 129.97(g)(1)(viii) and (ix).

The potential $NO_x$ emission reductions in tpy beyond current RACT allowable emissions is approximately 253,623 tons from 810 units as follows: for 257 boilers—approximately 70,149 tons; for EGUs equipped with SCR systems—approximately 138,972 tons; for engines—approximately 20,596 tons; and for turbines—approximately 23,906 tons.

The actual $NO_x$ emissions from coal-fired EGUs in this Commonwealth for 2013 were 119,025 tons. The actual 2013 $NO_x$ emissions from coal-fired EGUs that are not scheduled for retirement or for fuel-switching were 92,728

tons. The expected $NO_x$ emissions from coal-fired EGUs that are not scheduled for retirement or fuel-switching, based on 2013 production rates and the $NO_x$ emission limitations in the final-form rulemaking, are 59,039 tpy. This is an anticipated reduction in actual emissions of approximately 36% from this sector.

Some commentators allege that additional support and analysis is needed in the Regulatory Analysis Form (RAF) and preamble to justify the proposed regulations.

The Board disagrees that there is insufficient information in either the preamble to the proposed rulemaking or the RAF to justify the regulations. Both of these documents are replete with substantive information regarding emissions data, cost-effectiveness numbers, public health information, statutory requirements, small business information and other types of analyses to demonstrate that the regulations are legally required, in the public interest, economically and technologically feasible, and will reduce emissions. The estimates included in the RAF to the proposed rulemaking and the final-form rulemaking are based on the information available to the Department. The presumptive RACT emission limitations were established based on cost-effectiveness of available control technology and are not based on the total number of affected units or number of total units requiring control.

Some commentators believed that the proposed rulemaking significantly underestimated the number of affected units that would require installation of $NO_x$ or VOC control technology. Approximately 150 units operated by natural gas transmission companies would be affected by the proposed rulemaking; this exceeds the Department's estimate for all affected units Statewide. The proposed rulemaking would have significant impact on natural gas transmission company operations, including many requirements to install control technology and associated costs that are significantly under-estimated by the Commonwealth.

The Board finds that the estimates for numbers of affected units included in the RAF to the proposed rulemaking and the final-form rulemaking are based on the information available to the Department. The presumptive RACT emission limitations were established based on cost-effectiveness of available control technology and not based on the total number of affected units or number of total units requiring control.

The Board re-evaluated the number of units requiring control as a result of revisions to emission limitations in the final-form rulemaking. The number of turbines requiring control has dropped from 64 to 17 primarily due to the final-form rulemaking setting forth a presumptive RACT emission limitation of 150 ppmvd $NO_x$ @ 15% oxygen for simple cycle or regenerative cycle turbines equal to or greater than 1,000 bhp and less than 6,000 bhp.

Several commentators said that compliance with the Federal Clean Air Interstate Rule (CAIR) or Cross-State Air Pollution Rule (CSAPR) should constitute compliance with RACT. The Department should rely on CAIR/CSAPR to satisfy RACT for EGUs.

The Board disagrees that compliance with CAIR/CSAPR should constitute compliance with RACT and that the Department should rely on CAIR/CSAPR to satisfy RACT for EGUs. Moreover, the United States Court of Appeals for the D.C. Circuit granted the EPA's request for voluntary vacatur of the presumption that compliance with the CAIR or the $NO_x$ SIP Call automatically constitutes RACT or reasonably available control measures for

$NO_x$ emissions from EGUs participating in regional cap-and-trade programs. *NRDC v. EPA*, No. 09-1198 (D.C. Cir.) (order of August 30, 2013). In the EPA's comments on the proposed rulemaking, designated ozone nonattainment areas required to implement RACT must achieve RACT level reductions inside the nonattainment area. In response to the EPA's comment, final-form § 129.98(a) has been amended to address the system-wide averaging provisions as follows: "System-wide emissions averaging must be among sources under common control of the same owner or operator within the same ozone nonattainment area in this Commonwealth." This approach should assure that emissions averaging will occur among units in the same ozone nonattainment area and that emission reductions from outside a given area of more severe nonattainment cannot be used to offset emissions within the area of more severe nonattainment.

Some commentators believed that the proposed RACT standard would allow coal plants to keep the air in some communities cleaner than others, a fact highly likely to continue racial disparity in air pollution. The health of citizens in this Commonwealth who have limited incomes or are living in poverty is also especially vulnerable to smog pollution. The Department runs the risk of exposing certain citizens, including those living in environmental justice communities, to a disproportionate amount of extra pollution.

The Board disagrees. The final-form rulemaking reduces the allowable emission rates for certain coal-fired facilities and requires the operation of existing control equipment for other facilities. Pollution from this sector continues to decline. For example, the actual $NO_x$ emissions from coal-fired EGUs in this Commonwealth for 2000 were 192,004 tons; the actual $NO_x$ emissions from coal-fired EGUs in this Commonwealth for 2013 were 119,025 tons. The actual 2013 $NO_x$ emissions from coal-fired EGUs that are not scheduled for retirement or for fuel-switching were 92,728 tons. The expected future $NO_x$ emissions from coal-fired EGUs that are not scheduled for retirement or fuel-switching, based on 2013 production rates and the $NO_x$ emission limitations in the final-form rulemaking, are 59,039 tpy.

## § 121.1. Definitions

Several commentators believed that all definitions should match Federal definitions. The proposed new definition for "stationary internal combustion engine" opens up application to the entirety of air quality regulations. It appears the Pennsylvania definition has always included portable (not mobile) combustion engines. The definition should be same as the EPA's reciprocating internal combustion engines rule in 40 CFR Part 63, Subpart ZZZZ (relating to National emission standards for hazardous air pollutants for stationary reciprocating internal combustion engines). Some commentators suggested that definitions consistent with the Federal definitions "'capacity factor' in 40 CFR 72, 'combustion turbine' in 40 CFR 60 NSPS, and 'stationary internal combustion engine' in NSPS IIII and JJJJ and NESHAPS ZZZZ" should be added.

The Board agrees. The final-form rulemaking contains definitions consistent with the Federal regulations. The final-form rulemaking revises the definition of "stationary internal combustion engine" to include the term "stationary reciprocating internal combustion engine." The final-form rulemaking adds definitions for "regenerative cycle combustion turbine," "simple cycle combustion turbine" and "stationary combustion turbine." Final-form § 129.97(c)(7)(i) establishes that the "annual capacity

factor" for a combustion unit is the ratio of the unit's heat input (in million Btu or equivalent units of measure) to the unit's maximum rated heat input (in million Btu or equivalent units of measure) times 8,760 hours during a period of 12 consecutive calendar months. The "annual capacity factor" for an EGU is established in final-form § 129.97(c)(7)(ii) as the ratio of the unit's actual electric output (expressed in MWe/hr) to the unit's nameplate capacity (or maximum observed hourly gross load (in MWe/hr) if greater than the nameplate capacity) times 8,760 hours during a period of 12 consecutive calendar months. Final-form § 129.97(c)(7)(iii) establishes that for any other unit, the "annual capacity factor" is the ratio of the unit's actual operating level to the unit's potential operating level during a period of 12 consecutive calendar months.

A commentator stated that "air contamination source" is broadly defined and becomes problematic when used in § 129.99(b) and (c). The commentator asked if the term applies to each individual piece of equipment or to a grouping of equipment.

The Board disagrees. The applicability threshold values of § 129.99(b) and (c) were determined as generic emission levels below which the application of add-on emission control technology is not economically feasible. "Air contamination source" is already defined in the act and § 121.1 and needs no further clarification.

§ 129.96. Applicability

A commentator believed that the preamble should have clearly indicated that the proposed rulemaking only applied to major sources of NO_x and VOCs.

The Board agrees that the NO_x RACT requirements are applicable to major NO_x emitting facilities and the VOC RACT requirements are applicable to major VOC emitting facilities. The NO_x requirements of §§ 129.96—129.100 apply Statewide to the owner and operator of a major NO_x emitting facility and the VOC requirements of §§ 129.96—129.100 apply Statewide to the owner and operator of a major VOC emitting facility. Section 129.96 was amended to clarify the applicability.

A commentator stated that while a number of existing regulations are referenced in the applicability section, there is no clarifying statement of prior presumptive RACT requirements that were promulgated under §§ 129.91—129.95. In the proposed rulemaking, these regulations are not superseded until the end of § 129.97. It may be clearer to address all the applicability pieces under § 129.96 instead of splitting it up.

The Board disagrees. Sections 129.91—129.95 are not superseded by the final-form rulemaking. The affected owners and operators of major VOC and NO_x emitting facilities are subject to §§ 129.91—129.95 and §§ 129.96—129.100. Section 129.97(i) is intended to ensure that an owner or operator complies with the more stringent of the RACT requirements in a RACT permit issued under §§ 129.91—129.95 and the presumptive RACT requirements in the final-form rulemaking. Section 129.97(i) and (j) specifically provides that the more stringent provisions apply whether those provisions are under the final-form rulemaking, some other regulation or a previously issued permit. These safeguards prevent backsliding from the most stringent applicable requirements.

A commentator's understanding of EPA policy is that those sources that have already installed air pollution control equipment as a result of previous RACT are not required to install additional controls absent new infor-

mation indicating otherwise. See, for example, 70 FR 71612, 71655 and *NRDC v. EPA*, 571 F.3d 1245, 1253—55. The Department should amend proposed § 129.96 to exclude NO_x and VOC sources that have already undergone RACT review and have resulting NO_x or VOC, or both, limits or restrictions, unless new information indicates that a new RACT analysis is justified.

The Board believes that the commentator is referring to *NRDC v. EPA*, 571 F.3d 1245 (D.C. Cir. 2009), decided by the D.C. Circuit Court in 2009, not 2008 as stated by the commentator. The Board disagrees with the commentator's assertion. The evaluation or re-evaluation of what constitutes RACT-level control for affected sources is a requirement that must be fulfilled each time the EPA promulgates a new NAAQS as was the case in 1979 for the 1-hour ozone standard and in 1997 for the 8-hour ozone standard or revises a NAAQS as was the case in 2008 for the 8-hour ozone standard. The final-form rulemaking addresses the RACT requirements for the 8-hour ozone NAAQS promulgated in 1997 and revised in 2008. The final-form rulemaking requirements are applicable to the owners and operators of subject sources in existence on or before July 20, 2012, and to owners and operators of subject sources when the installation of a new source or a modification or change in operation of an existing source after July 20, 2012, results in the source or facility meeting the definition of a major NO_x emitting facility or a major VOC emitting facility.

The EPA's Phase 2 Rule certification provision allows states to certify that the control measures approved as RACT under the 1-hour ozone standard also satisfy the RACT requirements under the 8-hour ozone standard absent information indicating they should not be approved. This approach adequately ensures that RACT determinations will take into account advances in technology.

The Department reviewed all available information, including Federal regulations and RACT regulations from various states. This review showed that a new RACT analysis is justified. The Board believes that the presumptive RACT requirements included in the final-form rulemaking are appropriate. Should an affected owner or operator not be able to comply with the presumptive requirement or emission limitation, the owner or operator may propose an alternative RACT requirement or RACT emission limitation under § 129.99(a) based on the source's potential to emit NO_x or VOCs.

Several commentators believed that since they are subject to more stringent requirements under other programs (such as Maximum Achievable Control Technology (MACT), National Emission Standards for Hazardous Air Pollutants (NESHAP) and New Source Performance Standards (NSPS)) they should be exempt from RACT requirements. The Department should exempt emergency generators and other sources with applicable Federally-mandated NO_x and VOC control requirements from RACT requirements. Additional exemptions are needed to accommodate facilities that are already subject to more stringent requirements or have already completed a RACT process.

The Board disagrees. An evaluation or re-evaluation of what constitutes RACT for affected sources is required under section 182 of the CAA for existing major NO_x emitting or existing major VOC emitting facilities each time a NAAQS is promulgated or revised. The final-form rulemaking addresses the RACT requirements for the 8-hour ozone NAAQS promulgated in 1997 and revised in 2008. RACT applies to the owners and operators of

existing major stationary sources of NO$_x$ and VOC in ozone nonattainment areas. RACT for covered categories is required Statewide and not just in designated ozone nonattainment areas in this Commonwealth because the Commonwealth is in the Northeast Ozone Transport Region established under section 184 of the CAA.

Section 182(b)(2) of the CAA requires that the Commonwealth implement RACT for each category of existing VOC sources in the area covered by a CTG document issued by the Administrator between November 15, 1990, and the date of attainment, as well as for all existing VOC sources in the area covered by any CTG issued before November 15, 1990, and all other major stationary sources of VOCs that are located in the area. Under sections 182(f)(1) and 184(b)(2) of the CAA, RACT requirements are applicable to all existing major sources of NO$_x$ in this Commonwealth.

The MACT and NESHAP requirements apply to the control of emissions of hazardous air pollutants (HAP) from existing or new major sources as required under section 112 of the CAA (42 U.S.C.A. § 7412). Many HAPs are also VOCs, but not all VOCs are HAPs. NO$_x$ are also not HAP. Therefore the owner or operator of an existing major source subject to MACT/NESHAP requirements for the control of HAP emissions may also be subject to RACT requirements for the control of NO$_x$ and VOC emissions. Therefore, the Board believes that no additional exemptions are warranted to accommodate the owners or operators of facilities that are already subject to more stringent requirements or have already completed a RACT process.

§ 129.97. *Presumptive RACT requirements, RACT emission limitations and petition for alternative compliance schedule*

Some commentators felt the proposed regulations were less stringent than those that similarly-situated Mid-Atlantic states, including New Jersey, are proposing. The commentators requested that the Board explain how the final-form rulemaking will ensure that the Commonwealth is adequately addressing emissions under its jurisdiction so that the Commonwealth is properly meeting its pollution control responsibilities to other states.

The Board disagrees. The Department reviewed and considered RACT regulations from similarly situated Mid-Atlantic states, including New Jersey, during the development of the proposed and final-form rulemakings. Source categories in this Commonwealth are diverse with numerous sources having varying characteristics differing from those of the other Mid-Atlantic states. The Department evaluated these source categories and determined that the presumptive RACT requirements included in the final-form rulemaking are appropriate. In this Commonwealth, all monitored areas are attaining the 1997 and 2008 ozone standards, except the Harrison monitor in Allegheny County. RACT regulations are not intended to address interstate transport issues.

Commentators said proposed § 129.97(c) appeared to establish an absolute obligation for relevant sources to be maintained and operated in accordance with both manufacturer's specifications and good engineering practices. However, in many cases, existing sources are components of complex process systems, integrated operations, or are specialized and custom designed, such that the equipment-specific manufacturer's specifications do not exist or are no longer relevant or applicable, and indeed can be inconsistent with "good engineering practice." Even more simply, with respect to older sources, manufacturer's

specifications may no longer even be available. Therefore, the regulation should be amended to require operation and maintenance of regulated sources in accordance with good engineering practice, which, in appropriate circumstances, would include operation in accordance with manufacturer's specifications.

The Board notes that the presumptive RACT requirements included in § 129.93 (relating to presumptive RACT emission limitations) require the installation, maintenance and operation of the source in accordance with manufacturer's specifications. This requirement has been implemented since 1995. In addition, an affected owner or operator that is not able to comply with the applicable presumptive RACT requirements and emission limitations in the final-form rulemaking may opt to determine RACT requirements on a case-by-case basis under § 129.99.

In the final-form rulemaking, "good engineering practices" has been replaced with "good operating practices." "Engineering" refers to design, whereas "operating" refers to operation. Since this final-form rulemaking is applicable to the owners and operators of existing operating sources, it is more appropriate to regulate operating practices. In addition, this language is consistent with the permit compliance requirements in § 127.444 (relating to compliance requirements.)

Some commentators stated that in proposed § 129.97(g)(3) there appears to be some disparity between the combustion turbine and the reciprocating engine proposed requirements. The proposed combustion turbine level of 42 ppm on natural gas is approximately four times lower than the RACT level for a lean burn reciprocating engine and approximately two times lower than a rich burn engine. Uncontrolled combustion turbines are close to the proposed RACT levels for reciprocating engines. With reciprocating engines far outnumbering gas turbines in this Commonwealth, the commentator asked if it makes sense, from an environmental or cost impact basis, or both, to have a RACT for combustion turbines, especially small combustion turbines. The RACT compliance cost analyses conducted by the Department is not detailed enough to determine if the RACT emissions level proposed for combustion turbines is cost effective.

The Board disagrees with the comparison of emission rates for engines to turbines. They are different combustion technologies and are considered to be different source types for the purposes of RACT determinations. Therefore, the Board disagrees that presumptive RACT requirements and emission limitations should not be established for turbines. The number of turbines subject to RACT requirements in this Commonwealth justifies the establishment of presumptive RACT emission limitations for turbines to minimize case-by-case RACT determinations.

Presumptive RACT emission limitations are implemented for each source category based on RACT determinations and associated emissions data. In addition, the owner or operator of any affected source that cannot meet a presumptive RACT emission limitation may propose an alternative limit determined on a case-by-case basis.

One commentator was concerned with the Board's statement in RAF Question 12 that the proposed regulations are "similar to regulations already adopted by Wisconsin and New York and approved by the EPA." However, the commentator believed that New York has in place significantly more stringent emissions limits than the Commonwealth. The commentator stated that the Board should either support or amend its response to RAF Question 12.

The Board believes that its response is adequate. The Department reviewed and considered RACT regulations from various states when evaluating what constitutes RACT for the types of sources affected by the final-form rulemaking. Source categories in this Commonwealth are diverse with numerous individual sources having varying characteristics. The Department evaluated these source categories and determined that the presumptive RACT requirements included in the final-form rulemaking are appropriate.

Due to variability in source type, combustion characteristics, unit size, fuel usage, operating conditions and source age, there are differences between the final-form rulemaking and the New York RACT regulations in terms of emission limits, exceptions, size cutoffs, and the like. For example, New York determined that combined-cycle combustion turbines operated after July 1, 2014, should undergo case-by-case analysis due to limited numbers. As New York noted in their Regulatory Impact Statement, "Because of the limited number of sources and the wide range of available control technologies, the [NY] Department was not able to identify a presumptive $NO_x$ RACT emission limit for combined cycle combustion turbines." However, due to the large number of these sources operating in this Commonwealth, the Department was able to determine a presumptive $NO_x$ RACT emission limitation for different categories of combined-cycle combustion turbines, including large combustion turbines that will likely be required to use SCR control to meet the applicable $NO_x$ RACT emission limitation. The basis for the determination of the presumptive RACT requirements and emission limitations included in the final-form rulemaking is included in the RAF and the comment and response document.

The determinations of what add-on control technologies are reasonably available to meet the presumptive RACT requirements and emission limitations included in the final-form rulemaking are consistent with the determinations of what add-on control technologies are reasonably available to meet the presumptive RACT requirements in New York. The RACT emission limits included in the final-form rulemaking are comparable to emission limits included in other states' RACT regulations, including New York and Wisconsin.

*Subsections (b) and (g)(1)—Combustion units*

A commentator believed that the proposed rulemaking requires minimization of $NO_x$ and carbon monoxide (CO) emissions which is inconsistent with the boiler MACT rule. The commentator recommended that this provision be amended to mirror the boiler MACT requirements. The commentator also stated that a periodic tune-up conducted in accordance with the boiler MACT satisfies § 129.99 in the year in which it is conducted.

The Board revised the final-form rulemaking to require biennial tune-ups for a combustion unit with a rated heat input equal to or greater than 20 million Btu/hour and less than 50 million Btu/hour conducted in accordance with 40 CFR 63.11223. CO emissions are required to be included in the record under 40 CFR 63.11223. In addition, CO emissions are recorded as a surrogate for VOC emissions.

The commentator found that reference to "flame pattern" is not applicable to all combustion sources. The commentator has seen instances when combustion unit language has been included in a combustion turbine permit rendering an irrelevant and impossible-to-comply-with permit condition.

The Board agrees that the requirements for combustion units referencing "flame pattern" are not applicable to all combustion sources, including turbines. The presumptive RACT requirement for a combustion unit with a rated heat input equal to or greater than 20 million Btu/hour and less than 50 million Btu/hour is a biennial tune-up conducted in accordance with the procedures in 40 CFR 63.11223, which includes inspection and adjustment of the flame pattern. A combustion unit is a stationary equipment used to burn fuel primarily for the purpose of producing power or heat by indirect heat transfer. While turbines are combustion sources, they produce power by direct heat transfer and are not combustion units by definition. Therefore, the tune-up requirement is not applicable to combustion turbines. In addition, this tune-up requirement should not appear as an applicable permit requirement for combustion turbines.

Commentators recommended that the presumptive RACT requirements for coal-fired boilers should be established based on actual emission levels achieved in practice while operating with post-combustion controls, such as SCR or SNCR systems. The SCR regulations should require the use of SCR or other control devices continuously to minimize $NO_x$ pollution.

The Board disagrees that the presumptive RACT requirements for coal-fired boilers should be established based solely on the lowest actual emission levels achieved in practice by some of the affected units while operating with post-combustion controls. The proposed and final-form RACT rulemakings establish presumptive emission limitations for $NO_x$ or VOCs that are achievable and sustainable during the expected life of the affected unit using technologies that are both technically and economically feasible. Implementation of the final-form rulemaking presumptive RACT requirements and RACT emission limitations will reduce the amount of ozone precursor emissions that the owner and operator of a facility subject to §§ 129.96—129.100 would be legally allowed to emit to the atmosphere.

Design limitations of the existing SCR and SNCR control technology installed on the affected coal-fired boilers dictate the operating parameters that are reasonably achievable. However, based on consideration of comments received during the public comment period and on the evaluation of $NO_x$ emissions data for coal-fired boilers for a 5-year period, the final-form rulemaking addresses the use of installed SCR or SNCR equipment in § 129.97(g)(1)(viii) and (ix). Further, the $NO_x$ emission limit for CFB combustion units in § 129.97(g)(1)(vi)(A) is revised from the proposed 0.20 lb $NO_x$/million Btu heat input to 0.16 lb $NO_x$/million Btu heat input in the final-form rulemaking.

Upon re-evaluation of the $NO_x$ emissions data from the coal-fired EGUs equipped with SCR, the Board concluded that a $NO_x$ emission limit of 0.12 lb/MMBtu was achievable with operation of SCR when an inlet temperature of 600°F is reached. This limit accounts for the design limitations of the existing SCR systems. In addition, compliance with this emission limit is also required when by-passing the SCR system.

Upon re-evaluation of the $NO_x$ emission data from CFB boilers, the Board concluded that a $NO_x$ emission limit of 0.16 lb/MMBtu was achievable. The 0.16 lb/MMBtu $NO_x$ emission level must be achieved at all times and, if equipped with SNCR, the SNCR must be in operation with the injection of reagents including ammonia or other $NO_x$-reducing agents, when the temperature at the area of the reagent injection is 1,600°F or greater.

The Board further believes that continuous operation of existing SCR and SNCR control technology installed on the combustion units subject to final-form § 129.97(g)(1)(vi)(A), (viii) and (ix) cannot be required due to changing market conditions and deployment of electric generating capacity. Therefore, due to the design limitations of the SCR and SNCR control technology and the minimum operating temperatures required for efficient operation and optimized $NO_x$ emission reduction, operation of the existing SCR and SNCR controls below the minimum designed temperature cannot be required in the final-form rulemaking.

A commentator wanted the Board to provide the technical analysis that supports the 0.08 lb $NO_x$/MMBtu heat input, as that is different from the EPA's NSPS which recognizes 0.10 lb $NO_x$/MMBtu.

The Board agrees and that analysis is as follows. The Department determined that the average uncontrolled $NO_x$ emission rate for natural gas-fired combustion units was 0.2 lb/MMBtu. At an average $NO_x$ control efficiency of 50% for low-$NO_x$ burners, the feasible control for natural gas-fired combustion units, the presumptive $NO_x$ RACT emission limitation for natural gas-fired combustion units rated at or above 50 MMBtu/hr is 0.1 lb/MMBtu. The Department initially lowered this to 0.08 lb $NO_x$/MMBtu to be consistent with Wisconsin's SIP-approved RACT requirements.

Upon further analysis, the Department could not find sufficient information to support the Commonwealth establishing a presumptive $NO_x$ RACT emission limitation of 0.08 lb/MMBtu just to be consistent with Wisconsin's RACT requirements. Therefore, in the final-form rulemaking, the presumptive $NO_x$ RACT emission limitation was revised from 0.08 lb $NO_x$/MMBtu to 0.10 lb $NO_x$/MMBtu for a natural gas-fired combustion unit or process heater with a rated heat input equal to or greater than 50 MMBtu/hour. This requirement is now consistent with the requirement in the NSPS in 40 CFR Part 60, Subpart Db (relating to standards of performance for industrial-commercial-institutional steam generating units) and § 129.201 (relating to boilers).

A commentator believed that due to the larger combustion zone available on natural gas-fired combustion units rated greater than 50 million Btu/hour, the presumptive RACT emission rate of 0.08 lb $NO_x$/MMBtu for these units is not achievable for a unit that was designed to burn coal or fuel oil and has been converted to firing natural gas. For example, the units at the Martins Creek facility were converted from an oil-fired design to allow combustion of natural gas. Stack testing of these units revealed that $NO_x$ emission rates cannot approach the standard that may be achievable for units originally designed to combust primarily or exclusively natural gas. Therefore, the commentator believed that case-by-case RACT determinations are appropriate for these sources.

The Board finds that in the final-form rulemaking the presumptive $NO_x$ RACT emission limitation was revised from 0.08 lb $NO_x$/MMBtu to 0.10 lb $NO_x$/MMBtu for a natural gas-fired combustion unit or process heater with a rated heat input equal to or greater than 50 million Btu/hour. This requirement is now consistent with the requirement in the NSPS in 40 CFR Part 60, Subpart Db and § 129.201. Should the owner or operator of a combustion unit choose not to comply with the presumptive requirement, the owner or operator may propose an alternative $NO_x$ RACT emission limitation based on the potential to emit $NO_x$ under § 129.99(a).

A commentator stated that even for those few boilers that lack controls superior to the contemplated RACT of low $NO_x$ burners, installation and operation of SNCR would achieve reductions of $NO_x$ at significantly less than $2,500 per ton.

The Board disagrees. The Department reviewed all available information, including Federal regulations and RACT regulations from various states. The cost-effectiveness of technically feasible add-on control devices, including SNCR, was calculated in accordance with the EPA Office of Air Quality Planning and Standards Cost Manual. The Board believes that the presumptive RACT requirements included in the final-form rulemaking are appropriate.

*Subsection (g)(2)—Combustion turbines*

A commentator found that the Commonwealth's analysis does not indicate whether a meaningful environmental benefit would be derived from VOC reductions. The Commonwealth should provide background documentation to support the basis for the concentration-based turbine standard.

The Board notes that RACT re-evaluation is a requirement to be fulfilled each time a NAAQS is promulgated. The final-form rulemaking addresses the RACT requirements for the 8-hour ozone NAAQS promulgated in 1997 and 2008. However, no specific emission reductions are required under the re-evaluation.

The Department found that the typical uncontrolled VOC emission limit for RACT I was 25 ppm @ 15% oxygen, as methane for turbines rated greater than 1,000 bhp and less than 180 MW. This translates into 9 ppm @ 15% oxygen, as propane. The cost of VOC control using an oxidation catalyst was found to be $21,112—$421,095, which is not cost-effective. Therefore, the final-form rulemaking establishes a presumptive RACT VOC emission limitation of 9 ppm @ 15% oxygen, as propane for simple cycle turbines and combined cycle turbines fired on fuel oil rated at greater than 1,000 bhp and less than 180 MW.

Continuous emission monitoring system (CEMS) data indicates that a combined cycle turbine fired on natural gas rated at greater than 1,000 bhp and less than 180 MW can meet a VOC emission limitation of 5 ppm @ 15% oxygen, as propane. Additionally, CEMS data indicates that turbines rated at greater than 180 MW can meet a VOC emission of 2 ppm @ 15% oxygen, as propane. Therefore, these emission limitations are established in the final-form rulemaking.

The technical support document is available with the final-form rulemaking, which includes documentation to support the basis for the VOC RACT emission limitations. VOC reductions of the type contemplated under this final-form rulemaking will assist in the maintenance of the 8-hour 1997 and 2006 ozone standards. The EPA regulates ground-level ozone as a criteria air pollutant because of its widespread adverse health and environmental effects. Exposure to high concentrations of ground-level ozone is a serious human and animal health and welfare threat, causing respiratory illnesses and decreased lung function, agricultural crop loss, visible foliar injury to sensitive plant species, and damage to forests, ecosystems and infrastructure.

*Subsection (g)(3)—Internal combustion engines*

Some commentators believed § 129.97(g)(3) was unclear. This paragraph should clearly state that emergency engines greater than 500 bhp are excluded from the

emission limits for stationary internal combustion engines greater than 500 bhp. Proposed subsections (c)(6) and (g)(3) were not compatible. One exempts emergency stand-by engines operating less than 500 hours in a 12-month rolling period, while the other generally includes stationary internal combustion engines. The commentators suggested adding "[e]xcept as provided in § 129.97(c)(6)" to the beginning of subsection (g)(3).

The Board agrees that the proposed paragraph was unclear. The final-form rulemaking has been amended to clarify that the owner or operator of a source that meets the requirements under § 129.97(c) would not be required to also meet the numerical presumptive RACT emission limitations under § 129.97(g) for that source.

*Subsection (h)—Portland cement kilns*

One commentator contended that the emissions limitations required of Portland cement kilns would likely require the significant expenditure of funds for the installation of NO$_x$ air pollution control technologies such as SNCR systems.

The Board disagrees. The presumptive RACT emission limitations included in the final-form rulemaking for Portland cement kilns are consistent with the emission limitations for Portland cement kilns in § 145.143 (relating to standard requirements). The Department believes that the final-form rulemaking contains appropriate presumptive RACT emission limitations for Portland cement kilns. In addition, several existing Portland cement kilns are equipped with SNCR. Should the owner or operator of a Portland cement kiln choose not to comply with the presumptive requirement, the owner or operator may propose an alternative NO$_x$ RACT emission limitation based on the potential to emit NO$_x$ under § 129.99(a).

Several commentators said that a compliance alternative needs to be included for cement kilns in this program, be it CAIR allowances or some other program NO$_x$ allowances. To ensure that this program does not result in an increase of emissions over what was contemplated in the proposed rulemaking, an allowance program should require a two-for-one allowance surrender. This provision would provide necessary flexibility to the cement industry and would also provide even greater emission offsets in the event a facility found itself out of compliance with the proposed regulation.

The Board disagrees. RACT re-evaluation is a requirement to be fulfilled each time a NAAQS is promulgated. The final-form rulemaking addresses the RACT requirements for the 8-hour ozone NAAQS promulgated in 1997 and 2008. RACT applies to existing major stationary sources of VOCs and NO$_x$ in ozone nonattainment areas. RACT is defined as "the lowest emission limitation that a particular source is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility." Therefore, CAIR allowances or some other program NO$_x$ allowances cannot be used to meet the RACT requirements.

Furthermore, the EPA commented on the proposed rulemaking that designated ozone nonattainment areas required to implement RACT must achieve RACT levels reductions inside the nonattainment area. In response to the EPA's comment, final-form § 129.98(a) has been amended to address the system-wide averaging provisions as follows: "System-wide emissions averaging must be among sources under common control of the same owner or operator within the same ozone nonattainment area in this Commonwealth." This approach should assure that emissions averaging will occur among units in the same ozone nonattainment area.

Some commentators found that the proposed rulemaking would impose year-round emission standards on cement kilns that are currently ozone season standards on cement kilns. This imposes additional costs without any public benefits.

The Board disagrees that the final-form rulemaking imposes additional costs without any public benefits. RACT re-evaluation is a requirement to be fulfilled each time a NAAQS is promulgated. The final-form rulemaking addresses the RACT requirements for the 8-hour ozone NAAQS promulgated in 1997 and 2008. RACT applies to existing major stationary sources of VOCs and NO$_x$ in ozone nonattainment areas. RACT is defined as "the lowest emission limitation that a particular source is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility." Including §§ 145.141—145.146 in § 129.96 is not appropriate because the requirements included in § 145.143 are applicable only during the ozone season (May 1 through September 30), whereas RACT requirements are applicable on a year-round basis. The emissions reductions resulting from year-round requirements will be beneficial to the public due to lower concentrations of ground-level ozone.

*Subsection (f)—Municipal waste combustors*

Commentators noted that the proposed NO$_x$ emissions limits for municipal waste combustors require only that municipal waste combustor operators meet emissions limits established in Federal emissions guidelines. While the HAP emissions limits in the Federal guidelines are MACT-based, and thus may be RACT for VOCs, the NO$_x$ limits are not MACT-based and are not RACT. Therefore, more stringent limitations should be established as RACT.

The Board finds that the current proposed standards are in compliance with the emission guidelines in 40 CFR Part 60, Subpart Cb (relating to emission guidelines and compliance times for large municipal waste combustors that are constructed on or before September 20, 1994). These emission guidelines range from 180 to 250 ppmvd NO$_x$ @ 7% oxygen. Out of six existing facilities, five are already limited to 180 ppm or less. The Covanta Plymouth (Montgomery County) facility has CEMS data (3rd quarter 2007) showing emissions above 180 ppm. Emissions were generally between 190 and 200 ppm, with a few data points near 180 ppm (one below 180 ppm). The units located at the Covanta Plymouth facility are equipped with SNCR. The existing SNCR could be optimized to achieve an emission limit of 180 ppm. Upon re-evaluation of the NO$_x$ emission data from municipal waste combustors, the Board concluded that a NO$_x$ emission limit of 180 ppmvd @ 7% oxygen was achievable. In final-form § 129.97(f), the NO$_x$ limit is revised to 180 ppmvd @ 7% oxygen for municipal waste combustors.

*§ 129.98. Facility-wide or system-wide NO$_x$ emissions averaging plan general requirements*

One commentator believed that the proposed alternative compliance mechanisms must include a rate sufficient to lower system-wide emissions. The 30-day system-wide rolling average rate is set so high that it fails to require reductions at all sources. The rulemaking may have the effect of allowing operators to discontinue the operation of NO$_x$ control equipment simply by running controls on a different unit. Therefore, the emission rate needed to achieve compliance with system-wide average is not consistent with an appropriate level of post-combustion controls. The averaging mechanism itself must reflect some level of control. At a minimum, the

system-wide rate needs to incorporate a sufficient use of control technologies already installed on the units. An amendment to the $NO_x$ rate ought to take into account unit configuration and control technologies that have already been installed.

The Board disagrees. The final-form rulemaking will not allow the operator to discontinue the operation of $NO_x$ control equipment, such as SCR or SNCR, by operating controls on a different unit. A 30-day rolling limit addresses problems that are faced by certain owners and operators, including variability in fuel (such as in waste coal combustors), emission spikes during start-up and shutdown of the emission source, and emissions during malfunctions. The 30-day rolling average will require that the owners and operators operate below the allowable standard to account for the occasional higher emissions. Design limitations of the existing SCR and SNCR control technology installed on the affected coal-fired boilers dictate the operating parameters that are reasonably achievable.

However, based on consideration of comments received during the public comment period and on the evaluation of $NO_x$ emissions data for coal-fired boilers for a 5-year period, final-form § 129.97(g)(1)(viii) and (ix) addresses the use of installed SCR or SNCR equipment. Further, the $NO_x$ emission limit for CFB combustion units in § 129.97(g)(1)(vi)(A) is lowered from the proposed 0.20 lb $NO_x$/million Btu heat input to 0.16 lb $NO_x$/million Btu heat input in the final-form rulemaking.

The final-form rulemaking adds § 129.97(g)(1)(viii), which states that the presumptive emission limitation for a combustion unit with an SCR system operating with an inlet temperature equal to or greater than 600°F is 0.12 lb $NO_x$/million Btu heat input. Section 129.97(g)(1)(viii) further states that compliance with this emission limit is also required when by-passing the SCR system. Therefore, operation of SCR for one facility cannot be used to offset non-operation of SCR from a different facility in an emissions averaging plan.

Many commentators found that utilities should not be allowed to average their $NO_x$ emissions over their entire fleet of power plants in addition to allowing them to average these emissions over 30 days rather than the 1-hour or 8-hour standard. Peaking units should not be allowed to average their $NO_x$ emissions over 30 days rather than 24 hours or less.

The Board disagrees. A 30-day rolling averaging period is appropriate to accommodate operation at varying load and operating conditions.

A 30-day rolling limit addresses problems including variability in fuel (such as in waste coal combustors), emission spikes during start-up and shutdown of the emission source, and emissions during malfunctions that are faced by certain owners and operators. Due to these unavoidable circumstances not indicative of normal operation, it would not be appropriate for utilities utilizing $NO_x$ CEMS to be required to show compliance with the presumptive $NO_x$ RACT emission limitations over a 1-hour or 8-hour averaging period. The 30-day rolling average will require that the owners and operators operate below the allowable standard to account for the occasional higher emissions. A 30-day rolling average has been approved by the EPA to demonstrate compliance with the short-term RACT limitations in SIP revisions submitted by certain states, including New York and Wisconsin.

Wisconsin's RACT regulations, which the EPA approved in October 2010, include emission averaging on a 30-day

rolling basis for determining compliance. Wisconsin described this period as short term and noted that this approach would allow averaging of the typical variations in emission levels from a single unit.

The 30-day rolling averages are determined on an operating-day basis by taking the total emissions and dividing by the total heat input during each 30-day period. Therefore, there is no difference for peaking units as compared to other units.

In a recent court decision from the 9th Circuit Court of Appeals, the court stated in *Nat'l Parks Conservation Ass'n v. EPA*, No. 12-73710 (9th Cir. 2015) that "EPA also properly set emissions limits for Corette [a coal-fired power plant] on a 30-day rolling average. . . . EPA's reasoned disagreement on this topic with PPL Montana's comment reflects its conclusion on a highly scientific question—the variance in emissions calculations that occurs when annualized rates are translated into thirty-day rolling averages—precisely the kind of question justifying deference to EPA's discretion. See *Nat'l Wildlife Fed'n v. U. S. Army Corps of Eng'rs*, 384 F.3d 1163, 1177-78 (9th Cir. 2004)." Similarly, the Department is setting a 30-day rolling average to accommodate variances in hourly or daily emission calculations. With these variances accommodated, the Department is able to set emission limitations at a lower level.

In the preamble to the final rule for Implementation of the 2008 National Ambient Air Quality Standards for Ozone: State Implementation Plan Requirements, the EPA supported the use of area-wide emissions averaging at 80 FR 12264, 12280. The final rule stated "[t]he EPA's existing policy recognizes that states can meet $NO_x$ RACT requirements by submitting as part of their $NO_x$ RACT SIP submittal a demonstration that the weighted average $NO_x$ emission rate from sources in the nonattainment area subject to RACT achieves RACT-level reductions." The final rule also stated "[c]onsistent with previous guidance, the EPA continues to believe that RACT can be met on average by a group of sources within a nonattainment area rather than at each individual source." The averaging provision included in § 129.98 is consistent with the EPA's final rule.

A number of commentators found that the equation for calculating the 30-day rolling average should reflect what the proposed rulemaking's actual text provides for, which is that the value for the 30-day rolling average is calculated by taking the total mass of $NO_x$ emissions for the sources under the plan (over the 30-day period) and comparing that with the total mass of $NO_x$ that the sources could have emitted by using the emission rates under the presumptive RACT. In these instances, the actual value of emissions must then be less than or equal to the allowable emissions over the 30-day period. Additionally, the averaging equation should also be generalized to allow operators to use engineering units consistent with the type of equipment or process.

The Board agrees with the commentators' suggestion about the 30-day rolling average equation. The facility-wide $NO_x$ emission averaging equation in § 129.98(e) has been revised in the final-form rulemaking to reflect a mass-to-mass comparison between actual and allowable $NO_x$ emissions. The aggregated actual emissions from sources included in the averaging plan must be no greater than aggregated allowable emissions on a 30-day rolling basis. The allowable emissions are necessarily determined using the actual operation of the emission sources included in the plan. The owner or operator assumes the responsibility to meet the allowable emission limit. See the response to comment 138 in the comment and

response document for information about how emission sources are selected for inclusion in an emissions averaging plan proposal submitted under § 129.98.

Section 129.98(d) has been revised in the final-form rulemaking to clarify that the application for the operating permit modification or the plan approval, if otherwise required, for averaging $NO_x$ emissions on either a facility-wide or system-wide basis using a 30-day rolling average submitted under § 129.98(b) must demonstrate that the aggregate $NO_x$ emissions emitted by the air contamination sources included in the facility-wide or system-wide $NO_x$ emissions averaging plan using a 30-day rolling average are not greater than the $NO_x$ emissions that would be emitted by the group of included sources if each source complied with the applicable $NO_x$ RACT emission limitation in § 129.97 on a source-specific basis.

Section 129.98(e) has been revised in the final-form rulemaking to incorporate the following changes in the facility-wide or system-wide $NO_x$ emissions averaging equation: the 0.9 factor was deleted and the final-form equation reflects a mass-to-mass comparison between actual and allowable $NO_x$ emissions. Since the final-form rulemaking sets forth more stringent requirements and emission limitations for certain affected sources than were proposed, the 0.9 factor is not included in the averaging equation.

### §§ 129.97(a) and (k), 129.99(i) and 129.100(b)—Compliance demonstration timeline

Several commentators noted that the timing in the proposed rulemaking for the implementation of the RACT regulations is not adequate. A 1-year compliance schedule for implementing alternative RACT $NO_x$ limitations is infeasible, grossly inadequate, impractical and unreasonable. The Board should explain why the time frames are reasonable or provide a request for extension provision in the final-form rulemaking.

The Board disagrees with the commentators. The final-form rulemaking provides an adequate amount of time for the implementation of the alternative RACT requirement or RACT emission limitation. Moreover, the EPA recently established a January 1, 2017, RACT implementation deadline for the 2008 8-hour ozone NAAQS. In the preamble for the SIP Implementation Requirements Rule published at 80 FR 12264, 12279, the EPA stated the following:

> The EPA believes that the January 1, 2017, date allows a sufficient amount of time for states to make RACT determinations and for sources to meet RACT requirements on the time-table originally anticipated under the 1990 CAA Amendments, and ensures that RACT measures are required to be in place throughout the last ozone season prior to the Moderate area attainment date of July 20, 2018.

The final-form rulemaking provides additional time for compliance if the installation of air cleaning devices or approval of alternative emission limitations or compliance schedules will be necessary for RACT compliance purposes.

Two commentators found that § 129.97(a) and (k), relative to alternative compliance schedules, should allow for an exception to the presumptive RACT limits in situations when a regulated entity submits a timely and complete proposal for an alternative RACT. As written, the subsections appear to require compliance with the presumptive RACT limits until the Department approves an alternative RACT. This creates uncertainty and puts the regulated entity at risk of being in noncompliance even though it applied for an alternative in good faith and on a timely basis. The subsections should be amended to provide a mechanism for a regulated source to secure an extension of those deadlines.

The Boards disagrees in part and agrees in part. Section 129.97(k)(2)(iv) has not been changed from proposed to final-form rulemaking. Proposed § 129.97(k)(2)(v) specified that the written petition include a proposed final compliance date that is as soon as possible but not later than 3 years after the effective date of adoption of the proposed rulemaking. Section 129.97(k)(2)(v) has been amended to specify that the written petition include a proposed final compliance date that is as soon as possible but not later than 3 years after the approval of the petition. The approved petition shall be incorporated in an applicable operating permit or plan approval. The affected owner and operator that cannot comply with the presumptive RACT requirement or RACT emission limitation without the installation of an air cleaning device therefore has 6 months to submit the written petition under § 129.97(k)(1) and may request an extension of the compliance date under § 129.97(k)(2)(v) of up to 3 years after the approval date of the petition.

Some commentators wanted to allow 12 to 18 months from the effective date of this final-form rulemaking to submit a proposed case-by-case RACT, and the compliance deadline for an approved alternative RACT should be submitted with the RACT proposal.

The Board disagrees with the commentators that applicants should have 12 to 18 months after the effective date of the final-form rulemaking to submit an alternative RACT proposal. The case-by-case RACT proposals for the existing RACT requirements in § 129.91 (relating to control of major sources of $NO_x$ and VOCs) were required to be submitted by the affected owners and operators by July 15, 1994, which was 6 months after the effective date of § 129.91. See 24 Pa.B. 467 (January 15, 1994). The 6-month time frame in final-form § 129.99(d)(1) for the submission of alternative RACT proposals is consistent with existing Department regulations.

Furthermore, at 80 FR 12264, 12282, the EPA stated that "...the January 1, 2017, date allows a sufficient amount of time for states to make RACT determinations and for sources to meet RACT requirements on the time-table originally anticipated under the 1990 CAA Amendments...." With a January 1, 2017, RACT implementation deadline, the 6-month deadline for the submittal of alternatives to the presumptive RACT requirements and limitations is reasonable.

The Board agrees with the commentators that the compliance deadline for an approved alternative RACT should be submitted with the RACT proposal and included this requirement in proposed § 129.99(d)(4). Final-form § 129.99(i)(2)(v) has been revised to specify that the written petition include a proposed final compliance date that is as soon as possible but not later than 3 years after the approval of the petition. If the petition is for the replacement of an existing source, the final compliance date will be determined on a case-by-case basis.

### § 129.99. Alternative RACT proposal and petition for alternative compliance schedule

Several commentators supported the provisions of the proposed rulemaking preserving case-by-case.

The Board thanks the commentators for their support. The Board believes that the section dealing with case-by-case provides certain flexibility for the regulated community. However, the Board does not expect that this

provision will be used routinely as the owners and operators of most affected sources shall likely meet the presumptive RACT requirements and RACT emission limitations.

The commentators recommended that the Department further outline the case-by-case process, as well as update and define dollar-per-ton cost thresholds against which case-by-case RACT petitions will be required to rank technology options. The Department provided similar detail in the first RACT implementation program in 1994 and, for example, could include implementation guidance and a reference to the updated EPA cost manual.

The Board notes that the Department did not establish a bright-line cost effectiveness threshold to determine RACT. For the determination of presumptive $NO_x$ RACT emission limitations, the Department generally used a $NO_x$ emission cost-effectiveness upper bound of $2,800 per ton $NO_x$ controlled. However, the cost effectiveness thresholds used for presumptive RACT emission limitations may not be appropriate for case-by-case determinations. Prior to the implementation of the final-form RACT rulemaking requirements, the Department may prepare additional guidance for alternative RACT proposals and petitions for an alternative compliance schedule, if necessary. The case-by-case process itself is outlined under § 129.99.

A commentator said that the Department is to approve, deny or modify the alternative RACT proposal in writing through the issuance of a plan approval or an operating permit modification prior to the owner or operator implementing the alternative RACT emission limitation. The proposed rulemaking should be revised to acknowledge that modifications of the alternative RACT proposal will not be made without input from the applicant.

The Board finds that § 129.99(e)(3) allows the Department to deny or modify the alternative RACT proposal submitted by the applicant if the proposal does not comply with § 129.99(d). The proposed alternative RACT determinations are required to undergo a public participation process when the applicant will have an opportunity to comment. In addition, the applicant has the right to appeal the final RACT determination.

### § 129.100. Compliance demonstration and recordkeeping requirements

*Subsections (a) and (c)—Source testing and monitoring*

A few commentators stated that many of these provisions do not meet the CAA requirement for a monitored, verifiable, measureable and Federally-enforceable emissions control program.

The Board disagrees. The final-form rulemaking contains adequate requirements for monitoring that are measureable and verifiable and will be Federally enforceable upon approval by the EPA as a SIP revision. These requirements are under § 129.100.

More than a few commentators believed that $NO_x$ emissions should be monitored by pollution sources and over a 1-hour and 8-hour standard.

The Board disagrees. For sources equipped with CEMS, a 30-day rolling averaging period is appropriate to accommodate operation at varying load and operating conditions. A 30-day rolling limit addresses problems including variability in fuel (such as in waste coal combustors), emission spikes during start-up and shutdown of the emission source, and emissions during malfunctions that are faced by certain owners and operators. Due to these unavoidable circumstances not indicative of normal opera-

tion, it would not be appropriate for utilities utilizing $NO_x$ CEMS to be required to show compliance with the presumptive $NO_x$ RACT emission limitations over a 1-hour or 8-hour averaging period. The 30-day rolling average will require that the owners and operators operate below the allowable standard to account for the occasional higher emissions. A 30-day rolling average has been approved by the EPA to demonstrate compliance with the short-term RACT limitations in SIP revisions submitted by certain states including New York and Wisconsin.

Wisconsin's RACT regulations, which the EPA approved in October 2010, include emission averaging on a 30-day rolling basis for determining compliance. Wisconsin described this period as short term and noted that this approach would allow averaging of the typical variations in emission levels from a single unit. For sources not equipped with CEMS, compliance with the presumptive $NO_x$ RACT emission limitations is to be shown with appropriate EPA reference-method source testing. Therefore, the RACT rulemaking contains adequate requirements for monitoring that are measureable and verifiable and will be Federally enforceable upon approval by the EPA as a SIP revision.

One commentator believed that the waiver regarding stack testing compliance demonstration in § 129.100(c) should be available to all sources subject to the proposed regulations, including those subject to § 129.99, the case-by-case RACT determination.

The Board responds by noting that the owner or operator of any source that is not subject to a presumptive RACT requirement may propose an alternative RACT emission limitation. The alternative RACT proposal may include alternative methods of compliance demonstration, including the use of previously performed source testing. Since this would involve case-by-case approval, there is no need to put any additional requirements in the final-form rulemaking.

Another commentator stated that, under § 129.100, compliance for each source subject to RACT limits is to be demonstrated through CEMS or source testing. The final-form rulemaking should provide that engines that are EPA-certified for the NSPS (40 CFR Part 60, Subparts IIII and JJJJ (relating to standards of performance for stationary compression ignition internal combustion engines; and standards of performance for stationary spark ignition internal combustion engines)) comply with RACT without resort to CEMS or source testing. The use of an EPA-certified engine should be sufficient to demonstrate compliance with RACT emission limitations.

The Board disagrees. Compliance must be demonstrated in accordance with § 129.100, which requires that compliance for each source subject to RACT limits is to be demonstrated through either CEMS or source testing. A certification in and of itself cannot show that a source is in compliance with an emission limit. Only a CEMS, stack test or other measuring protocol can assure compliance. In the case of RACT, the Department decided that a CEMS or stack test is the most efficacious way to show compliance.

*Subsections (d)—(i)—Recordkeeping*

A few commentators noted that proposed § 129.100 contained compliance demonstration and recordkeeping requirements for sources subject to part or all of the proposed rulemaking. However, there does not seem to be any direction for a source only subject to work practice standards (such as the vague good engineering practices

requirement). The commentators asked what is their compliance demonstration method and what records is a site required to keep to meet this requirement.

The Board points out that § 127.444 requires sources to operate in a manner consistent with good operating practices. Sources subject to § 129.97 are already subject to § 127.444. The Title V Operating Permit includes the appropriate recordkeeping and reporting requirements to demonstrate compliance with all applicable requirements.

It should be noted that the presumptive RACT requirements included in § 129.93 require the installation, maintenance and operation of the source in accordance with manufacturer's specifications. This requirement has been implemented since 1995. In addition, the owner or operator may opt to determine RACT requirements on a case-by-case basis under § 129.99 in place of the presumptive RACT requirements and RACT emission limitations under § 129.97.

The commentator felt that CO should not be included in the log book. At a minimum the CO emissions requirement should be removed as CO is not part of the proposed $NO_x$ and VOC RACT.

The Board disagrees. The final-form rulemaking has been revised to require biennial tune-ups for a combustion unit with a rated heat input equal to or greater than 20 million Btu/hour and less than 50 million Btu/hour conducted in accordance with 40 CFR 63.11223. CO emissions are required to be included in the record under 40 CFR 63.11223. In addition, CO emissions are recorded as a surrogate for VOC emissions.

A commentator stated that the cement kiln limits apply at all times, including malfunctions, so there is no logical reason why the Department would need malfunction logs to assess compliance with the proposed rulemaking. Malfunction records are already required under Title V boilerplate conditions and do not need to be repeated in the proposed rulemaking.

The Board notes that the presumptive $NO_x$ RACT emission limitations for Portland cement kilns are applicable at all times, including start-up, shutdown and malfunction. The Department agrees that malfunction records are already required by Title V permits. Therefore, no additional recordkeeping requirements are imposed on the owner or operator to record malfunction information due to the final-form rulemaking.

*Miscellaneous comments*

A commentator believed that the failure to apply MACT-based limits uniformly, especially to municipal waste combustors, also poses a risk of increased VOC exposure to vulnerable populations that may also fall under the rubric of environmental justice communities which are warranted additional protection under Federal Executive Order 12898 (1994), Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations.

The Board disagrees that the failure to apply MACT-level limitations to subject sources, including municipal waste combustors, will pose a risk of increased VOC exposure to vulnerable populations. The proposed and final-form rulemakings address the Commonwealth's obligations under the act, the CAA and regulations issued under the CAA to establish RACT requirements for the 8-hour ozone NAAQS promulgated in 1997 and revised in 2008. The RACT requirements and emission limitations in the proposed rulemaking are applicable to the owners and operators of subject sources of $NO_x$ or VOC emissions

(precursors to ozone formation) in existence on or before July 20, 2012, the effective date of the EPA's designations and classifications for the 2008 ozone NAAQS published at 77 FR 30088.

The Commonwealth must implement permanent and enforceable control measures to attain and maintain the standards and to ensure violations of the standards do not occur for the next decade.

This final-form rulemaking will provide reductions of both potential and actual $NO_x$ and VOC emissions from major $NO_x$ and VOC emitting facilities Statewide. Additionally, the owners and operators of many of the facilities that the commentator is concerned about are already subject to MACT.

A commentator requested clarification regarding the jurisdiction of the Philadelphia Air Management Services (AMS) in implementing/enforcing the RACT regulations in proposed §§ 129.96—129.100. The commentator recommended that compliance with proposed §§ 129.96—129.100 satisfy compliance with Philadelphia AMS RACT requirements.

The Philadelphia AMS in the City of Philadelphia's Health Department administers a local air pollution control program approved by the Department under section 12 of the act (35 P.S. § 4012). Air quality regulations enforced by the Philadelphia AMS are codified under Title 3 of the *Philadelphia Code*. The Philadelphia AMS may incorporate Department regulations by reference or may enact regulations of its own to satisfy the obligations under the CAA and regulations issued under the CAA. The Philadelphia AMS has required the owners and operators of affected sources in its jurisdiction to determine RACT requirements on a case-by-case basis for the 1997 ozone standard. While the Board's RACT regulations will apply Statewide, the Philadelphia AMS may establish separate RACT requirements and compliance standards for the owners and operators of affected sources under its jurisdiction.

Commentators signed a petition that expressed concern that the proposed rulemaking will not do enough to address pollution at coal-fired power plants.

The Board acknowledges receipt of a petition containing 2,246 signatures. The Board also disagrees with the commentators. The final-form rulemaking requires the owners and operators of any combustion unit equipped with an SCR system that is operating with an inlet temperature equal to or greater than 600°F to meet a $NO_x$ emission limit of 0.12 lb $NO_x$/million Btu. Compliance with this emission limit is also required when by-passing the SCR system. The more stringent $NO_x$ emission limitation for coal-fired units equipped with SCR systems will reduce $NO_x$ emissions from the electric generating sector to approximately 59,000 tons of actual $NO_x$ emissions. It is also important to note that $NO_x$ emissions have declined significantly in this Commonwealth, especially from coal-fired EGUs—$NO_x$ emissions decreased from approximately 192,004 tons in 2000 to 119,025 tons of $NO_x$ emissions in 2013. The final-form rulemaking will result in further reductions in actual $NO_x$ emissions from one of the largest sources of $NO_x$ emissions in the Department emissions inventory.

G. *Benefits, Costs and Compliance*

*Benefits*

Reduced ambient concentrations of ground-level ozone would reduce the incidences of hospital admissions for respiratory ailments including asthma and improve the quality of life for citizens overall. While children, the

elderly and those with respiratory problems are most at risk, even healthy individuals may experience increased respiratory ailments and other symptoms when they are exposed to high levels of ambient ground-level ozone while engaged in activities that involve physical exertion.

This final-form rulemaking may create economic opportunities for $NO_x$ and VOC emission control technology innovators, manufacturers and distributors through an increased demand for new or improved equipment. In addition, the owners and operators of regulated facilities may be required to install and operate an emissions monitoring system or equipment necessary for an emissions monitoring method to comply with this final-form rulemaking, thereby creating an economic opportunity for the emissions monitoring industry.

*Compliance costs*

Compliance costs will vary for each facility depending on which compliance option is chosen by the owner and operator of a facility. The final-form rulemaking includes a provision for the owner and operator of an affected facility to meet the applicable presumptive $NO_x$ RACT or VOC RACT emission limitation under § 129.97, which is the option to propose an alternative compliance schedule if an air cleaning device must be installed. In addition, in the case of a $NO_x$ limitation, the owners and operators of an affected facility may elect to meet that applicable $NO_x$ RACT emission limitation by averaging $NO_x$ emissions on either a facility-wide or system-wide basis using a 30-day rolling average under § 129.98.

An affected facility owner or operator may also submit a case-specific RACT proposal for an alternative emission limitation to the Department for approval under § 129.99. Under this provision, the owner or operator shall demonstrate to the Department's satisfaction that it is economically or technically infeasible to meet the applicable proposed $NO_x$ RACT or VOC RACT emission limitation. These provisions may minimize compliance costs to the owner or operator of an affected facility.

The emission limitations established by this final-form rulemaking will not require the submission of applications for amendments to existing operating permits. These requirements will be incorporated as applicable requirements at the time of permit renewal, if less than 3 years remain in the permit term, as specified under § 127.463(c) (relating to operating permit revisions to incorporate applicable standards). If 3 years or more remain in the permit term, the requirements will be incorporated as applicable requirements in the permit within 18 months of the promulgation of the final-form rulemaking, as required under § 127.463(b). Most importantly, § 127.463(e) specifies that "[r]egardless of whether a revision is required under this section, the permittee shall meet the applicable standards or regulations promulgated under the Clean Air Act within the time frame required by standards or regulations." Consequently, the requirements will apply to affected owners and operators irrespective of a modification to the operating permit.

*Compliance assistance plan*

The Department will continue to work with the Small Business Assistance Program to aid the facilities less able to handle permitting matters with in-house staff. Through increased preapplication meetings with facilities, industry and the Department both benefit by faster review of permit applications.

*Paperwork requirements*

The final-form rulemaking will not increase the paperwork that is already generated during the normal course of business operations.

H. *Pollution Prevention*

The Pollution Prevention Act of 1990 (42 U.S.C.A. §§ 13101—13109) established a National policy that promotes pollution prevention as the preferred means for achieving state environmental protection goals. The Department encourages pollution prevention, which is the reduction or elimination of pollution at its source, through the substitution of environmentally friendly materials, more efficient use of raw materials and the incorporation of energy efficiency strategies. Pollution prevention practices can provide greater environmental protection with greater efficiency because they can result in significant cost savings to the owners and operators of facilities that permanently achieve or move beyond compliance. The final RACT requirements allow the Department and approved local air pollution control agencies to maintain or increase the reductions of $NO_x$ and VOC emissions from the regulated sources in this Commonwealth, sustain the gains made in healthful air quality and ensure continued protection of the environment and the public health and welfare of the citizens of this Commonwealth.

I. *Sunset Review*

This final-form rulemaking will be reviewed in accordance with the sunset review schedule published by the Department to determine whether the regulations effectively fulfill the goals for which they were intended.

J. *Regulatory Review*

Under section 5(a) of the Regulatory Review Act (71 P.S. § 745.5(a)), on April 7, 2014, the Department submitted a copy of the notice of proposed rulemaking, published at 44 Pa.B. 2392 (April 19, 2014), to the Independent Regulatory Review Commission (IRRC) and the Chairpersons of the House and Senate Environmental Resources and Energy Committees for review and comment.

Under section 5(c) of the Regulatory Review Act, IRRC and the House and Senate Committees were provided with copies of comments received during the public comment period, as well as other documents when requested. In preparing the final-form rulemaking, the Department has considered all comments from IRRC and the public.

Under section 5.1(j.2) of the Regulatory Review Act (71 P.S. § 745.5a(j.2)), on March 9, 2016, the final-form rulemaking was deemed approved by the House and Senate Committees. Under section 5.1(e) of the Regulatory Review Act, IRRC met on March 10, 2016, and approved the final-form rulemaking.

K. *Findings*

The Board finds that:

(1) Public notice of proposed rulemaking was given under sections 201 and 202 of the act of July 31, 1968 (P. L. 769, No. 240) (45 P.S. §§ 1201 and 1202) and regulations promulgated thereunder, 1 Pa. Code §§ 7.1 and 7.2.

(2) At least a 60-day public comment period was provided as required by law and all comments were considered.

(3) This final-form rulemaking does not enlarge the purpose of the proposed rulemaking published at 44 Pa.B. 2392.

(4) These regulations are necessary and appropriate for administration and enforcement of the authorizing acts identified in Section C of this preamble.

(5) These regulations are reasonably necessary to attain and maintain the 8-hour ozone NAAQS and to satisfy related CAA requirements.

L. *Order*

The Board, acting under the authorizing statutes, orders that:

(a) The regulations of the Department, 25 Pa. Code Chapters 121 and 129, are amended by adding §§ 129.96—129.100 and by amending § 121.1 to read as set forth in Annex A, with ellipses referring to existing text of the regulations.

(b) The Chairperson of the Board shall submit this order and Annex A to the Office of General Counsel and the Office of Attorney General for review and approval as to legality and form, as required by law.

(c) The Chairperson of the Board shall submit this order and Annex A to IRRC and the Committees as required by the Regulatory Review Act.

(d) The Chairperson of the Board shall certify this order and Annex A and deposit them with the Legislative Reference Bureau as required by law.

(e) This final-form rulemaking will be submitted to the EPA as an amendment to the Pennsylvania SIP.

(f) This order shall take effect upon publication in the *Pennsylvania Bulletin*.

JOHN QUIGLEY,
*Chairperson*

(*Editor's Note:* See 46 Pa.B. 1623 (March 26, 2016) for IRRC's approval order.)

**Fiscal Note:** Fiscal Note 7-485 remains valid for the final adoption of the subject regulations.

**Annex A**

**TITLE 25. ENVIRONMENTAL PROTECTION**

**PART I. DEPARTMENT OF ENVIRONMENTAL PROTECTION**

**Subpart C. PROTECTION OF NATURAL RESOURCES**

**ARTICLE III. AIR RESOURCES**

**CHAPTER 121. GENERAL PROVISIONS**

**§ 121.1. Definitions.**

The definitions in section 3 of the act (35 P. S. § 4003) apply to this article. In addition, the following words and terms, when used in this article, have the following meanings, unless the context clearly indicates otherwise:

\*    \*    \*    \*    \*

*CEMS—Continuous emissions monitoring system*—All of the equipment that may be required to meet the data acquisition and availability requirements established under the act or the Clean Air Act to monitor, measure, calculate, sample, condition, analyze and provide a record of emissions from an affected unit on a continuous basis.

\*    \*    \*    \*    \*

*Major $NO_x$ emitting facility*—A facility which emits or has the potential to emit $NO_x$ from the processes located at the site or on contiguous properties under the common control of the same person at a rate greater than one of the following:

(i) Ten TPY in an ozone nonattainment area designated as extreme under section 182(e) and (f) of the Clean Air Act (42 U.S.C.A. § 7511a(e) and (f)).

(ii) Twenty-five TPY in an ozone nonattainment area designated as severe under section 182(d) and (f) of the Clean Air Act.

(iii) Fifty TPY in an area designated as serious under section 182(c) and (f) of the Clean Air Act.

(iv) One hundred TPY in an area included in an ozone transport region established under section 184 of the Clean Air Act (42 U.S.C.A. § 7511c).

(v) Twenty-five TPY and is located in Bucks, Chester, Delaware, Montgomery or Philadelphia County. This threshold does not apply to §§ 129.96—129.100 (relating to additional RACT requirements for major sources of $NO_x$ and VOCs).

*Major VOC emitting facility*—A facility which emits or has the potential to emit VOCs from processes located at the site or on contiguous properties under the common control of the same person at a rate greater than one of the following:

(i) Ten TPY in an ozone nonattainment area designated as extreme under section 182(e) of the Clean Air Act.

(ii) Twenty-five TPY in an ozone nonattainment area designated as severe under section 182(d) of the Clean Air Act.

(iii) Fifty TPY in an area included in an ozone transport region established under section 184 of the Clean Air Act.

(iv) Twenty-five TPY and is located in Bucks, Chester, Delaware, Montgomery or Philadelphia County. This threshold does not apply to §§ 129.96—129.100.

\*    \*    \*    \*    \*

*Process*—A method, reaction or operation in which materials are handled or whereby materials undergo physical change—that is, the size, shape, appearance, temperature, state or other physical property of the material is altered—or chemical change—that is, a substance with different chemical composition or properties is formed or created. The term includes all of the equipment, operations and facilities necessary for the completion of the transformation of the materials to produce a physical or chemical change. There may be several processes in series or parallel necessary to the manufacture of a product.

*Process heater*—

(i) An enclosed device using controlled flame, that is not a boiler, the primary purpose of which is to transfer heat to a process material or to a heat transfer material for use in a process unit.

(ii) The term does not include an enclosed device that meets either of the following circumstances:

(A) Has the primary purpose of generating steam.

(B) In which the material being heated is in direct contact with the products of combustion, including:

(I) A furnace.

(II) A kiln.

(III) An unfired waste heat recovery heater.

(IV) A unit used for comfort heat, space heat or food preparation for onsite consumption.

(V) An autoclave.

*Project*—A physical change in or change in the method of operation of an existing facility, including a new emissions unit.

\* \* \* \* \*

*Refinery component*—A piece of equipment which has the potential to leak VOCs when tested in the manner specified in § 129.58 (relating to petroleum refineries—fugitive sources). These sources include, but are not limited to, pump seals, compressor seals, seal oil degassing vents, pipeline valves, pressure relief devices, process drains and open-ended pipes. Excluded from these sources are valves which are not externally regulated.

*Refinery gas*—Gas produced at a refinery which produces petroleum products, including gasoline, from refinery units.

*Refinery unit*—A basic process operation, such as distillation hydrotreating, cracking or reforming of hydrocarbons which is made up of a set of refinery components.

*Regenerative cycle combustion turbine*—A stationary combustion turbine which recovers heat from the combustion turbine exhaust gases to preheat the inlet combustion air to the combustion turbine.

*Regulated NSR pollutant*—

\* \* \* \* \*

*Silicone insulation material*—An insulating material applied to exterior metal surfaces of aerospace vehicles for protection from high temperatures caused by atmospheric friction or engine exhaust. These materials differ from ablative coatings in that they are not designed to be purposefully exposed to open flame or extreme heat and charred.

*Simple cycle combustion turbine*—A stationary combustion turbine which does not recover heat from the combustion turbine exhaust gases to preheat the inlet combustion air to the combustion turbine, or which does not recover heat from the combustion turbine exhaust gases for purposes other than enhancing the performance of the combustion turbine itself.

*Single coat*—One film of coating applied to a metal surface.

\* \* \* \* \*

*Start-up*—For purposes of §§ 129.301—129.310, the period of time, after initial construction, shutdown or cold shutdown, during which a glass melting furnace is heated to stable operating temperature by the primary furnace combustion system, and systems and instrumentation are brought to stabilization.

*Stationary combustion turbine*—Equipment, including the turbine, fuel, air, lubrication and exhaust gas systems, control systems (except emissions control equipment), heat recovery system, and ancillary components and subcomponents comprising a simple cycle combustion turbine, a regenerative or recuperative cycle combustion turbine, a combined cycle combustion turbine, and a combined heat and power combustion turbine-based system. The equipment is not self-propelled or intended to be propelled while performing its function. The equipment may be mounted on a vehicle for portability.

*Stationary internal combustion engine* or *stationary reciprocating internal combustion engine*—

(i) An internal combustion engine which uses reciprocating motion to convert heat energy into mechanical work and which is not mobile.

(ii) The term does not include the following:

(A) A combustion turbine.

(B) A nonroad engine as defined in 40 CFR 1068.30 (relating to what definitions apply to this part), excluding paragraph (2)(ii) of this definition.

(C) An engine used to propel a motor vehicle, an aircraft or a vehicle used solely for competition.

(D) A portable temporary source such as an air compressor or generator.

*Stockpiling*—The act of placing, storing and removing materials on piles exposed to the outdoor atmosphere. Placing refers to the deposition of material onto the pile. Removing refers to disturbing the pile either for loading of material into or onto vehicles for transportation purposes or for material handling. Material that is not to be utilized in the production of a product or is not itself a useful product is excluded from the definition of stockpile material. Operations which consist entirely of transferring material between different transportation conveyances are also excluded from this definition.

\* \* \* \* \*

## CHAPTER 129. STANDARDS FOR SOURCES

### ADDITIONAL RACT REQUIREMENTS FOR MAJOR SOURCES OF NO$_x$ AND VOCs

### § 129.96. Applicability.

(a) The NO$_x$ requirements of this section and §§ 129.97—129.100 apply Statewide to the owner and operator of a major NO$_x$ emitting facility and the VOC requirements of this section and §§ 129.97—129.100 apply Statewide to the owner and operator of a major VOC emitting facility that were in existence on or before July 20, 2012, for which a requirement or emission limitation, or both, has not been established in §§ 129.51—129.52c, 129.54—129.69, 129.71—129.73, 129.75, 129.77, 129.101—129.107 and 129.301—129.310.

(b) The NO$_x$ requirements of this section and §§ 129.97—129.100 apply Statewide to the owner and operator of a NO$_x$ emitting facility and the VOC requirements of this section and §§ 129.97—129.100 apply Statewide to the owner and operator of a VOC emitting facility when the installation of a new source or a modification or change in operation of an existing source after July 20, 2012, results in the source or facility meeting the definition of a major NO$_x$ emitting facility or a major VOC emitting facility and for which a requirement or an emission limitation, or both, has not been established in §§ 129.51—129.52c, 129.54—129.69, 129.71—129.73, 129.75, 129.77, 129.101—129.107 and 129.301—129.310.

(c) This section and §§ 129.97—129.100 do not apply to the owner and operator of a NO$_x$ air contamination source located at a major NO$_x$ emitting facility that has the potential to emit less than 1 TPY of NO$_x$ or a VOC air contamination source located at a major VOC emitting facility that has the potential to emit less than 1 TPY of VOC.

(d) This section and §§ 129.97—129.100 do not apply to the owner and operator of a facility which is not a major NO$_x$ emitting facility or a major VOC emitting facility on or before January 1, 2017.

### § 129.97. Presumptive RACT requirements, RACT emission limitations and petition for alternative compliance schedule.

(a) The owner and operator of a source listed in one or more of subsections (b)—(h) located at a major NO$_x$

emitting facility or major VOC emitting facility subject to § 129.96 (relating to applicability) shall comply with the applicable presumptive RACT requirement or RACT emission limitation, or both, beginning with the specified compliance date as follows, unless an alternative compliance schedule is submitted and approved under subsections (k)—(m) or § 129.99 (relating to alternative RACT proposal and petition for alternative compliance schedule):

(1) January 1, 2017, for a source subject to § 129.96(a).

(2) January 1, 2017, or 1 year after the date the source meets the definition of a major $NO_x$ emitting facility or major VOC emitting facility, whichever is later, for a source subject to § 129.96(b).

(b) The owner and operator of a source specified in this subsection, which is located at a major $NO_x$ emitting facility or major VOC emitting facility subject to § 129.96 shall comply with the following:

(1) The presumptive RACT requirement for a combustion unit with a rated heat input equal to or greater than 20 million Btu/hour and less than 50 million Btu/hour, which is the performance of a biennial tune-up conducted in accordance with the procedures in 40 CFR 63.11223 (relating to how do I demonstrate continuous compliance with the work practice and management practice standards). The biennial tune-up must include, at a minimum, the following:

(i) Inspection and cleaning or replacement of fuel-burning equipment, including the burners and components, as necessary, for proper operation as specified by the manufacturer.

(ii) Inspection of the flame pattern and adjustment of the burner, as necessary, to optimize the flame pattern to minimize total emissions of $NO_x$ and, to the extent possible, emissions of CO.

(iii) Inspection and adjustment, as necessary, of the air-to-fuel ratio control system to ensure proper calibration and operation as specified by the manufacturer.

(2) The owner or operator of a combustion unit with an oxygen trim system that maintains an optimum air-to-fuel ratio that would otherwise be subject to a biennial tune-up shall conduct a tune-up of the boiler one time in each 5-year calendar period. The tune-up must include, at a minimum, the following:

(i) Inspection and cleaning or replacement of fuel-burning equipment, including the burners and components, as necessary, for proper operation as specified by the manufacturer.

(ii) Inspection of the flame pattern and adjustment of the burner, as necessary, to optimize the flame pattern to minimize total emissions of $NO_x$ and, to the extent possible, emissions of CO.

(iii) Inspection and adjustment, as necessary, of the air-to-fuel ratio control system to ensure proper calibration and operation as specified by the manufacturer.

(3) The applicable recordkeeping requirements of § 129.100(d), (e) or (f) (relating to compliance demonstration and recordkeeping requirements).

(c) The owner and operator of a source specified in this subsection, which is located at a major $NO_x$ emitting facility or major VOC emitting facility subject to § 129.96 shall install, maintain and operate the source in accordance with the manufacturer's specifications and with good operating practices:

(1) A $NO_x$ air contamination source that has the potential to emit less than 5 TPY of $NO_x$.

(2) A VOC air contamination source that has the potential to emit less than 2.7 TPY of VOC.

(3) A boiler or other combustion source with an individual rated gross heat input less than 20 million Btu/hour.

(4) A combustion turbine with a rated output less than 1,000 bhp.

(5) A stationary internal combustion engine rated at less than 500 bhp (gross).

(6) An incinerator, thermal oxidizer or catalytic oxidizer used primarily for air pollution control.

(7) A fuel-burning unit with an annual capacity factor of less than 5%.

(i) For a combustion unit, the annual capacity factor is the ratio of the unit's heat input (in million Btu or equivalent units of measure) to the unit's maximum rated hourly heat input rate (in million Btu/hour or equivalent units of measure) multiplied by 8,760 hours during a period of 12 consecutive calendar months.

(ii) For an electric generating unit, the annual capacity factor is the ratio of the unit's actual electric output (expressed in MWe/hr) to the unit's nameplate capacity (or maximum observed hourly gross load (in MWe/hr) if greater than the nameplate capacity) multiplied by 8,760 hours during a period of 12 consecutive calendar months.

(iii) For any other unit, the annual capacity factor is the ratio of the unit's actual operating level to the unit's potential operating level during a period of 12 consecutive calendar months.

(8) An emergency standby engine operating less than 500 hours in a 12-month rolling period.

(d) Except as specified under subsection (c), the owner and operator of a combustion unit or other combustion source located at a major VOC emitting facility subject to § 129.96 shall install, maintain and operate the source in accordance with the manufacturer's specifications and with good operating practices for the control of the VOC emissions from the combustion unit or other combustion source.

(e) The owner and operator of a municipal solid waste landfill subject to § 129.96 shall comply with the following applicable presumptive RACT requirement:

(1) For a municipal solid waste landfill constructed on or before May 30, 1991, emission guidelines and compliance times in 40 CFR Part 60, Subpart Cc (relating to emission guidelines and compliance times for municipal solid waste landfills), which are adopted and incorporated by reference in § 122.3 (relating to adoption of standards), and applicable Federal or state plans in 40 CFR Part 62 (relating to approval and promulgation of state plans for designated facilities and pollutants).

(2) For a municipal solid waste landfill constructed after May 30, 1991, New Source Performance Standards in 40 CFR Part 60, Subpart WWW (relating to standards of performance for municipal solid waste landfills), which are adopted and incorporated by reference in § 122.3.

(f) The owner and operator of a municipal waste combustor subject to § 129.96 shall comply with the presumptive RACT requirement of 180 ppmvd $NO_x$ @ 7% oxygen.

(g) Except as specified under subsection (c), the owner and operator of a $NO_x$ air contamination source specified in this subsection, which is located at a major $NO_x$ emitting facility or a VOC air contamination source specified in this subsection, which is located at a major VOC emitting facility subject to § 129.96 may not cause, allow or permit $NO_x$ or VOCs to be emitted from the air contamination source in excess of the applicable presumptive RACT emission limitation:

(1) A combustion unit or process heater:

(i) For a natural gas-fired combustion unit or process heater with a rated heat input equal to or greater than 50 million Btu/hour, 0.10 lb $NO_x$/million Btu heat input.

(ii) For a distillate oil-fired combustion unit or process heater with a rated heat input equal to or greater than 50 million Btu/hour, 0.12 lb $NO_x$/million Btu heat input.

(iii) For a residual oil-fired or other liquid fuel-fired combustion unit or process heater with a rated heat input equal to or greater than 50 million Btu/hour, 0.20 lb $NO_x$/million Btu heat input.

(iv) For a refinery gas-fired combustion unit or process heater with a rated heat input equal to or greater than 50 million Btu/hour, 0.25 lb $NO_x$/million Btu heat input.

(v) For a coal-fired combustion unit with a rated heat input equal to or greater than 50 million Btu/hour and less than 250 million Btu/hour, 0.45 lb $NO_x$/million Btu heat input.

(vi) For a coal-fired combustion unit with a rated heat input equal to or greater than 250 million Btu/hour that is:

(A) A circulating fluidized bed combustion unit, 0.16 lb $NO_x$/million Btu heat input.

(B) A tangentially fired combustion unit, 0.35 lb $NO_x$/million Btu heat input.

(C) Any other type of coal-fired combustion unit, 0.40 lb $NO_x$/million Btu heat input.

(vii) For any other type of solid fuel-fired combustion unit with a rated heat input equal to or greater than 50 million Btu/hour, 0.25 lb $NO_x$/million Btu heat input.

(viii) For a coal-fired combustion unit with a selective catalytic reduction system operating with an inlet temperature equal to or greater than 600°F, 0.12 lb $NO_x$/million Btu heat input. Compliance with this emission limit is also required when by-passing the selective catalytic reduction system.

(ix) For a coal-fired combustion unit with a selective noncatalytic reduction system, the selective noncatalytic reduction system shall be operated with the injection of reagents including ammonia or other $NO_x$-reducing agents when the temperature at the area of the reagent injection is equal to or greater than 1,600°F.

(2) A combustion turbine:

(i) For a combined cycle or combined heat and power combustion turbine with a rated output equal to or greater than 1,000 bhp and less than 180 MW when firing:

(A) Natural gas or a noncommercial gaseous fuel, 42 ppmvd $NO_x$ @ 15% oxygen.

(B) Fuel oil, 96 ppmvd $NO_x$ @ 15% oxygen.

(C) Natural gas or a noncommercial gaseous fuel, 5 ppmvd VOC (as propane) @ 15% oxygen.

(D) Fuel oil, 9 ppmvd VOC (as propane) @ 15% oxygen.

(ii) For a combined cycle or combined heat and power combustion turbine with a rated output equal to or greater than 180 MW when firing:

(A) Natural gas or a noncommercial gaseous fuel, 4 ppmvd $NO_x$ @ 15% oxygen.

(B) Fuel oil, 8 ppmvd $NO_x$ @ 15% oxygen.

(C) Natural gas or a noncommercial gaseous fuel, 2 ppmvd VOC (as propane) @ 15% oxygen.

(D) Fuel oil, 2 ppmvd VOC (as propane) @ 15% oxygen.

(iii) For a simple cycle or regenerative cycle combustion turbine with a rated output equal to or greater than 1,000 bhp and less than 6,000 bhp when firing:

(A) Natural gas or a noncommercial gaseous fuel, 150 ppmvd $NO_x$ @ 15% oxygen.

(B) Fuel oil, 150 ppmvd $NO_x$ @ 15% oxygen.

(C) Natural gas or a noncommercial gaseous fuel, 9 ppmvd VOC (as propane) @ 15% oxygen.

(D) Fuel oil, 9 ppmvd VOC (as propane) @ 15% oxygen.

(iv) For a simple cycle or regenerative cycle combustion turbine with a rated output equal to or greater than 6,000 bhp when firing:

(A) Natural gas or a noncommercial gaseous fuel, 42 ppmvd $NO_x$ @ 15% oxygen.

(B) Fuel oil, 96 ppmvd $NO_x$ @ 15% oxygen.

(C) Natural gas or a noncommercial gaseous fuel, 9 ppmvd VOC (as propane) @ 15% oxygen.

(D) Fuel oil, 9 ppmvd VOC (as propane) @ 15% oxygen.

(3) A stationary internal combustion engine:

(i) For a lean burn stationary internal combustion engine with a rating equal to or greater than 500 bhp fired with:

(A) Natural gas or a noncommercial gaseous fuel, 3.0 grams $NO_x$/bhp-hr.

(B) Natural gas or a noncommercial gaseous fuel, liquid fuel or dual-fuel, 1.0 gram VOC/bhp-hr excluding formaldehyde.

(ii) For a stationary internal combustion engine with a rating equal to or greater than 500 bhp fired with liquid fuel or dual-fuel, 8.0 grams $NO_x$/bhp-hr.

(iii) For a rich burn stationary internal combustion engine with a rating equal to or greater than 500 bhp fired with:

(A) Natural gas or a noncommercial gaseous fuel, 2.0 grams $NO_x$/bhp-hr.

(B) Natural gas or a noncommercial gaseous fuel, 1.0 gram VOC/bhp-hr.

(4) A unit firing multiple fuels:

(i) The applicable RACT multiple fuel emission limit shall be determined on a total heat input fuel weighted basis using the following equation:

$$E_{HIweighted} = \frac{\sum_{i=1}^{n} E_i HI_i}{\sum_{i=1}^{n} HI_i}$$

Where:

$E_{HIweighted}$ = The heat input fuel weighted multiple fuel emission rate or emission limitation for the compliance period, expressed in units of measure consistent with the units of measure for the emission limitation.

$E_i$ = The emission rate or emission limit for fuel i during the compliance period, expressed in units of measure consistent with the units of measure for the emission limitation.

$HI_i$ = The total heat input for fuel i during the compliance period.

n = The number of different fuels used during the compliance period.

(ii) A fuel representing less than 1% of the unit's annual fuel consumption on a heat input basis is excluded when determining the applicable RACT multiple fuel emission limit calculated in accordance with subparagraph (i).

(iii) The determination in subparagraph (i) does not apply to a stationary internal combustion engine that is subject to the RACT emission limits in paragraph (3).

(h) The owner and operator of a Portland cement kiln subject to § 129.96 shall comply with the following applicable presumptive RACT emission limitation:

(1) 3.88 pounds of $NO_x$ per ton of clinker produced for a long wet-process cement kiln as defined in § 145.142 (relating to definitions).

(2) 3.44 pounds of $NO_x$ per ton of clinker produced for a long dry-process cement kiln as defined in § 145.142.

(3) 2.36 pounds of $NO_x$ per ton of clinker produced for:

(i) A preheater cement kiln as defined in § 145.142.

(ii) A precalciner cement kiln as defined in § 145.142.

(i) The requirements and emission limitations of this section supersede the requirements and emission limitations of a RACT permit issued to the owner or operator of an air contamination source subject to one or more of subsections (b)—(h) prior to April 23, 2016, under §§ 129.91—129.95 (relating to stationary sources of $NO_x$ and VOCs) to control, reduce or minimize $NO_x$ emissions or VOC emissions, or both, from the air contamination source unless the permit contains more stringent requirements or emission limitations, or both.

(j) The requirements and emission limitations of this section supersede the requirements and emission limitations of §§ 129.201—129.205, 145.111—145.113 and 145.141—145.146 (relating to additional $NO_x$ requirements; emissions of $NO_x$ from stationary internal combustion engines; and emissions of $NO_x$ from cement manufacturing) unless the requirements or emission limitations of §§ 129.201—129.205, §§ 145.111—145.113 or §§ 145.141—145.146 are more stringent.

(k) The owner or operator of a major $NO_x$ emitting facility or a major VOC emitting facility subject to § 129.96 that includes an air contamination source subject to one or more of subsections (b)—(h) that cannot meet the applicable presumptive RACT requirement or RACT emission limitation without installation of an air cleaning device may submit a petition, in writing, requesting an alternative compliance schedule in accordance with the following:

(1) The written petition shall be submitted to the Department or appropriate approved local air pollution control agency as soon as possible but not later than:

(i) October 24, 2016, for a source subject to § 129.96(a).

(ii) October 24, 2016, or 6 months after the date that the source meets the definition of a major $NO_x$ emitting facility, whichever is later, for a source subject to § 129.96(b).

(2) The written petition must include:

(i) A description, including make, model and location, of each affected source subject to a RACT requirement or a RACT emission limitation in one or more of subsections (b)—(h).

(ii) A description of the proposed air cleaning device to be installed.

(iii) A schedule containing proposed interim dates for completing each phase of the required work to install the air cleaning device described in subparagraph (ii).

(iv) A proposed interim emission limitation that will be imposed on the affected source until compliance is achieved with the applicable RACT requirement or RACT emission limitation.

(v) A proposed final compliance date that is as soon as possible but not later than 3 years after the written approval of the petition by the Department or the appropriate approved local air pollution control agency. The approved petition shall be incorporated in an applicable operating permit or plan approval.

(l) The Department or appropriate approved local air pollution control agency will review the timely and complete written petition requesting an alternative compliance schedule submitted in accordance with subsection (k) and approve or deny the petition in writing.

(m) Approval or denial under subsection (l) of the timely and complete petition for an alternative compliance schedule submitted under subsection (k) will be effective on the date the letter of approval or denial of the petition is signed by the authorized representative of the Department or appropriate approved local air pollution control agency.

## § 129.98. Facility-wide or system-wide $NO_x$ emissions averaging plan general requirements.

(a) The owner or operator of a major $NO_x$ emitting facility subject to § 129.96 (relating to applicability) that includes at least one air contamination source subject to a $NO_x$ RACT emission limitation in § 129.97 (relating to presumptive RACT requirements, RACT emission limitations and petition for alternative compliance schedule) that cannot meet the applicable $NO_x$ RACT emission limitation may elect to meet the applicable $NO_x$ RACT emission limitation in § 129.97 by averaging $NO_x$ emissions on either a facility-wide or system-wide basis using a 30-day rolling average. System-wide emissions averaging must be among sources under common control of the same owner or operator within the same ozone nonattainment area in this Commonwealth.

(b) The owner or operator of each facility that elects to comply with subsection (a) shall submit a written $NO_x$ emissions averaging plan to the Department or appropriate approved local air pollution control agency as part of an application for an operating permit modification or a plan approval, if otherwise required. The application incorporating the requirements of this section shall be submitted by the applicable date as follows:

(1) October 24, 2016, for a source subject to § 129.96(a).

(2) October 24, 2016, or 6 months after the date that the source meets the definition of a major $NO_x$ emitting facility, whichever is later, for a source subject to § 129.96(b).

(c) Each $NO_x$ air contamination source included in the application for an operating permit modification or a plan approval, if otherwise required, for averaging $NO_x$ emis-

sions on either a facility-wide or system-wide basis using a 30-day rolling average submitted under subsection (b) must be an air contamination source subject to a $NO_x$ RACT emission limitation in § 129.97.

(d) The application for the operating permit modification or the plan approval, if otherwise required, for averaging $NO_x$ emissions on either a facility-wide or system-wide basis using a 30-day rolling average submitted under subsection (b) must demonstrate that the aggregate $NO_x$ emissions emitted by the air contamination sources included in the facility-wide or system-wide $NO_x$ emissions averaging plan using a 30-day rolling average are not greater than the $NO_x$ emissions that would be emitted by the group of included sources if each source complied with the applicable $NO_x$ RACT emission limitation in § 129.97 on a source-specific basis.

(e) The owner or operator shall calculate the alternative facility-wide or system-wide $NO_x$ RACT emissions limitation using a 30-day rolling average for the air contamination sources included in the application for the operating permit modification or plan approval, if otherwise required, submitted under subsection (b) by using the following equation to sum the emissions for all of the sources included in the $NO_x$ emissions averaging plan:

$$\left[ \sum\nolimits_{i=1}^{n} Ei_{actual} \right] \leq \left[ \sum\nolimits_{i=1}^{n} Ei_{allowable} \right]$$

Where:

$Ei_{actual}$ = The actual $NO_x$ mass emissions, including emissions during start-ups, shutdowns and malfunctions, for air contamination source i on a 30-day rolling basis.

$Ei_{allowable}$ = The allowable $NO_x$ mass emissions computed using the allowable emission rate limitations for air contamination source i on a 30-day rolling basis specified in § 129.97. If an air contamination source included in an averaging plan is subject to a numerical emission rate limit that is more stringent than the applicable allowable emission rate limitation in § 129.97, then the numerical emission rate limit shall be used for the calculation of the allowable $NO_x$ mass emissions.

n = The number of air contamination sources included in the $NO_x$ emissions averaging plan.

(f) The application for the operating permit modification or a plan approval, if otherwise required, specified in subsections (b)—(e) may include facility-wide or system-wide $NO_x$ emissions averaging using a 30-day rolling average only for $NO_x$ emitting sources or $NO_x$ emitting facilities that are owned or operated by the applicant.

(g) The application for the operating permit modification or a plan approval, if otherwise required, specified in subsections (b)—(f) must include the following information:

(1) Identification of each air contamination source included in the $NO_x$ emissions averaging plan.

(2) Each air contamination source's applicable emission limitation in § 129.97.

(3) Methods for demonstrating compliance and recordkeeping and reporting requirements in accordance with § 129.100 (relating to compliance demonstration and recordkeeping requirements) for each source included in the $NO_x$ emissions averaging plan submitted under subsection (b).

(h) An air contamination source or facility included in the facility-wide or system-wide $NO_x$ emissions averaging plan submitted in accordance with subsections (b)—(g)

may be included in only one facility-wide or system-wide $NO_x$ emissions averaging plan.

(i) The Department or appropriate approved local air pollution control agency will issue a modification to the operating permit or a plan approval authorizing the $NO_x$ emissions averaging plan.

(j) The owner or operator of an air contamination source or facility included in the facility-wide or system-wide $NO_x$ emissions averaging plan submitted in accordance with subsections (b)—(h) shall submit the reports and records specified in subsection (g)(3) to the Department or appropriate approved local air pollution control agency on the schedule specified in subsection (g)(3) to demonstrate compliance with § 129.100.

(k) The owner or operator of an air contamination source or facility included in a facility-wide or system-wide $NO_x$ emissions averaging plan submitted in accordance with subsections (b)—(h) that achieves emission reductions in accordance with other emission limitations required under the act or the Clean Air Act, or regulations adopted under the act or the Clean Air Act, that are not $NO_x$ RACT emission limitations may not substitute those emission reductions for the emission reductions required by the facility-wide or system-wide $NO_x$ emissions averaging plan submitted to the Department or appropriate approved local air pollution control agency under subsection (b).

(l) The owner or operator of an air contamination source subject to a $NO_x$ RACT emission limitation in § 129.97 that is not included in a facility-wide or system-wide $NO_x$ emissions averaging plan submitted under subsection (b) shall operate the source in compliance with the applicable $NO_x$ RACT emission limitation in § 129.97.

(m) The owner and operator of the air contamination sources included in a facility-wide or system-wide $NO_x$ emissions averaging plan submitted under subsection (b) shall be liable for a violation of an applicable $NO_x$ RACT emission limitation at each source included in the $NO_x$ emissions averaging plan.

### § 129.99. Alternative RACT proposal and petition for alternative compliance schedule.

(a) The owner or operator of an air contamination source subject to § 129.97 (relating to presumptive RACT requirements, RACT emission limitations and petition for alternative compliance schedule) located at a major $NO_x$ emitting facility or major VOC emitting facility subject to § 129.96 (relating to applicability) that cannot meet the applicable presumptive RACT requirement or RACT emission limitation of § 129.97 may propose an alternative RACT requirement or RACT emission limitation in accordance with subsection (d).

(b) The owner or operator of a $NO_x$ air contamination source with a potential emission rate equal to or greater than 5.0 tons of $NO_x$ per year that is not subject to § 129.97 or §§ 129.201—129.205 (relating to additional $NO_x$ requirements) located at a major $NO_x$ emitting facility subject to § 129.96 shall propose a $NO_x$ RACT requirement or RACT emission limitation in accordance with subsection (d).

(c) The owner or operator of a VOC air contamination source with a potential emission rate equal to or greater than 2.7 tons of VOC per year that is not subject to § 129.97 located at a major VOC emitting facility subject to § 129.96 shall propose a VOC RACT requirement or RACT emission limitation in accordance with subsection (d).

(d) The owner or operator proposing an alternative RACT requirement or RACT emission limitation under subsection (a), (b) or (c) shall:

(1) Submit a written RACT proposal in accordance with the procedures in § 129.92(a)(1)—(5), (7)—(10) and (b) (relating to RACT proposal requirements) to the Department or appropriate approved local air pollution control agency as soon as possible but not later than:

(i) October 24, 2016, for a source subject to § 129.96(a).

(ii) October 24, 2016, or 6 months after the date that the source meets the definition of a major $NO_x$ emitting facility or major VOC emitting facility, whichever is later, for a source subject to § 129.96(b).

(2) Be in receipt of an approval issued by the Department or appropriate approved local air pollution control agency in writing through a plan approval or operating permit modification for a RACT proposal submitted under paragraph (1)(ii) prior to the installation, modification or change in the operation of the existing air contamination source that will result in the source or facility meeting the definition of a major $NO_x$ emitting facility or major VOC emitting facility.

(3) Include in the RACT proposal the proposed alternative $NO_x$ RACT requirement or RACT emission limitation or VOC RACT requirement or RACT emission limitation developed in accordance with the procedures in § 129.92(a)(1)—(5) and (b).

(4) Include in the RACT proposal a schedule for completing implementation of the RACT requirement or RACT emission limitation as soon as possible but not later than:

(i) January 1, 2017, for a source subject to § 129.96(a).

(ii) January 1, 2017, or 1 year after the date that the source meets the definition of a major $NO_x$ emitting facility or major VOC emitting facility, whichever is later, for a source subject to § 129.96(b).

(5) Include interim dates in the schedule required under paragraph (4) for the:

(i) Issuance of purchase orders.

(ii) Start and completion of process, technology and control technology changes.

(iii) Completion of compliance testing.

(6) Include in the RACT proposal methods for demonstrating compliance and recordkeeping and reporting requirements in accordance with § 129.100 (relating to compliance demonstration and recordkeeping requirements) for each air contamination source included in the RACT proposal.

(7) Demonstrate to the satisfaction of the Department or the appropriate approved local air pollution control agency that the proposed requirement or RACT emission limitation is RACT for the air contamination source.

(e) The Department or appropriate approved local air pollution control agency will:

(1) Review the timely and complete alternative RACT proposal submitted in accordance with subsection (d).

(2) Approve the alternative RACT proposal submitted under subsection (d), in writing, if the Department or appropriate approved local air pollution control agency is satisfied that the alternative RACT proposal complies with the requirements of subsection (d) and that the proposed alternative requirement or RACT emission limitation is RACT for the air contamination source.

(3) Deny or modify the alternative RACT proposal submitted under subsection (d), in writing, if the proposal does not comply with the requirements of subsection (d).

(f) The proposed alternative RACT requirement or RACT emission limitation and the implementation schedule submitted under subsection (d) will be approved, denied or modified by the Department or appropriate approved local air pollution control agency in accordance with subsection (e) in writing through the issuance of a plan approval or operating permit modification prior to the owner or operator implementing the alternative RACT requirement or RACT emission limitation.

(g) The emission limit and requirements specified in the plan approval or operating permit issued by the Department or appropriate approved local air pollution control agency under subsection (f) supersede the emission limit and requirements in the existing plan approval or operating permit issued to the owner or operator of the source prior to April 23, 2016, on the date specified in the plan approval or operating permit issued by the Department or appropriate approved local air pollution control agency under subsection (f), except to the extent the existing plan approval or operating permit contains more stringent requirements.

(h) The Department will submit each alternative RACT requirement or RACT emission limitation approved under subsection (f) to the Administrator of the EPA for approval as a revision to the SIP. The owner and operator of the facility shall bear the costs of public hearings and notifications, including newspaper notices, required for the SIP submittal.

(i) The owner and operator of a facility proposing to comply with the applicable RACT requirement or RACT emission limitation under subsection (a), (b) or (c) through the installation of an air cleaning device may submit a petition, in writing, requesting an alternative compliance schedule in accordance with the following:

(1) The written petition requesting an alternative compliance schedule shall be submitted to the Department or appropriate approved local air pollution control agency as soon as possible but not later than:

(i) October 24, 2016, for a source subject to § 129.96(a).

(ii) October 24, 2016, or 6 months after the date that the source meets the definition of a major $NO_x$ emitting facility, whichever is later, for a source subject to § 129.96(b).

(2) The written petition must include:

(i) A description, including make, model and location, of each air contamination source subject to a RACT requirement or RACT emission limitation in one or more of subsections (a)—(c).

(ii) A description of the proposed air cleaning device to be installed.

(iii) A schedule containing proposed interim dates for completing each phase of the required work to install the air cleaning device described in subparagraph (ii).

(iv) A proposed interim emission limitation that will be imposed on the affected air contamination source until compliance is achieved with the applicable RACT requirement or RACT emission limitation.

(v) A proposed final compliance date that is as soon as possible but not later than 3 years after the approval of the petition by the Department or the appropriate approved local air pollution control agency. If the petition is for the replacement of an existing source, the final

compliance date will be determined on a case-by-case basis. The approved petition shall be incorporated in an applicable operating permit or plan approval.

(j) The Department or appropriate approved local air pollution control agency will review the timely and complete written petition requesting an alternative compliance schedule submitted in accordance with subsection (i) and approve or deny the petition in writing.

(k) The emission limit and requirements specified in the plan approval or operating permit issued by the Department or appropriate approved local air pollution control agency under subsection (j) supersede the emission limit and requirements in the existing plan approval or operating permit issued to the owner or operator of the source prior to April 23, 2016, on the date specified in the plan approval or operating permit issued by the Department or appropriate approved local air pollution control agency under subsection (j), except to the extent the existing plan approval or operating permit contains more stringent requirements.

(l) Approval or denial under subsection (j) of the timely and complete petition for an alternative compliance schedule submitted under subsection (i) will be effective on the date the letter of approval or denial of the petition is signed by the authorized representative of the Department or appropriate approved local air pollution control agency.

### § 129.100. Compliance demonstration and recordkeeping requirements.

(a) Except as provided in subsection (c), the owner and operator of an air contamination source subject to a $NO_x$ requirement or RACT emission limitation or VOC requirement or RACT emission limitation, or both, listed in § 129.97 (relating to presumptive RACT requirements, RACT emission limitations and petition for alternative compliance schedule) shall demonstrate compliance with the applicable RACT requirement or RACT emission limitation by performing the following monitoring or testing procedures:

(1) For an air contamination source with a CEMS, monitoring and testing in accordance with the requirements of Chapter 139, Subchapter C (relating to requirements for source monitoring for stationary sources) using a 30-day rolling average, except municipal waste combustors.

(i) A 30-day rolling average emission rate for an air contamination source that is a combustion unit shall be expressed in pounds per million Btu and calculated in accordance with the following procedure:

(A) Sum the total pounds of pollutant emitted from the combustion unit for the current operating day and the previous 29 operating days.

(B) Sum the total heat input to the combustion unit in million Btu for the current operating day and the previous 29 operating days.

(C) Divide the total number of pounds of pollutant emitted by the combustion unit for the 30 operating days by the total heat input to the combustion unit for the 30 operating days.

(ii) A 30-day rolling average emission rate for each applicable RACT emission limitation shall be calculated for an affected air contamination source for each consecutive operating day.

(iii) Each 30-day rolling average emission rate for an affected air contamination source must include the emis-

sions that occur during the entire operating day, including emissions from start-ups, shutdowns and malfunctions.

(2) For a Portland cement kiln with a CEMS, monitoring of clinker production rates in accordance with 40 CFR 63.1350(d) (relating to monitoring requirements).

(3) For a municipal waste combustor with a CEMS, monitoring and testing in accordance with the requirements in Chapter 139, Subchapter C, using a daily average.

(4) For an air contamination source without a CEMS, monitoring and testing in accordance with a Department-approved emissions source test that meets the requirements of Chapter 139, Subchapter A (relating to sampling and testing methods and procedures). The source test shall be conducted one time in each 5-year calendar period.

(b) Except as provided in § 129.97(k) and § 129.99(i) (relating to alternative RACT proposal and petition for alternative compliance schedule), the owner and operator of an air contamination source subject to subsection (a) shall demonstrate compliance with the applicable RACT requirement or RACT emission limitation in accordance with the procedures in subsection (a) not later than:

(1) January 1, 2017, for a source subject to § 129.96(a) (relating to applicability).

(2) January 1, 2017, or 1 year after the date that the source meets the definition of a major $NO_x$ emitting facility or major VOC emitting facility, whichever is later, for a source subject to § 129.96(b).

(c) An owner or operator of an air contamination source subject to this section, §§ 129.96 and 129.97 and § 129.98 (relating to facility-wide or system-wide $NO_x$ emissions averaging plan general requirements) may request a waiver from the requirement to demonstrate compliance with the applicable emission limitation listed in § 129.97 if the following requirements are met:

(1) The request for a waiver is submitted, in writing, to the Department not later than:

(i) October 24, 2016, for a source subject to § 129.96(a).

(ii) October 24, 2016, or 6 months after the date that the source meets the definition of a major $NO_x$ emitting facility or major VOC emitting facility, whichever is later, for a source subject to § 129.96(b).

(2) The request for a waiver demonstrates that a Department-approved emissions source test was performed in accordance with the requirements of Chapter 139, Subchapter A, on or after:

(i) April 23, 2015, for a source subject to § 129.96(a).

(ii) April 23, 2015, or within 12 months prior to the date that the source meets the definition of a major $NO_x$ emitting facility or major VOC emitting facility, whichever is later, for a source subject to § 129.96(b).

(3) The request for a waiver demonstrates to the satisfaction of the Department that the test results show that the source's rate of emissions is in compliance with the source's applicable $NO_x$ emission limitation or VOC emission limitation.

(4) The Department approves, in writing, the request for a waiver.

(d) The owner and operator of an air contamination source subject to this section and §§ 129.96—129.99 shall

keep records to demonstrate compliance with §§ 129.96—129.99 in the following manner:

(1) The records must include sufficient data and calculations to demonstrate that the requirements of §§ 129.96—129.99 are met.

(2) Data or information required to determine compliance shall be recorded and maintained in a time frame consistent with the averaging period of the requirement.

(e) Beginning with the compliance date specified in § 129.97(a), the owner or operator of an air contamination source claiming that the air contamination source is exempt from the applicable $NO_x$ emission rate threshold specified in § 129.99(b) and the requirements of § 129.97 based on the air contamination source's potential to emit shall maintain records that demonstrate to the Department or appropriate approved local air pollution control agency that the air contamination source is not subject to the specified emission rate threshold.

(f) Beginning with the compliance date specified in § 129.97(a), the owner or operator of an air contamination source claiming that the air contamination source is exempt from the applicable VOC emission rate threshold specified in § 129.99(c) and the requirements of § 129.97 based on the air contamination source's potential to emit shall maintain records that demonstrate to the Department or appropriate approved local air pollution control agency that the air contamination source is not subject to the specified emission rate threshold.

(g) The owner or operator of a combustion unit subject to § 129.97(b) shall record each adjustment conducted under the procedures in § 129.97(b). This record must contain, at a minimum:

(1) The date of the tuning procedure.

(2) The name of the service company and the technician performing the procedure.

(3) The final operating rate or load.

(4) The final $NO_x$ and CO emission rates.

(5) The final excess oxygen rate.

(6) Other information required by the applicable operating permit.

(h) The owner or operator of a Portland cement kiln subject to § 129.97(h) shall maintain a daily operating log for each Portland cement kiln. The record for each kiln must include:

(1) The total hours of operation.

(2) The type and quantity of fuel used.

(3) The quantity of clinker produced.

(4) The date, time and duration of a start-up, shutdown or malfunction of a Portland cement kiln or emissions monitoring system.

(i) The records shall be retained by the owner or operator for 5 years and made available to the Department or appropriate approved local air pollution control agency upon receipt of a written request from the Department or appropriate approved local air pollution control agency.

[Pa.B. Doc. No. 16-694. Filed for public inspection April 22, 2016, 9:00 a.m.]

———

JA319



**pennsylvania**
DEPARTMENT OF ENVIRONMENTAL
PROTECTION



RECEIVED
SEP 2 6 2017
EPA, REGION III
OFFICE OF REGIONAL ADMINISTRATOR

September 22, 2017

Mr. Cecil A. Rodrigues                    SEP 2 6 2017
Acting Regional Administrator
U.S. Environmental Protection Agency, Region III
1650 Arch Street, (Mail Code: 3RA00)
Philadelphia, PA 19103-2029

Dear Mr. Rodrigues:

Enclosed for your approval is a supplement to the revision to Pennsylvania's State
Implementation Plan (SIP) concerning amendments to 25 Pa. Code Chapters 121 and 129
(relating to general provisions; and standards for sources) to adopt additional reasonably
available control technology (RACT) requirements for major sources of oxides of nitrogen ($NO_x$)
and volatile organic compound (VOC) emissions. The final rulemaking adopting these RACT
amendments was effective upon publication in the *Pennsylvania Bulletin* on April 23, 2016
(46 Pa.B. 2036). The amendments were submitted to the U.S. Environmental Protection Agency
(EPA) on May 16, 2016, to fulfill certain 8-hour ozone RACT requirements for the 1997 and
2008 ozone National Ambient Air Quality Standards and to satisfy requirements of the Clean Air
Act (42 U.S.C.A. §§ 7401—7671q) for sources located in ozone nonattainment areas and the
Ozone Transport Region.

This supplement includes the cost analysis performed in relation to the presumptive RACT NOx
and VOC emission limitations. In addition, this supplement includes information regarding the
Talen Energy Brunner Island facility.

Should you have questions regarding this SIP submittal supplement, please contact
Krishnan Ramamurthy, Director of the Bureau of Air Quality, by e-mail at kramamurth@pa.gov
or by telephone at 717.787.9702.

Sincerely,

Patrick McDonnell
Secretary

Enclosures

The Environmental Protection Agency ("EPA") has requested the Pennsylvania Department of Environmental Protection ("Department" or "DEP") to clarify aspects of the Reasonably Available Control Technology ("RACT") regulation for the 1997 and 2008 8-hour ozone national ambient air quality standards ("NAAQS").  The Department is submitting the clarifications in this letter to EPA from the Secretary of the Pennsylvania DEP to be included in EPA's rulemaking docket for the review of Pennsylvania's RACT rule as a state implementation plan ("SIP") revision.

**Calculation of Allowable Mass Emission Levels (Ei$_{allowable}$) in an Averaging Plan under 25 Pa. Code §129.98(e)**

The core principal behind the RACT averaging provisions in 25 Pa. Code §129.98 is that the total nitrogen oxides ("NO$_x$") emissions from a given group of emission units must be no greater than the NO$_x$ emissions from the same group had they individually been compliant with the presumptive NO$_x$ RACT emission limitations.

In all cases but one, the emission units within averaging plans have NO$_x$ emissions monitored through continuous emission monitoring systems ("CEMS").  Mass NO$_x$ emissions from each emission unit are calculated each hour using Department certified CEMS. The allowable mass emissions are calculated each hour using the presumptive NO$_x$ RACT emission limit (or more-stringent limit, if applicable) and the actual heat input from the Department certified CEMS.  The total mass emissions and total allowable mass emissions from all emission units in an averaging plan are summed over each 30-operating day period and compared.  The company data acquisition system ("DAS") will be programmed to calculate the actual and allowable emissions for the 30-operating day period using information obtained from Department certified CEMS. A summary report will be provided to the applicable DEP Regional Office staff to demonstrate compliance or non-compliance with the RACT averaging plan.  If the total mass emissions exceed the allowable mass emissions during the 30-operating days, all sources that make up the average will be deemed out of compliance for the operating day and appropriate enforcement action will be taken.

Each facility will have the calculations present and up-to-date.  On any day, an inspector at the facility can easily determine if the averaged sources are in compliance with the RACT averaging plan.

In the proposed RACT rule, the averaging equations were tailored specifically for combustion units for which the presumptive emission limits are expressed as pounds of NO$_x$ per million Btu.  Total mass emissions for each emission unit were to be calculated based on daily NO$_x$ emission rate and the actual heat input.  The total allowable mass emissions for each emissions unit were to be calculated based on the allowable NO$_x$ emission rate and the *actual* heat input.  In response to public comments received, the Department revised the regulations to allow averaging of NO$_x$ emissions from emission units including combustion units to demonstrate compliance with the applicable presumptive NO$_x$ emission limits.   However, the equation in the proposed regulation is not appropriate for emission units other than combustion units since the presumptive

1

JA321

NO$_x$ emission limitations for units other than combustion units are not expressed as pounds per million Btu.  Therefore, the Department revised the equation accordingly in the final form rulemaking.   The attached document entitled *RACT 2 – Source Testing and Monitoring Requirements* was developed to assist with implementing the source testing and monitoring requirements contained in the RACT requirements at major NO$_x$ or VOC emitting facilities that are subject to 25 Pa. Code Chapter 129. (See Attachment 1).  Please note that for combustion units, allowable mass emissions are still calculated based on the allowable NO$_x$ emission rate and the actual heat input.   For turbines, the NOx emission standard in ppm can be translated into a lb/MMBtu standard through the use of EPA-approved conversion factors.  Also attached is an actual compliance demonstration from Talen Energy averaging NOx emissions from their emission units located at the Brunner Island and Montour facilities for the first quarter of 2017 (See Attachments 2 and 3).

One of the provisions in calculating allowable NO$_x$ mass emissions is that if an emission unit has an applicable NO$_x$ emission limitation that is more stringent than the presumptive NO$_x$ emission limitation, the owner or operator is required to use the more stringent NO$_x$ emission limitation.  This provision is to preclude the possibility of an owner or operator using already required NO$_x$ emission reductions to offset NO$_x$ RACT emission reductions from a different emission unit.

Conditions pertaining to the averaging provisions will be included in the Title V permit for each facility employing facility-wide or system-wide NOx RACT averaging.  While the Department does not believe that these specific conditions need to be submitted to EPA for approval as facility-specific SIP revisions, it intends to submit the terms and conditions dealing with emission averaging to EPA as facility specific SIP revisions to address EPA's concerns.

**Applicability of System-Wide Averaging Provisions**

25 Pa. Code §129.98(a) states, in part, "System-wide emissions averaging must be among sources under common control of the same owner or operator within the same ozone nonattainment area in this Commonwealth."  In response to comments submitted by EPA the final rulemaking clarified the conditions under which an owner or operator may propose an averaging plan.  The Department's interpretation, which is consistent with EPA's response, regarding unclassifiable/attainment areas is laid out in the preamble to the regulation as follows.   "The averaging must be conducted within the same ozone nonattainment area in this Commonwealth. The Department interprets this provision to allow emissions averaging in areas designated as unclassifiable/attainment for the ozone NAAQS."  For the purposes of 25 Pa. Code §129.98, all areas of the Commonwealth designated as unclassifiable/attainment for ozone are to be considered as one single nonattainment area.

JA322

**Alternative RACT proposals**

The Department will submit all source-specific RACT determinations under 25 Pa. Code §129.99 to EPA for approval as SIP revisions within 12 months of EPA's final rulemaking.

**Presumptive RACT for Large Coal-Fired Boilers Without Post-Combustion Controls**

The public comment period for draft final-form RACT regulation for the 1997 and 2008 8-hour ozone NAAQS, also known as RACT II, ended on June 30, 2014. On March 2, 2015, the Sierra Club sent a letter to the Department objecting to certain provisions in the draft final-form RACT II regulation approved by the Air Quality Technical Advisory Committee ("AQTAC") on November 7, 2014 (See Attachment 4). Sierra Club provided their cost analysis for the installation of selective catalytic reduction ("SCR") controls on electric generating units ("EGUs") at Brunner Island. According to the analyses prepared by the Sierra Club's consultant, cost efficacy for $NO_x$ removal for boilers at Brunner Island would be approximately $3,500 per ton. Although the Sierra Club based its analyses on the EPA methodology, DEP staff determined that these analyses are flawed.

The Sierra Club's cost analysis did not provide the basis or reference for total capital costs ("TCC") for the installation of SCR on the units. The TCC used in the Sierra Club's analysis was not consistent with the either the actual capital costs incurred by the recent installation of SCR on comparable units at the Conemaugh Generating Station or the average capital costs estimated using estimates from the PJM Interconnection (See Attachment 5).

While Sierra Club's analysis was reported to be conducted using EPA Office of Air Quality Planning and Standards ("OAQPS") cost analysis methodologies, the Sierra Club did not include the administrative cost of 2% of TCC and overhead cost of 60% of maintenance cost as prescribed in EPA's OAQPS Cost Manual. Additionally, the Sierra Club used 1.5% of TCC factors for property tax and insurance rather than 2% of TCC as prescribed in EPA's Cost Manual.

In addition to the review of Sierra Club's March 2, 2015 cost analysis, DEP independently conducted its own economic feasibility analysis for installation of additional $NO_x$ emission control by SCR (See Attachment 5). DEP determined that it would cost prohibitive to install and operate SCR for the EGUs at Brunner Island for RACT compliance purposes. DEP concluded that no changes to the draft final-form RACT regulation for presumptive RACT emission limitations for large coal-fired boilers were necessary, based on the supplemental information provided by Sierra Club.

In the independent analysis, DEP calculated cost-effectiveness using quoted capital costs and balance of plant costs for SCR installation for Unit 3 at Brunner Island (See Attachment 6) and the EPA's OAQPS factors for other costs. The SCR capital cost for

3

JA323

the Unit 3 project would be $200,875,714, or approximately $27,408 per (MMBtu/hr). This is consistent with the actual capital SCR controls recently installed for two existing boilers at the Conemaugh power plant. The cost for the SCR systems installation for the Conemaugh units, incurred between 2012 and 2015, was approximately $450 million dollars or $27,900 per MMBtu/hr. DEP estimated the capital costs and balance of plant costs from Units 1 and 2 using the Vendor Quote for Unit 3 and the ratios derived from the default capital and balance of plants costs determined by the EPA's OAQPS spreadsheet. The SCR capital costs for the Unit 1 and Unit 2 projects are estimated using EPA's OAQPS ratios to be $81,096,990 and $91,520,219, respectively.

DEP's cost analysis for the Brunner Island facility is based on the current unit-by-unit $NO_x$ potential-to-emit ("PTE") as a baseline. The restricted PTE levels were established on March 28, 2016 with the issuance of plan approval 67-05005J (See Attachment 7). All units at the Brunner Island facility were capable of firing on natural gas as of April 2017. The PTE established for units 1, 2, and 3 at the Brunner Island facility are 3751, 4261, and 8186 tons of $NO_x$ per year, respectively.

There were a few deviations made from the default settings in the EPA's OAQPS SCR cost spreadsheet. DEP used Method 2 to calculate catalyst replace costs as it is more appropriate for a coal-fired boiler as indicated within the spreadsheet. Method 1 does not take into account additional costs incurred specifically related to the use of coal as fuel, such as the amount and chemical nature of particulate loading to the catalyst. This results in several million dollars' worth of added annual cost likely due to the harsh environment in which the catalyst must operate.

DEP also used a 20-year capital recovery period as opposed to the default 30-year capital recovery period. In the recent Best Available Retrofit Technology ("BART") analysis conducted nation-wide on existing coal-fired EGUs, a maximum of 20 years was used in the economic analysis. In addition, the Internal Revenue Service ("IRS") requires the use of the General Depreciation System ("GDS") to recover basis. Under GDS electrical generating equipment should be depreciated over 20 years in accordance with IRS Publication 946. The Brunner Island units are also not expected to be in operation for 30 years. The latest unit, Unit 3, was built in the early 1970s. After 30 years from today, the unit would be approximately 75 years old. Very few existing coal-fired units of that age exist today. It is highly improbable that the Brunner Island units will still be running on coal at that age or older.

The DEP cost analysis for these units using the PTE as baseline emissions and the $NO_x$ RACT presumptive SCR limit of 0.12 lb/MMBtu as the controlled emission rate yields a cost effectiveness of $7123, $7028, and $6456 per ton of $NO_x$ controlled for units 1, 2, and 3, respectively. It should be noted that Wisconsin's SIP-approved RACT regulations in 2010 were based on a NOx cost-effectiveness benchmark of $2,500 per ton controlled. Additionally, New York's SIP-approved RACT regulations for coal-fired EGUs indicated a cost-effectiveness benchmark of approximately $5,500 per ton controlled. Therefore, DEP concludes that the installation of SCR on the units at the Brunner Island facility continues to be cost prohibitive for RACT purposes.

4

DEP also performed a cost analysis for the use of selective non-catalytic reduction ("SNCR") on the Brunner Island Units (See Attachment 8). DEP calculated costs using the EPA's OAQPS SNCR cost spreadsheet and the current restricted NOx PTE per unit.

In addition to the use of a 20-year capital recovery period, there are other deviations from the default settings in the EPA's OAQPS SNCR cost spreadsheet. Data from several coal-fired facilities that utilize SNCR show that actual NOx reduction efficiency is approximately 20%. When compared to smaller boilers, SNCR does not scale well due to the difficulties involved in properly mixing such a large exhaust volume. There was also added costs due to fly ash. Currently, Talen sells the fly ash from the Brunner Island units for a small profit. The addition of an SNCR will expose the exhaust stream to ammonia or urea which will render the ash unusable for the customer. The will result in Talen having to pay to have the ash removed at considerable cost. Therefore, the costs to dispose the ammonia-laden fly ash as well as the lost revenue from not being able to sell the fly ash have been included into the cost-efficiency calculations.

The DEP cost analysis for these units using the PTE as baseline emissions and a 20% NOx control efficiency rate for SNCR yields a cost effectiveness of $8019, $7873, and $7278 per ton of $NO_x$ controlled for units 1, 2, and 3, respectively. DEP concludes that the installation of SNCR on the units at the Brunner Island facility continues to be cost prohibitive for RACT purposes.

**Presumptive RACT for Large Coal-Fired Boilers with SCR Already Installed**

The actual $NO_x$ emission rates from coal-fired EGUs operating with SCR range from 0.09 to 0.22 lb/MMBtu on a 30-operating-day rolling basis with an average $NO_x$ emission rate of 0.15 lb/MMBtu heat input. DEP determined subsequently that the average $NO_x$ emission rate from all EGUs located at Bruce Mansfield, Keystone, and Montour is 0.12 lb/MMBtu when the SCR is operational. This emission rate is lower than the $NO_x$ emission rate (0.15 lb/MMBtu heat input) included in the draft final-form $NO_x$ RACT regulation considered by AQTAC in November 2014. Based on the DEP analysis of historical data, EGUs at Keystone and Bruce Mansfield should not have a problem meeting 0.12 lb/MMBtu heat input limit (See Attachment 9). The EGUs at the Montour facility also should be able to achieve a $NO_x$ emission level at or below 0.12 lb/MMBtu heat input if the ammonia injection rate is adjusted and other changes in the SCR system are implemented by the operator. However, the operators of the units with SCR installed at Homer City will be upgrading the SCR systems at the plant in order to achieve the 0.12 lb/MMBtu $NO_x$ emission rate.

The DEP acknowledges that the $NO_x$ RACT limit in the final rulemaking is not the lowest achievable emissions rate ("LAER") for this technology. However, the EPA has indicated in the preamble for the final rule approving a SIP revision for Wisconsin's $NO_x$ RACT Rule that:

5

JA325

"RACT limits are not meant to be the lowest achievable emissions rate. The Nitrogen Oxides Supplement to the General Preamble for the Implementation of Title I of the Clean Air Act Amendments of 1990 addresses the issue of an acceptable emission limit. *See* section 4.6 *RACT for Certain Electric Utility Boilers* (57 FR 55626), "The EPA expects States, to the extent practicable, to demonstrate that the variety of emission controls adopted are consistent with the most effective level of combustion modification reasonably available for its individual affected sources."  See 75 FR 64155, 64157 (October 19, 2010).

The Department's reevaluation of the $NO_x$ RACT limit for coal-fired EGUs, taking into consideration cost-effectiveness and technological feasibility, is consistent with the approach outlined in the preamble of the October 19, 2010, EPA rule approving Wisconsin's RACT SIP revision.  In addition, on May 18, 2015, DEP received a letter from EPA Region III concurring that the $NO_x$ RACT presumptive limit of 0.12 lb per million Btu is, "consistent with what the Agency has previously approved for RACT in other nearby Ozone Transport Commission states such as Delaware, New York and New Jersey" (See Attachment 10).

**Presumptive RACT for Large Coal-Fired Boilers with SNCR Already Installed**

The following list contains facilities and units which were operating with SNCR in 2011. Several facilities on that list are permanently shut down.  They are AES Beaver Valley, Cromby, Eddystone, Elrama, Hatfield's Ferry, and Piney Creek.  DEP has approved emission reduction credits ("ERCs") as a result of the permanent shutdown of AES Beaver Valley Units 032, 033, 034, and 035; Cromby Unit 1; Eddystone Units 1 and 2; Elrama Units 1, 2, 3, and 4; and Piney Creek Unit 031 (See Attachment 11).  The generation of ERCs show that the shutdowns are permanent and enforceable.  The application for the generation of ERCS as a result of permanently shutdown of emission units at Hatfield's Ferry in 2013 is still under review.

| Facility Name | Unit IDs | Boiler Type | Operational Status | Comments |
|---|---|---|---|---|
| AES Beaver Valley | 032, 033, 034, 035 | Wall | Shutdown September 2015 | ERCs certified on August 11, 2016 acknowledging permanent shutdown of the sources |
| Cromby | 1 | Wall | Shutdown December 2011 | ERCs certified on August 14, 2013 acknowledging permanent shutdown of the source |
| Eddystone | 1, 2 | Tangential | Shutdown May 2012 | ERCs certified on March 19, 2013 acknowledging permanent shutdown of the sources |
| Elrama | 1, 2, 3, 4 | 3 Vertical, 1 Wall | Shutdown October 2012 | ERCs certified on March 10, 2015 acknowledging |

6

JA326

| | | | | permanent shutdown of the sources |
|---|---|---|---|---|
| Hatfield's Ferry | 3 | Cell | Shutdown October 2013 | Application for ERCs received on April 30, 2015 is under review |
| Piney Creek | 031 | CFB | Shutdown April 2013 | ERCs certified on October 5, 2015 acknowledging permanent shutdown of the source |
| Cambria Cogen | 1, 2 | CFB | Operational | Waste coal-fired |
| Scrubgrass | 1, 2 | CFB | Operational | Waste coal-fired |
| Seward | 1, 2 | CFB | Operational | Waste coal-fired |
| P.H. Glatfelter | 036 | CFB | Operational | Waste coal-fired |
| New Castle | 3, 4, 5 | Wall | Operational | Added natural gas |
| Shawville | 1, 2, 3, 4 | 2 Wall, 2 Tangential | Operational | Added natural gas |

An analysis of actual emission rates from CFB boilers shows that units equipped with SNCR do not emit $NO_x$ at a lower level than units without SNCR.  Please see the chart below.

| CFB EGU Performance Jan 2010 - Mar 2017 | $NO_x$ Average lb/MMBtu | $NO_x$ Weighted Average lb/MMBtu |
|---|---|---|
| SNCR | 0.142 | 0.134 |
| Non-SNCR | 0.093 | 0.084 |

CFB boilers are used to burn waste coal.  This provides an enormous overall environmental benefit by reducing the waste coal piles that litter parts of Pennsylvania's landscape.  It mitigates acid drainage and the slow uncontrolled combustion of these piles that happen naturally.  A consequence of burning waste coal is that the fuel is not uniform.  When compared to conventional coal, waste coal (both anthracite and bituminous) is not as homogeneous and the variability of fuel characteristics are significant. Fuel-bound nitrogen plays a larger role in $NO_x$ formation from waste coal than conventional coal.  While the CFB technology can mitigate some of this uncertainty, some facilities employ SNCR to further reduce $NO_x$ emissions.  As shown on the chart above, these facilities still have higher $NO_x$ emissions than those that do not require SNCR.  The Department has determined that the installation of SNCR is not necessary and also cost prohibitive for all CFB units burning waste coal to comply with RACT requirements.  It is also generally accepted that SCR is not technically feasible for CFB boilers due to high temperatures.  Given the performance of CFBs with and without SNCR, based on the evaluation of all available emission data from these units

JA327

burning waste coal DEP determined that the presumptive RACT $NO_x$ emission limit of 0.16 lb/MMBtu is appropriate for all CFB boilers. The final form rulemaking requires these units to operate already installed SNCR irrespective of their emission rates.

The only operating EGUs that are equipped with SNCR and capable of firing conventional coal (i.e. not waste coal) are located at the Shawville and New Castle facilities.  It is the Department's interpretation that no presumptive $NO_x$ RACT emission limitations have been established in 25 Pa. Code §129.97 for non-CFB combustion units equipped with SNCR when firing coal.  Therefore, the Department will submit source-specific RACT determinations to EPA as SIP revisions for these EGUs prior to the firing of coal at these facilities.  Conditions will be included in the Shawville and New Castle Title V permits prohibiting the use of coal as fuel as these facilities until a source-specific RACT determination has been approved by the Department.

| Average NOx Rate, lb/MMBtu, presumably when SCR is in operation (i.e. <0.30 lb/MMBtu) over the _last 5 years_ | Daily | 30-Day |
|---|---|---|
| Homer City Unit 1 | 0.19 | 0.19 |
| Homer City Unit 2 | 0.19 | 0.19 |
| Homer City Unit 3 | 0.19 | 0.19 |
| **Bruce Mansfield Unit 1** | 0.12 | 0.12 |
| **Bruce Mansfield Unit 2** | 0.11 | 0.11 |
| **Bruce Mansfield Unit 3** | 0.14 | 0.14 |
| **Keystone Unit 1** | 0.10 | 0.10 |
| **Keystone Unit 2** | 0.10 | 0.09 |
| **Montour Unit 1** | 0.15 | 0.15 |
| **Montour Unit 2** | 0.16 | 0.15 |
| Cheswick | 0.21 | 0.22 |
| **Average of BM, Key, Mon Only** | **0.12** | **0.12** |



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

Ms. Joyce Epps, Director                                                    MAY 1 8 2015
Bureau of Air Quality
Department of Environmental Protection
Market Street Office Building, 12th Floor
P.O. Box 8468
Harrisburg, PA 17105-8468

Dear Ms. Epps:

        The Environmental Protection Agency (EPA) has reviewed the draft final-form
Reasonably Available Control Technology (RACT) II regulation that the Pennsylvania
Department of Environmental Protection (PADEP) sent to the Air Quality Technical Advisory
Committee (AQTAC) for the April 16, 2015 meeting in which the nitrogen oxides (NOx)
emission limit was revised to 0.12 pounds of NOx per million British Thermal Units (lbs
NOx/mm BTU) for the coal-fired electric generating units (EGUs) currently equipped with
selective catalytic reduction (SCR).

        EPA believes this limit is consistent with what the Agency has previously approved for
RACT in other nearby Ozone Transport Commission states such as Delaware, New York and
New Jersey. Also, according to data reviewed by EPA, several Pennsylvania affected units
(Homer City Units 1 through 3, Bruce Mansfield Units 1 through 3, Cheswick Unit 1, Keystone
Units 1 and 2, and Montour Units 1 and 2) were able to average 0.12 lbs NOx/mm BTU or less
(as a 153-day ozone season average) after installation of the SCR in the 2003 to 2004 time frame
after the NOx SIP call requirements were first imposed. Therefore, a limit of 0.12 lb NOx/mm
BTU heat input appears achievable by Pennsylvania EGUs with SCR.

        We offer our technical assistance as your regulation and SIP development process
continue and will continue to work with you and your staff at PADEP. If you have any
questions, please contact Ms. Cristina Fernandez from the Office of Air Program Planning at
(215) 814-2178 or fernandez.cristina@epa.gov.

                                Sincerely,

                                Diana Esher

                                Diana Esher, Director
                                Air Protection Division



April 13, 2018

*Filed via Regulations.gov and Electronic Mail to speilberger.susan@epa.gov*

Re:    Sierra Club Comments Concerning EPA's Proposed Approval and Promulgation of Air Quality Implementation Plans; Pennsylvania; Regulatory Amendments Addressing Reasonably Available Control Technology Requirements Under the 1997 and 2008 8-Hour Ozone National Ambient Air Quality Standards

Sierra Club submits, on behalf of its over 32,000 members in the state of Pennsylvania, and of the tens of thousands of others residing in states downwind of Pennsylvania's ozone-causing pollution sources, submits these comments concerning EPA's Proposed Approval and Promulgation of Air Quality Implementation Plans; Pennsylvania; Regulatory Amendments Addressing Reasonably Available Control Technology Requirements Under the 1997 and 2008 8-Hour Ozone National Ambient Air Quality Standards ("Proposed RACT SIP Approval"), 83 Fed. Reg. 11,155 (March 14, 2018). While the Sierra Club applauds EPA taking steps to move forward in taking long overdue action on Pennsylvania's RACT SIP submittal, EPA's proposed approval is nonetheless flawed for three main reasons:

(1) The proposed emission limits for SCR-equipped coal-fired boilers are far laxer than achievable with reasonably available control technology;
(2) The temperature-based exemptions from SCR operation are unsupported and unsupportable; and,
(3) The lack of reporting requirements for those same temperature-based exemptions from SCR operation render it nearly impossible for members of the public or regulatory agencies to ever know for sure if the RACT limits are being complied with.

Essentially, the combination of a high base emission rate, a thirty-day averaging period, and an inlet-temperature exemption for SCR-equipped coal boilers presents a very weak and unprotective emission standard inconsistent with the requirements of RACT. Accordingly, EPA should partially disapprove the RACT SIP submittal, and instead issue a Federal Implementation Plan ("FIP") correcting these problems and imposing a 0.07 lbs/MMbtu NOx emission limit for SCR-equipped coal-fired boilers, without an inlet temperature exemption, as discussed in greater detail below.

## Background

### A.     Ground-Level Ozone Is Dangerous to Human Health

Ozone, the main component of smog, is a corrosive air pollutant that inflames the lungs, constricts breathing, and likely kills people.  *See* U.S. EPA, National Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65,292, 65,308/3-09/1 (Oct. 26, 2015); U.S. EPA, Integrated Science Assessment for Ozone and Related Photochemical Oxidants 2-20 to -23 tbl.2-1 (EPA-HQ-OAR-2008-0699-0405, Feb. 2013) ("ISA").  It causes and exacerbates asthma attacks, emergency room visits, hospitalizations, and other serious health harms.  *See, e.g.*, EPA, *Policy Assessment for the Review of the Ozone National Ambient Air Quality Standards* 3-18, 3-26 to -29, 3-32 (EPA-HQ-OAR-2008-0699-0404, Aug. 2014) ("PA"); ISA 2-16 to -18, 2-20 to -24 tbl.2-1. Ozone-induced health problems can force people to change their ordinary activities, requiring children to stay indoors and forcing people to take medication and miss work or school. *See, e.g.*, PA 4-12.

Ozone can harm healthy adults, but others are more vulnerable.  *See* 80 Fed. Reg. at 65,310/1-3.  Because their respiratory tracts are not fully developed, children are especially vulnerable to ozone pollution, particularly when they have elevated respiratory rates, as when playing outdoors.  *See, e.g.*, PA 3-81 to -82. People with lung disease and the elderly also have heightened vulnerability. *See* 80 Fed. Reg. at 65,310/3.  People with asthma suffer more severe impacts from ozone exposure than healthy individuals do and are more vulnerable at lower levels of exposure.  *Id.* at 65,311/1 n.37, 65,322/3.

Ozone also damages vegetation and forested ecosystems, causing or contributing to widespread stunting of plant growth, tree deaths, visible leaf injury, reduced carbon storage, and reduced crop yields.  PA 5-2 to -3; ISA 9-1.  The damage includes tree-growth losses reaching 30- 50% in some areas, and widespread visible leaf injury, including 25-37% of sites studied in just one state.  PA 5-13; ISA 9-40.  By harming vegetation, ozone can also damage entire ecosystems, leading to ecological and economic losses.  80 Fed. Reg. at 65,370/1-2, 65,377/3.

### B.     Ozone National Ambient Air Quality Standards and Pennsylvania

In 2008, EPA revised the 1997 ozone NAAQS to 75 parts per billion with an 8-hour averaging period.[1]  In 2012, EPA finalized designations, including nonattainment designations, under this 2008 NAAQS, adding to unresolved nonattainment designations in Pennsylvania under the preexisting 1997 NAAQS.

Seventeen counties centered around Pittsburgh and Philadelphia are designated nonattainment under the 2008 ozone NAAQS.[2]  These seventeen counties contain over 8.1 million residents, or roughly two-thirds of Pennsylvania's total population.[3]

---

[1] 73 Fed. Reg. 16,483 (March 27, 2008).

[2] These seventeen counties are Allegheny, Armstrong, Beaver, Berks, Bucks, Butler, Carbon, Chester, Delaware, Fayette, Lancaster, Lehigh, Montgomery, Northampton, Philadelphia, Washington and Westmoreland.  *See* Pennsylvania DEP, Attainment Status by Principal Pollutants, *at* http://www.dep.pa.gov/Business/Air/BAQ/Regulations/Pages/Attainment-Status.aspx.

*Figure 1: Pennsylvania Ozone Nonattainment Areas*





**Nonattainment Areas**

Allentown-Bethlehem-Easton, PA

Lancaster, PA

Philadelphia-Wilmington-Atlantic City, PA-DE-MD-NJ

Pittsburgh-Beaver Valley, PA

Reading, PA

Moreover, huge numbers of Pennsylvania residents are particularly susceptible to ozone pollution, including more than 1.9 million seniors, 2.4 million children, and nearly 1.2 million asthma sufferers.[4]

Because of these nonattainment designations, and because Pennsylvania is part of the Ozone Transport Region, Pennsylvania was required to prepare a RACT SIP revision for major stationary sources of the ozone precursor pollutants NOx and VOCs in Pennsylvania. *See* 42 U.S.C. § 7502(c)(1).

In Pennsylvania, electric power plants are the source of a quarter of all NOx emissions in the state.

---

[3] To be precise, 8, 147,144 out of 12,805,537 Pennsylvanians (US Census Bureau 2017 population estimate) live in ozone nonattainment areas.

[4] *See* American Lung Association State of the Air 2017 at 138, *available at* http://www.lung.org/assets/documents/healthy-air/state-of-the-air/state-of-the-air-2017.pdf.

Table 1: Sources of NOx Pollution in Pennsylvania[5]

| Category | Pollutant | Tonnage | Percentage |
|---|---|---|---|
| Highway Vehicles | Nitrogen Oxides | 174,231 | 34.7% |
| Fuel Comb. Elec. Util. | Nitrogen Oxides | 123,147 | 24.5% |
| Off-Highway | Nitrogen Oxides | 61,726 | 12.3% |
| Fuel Comb. Industrial | Nitrogen Oxides | 53,329 | 10.6% |
| Fuel Comb. Other | Nitrogen Oxides | 32,312 | 6.4% |
| Petroleum & Related Industries | Nitrogen Oxides | 20,254 | 4.0% |
| Other Industrial Processes | Nitrogen Oxides | 17,266 | 3.4% |
| Natural Resources | Nitrogen Oxides | 9,343 | 1.9% |
| Waste Disposal & Recycling | Nitrogen Oxides | 7,914 | 1.6% |
| Metals Processing | Nitrogen Oxides | 2,208 | 0.4% |
| **TOTAL** | Nitrogen Oxides | **501,730** | **100.0%** |

Accordingly, properly implemented RACT standards in the electrical generating sector are critical to addressing Pennsylvania's ozone attainment problems.

C.     The Legal Standard for RACT

RACT determinations and RACT-based emission limits are required by the Clean Air Act for areas failing to attain National Ambient Air Quality Standards ("NAAQS"). *See* 42 U.S.C. § 7502(c)(1). RACT is a technology-forcing standard intended to ensure that polluting sources are controlled consistent with available methods for reducing pollution. As a result, RACT is a stringent standard, designed to induce and require improvements in control technology and reductions in pollutant emissions. Indeed, EPA has long maintained that "RACT should represent the toughest level of control considering technological and economic feasibility that can be applied to a specific situation" and that "[a]nything less than this is by definition less than RACT."[6]

RACT is defined as "the lowest emissions limit that a particular source is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility."[7] The RACT definition comprises two parts: (a) technological feasibility and (b) economic feasibility.

---

[5] Data from the National Emissions Inventory 2014.

[6] Memorandum from Roger Strelow, Assistant Administrator for Air and Waste Management, U.S. EPA, to Regional Administrators, Regions I - X (Dec. 9, 1976), at 2 (hereinafter "Strelow Memo"), *available at* https://www3.epa.gov/ttn/naaqs/aqmguide/collection/cp2/19761209_strelow_ract.pdf.

[7] State Implementation Plans; Nitrogen Oxides Supplement to the General Preamble for the Implementation of Title I of the Clean Air Act Amendments of 1990, 57 Fed. Reg. 55,620, 55,624/3 (Nov. 25, 1992); *see also Navistar Int'l Transp. Corp. v. United States EPA*, 941 F.2d 1339, 1343 (6th Cir. 1991) ("Since 1976, the EPA has interpreted

*(a) Technological Feasibility*

"The technological feasibility of applying an emission reduction method to a particular source should consider the source's process and operating procedures, raw materials, physical plant layout, and any other environmental impacts such as water pollution, waste disposal, and energy requirements."[8]

*(b) Economic Feasibility*

As EPA has explained, "[e]conomic feasibility considers the cost of reducing emissions and the difference in costs between the particular source and other similar sources that have implemented emission reduction."[9]  Specifically,

> EPA presumes that it is reasonable for similar sources to bear similar costs of emission reductions.  **Economic feasibility rests very little on the ability of a particular source to 'afford' to reduce emissions to the level of similar sources.  Less efficient sources would be rewarded by having to bear lower emission reduction costs if affordability were given high consideration.  Rather, economic feasibility for RACT purposes is largely determined by evidence that other sources in a source category have in fact applied the control technology in question.**[10]

Further, EPA has explained that RACT is not intended to enshrine existing control methods, but rather is technology-forcing.[11]  Thus, "[i]n determining RACT for an individual source or group of sources, the control agency, using the available guidance, should select the best available controls, deviating from those controls only where local conditions are such that they cannot be applied there and imposing even tougher controls where conditions allow."[12]

D.    The Pennsylvania RACT SIP Revision Proposal

In relevant part, the Pennsylvania RACT SIP Revision Proposal under consideration by EPA sets NOx emission limits for selective catalytic converter ("SCR")-equipped coal-fired boilers. Specifically, for such boilers, while operating with an inlet temperature greater or equal to 600 degrees Fahrenheit, such units are required to hit an emission limit of 0.12 pounds of NOx per MMbtu.  25 Pa. Code § 129.97(g)(1)(viii); *see also* Proposed RACT SIP Approval Technical Support Document ("TSD") at 11.  Under the Proposal, when SCR-equipped boilers are operating with an inlet temperature of below 600 degrees Fahrenheit, the 0.12 lbs/MMbtu limit does not apply.

---

reasonably available control technology to be the lowest emission limitation that a particular source is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility.") (quotations omitted).

[8] U.S. EPA, State Implementation Plans; General Preamble for the Implementation of Title I of the Clean Air Act Amendments of 1990; Supplemental, 57 Fed. Reg. 18,070, 18,074 (Apr. 28, 1992).

[9] 57 Fed. Reg. at 18,074.

[10] 57 Fed. Reg. at 18,074 (emphasis added).

[11] Strelow Memo at 2.

[12] *Id.*

**Substantive Comments**

A.   The Emission Limit for SCR-Equipped Coal Boilers in the Proposed Approval is Far Laxer than Required by RACT

SCR is capable of high rates of NOx removal, resulting in control levels significantly better than the 0.12 lbs/MMbtu 30-day rolling average rates that EPA proposes to approve. Indeed, this fact is recognized in other states that have set RACT provisions for SCR-equipped coal boilers.  As such, EPA should not approve the Pennsylvania ozone RACT SIP revision, and should instead prepare a Federal plant requiring a 0.07 lbs/MMbtu limit, without an inlet temperature exemption.

SCR systems maintained consistent with good operating procedures can regularly ensure NOx emission reductions of 90% or more.  This translates to emission limits of 0.05 lbs/MMBtu or lower, such that a 0.07 lbs/MMBtu rate is consistently achievable on 30-day averages.  Nor are such emission reductions theoretical: the actual historical experience of the Pennsylvania coal fleet has been that, when the Pennsylvania facilities run their SCR systems, they have achieved very high rates of NOx removal.

*Table 2: Historically Achieved Low NOx Emission Rates from Large SCR-Equipped Pennsylvania Coal EGUs*[13]

| Facility Name | Unit ID | Associated Stacks | Year | Month | Avg. NOx Rate (lbs/MMBtu) | NOx (tons) | Heat Input (MMBtu) | Operating Time | Gross Load (MW-h) |
|---|---|---|---|---|---|---|---|---|---|
| Montour | 2 | | 2003 | 7 | 0.030 | 67.1 | 4439436.4 | 744 | 536857 |
| Cheswick | 1 | | 2012 | 5 | 0.032 | 0.588 | 35245.188 | 101.18 | 36 |
| Montour | 2 | | 2003 | 9 | 0.038 | 76.344 | 4123397.3 | 720 | 499275 |
| Keystone | 2 | | 2007 | 7 | 0.040 | 112.732 | 5665959.7 | 744 | 640802 |
| Keystone | 1 | | 2003 | 5 | 0.040 | 118.068 | 5859460.6 | 744 | 646929 |
| Keystone | 2 | | 2004 | 5 | 0.040 | 114.972 | 5703423.8 | 744 | 660861 |
| Keystone | 1 | | 2003 | 8 | 0.040 | 118.286 | 5865375 | 744 | 645819 |
| Keystone | 2 | | 2007 | 5 | 0.040 | 116.926 | 5791947.1 | 744 | 644098 |
| Keystone | 2 | | 2007 | 8 | 0.040 | 115.714 | 5726245.2 | 744 | 652474 |
| Keystone | 1 | | 2005 | 9 | 0.041 | 113.99 | 5636526.6 | 720 | 625140 |
| Keystone | 1 | | 2006 | 9 | 0.041 | 115.749 | 5707471.6 | 720 | 613484 |
| Keystone | 2 | | 2010 | 8 | 0.041 | 124.326 | 6126809.2 | 744 | 674539 |
| Keystone | 1 | | 2003 | 9 | 0.041 | 113.58 | 5592747.1 | 720 | 619893 |
| Keystone | 2 | | 2008 | 9 | 0.041 | 115.562 | 5650612.5 | 720 | 625472 |
| Montour | 2 | | 2004 | 8 | 0.041 | 88.05 | 4407282.1 | 744 | 512416 |
| Keystone | 1 | | 2006 | 5 | 0.042 | 121.882 | 5873818.6 | 744 | 646370 |
| Montour | 2 | | 2004 | 7 | 0.042 | 92.634 | 4531632.4 | 744 | 524862 |
| Keystone | 2 | | 2008 | 6 | 0.042 | 116.154 | 5595462 | 720 | 630999 |
| Keystone | 2 | | 2005 | 7 | 0.042 | 117.264 | 5638788.3 | 744 | 646167 |
| Keystone | 2 | | 2003 | 7 | 0.042 | 102.321 | 5161755.284 | 655.54 | 575235 |
| Montour | 2 | | 2006 | 6 | 0.042 | 85.84 | 4210710 | 720 | 500644 |
| Keystone | 1 | | 2006 | 8 | 0.042 | 114 | 5660406.822 | 702.13 | 617690 |
| Montour | 1 | | 2005 | 8 | 0.042 | 98.216 | 4692243.3 | 744 | 548099 |
| Montour | 2 | | 2004 | 6 | 0.042 | 87.029 | 4185072 | 720 | 482174 |
| Keystone | 1 | | 2003 | 7 | 0.043 | 120.762 | 5800313.2 | 744 | 645725 |
| Keystone | 2 | | 2010 | 9 | 0.043 | 124.082 | 5791138.9 | 720 | 643614 |
| Montour | 1 | | 2003 | 5 | 0.043 | 86.214 | 4172669.3 | 744 | 488193 |
| Montour | 1 | | 2003 | 7 | 0.043 | 97.155 | 4579253.7 | 744 | 526681 |
| Montour | 1 | | 2004 | 8 | 0.043 | 92.851 | 4388824.7 | 744 | 499426 |
| Montour | 2 | | 2007 | 8 | 0.043 | 100.713 | 4715245.9 | 744 | 564056 |

[13] Data taken from U.S. EPA's Air Markets Database, *available at* http://ampd.epa.gov/ampd/.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Keystone | 1 | | 2005 | 6 | 0.043 | 117.118 | 5583698.5 | 720 | 609977 |
| Keystone | 1 | | 2004 | 5 | 0.043 | 111.845 | 5392678.613 | 694.97 | 606445 |
| Keystone | 1 | | 2005 | 8 | 0.043 | 124.287 | 5924907.2 | 744 | 649394 |
| Cheswick | 1 | | 2003 | 8 | 0.044 | 66.075 | 3064135.7 | 744 | 376917 |
| Keystone | 2 | | 2008 | 5 | 0.044 | 120.629 | 5583061.9 | 744 | 630889 |
| Keystone | 2 | | 2009 | 2 | 0.044 | 114.36 | 5243190.4 | 672 | 596584 |
| Keystone | 2 | | 2010 | 5 | 0.044 | 127.333 | 5824804.1 | 744 | 651472 |
| Keystone | 1 | | 2005 | 7 | 0.044 | 119.069 | 5513428.04 | 697.1 | 600535 |
| Keystone | 2 | | 2008 | 8 | 0.044 | 121.724 | 5818626.565 | 732.02 | 635635 |
| Keystone | 2 | | 2003 | 9 | 0.044 | 123.735 | 5594491 | 720 | 623178 |
| Keystone | 2 | | 2010 | 10 | 0.044 | 134.278 | 6036814.9 | 744 | 655498 |
| Montour | 2 | | 2005 | 8 | 0.044 | 104.979 | 4750366.6 | 744 | 554523 |
| Montour | 1 | | 2003 | 9 | 0.045 | 96.161 | 4402838.5 | 720 | 500590 |
| Montour | 2 | | 2000 | 8 | 0.045 | 102.498 | 4597455.5 | 744 | 527334 |
| Keystone | 2 | | 2010 | 6 | 0.045 | 122.603 | 5667520.546 | 715.73 | 634835 |
| Montour | 1 | | 2008 | 8 | 0.045 | 15.817 | 704049.22 | 106.8 | 77906 |
| Keystone | 2 | | 2010 | 4 | 0.045 | 125.975 | 5691292.1 | 720 | 642937 |
| Keystone | 2 | | 2009 | 3 | 0.045 | 130.202 | 5780320.6 | 744 | 656156 |
| Montour | 1 | | 2003 | 8 | 0.045 | 98.488 | 4534403.9 | 744 | 515840 |
| Keystone | 2 | | 2010 | 1 | 0.046 | 127.776 | 5738525.8 | 744 | 666152 |
| Keystone | 1 | | 2006 | 7 | 0.046 | 123.511 | 5515930.472 | 700.16 | 607318 |
| Keystone | 1 | | 2006 | 6 | 0.046 | 124.226 | 5498493.328 | 708.8 | 602567 |
| Keystone | 2 | | 2008 | 7 | 0.046 | 130.683 | 5932011.6 | 744 | 647563 |
| Montour | 1 | | 2005 | 7 | 0.046 | 103.265 | 4600618.2 | 744 | 539606 |
| Montour | 1 | | 2003 | 6 | 0.047 | 86.746 | 3914353.4 | 720 | 450434 |
| Montour | 1 | | 2006 | 6 | 0.047 | 96.12 | 4171816.3 | 720 | 502086 |
| Montour | 2 | | 2006 | 7 | 0.047 | 91.26 | 4091489.974 | 683.41 | 484712 |
| Cheswick | 1 | | 2003 | 9 | 0.047 | 58.531 | 2694701.412 | 697.23 | 330643 |
| Montour | 2 | | 2005 | 9 | 0.047 | 105.137 | 4464323.4 | 720 | 524176 |
| Montour | 1 | | 2004 | 7 | 0.048 | 104.511 | 4434905.9 | 744 | 505947 |
| Keystone | 1 | | 2009 | 8 | 0.048 | 133.631 | 5603868.2 | 744 | 645152 |
| Montour | 1 | | 2005 | 9 | 0.048 | 106.054 | 4470857 | 720 | 521034 |
| Keystone | 2 | | 2004 | 6 | 0.048 | 124.727 | 5429282.6 | 720 | 617362 |
| Keystone | 1 | | 2003 | 6 | 0.048 | 111.497 | 4864688.19 | 642.3 | 537339 |
| Montour | 1 | | 2004 | 9 | 0.049 | 99.722 | 4103421.6 | 720 | 478214 |
| Montour | 2 | | 2003 | 6 | 0.049 | 74.863 | 3345036.754 | 647.34 | 403755 |
| Keystone | 2 | | 2005 | 6 | 0.049 | 97.685 | 4347359.412 | 598.93 | 496629 |
| Montour | 1 | | 2006 | 8 | 0.049 | 106.304 | 4311772.008 | 738.33 | 531098 |
| Keystone | 2 | | 2003 | 6 | 0.049 | 128.762 | 5528386.09 | 719.9 | 608507 |
| Keystone | 1 | | 2007 | 8 | 0.050 | 133.845 | 5503301.8 | 744 | 653050 |
| Montour | 1 | | 2006 | 7 | 0.050 | 105.205 | 4397388 | 744 | 528127 |
| Keystone | 1 | | 2005 | 5 | 0.050 | 126.863 | 5429174.66 | 699.82 | 588554 |
| Keystone | 1 | | 2010 | 6 | 0.050 | 144.737 | 5780176.2 | 720 | 641856 |
| Keystone | 2 | | 2005 | 5 | 0.050 | 128.387 | 5477229 | 744 | 630823 |
| Montour | 1 | | 2007 | 8 | 0.050 | 114.684 | 4581728.1 | 744 | 533517 |
| Keystone | 2 | | 2003 | 5 | 0.050 | 100.231 | 4268130.166 | 563.32 | 474305 |
| Montour | 2 | | 2007 | 9 | 0.050 | 112.935 | 4507820.8 | 720 | 536571 |
| Montour | 1 | | 2006 | 5 | 0.050 | 106.735 | 4310819.7 | 744 | 519205 |
| Keystone | 1 | | 2007 | 5 | 0.051 | 145.762 | 5712706.8 | 744 | 650215 |
| Keystone | 1 | | 2009 | 7 | 0.051 | 113.213 | 4737472.379 | 651.76 | 541948 |
| Keystone | 1 | | 2010 | 8 | 0.051 | 152.639 | 5990596.6 | 744 | 669599 |
| Keystone | 1 | | 2010 | 9 | 0.052 | 146.121 | 5674395.1 | 720 | 639307 |
| Keystone | 2 | | 2009 | 1 | 0.052 | 139.232 | 5750126 | 744 | 649321 |
| Keystone | 1 | | 2010 | 5 | 0.052 | 148.113 | 5791544.8 | 744 | 644327 |
| Keystone | 1 | | 2009 | 12 | 0.052 | 152.335 | 5854402.1 | 744 | 672058 |
| Keystone | 2 | | 2007 | 9 | 0.053 | 119.857 | 4684463.18 | 622.64 | 530819 |
| Keystone | 2 | | 2009 | 7 | 0.053 | 127.679 | 5162814.304 | 690.83 | 564361 |
| Keystone | 2 | | 2003 | 8 | 0.053 | 120.464 | 4937351.476 | 642.03 | 551836 |
| Montour | 1 | | 2005 | 6 | 0.054 | 114.326 | 4338969.4 | 720 | 508440 |
| Keystone | 2 | | 2007 | 6 | 0.054 | 103.178 | 4340638.132 | 591.56 | 483415 |
| Montour | 1 | | 2007 | 7 | 0.054 | 122.431 | 4572721.6 | 744 | 523045 |
| Montour | 1 | | 2009 | 3 | 0.054 | 121.922 | 4540397.3 | 744 | 523361 |
| Keystone | 1 | | 2009 | 6 | 0.054 | 117.05 | 4566425.597 | 623.69 | 524741 |
| Keystone | 1 | | 2010 | 10 | 0.055 | 147.988 | 5601051.18 | 739.9 | 634498 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Cheswick | 1 | | 2003 | 7 | 0.055 | 68.347 | 2778570.434 | 698.08 | 328214 |
| Montour | 2 | | 2003 | 8 | 0.055 | 96.629 | 3642299.201 | 699.88 | 447330 |
| Bruce Mansfield | 1 | MS1A, MS1B | 2003 | 6 | 0.056 | 126.544 | 4563727.9 | 720 | 574675 |
| Keystone | 2 | | 2006 | 5 | 0.056 | 139.477 | 5395247.14 | 735.52 | 623124 |
| Keystone | 1 | | 2010 | 7 | 0.056 | 168.277 | 6034383.8 | 744 | 660722 |
| Bruce Mansfield | 1 | MS3A, MS3B | 2004 | 6 | 0.057 | 107.733 | 4315921.66 | 569.26 | 477163 |
| Keystone | 3 | | 2005 | 5 | 0.057 | 150.553 | 5292144.7 | 744 | 641675 |
| Keystone | 1 | | 2010 | 1 | 0.057 | 163.683 | 5895917.4 | 744 | 672754 |
| Keystone | 1 | | 2010 | 4 | 0.057 | 156.169 | 5654026.3 | 720 | 634793 |
| Montour | 1 | | 2009 | 7 | 0.057 | 137.654 | 4926893.1 | 744 | 521721 |
| Montour | 2 | | 2005 | 7 | 0.057 | 108.57 | 4068449.3 | 744 | 459714 |
| Montour | 2 | | 2010 | 12 | 0.057 | 128.541 | 4499373.4 | 744 | 555083 |
| Keystone | 1 | | 2010 | 2 | 0.057 | 138.747 | 5008294.24 | 625.1 | 566803 |
| Keystone | 2 | | 2010 | 7 | 0.057 | 122.096 | 4459914.556 | 585.14 | 495821 |
| Montour | 2 | | 2004 | 5 | 0.057 | 111.611 | 4161139.228 | 677.44 | 470150 |
| Montour | 1 | | 2009 | 2 | 0.058 | 117.562 | 4100018.2 | 672 | 477837 |
| Cheswick | 1 | | 2003 | 6 | 0.058 | 94.561 | 3372816.3 | 720 | 357948 |
| Montour | 2 | | 2006 | 5 | 0.058 | 101.767 | 3811081.603 | 664.95 | 452392 |
| Montour | 1 | | 2004 | 6 | 0.058 | 113.071 | 4017715.2 | 709.48 | 458048 |
| Keystone | 2 | | 2004 | 7 | 0.059 | 143.343 | 5028431.47 | 668.22 | 571750 |
| Montour | 2 | | 2006 | 9 | 0.059 | 125.415 | 4259988 | 720 | 504968 |
| Montour | 1 | | 2007 | 9 | 0.060 | 101.639 | 3644159.541 | 652.5 | 446656 |
| Keystone | 2 | | 2009 | 6 | 0.060 | 119.418 | 4282524.051 | 572.84 | 469497 |
| Homer City | 1 | | 2006 | 9 | 0.061 | 119.361 | 3947780.2 | 720 | 444131 |
| Homer City | 1 | | 2005 | 7 | 0.061 | 132.522 | 4380951.4 | 744 | 481003 |
| Homer City | 1 | | 2005 | 8 | 0.062 | 136.908 | 4438118.5 | 744 | 485917 |
| Montour | 2 | | 2004 | 9 | 0.063 | 129.886 | 4240015.3 | 720 | 500903 |
| Homer City | 1 | | 2006 | 6 | 0.063 | 126.702 | 3983712.7 | 720 | 451522 |
| Keystone | 1 | | 2007 | 9 | 0.064 | 170.901 | 5345386.9 | 720 | 632436 |
| Homer City | 2 | | 2006 | 7 | 0.064 | 130.854 | 4056510.6 | 744 | 447616 |
| Bruce Mansfield | 2 | MS2A, MS2B | 2005 | 5 | 0.065 | 168.187 | 5207301.4 | 744 | 621467 |
| Keystone | 1 | | 2009 | 10 | 0.065 | 104.135 | 3451199.249 | 456.27 | 391201 |
| Bruce Mansfield | 1 | MS1A, MS1B | 2012 | 2 | 0.065 | 142.759 | 4372958.3 | 696 | 491167 |
| Montour | 2 | | 2001 | 5 | 0.066 | 155.928 | 4737194.8 | 744 | 527504 |
| Montour | 2 | | 2003 | 5 | 0.066 | 115.101 | 3632931.472 | 668.53 | 442468 |
| Homer City | 1 | | 2005 | 9 | 0.066 | 135.781 | 4157677 | 720 | 466586 |
| Montour | 2 | | 2001 | 8 | 0.066 | 156.025 | 4759565.7 | 744 | 524923 |
| Keystone | 2 | | 2009 | 8 | 0.066 | 190.941 | 5741709.6 | 744 | 637227 |
| Homer City | 1 | | 2006 | 7 | 0.067 | 136.98 | 4113099.7 | 744 | 462874 |
| Bruce Mansfield | 1 | MS1A, MS1B | 2005 | 5 | 0.067 | 151.791 | 4850905.825 | 737.5 | 590200 |
| Montour | 2 | | 2007 | 7 | 0.067 | 128.34 | 4159041.928 | 670.26 | 491905 |
| Montour | 1 | | 2008 | 6 | 0.067 | 130.214 | 4238735.25 | 714.5 | 486000 |
| Montour | 1 | | 2009 | 4 | 0.068 | 121.22 | 3743460.243 | 637.85 | 413289 |
| Bruce Mansfield | 1 | MS1A, MS1B | 2007 | 9 | 0.068 | 174.528 | 5161775 | 720 | 607226 |
| Homer City | 1 | | 2006 | 5 | 0.068 | 147.544 | 4301079.2 | 744 | 479114 |
| Montour | 2 | | 2001 | 6 | 0.069 | 144.912 | 4199958.5 | 720 | 476719 |
| Bruce Mansfield | 2 | MS2A, MS2B | 2003 | 7 | 0.069 | 169.455 | 5092103.375 | 709.25 | 573960 |
| Homer City | 2 | | 2006 | 9 | 0.069 | 113.652 | 3442640.383 | 673.35 | 385976 |
| Keystone | 2 | | 2009 | 4 | 0.069 | 195.181 | 5606989.5 | 720 | 630282 |
| Bruce Mansfield | 1 | MS1A, MS1B | 2008 | 7 | 0.069 | 198.379 | 5749920.8 | 744 | 644504 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Bruce Mansfield | 1 | MS1A, MS1B | 2004 | 6 | 0.070 | 176.7 | 5021082.3 | 720 | 570982 |
| Cheswick | 1 | | 2004 | 8 | 0.070 | 100.668 | 3254830.324 | 701.22 | 322538 |
| Cheswick | 1 | | 2004 | 9 | 0.070 | 101.226 | 3133899.647 | 705.25 | 330034 |
| Bruce Mansfield | 1 | MS1A, MS1B | 2008 | 9 | 0.070 | 188.69 | 5396446.1 | 720 | 628014 |
| Montour | 1 | | 2009 | 6 | 0.070 | 136.068 | 4090406.03 | 651.01 | 432885 |
| Keystone | 1 | | 2008 | 5 | 0.070 | 205.1 | 5870815.6 | 744 | 634256 |

Table 2 above demonstrates this.  As the shaded column records, Pennsylvania coal plants equipped with SCR have historically achieved 30-day periods with average NOx emission rates lower than 0.07 lbs/MMBtu; many, in fact, have emitted at even *lower* rates—as low as 0.04 or even 0.03 lbs/MMBtu.  Plainly, the actual experience of SCR in Pennsylvania is that, when facilities operate the controls, very low levels of NOx emissions are the result.

Indeed, Pennsylvania itself has recognized that coal-fired EGUs equipped with SCR are capable of dramatic reductions in NOx.  For example, in 2000, Pennsylvania DEP stated in a public notice that operation of SCR controls at a coal-fired EGU

> [W]ill control the nitrogen oxides emissions from Unit #1 and, when operating, will reduce the nitrogen oxides emissions by up to 90% from the level which currently exists.  The resultant nitrogen oxides emission rate may be as low as .04 pounds per million BTU of heat input.[14]

Pennsylvania has thus long-acknowledged that SCR-equipped coal-fired facilities can achieve very low rates of NOx emissions, without an inlet temperature-based exemption.  Moreover, DEP's assessment of the reduction rate for the SCR controls referenced in the public notice proved accurate: while operating its SCR, the plant in question—Montour—has achieved extremely high rates of NOx removal, with emissions in the 0.04 lbs/MMBtu range for multiple months in 2003, 2004, 2005, and 2008.  *See* Table 2, *supra*.  Accordingly, a RACT/RACM determination of 0.07 lbs/MMBtu is well-supported by this and other Pennsylvania facilities' actual historical experience.

Peer states have also determined presumptive RACT limits far more protective of air quality than EPA proposes to approve here.  For example, the state of New York has set NOx emission rates for coal-fired boilers of all sorts at a range of between 0.12 and 0.08 lbs/MMBtu.  *See* 6 CRR-NY 227-2.4(a)(1)(ii), (b)(1)(ii) (for "very large" and "large" coal-fired boilers, respectively).  Notably, nowhere in New York's more protective standard is an exemption for inlet temperatures.  *Id.*  Likewise, Connecticut's RACT limits for EGU coal boilers, while also 0.12 lbs/MMBtu, are on a much shorter daily block average, and—like with New York—there is no inlet temperature-based exemption.  *See* RCSA 22a-174-22e(d)(2)(C).

In face of this, the Proposed Approval points to a single table listing ranges of "Other States' NOx RACT Limits," but does no actual analysis of the applicability of those ranges to the Pennsylvania context.  *See* Proposed Approval TSD at 22-23.  As is clear from a review of Appendix B to the TSD, the Proposed Approval ignores such critical distinctions as averaging

---

[14] June 20, 2000 Correspondence from DEP to Linda A. Boyer, PPL Electric Utilities Corporation Re: Plan Approval Application #OP-47-0001D, at 2, attached hereto as Exhibit 1.

periods (the 30-day averaging period in Pennsylvania's RACT submission is far longer than the 24-hour averaging period in Delaware, for example), gives no weight to Pennsylvania's proposed inlet temperature exemption, and ignores Connecticut's Phase 2 RACT regulations in favor of the prior, less protective emission limits. As a result, the Proposed Approval presents little more than a perfunctory conclusion that Pennsylvania's proposed limits are "comparable," when they plainly are not.

This is clear even when looking at the Proposed Approval's other proffered support for Pennsylvania's coal-fired, SCR-equipped emission rates: EPA's assessment of annualized emission rates from SCR-equipped boilers. As EPA concedes, these units have, historically (in 2011, 2015, and 2016) achieved annual emission rates of 0.107 lbs/MMbtu. Setting aside the fact that this supports a *lower* emission rate than 0.12 lbs/MMbtu, EPA's approach is flawed for two reasons. First, and most critically, during the 2011, 2015, and 2016 years that EPA examined, *Pennsylvania's SCR-equipped coal boilers were not required by state or federal law to consistently hit any particularly low NOx emission limit*. As a result, these years represent control operation that dramatically underestimates the NOx reductions Pennsylvania's SCR controls can actually achieve. EPA's selection of years is somewhat odd, moreover. Looking at annual emission rates from 2016 to 2016, there are many plants that, despite lacking any specific low emission rate requirement, nonetheless achieved emission rates significantly lower than the ones EPA cites. For example, Seward, Keystone, and Bruce Mansfield all achieved lower annual NOx emission rates than the 0.107 lbs/MMbtu rate that EPA cites—indeed, in 2009, Bruce Mansfield, plantwide, achieved an annual rate of 0.088 lbs/MMbtu, and Keystone achieved 0.074 lbs/MMbtu. Absent from the Proposed Approval is any explanation for why such data was ignored.

*Table 3: Exemplar Low Annual NOx Emission Rates from Large SCR-Equipped Pennsylvania Coal EGUs* [15]

| Facility Name | Year | Yearly Avg. NOx Rate (lbs/MMBtu) |
|---|---|---|
| Keystone | 2009 | 0.074 |
| Keystone | 2010 | 0.086 |
| Bruce Mansfield | 2009 | 0.088 |
| Seward | 2012 | 0.092 |
| Seward | 2007 | 0.096 |
| Seward | 2014 | 0.099 |
| Seward | 2013 | 0.101 |
| Seward | 2015 | 0.101 |
| Seward | 2006 | 0.102 |
| Seward | 2011 | 0.103 |

Second, and relatedly, when well-operated, Pennsylvania's SCR-equipped coal fleet has demonstrated emission rates less than half of what the Proposed Approval appears to consider as demonstrative, and significantly less than that in Pennsylvania's RACT SIP submittal, as is demonstrated in Table 2, *supra*. Indeed, numerous plants have demonstrated that they are quite

---

[15] Data from EPA's Air Markets Program Data tool, *available at* https://ampd.epa.gov/ampd/.

capable of hitting, for extended, 30-day periods of time, emission rates that are less than half, less than a third, and even less than a *quarter* of the emission rates in the RACT limits considered in the Proposed Approval. *Id.* (noting that Bruce Mansfield has historically achieved a 30-day average of 0.055 lbs/MMbtu, Keystone has achieved 0.040 lbs./MMbtu, Cheswick has achieved 0.032 lbs/MMbtu, and Montour has achieved 0.030 lbs/MMbtu). Notably, this is straight, self-reported emissions data, without emissions removed when the facilities were operating below some inlet-temperature threshold.

Accordingly, the Proposed Approval of Pennsylvania's 0.12 lbs/MMbtu NOx limit, with its lengthy averaging period and inlet-temperature exceptions, is unsupported.

B.    The Proposed Approval of Pennsylvania's SCR Inlet Temperature Exemption is Unsupported

The Proposed Approval of 25 Pa. Code section 129.97(g)(1)(viii) lacks adequate basis, and is contradicted by facts concerning SCR operation and inlet temperature. Accordingly, finalizing such an approval would be arbitrary and capricious. An agency must "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). EPA's approval is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider [or] entirely failed to consider an important aspect of the problem." *Id.* Here, despite the Proposed Approval, EPA has provided no data, relevant or otherwise, to support the inlet temperature exemption in Pennsylvania's SIP revision. Moreover, even adopting the premise that catalysts have minimum operating temperature (MOTs) of 600degrees Fahrenheit, the Proposed Approval fails entirely to consider what significance this design parameter has in the statutory RACT framework or whether it justifies wholesale abandonment of NOx emission limits under those conditions.[16]

The sub-600degrees Fahrenheit loophole is quite significant in terms of the greater amount of NOx it allows facilities to emit. *See State Farm*, 463 U.S. at 43. The magnitude of the loophole, and the degree to which Pennsylvania utilities use it to avoid controls is evident from emissions data taken since 25 Pa. Code 129.97 came into effect at the beginning of 2017. As illustrated in Figure 2 below, which depicts typical emissions from a coal unit subject to Pennsylvania's RACT regulations for SCR-equipped coal boilers (Cheswick), utilities rely on the loophole at night when demand is low. During evenings and at night, Cheswick reduces its heat rate by ~50% and appears to bypass its SCR system, causing NOx emission rates to more than triple to ~0.35 lb NOx per million Btu. The jump in NOx emissions is so great that the total amount of NOx released per hour at night is actually larger than during the day at when the plant is operating at capacity. The flood of NOx at night pushed Cheswick's overall emissions during June 2017 to ~0.15 lb NOx per million Btu, 50% higher than the ~0.1 the plant achieved when controls are operating.

---

[16] *See* Proposed Approval TSD at 21.

*Figure 2: Typical Cheswick performance, post-25 Pa. Code 129.97(g)(1)(viii).*[17]



However, in face of the dramatic increase in emission levels the loophole would allow, EPA has provided no evidence, nor has Pennsylvania, either that a temperature-based exemption is necessary or that 600 degrees is the correct threshold.  In fact, EPA does not mention the loophole at all in its proposed approval, and only mentions it in passing in the TSD, merely claiming without data or support that that 600 degrees Fahrenheit is consistent with a range of SCR operating temperatures.[18]  Nor does Pennsylvania provide such data or support: in response to comments, Pennsylvania simply states that operating SCR below some temperature threshold can cause issues, but does not discuss what that threshold should be, what those issues could be, or how feasible remedying those issues may be.[19]  This is in direct contract to prior actions by EPA, where, when considering the implications of MOTs in determining BACT, EPA recognized that MOT varies significantly between EGU's and required utilities to supply more technical data to support any accommodation of this parameter.[20]

Unsurprisingly, contrary to the unsupported claims of Pennsylvania accepted uncritically in the Proposed Approval, it is simply not the case that below 600 degrees Fahrenheit SCR does not work and irreparable fouling occurs.[21]  In actuality, MOT is neither a hard limit below which catastrophe occurs, nor is a temperature as high as 600 degrees Fahrenheit a supportable MOT for RACT purposes.  Instead, MOT is significantly lower and contingent on a range of variables that contribute to ammonium bisulfate formation, including fuel sulfur content, operational parameters like injected ammonia and excess oxygen, water vapor concentration, and catalyst

---

[17] Data from EPA's Air Markets Program Data tool, *available at* https://ampd.epa.gov/ampd/.

[18] *See* Proposed Approval TSD at 21.

[19] *See* Pennsylvania Department of Environmental Protection, Comment and Response Document:  Additional RACT Requirements for Major Sources of NOx and VOCs ("PADEP, Comment Response") at 58-59, *available at* https://www.regulations.gov/document?D=EPA-R03-OAR-2017-0290-0004.

[20] *See* Promulgation of Air Quality Implementation Plans; Arizona; Regional Haze Federal Implementation Plan; Reconsideration, 81 Fed. Reg. 21,735 at 39/3 (Apr. 13, 2016), *available at* https://www.gpo.gov/fdsys/pkg/FR-2016-04-13/pdf/2016-07911.pdf.

[21] *See* PADEP, Comment Response at 58-59.

characteristics[22]—none of which is discussed by either Pennsylvania or the Proposed Approval. Indeed, an actual MOT for plants is far below 600 degrees Fahrenheit, as EPA seems to acknowledge, listing a MOT of 315 degrees Fahrenheit in this docket[23] and 400 degrees Fahrenheit in others.[24]  Moreover, operation of a unit below MOT for relatively short time periods—such as running at reduced load overnight, as Cheswick and other Pennsylvania SCR-equipped coal plants do—does not cause significant SCR-operation problems: any formation of ammonium bisulfate is readily and almost immediately reversed by subsequently operating the unit above the MOT, causing the ammonium bisulfate to evaporate.[25]

The Proposed Approval discusses none of this, and thus improperly assumes that the temperature loophole is consistent with RACT.  In this very rulemaking proposal, even though EPA describes a purported typical RACT analysis, it nonetheless fails to apply it the temperature loophole.  Specifically, while EPA concedes that it is required consider technical and economic feasibility,[26] controls that have been achieved by other similar sources,[27] and even NOx limits in place in other states,[28]  EPA does none of this concerning MOT.[29]  Accordingly, EPA does not even attempt to justify inclusion of the loophole.

Nor could it—there are simply too many reasonably available alternatives for utilities to comply with the presumptive RACT limit without the loophole (as is clear from the fact that other states, such as New York and Connecticut, do not include such loopholes in their RACT regulations).  The Cheswick example is instructive.

In 2017, under Pennsylvania's RACT regulations, Cheswick appears to have only turned on its SCR controls once its boiler reached ~3100 MMbtu/hour.

[22] *See, e.g.,* Jay Ratafia-Brown, Advanced NO$_x$ Control Assessment at 2-7, 2-8, prepared for U.S. Department of Energy (March 1989) *available at*
https://www.netl.doe.gov/File%20Library/Research/Coal/major%20demonstrations/cctdp/Round2/00000157.pdf;
Reinhold Environmental, Ltd., Presentation at 2008 Conference of Worldwide Pollution Control Association, Richmond, VA, at 24, *available at*
http://wpca.info/pdf/presentations/Richmond2008/WPCA,%20SCR%20Catalyst%20Design,%20Argillon.pdf
(explaining dependence of MOT on SO$_3$ and water vapor).
[23] *See* Proposed Approval TSD at 21.
[24] *See* EPA, Technical Support Document for the Proposed Phase 3 Action on the Federal Implementation Plan for the Regional Haze Program in the State of Arizona at 24 (Jan. 27, 2013), *available at*
https://www.regulations.gov/document?D=EPA-R09-OAR-2013-0588-0009
[25] *See, e.g.*, EPRI, Investigation of Catalyst Deactivation from Operation Below the Minimum Operating Temperature (abstract), Product ID:1023928(Sept. 11, 2012), *available at*
https://www.epri.com/#/pages/product/1023928/ .
[26] *See* Approval and Promulgation of Air Quality Implementation Plans; Pennsylvania; Regulatory Amendments Addressing Reasonably Available Control Technology Requirements Under the 1997 and 2008 8-Hour Ozone National Ambient Air Quality Standards*, 83 Fed. Reg. 11,155 at 11156/3, (Mar. 14, 2018).
[27] *See id*. at 11,158/3.
[28] *Id.*
[29] *See* Proposed Approval TSD at 21.

*Figure 3: Cheswick NOx Emission Rate and Heat Input in 2017*[30]



As Figure 3 shows, hours in which Cheswick operated in 2017 with heat inputs above 0 but below 3100 MMbtu/hour have widely varied but generally significantly high NOx emission rates—consistent with no control operation.  It is above 3100 MMbtu/hour that Cheswick appears to use its SCR, resulting in the strong clustering of data around 0.10 as a NOx emission rate.  However, during prior years, Cheswick demonstrated that it is quite able to use its SCR very effectively at much lower heat inputs.

*Figure 4: Cheswick NOx Emission Rate and Heat Input in 2003-2005 Ozone Season*[31]



---

[30] Data from EPA's Air Markets Program Data tool, *available at* https://ampd.epa.gov/ampd/.
[31] Data from EPA's Air Markets Program Data tool, *available at* https://ampd.epa.gov/ampd/.

As Figure 4 makes plain, in prior years, Cheswick's emissions data shows the clustering of low-NOx emission rates, consistent with SCR-operation, beginning at ~2400 MMbtu/hour, roughly 700 MMbtu/hour *lower* than under Pennsylvania's ozone RACT regulations. Cheswick operated this way long-term, without apparent control issues. Accordingly, operating under the assumption that Cheswick's 2017 operation is informed by the 600-degree MOT in the RACT regulations, and that the heat input of the boiler is a rough proxy for inlet temperature, it is evident that Cheswick is quite capable of utilizing its SCR at temperatures much, much lower than 600 degrees. The situation is similar for other Pennsylvania SCR-equipped coal plants.

This is true because there are numerous ways plant operators can achieve low NOx emission rates despite variable inlet temperature conditions. For example, here are controls and operation adjustments capable of elevating the inlet temperatures such as bypassing or reducing heat outtake of the economizer, allowing a greater SCR operation range, and a concomitant reduction in emissions.[32] Likewise, periodic operation of controls below MOT, such as during nighttime low-load periods at Cheswick, is also technically feasible: as noted above, it is well-established that any ammonium bisulfate accumulation is readily reversible.[33] Finally, a 30-day average presumptive RACT limit of 0.12 lb NOx per million Btu—which Pennsylvania repeatedly acknowledges is higher than the lowest achievable emissions reductions from SCR—itself is more than enough to accommodate occasional lapses of control operation.

At bare minimum it is technically and economically feasible to lower the temperature threshold for the loophole to a level closer to the idle temperature for the unit, removing the economic incentive to park just outside the threshold for controls and reducing the impact of such behavior. As currently structured, the loophole perversely incentivizes higher hourly NOx emissions at night and profitable circumvention of controls. As such, EPA should not approve Pennsylvania's proposed inlet temperature loophole as part of its RACT SIP revision.

C.    Because the RACT SIP Proposal Fails to Require Reporting of Inlet Temperature, It is Nearly Impossible for the Public—Or Regulators—to Assess Compliance

Compounding the problems identified above, the RACT SIP Proposal considered in the Proposed Approval does not actually require SCR-equipped coal plant operators to report exactly what their continuous SCR inlet temperatures are, thus rendering it extremely difficult for stakeholders to know whether or not such plants are complying with the RACT regulations. Hiding this information from regulators and the public would render 25 Pa. Code section 129.97(g)(1)(viii) effectively unenforceable, meaning it is a violation of the Clean Air Act's requirements for nonattainment plans for EPA to approve it. Emission limitations issued in compliance with section 172 of the act must be enforceable. *See* 42 U.S.C. § 7502(c)(6); *Ass'n of Irritated Residents v. United States EPA*, 686 F.3d 668, 677-78 (9th Cir. 2012) (finding EPA approval of an unenforceable/discretionary SIP element arbitrary and capricious). When compliance cannot be assessed, a provision cannot be enforced.

---

[32] *See, e.g.*, EPRI, Summary of Selective Catalytic Reduction System Operational Issues at Low Load at § 2 and 3, Product Id: 1021208 (Nov. 2010) (explaining strategies for maintaining SCR minimum temperature and operating below minimum temperature) *available at* https://www.epri.com/#/pages/product/1021208/.
[33] *Id.*

Under the inlet temperature loophole in 129.97(g)(1)(viii), SCR-equipped coal plants only required to achieve compliance with the 0.12 lbs /MMbtu emission limit when SCR inlet temperature—data known only to the utility—is above 600degrees Farenheit.  While this is likely the case when a large unit is running at full capacity, there is no straightforward way for members of the public to know whether an EGU has simply switched off its controls at 610 or 620 or 700 or 800º F instead, absent an inlet temperature reporting requirement.  This lack of a reporting requirement renders calculating the 30-day running average the RACT regulation uses to determine compliance exceedingly difficult.  This violates the Clean Air Act's requirement that required elements of SIPs, such as RACT, be enforceable. *See* 42 U.S.C. § 7502(c)(6).

As such, EPA should not approve the inlet temperature loophole in the RACT SIP revision.

## Conclusion

For the foregoing reasons EPA should partially disapprove the RACT SIP submittal, and instead issue a FIP correcting these problems and imposing a 0.07 lbs/MMbtu NOx emission limit for SCR-equipped coal-fired boilers, without an inlet temperature exemption.

_____/s/_____
Zachary M. Fabish
Senior Attorney
50 F Street, NW - 8th Floor
Washington, DC 20001
(202) 675-7917
(202) 547-6009 (fax)
zachary.fabish@sierraclub.org

Nathan Taylor
Legal Fellow
Environmental Law Program
50 F Street, NW - 8th Floor
Washington, DC 20001
 (202) 650-6072
nathan.taylor@sierraclub.org

# Exhibit 1



Pennsylvania Department of Environmental Protection

**208 West Third Street, Suite 101**
**Williamsport, PA 17701-6448**
June 20, 2000

**Northcentral Regional Office**

Fax  570-327-3420

Date Filed: 02/25/2020     Page: 328     Document: 52-2     Case: 19-2562

Linda A. Boyer
Senior Environmental Compliance Engineer
PPL Electric Utilities Corporation
Two North Ninth Street
Allentown, PA 18101-1179

Re:  Plan Approval Application #OP-47-0001D
Montour SES
Derry Township, Montour County

Dear Ms. Boyer:

As the Montour SES is a Title V facility, the enclosed notice must be published in a newspaper of general circulation in the Derry Township, Montour County area on at least three separate days. The publication of this notice is the responsibility of PPL and should be accomplished within 14 days of your receipt of this letter. Please do not modify the notice in any way without first obtaining Department approval to do so.

You are required to submit proof of publication of the respective notice to the Department.

Should you have any questions regarding this matter, I can be contacted at 570-327-3640.

Sincerely,

Richard L. Maxwell Jr.

Richard L. Maxwell, Jr.
Chief, Engineering Services
Air Quality Program

Enclosure

cc:  File

RLM/bls

JA348

An Equal Opportunity Employer

## Notice

### PPL Electric Utilities Corporation
### Montour SES
### Derry Township, Montour County

PPL Electric Utilities Corporation (2 North Ninth Street, Allentown, PA 18101-1179) has submitted an application (#OP-47-0001D) to the Department of Environmental Protection for plan approval to install two air cleaning devices, an electrostatic precipitator and a selective catalytic reduction system, on a 750 megawatt rated capacity bituminous coal-fired utility boiler (Unit #1) at the Montour SES located in Derry Township, Montour County. In accordance with 25 Pa. Code §§ 127.44(b) and 127.424(b), the Department of Environmental Protection intends to issue plan approval for the installation of the respective air cleaning devices should the Department's review of the respective application convince the Department that plan approval is warranted. The plan approval, if issued, will subsequently be incorporated into a Title V operating permit via administrative amendment in accordance with 25 Pa. Code § 127.450.

The Montour SES is a major facility for which a Title V operating permit application (#TVOP-47-00001) has been submitted but for which no Title V operating permit has yet been issued. The proposed electrostatic precipitator will control particulate matter emitted from Unit #1 and will replace the electrostatic precipitator currently used for that purpose. The resultant particulate matter emissions will be no greater than .1 pound per million BTU of heat input and may be less.

The proposed selective catalytic reduction system will control the nitrogen oxides emissions from Unit #1 and, when operating, will reduce the nitrogen oxides emissions by up to 90% from the level which currently exists. The resultant nitrogen oxides emission rate may be as low as .04 pounds per million BTU of heat input.

The plan approval, should the Department of Environmental Protection decide to issue one, and any subsequent administratively-amended Title V operating permit, will contain appropriate conditions pertaining to the operation of the electrostatic precipitator and the selective catalytic reduction system as well as appropriate recordkeeping and reporting conditions to ensure compliance.

A copy of the plan approval application is available for public inspection during normal business hours at the addressed listed below. Persons interested in inspecting the application should schedule an appointment in advance.

Any person wishing to protest the issuance of plan approval or provide the Department with additional information which he/she believes should be considered in the Department's review of the respective plan approval application may do so by submitting the protest or information in writing to the Department at the address listed below. Protests or comments must be received by the Department within 30 days from the last day of publication of this notice in order to be considered. Each protest or comment should include the following: name, address and telephone number of the person submitting the protest or comment and a concise statement explaining the relevancy of the protest or comment being presented to the Department.

A public hearing may be held if the Department, in its discretion, decides that such a hearing is warranted based on the information received. All persons submitting comments, protesting the issuance of plan approval or requesting a hearing will be notified of the decision to hold a hearing by publication in a newspaper of general circulation in the Derry Township area or by letter or telephone if the Department feels that such contact is adequate.

JA349

Written comments, protests or a request for a public hearing should be directed to David W. Aldenderfer, Environmental Program Manager, Air Quality Program, Department of Environmental Protection, 208 West Third Street, Suite 101, Williamsport, PA 17701-6448.

For additional information regarding the respective plan approval application, contact Richard L. Maxwell, Jr., Chief of Engineering Services, Air Quality Program, Department of Environmental Protection, 208 West Third Street, Suite 101, Williamsport, PA 17701-6448. Telephone 570-327-3745.

Case: 19-2562    Document: 52-2    Page: 330    Date Filed: 02/25/2020

**NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION**

Office of Air Resources, Climate Change & Energy, Deputy Commissioner
625 Broadway, 14th Floor, Albany, New York 12233-1010
P: (518) 402-2794 I F: (518) 402-9016
www.dec.ny.gov

APR 1 3 2018

Docket ID No. EPA-R03-OAR-2017-0290
U.S. Environmental Protection Agency, Region 3
1650 Arch Street
Philadelphia, PA  19103-2029

Re:    Approval and Promulgation of Air Quality Implementation Plans; Pennsylvania;
       Regulatory Amendments Addressing Reasonably Available Control Technology
       Requirements Under the 1997 and 2008 8-Hour Ozone National Ambient Air
       Quality Standards
       Fed. Reg. Vol. 83, No. 50, Pages 11155-11162, March 14, 2018

Dear Docket Administrator:

DEC appreciates the opportunity to comment on EPA's proposed approval of
Pennsylvania's revisions to their Reasonably Available Control Technology (RACT)
regulations, titled "Additional RACT Requirements for Major Sources of NOx and VOCs"
and commonly referred to as the "RACT II Rule." While DEC welcomes actions by
Pennsylvania to reduce ozone precursor emissions from its major stationary sources,
DEC believes Pennsylvania's updated RACT standards should be made stronger and
therefore more protective of public health, both in Pennsylvania and downwind areas.

EPA's action on Pennsylvania's NOx RACT regulation is important to DEC because of
the large impact that stationary sources in Pennsylvania have on air quality in New York
– particularly in the New York-Northern New Jersey-Long Island, NY-NJ-CT
nonattainment area (often referred to as the New York metropolitan area, or NYMA).
The NYMA remains in nonattainment of the 2008 ozone NAAQS, and EPA has also
indicated to New York that it plans to designate the NYMA as nonattainment for the
2015 ozone NAAQS.  Furthermore, DEC submitted a Clean Air Act section 126(b)
petition on March 13, 2018 seeking emission reductions from sources in nine states;
that petition demonstrates that Pennsylvania's high-emitting stationary sources (defined
as 400 tons per year of NOx or greater) contribute up to 4.97 parts per billion of ozone
to NYMA monitors.

EPA states that it reviewed NOx emission limits in effect in adjacent OTR states and
that the RACT II Rule's presumptive NOx limits "are comparable to NOx emission
limitations in other states" (83 FR 11158).[1]  A review of the rules effective in New York
does not bear out that conclusion.  The table enclosed with this letter presents a
simplified comparison between Pennsylvania and New York limits, the latter of which
were adopted in 2010 and fully effective as of July 2014.  The table demonstrates that

---

[1] "Appendix B – Comparison NOx State Regulations [sic] for Sources Covered by Pennsylvania's Presumptive
RACT." Note that EPA erred by listing the repealed presumptive limits for New York's combined cycle units, which
are now actually case-by-case.

NEW YORK
STATE OF
OPPORTUNITY | Department of
Environmental
Conservation

RACT limits in New York are more stringent nearly across the board, some by significant amounts.  The presumptive limits for Pennsylvania are more comparable to limits that were effective in New York from 1995 to 2014.  EPA's comparison also fails to mention the phase-in approach of Connecticut's RACT program, which was updated in December 2016; Phase 2, with more stringent limits and averaging times comparable to New York's NOx RACT, will be in effect as of June 2023.

DEC has concerns with both the limits and averaging times that have been established in the proposed RACT II Rule.  DEC's 2010 NOx RACT update utilized a control cost benchmark in the range of $5,000 to $5,500 per ton of NOx removed, which presumes selective catalytic reduction (SCR) controls are economically and technically feasible for coal units.  (Individual units can of course make a demonstration that presumptive RACT is not economically or technically feasible to set an alternative emission limit).  Delaware and New Jersey do not have specific cost-effectiveness benchmarks but may consider Best Available Control Technology (BACT)-level controls to be cost-effective as RACT.  Pennsylvania's Regulatory Analysis Form discussed the economic considerations of the RACT II proposal, noting that a $2,500 per ton benchmark was used for NOx reductions.  Pennsylvania cited consistency with Wisconsin's NOx RACT benchmark in selecting this value.  DEC believes that Pennsylvania should utilize a cost-per-ton benchmark and related RACT levels more comparable to those utilized in nearby ozone transport region (OTR) states.

EPA also fails to discuss the averaging times utilized in the RACT II Rule, which are an important consideration of the rule's stringency.  Pennsylvania relies on a 30-day averaging time year-round; New York and other OTR states use a 24-hour averaging time during the ozone season on most units, and New York even uses a 1-hour averaging time on its combustion turbines equipped with continuous emission monitoring systems.  Pennsylvania units that have post-combustion controls installed lose the incentive to operate them every day, since the higher daily emissions will be averaged out – potentially compromising air quality on hot, stagnant summer days.  Units with a 24-hour averaging time, on the other hand, must continuously run their controls or risk violating their presumptive NOx limits.

New York urges EPA to require Pennsylvania to develop a RACT rule that better represents the current state of control availability and costs and is more consistent with the RACT rules in neighboring states.  Thank you for considering these comments.

Sincerely,

J. Jared Snyder
Deputy Commissioner
Air Resources, Climate Change and Energy

Enclosure

| Unit Type | Fuel Type | PA Limit | NY Limit |
|---|---|---|---|
| **PA NOx RACT II Rule vs. NY NOx RACT (adopted 2010)** | | | |
| **Boilers (lb/MMBtu)** | | | |
| **> 50 MMBtu/hr** | | | |
| | Natural Gas | 0.10 | 0.05-0.06 |
| | Distillate Oil | 0.12 | 0.08 |
| | Other Liquid Fuel | 0.20 | 0.15-0.20 |
| | Coal | 0.45 | 0.20 |
| | Other Solid Fuel | 0.25 | Case-by-case |
| **> 250 MMBtu/hr** | | | |
| | Natural Gas | 0.10 | 0.08 |
| | Coal | - | - |
| | -Circ. Fluidized Bed | 0.16 | 0.08 |
| | -Tangentially-fired | 0.35 | 0.12 |
| | -Wall-fired | 0.40 | 0.12 |
| | -Cyclone | 0.40 | 0.20 |
| | -With SCR | 0.12 | No distinction |
| **Combined Cycle Turbines (ppmvd, 15% oxygen)** | | | |
| **> 1000 bhp / < 180 MW** | | | |
| | Natural Gas | 42 | 42 in 1995; case-by-case in 2010 |
| | Oil | 96 | 65 in 1995; case-by-case in 2010 |
| **> 180 MW** | | | |
| | Natural Gas | 4 | Case-by-case (mostly LAER) |
| | Oil | 8 | Case-by-case (mostly LAER) |
| **Simple Cycle Turbines (ppmvd, 15% oxygen)** | | | |
| **> 1000 bhp / < 6000 bhp** | | | |
| | Natural Gas | 150 | 50 |
| | Oil | 150 | 100 |
| **> 6000 bhp** | | | |
| | Natural Gas | 42 | 50 |
| | Oil | 96 | 100 |
| **Stationary Internal Combustion Engines (g/bhp-hr)** | | | |
| **Lean Burn** | | > 500 bhp | > 200 bhp NYMA/> 400 bhp rest of NY |
| | Natural Gas | 3.0 | 1.5 |
| | Oil | 8.0 | 2.3 |
| **Rich Burn** | | > 500 bhp | > 200 bhp NYMA/> 400 bhp rest of NY |
| | Natural Gas | 2.0 | 1.5 |
| | Oil | 8.0 | 2.3 |



**Maryland**
Department of
the Environment

Larry Hogan, Governor
Boyd K. Rutherford, Lt. Governor

Ben Grumbles, Secretary
Horacio Tablada, Deputy Secretary

April 12, 2018

To Whom It May Concern:

The Maryland Department of the Environment (MDE) appreciates the opportunity to comment on the Environmental Protection Agency's (EPA) Proposed Approval of *Pennsylvania Air Quality Implementation Plans; Regulatory Amendments Addressing Reasonably Available Control Technology Requirements Under the 1997 and 2008 8-Hour Ozone National Ambient Air Quality Standards*, dated March 14, 2018. The MDE has three groups of comments regarding the proposed approval of Pennsylvania's RACT II Rule.

The MDE urges the EPA consider the following issues when determining the approvability of the Pennsylvania SIP revision as RACT.

- The proposed NOx RACT limits for coal-fired boilers with SCR & SNCR controls are overly permissive
- Averaging plan issues, including plan deficiencies and inappropriate averaging options
- Extended averaging periods for RACT compliance

The MDE discusses these comments in detail below.

### The proposed NOx RACT limits for coal-fired boilers with SCR & SNCR controls are overly permissive

In the proposed approval of the Pennsylvania RACT II Rule, the EPA finds that the presumptive NOx limits in 25 Pa. Code section 129.97 are comparable to NOx RACT limits in other states and are consistent with EPA's RACT guidance on additional control requirements; per EPA, the presumptive rates represent emissions limitations achievable through implementation of reasonably available controls. However, MDE has completed extensive analysis which demonstrates that additional NOx reductions are available at a reasonable cost, simply by running installed post-combustion controls in an optimal manner.

For SCR equipped units, EPA finds that the presumptive NOx limit of 0.12 lbs/mmBtu when the SCR inlet temperature is greater than 600 F is consistent with the operation of presently installed SCR and reasonably represents RACT for coal-fired boilers with this control in place. However, the table below indicates that all of Pennsylvania's coal-fired boilers equipped with SCR have demonstrated that they can achieve NOx emission rates far below 0.12 lb/mmBtu, including hours where the SCR inlet temperature may be lower than 600 F.

| Facility | Unit | Best Performing OS NOx Emission Rate 2005-2017 (lbs/mmBtu) | % Reduction from Presumptive RACT Rate | Facility | Unit | Best Performing OS NOx Emission Rate 2005-2017 (lbs/mmBtu) | % Reduction from Presumptive RACT Rate |
|---|---|---|---|---|---|---|---|
| Bruce Mansfield | 1 | 0.0650 | -45.83% | Homer City | 2 | 0.0826 | -31.17% |
| Bruce Mansfield | 2 | 0.0775 | -35.42% | Homer City | 3 | 0.0872 | -27.33% |
| Bruce Mansfield | 3 | 0.0744 | -38.00% | Keystone | 1 | 0.0431 | -64.08% |
| Cheswick | 1 | 0.0901 | -24.92% | Keystone | 2 | 0.0433 | -63.92% |
| Conemaugh | 1 | 0.0720 | -40.00% | Montour | 1 | 0.0581 | -51.58% |
| Conemaugh | 2 | 0.0744 | -38.00% | Montour | 2 | 0.0578 | -51.83% |
| Homer City | 1 | 0.0667 | -44.42% | | | | |

Coal-fired units in Pennsylvania with SCR controls are clearly capable meeting far more stringent emission limits simply by running their SCR controls in a manner consistent with past operation. The RACT II NOx limit for these units is, on average, nearly 60% higher than what they have achieved in the past. As such, the MDE argues that the Pennsylvania's coal-fired boilers with SCR post-combustion controls should be subject to more stringent emission standards representative of full use and optimization of installed controls. These emissions standards should be based on individual units' past demonstrated emission rates. These emissions standards are clearly reasonable and achievable; no additional capital investment is required as the control technology is already installed and the rates are clearly reasonable as they have already been achieved in the past. EPA should require Pennsylvania to adopt regulations that ensure optimization of existing post-combustion NOx controls.

Maryland has already taken this step by adopting COMAR 26.11.38 *Control of NOx Emissions from Coal-Fired Electric Generating Units* which requires full optimization of SCR and SNCR controls every day of the ozone season (see COMAR 26.11.38.03). Maryland's COMAR 26.11.38 regulation imposes limits of 0.09 lb/mmBtu for coal-fired EGUs with equipped with SCR. As can be seen in the table above, this is a reasonable NOx emission rate for many of PA's coal-fired EGUs equipped with SCR, as they have already demonstrated they can achieve rates below this limit. A RACT emission limit of 0.09 lb/mmBtu for Pennsylvania's coal-fired units with SCR controls would also provide a 25% reduction in NOx over the existing limit.

For coal-fired boilers equipped with SNCR, EPA states in the Technical Support Document for this proposed ruling that:

"Although boilers with SNCR are not subject to a particular NOx emission limit under the RACT II Rule aside from the boiler type limit (0.16, 0.35, or 0.4 lb/MMBTU), we expect additional NOx reductions to be achieved through optimum operation of the SNCR, consistent with the requirement in section 129.97(g)(1)(ix). Because boilers with SNCR are also required to comply with the boiler type limits in section 129.97(g)(1)(vi) when SNCR is not required to be operated (when injection temperature is less than 1,600 ºF), these boilers remain subject to continuous emission limitations" (pg 22).

The MDE supports the requirement that post-combustion controls be fully optimized every day of the ozone season. However, Pennsylvania's RACT II rule does not explicitly require "optimum operation of the SNCR" as EPA cites in its TSD. Section 129.97(g)(1)(ix) simply states that the SNCR system "...shall be operated with the injection of reagents..." when the SNCR system is above 1600 F, without any optimization requirement or emission limit to ensure that these NOx reductions are achieved. EPA also indicates in its proposed rulemaking that a state has not fully met its RACT requirements until it establishes emissions limitations applicable to the appropriate sets of sources. As such, the MDE requests that EPA revisit it's proposed approval of NOx RACT rates for coal-fired boilers with SNCR controls to ensure that the optimization requirement is constrained by an emission rate (at temperatures above 1,600F) consistent with operation of the installed controls.

### Averaging plan issues, including plan deficiencies and inappropriate averaging options

Major sources subject to the presumptive requirements of 25 Pa. Code section 129.97 that cannot comply with the applicable NOx limits for any given emissions units may choose between two alternative compliance options to establish RACT. These sources may either (1) propose an alternative NOx emissions limit based on average NOx emissions from multiple sources, or (2) propose a source-specific emission limit. The NOx averaging provisions in Pa. Code section 129.98 allow the owner or operator of an affected major NOx source that is unable to meet a NOx presumptive limit for at least one of its emissions units to establish an alternative RACT limit by averaging the NOx emissions from the non-compliant unit with other emissions units. In its proposed conditional approval, EPA determined that the NOx averaging provisions in 25 Pa. Code section 129.98 are not sufficient to address RACT for a number of reasons.

EPA determined that the NOx averaging provisions in 25 Pa. Code section 129.98 are not approvable because Pennsylvania has not included the needed demonstration of the averaging plans in their RACT SIP submission. MDE supports EPA's conditional approval of the NOx RACT averaging plans until said plans are submitted d to EPA as a SIP revision within the one year deadline. If the Pennsylvania Department of Environmental Protection (PADEP) chooses to allow averaging as an option for RACT compliance, the MDE argues that the averaging plans must provide explicit emissions limits for individual sources which are consistent with the reasonably achievable controls for that source. MDE recommends using historical achievable NOx rates as the bases for the emission limits. Furthermore, the averaging plan must document/show that the NOx emission limits in place are more stringent than the presumptive limits that would be in effect otherwise. Also, if/when the PADEP provides NOx averaging plans to EPA, it is imperative that EPA review these plans critically and deny SIP approval of any averaging plan if the source does not provide sufficient justification for the technical and/or economic infeasibility of meeting the presumptive RACT limit.

Case: 19-2562    Document: 52-2    Page: 336    Date Filed: 02/25/2020

EPA also cites the vagueness of Pennsylvania's NOx averaging provisions as a deficiency. In the TSD for this proposal, EPA states:

> "Subsection 129.98(e) does not provide how to compute the alternative limit, but only specifies that the limit would be determined using a 30-day rolling average based on the application of the relevant presumptive limit under section 129.97 or a more stringent limit, and that the alternative limit would ultimately be expressed as NOx mass emissions. This lack of specificity in section 129.98 allows certain unbounded discretion in determining an alternative NOx RACT limit, which correspondingly results in our inability to determine if such limit is adequate for RACT. Also, the uncertainty of subsection 129.98(e) prevents consistent implementation of NOx averaging provisions and ultimately prevents the adequate enforceability of these provisions as a practical matter" (pg 34).

MDE fully agrees with this statement. Subsection 129.98(e) simply states that the "allowable NOx emissions should be computed using the allowable emission rate limitations for air contamination source i on a 30-day rolling basis". Although the text of the Subsection cites a computation based on rates, the equation presented for compliance determination refers to $NO_x$ mass. This could be interpreted to calculate allowable emissions by assuming that all units in the system are operating consistently for 720 hours, regardless of actual utilization of the units. Sources would easily be able to demonstrate compliance with this requirement without operating reasonably available controls, provided that all units within the averaging plan are not operating at full load for 720 hours. A clarification of the compliance determination in Subsection 129.98(e) is needed. At a minimum EPA should require that the alternative facility-wide or system-wide $NO_x$ RACT limitations are based on emission rates (lb/mmBtu) and not emission mass (lbs).

Discussions on potential averaging scenarios between Pennsylvania, Maryland and other states within the OTR, have brought to light additional issues that could arise from unbounded averaging options; the vague nature of section 129.98 may allow for instances where averaging is inappropriate or unnecessary.

- Unnecessary averaging may occur where a facility or system-wide averaging option is selected, but, based on analysis of past performance, is unnecessary. While 25 Pa. Code section 129.98 explicitly states that averaging is for units that cannot comply with the presumptive RACT II limits, it does not outline how a unit will demonstrate that compliance with the presumptive NOx RACT rate is is not achievable. It would therefore be up to the owner or operator to decide what rate is achievable or reasonable and when it would be necessary to average. For coal-fired facilities, especially those with SCR or SNCR controls, owners or operators would simply have to indicate that the presumptive RACT rate is not achievable. However, past performance indicates that the RACT II rate is achievable, and may be more lenient than is necessary. Averaging under these circumstances could allow large emitters with advanced post-combustion controls to opt-out of fully utilizing their NOx controls and allow them to inappropriately curtail the amount of NOx reductions they could actually achieve.
- Inappropriate averaging may occur where units at the same facility or system are allowed to average across different fuel types. As 25 Pa. Code section 129.98 does not indicate how averaging can be achieved, it would be open to the owner or operator's discretion to determine which units should be averaged together. This could allow for averaging scenarios that could be considered to be inappropriate. For example, averaging across different fuel-types within the same facility or system would allow cleaner burning natural gas units to average with coal-fired units. If those coal fired

Case: 19-2562    Document: 52-2    Page: 337    Date Filed: 02/25/2020

Case: 19-2562   Document: 52-2   Page: 338   Date Filed: 02/25/2020

units are equipped with SCR or SNCR controls, this could inappropriately allow those coal-fired units to avoid fully optimizing their controls.

The MDE urges the EPA to revisit its conditional approval of 25 Pa. Code section 129.98 to ensure that all deficiencies are addressed, including the vagueness of the section requirements, and resolving situations where inappropriate or unnecessary averaging may be taken, and reducing averaging times (as discussed in greater detail below) to ensure that NOx emissions continue to be effectively and reasonably controlled. Furthermore, the conditional approval that the EPA is considering for the averaging plans needs to be better defined. The EPA should fully develop methods and conditions that the PADEP needs to address for complete approval.

### Extended averaging periods for RACT compliance

The MDE also has strong reservations about the averaging time allowed in 25 Pa. Code sections 129.98 and 129.100. Sources complying with presumptive RACT limits as well as facilities and systems choosing either NOx averaging option demonstrate compliance with RACT limits on a 30-day rolling average basis. Allowing averaging NOx emission rates over a 30-day rolling period allows units to emit at significantly higher rates on some days. As long as rates are lower on other days, the 30-day rolling rate may be met. This can potentially lead to units emitting at significantly high rates on high ozone days, precisely when effective operation of NOx controls are needed the most. The 30-day averaging time allowed by Pennsylvania RACT II is also inconsistent with RACT in other OTC states; other states in the OTR have NOx emission limits on either a 1-hour or 24-hour basis. MDE urges EPA to consider these overly permissive averaging times in its evaluation of Pennsylvania's RACT submission.

### Conclusion

As discussed above, the MDE urges the EPA to reconsider its approval of sections 129.97 and 129.100 and its conditional approval of section 129.98 of the Pennsylvania SIP revision as RACT, and requests the EPA to consider the arguments that are presented in this letter. Specifically, the MDE asks the EPA to consider:

- Overly permissive nature of NOx RACT limits for coal-fired boilers with SCR & SNCR controls
- Averaging plan issues, including plan deficiencies and inappropriate averaging options
- Extended averaging periods for RACT compliance

The MDE's Air and Radiation Administration thanks you for the opportunity to comment on EPA's Proposed Approval of *Pennsylvania Air Quality Implementation Plans; Regulatory Amendments Addressing Reasonably Available Control Technology Requirements Under the 1997 and 2008 8-Hour Ozone National Ambient Air Quality Standards*. If you have any questions, please do not hesitate to contact me our Department at 410-537-3245.

Sincerely,

Brian J. Hug, Program Manager
Air Quality Planning Program, Air and Radiation Administration

JA358