# STATUTORY AND REGULATORY ADDENDUM

# TABLE OF CONTENTS

**STATUTES**                                                                    **PAGE**

42 U.S.C. § 7408 ...............................................................................ADD01

42 U.S.C. § 7409 ...............................................................................ADD04

42 U.S.C. § 7410 ...............................................................................ADD05

42 U.S.C. § 7502 ...............................................................................ADD14

42 U.S.C. § 7511 ...............................................................................ADD18

42 U.S.C. § 7607 ...............................................................................ADD21

**REGULATIONS**

40 C.F.R. § 52.02 ..............................................................................ADD27

40 C.F.R. §§ 63.10030- 63.10033..........................................................ADD29

40 C.F.R. § 75.73 ..............................................................................ADD37

40 C.F.R. § 81.339 (excerpt)...............................................................ADD42

40 C.F.R. § 97.74 ..............................................................................ADD44

25 Pa. Code §§ 129.96- 129.100...........................................................ADD47

25 Pa. Code §§ 139.101-139.111 ..........................................................ADD64

and maintenance of a PM$_{2.5}$ monitoring network necessary to implement the national ambient air quality standards for PM$_{2.5}$ under section 109 of the Clean Air Act [42 U.S.C. 7409]. This implementation shall not result in a diversion or reprogramming of funds from other Federal, State or local Clean Air Act activities. Any funds previously diverted or reprogrammed from section 105 Clean Air Act [42 U.S.C. 7405] grants for PM$_{2.5}$ monitors must be restored to State or local air programs in fiscal year 1999.

''(b) EPA and the States, consistent with their respective authorities under the Clean Air Act [42 U.S.C. 7401 et seq.], shall ensure that the national network (designated in subsection (a)) which consists of the PM$_{2.5}$ monitors necessary to implement the national ambient air quality standards is established by December 31, 1999.

''(c)(1) The Governors shall be required to submit designations referred to in section 107(d)(1) of the Clean Air Act [42 U.S.C. 7407(d)(1)] for each area following promulgation of the July 1997 PM$_{2.5}$ national ambient air quality standard within 1 year after receipt of 3 years of air quality monitoring data performed in accordance with any applicable Federal reference methods for the relevant areas. Only data from the monitoring network designated in subsection (a) and other Federal reference method PM$_{2.5}$ monitors shall be considered for such designations. Nothing in the previous sentence shall be construed as affecting the Governor's authority to designate an area initially as nonattainment, and the Administrator's authority to promulgate the designation of an area as nonattainment, under section 107(d)(1) of the Clean Air Act, based on its contribution to ambient air quality in a nearby nonattainment area.

''(2) For any area designated as nonattainment for the July 1997 PM$_{2.5}$ national ambient air quality standard in accordance with the schedule set forth in this section, notwithstanding the time limit prescribed in paragraph (2) of section 169B(e) of the Clean Air Act [42 U.S.C. 7492(e)(2)], the Administrator shall require State implementation plan revisions referred to in such paragraph (2) to be submitted at the same time as State implementation plan revisions referred to in section 172 of the Clean Air Act [42 U.S.C. 7502] implementing the revised national ambient air quality standard for fine particulate matter to be submitted. For any area designated as attainment or unclassifiable for such standard, the Administrator shall require the State implementation plan revisions referred to in such paragraph (2) to be submitted 1 year after the area has been so designated. The preceding provisions of this paragraph shall not preclude the implementation of the agreements and recommendations set forth in the Grand Canyon Visibility Transport Commission Report dated June 1996.

''(d) The Administrator shall promulgate the designations referred to in section 107(d)(1) of the Clean Air Act [42 U.S.C. 7407(d)(1)] for each area following promulgation of the July 1997 PM$_{2.5}$ national ambient air quality standard by the earlier of 1 year after the initial designations required under subsection (c)(1) are required to be submitted or December 31, 2005.

''(e) FIELD STUDY.—Not later than 2 years after the date of enactment of the SAFETEA–LU [Aug. 10, 2005], the Administrator shall—

''(1) conduct a field study of the ability of the PM$_{2.5}$ Federal Reference Method to differentiate those particles that are larger than 2.5 micrometers in diameter;

''(2) develop a Federal reference method to measure directly particles that are larger than 2.5 micrometers in diameter without reliance on subtracting from coarse particle measurements those particles that are equal to or smaller than 2.5 micrometers in diameter;

''(3) develop a method of measuring the composition of coarse particles; and

''(4) submit a report on the study and responsibilities of the Administrator under paragraphs (1) through (3) to—

''(A) the Committee on Energy and Commerce of the House of Representatives; and

''(B) the Committee on Environment and Public Works of the Senate.

''SEC. 6103. OZONE DESIGNATION REQUIREMENTS.

''(a) The Governors shall be required to submit the designations referred to in section 107(d)(1) of the Clean Air Act [42 U.S.C. 7407(d)(1)] within 2 years following the promulgation of the July 1997 ozone national ambient air quality standards.

''(b) The Administrator shall promulgate final designations no later than 1 year after the designations required under subsection (a) are required to be submitted.

''SEC. 6104. ADDITIONAL PROVISIONS.

''Nothing in sections 6101 through 6103 shall be construed by the Administrator of Environmental Protection Agency or any court, State, or person to affect any pending litigation or to be a ratification of the ozone or PM$_{2.5}$ standards.''

PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

## § 7408. Air quality criteria and control techniques

### (a) Air pollutant list; publication and revision by Administrator; issuance of air quality criteria for air pollutants

(1) For the purpose of establishing national primary and secondary ambient air quality standards, the Administrator shall within 30 days after December 31, 1970, publish, and shall from time to time thereafter revise, a list which includes each air pollutant—

(A) emissions of which, in his judgment, cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare;

(B) the presence of which in the ambient air results from numerous or diverse mobile or stationary sources; and

(C) for which air quality criteria had not been issued before December 31, 1970 but for which he plans to issue air quality criteria under this section.

(2) The Administrator shall issue air quality criteria for an air pollutant within 12 months after he has included such pollutant in a list

under paragraph (1). Air quality criteria for an air pollutant shall accurately reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of such pollutant in the ambient air, in varying quantities. The criteria for an air pollutant, to the extent practicable, shall include information on—

(A) those variable factors (including atmospheric conditions) which of themselves or in combination with other factors may alter the effects on public health or welfare of such air pollutant;

(B) the types of air pollutants which, when present in the atmosphere, may interact with such pollutant to produce an adverse effect on public health or welfare; and

(C) any known or anticipated adverse effects on welfare.

**(b) Issuance by Administrator of information on air pollution control techniques; standing consulting committees for air pollutants; establishment; membership**

(1) Simultaneously with the issuance of criteria under subsection (a), the Administrator shall, after consultation with appropriate advisory committees and Federal departments and agencies, issue to the States and appropriate air pollution control agencies information on air pollution control techniques, which information shall include data relating to the cost of installation and operation, energy requirements, emission reduction benefits, and environmental impact of the emission control technology. Such information shall include such data as are available on available technology and alternative methods of prevention and control of air pollution. Such information shall also include data on alternative fuels, processes, and operating methods which will result in elimination or significant reduction of emissions.

(2) In order to assist in the development of information on pollution control techniques, the Administrator may establish a standing consulting committee for each air pollutant included in a list published pursuant to subsection (a)(1), which shall be comprised of technically qualified individuals representative of State and local governments, industry, and the academic community. Each such committee shall submit, as appropriate, to the Administrator information related to that required by paragraph (1).

**(c) Review, modification, and reissuance of criteria or information**

The Administrator shall from time to time review, and, as appropriate, modify, and reissue any criteria or information on control techniques issued pursuant to this section. Not later than six months after August 7, 1977, the Administrator shall revise and reissue criteria relating to concentrations of NO₂ over such period (not more than three hours) as he deems appropriate. Such criteria shall include a discussion of nitric and nitrous acids, nitrites, nitrates, nitrosamines, and other carcinogenic and potentially carcinogenic derivatives of oxides of nitrogen.

**(d) Publication in Federal Register; availability of copies for general public**

The issuance of air quality criteria and information on air pollution control techniques shall

be announced in the Federal Register and copies shall be made available to the general public.

**(e) Transportation planning and guidelines**

The Administrator shall, after consultation with the Secretary of Transportation, and after providing public notice and opportunity for comment, and with State and local officials, within nine months after November 15, 1990,[1] and periodically thereafter as necessary to maintain a continuous transportation-air quality planning process, update the June 1978 Transportation-Air Quality Planning Guidelines and publish guidance on the development and implementation of transportation and other measures necessary to demonstrate and maintain attainment of national ambient air quality standards. Such guidelines shall include information on—

(1) methods to identify and evaluate alternative planning and control activities;

(2) methods of reviewing plans on a regular basis as conditions change or new information is presented;

(3) identification of funds and other resources necessary to implement the plan, including interagency agreements on providing such funds and resources;

(4) methods to assure participation by the public in all phases of the planning process; and

(5) such other methods as the Administrator determines necessary to carry out a continuous planning process.

**(f) Information regarding processes, procedures, and methods to reduce or control pollutants in transportation; reduction of mobile source related pollutants; reduction of impact on public health**

(1) The Administrator shall publish and make available to appropriate Federal, State, and local environmental and transportation agencies not later than one year after November 15, 1990, and from time to time thereafter—

(A) information prepared, as appropriate, in consultation with the Secretary of Transportation, and after providing public notice and opportunity for comment, regarding the formulation and emission reduction potential of transportation control measures related to criteria pollutants and their precursors, including, but not limited to—

(i) programs for improved public transit;

(ii) restriction of certain roads or lanes to, or construction of such roads or lanes for use by, passenger buses or high occupancy vehicles;

(iii) employer-based transportation management plans, including incentives;

(iv) trip-reduction ordinances;

(v) traffic flow improvement programs that achieve emission reductions;

(vi) fringe and transportation corridor parking facilities serving multiple occupancy vehicle programs or transit service;

(vii) programs to limit or restrict vehicle use in downtown areas or other areas of emission concentration particularly during periods of peak use;

(viii) programs for the provision of all forms of high-occupancy, shared-ride services;

_____

[1] See Codification note below.

(ix) programs to limit portions of road surfaces or certain sections of the metropolitan area to the use of non-motorized vehicles or pedestrian use, both as to time and place;

(x) programs for secure bicycle storage facilities and other facilities, including bicycle lanes, for the convenience and protection of bicyclists, in both public and private areas;

(xi) programs to control extended idling of vehicles;

(xii) programs to reduce motor vehicle emissions, consistent with subchapter II, which are caused by extreme cold start conditions;

(xiii) employer-sponsored programs to permit flexible work schedules;

(xiv) programs and ordinances to facilitate non-automobile travel, provision and utilization of mass transit, and to generally reduce the need for single-occupant vehicle travel, as part of transportation planning and development efforts of a locality, including programs and ordinances applicable to new shopping centers, special events, and other centers of vehicle activity;

(xv) programs for new construction and major reconstructions of paths, tracks or areas solely for the use by pedestrian or other non-motorized means of transportation when economically feasible and in the public interest. For purposes of this clause, the Administrator shall also consult with the Secretary of the Interior; and

(xvi) program to encourage the voluntary removal from use and the marketplace of pre-1980 model year light duty vehicles and pre-1980 model light duty trucks.[2]

(B) information on additional methods or strategies that will contribute to the reduction of mobile source related pollutants during periods in which any primary ambient air quality standard will be exceeded and during episodes for which an air pollution alert, warning, or emergency has been declared;

(C) information on other measures which may be employed to reduce the impact on public health or protect the health of sensitive or susceptible individuals or groups; and

(D) information on the extent to which any process, procedure, or method to reduce or control such air pollutant may cause an increase in the emissions or formation of any other pollutant.

(2) In publishing such information the Administrator shall also include an assessment of—

(A) the relative effectiveness of such processes, procedures, and methods;

(B) the potential effect of such processes, procedures, and methods on transportation systems and the provision of transportation services; and

(C) the environmental, energy, and economic impact of such processes, procedures, and methods.

**(g) Assessment of risks to ecosystems**

The Administrator may assess the risks to ecosystems from exposure to criteria air pollut-

ants (as identified by the Administrator in the Administrator's sole discretion).

**(h) RACT/BACT/LAER clearinghouse**

The Administrator shall make information regarding emission control technology available to the States and to the general public through a central database. Such information shall include all control technology information received pursuant to State plan provisions requiring permits for sources, including operating permits for existing sources.

(July 14, 1955, ch. 360, title I, §108, as added Pub. L. 91–604, §4(a), Dec. 31, 1970, 84 Stat. 1678; amended Pub. L. 95–95, title I, §§104, 105, title IV, §401(a), Aug. 7, 1977, 91 Stat. 689, 790; Pub. L. 101–549, title I, §§108(a)–(c), (o), 111, Nov. 15, 1990, 104 Stat. 2465, 2466, 2469, 2470; Pub. L. 105–362, title XV, §1501(b), Nov. 10, 1998, 112 Stat. 3294.)

<center>CODIFICATION</center>

November 15, 1990, referred to in subsec. (e), was in the original "enactment of the Clean Air Act Amendments of 1989", and was translated as meaning the date of the enactment of Pub. L. 101–549, popularly known as the Clean Air Act Amendments of 1990, to reflect the probable intent of Congress.

Section was formerly classified to section 1857c–3 of this title.

<center>PRIOR PROVISIONS</center>

A prior section 108 of act July 14, 1955, was renumbered section 115 by Pub. L. 91–604 and is classified to section 7415 of this title.

<center>AMENDMENTS</center>

1998—Subsec. (f)(3), (4). Pub. L. 105–362 struck out par. (3), which required reports by the Secretary of Transportation and the Administrator to be submitted to Congress by Jan. 1, 1993, and every 3 years thereafter, reviewing and analyzing existing State and local air quality related transportation programs, evaluating achievement of goals, and recommending changes to existing programs, and par. (4), which required that in each report after the first report the Secretary of Transportation include a description of the actions taken to implement the changes recommended in the preceding report.

1990—Subsec. (e). Pub. L. 101–549, §108(a), inserted first sentence and struck out former first sentence which read as follows: "The Administrator shall, after consultation with the Secretary of Transportation and the Secretary of Housing and Urban Development and State and local officials and within 180 days after August 7, 1977, and from time to time thereafter, publish guidelines on the basic program elements for the planning process assisted under section 7505 of this title."

Subsec. (f)(1). Pub. L. 101–549, §108(b), in introductory provisions, substituted present provisions for provisions relating to Federal agencies, States, and air pollution control agencies within either 6 months or one year after Aug. 7, 1977.

Subsec. (f)(1)(A). Pub. L. 101–549, §108(b), substituted present provisions for provisions relating to information prepared in cooperation with Secretary of Transportation, regarding processes, procedures, and methods to reduce certain pollutants.

Subsec. (f)(3), (4). Pub. L. 101–549, §111, added pars. (3) and (4).

Subsec. (g). Pub. L. 101–549, §108(o), added subsec. (g).

Subsec. (h). Pub. L. 101–549, §108(c), added subsec. (h).

1977—Subsec. (a)(1)(A). Pub. L. 95–95, §401(a), substituted "emissions of which, in his judgment, cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare" for "which in his judgment has an adverse effect on public health or welfare".

---

[2] So in original. The period probably should be a semicolon.

Subsec. (b)(1). Pub. L. 95–95, §104(a), substituted "cost of installation and operation, energy requirements, emission reduction benefits, and environmental impact of the emission control technology" for "technology and costs of emission control".

Subsec. (c). Pub. L. 95–95, §104(b), inserted provision directing the Administrator, not later than six months after Aug. 7, 1977, to revise and reissue criteria relating to concentrations of $NO_2$ over such period (not more than three hours) as he deems appropriate, with the criteria to include a discussion of nitric and nitrous acids, nitrites, nitrates, nitrosamines, and other carcinogenic and potentially carcinogenic derivatives of oxides of nitrogen.

Subsecs. (e), (f). Pub. L. 95–95, §105, added subsecs. (e) and (f).

EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

§ 7409. National primary and secondary ambient air quality standards

(a) Promulgation

(1) The Administrator—

(A) within 30 days after December 31, 1970, shall publish proposed regulations prescribing a national primary ambient air quality standard and a national secondary ambient air quality standard for each air pollutant for which air quality criteria have been issued prior to such date; and

(B) after a reasonable time for interested persons to submit written comments thereon (but no later than 90 days after the initial publication of such proposed standards) shall by regulation promulgate such proposed national primary and secondary ambient air quality standards with such modifications as he deems appropriate.

(2) With respect to any air pollutant for which air quality criteria are issued after December 31, 1970, the Administrator shall publish, simultaneously with the issuance of such criteria and information, proposed national primary and secondary ambient air quality standards for any such pollutant. The procedure provided for in paragraph (1)(B) of this subsection shall apply to the promulgation of such standards.

(b) Protection of public health and welfare

(1) National primary ambient air quality standards, prescribed under subsection (a) shall be ambient air quality standards the attainment and maintenance of which in the judgment of the Administrator, based on such criteria and

allowing an adequate margin of safety, are requisite to protect the public health. Such primary standards may be revised in the same manner as promulgated.

(2) Any national secondary ambient air quality standard prescribed under subsection (a) shall specify a level of air quality the attainment and maintenance of which in the judgment of the Administrator, based on such criteria, is requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air. Such secondary standards may be revised in the same manner as promulgated.

(c) National primary ambient air quality standard for nitrogen dioxide

The Administrator shall, not later than one year after August 7, 1977, promulgate a national primary ambient air quality standard for $NO_2$ concentrations over a period of not more than 3 hours unless, based on the criteria issued under section 7408(c) of this title, he finds that there is no significant evidence that such a standard for such a period is requisite to protect public health.

(d) Review and revision of criteria and standards; independent scientific review committee; appointment; advisory functions

(1) Not later than December 31, 1980, and at five-year intervals thereafter, the Administrator shall complete a thorough review of the criteria published under section 7408 of this title and the national ambient air quality standards promulgated under this section and shall make such revisions in such criteria and standards and promulgate such new standards as may be appropriate in accordance with section 7408 of this title and subsection (b) of this section. The Administrator may review and revise criteria or promulgate new standards earlier or more frequently than required under this paragraph.

(2)(A) The Administrator shall appoint an independent scientific review committee composed of seven members including at least one member of the National Academy of Sciences, one physician, and one person representing State air pollution control agencies.

(B) Not later than January 1, 1980, and at five-year intervals thereafter, the committee referred to in subparagraph (A) shall complete a review of the criteria published under section 7408 of this title and the national primary and secondary ambient air quality standards promulgated under this section and shall recommend to the Administrator any new national ambient air quality standards and revisions of existing criteria and standards as may be appropriate under section 7408 of this title and subsection (b) of this section.

(C) Such committee shall also (i) advise the Administrator of areas in which additional knowledge is required to appraise the adequacy and basis of existing, new, or revised national ambient air quality standards, (ii) describe the research efforts necessary to provide the required information, (iii) advise the Administrator on the relative contribution to air pollution concentrations of natural as well as anthropogenic activity, and (iv) advise the Administrator of any adverse public health, welfare, so-

cial, economic, or energy effects which may result from various strategies for attainment and maintenance of such national ambient air quality standards.

(July 14, 1955, ch. 360, title I, § 109, as added Pub. L. 91–604, § 4(a), Dec. 31, 1970, 84 Stat. 1679; amended Pub. L. 95–95, title I, § 106, Aug. 7, 1977, 91 Stat. 691.)

<center>CODIFICATION</center>

Section was formerly classified to section 1857c–4 of this title.

<center>PRIOR PROVISIONS</center>

A prior section 109 of act July 14, 1955, was renumbered section 116 by Pub. L. 91–604 and is classified to section 7416 of this title.

<center>AMENDMENTS</center>

1977—Subsec. (c). Pub. L. 95–95, § 106(b), added subsec. (c).

Subsec. (d). Pub. L. 95–95, § 106(a), added subsec. (d).

<center>EFFECTIVE DATE OF 1977 AMENDMENT</center>

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

<center>MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS</center>

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

<center>TERMINATION OF ADVISORY COMMITTEES</center>

Advisory committees established after Jan. 5, 1973, to terminate not later than the expiration of the 2-year period beginning on the date of their establishment, unless, in the case of a committee established by the President or an officer of the Federal Government, such committee is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a committee established by the Congress, its duration is otherwise provided for by law. See section 14 of Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 776, set out in the Appendix to Title 5, Government Organization and Employees.

<center>ROLE OF SECONDARY STANDARDS</center>

Pub. L. 101–549, title VIII, § 817, Nov. 15, 1990, 104 Stat. 2697, provided that:

''(a) REPORT.—The Administrator shall request the National Academy of Sciences to prepare a report to the Congress on the role of national secondary ambient air quality standards in protecting welfare and the environment. The report shall:

''(1) include information on the effects on welfare and the environment which are caused by ambient concentrations of pollutants listed pursuant to section 108 [42 U.S.C. 7408] and other pollutants which may be listed;

''(2) estimate welfare and environmental costs incurred as a result of such effects;

''(3) examine the role of secondary standards and the State implementation planning process in preventing such effects;

''(4) determine ambient concentrations of each such pollutant which would be adequate to protect welfare and the environment from such effects;

''(5) estimate the costs and other impacts of meeting secondary standards; and

''(6) consider other means consistent with the goals and objectives of the Clean Air Act [42 U.S.C. 7401 et seq.] which may be more effective than secondary standards in preventing or mitigating such effects.

''(b) SUBMISSION TO CONGRESS; COMMENTS; AUTHORIZATION.—(1) The report shall be transmitted to the Congress not later than 3 years after the date of enactment of the Clean Air Act Amendments of 1990 [Nov. 15, 1990].

''(2) At least 90 days before issuing a report the Administrator shall provide an opportunity for public comment on the proposed report. The Administrator shall include in the final report a summary of the comments received on the proposed report.

''(3) There are authorized to be appropriated such sums as are necessary to carry out this section.''

## § 7410. State implementation plans for national primary and secondary ambient air quality standards

### (a) Adoption of plan by State; submission to Administrator; content of plan; revision; new sources; indirect source review program; supplemental or intermittent control systems

(1) Each State shall, after reasonable notice and public hearings, adopt and submit to the Administrator, within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof) under section 7409 of this title for any air pollutant, a plan which provides for implementation, maintenance, and enforcement of such primary standard in each air quality control region (or portion thereof) within such State. In addition, such State shall adopt and submit to the Administrator (either as a part of a plan submitted under the preceding sentence or separately) within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national ambient air quality secondary standard (or revision thereof), a plan which provides for implementation, maintenance, and enforcement of such secondary standard in each air quality control region (or portion thereof) within such State. Unless a separate public hearing is provided, each State shall consider its plan implementing such secondary standard at the hearing required by the first sentence of this paragraph.

(2) Each implementation plan submitted by a State under this chapter shall be adopted by the State after reasonable notice and public hearing. Each such plan shall—

(A) include enforceable emission limitations and other control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements of this chapter;

(B) provide for establishment and operation of appropriate devices, methods, systems, and procedures necessary to—

(i) monitor, compile, and analyze data on ambient air quality, and

(ii) upon request, make such data available to the Administrator;

(C) include a program to provide for the enforcement of the measures described in subparagraph (A), and regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that national ambient air quality standards are achieved, including a permit program as required in parts C and D;

(D) contain adequate provisions—

(i) prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will—

(I) contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard, or

(II) interfere with measures required to be included in the applicable implementation plan for any other State under part C to prevent significant deterioration of air quality or to protect visibility,

(ii) insuring compliance with the applicable requirements of sections 7426 and 7415 of this title (relating to interstate and international pollution abatement);

(E) provide (i) necessary assurances that the State (or, except where the Administrator deems inappropriate, the general purpose local government or governments, or a regional agency designated by the State or general purpose local governments for such purpose) will have adequate personnel, funding, and authority under State (and, as appropriate, local) law to carry out such implementation plan (and is not prohibited by any provision of Federal or State law from carrying out such implementation plan or portion thereof), (ii) requirements that the State comply with the requirements respecting State boards under section 7428 of this title, and (iii) necessary assurances that, where the State has relied on a local or regional government, agency, or instrumentality for the implementation of any plan provision, the State has responsibility for ensuring adequate implementation of such plan provision;

(F) require, as may be prescribed by the Administrator—

(i) the installation, maintenance, and replacement of equipment, and the implementation of other necessary steps, by owners or operators of stationary sources to monitor emissions from such sources,

(ii) periodic reports on the nature and amounts of emissions and emissions-related data from such sources, and

(iii) correlation of such reports by the State agency with any emission limitations or standards established pursuant to this chapter, which reports shall be available at reasonable times for public inspection;

(G) provide for authority comparable to that in section 7603 of this title and adequate contingency plans to implement such authority;

(H) provide for revision of such plan—

(i) from time to time as may be necessary to take account of revisions of such national

primary or secondary ambient air quality standard or the availability of improved or more expeditious methods of attaining such standard, and

(ii) except as provided in paragraph (3)(C), whenever the Administrator finds on the basis of information available to the Administrator that the plan is substantially inadequate to attain the national ambient air quality standard which it implements or to otherwise comply with any additional requirements established under this chapter;

(I) in the case of a plan or plan revision for an area designated as a nonattainment area, meet the applicable requirements of part D (relating to nonattainment areas);

(J) meet the applicable requirements of section 7421 of this title (relating to consultation), section 7427 of this title (relating to public notification), and part C (relating to prevention of significant deterioration of air quality and visibility protection);

(K) provide for—

(i) the performance of such air quality modeling as the Administrator may prescribe for the purpose of predicting the effect on ambient air quality of any emissions of any air pollutant for which the Administrator has established a national ambient air quality standard, and

(ii) the submission, upon request, of data related to such air quality modeling to the Administrator;

(L) require the owner or operator of each major stationary source to pay to the permitting authority, as a condition of any permit required under this chapter, a fee sufficient to cover—

(i) the reasonable costs of reviewing and acting upon any application for such a permit, and

(ii) if the owner or operator receives a permit for such source, the reasonable costs of implementing and enforcing the terms and conditions of any such permit (not including any court costs or other costs associated with any enforcement action),

until such fee requirement is superseded with respect to such sources by the Administrator's approval of a fee program under subchapter V; and

(M) provide for consultation and participation by local political subdivisions affected by the plan.

(3)(A) Repealed. Pub. L. 101–549, title I, § 101(d)(1), Nov. 15, 1990, 104 Stat. 2409.

(B) As soon as practicable, the Administrator shall, consistent with the purposes of this chapter and the Energy Supply and Environmental Coordination Act of 1974 [15 U.S.C. 791 et seq.], review each State's applicable implementation plans and report to the State on whether such plans can be revised in relation to fuel burning stationary sources (or persons supplying fuel to such sources) without interfering with the attainment and maintenance of any national ambient air quality standard within the period permitted in this section. If the Administrator determines that any such plan can be revised, he

shall notify the State that a plan revision may be submitted by the State. Any plan revision which is submitted by the State shall, after public notice and opportunity for public hearing, be approved by the Administrator if the revision relates only to fuel burning stationary sources (or persons supplying fuel to such sources), and the plan as revised complies with paragraph (2) of this subsection. The Administrator shall approve or disapprove any revision no later than three months after its submission.

(C) Neither the State, in the case of a plan (or portion thereof) approved under this subsection, nor the Administrator, in the case of a plan (or portion thereof) promulgated under subsection (c), shall be required to revise an applicable implementation plan because one or more exemptions under section 7418 of this title (relating to Federal facilities), enforcement orders under section 7413(d)[1] of this title, suspensions under subsection (f) or (g) (relating to temporary energy or economic authority), orders under section 7419 of this title (relating to primary nonferrous smelters), or extensions of compliance in decrees entered under section 7413(e)[1] of this title (relating to iron- and steel-producing operations) have been granted, if such plan would have met the requirements of this section if no such exemptions, orders, or extensions had been granted.

(4) Repealed. Pub. L. 101–549, title I, § 101(d)(2), Nov. 15, 1990, 104 Stat. 2409.

(5)(A)(i) Any State may include in a State implementation plan, but the Administrator may not require as a condition of approval of such plan under this section, any indirect source review program. The Administrator may approve and enforce, as part of an applicable implementation plan, an indirect source review program which the State chooses to adopt and submit as part of its plan.

(ii) Except as provided in subparagraph (B), no plan promulgated by the Administrator shall include any indirect source review program for any air quality control region, or portion thereof.

(iii) Any State may revise an applicable implementation plan approved under this subsection to suspend or revoke any such program included in such plan, provided that such plan meets the requirements of this section.

(B) The Administrator shall have the authority to promulgate, implement and enforce regulations under subsection (c) respecting indirect source review programs which apply only to federally assisted highways, airports, and other major federally assisted indirect sources and federally owned or operated indirect sources.

(C) For purposes of this paragraph, the term "indirect source" means a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution. Such term includes parking lots, parking garages, and other facilities subject to any measure for management of parking supply (within the meaning of subsection (c)(2)(D)(ii)), including regulation of existing off-street parking but such term does not include new or existing on-street parking. Direct emis-

sions sources or facilities at, within, or associated with, any indirect source shall not be deemed indirect sources for the purpose of this paragraph.

(D) For purposes of this paragraph the term "indirect source review program" means the facility-by-facility review of indirect sources of air pollution, including such measures as are necessary to assure, or assist in assuring, that a new or modified indirect source will not attract mobile sources of air pollution, the emissions from which would cause or contribute to air pollution concentrations—

(i) exceeding any national primary ambient air quality standard for a mobile source-related air pollutant after the primary standard attainment date, or

(ii) preventing maintenance of any such standard after such date.

(E) For purposes of this paragraph and paragraph (2)(B), the term "transportation control measure" does not include any measure which is an "indirect source review program".

(6) No State plan shall be treated as meeting the requirements of this section unless such plan provides that in the case of any source which uses a supplemental, or intermittent control system for purposes of meeting the requirements of an order under section 7413(d)[1] of this title or section 7419 of this title (relating to primary nonferrous smelter orders), the owner or operator of such source may not temporarily reduce the pay of any employee by reason of the use of such supplemental or intermittent or other dispersion dependent control system.

**(b) Extension of period for submission of plans**

The Administrator may, wherever he determines necessary, extend the period for submission of any plan or portion thereof which implements a national secondary ambient air quality standard for a period not to exceed 18 months from the date otherwise required for submission of such plan.

**(c) Preparation and publication by Administrator of proposed regulations setting forth implementation plan; transportation regulations study and report; parking surcharge; suspension authority; plan implementation**

(1) The Administrator shall promulgate a Federal implementation plan at any time within 2 years after the Administrator—

(A) finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the minimum criteria established under subsection (k)(1)(A), or

(B) disapproves a State implementation plan submission in whole or in part,

unless the State corrects the deficiency, and the Administrator approves the plan or plan revision, before the Administrator promulgates such Federal implementation plan.

(2)(A) Repealed. Pub. L. 101–549, title I, § 101(d)(3)(A), Nov. 15, 1990, 104 Stat. 2409.

(B) No parking surcharge regulation may be required by the Administrator under paragraph (1) of this subsection as a part of an applicable implementation plan. All parking surcharge regulations previously required by the Adminis-

[1] See References in Text note below.

trator shall be void upon June 22, 1974. This subparagraph shall not prevent the Administrator from approving parking surcharges if they are adopted and submitted by a State as part of an applicable implementation plan. The Administrator may not condition approval of any implementation plan submitted by a State on such plan's including a parking surcharge regulation.

(C) Repealed. Pub. L. 101–549, title I, § 101(d)(3)(B), Nov. 15, 1990, 104 Stat. 2409.

(D) For purposes of this paragraph—

(i) The term "parking surcharge regulation" means a regulation imposing or requiring the imposition of any tax, surcharge, fee, or other charge on parking spaces, or any other area used for the temporary storage of motor vehicles.

(ii) The term "management of parking supply" shall include any requirement providing that any new facility containing a given number of parking spaces shall receive a permit or other prior approval, issuance of which is to be conditioned on air quality considerations.

(iii) The term "preferential bus/carpool lane" shall include any requirement for the setting aside of one or more lanes of a street or highway on a permanent or temporary basis for the exclusive use of buses or carpools, or both.

(E) No standard, plan, or requirement, relating to management of parking supply or preferential bus/carpool lanes shall be promulgated after June 22, 1974, by the Administrator pursuant to this section, unless such promulgation has been subjected to at least one public hearing which has been held in the area affected and for which reasonable notice has been given in such area. If substantial changes are made following public hearings, one or more additional hearings shall be held in such area after such notice.

(3) Upon application of the chief executive officer of any general purpose unit of local government, if the Administrator determines that such unit has adequate authority under State or local law, the Administrator may delegate to such unit the authority to implement and enforce within the jurisdiction of such unit any part of a plan promulgated under this subsection. Nothing in this paragraph shall prevent the Administrator from implementing or enforcing any applicable provision of a plan promulgated under this subsection.

(4) Repealed. Pub. L. 101–549, title I, § 101(d)(3)(C), Nov. 15, 1990, 104 Stat. 2409.

(5)(A) Any measure in an applicable implementation plan which requires a toll or other charge for the use of a bridge located entirely within one city shall be eliminated from such plan by the Administrator upon application by the Governor of the State, which application shall include a certification by the Governor that he will revise such plan in accordance with subparagraph (B).

(B) In the case of any applicable implementation plan with respect to which a measure has been eliminated under subparagraph (A), such plan shall, not later than one year after August 7, 1977, be revised to include comprehensive measures to:

(i) establish, expand, or improve public transportation measures to meet basic transportation needs, as expeditiously as is practicable; and

(ii) implement transportation control measures necessary to attain and maintain national ambient air quality standards,

and such revised plan shall, for the purpose of implementing such comprehensive public transportation measures, include requirements to use (insofar as is necessary) Federal grants, State or local funds, or any combination of such grants and funds as may be consistent with the terms of the legislation providing such grants and funds. Such measures shall, as a substitute for the tolls or charges eliminated under subparagraph (A), provide for emissions reductions equivalent to the reductions which may reasonably be expected to be achieved through the use of the tolls or charges eliminated.

(C) Any revision of an implementation plan for purposes of meeting the requirements of subparagraph (B) shall be submitted in coordination with any plan revision required under part D.

**(d), (e) Repealed. Pub. L. 101–549, title I, § 101(d)(4), (5), Nov. 15, 1990, 104 Stat. 2409**

**(f) National or regional energy emergencies; determination by President**

(1) Upon application by the owner or operator of a fuel burning stationary source, and after notice and opportunity for public hearing, the Governor of the State in which such source is located may petition the President to determine that a national or regional energy emergency exists of such severity that—

(A) a temporary suspension of any part of the applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) may be necessary, and

(B) other means of responding to the energy emergency may be inadequate.

Such determination shall not be delegable by the President to any other person. If the President determines that a national or regional energy emergency of such severity exists, a temporary emergency suspension of any part of an applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) adopted by the State may be issued by the Governor of any State covered by the President's determination under the condition specified in paragraph (2) and may take effect immediately.

(2) A temporary emergency suspension under this subsection shall be issued to a source only if the Governor of such State finds that—

(A) there exists in the vicinity of such source a temporary energy emergency involving high levels of unemployment or loss of necessary energy supplies for residential dwellings; and

(B) such unemployment or loss can be totally or partially alleviated by such emergency suspension.

Not more than one such suspension may be issued for any source on the basis of the same set of circumstances or on the basis of the same emergency.

(3) A temporary emergency suspension issued by a Governor under this subsection shall re-

main in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator, if any. The Administrator may disapprove such suspension if he determines that it does not meet the requirements of paragraph (2).

(4) This subsection shall not apply in the case of a plan provision or requirement promulgated by the Administrator under subsection (c) of this section, but in any such case the President may grant a temporary emergency suspension for a four month period of any such provision or requirement if he makes the determinations and findings specified in paragraphs (1) and (2).

(5) The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c–10 [2] of this title, as in effect before August 7, 1977, or section 7413(d) [2] of this title, upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

**(g) Governor's authority to issue temporary emergency suspensions**

(1) In the case of any State which has adopted and submitted to the Administrator a proposed plan revision which the State determines—

(A) meets the requirements of this section, and

(B) is necessary (i) to prevent the closing for one year or more of any source of air pollution, and (ii) to prevent substantial increases in unemployment which would result from such closing, and

which the Administrator has not approved or disapproved under this section within 12 months of submission of the proposed plan revision, the Governor may issue a temporary emergency suspension of the part of the applicable implementation plan for such State which is proposed to be revised with respect to such source. The determination under subparagraph (B) may not be made without regard to whether or not the proposed plan revision is approved.

(2) A temporary emergency suspension issued by a Governor under this subsection shall remain in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator. The Administrator may disapprove such suspension if he determines that it does not meet the requirements of this subsection.

(3) The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c–10 [2] of this title as in effect before August 7, 1977, or under section 7413(d) [2] of this title upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

---

[2] See References in Text note below.

**(h) Publication of comprehensive document for each State setting forth requirements of applicable implementation plan**

(1) Not later than 5 years after November 15, 1990, and every 3 years thereafter, the Administrator shall assemble and publish a comprehensive document for each State setting forth all requirements of the applicable implementation plan for such State and shall publish notice in the Federal Register of the availability of such documents.

(2) The Administrator may promulgate such regulations as may be reasonably necessary to carry out the purpose of this subsection.

**(i) Modification of requirements prohibited**

Except for a primary nonferrous smelter order under section 7419 of this title, a suspension under subsection (f) or (g) (relating to emergency suspensions), an exemption under section 7418 of this title (relating to certain Federal facilities), an order under section 7413(d) [2] of this title (relating to compliance orders), a plan promulgation under subsection (c), or a plan revision under subsection (a)(3); no order, suspension, plan revision, or other action modifying any requirement of an applicable implementation plan may be taken with respect to any stationary source by the State or by the Administrator.

**(j) Technological systems of continuous emission reduction on new or modified stationary sources; compliance with performance standards**

As a condition for issuance of any permit required under this subchapter, the owner or operator of each new or modified stationary source which is required to obtain such a permit must show to the satisfaction of the permitting authority that the technological system of continuous emission reduction which is to be used at such source will enable it to comply with the standards of performance which are to apply to such source and that the construction or modification and operation of such source will be in compliance with all other requirements of this chapter.

**(k) Environmental Protection Agency action on plan submissions**

**(1) Completeness of plan submissions**

**(A) Completeness criteria**

Within 9 months after November 15, 1990, the Administrator shall promulgate minimum criteria that any plan submission must meet before the Administrator is required to act on such submission under this subsection. The criteria shall be limited to the information necessary to enable the Administrator to determine whether the plan submission complies with the provisions of this chapter.

**(B) Completeness finding**

Within 60 days of the Administrator's receipt of a plan or plan revision, but no later than 6 months after the date, if any, by which a State is required to submit the plan or revision, the Administrator shall determine whether the minimum criteria estab-

lished pursuant to subparagraph (A) have been met. Any plan or plan revision that a State submits to the Administrator, and that has not been determined by the Administrator (by the date 6 months after receipt of the submission) to have failed to meet the minimum criteria established pursuant to subparagraph (A), shall on that date be deemed by operation of law to meet such minimum criteria.

**(C) Effect of finding of incompleteness**

Where the Administrator determines that a plan submission (or part thereof) does not meet the minimum criteria established pursuant to subparagraph (A), the State shall be treated as not having made the submission (or, in the Administrator's discretion, part thereof).

**(2) Deadline for action**

Within 12 months of a determination by the Administrator (or a determination deemed by operation of law) under paragraph (1) that a State has submitted a plan or plan revision (or, in the Administrator's discretion, part thereof) that meets the minimum criteria established pursuant to paragraph (1), if applicable (or, if those criteria are not applicable, within 12 months of submission of the plan or revision), the Administrator shall act on the submission in accordance with paragraph (3).

**(3) Full and partial approval and disapproval**

In the case of any submittal on which the Administrator is required to act under paragraph (2), the Administrator shall approve such submittal as a whole if it meets all of the applicable requirements of this chapter. If a portion of the plan revision meets all the applicable requirements of this chapter, the Administrator may approve the plan revision in part and disapprove the plan revision in part. The plan revision shall not be treated as meeting the requirements of this chapter until the Administrator approves the entire plan revision as complying with the applicable requirements of this chapter.

**(4) Conditional approval**

The Administrator may approve a plan revision based on a commitment of the State to adopt specific enforceable measures by a date certain, but not later than 1 year after the date of approval of the plan revision. Any such conditional approval shall be treated as a disapproval if the State fails to comply with such commitment.

**(5) Calls for plan revisions**

Whenever the Administrator finds that the applicable implementation plan for any area is substantially inadequate to attain or maintain the relevant national ambient air quality standard, to mitigate adequately the interstate pollutant transport described in section 7506a of this title or section 7511c of this title, or to otherwise comply with any requirement of this chapter, the Administrator shall require the State to revise the plan as necessary to correct such inadequacies. The Administrator shall notify the State of the inadequacies, and may establish reasonable deadlines (not to exceed 18 months after the date of such notice) for the submission of such plan revisions. Such findings and notice shall be public. Any finding under this paragraph shall, to the extent the Administrator deems appropriate, subject the State to the requirements of this chapter to which the State was subject when it developed and submitted the plan for which such finding was made, except that the Administrator may adjust any dates applicable under such requirements as appropriate (except that the Administrator may not adjust any attainment date prescribed under part D, unless such date has elapsed).

**(6) Corrections**

Whenever the Administrator determines that the Administrator's action approving, disapproving, or promulgating any plan or plan revision (or part thereof), area designation, redesignation, classification, or reclassification was in error, the Administrator may in the same manner as the approval, disapproval, or promulgation revise such action as appropriate without requiring any further submission from the State. Such determination and the basis thereof shall be provided to the State and public.

**(l) Plan revisions**

Each revision to an implementation plan submitted by a State under this chapter shall be adopted by such State after reasonable notice and public hearing. The Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), or any other applicable requirement of this chapter.

**(m) Sanctions**

The Administrator may apply any of the sanctions listed in section 7509(b) of this title at any time (or at any time after) the Administrator makes a finding, disapproval, or determination under paragraphs (1) through (4), respectively, of section 7509(a) of this title in relation to any plan or plan item (as that term is defined by the Administrator) required under this chapter, with respect to any portion of the State the Administrator determines reasonable and appropriate, for the purpose of ensuring that the requirements of this chapter relating to such plan or plan item are met. The Administrator shall, by rule, establish criteria for exercising his authority under the previous sentence with respect to any deficiency referred to in section 7509(a) of this title to ensure that, during the 24-month period following the finding, disapproval, or determination referred to in section 7509(a) of this title, such sanctions are not applied on a statewide basis where one or more political subdivisions covered by the applicable implementation plan are principally responsible for such deficiency.

**(n) Savings clauses**

**(1) Existing plan provisions**

Any provision of any applicable implementation plan that was approved or promulgated by the Administrator pursuant to this section as

in effect before November 15, 1990, shall remain in effect as part of such applicable implementation plan, except to the extent that a revision to such provision is approved or promulgated by the Administrator pursuant to this chapter.

**(2) Attainment dates**

For any area not designated nonattainment, any plan or plan revision submitted or required to be submitted by a State—

(A) in response to the promulgation or revision of a national primary ambient air quality standard in effect on November 15, 1990, or

(B) in response to a finding of substantial inadequacy under subsection (a)(2) (as in effect immediately before November 15, 1990),

shall provide for attainment of the national primary ambient air quality standards within 3 years of November 15, 1990, or within 5 years of issuance of such finding of substantial inadequacy, whichever is later.

**(3) Retention of construction moratorium in certain areas**

In the case of an area to which, immediately before November 15, 1990, the prohibition on construction or modification of major stationary sources prescribed in subsection (a)(2)(I) (as in effect immediately before November 15, 1990) applied by virtue of a finding of the Administrator that the State containing such area had not submitted an implementation plan meeting the requirements of section 7502(b)(6) of this title (relating to establishment of a permit program) (as in effect immediately before November 15, 1990) or 7502(a)(1) of this title (to the extent such requirements relate to provision for attainment of the primary national ambient air quality standard for sulfur oxides by December 31, 1982) as in effect immediately before November 15, 1990, no major stationary source of the relevant air pollutant or pollutants shall be constructed or modified in such area until the Administrator finds that the plan for such area meets the applicable requirements of section 7502(c)(5) of this title (relating to permit programs) or subpart 5 of part D (relating to attainment of the primary national ambient air quality standard for sulfur dioxide), respectively.

**(o) Indian tribes**

If an Indian tribe submits an implementation plan to the Administrator pursuant to section 7601(d) of this title, the plan shall be reviewed in accordance with the provisions for review set forth in this section for State plans, except as otherwise provided by regulation promulgated pursuant to section 7601(d)(2) of this title. When such plan becomes effective in accordance with the regulations promulgated under section 7601(d) of this title, the plan shall become applicable to all areas (except as expressly provided otherwise in the plan) located within the exterior boundaries of the reservation, notwithstanding the issuance of any patent and including rights-of-way running through the reservation.

**(p) Reports**

Any State shall submit, according to such schedule as the Administrator may prescribe, such reports as the Administrator may require relating to emission reductions, vehicle miles traveled, congestion levels, and any other information the Administrator may deem necessary to assess the development[3] effectiveness, need for revision, or implementation of any plan or plan revision required under this chapter.

(July 14, 1955, ch. 360, title I, §110, as added Pub. L. 91–604, §4(a), Dec. 31, 1970, 84 Stat. 1680; amended Pub. L. 93–319, §4, June 22, 1974, 88 Stat. 256; Pub. L. 95–95, title I, §§107, 108, Aug. 7, 1977, 91 Stat. 691, 693; Pub. L. 95–190, §14(a)(1)–(6), Nov. 16, 1977, 91 Stat. 1399; Pub. L. 97–23, §3, July 17, 1981, 95 Stat. 142; Pub. L. 101–549, title I, §§101(b)–(d), 102(h), 107(c), 108(d), title IV, §412, Nov. 15, 1990, 104 Stat. 2404–2408, 2422, 2464, 2466, 2634.)

<center>REFERENCES IN TEXT</center>

The Energy Supply and Environmental Coordination Act of 1974, referred to in subsec. (a)(3)(B), is Pub. L. 93–319, June 22, 1974, 88 Stat. 246, as amended, which is classified principally to chapter 16C (§791 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 791 of Title 15 and Tables.

Section 7413 of this title, referred to in subsecs. (a)(3)(C), (6), (f)(5), (g)(3), and i), was amended generally by Pub. L. 101–549, title VII, §701, Nov. 15, 1990, 104 Stat. 2672, and, as so amended, subsecs. (d) and (e) of section 7413 no longer relates to final compliance orders and steel industry compliance extension, respectively.

Section 1857c–10 of this title, as in effect before August 7, 1977, referred to in subsecs. (f)(5) and (g)(3), was in the original "section 119, as in effect before the date of the enactment of this paragraph", meaning section 119 of act July 14, 1955, ch. 360, title I, as added June 22, 1974, Pub. L. 93–319, §3, 88 Stat. 248, (which was classified to section 1857c–10 of this title) as in effect prior to the enactment of subsecs. (f)(5) and (g)(3) of this section by Pub. L. 95–95, §107, Aug. 7, 1977, 91 Stat. 691, effective Aug. 7, 1977. Section 112(b)(1) of Pub. L. 95–95 repealed section 119 of act July 14, 1955, ch. 360, title I, as added by Pub. L. 93–319, and provided that all references to such section 119 in any subsequent enactment which supersedes Pub. L. 93–319 shall be construed to refer to section 113(d) of the Clean Air Act and to paragraph (5) thereof in particular which is classified to section 7413(d)(5) of this title. Section 7413 of this title was subsequently amended generally by Pub. L. 101–549, title VII, §701, Nov. 15, 1990, 104 Stat. 2672, see note above. Section 117(b) of Pub. L. 95–95 added a new section 119 of act July 14, 1955, which is classified to section 7419 of this title.

<center>CODIFICATION</center>

Section was formerly classified to section 1857c–5 of this title.

<center>PRIOR PROVISIONS</center>

A prior section 110 of act July 14, 1955, was renumbered section 117 by Pub. L. 91–604 and is classified to section 7417 of this title.

<center>AMENDMENTS</center>

1990—Subsec. (a)(1). Pub. L. 101–549, §101(d)(8), substituted "3 years (or such shorter period as the Administrator may prescribe)" for "nine months" in two places.

Subsec. (a)(2). Pub. L. 101–549, §101(b), amended par. (2) generally, substituting present provisions for provisions setting the time within which the Administrator was to approve or disapprove a plan or portion thereof

---

[3] So in original. Probably should be followed by a comma.

and listing the conditions under which the plan or portion thereof was to be approved after reasonable notice and hearing.

Subsec. (a)(3)(A). Pub. L. 101–549, §101(d)(1), struck out subpar. (A) which directed Administrator to approve any revision of an implementation plan if it met certain requirements and had been adopted by the State after reasonable notice and public hearings.

Subsec. (a)(3)(D). Pub. L. 101–549, §101(d)(1), struck out subpar. (D) which directed that certain implementation plans be revised to include comprehensive measures and requirements.

Subsec. (a)(4). Pub. L. 101–549, §101(d)(2), struck out par. (4) which set forth requirements for review procedure.

Subsec. (c)(1). Pub. L. 101–549, §102(h), amended par. (1) generally, substituting present provisions for provisions relating to preparation and publication of regulations setting forth an implementation plan, after opportunity for a hearing, upon failure of a State to make required submission or revision.

Subsec. (c)(2)(A). Pub. L. 101–549, §101(d)(3)(A), struck out subpar. (A) which required a study and report on necessity of parking surcharge, management of parking supply, and preferential bus/carpool lane regulations to achieve and maintain national primary ambient air quality standards.

Subsec. (c)(2)(C). Pub. L. 101–549, §101(d)(3)(B), struck out subpar. (C) which authorized suspension of certain regulations and requirements relating to management of parking supply.

Subsec. (c)(4). Pub. L. 101–549, §101(d)(3)(C), struck out par. (4) which permitted Governors to temporarily suspend measures in implementation plans relating to retrofits, gas rationing, and reduction of on-street parking.

Subsec. (c)(5)(B). Pub. L. 101–549, §101(d)(3)(D), struck out "(including the written evidence required by part D)," after "include comprehensive measures".

Subsec. (d). Pub. L. 101–549, §101(d)(4), struck out subsec. (d) which defined an applicable implementation plan for purposes of this chapter.

Subsec. (e). Pub. L. 101–549, §101(d)(5), struck out subsec. (e) which permitted an extension of time for attainment of a national primary ambient air quality standard.

Subsec. (f)(1). Pub. L. 101–549, §412, inserted "or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets)" in subpar. (A) and in last sentence.

Subsec. (g)(1). Pub. L. 101–549, §101(d)(6), substituted "12 months of submission of the proposed plan revision" for "the required four month period" in closing provisions.

Subsec. (h)(1). Pub. L. 101–549, §101(d)(7), substituted "5 years after November 15, 1990, and every three years thereafter" for "one year after August 7, 1977, and annually thereafter" and struck out at end "Each such document shall be revised as frequently as practicable but not less often than annually."

Subsecs. (k) to (n). Pub. L. 101–549, §101(c), added subsecs. (k) to (n).

Subsec. (o). Pub. L. 101–549, §107(c), added subsec. (o).

Subsec. (p). Pub. L. 101–549, §108(d), added subsec. (p).

1981—Subsec. (a)(3)(C). Pub. L. 97–23 inserted reference to extensions of compliance in decrees entered under section 7413(e) of this title (relating to iron- and steel-producing operations).

1977—Subsec. (a)(2)(A). Pub. L. 95–95, §108(a)(1), substituted "(A) except as may be provided in subparagraph (I)(i) in the case of a plan" for "(A)(i) in the case of a plan".

Subsec. (a)(2)(B). Pub. L. 95–95, §108(a)(2), substituted "transportation controls, air quality maintenance plans, and preconstruction review of direct sources of air pollution as provided in subparagraph (D)" for "land use and transportation controls".

Subsec. (a)(2)(D). Pub. L. 95–95, §108(a)(3), substituted "it includes a program to provide for the enforcement of emission limitations and regulation of the modifica-

tion, construction, and operation of any stationary source, including a permit program as required in parts C and D and a permit or equivalent program for any major emitting facility, within such region as necessary to assure (i) that national ambient air quality standards are achieved and maintained, and (ii) a procedure" for "it includes a procedure".

Subsec. (a)(2)(E). Pub. L. 95–95, §108(a)(4), substituted "it contains adequate provisions (i) prohibiting any stationary source within the State from emitting any air pollutant in amounts which will (I) prevent attainment or maintenance by any other State of any such national primary or secondary ambient air quality standard, or (II) interfere with measures required to be included in the applicable implementation plan for any other State under part C to prevent significant deterioration of air quality or to protect visibility, and (ii) insuring compliance with the requirements of section 7426 of this title, relating to interstate pollution abatement" for "it contains adequate provisions for intergovernmental cooperation, including measures necessary to insure that emissions of air pollutants from sources located in any air quality control region will not interfere with the attainment or maintenance of such primary or secondary standard in any portion of such region outside of such State or in any other air quality control region".

Subsec. (a)(2)(F). Pub. L. 95–95, §108(a)(5), added cl. (vi).

Subsec. (a)(2)(H). Pub. L. 95–95, §14(a)(1), substituted "1977;" for "1977".

Pub. L. 95–95, §108(a)(6), inserted "except as provided in paragraph (3)(C)," after "or (ii)" and "or to otherwise comply with any additional requirements established under the Clean Air Act Amendments of 1977" after "to achieve the national ambient air quality primary or secondary standard which it implements".

Subsec. (a)(2)(I). Pub. L. 95–95, §108(b), added subpar. (I).

Subsec. (a)(2)(J). Pub. L. 95–190, §14(a)(2), substituted "; and" for ", and".

Pub. L. 95–95, §108(b), added subpar. (J).

Subsec. (a)(2)(K). Pub. L. 95–95, §108(b), added subpar. (K).

Subsec. (a)(3)(C). Pub. L. 95–95, §108(c), added subpar. (C).

Subsec. (a)(3)(D). Pub. L. 95–190, §14(a)(4), added subpar. (D).

Subsec. (a)(5). Pub. L. 95–95, §108(e), added par. (5).

Subsec. (a)(5)(D). Pub. L. 95–190, §14(a)(3), struck out "preconstruction or premodification" before "review".

Subsec. (a)(6). Pub. L. 95–95, §108(e), added par. (6).

Subsec. (c)(1). Pub. L. 95–95, §108(d)(1), (2), substituted "plan which meets the requirements of this section" for "plan for any national ambient air quality primary or secondary standard within the time prescribed" in subpar. (A) and, in provisions following subpar. (C), directed that any portion of a plan relating to any measure described in first sentence of 7421 of this title (relating to consultation) or the consultation process be required under such section 7421 of this title not be required to be promulgated before the date eight months after such date required for submission.

Subsec. (c)(3) to (5). Pub. L. 95–95, §108(d)(3), added pars. (3) to (5).

Subsec. (d). Pub. L. 95–95, §108(f), substituted "and which implements the requirements of this section" for "and which implements a national primary or secondary ambient air quality standard in a State".

Subsec. (f). Pub. L. 95–95, §107(a), substituted provisions relating to the handling of national or regional energy emergencies for provisions relating to the postponement of compliance by stationary sources or classes of moving sources with any requirement of applicable implementation plans.

Subsec. (g). Pub. L. 95–95, §108(g), added subsec. (g) relating to publication of comprehensive document.

Pub. L. 95–95, §107(b), added subsec. (g) relating to Governor's authority to issue temporary emergency suspensions.

Subsec. (h). Pub. L. 95–190, §14(a)(5), redesignated subsec. (g), added by Pub. L. 95–95, §108(g), as (h). Former subsec. (h) redesignated (i).

Subsec. (i). Pub. L. 95–190, §14(a)(5), redesignated subsec. (h), added by Pub. L. 95–95, §108(g), as (i). Former subsec. (i) redesignated (j) and amended.

Subsec. (j). Pub. L. 95–190 §14(a)(5), (6), redesignated subsec. (i), added by Pub. L. 95–95, §108(g), as (j) and in subsec. (j) as so redesignated, substituted ''will enable such source'' for ''at such source will enable it''.

1974—Subsec. (a)(3). Pub. L. 93–319, §4(a), designated existing provisions as subpar. (A) and added subpar. (B).

Subsec. (c). Pub. L. 93–319, §4(b), designated existing provisions as par. (1) and existing pars. (1), (2), and (3) as subpars. (A), (B), and (C), respectively, of such redesignated par. (1), and added par. (2).

EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF IMPLEMENTATION PLANS APPROVED AND IN EFFECT PRIOR TO AUG. 7, 1977

Nothing in the Clean Air Act Amendments of 1977 [Pub. L. 95–95] to affect any requirement of an approved implementation plan under this section or any other provision in effect under this chapter before Aug. 7, 1977, until modified or rescinded in accordance with this chapter as amended by the Clean Air Act Amendments of 1977, see section 406(c) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

SAVINGS PROVISION

Pub. L. 91–604, §16, Dec. 31, 1970, 84 Stat. 1713, provided that:

''(a)(1) Any implementation plan adopted by any State and submitted to the Secretary of Health, Education, and Welfare, or to the Administrator pursuant to the Clean Air Act [this chapter] prior to enactment of this Act [Dec. 31, 1970] may be approved under section 110 of the Clean Air Act [this section] (as amended by this Act) [Pub. L. 91–604] and shall remain in effect, unless the Administrator determines that such implementation plan, or any portion thereof, is not consistent with applicable requirements of the Clean Air Act [this chapter] (as amended by this Act) and will not provide for the attainment of national primary ambient air quality standards in the time required by such Act. If the Administrator so determines, he shall, within 90 days after promulgation of any national ambient air quality standards pursuant to section 109(a) of the Clean Air Act [section 7409(a) of this title], notify the State and specify in what respects changes are needed to meet the additional requirements of such Act, including requirements to implement national secondary ambient air quality standards. If such changes are not adopted by the State after public hearings and within six months after such notification, the Administrator shall promulgate such changes pursuant to section 110(c) of such Act [subsec. (c) of this section].

''(2) The amendments made by section 4(b) [amending sections 7403 and 7415 of this title] shall not be construed as repealing or modifying the powers of the Administrator with respect to any conference convened under section 108(d) of the Clean Air Act [section 7415 of this title] before the date of enactment of this Act [Dec. 31, 1970].

''(b) Regulations or standards issued under this title II of the Clean Air Act [subchapter II of this chapter] prior to the enactment of this Act [Dec. 31, 1970] shall continue in effect until revised by the Administrator consistent with the purposes of such Act [this chapter].''

FEDERAL ENERGY ADMINISTRATOR

''Federal Energy Administrator'', for purposes of this chapter, to mean Administrator of Federal Energy Administration established by Pub. L. 93–275, May 7, 1974, 88 Stat. 97, which is classified to section 761 et seq. of Title 15, Commerce and Trade, but with the term to mean any officer of the United States designated as such by the President until Federal Energy Administrator takes office and after Federal Energy Administration ceases to exist, see section 798 of Title 15, Commerce and Trade.

Federal Energy Administration terminated and functions vested by law in Administrator thereof transferred to Secretary of Energy (unless otherwise specifically provided) by sections 7151(a) and 7293 of this title.

## § 7411. Standards of performance for new stationary sources

### (a) Definitions

For purposes of this section:

(1) The term ''standard of performance'' means a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated.

(2) The term ''new source'' means any stationary source, the construction or modification of which is commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source.

(3) The term ''stationary source'' means any building, structure, facility, or installation which emits or may emit any air pollutant. Nothing in subchapter II of this chapter relating to nonroad engines shall be construed to apply to stationary internal combustion engines.

(4) The term ''modification'' means any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emit-

and the reports pursuant to subsection (d)(2) and any other relevant information, within eighteen months of receipt of the report referred to in subsection (d)(2) of this section, carry out the Administrator's regulatory responsibilities under section 7491 of this title, including criteria for measuring "reasonable progress" toward the national goal.

(2) Any regulations promulgated under section 7491 of this title pursuant to this subsection shall require affected States to revise within 12 months their implementation plans under section 7410 of this title to contain such emission limits, schedules of compliance, and other measures as may be necessary to carry out regulations promulgated pursuant to this subsection.

**(f) Grand Canyon visibility transport commission**

The Administrator pursuant to subsection (c)(1) shall, within 12 months, establish a visibility transport commission for the region affecting the visibility of the Grand Canyon National Park.

(July 14, 1955, ch. 360, title I, § 169B, as added Pub. L. 101–549, title VIII, § 816, Nov. 15, 1990, 104 Stat. 2695.)

REFERENCES IN TEXT

The Clean Air Act Amendments of 1990, referred to in subsec. (b), probably means Pub. L. 101–549, Nov. 15, 1990, 104 Stat. 2399. For complete classification of this Act to the Code, see Short Title note set out under section 7401 of this title and Tables.

The Federal Advisory Committee Act, referred to in subsec. (c)(1), is Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 770, as amended, which is set out in the Appendix to Title 5, Government Organization and Employees.

PART D—PLAN REQUIREMENTS FOR
NONATTAINMENT AREAS

SUBPART 1—NONATTAINMENT AREAS IN GENERAL

**§ 7501. Definitions**

For the purpose of this part—

(1) REASONABLE FURTHER PROGRESS.—The term "reasonable further progress" means such annual incremental reductions in emissions of the relevant air pollutant as are required by this part or may reasonably be required by the Administrator for the purpose of ensuring attainment of the applicable national ambient air quality standard by the applicable date.

(2) NONATTAINMENT AREA.—The term "nonattainment area" means, for any air pollutant, an area which is designated "nonattainment" with respect to that pollutant within the meaning of section 7407(d) of this title.

(3) The term "lowest achievable emission rate" means for any source, that rate of emissions which reflects—

(A) the most stringent emission limitation which is contained in the implementation plan of any State for such class or category of source, unless the owner or operator of the proposed source demonstrates that such limitations are not achievable, or

(B) the most stringent emission limitation which is achieved in practice by such class or category of source, whichever is more stringent.

In no event shall the application of this term permit a proposed new or modified source to emit any pollutant in excess of the amount allowable under applicable new source standards of performance.

(4) The terms "modifications" and "modified" mean the same as the term "modification" as used in section 7411(a)(4) of this title.

(July 14, 1955, ch. 360, title I, § 171, as added Pub. L. 95–95, title I, § 129(b), Aug. 7, 1977, 91 Stat. 745; amended Pub. L. 101–549, title I, § 102(a)(2), Nov. 15, 1990, 104 Stat. 2412.)

AMENDMENTS

1990—Pub. L. 101–549, § 102(a)(2)(A), struck out "and section 7410(a)(2)(I) of this title" after "purpose of this part".

Pars. (1), (2). Pub. L. 101–549, § 102(a)(2)(B), (C), amended pars. (1) and (2) generally. Prior to amendment, pars. (1) and (2) read as follows:

"(1) The term 'reasonable further progress' means annual incremental reductions in emissions of the applicable air pollutant (including substantial reductions in the early years following approval or promulgation of plan provisions under this part and section 7410(a)(2)(I) of this title and regular reductions thereafter) which are sufficient in the judgment of the Administrator, to provide for attainment of the applicable national ambient air quality standard by the date required in section 7502(a) of this title.

"(2) The term 'nonattainment area' means, for any air pollutant an area which is shown by monitored data or which is calculated by air quality modeling (or other methods determined by the Administrator to be reliable) to exceed any national ambient air quality standard for such pollutant. Such term includes any area identified under subparagraphs (A) through (C) of section 7407(d)(1) of this title."

EFFECTIVE DATE

Part effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

**§ 7502. Nonattainment plan provisions in general**

**(a) Classifications and attainment dates**

**(1) Classifications**

(A) On or after the date the Administrator promulgates the designation of an area as a nonattainment area pursuant to section 7407(d) of this title with respect to any national ambient air quality standard (or any revised standard, including a revision of any standard in effect on November 15, 1990), the Administrator may classify the area for the purpose of applying an attainment date pursuant to paragraph (2), and for other purposes. In determining the appropriate classification, if any, for a nonattainment area, the Administrator may consider such factors as the severity of nonattainment in such area and the availability and feasibility of the pollution control measures that the Administrator believes may be necessary to provide for attainment of such standard in such area.

(B) The Administrator shall publish a notice in the Federal Register announcing each classification under subparagraph (A), except the Administrator shall provide an opportunity for at least 30 days for written comment. Such classification shall not be subject to the provisions of sections 553 through 557 of title 5 (con-

cerning notice and comment) and shall not be subject to judicial review until the Administrator takes final action under subsection (k) or (*l*) of section 7410 of this title (concerning action on plan submissions) or section 7509 of this title (concerning sanctions) with respect to any plan submissions required by virtue of such classification.

(C) This paragraph shall not apply with respect to nonattainment areas for which classifications are specifically provided under other provisions of this part.

**(2) Attainment dates for nonattainment areas**

(A) The attainment date for an area designated nonattainment with respect to a national primary ambient air quality standard shall be the date by which attainment can be achieved as expeditiously as practicable, but no later than 5 years from the date such area was designated nonattainment under section 7407(d) of this title, except that the Administrator may extend the attainment date to the extent the Administrator determines appropriate, for a period no greater than 10 years from the date of designation as nonattainment, considering the severity of nonattainment and the availability and feasibility of pollution control measures.

(B) The attainment date for an area designated nonattainment with respect to a secondary national ambient air quality standard shall be the date by which attainment can be achieved as expeditiously as practicable after the date such area was designated nonattainment under section 7407(d) of this title.

(C) Upon application by any State, the Administrator may extend for 1 additional year (hereinafter referred to as the ''Extension Year'') the attainment date determined by the Administrator under subparagraph (A) or (B) if—

(i) the State has complied with all requirements and commitments pertaining to the area in the applicable implementation plan, and

(ii) in accordance with guidance published by the Administrator, no more than a minimal number of exceedances of the relevant national ambient air quality standard has occurred in the area in the year preceding the Extension Year.

No more than 2 one-year extensions may be issued under this subparagraph for a single nonattainment area.

(D) This paragraph shall not apply with respect to nonattainment areas for which attainment dates are specifically provided under other provisions of this part.

**(b) Schedule for plan submissions**

At the time the Administrator promulgates the designation of an area as nonattainment with respect to a national ambient air quality standard under section 7407(d) of this title, the Administrator shall establish a schedule according to which the State containing such area shall submit a plan or plan revision (including the plan items) meeting the applicable requirements of subsection (c) and section 7410(a)(2) of this title. Such schedule shall at a minimum, in-

clude a date or dates, extending no later than 3 years from the date of the nonattainment designation, for the submission of a plan or plan revision (including the plan items) meeting the applicable requirements of subsection (c) and section 7410(a)(2) of this title.

**(c) Nonattainment plan provisions**

The plan provisions (including plan items) required to be submitted under this part shall comply with each of the following:

**(1) In general**

Such plan provisions shall provide for the implementation of all reasonably available control measures as expeditiously as practicable (including such reductions in emissions from existing sources in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology) and shall provide for attainment of the national primary ambient air quality standards.

**(2) RFP**

Such plan provisions shall require reasonable further progress.

**(3) Inventory**

Such plan provisions shall include a comprehensive, accurate, current inventory of actual emissions from all sources of the relevant pollutant or pollutants in such area, including such periodic revisions as the Administrator may determine necessary to assure that the requirements of this part are met.

**(4) Identification and quantification**

Such plan provisions shall expressly identify and quantify the emissions, if any, of any such pollutant or pollutants which will be allowed, in accordance with section 7503(a)(1)(B) of this title, from the construction and operation of major new or modified stationary sources in each such area. The plan shall demonstrate to the satisfaction of the Administrator that the emissions quantified for this purpose will be consistent with the achievement of reasonable further progress and will not interfere with attainment of the applicable national ambient air quality standard by the applicable attainment date.

**(5) Permits for new and modified major stationary sources**

Such plan provisions shall require permits for the construction and operation of new or modified major stationary sources anywhere in the nonattainment area, in accordance with section 7503 of this title.

**(6) Other measures**

Such plan provisions shall include enforceable emission limitations, and such other control measures, means or techniques (including economic incentives such as fees, marketable permits, and auctions of emission rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to provide for attainment of such standard in such area by the applicable attainment date specified in this part.

**(7) Compliance with section 7410(a)(2)**

Such plan provisions shall also meet the applicable provisions of section 7410(a)(2) of this title.

**(8) Equivalent techniques**

Upon application by any State, the Administrator may allow the use of equivalent modeling, emission inventory, and planning procedures, unless the Administrator determines that the proposed techniques are, in the aggregate, less effective than the methods specified by the Administrator.

**(9) Contingency measures**

Such plan shall provide for the implementation of specific measures to be undertaken if the area fails to make reasonable further progress, or to attain the national primary ambient air quality standard by the attainment date applicable under this part. Such measures shall be included in the plan revision as contingency measures to take effect in any such case without further action by the State or the Administrator.

**(d) Plan revisions required in response to finding of plan inadequacy**

Any plan revision for a nonattainment area which is required to be submitted in response to a finding by the Administrator pursuant to section 7410(k)(5) of this title (relating to calls for plan revisions) must correct the plan deficiency (or deficiencies) specified by the Administrator and meet all other applicable plan requirements of section 7410 of this title and this part. The Administrator may reasonably adjust the dates otherwise applicable under such requirements to such revision (except for attainment dates that have not yet elapsed), to the extent necessary to achieve a consistent application of such requirements. In order to facilitate submittal by the States of adequate and approvable plans consistent with the applicable requirements of this chapter, the Administrator shall, as appropriate and from time to time, issue written guidelines, interpretations, and information to the States which shall be available to the public, taking into consideration any such guidelines, interpretations, or information provided before November 15, 1990.

**(e) Future modification of standard**

If the Administrator relaxes a national primary ambient air quality standard after November 15, 1990, the Administrator shall, within 12 months after the relaxation, promulgate requirements applicable to all areas which have not attained that standard as of the date of such relaxation. Such requirements shall provide for controls which are not less stringent than the controls applicable to areas designated nonattainment before such relaxation.

(July 14, 1955, ch. 360, title I, § 172, as added Pub. L. 95–95, title I, § 129(b), Aug. 7, 1977, 91 Stat. 746; amended Pub. L. 95–190, § 14(a)(55), (56), Nov. 16, 1977, 91 Stat. 1402; Pub. L. 101–549, title I, § 102(b), Nov. 15, 1990, 104 Stat. 2412.)

AMENDMENTS

1990—Pub. L. 101–549 amended section generally, substituting present provisions for provisions which related to: in subsec. (a), expeditious attainment of national ambient air quality standards; in subsec. (b), requisite provisions of plan; and in subsec. (c), attainment of applicable standard not later than July 1, 1987.

1977—Subsec. (b)(4). Pub. L. 95–190, § 14(a)(55), substituted "subsection (a)" for "paragraph (1)".

Subsec. (c). Pub. L. 95–190, § 14(a)(56), substituted "December 31" for "July 1".

NONATTAINMENT AREAS

Pub. L. 95–95, title I, § 129(a), Aug. 7, 1977, 91 Stat. 745, as amended by Pub. L. 95–190, § 14(b)(2), (3), Nov. 16, 1977, 91 Stat. 1404, provided that:

"(1) Before July 1, 1979, the interpretative regulation of the Administrator of the Environmental Protection Agency published in 41 Federal Register 55524–30, December 21, 1976, as may be modified by rule of the Administrator, shall apply except that the baseline to be used for determination of appropriate emission offsets under such regulation shall be the applicable implementation plan of the State in effect at the time of application for a permit by a proposed major stationary source (within the meaning of section 302 of the Clean Air Act) [section 7602 of this title].

"(2) Before July 1, 1979, the requirements of the regulation referred to in paragraph (1) shall be waived by the Administrator with respect to any pollutant if he determines that the State has—

"(A) an inventory of emissions of the applicable pollutant for each nonattainment area (as defined in section 171 of the Clean Air Act [section 7501 of this title]) that identifies the type, quantity, and source of such pollutant so as to provide information sufficient to demonstrate that the requirements of subparagraph (C) are being met;

"(B) an enforceable permit program which—

"(i) requires new or modified major stationary sources to meet emission limitations at least as stringent as required under the permit requirements referred to in paragraphs (2) and (3) of section 173 of the Clean Air Act [section 7503 of this title] (relating to lowest achievable emission rate and compliance by other sources) and which assures compliance with the annual reduction requirements of subparagraph (C); and

"(ii) requires existing sources to achieve such reduction in emissions in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology, and

"(C) a program which requires reductions in total allowable emissions in the area prior to July 1, 1979, so as to provide for the same level of emission reduction as would result from the application of the regulation referred to in paragraph (1).

The Administrator shall terminate such waiver if in his judgment the reduction in emissions actually being attained is less than the reduction on which the waiver was conditioned pursuant to subparagraph (C), or if the Administrator determines that the State is no longer in compliance with any requirement of this paragraph. Upon application by the State, the Administrator may reinstate a waiver terminated under the preceding sentence if he is satisfied that such State is in compliance with all requirements of this subsection.

"(3) Operating permits may be issued to those applicants who were properly granted construction permits, in accordance with the law and applicable regulations in effect at the time granted, for construction of a new or modified source in areas exceeding national primary air quality standards on or before the date of enactment of this Act [Aug. 7, 1977] if such construction permits were granted prior to the date of the enactment of this Act and the person issued any such permit is able to demonstrate that the emissions from the source will be within the limitations set forth in such construction permit."

STATE IMPLEMENTATION PLAN REVISION

Pub. L. 95–95, title I, § 129(c), Aug. 7, 1977, 91 Stat. 750, as amended by Pub. L. 95–190, § 14(b)(4), Nov. 16, 1977, 91 Stat. 1405, provided that: "Notwithstanding the requirements of section 406(d)(2) [set out as an Effective Date of 1977 Amendment note under section 7401 of this title] (relating to date required for submission of certain implementation plan revisions), for purposes of

section 110(a)(2) of the Clean Air Act [section 7410(a)(2) of this title] each State in which there is any non-attainment area (as defined in part D of title I of the Clean Air Act) [this part] shall adopt and submit an implementation plan revision which meets the requirements of section 110(a)(2)(I) [section 7410(a)(2)(I) of this title] and part D of [title I of the Clean Air Act [this part] not later than January 1, 1979. In the case of any State for which a plan revision adopted and submitted before such date has made the demonstration required under section 172(a)(2) of the Clean Air Act [subsec. (a)(2) of this section] (respecting impossibility of attainment before 1983), such State shall adopt and submit to the Administrator a plan revision before July 1, 1982, which meets the requirements of section 172(b) and (c) of such Act [subsecs. (b) and (c) of this section].''

### § 7503. Permit requirements

#### (a) In general

The permit program required by section 7502(b)(6)[1] of this title shall provide that permits to construct and operate may be issued if—

(1) in accordance with regulations issued by the Administrator for the determination of baseline emissions in a manner consistent with the assumptions underlying the applicable implementation plan approved under section 7410 of this title and this part, the permitting agency determines that—

(A) by the time the source is to commence operation, sufficient offsetting emissions reductions have been obtained, such that total allowable emissions from existing sources in the region, from new or modified sources which are not major emitting facilities, and from the proposed source will be sufficiently less than total emissions from existing sources (as determined in accordance with the regulations under this paragraph) prior to the application for such permit to construct or modify so as to represent (when considered together with the plan provisions required under section 7502 of this title) reasonable further progress (as defined in section 7501 of this title); or

(B) in the case of a new or modified major stationary source which is located in a zone (within the nonattainment area) identified by the Administrator, in consultation with the Secretary of Housing and Urban Development, as a zone to which economic development should be targeted, that emissions of such pollutant resulting from the proposed new or modified major stationary source will not cause or contribute to emissions levels which exceed the allowance permitted for such pollutant for such area from new or modified major stationary sources under section 7502(c) of this title;

(2) the proposed source is required to comply with the lowest achievable emission rate;

(3) the owner or operator of the proposed new or modified source has demonstrated that all major stationary sources owned or operated by such person (or by any entity controlling, controlled by, or under common control with such person) in such State are subject to emission limitations and are in compliance, or on a schedule for compliance, with all applica-

ble emission limitations and standards under this chapter; and[2]

(4) the Administrator has not determined that the applicable implementation plan is not being adequately implemented for the nonattainment area in which the proposed source is to be constructed or modified in accordance with the requirements of this part; and

(5) an analysis of alternative sites, sizes, production processes, and environmental control techniques for such proposed source demonstrates that benefits of the proposed source significantly outweigh the environmental and social costs imposed as a result of its location, construction, or modification.

Any emission reductions required as a precondition of the issuance of a permit under paragraph (1) shall be federally enforceable before such permit may be issued.

#### (b) Prohibition on use of old growth allowances

Any growth allowance included in an applicable implementation plan to meet the requirements of section 7502(b)(5) of this title (as in effect immediately before November 15, 1990) shall not be valid for use in any area that received or receives a notice under section 7410(a)(2)(H)(ii) of this title (as in effect immediately before November 15, 1990) or under section 7410(k)(1) of this title that its applicable implementation plan containing such allowance is substantially inadequate.

#### (c) Offsets

(1) The owner or operator of a new or modified major stationary source may comply with any offset requirement in effect under this part for increased emissions of any air pollutant only by obtaining emission reductions of such air pollutant from the same source or other sources in the same nonattainment area, except that the State may allow the owner or operator of a source to obtain such emission reductions in another nonattainment area if (A) the other area has an equal or higher nonattainment classification than the area in which the source is located and (B) emissions from such other area contribute to a violation of the national ambient air quality standard in the nonattainment area in which the source is located. Such emission reductions shall be, by the time a new or modified source commences operation, in effect and enforceable and shall assure that the total tonnage of increased emissions of the air pollutant from the new or modified source shall be offset by an equal or greater reduction, as applicable, in the actual emissions of such air pollutant from the same or other sources in the area.

(2) Emission reductions otherwise required by this chapter shall not be creditable as emissions reductions for purposes of any such offset requirement. Incidental emission reductions which are not otherwise required by this chapter shall be creditable as emission reductions for such purposes if such emission reductions meet the requirements of paragraph (1).

#### (d) Control technology information

The State shall provide that control technology information from permits issued under

---

[1] See References in Text note below.

[2] So in original. The word ''and'' probably should not appear.

**(d) Attainment of PM–10 levels**

Notwithstanding any other provision of law, any State that establishes to the satisfaction of the Administrator that, with respect to a PM–10 nonattainment area in such State, such State would have attained the national ambient air quality standard for carbon monoxide by the applicable attainment date, but for emissions emanating from outside the United States, shall not be subject to the provisions of section 7513(b)(2) of this title.

(July 14, 1955, ch. 360, title I, §179B, as added Pub. L. 101–549, title VIII, §818, Nov. 15, 1990, 104 Stat. 2697.)

ESTABLISHMENT OF PROGRAM TO MONITOR AND IM-PROVE AIR QUALITY IN REGIONS ALONG BORDER BE-TWEEN UNITED STATES AND MEXICO

Pub. L. 101–549, title VIII, §815, Nov. 15, 1990, 104 Stat. 2693, provided that:

''(a) IN GENERAL.—The Administrator of the Environmental Protection Agency (hereinafter referred to as the 'Administrator') is authorized, in cooperation with the Department of State and the affected States, to negotiate with representatives of Mexico to authorize a program to monitor and improve air quality in regions along the border between the United States and Mexico. The program established under this section shall not extend beyond July 1, 1995.

''(b) MONITORING AND REMEDIATION.—

''(1) MONITORING.—The monitoring component of the program conducted under this section shall identify and determine sources of pollutants for which national ambient air quality standards (hereinafter referred to as 'NAAQS') and other air quality goals have been established in regions along the border between the United States and Mexico. Any such monitoring component of the program shall include, but not be limited to, the collection of meteorological data, the measurement of air quality, the compilation of an emissions inventory, and shall be sufficient to the extent necessary to successfully support the use of a state-of-the-art mathematical air modeling analysis. Any such monitoring component of the program shall collect and produce data projecting the level of emission reductions necessary in both Mexico and the United States to bring about attainment of both primary and secondary NAAQS, and other air quality goals, in regions along the border in the United States. Any such monitoring component of the program shall include to the extent possible, data from monitoring programs undertaken by other parties.

''(2) REMEDIATION.—The Administrator is authorized to negotiate with appropriate representatives of Mexico to develop joint remediation measures to reduce the level of airborne pollutants to achieve and maintain primary and secondary NAAQS, and other air quality goals, in regions along the border between the United States and Mexico. Such joint remediation measures may include, but not be limited to measures included in the Environmental Protection Agency's Control Techniques and Control Technology documents. Any such remediation program shall also identify those control measures implementation of which in Mexico would be expedited by the use of material and financial assistance of the United States.

''(c) ANNUAL REPORTS.—The Administrator shall, each year the program authorized in this section is in operation, report to Congress on the progress of the program in bringing nonattainment areas along the border of the United States into attainment with primary and secondary NAAQS. The report issued by the Administrator under this paragraph shall include recommendations on funding mechanisms to assist in implementation of monitoring and remediation efforts.

''(d) FUNDING AND PERSONNEL.—The Administrator may, where appropriate, make available, subject to the appropriations, such funds, personnel, and equipment as may be necessary to implement the provisions of this section. In those cases where direct financial assistance of the United States is provided to implement monitoring and remediation programs in Mexico, the Administrator shall develop grant agreements with appropriate representatives of Mexico to assure the accuracy and completeness of monitoring data and the performance of remediation measures which are financed by the United States. With respect to any control measures within Mexico funded by the United States, the Administrator shall, to the maximum extent practicable, utilize resources of Mexico where such utilization would reduce costs to the United States. Such funding agreements shall include authorization for the Administrator to—

''(1) review and agree to plans for monitoring and remediation;

''(2) inspect premises, equipment and records to insure compliance with the agreements established under and the purposes set forth in this section; and

''(3) where necessary, develop grant agreements with affected States to carry out the provisions of this section.''

SUBPART 2—ADDITIONAL PROVISIONS FOR OZONE NONATTAINMENT AREAS

§ 7511. Classifications and attainment dates

**(a) Classification and attainment dates for 1989 nonattainment areas**

(1) Each area designated nonattainment for ozone pursuant to section 7407(d) of this title shall be classified at the time of such designation, under table 1, by operation of law, as a Marginal Area, a Moderate Area, a Serious Area, a Severe Area, or an Extreme Area based on the design value for the area. The design value shall be calculated according to the interpretation methodology issued by the Administrator most recently before November 15, 1990. For each area classified under this subsection, the primary standard attainment date for ozone shall be as expeditiously as practicable but not later than the date provided in table 1.

TABLE 1

| Area class | Design value* | Primary standard attainment date** |
|---|---|---|
| Marginal .. | 0.121 up to 0.138 ... | 3 years after November 15, 1990 |
| Moderate .. | 0.138 up to 0.160 ... | 6 years after November 15, 1990 |
| Serious ..... | 0.160 up to 0.180 ... | 9 years after November 15, 1990 |
| Severe ...... | 0.180 up to 0.280 ... | 15 years after November 15, 1990 |
| Extreme ... | 0.280 and above ... | 20 years after November 15, 1990 |

*The design value is measured in parts per million (ppm).
**The primary standard attainment date is measured from November 15, 1990.

(2) Notwithstanding table 1, in the case of a severe area with a 1988 ozone design value between 0.190 and 0.280 ppm, the attainment date shall be 17 years (in lieu of 15 years) after November 15, 1990.

(3) At the time of publication of the notice under section 7407(d)(4) of this title (relating to area designations) for each ozone nonattainment area, the Administrator shall publish a notice announcing the classification of such ozone non-

attainment area. The provisions of section 7502(a)(1)(B) of this title (relating to lack of notice and comment and judicial review) shall apply to such classification.

(4) If an area classified under paragraph (1) (Table 1) would have been classified in another category if the design value in the area were 5 percent greater or 5 percent less than the level on which such classification was based, the Administrator may, in the Administrator's discretion, within 90 days after the initial classification, by the procedure required under paragraph (3), adjust the classification to place the area in such other category. In making such adjustment, the Administrator may consider the number of exceedances of the national primary ambient air quality standard for ozone in the area, the level of pollution transport between the area and other affected areas, including both intrastate and interstate transport, and the mix of sources and air pollutants in the area.

(5) Upon application by any State, the Administrator may extend for 1 additional year (hereinafter referred to as the "Extension Year") the date specified in table 1 of paragraph (1) of this subsection if—

(A) the State has complied with all requirements and commitments pertaining to the area in the applicable implementation plan, and

(B) no more than 1 exceedance of the national ambient air quality standard level for ozone has occurred in the area in the year preceding the Extension Year.

No more than 2 one-year extensions may be issued under this paragraph for a single non-attainment area.

**(b) New designations and reclassifications**

**(1) New designations to nonattainment**

Any area that is designated attainment or unclassifiable for ozone under section 7407(d)(4) of this title, and that is subsequently redesignated to nonattainment for ozone under section 7407(d)(3) of this title, shall, at the time of the redesignation, be classified by operation of law in accordance with table 1 under subsection (a). Upon its classification, the area shall be subject to the same requirements under section 7410 of this title, subpart 1 of this part, and this subpart that would have applied had the area been so classified at the time of the notice under subsection (a)(3), except that any absolute, fixed date applicable in connection with any such requirement is extended by operation of law by a period equal to the length of time between November 15, 1990, and the date the area is classified under this paragraph.

**(2) Reclassification upon failure to attain**

(A) Within 6 months following the applicable attainment date (including any extension thereof) for an ozone nonattainment area, the Administrator shall determine, based on the area's design value (as of the attainment date), whether the area attained the standard by that date. Except for any Severe or Extreme area, any area that the Administrator finds has not attained the standard by that date shall be reclassified by operation of law

in accordance with table 1 of subsection (a) to the higher of—

(i) the next higher classification for the area, or

(ii) the classification applicable to the area's design value as determined at the time of the notice required under subparagraph (B).

No area shall be reclassified as Extreme under clause (ii).

(B) The Administrator shall publish a notice in the Federal Register, no later than 6 months following the attainment date, identifying each area that the Administrator has determined under subparagraph (A) as having failed to attain and identifying the reclassification, if any, described under subparagraph (A).

**(3) Voluntary reclassification**

The Administrator shall grant the request of any State to reclassify a nonattainment area in that State in accordance with table 1 of subsection (a) to a higher classification. The Administrator shall publish a notice in the Federal Register of any such request and of action by the Administrator granting the request.

**(4) Failure of Severe Areas to attain standard**

(A) If any Severe Area fails to achieve the national primary ambient air quality standard for ozone by the applicable attainment date (including any extension thereof), the fee provisions under section 7511d of this title shall apply within the area, the percent reduction requirements of section 7511a(c)(2)(B) and (C) of this title (relating to reasonable further progress demonstration and NOₓ control) shall continue to apply to the area, and the State shall demonstrate that such percent reduction has been achieved in each 3-year interval after such failure until the standard is attained. Any failure to make such a demonstration shall be subject to the sanctions provided under this part.

(B) In addition to the requirements of subparagraph (A), if the ozone design value for a Severe Area referred to in subparagraph (A) is above 0.140 ppm for the year of the applicable attainment date, or if the area has failed to achieve its most recent milestone under section 7511a(g) of this title, the new source review requirements applicable under this subpart in Extreme Areas shall apply in the area and the term[1] "major source" and "major stationary source" shall have the same meaning as in Extreme Areas.

(C) In addition to the requirements of subparagraph (A) for those areas referred to in subparagraph (A) and not covered by subparagraph (B), the provisions referred to in subparagraph (B) shall apply after 3 years from the applicable attainment date unless the area has attained the standard by the end of such 3-year period.

(D) If, after November 15, 1990, the Administrator modifies the method of determining compliance with the national primary ambi-

---

[1] So in original. Probably should be "terms".

ent air quality standard, a design value or other indicator comparable to 0.140 in terms of its relationship to the standard shall be used in lieu of 0.140 for purposes of applying the provisions of subparagraphs (B) and (C).

**(c) References to terms**

(1) Any reference in this subpart to a "Marginal Area", a "Moderate Area", a "Serious Area", a "Severe Area", or an "Extreme Area" shall be considered a reference to a Marginal Area, a Moderate Area, a Serious Area, a Severe Area, or an Extreme Area as respectively classified under this section.

(2) Any reference in this subpart to "next higher classification" or comparable terms shall be considered a reference to the classification related to the next higher set of design values in table 1.

(July 14, 1955, ch. 360, title I, § 181, as added Pub. L. 101–549, title I, § 103, Nov. 15, 1990, 104 Stat. 2423.)

EXEMPTIONS FOR STRIPPER WELLS

Pub. L. 101–549, title VIII, § 819, Nov. 15, 1990, 104 Stat. 2698, provided that: "Notwithstanding any other provision of law, the amendments to the Clean Air Act made by section 103 of the Clean Air Act Amendments of 1990 [enacting this section and sections 7511a to 7511f of this title] (relating to additional provisions for ozone nonattainment areas), by section 104 of such amendments [enacting sections 7512 and 7512a of this title] (relating to additional provisions for carbon monoxide nonattainment areas), by section 105 of such amendments [enacting sections 7513 to 7513b of this title and amending section 7476 of this title] (relating to additional provisions for PM–10 nonattainment areas), and by section 106 of such amendments [enacting sections 7514 and 7514a of this title] (relating to additional provisions for areas designated as nonattainment for sulfur oxides, nitrogen dioxide, and lead) shall not apply with respect to the production of and equipment used in the exploration, production, development, storage or processing of—

"(1) oil from a stripper well property, within the meaning of the June 1979 energy regulations (within the meaning of section 4996(b)(7) of the Internal Revenue Code of 1986 [26 U.S.C. 4996(b)(7)], as in effect before the repeal of such section); and

"(2) stripper well natural gas, as defined in section 108(b) of the Natural Gas Policy Act of 1978 (15 U.S.C. 3318(b)),[,]

except to the extent that provisions of such amendments cover areas designated as Serious pursuant to part D of title I of the Clean Air Act [this part] and having a population of 350,000 or more, or areas designated as Severe or Extreme pursuant to such part D."

## § 7511a. Plan submissions and requirements

**(a) Marginal Areas**

Each State in which all or part of a Marginal Area is located shall, with respect to the Marginal Area (or portion thereof, to the extent specified in this subsection), submit to the Administrator the State implementation plan revisions (including the plan items) described under this subsection except to the extent the State has made such submissions as of November 15, 1990.

**(1) Inventory**

Within 2 years after November 15, 1990, the State shall submit a comprehensive, accurate, current inventory of actual emissions from all sources, as described in section 7502(c)(3) of this title, in accordance with guidance provided by the Administrator.

**(2) Corrections to the State implementation plan**

Within the periods prescribed in this paragraph, the State shall submit a revision to the State implementation plan that meets the following requirements—

**(A) Reasonably available control technology corrections**

For any Marginal Area (or, within the Administrator's discretion, portion thereof) the State shall submit, within 6 months of the date of classification under section 7511(a) of this title, a revision that includes such provisions to correct requirements in (or add requirements to) the plan concerning reasonably available control technology as were required under section 7502(b) of this title (as in effect immediately before November 15, 1990), as interpreted in guidance issued by the Administrator under section 7408 of this title before November 15, 1990.

**(B) Savings clause for vehicle inspection and maintenance**

(i) For any Marginal Area (or, within the Administrator's discretion, portion thereof), the plan for which already includes, or was required by section 7502(b)(11)(B) of this title (as in effect immediately before November 15, 1990) to have included, a specific schedule for implementation of a vehicle emission control inspection and maintenance program, the State shall submit, immediately after November 15, 1990, a revision that includes any provisions necessary to provide for a vehicle inspection and maintenance program of no less stringency than that of either the program defined in House Report Numbered 95–294, 95th Congress, 1st Session, 281–291 (1977) as interpreted in guidance of the Administrator issued pursuant to section 7502(b)(11)(B) of this title (as in effect immediately before November 15, 1990) or the program already included in the plan, whichever is more stringent.

(ii) Within 12 months after November 15, 1990, the Administrator shall review, revise, update, and republish in the Federal Register the guidance for the States for motor vehicle inspection and maintenance programs required by this chapter, taking into consideration the Administrator's investigations and audits of such program. The guidance shall, at a minimum, cover the frequency of inspections, the types of vehicles to be inspected (which shall include leased vehicles that are registered in the nonattainment area), vehicle maintenance by owners and operators, audits by the State, the test method and measures, including whether centralized or decentralized, inspection methods and procedures, quality of inspection, components covered, assurance that a vehicle subject to a recall notice from a manufacturer has complied with that notice, and effective implementation and enforcement, including ensuring that any re-

volve persons who are not prime contractors or direct recipients of Federal assistance by way of contracts, grants, or loans.

(b) Federal agencies shall reconsider any exemption granted under subsection (a) whenever requested to do so by the Administrator.

(c) The Administrator shall annually notify the President and the Congress of all exemptions granted, or in effect, under this Order during the preceding year.

SEC. 9. *Related Actions.* The imposition of any sanction or penalty under or pursuant to this Order shall not relieve any person of any legal duty to comply with any provisions of the Air Act or the Water Act.

SEC. 10. *Applicability.* This Order shall not apply to contracts, grants, or loans involving the use of facilities located outside the United States.

SEC. 11. *Uniformity.* Rules, regulations, standards, and guidelines issued pursuant to this order and section 508 of the Water Act [33 U.S.C. 1368] shall, to the maximum extent feasible, be uniform with regulations issued pursuant to this order, Executive Order No. 11602 of June 29, 1971 [formerly set out above], and section 306 of the Air Act [this section].

SEC. 12. *Order Superseded.* Executive Order No. 11602 of June 29, 1971, is hereby superseded.

RICHARD NIXON.

## § 7607. Administrative proceedings and judicial review

### (a) Administrative subpenas; confidentiality; witnesses

In connection with any determination under section 7410(f) of this title, or for purposes of obtaining information under section 7521(b)(4)[1] or 7545(c)(3) of this title, any investigation, monitoring, reporting requirement, entry, compliance inspection, or administrative enforcement proceeding under the[2] chapter (including but not limited to section 7413, section 7414, section 7420, section 7429, section 7477, section 7524, section 7525, section 7542, section 7603, or section 7606 of this title),,[3] the Administrator may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and he may administer oaths. Except for emission data, upon a showing satisfactory to the Administrator by such owner or operator that such papers, books, documents, or information or particular part thereof, if made public, would divulge trade secrets or secret processes of such owner or operator, the Administrator shall consider such record, report, or information or particular portion thereof confidential in accordance with the purposes of section 1905 of title 18, except that such paper, book, document, or information may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter, to persons carrying out the National Academy of Sciences' study and investigation provided for in section 7521(c) of this title, or when relevant in any proceeding under this chapter. Witnesses summoned shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpena served upon any person under this subparagraph,[4] the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Administrator to appear and produce papers, books, and documents before the Administrator, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

### (b) Judicial review

(1) A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 7412 of this title, any standard of performance or requirement under section 7411 of this title,[3] any standard under section 7521 of this title (other than a standard required to be prescribed under section 7521(b)(1) of this title), any determination under section 7521(b)(5)[1] of this title, any control or prohibition under section 7545 of this title, any standard under section 7571 of this title, any rule issued under section 7413, 7419, or under section 7420 of this title, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 7410 of this title or section 7411(d) of this title, any order under section 7411(j) of this title, under section 7412 of this title, under section 7419 of this title, or under section 7420 of this title, or his action under section 1857c–10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977) or under regulations thereunder, or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title, or any other final action of the Administrator under this chapter (including any denial or disapproval by the Administrator under subchapter I) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise. The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule

---

[1] See References in Text note below.
[2] So in original. Probably should be "this".
[3] So in original.
[4] So in original. Probably should be "subsection,".

or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.

(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement. Where a final decision by the Administrator defers performance of any nondiscretionary statutory action to a later time, any person may challenge the deferral pursuant to paragraph (1).

**(c) Additional evidence**

In any judicial proceeding in which review is sought of a determination under this chapter required to be made on the record after notice and opportunity for hearing, if any party applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as to [5] the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence.

**(d) Rulemaking**

(1) This subsection applies to—

(A) the promulgation or revision of any national ambient air quality standard under section 7409 of this title,

(B) the promulgation or revision of an implementation plan by the Administrator under section 7410(c) of this title,

(C) the promulgation or revision of any standard of performance under section 7411 of this title, or emission standard or limitation under section 7412(d) of this title, any standard under section 7412(f) of this title, or any regulation under section 7412(g)(1)(D) and (F) of this title, or any regulation under section 7412(m) or (n) of this title,

(D) the promulgation of any requirement for solid waste combustion under section 7429 of this title,

(E) the promulgation or revision of any regulation pertaining to any fuel or fuel additive under section 7545 of this title,

(F) the promulgation or revision of any aircraft emission standard under section 7571 of this title,

(G) the promulgation or revision of any regulation under subchapter IV–A (relating to control of acid deposition),

(H) promulgation or revision of regulations pertaining to primary nonferrous smelter orders under section 7419 of this title (but not including the granting or denying of any such order),

(I) promulgation or revision of regulations under subchapter VI (relating to stratosphere and ozone protection),

(J) promulgation or revision of regulations under part C of subchapter I (relating to prevention of significant deterioration of air quality and protection of visibility),

(K) promulgation or revision of regulations under section 7521 of this title and test procedures for new motor vehicles or engines under section 7525 of this title, and the revision of a standard under section 7521(a)(3) of this title,

(L) promulgation or revision of regulations for noncompliance penalties under section 7420 of this title,

(M) promulgation or revision of any regulations promulgated under section 7541 of this title (relating to warranties and compliance by vehicles in actual use),

(N) action of the Administrator under section 7426 of this title (relating to interstate pollution abatement),

(O) the promulgation or revision of any regulation pertaining to consumer and commercial products under section 7511b(e) of this title,

(P) the promulgation or revision of any regulation pertaining to field citations under section 7413(d)(3) of this title,

(Q) the promulgation or revision of any regulation pertaining to urban buses or the clean-fuel vehicle, clean-fuel fleet, and clean fuel programs under part C of subchapter II,

(R) the promulgation or revision of any regulation pertaining to nonroad engines or nonroad vehicles under section 7547 of this title,

(S) the promulgation or revision of any regulation relating to motor vehicle compliance program fees under section 7552 of this title,

(T) the promulgation or revision of any regulation under subchapter IV–A (relating to acid deposition),

(U) the promulgation or revision of any regulation under section 7511b(f) of this title pertaining to marine vessels, and

(V) such other actions as the Administrator may determine.

The provisions of section 553 through 557 and section 706 of title 5 shall not, except as expressly provided in this subsection, apply to actions to which this subsection applies. This subsection shall not apply in the case of any rule or circumstance referred to in subparagraphs (A) or (B) of subsection 553(b) of title 5.

(2) Not later than the date of proposal of any action to which this subsection applies, the Administrator shall establish a rulemaking docket for such action (hereinafter in this subsection referred to as a "rule"). Whenever a rule applies only within a particular State, a second (identical) docket shall be simultaneously established in the appropriate regional office of the Environmental Protection Agency.

(3) In the case of any rule to which this subsection applies, notice of proposed rulemaking shall be published in the Federal Register, as provided under section 553(b) of title 5, shall be accompanied by a statement of its basis and purpose and shall specify the period available for public comment (hereinafter referred to as

---

[5] So in original. The word "to" probably should not appear.

the "comment period"). The notice of proposed rulemaking shall also state the docket number, the location or locations of the docket, and the times it will be open to public inspection. The statement of basis and purpose shall include a summary of—

(A) the factual data on which the proposed rule is based;

(B) the methodology used in obtaining the data and in analyzing the data; and

(C) the major legal interpretations and policy considerations underlying the proposed rule.

The statement shall also set forth or summarize and provide a reference to any pertinent findings, recommendations, and comments by the Scientific Review Committee established under section 7409(d) of this title and the National Academy of Sciences, and, if the proposal differs in any important respect from any of these recommendations, an explanation of the reasons for such differences. All data, information, and documents referred to in this paragraph on which the proposed rule relies shall be included in the docket on the date of publication of the proposed rule.

(4)(A) The rulemaking docket required under paragraph (2) shall be open for inspection by the public at reasonable times specified in the notice of proposed rulemaking. Any person may copy documents contained in the docket. The Administrator shall provide copying facilities which may be used at the expense of the person seeking copies, but the Administrator may waive or reduce such expenses in such instances as the public interest requires. Any person may request copies by mail if the person pays the expenses, including personnel costs to do the copying.

(B)(i) Promptly upon receipt by the agency, all written comments and documentary information on the proposed rule received from any person for inclusion in the docket during the comment period shall be placed in the docket. The transcript of public hearings, if any, on the proposed rule shall also be included in the docket promptly upon receipt from the person who transcribed such hearings. All documents which become available after the proposed rule has been published and which the Administrator determines are of central relevance to the rulemaking shall be placed in the docket as soon as possible after their availability.

(ii) The drafts of proposed rules submitted by the Administrator to the Office of Management and Budget for any interagency review process prior to proposal of any such rule, all documents accompanying such drafts, and all written comments thereon by other agencies and all written responses to such written comments by the Administrator shall be placed in the docket no later than the date of proposal of the rule. The drafts of the final rule submitted for such review process prior to promulgation and all written comments thereon, all documents accompanying such drafts, and written responses thereto shall be placed in the docket no later than the date of promulgation.

(5) In promulgating a rule to which this subsection applies (i) the Administrator shall allow any person to submit written comments, data, or documentary information; (ii) the Administrator shall give interested persons an opportunity for the oral presentation of data, views, or arguments, in addition to an opportunity to make written submissions; (iii) a transcript shall be kept of any oral presentation; and (iv) the Administrator shall keep the record of such proceeding open for thirty days after completion of the proceeding to provide an opportunity for submission of rebuttal and supplementary information.

(6)(A) The promulgated rule shall be accompanied by (i) a statement of basis and purpose like that referred to in paragraph (3) with respect to a proposed rule and (ii) an explanation of the reasons for any major changes in the promulgated rule from the proposed rule.

(B) The promulgated rule shall also be accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period.

(C) The promulgated rule may not be based (in part or whole) on any information or data which has not been placed in the docket as of the date of such promulgation.

(7)(A) The record for judicial review shall consist exclusively of the material referred to in paragraph (3), clause (i) of paragraph (4)(B), and subparagraphs (A) and (B) of paragraph (6).

(B) Only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review. If the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule, the Administrator shall convene a proceeding for reconsideration of the rule and provide the same procedural rights as would have been afforded had the information been available at the time the rule was proposed. If the Administrator refuses to convene such a proceeding, such person may seek review of such refusal in the United States court of appeals for the appropriate circuit (as provided in subsection (b)). Such reconsideration shall not postpone the effectiveness of the rule. The effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for a period not to exceed three months.

(8) The sole forum for challenging procedural determinations made by the Administrator under this subsection shall be in the United States court of appeals for the appropriate circuit (as provided in subsection (b)) at the time of the substantive review of the rule. No interlocutory appeals shall be permitted with respect to such procedural determinations. In reviewing alleged procedural errors, the court may invalidate the rule only if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made.

(9) In the case of review of any action of the Administrator to which this subsection applies,

the court may reverse any such action found to be—

　　(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

　　(B) contrary to constitutional right, power, privilege, or immunity;

　　(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or

　　(D) without observance of procedure required by law, if (i) such failure to observe such procedure is arbitrary or capricious, (ii) the requirement of paragraph (7)(B) has been met, and (iii) the condition of the last sentence of paragraph (8) is met.

　(10) Each statutory deadline for promulgation of rules to which this subsection applies which requires promulgation less than six months after date of proposal may be extended to not more than six months after date of proposal by the Administrator upon a determination that such extension is necessary to afford the public, and the agency, adequate opportunity to carry out the purposes of this subsection.

　(11) The requirements of this subsection shall take effect with respect to any rule the proposal of which occurs after ninety days after August 7, 1977.

**(e) Other methods of judicial review not authorized**

　Nothing in this chapter shall be construed to authorize judicial review of regulations or orders of the Administrator under this chapter, except as provided in this section.

**(f) Costs**

　In any judicial proceeding under this section, the court may award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such award is appropriate.

**(g) Stay, injunction, or similar relief in proceedings relating to noncompliance penalties**

　In any action respecting the promulgation of regulations under section 7420 of this title or the administration or enforcement of section 7420 of this title no court shall grant any stay, injunctive, or similar relief before final judgment by such court in such action.

**(h) Public participation**

　It is the intent of Congress that, consistent with the policy of subchapter II of chapter 5 of title 5, the Administrator in promulgating any regulation under this chapter, including a regulation subject to a deadline, shall ensure a reasonable period for public participation of at least 30 days, except as otherwise expressly provided in section [6] 7407(d), 7502(a), 7511(a) and (b), and 7512(a) and (b) of this title.

(July 14, 1955, ch. 360, title III, § 307, as added Pub. L. 91–604, § 12(a), Dec. 31, 1970, 84 Stat. 1707; amended Pub. L. 92–157, title III, § 302(a), Nov. 18, 1971, 85 Stat. 464; Pub. L. 93–319, § 6(c), June 22, 1974, 88 Stat. 259; Pub. L. 95–95, title III, §§ 303(d), 305(a), (c), (f)–(h), Aug. 7, 1977, 91 Stat. 772, 776, 777; Pub. L. 95–190, § 14(a)(79), (80), Nov. 16, 1977,

--------

[6] So in original. Probably should be "sections".

91 Stat. 1404; Pub. L. 101–549, title I, §§ 108(p), 110(5), title III, § 302(g), (h), title VII, §§ 702(c), 703, 706, 707(h), 710(5), Nov. 15, 1990, 104 Stat. 2469, 2470, 2574, 2681–2684.)

REFERENCES IN TEXT

　Section 7521(b)(4) of this title, referred to in subsec. (a), was repealed by Pub. L. 101–549, title II, § 230(2), Nov. 15, 1990, 104 Stat. 2529.

　Section 7521(b)(5) of this title, referred to in subsec. (b)(1), was repealed by Pub. L. 101–549, title II, § 230(3), Nov. 15, 1990, 104 Stat. 2529.

　Section 1857c–10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977, referred to in subsec. (b)(1), was in the original "section 119(c)(2)(A), (B), or (C) (as in effect before the date of enactment of the Clean Air Act Amendments of 1977)", meaning section 119 of act July 14, 1955, ch. 360, title I, as added June 22, 1974, Pub. L. 93–319, § 3, 88 Stat. 248, (which was classified to section 1857c–10 of this title) as in effect prior to the enactment of Pub. L. 95–95, Aug. 7, 1977, 91 Stat. 691, effective Aug. 7, 1977. Section 112(b)(1) of Pub. L. 95–95 repealed section 119 of act July 14, 1955, ch. 360, title I, as added by Pub. L. 93–319, and provided that all references to such section 119 in any subsequent enactment which supersedes Pub. L. 93–319 shall be construed to refer to section 113(d) of the Clean Air Act and to paragraph (5) thereof in particular which is classified to subsec. (d)(5) of section 7413 of this title. Section 7413(d) of this title was subsequently amended generally by Pub. L. 101–549, title VII, § 701, Nov. 15, 1990, 104 Stat. 2672, and, as so amended, no longer relates to final compliance orders. Section 117(b) of Pub. L. 95–95 added a new section 119 of act July 14, 1955, which is classified to section 7419 of this title.

　Part C of subchapter I, referred to in subsec. (d)(1)(J), was in the original "subtitle C of title I", and was translated as reading "part C of title I" to reflect the probable intent of Congress, because title I does not contain subtitles.

CODIFICATION

　In subsec. (h), "subchapter II of chapter 5 of title 5" was substituted for "the Administrative Procedures Act" on authority of Pub. L. 89–554, § 7(b), Sept. 6, 1966, 80 Stat. 631, the first section of which enacted Title 5, Government Organization and Employees.

　Section was formerly classified to section 1857h–5 of this title.

PRIOR PROVISIONS

　A prior section 307 of act July 14, 1955, was renumbered section 314 by Pub. L. 91–604 and is classified to section 7614 of this title.

　Another prior section 307 of act July 14, 1955, ch. 360, title III, formerly § 14, as added Dec. 17, 1963, Pub. L. 88–206, § 1, 77 Stat. 401, was renumbered section 307 by Pub. L. 89–272, renumbered section 310 by Pub. L. 90–148, and renumbered section 317 by Pub. L. 91–604, and is set out as a Short Title note under section 7401 of this title.

AMENDMENTS

　1990—Subsec. (a). Pub. L. 101–549, § 703, struck out par. (1) designation at beginning, inserted provisions authorizing issuance of subpoenas and administration of oaths for purposes of investigations, monitoring, reporting requirements, entries, compliance inspections, or administrative enforcement proceedings under this chapter, and struck out "or section 7521(b)(5)" after "section 7410(f)".

　Subsec. (b)(1). Pub. L. 101–549, § 706(2), which directed amendment of second sentence by striking "under section 7413(d) of this title" immediately before "under section 7419 of this title", was executed by striking "under section 7413(d) of this title," before "under section 7419 of this title", to reflect the probable intent of Congress.

Pub. L. 101–549, §706(1), inserted at end: ''The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.''

Pub. L. 101–549, §702(c), inserted ''or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title,'' before ''or any other final action of the Administrator''.

Pub. L. 101–549, §302(g), substituted ''section 7412'' for ''section 7412(c)''.

Subsec. (b)(2). Pub. L. 101–549, §707(h), inserted sentence at end authorizing challenge to deferrals of performance of nondiscretionary statutory actions.

Subsec. (d)(1)(C). Pub. L. 101–549, §110(5)(A), amended subpar. (C) generally. Prior to amendment, subpar. (C) read as follows: ''the promulgation or revision of any standard of performance under section 7411 of this title or emission standard under section 7412 of this title,''.

Subsec. (d)(1)(D), (E). Pub. L. 101–549, §302(h), added subpar. (D) and redesignated former subpar. (D) as (E). Former subpar. (E) redesignated (F).

Subsec. (d)(1)(F). Pub. L. 101–549, §302(h), redesignated subpar. (E) as (F). Former subpar. (F) redesignated (G).

Pub. L. 101–549, §110(5)(B), amended subpar. (F) generally. Prior to amendment, subpar. (F) read as follows: ''promulgation or revision of regulations pertaining to orders for coal conversion under section 7413(d)(5) of this title (but not including orders granting or denying any such orders),''.

Subsec. (d)(1)(G), (H). Pub. L. 101–549, §302(h), redesignated subpars. (F) and (G) as (G) and (H), respectively. Former subpar. (H) redesignated (I).

Subsec. (d)(1)(I). Pub. L. 101–549, §710(b), which directed that subpar. (H) be amended by substituting ''subchapter VI'' for ''part B of subchapter I'', was executed by making the substitution in subpar. (I), to reflect the probable intent of Congress and the intervening redesignation of subpar. (H) as (I) by Pub. L. 101–549, §302(h), see below.

Pub. L. 101–549, §302(h), redesignated subpar. (H) as (I). Former subpar. (I) redesignated (J).

Subsec. (d)(1)(J) to (M). Pub. L. 101–549, §302(h), redesignated subpars. (I) to (L) as (J) to (M), respectively. Former subpar. (M) redesignated (N).

Subsec. (d)(1)(N). Pub. L. 101–549, §302(h), redesignated subpar. (M) as (N). Former subpar. (N) redesignated (O).

Pub. L. 101–549, §110(5)(C), added subpar. (N) and redesignated former subpar. (N) as (U).

Subsec. (d)(1)(O) to (T). Pub. L. 101–549, §302(h), redesignated subpars. (N) to (S) as (O) to (T), respectively. Former subpar. (T) redesignated (U).

Pub. L. 101–549, §110(5)(C), added subpars. (O) to (T).

Subsec. (d)(1)(U). Pub. L. 101–549, §302(h), redesignated subpar. (T) as (U). Former subpar. (U) redesignated (V).

Pub. L. 101–549, §110(5)(C), redesignated former subpar. (N) as (U).

Subsec. (d)(1)(V). Pub. L. 101–549, §302(h), redesignated subpar. (U) as (V).

Subsec. (h). Pub. L. 101–549, §108(p), added subsec. (h).

1977—Subsec. (b)(1). Pub. L. 95–190 in text relating to filing of petitions for review in the United States Court of Appeals for the District of Columbia inserted provision respecting requirements under sections 7411 and 7412 of this title, and substituted provisions authorizing review of any rule issued under section 7413, 7419, or 7420 of this title, for provisions authorizing review of any rule or order issued under section 7420 of this title, relating to noncompliance penalties, and in text relating to filing of petitions for review in the United States Court of Appeals for the appropriate circuit inserted provision respecting review under section 7411(j), 7412(c), 7413(d), or 7419 of this title, provision authorizing review of denials or disapprovals by the Administrator under subchapter I of this chapter.

Pub. L. 95–95, §305(c), (h), inserted rules or orders issued under section 7420 of this title (relating to noncompliance penalties) and any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter to the enumeration of actions of the Administrator for which a petition for review may be filed only in the United States Court of Appeals for the District of Columbia, added the approval or promulgation by the Administrator of orders under section 7420 of this title, or any other final action of the Administrator under this chapter which is locally or regionally applicable to the enumeration of actions by the Administrator for which a petition for review may be filed only in the United States Court of Appeals for the appropriate circuit, inserted provision that petitions otherwise capable of being filed in the Court of Appeals for the appropriate circuit may be filed only in the Court of Appeals for the District of Columbia if the action is based on a determination of nationwide scope, and increased from 30 days to 60 days the period during which the petition must be filed.

Subsec. (d). Pub. L. 95–95, §305(a), added subsec. (d).

Subsec. (e). Pub. L. 95–95, §303(d), added subsec. (e).

Subsec. (f). Pub. L. 95–95, §305(f), added subsec. (f).

Subsec. (g). Pub. L. 95–95, §305(g), added subsec. (g).

1974—Subsec. (b)(1). Pub. L. 93–319 inserted reference to the Administrator's action under section 1857c–10(c)(2)(A), (B), or (C) of this title or under regulations thereunder and substituted reference to the filing of a petition within 30 days from the date of promulgation, approval, or action for reference to the filing of a petition within 30 days from the date of promulgation or approval.

1971—Subsec. (a)(1). Pub. L. 92–157 substituted reference to section ''7545(c)(3)'' for ''7545(c)(4)'' of this title.

### EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

### TERMINATION OF ADVISORY COMMITTEES

Advisory committees established after Jan. 5, 1973, to terminate not later than the expiration of the 2-year period beginning on the date of their establishment, unless, in the case of a committee established by the President or an officer of the Federal Government, such committee is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a committee established by the Congress, its duration is otherwise provided for by law. See section 14 of Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 776, set out in the Appendix to Title 5, Government Organization and Employees.

### PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

### MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L.

95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

## § 7608. Mandatory licensing

Whenever the Attorney General determines, upon application of the Administrator—

(1) that—

(A) in the implementation of the requirements of section 7411, 7412, or 7521 of this title, a right under any United States letters patent, which is being used or intended for public or commercial use and not otherwise reasonably available, is necessary to enable any person required to comply with such limitation to so comply, and

(B) there are no reasonable alternative methods to accomplish such purpose, and

(2) that the unavailability of such right may result in a substantial lessening of competition or tendency to create a monopoly in any line of commerce in any section of the country,

the Attorney General may so certify to a district court of the United States, which may issue an order requiring the person who owns such patent to license it on such reasonable terms and conditions as the court, after hearing, may determine. Such certification may be made to the district court for the district in which the person owning the patent resides, does business, or is found.

(July 14, 1955, ch. 360, title III, §308, as added Pub. L. 91–604, §12(a), Dec. 31, 1970, 84 Stat. 1708.)

<center>CODIFICATION</center>

Section was formerly classified to section 1857h–6 of this title.

<center>PRIOR PROVISIONS</center>

A prior section 308 of act July 14, 1955, was renumbered section 315 by Pub. L. 91–604 and is classified to section 7615 of this title.

<center>MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS</center>

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

## § 7609. Policy review

### (a) Environmental impact

The Administrator shall review and comment in writing on the environmental impact of any matter relating to duties and responsibilities granted pursuant to this chapter or other provisions of the authority of the Administrator, contained in any (1) legislation proposed by any Federal department or agency, (2) newly authorized Federal projects for construction and any major Federal agency action (other than a project for construction) to which section 4332(2)(C) of this title applies, and (3) proposed regulations published by any department or agency of the Federal Government. Such written comment shall be made public at the conclusion of any such review.

### (b) Unsatisfactory legislation, action, or regulation

In the event the Administrator determines that any such legislation, action, or regulation is unsatisfactory from the standpoint of public health or welfare or environmental quality, he shall publish his determination and the matter shall be referred to the Council on Environmental Quality.

(July 14, 1955, ch. 360, title III, §309, as added Pub. L. 91–604, §12(a), Dec. 31, 1970, 84 Stat. 1709.)

<center>CODIFICATION</center>

Section was formerly classified to section 1857h–7 of this title.

<center>PRIOR PROVISIONS</center>

A prior section 309 of act July 14, 1955, ch. 360, title III, formerly §13, as added Dec. 17, 1963, Pub. L. 88–206, §1, 77 Stat. 401; renumbered §306, Oct. 20, 1965, Pub. L. 89–272, title I, §101(4), 79 Stat. 992; renumbered §309, Nov. 21, 1967, Pub. L. 90–148, §2, 81 Stat. 506; renumbered §316, Dec. 31, 1970, Pub. L. 91–604, §12(a), 84 Stat. 1705, related to appropriations and was classified to section 1857*l* of this title, prior to repeal by section 306 of Pub. L. 95–95. See section 7626 of this title.

<center>MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS</center>

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

## § 7610. Other authority

### (a) Authority and responsibilities under other laws not affected

Except as provided in subsection (b) of this section, this chapter shall not be construed as superseding or limiting the authorities and responsibilities, under any other provision of law, of the Administrator or any other Federal officer, department, or agency.

### (b) Nonduplication of appropriations

No appropriation shall be authorized or made under section 241, 243, or 246 of this title for any fiscal year after the fiscal year ending June 30, 1964, for any purpose for which appropriations may be made under authority of this chapter.

(July 14, 1955, ch. 360, title III, §310, formerly §10, as added Pub. L. 88–206, §1, Dec. 17, 1963, 77 Stat. 401; renumbered §303, Pub. L. 89–272, title I, §101(4), Oct. 20, 1965, 79 Stat. 992; amended

<center>ADD26</center>

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

52.976  Review of new sources and modification.
52.977  Control  strategy  and  regulations: Ozone.
52.978–52.983  [Reserved]
52.984  Interstate  pollutant  transport  provisions;  What  are  the  FIP  requirements  for decreases  in  emissions  of  nitrogen  oxides?
52.985  Visibility protection.
52.986  Significant deterioration of air quality.
52.987  Control of hydrocarbon emissions.
52.988  [Reserved]
52.990  Stack height regulations
52.991  Small business assistance program.
52.992  Area-wide  nitrogen  oxides  exemptions.
52.993  Emissions inventories.
52.994  [Reserved]
52.995  Enhanced  ambient  air  quality  monitoring.
52.996  Disapprovals.
52.999  Original Identification of plan section.
52.1000–52.1018  [Reserved]

AUTHORITY: 42 U.S.C. 7401 *et seq.*

EDITORIAL NOTE: Nomenclature changes to part 52 appear at 81 FR 74586, Oct. 26, 2016.

## Subpart A—General Provisions

SOURCE: 37 FR 10846, May 31, 1972, unless otherwise noted.

### § 52.01  Definitions.

All terms used in this part but not defined herein shall have the meaning given them in the Clean Air Act and in parts 51 and 60 of this chapter.

(a) The term *stationary source* means any building, structure, facility, or installation which emits or may emit an air pollutant for which a national standard is in effect.

(b) The term *commenced* means that an owner or operator has undertaken a continuous program of construction or modification.

(c) The term *construction* means fabrication, erection, or installation.

(d) The phrases *modification* or *modified source* mean any physical change in, or change in the method of operation of, a stationary source which increases the emission rate of any pollutant for which a national standard has been promulgated under part 50 of this chapter or which results in the emission of any such pollutant not previously emitted, except that:

(1) Routine maintenance, repair, and replacement shall not be considered a physical change, and

(2) The following shall not be considered a change in the method of operation:

(i) An increase in the production rate, if such increase does not exceed the operating design capacity of the source;

(ii) An increase in the hours of operation;

(iii) Use of an alternative fuel or raw material, if prior to the effective date of a paragraph in this part which imposes conditions on or limits modifications, the source is designed to accommodate such alternative use.

(e) The term *startup* means the setting in operation of a source for any purpose.

(f) [Reserved]

(g) The term *heat input* means the total gross calorific value (where gross calorific value is measured by ASTM Method D2015–66, D240–64, or D1826–64) of all fuels burned.

(h) The term *total rated capacity* means the sum of the rated capacities of all fuel-burning equipment connected to a common stack. The rated capacity shall be the maximum guaranteed by the equipment manufacturer or the maximum normally achieved during use, whichever is greater.

[37 FR 19807, Sept. 22, 1972, as amended at 38 FR 12698, May 14, 1973; 39 FR 42514, Dec. 5, 1974; 43 FR 26410, June 19, 1978]

### § 52.02  Introduction.

(a) This part sets forth the Administrator's approval and disapproval of State plans and the Administrator's promulgation of such plans or portions thereof. Approval of a plan or any portion thereof is based upon a determination by the Administrator that such plan or portion meets the requirements of section 110 of the Act and the provisions of part 51 of this chapter.

(b) Any plan or portion thereof promulgated by the Administrator substitutes for a State plan or portion thereof disapproved by the Administrator or not submitted by a State, or supplements a State plan or portion thereof. The promulgated provisions, together with any portions of a State plan approved by the Administrator,

constitute the applicable plan for purposes of the Act.

(c) Where nonregulatory provisions of a plan are disapproved, the disapproval is noted in this part and a detailed evaluation is provided to the State, but no substitute provisions are promulgated by the Administrator.

(d) All approved plans and plan revisions listed in subparts B through DDD and FFF of this part and on file at the Office of the Federal Register are approved for incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. Notice of amendments to the plans will be published in the FEDERAL REGISTER. The plans and plan revisions are available for inspection at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030, or go to: *http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html*. In addition the plans and plan revisions are available at the following locations:

(1) Office of Air and Radiation, Docket and Information Center (Air Docket), EPA, 401 M St., SW., Room M1500, Washington, DC 20460.

(2) The appropriate EPA Regional Office as listed below:

(i) Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont. Environmental Protection Agency, Region 1, 5 Post Office Square—Suite 100, Boston, MA 02109–3912.

(ii) New York, New Jersey, Puerto Rico, and Virgin Islands. Environmental Protection Agency, Region 2, 290 Broadway, New York, NY 10007–1866.

(iii) Delaware, District of Columbia, Pennsylvania, Maryland, Virginia, and West Virginia. Environmental Protection Agency, Region 3, 1650 Arch Street, Philadelphia, PA 19103–2029.

(iv) Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, and Tennessee. Environmental Protection Agency, Region 4, 61 Forsyth Street, Atlanta, Georgia 30303.

(v) Illinois, Indiana, Michigan, Minnesota, Ohio, and Wisconsin. Environmental Protection Agency, Region 5, 77 West Jackson Boulevard, Chicago, IL 60604–3507.

(vi) Arkansas, Louisiana, New Mexico, Oklahoma, and Texas. Environmental Protection Agency, Region 6, Fountain Place, 1445 Ross Avenue, Suite 1200, Dallas TX 75202–2733.

(vii) Iowa, Kansas, Missouri, and Nebraska. Environmental Protection Agency, Region 7, 11201 Renner Boulevard, Lenexa, Kansas 66219.

(viii) Colorado, Montana, North Dakota, South Dakota, Utah, and Wyoming. Environmental Protection Agency, Region 8, 1595 Wynkoop Street, Denver, CO 80202–1129.

(ix) Arizona, California, Hawaii, Nevada, American Samoa, Commonwealth of the Northern Mariana Islands, and Guam. Environmental Protection Agency, Region 9, 75 Hawthorne Street, San Francisco, CA 94105.

(x) Alaska, Idaho, Oregon, and Washington. Environmental Protection Agency, Region 10, 1200 6th Avenue Seattle, WA 98101.

(e) Each State's plan is dealt with in a separate subpart, which includes an introductory section identifying the plan by name and the date of its submittal, a section classifying regions, and a section setting forth dates for attainment of the national standards. Additional sections are included as necessary to specifically identify disapproved provisions, to set forth reasons for disapproval, and to set forth provisions of the plan promulgated by the Administrator. Except as otherwise specified, all supplemental information submitted to the Administrator with respect to any plan has been submitted by the Governor of the State.

(f) Revisions to applicable plans will be included in this part when approved or promulgated by the Administrator.

[37 FR 10846, May 31, 1972, as amended at 37 FR 15080, July 27, 1972; 47 FR 38886, Sept. 3, 1982; 61 FR 16060, Apr. 11, 1996; 72 FR 38793, July 16, 2007; 76 FR 49671, Aug. 11, 2011; 78 FR 37975, June 25, 2013; 79 FR 22035, Apr. 21, 2014]

§52.04 Classification of regions.

Each subpart sets forth the priority classification, by pollutant, for each region in the State. Each plan for each region was evaluated according to the requirements of part 51 of this chapter applicable to regions of that priority.

11

**Environmental Protection Agency** §63.10030

$$O_L = z + \frac{(0.75 \times L)}{R} \quad (\text{Eq. 12})$$

Where:

$O_L$ = the operating limit for your PM CPMS on a 30-day rolling average, in milliamps,

$L$ = your source PM emissions limit in lb/MWh,

$z$ = your instrument zero in milliamps, determined from (b)(2)(i)(A) of this section, and

$R$ = the relative PM lb/MWh per milliamp for your PM CPMS, from equation 11.

(ii) If your PM compliance test demonstrates your PM emissions exceed 75 percent of your emissions limit, you will use the average PM CPMS value recorded during the PM compliance test demonstrating compliance with the PM limit to establish your operating limit.

(A) Determine your operating limit by averaging the PM CPMS milliamp output corresponding to your three PM performance test runs that demonstrate compliance with the emission limit using equation 13.

$$O_h = \frac{1}{n} \sum_{i=1}^{n} X_i \quad (\text{Eq. 13})$$

Where:

$X_i$ = the PM CPMS data points for all runs i,

$n$ = the number of data points, and

$O_h$ = your site specific operating limit, in milliamps.

(iii) Your PM CPMS must provide a 4–20 milliamp output and the establishment of its relationship to manual reference method measurements must be determined in units of milliamps.

(iv) Your PM CPMS operating range must be capable of reading PM concentrations from zero to a level equivalent to two times your allowable emission limit. If your PM CPMS is an auto-ranging instrument capable of multiple scales, the primary range of the instrument must be capable of reading PM concentration from zero to a level equivalent to two times your allowable emission limit.

(v) During the initial performance test or any such subsequent performance test that demonstrates compliance with the PM limit, record and average all milliamp output values from the PM CPMS for the periods corresponding to the compliance test runs.

(vi) For PM performance test reports used to set a PM CPMS operating limit, the electronic submission of the test report must also include the make and model of the PM CPMS instrument, serial number of the instrument, analytical principle of the instrument (e.g. beta attenuation), span of the instruments primary analytical range, milliamp value equivalent to the instrument zero output, technique by which this zero value was determined, and the average milliamp signal corresponding to each PM compliance test run.

(c) You must operate and maintain your process and control equipment such that the 30 operating day average PM CPMS output does not exceed the operating limit determined in paragraphs (a) and (b) of this section.

[77 FR 9464, Feb. 16, 2012, as amended at 78 FR 24086, Apr. 24, 2013; 81 FR 20187, Apr. 6, 2016]

NOTIFICATION, REPORTS, AND RECORDS

§63.10030 What notifications must I submit and when?

(a) You must submit all of the notifications in §§63.7(b) and (c), 63.8 (e), (f)(4) and (6), and 63.9 (b) through (h) that apply to you by the dates specified.

193

ADD29

(b) As specified in §63.9(b)(2), if you startup your EGU that is an affected source before April 16, 2012, you must submit an Initial Notification not later than 120 days after April 16, 2012.

(c) As specified in §63.9(b)(4) and (b)(5), if you startup your new or reconstructed EGU that is an affected source on or after April 16, 2012, you must submit an Initial Notification not later than 15 days after the actual date of startup of the EGU that is an affected source.

(d) When you are required to conduct a performance test, you must submit a Notification of Intent to conduct a performance test at least 30 days before the performance test is scheduled to begin.

(e) When you are required to conduct an initial compliance demonstration as specified in §63.10011(a), you must submit a Notification of Compliance Status according to §63.9(h)(2)(ii). The Notification of Compliance Status report must contain all the information specified in paragraphs (e)(1) through (8) of this section, as applicable.

(1) A description of the affected source(s), including identification of the subcategory of the source, the design capacity of the source, a description of the add-on controls used on the source, description of the fuel(s) burned, including whether the fuel(s) were determined by you or EPA through a petition process to be a non-waste under 40 CFR 241.3, whether the fuel(s) were processed from discarded non-hazardous secondary materials within the meaning of 40 CFR 241.3, and justification for the selection of fuel(s) burned during the performance test.

(2) Summary of the results of all performance tests and fuel analyses and calculations conducted to demonstrate initial compliance including all established operating limits.

(3) Identification of whether you plan to demonstrate compliance with each applicable emission limit through performance testing; fuel moisture analyses; performance testing with operating limits (e.g., use of PM CPMS); CEMS; or a sorbent trap monitoring system.

(4) Identification of whether you plan to demonstrate compliance by emissions averaging.

(5) A signed certification that you have met all applicable emission limits and work practice standards.

(6) If you had a deviation from any emission limit, work practice standard, or operating limit, you must also submit a brief description of the deviation, the duration of the deviation, emissions point identification, and the cause of the deviation in the Notification of Compliance Status report.

(7) In addition to the information required in §63.9(h)(2), your notification of compliance status must include the following:

(i) A summary of the results of the annual performance tests and documentation of any operating limits that were reestablished during this test, if applicable. If you are conducting stack tests once every 3 years consistent with §63.10005(h)(1)(i), the date of each stack test conducted during the previous 3 years, a comparison of emission level you achieved in each stack test conducted during the previous 3 years to the 50 percent emission limit threshold required in §63.10006(i), and a statement as to whether there have been any operational changes since the last stack test that could increase emissions.

(ii) Certifications of compliance, as applicable, and must be signed by a responsible official stating:

(A) "This EGU complies with the requirements in §63.10021(a) to demonstrate continuous compliance." and

(B) "No secondary materials that are solid waste were combusted in any affected unit."

(iii) For each of your existing EGUs, identification of each emissions limit as specified in Table 2 to this subpart with which you plan to comply.

(A) You may switch from a mass per heat input to a mass per gross output limit (or vice-versa), provided that:

(1) You submit a request that identifies for each EGU or EGU emissions averaging group involved in the proposed switch both the current and proposed emission limit;

(2) Your request arrives to the Administrator at least 30 calendar days prior to the date that the switch is proposed to occur;

(3) Your request demonstrates through performance stack test results

194

**Environmental Protection Agency**                     **§ 63.10030**

completed within 30 days prior to your submission, compliance for each EGU or EGU emissions averaging group with both the mass per heat input and mass per gross output limits;

(*4*) You revise and submit all other applicable plans, *e.g.*, monitoring and emissions averaging, with your request; and

(*5*) You maintain records of all information regarding your choice of emission limits.

(B) You begin to use the revised emission limits starting in the next reporting period, after receipt of written acknowledgement from the Administrator of the switch.

(C) From submission of your request until start of the next reporting period after receipt of written acknowledgement from the Administrator of the switch, you demonstrate compliance with both the mass per heat input and mass per gross output emission limits for each pollutant for each EGU or EGU emissions averaging group.

(8) Identification of whether you plan to rely on paragraph (1) or (2) of the definition of "startup" in § 63.10042.

(i) Should you choose to rely on paragraph (2) of the definition of "startup" in § 63.10042 for your EGU, you shall include a report that identifies:

(A) The original EGU installation date;

(B) The original EGU design characteristics, including, but not limited to, fuel mix and PM controls;

(C) Each design PM control device efficiency established during performance testing or while operating in periods other than startup and shutdown periods;

(D) The design PM emission rate from the EGU in terms of pounds PM per MMBtu and pounds PM per hour established during performance testing or while operating in periods other than startup and shutdown periods;

(E) The design time from start of fuel combustion to necessary conditions for each PM control device startup;

(F) Each design PM control device efficiency upon startup of the PM control device, if different from the efficiency provided in paragraph (e)(8)(i)(C) of this section;

(G) Current EGU PM producing characteristics, including, but not limited to, fuel mix and PM controls, if different from the characteristics provided in paragraph (e)(8)(i)(B) of this section;

(H) Current PM control device efficiency from each PM control device, if different from the efficiency provided in paragraph (e)(8)(i)(C) of this section;

(I) Current PM emission rate from the EGU in terms of pounds PM per MMBtu and pounds per hour, if different from the rate provided in paragraph (e)(8)(i)(D) of this section;

(J) Current time from start of fuel combustion to conditions necessary for each PM control device startup, if different from the time provided in paragraph (e)(8)(i)(E) of this section; and

(K) Current PM control device efficiency upon startup of each PM control device, if different from the efficiency provided in paragraph (e)(8)(i)(H) of this section.

(ii) The report shall be prepared, signed, and sealed by a professional engineer licensed in the state where your EGU is located.

(iii) You may switch from paragraph (1) of the definition of "startup" in § 63.10042 to paragraph (2) of the definition of "startup" (or vice-versa), provided that:

(A) You submit a request that identifies for each EGU or EGU emissions averaging group involved in the proposed switch both the current definition of "startup" relied on and the proposed definition you plan to rely on;

(B) Your request arrives to the Administrator at least 30 calendar days prior to the date that the switch is proposed to occur;

(C) You revise and submit all other applicable plans, *e.g.*, monitoring and emissions averaging, with your submission;

(D) You maintain records of all information regarding your choice of the definition of "startup"; and

(E) You begin to use the revised definition of "startup" in the next reporting period after receipt of written acknowledgement from the Administrator of the switch.

(f) You must submit the notifications in § 63.10000(h)(2) and (i)(2) that may apply to you by the dates specified.

[77 FR 9464, Feb. 16, 2012, as amended at 77 FR 23404, Apr. 19, 2012; 78 FR 24087, Apr. 24, 2013; 79 FR 68791, Nov. 19, 2014; 81 FR 20187, Apr. 6, 2016]

### § 63.10031 What reports must I submit and when?

(a) You must submit each report in Table 8 to this subpart that applies to you. If you are required to (or elect to) continuously monitor Hg and/or HCl and/or HF emissions, you must also submit the electronic reports required under appendix A and/or appendix B to the subpart, at the specified frequency.

(b) Unless the Administrator has approved a different schedule for submission of reports under § 63.10(a), you must submit each report by the date in Table 8 to this subpart and according to the requirements in paragraphs (b)(1) through (5) of this section.

(1) The first compliance report must cover the period beginning on the compliance date that is specified for your affected source in § 63.9984 and ending on June 30 or December 31, whichever date is the first date that occurs at least 180 days after the compliance date that is specified for your source in § 63.9984.

(2) The first compliance report must be postmarked or submitted electronically no later than July 31 or January 31, whichever date is the first date following the end of the first calendar half after the compliance date that is specified for your source in § 63.9984.

(3) Each subsequent compliance report must cover the semiannual reporting period from January 1 through June 30 or the semiannual reporting period from July 1 through December 31.

(4) Each subsequent compliance report must be postmarked or submitted electronically no later than July 31 or January 31, whichever date is the first date following the end of the semiannual reporting period.

(5) For each affected source that is subject to permitting regulations pursuant to part 70 or part 71 of this chapter, and if the permitting authority has established dates for submitting semiannual reports pursuant to 40 CFR 70.6(a)(3)(iii)(A) or 40 CFR 71.6(a)(3)(iii)(A), you may submit the first and subsequent compliance reports according to the dates the permitting authority has established instead of according to the dates in paragraphs (b)(1) through (4) of this section.

(c) The compliance report must contain the information required in paragraphs (c)(1) through (9) of this section.

(1) The information required by the summary report located in 63.10(e)(3)(vi).

(2) The total fuel use by each affected source subject to an emission limit, for each calendar month within the semiannual reporting period, including, but not limited to, a description of the fuel, whether the fuel has received a non-waste determination by EPA or your basis for concluding that the fuel is not a waste, and the total fuel usage amount with units of measure.

(3) Indicate whether you burned new types of fuel during the reporting period. If you did burn new types of fuel you must include the date of the performance test where that fuel was in use.

(4) Include the date of the most recent tune-up for each EGU. The date of the tune-up is the date the tune-up provisions specified in § 63.10021(e)(6) and (7) were completed.

(5) Should you choose to rely on paragraph (2) of the definition of "startup" in § 63.10042 for your EGU, for each instance of startup or shutdown you shall:

(i) Include the maximum clean fuel storage capacity and the maximum hourly heat input that can be provided for each clean fuel determined according to the requirements of § 63.10032(f).

(ii) Include the information required to be monitored, collected, or recorded according to the requirements of § 63.10020(e).

(iii) If you choose to use CEMS to demonstrate compliance with numerical limits, include hourly average CEMS values and hourly average flow values during startup periods or shutdown periods. Use units of milligrams per cubic meter for PM CEMS values, micrograms per cubic meter for Hg CEMS values, and ppmv for HCl, HF, or

**Environmental Protection Agency**                               **§ 63.10031**

SO₂ CEMS values. Use units of standard cubic meters per hour on a wet basis for flow values.

(iv) If you choose to use a separate sorbent trap measurement system for startup or shutdown reporting periods, include hourly average mercury concentration values in terms of micrograms per cubic meter.

(v) If you choose to use a PM CPMS, include hourly average operating parameter values in terms of the operating limit, as well as the operating parameter to PM correlation equation.

(6) You must report emergency bypass information annually from EGUs with LEE status.

(7) A summary of the results of the annual performance tests and documentation of any operating limits that were reestablished during the test, if applicable. If you are conducting stack tests once every 3 years to maintain LEE status, consistent with §63.10006(b), the date of each stack test conducted during the previous 3 years, a comparison of emission level you achieved in each stack test conducted during the previous 3 years to the 50 percent emission limit threshold required in §63.10005(h)(1)(i), and a statement as to whether there have been any operational changes since the last stack test that could increase emissions.

(8) A certification.

(9) If you have a deviation from any emission limit, work practice standard, or operating limit, you must also submit a brief description of the deviation, the duration of the deviation, emissions point identification, and the cause of the deviation.

(d) For each excess emissions occurring at an affected source where you are using a CMS to comply with that emission limit or operating limit, you must include the information required in §63.10(e)(3)(v) in the compliance report specified in section (c).

(e) Each affected source that has obtained a Title V operating permit pursuant to part 70 or part 71 of this chapter must report all deviations as defined in this subpart in the semiannual monitoring report required by 40 CFR 70.6(a)(3)(iii)(A) or 40 CFR 71.6(a)(3)(iii)(A). If an affected source submits a compliance report pursuant

to Table 8 to this subpart along with, or as part of, the semiannual monitoring report required by 40 CFR 70.6(a)(3)(iii)(A) or 40 CFR 71.6(a)(3)(iii)(A), and the compliance report includes all required information concerning deviations from any emission limit, operating limit, or work practice requirement in this subpart, submission of the compliance report satisfies any obligation to report the same deviations in the semiannual monitoring report. Submission of a compliance report does not otherwise affect any obligation the affected source may have to report deviations from permit requirements to the permit authority.

(f) On or after July 1, 2020, within 60 days after the date of completing each performance test, you must submit the performance test reports required by this subpart to the EPA's WebFIRE database by using the Compliance and Emissions Data Reporting Interface (CEDRI) that is accessed through the EPA's Central Data Exchange (CDX) (*https://cdx.epa.gov*). Performance test data must be submitted in the file format generated through use of EPA's Electronic Reporting Tool (ERT) (see *https://www.epa.gov/ttn/chief/ert/ index.html*). Only data collected using those test methods on the ERT website are subject to this requirement for submitting reports electronically to WebFIRE. Owners or operators who claim that some of the information being submitted for performance tests is confidential business information (CBI) must submit a complete ERT file including information claimed to be CBI on a compact disk or other commonly used electronic storage media (including, but not limited to, flash drives) to EPA. The electronic media must be clearly marked as CBI and mailed to U.S. EPA/OAPQS/CORE CBI Office, Attention: WebFIRE Administrator, MD C404–02, 4930 Old Page Rd., Durham, NC 27703. The same ERT file with the CBI omitted must be submitted to EPA via CDX as described earlier in this paragraph. At the discretion of the delegated authority, you must also submit these reports, including the confidential business information, to the delegated authority in the

format specified by the delegated authority.

(1) On or after July 1, 2020, within 60 days after the date of completing each CEMS (SO₂, PM, HCl, HF, and Hg) performance evaluation test, as defined in § 63.2 and required by this subpart, you must submit the relative accuracy test audit (RATA) data (or, for PM CEMS, RCA and RRA data) required by this subpart to EPA's WebFIRE database by using CEDRI that is accessed through EPA's CDX (*https://cdx.epa.gov*). The RATA data shall be submitted in the file format generated through use of EPA's Electronic Reporting Tool (ERT) (*https://www.epa.gov/ttn/chief/ert/index.html*). Only RATA data compounds listed on the ERT website are subject to this requirement. Owners or operators who claim that some of the information being submitted for RATAs is confidential business information (CBI) shall submit a complete ERT file including information claimed to be CBI on a compact disk or other commonly used electronic storage media (including, but not limited to, flash drives) by registered letter to EPA and the same ERT file with the CBI omitted to EPA via CDX as described earlier in this paragraph. The compact disk or other commonly used electronic storage media shall be clearly marked as CBI and mailed to U.S. EPA/OAPQS/CORE CBI Office, Attention: WebFIRE Administrator, MD C404–02, 4930 Old Page Rd., Durham, NC 27703. At the discretion of the delegated authority, owners or operators shall also submit these RATAs to the delegated authority in the format specified by the delegated authority. Owners or operators shall submit calibration error testing, drift checks, and other information required in the performance evaluation as described in § 63.2 and as required in this chapter.

(2) On or after July 1, 2020, for a PM CEMS, PM CPMS, or approved alternative monitoring using a HAP metals CEMS, within 60 days after the reporting periods ending on March 31st, June 30th, September 30th, and December 31st, you must submit quarterly reports to the EPA's WebFIRE database by using the CEDRI that is accessed through the EPA's CDX (*https://cdx.epa.gov*). You must use the appro-

priate electronic reporting form in CEDRI or provide an alternate electronic file consistent with EPA's reporting form output format. For each reporting period, the quarterly reports must include all of the calculated 30-boiler operating day rolling average values derived from the CEMS and PM CPMS.

(3) Reports for an SO₂ CEMS, a Hg CEMS or sorbent trap monitoring system, an HCl or HF CEMS, and any supporting monitors for such systems (such as a diluent or moisture monitor) shall be submitted using the ECMPS Client Tool, as provided for in Appendices A and B to this subpart and § 63.10021(f).

(4) On or after July 1, 2020, submit the compliance reports required under paragraphs (c) and (d) of this section and the notification of compliance status required under § 63.10030(e) to the EPA's WebFIRE database by using the CEDRI that is accessed through EPA's CDX (*https://cdx.epa.gov*). You must use the appropriate electronic reporting form in CEDRI or provide an alternate electronic file consistent with EPA's reporting form output format.

(5) All reports required by this subpart not subject to the requirements in paragraphs (f) introductory text and (f)(1) through (4) of this section must be sent to the Administrator at the appropriate address listed in § 63.13. If acceptable to both the Administrator and the owner or operator of an EGU, these reports may be submitted on electronic media. The Administrator retains the right to require submittal of reports subject to paragraphs (f) introductory text and (f)(1) through (4) of this section in paper format.

(6) Prior to July 1, 2020, all reports subject to electronic submittal in paragraphs (f) introductory text, (f)(1), (2), and (4) of this section shall be submitted to the EPA at the frequency specified in those paragraphs in electronic portable document format (PDF) using the ECMPS Client Tool. Each PDF version of a submitted report must include sufficient information to assess compliance and to demonstrate that the testing was done properly. The following data elements must be entered into the ECMPS Client Tool at

198

**Environmental Protection Agency**                                §63.10032

the time of submission of each PDF file:

(i) The facility name, physical address, mailing address (if different from the physical address), and county;

(ii) The ORIS code (or equivalent ID number assigned by EPA's Clean Air Markets Division (CAMD)) and the Facility Registry System (FRS) ID;

(iii) The EGU (or EGUs) to which the report applies. Report the EGU IDs as they appear in the CAMD Business System;

(iv) If any of the EGUs in paragraph (f)(6)(iii) of this section share a common stack, indicate which EGUs share the stack. If emissions data are monitored and reported at the common stack according to part 75 of this chapter, report the ID number of the common stack as it is represented in the electronic monitoring plan required under §75.53 of this chapter;

(v) If any of the EGUs described in paragraph (f)(6)(iii) of this section are in an averaging plan under §63.10009, indicate which EGUs are in the plan and whether it is a 30- or 90-day averaging plan;

(vi) The identification of each emission point to which the report applies. An ''emission point'' is a point at which source effluent is released to the atmosphere, and is either a dedicated stack that serves one of the EGUs identified in paragraph (f)(6)(iii) of this section or a common stack that serves two or more of those EGUs. To identify an emission point, associate it with the EGU or stack ID in the CAMD Business system or the electronic monitoring plan (e.g., ''Unit 2 stack,'' ''common stack CS001,'' or ''multiple stack MS001'');

(vii) The rule citation (e.g., §63.10031(f)(1), §63.10031(f)(2), etc.) for which the report is showing compliance;

(viii) The pollutant(s) being addressed in the report;

(ix) The reporting period being covered by the report (if applicable);

(x) The relevant test method that was performed for a performance test (if applicable);

(xi) The date the performance test was conducted (if applicable); and

(xii) The responsible official's name, title, and phone number.

(g) If you had a malfunction during the reporting period, the compliance report must include the number, duration, and a brief description for each type of malfunction which occurred during the reporting period and which caused or may have caused any applicable emission limitation to be exceeded.

[77 FR 9464, Feb. 16, 2012, as amended at 77 FR 23404, Apr. 19, 2012; 79 FR 68791, Nov. 19, 2014; 79 FR 68799, Nov. 19, 2014; 80 FR 15514, Mar. 24, 2015; 81 FR 20188, Apr. 6, 2016; 82 FR 16739, Apr. 6, 2017; 83 FR 30883, July 2, 2018]

### §63.10032  What records must I keep?

(a) You must keep records according to paragraphs (a)(1) and (2) of this section. If you are required to (or elect to) continuously monitor Hg and/or HCl and/or HF emissions, you must also keep the records required under appendix A and/or appendix B to this subpart.

(1) A copy of each notification and report that you submitted to comply with this subpart, including all documentation supporting any Initial Notification or Notification of Compliance Status or semiannual compliance report that you submitted, according to the requirements in §63.10(b)(2)(xiv).

(2) Records of performance stack tests, fuel analyses, or other compliance demonstrations and performance evaluations, as required in §63.10(b)(2)(viii).

(b) For each CEMS and CPMS, you must keep records according to paragraphs (b)(1) through (4) of this section.

(1) Records described in §63.10(b)(2)(vi) through (xi).

(2) Previous (i.e., superseded) versions of the performance evaluation plan as required in §63.8(d)(3).

(3) Request for alternatives to relative accuracy test for CEMS as required in §63.8(f)(6)(i).

(4) Records of the date and time that each deviation started and stopped, and whether the deviation occurred during a period of startup, shutdown, or malfunction or during another period.

(c) You must keep the records required in Table 7 to this subpart including records of all monitoring data and calculated averages for applicable PM CPMS operating limits to show

199

continuous compliance with each emission limit and operating limit that applies to you.

(d) For each EGU subject to an emission limit, you must also keep the records in paragraphs (d)(1) through (3) of this section.

(1) You must keep records of monthly fuel use by each EGU, including the type(s) of fuel and amount(s) used.

(2) If you combust non-hazardous secondary materials that have been determined not to be solid waste pursuant to 40 CFR 241.3(b)(1), you must keep a record which documents how the secondary material meets each of the legitimacy criteria. If you combust a fuel that has been processed from a discarded non-hazardous secondary material pursuant to 40 CFR 241.3(b)(2), you must keep records as to how the operations that produced the fuel satisfies the definition of processing in 40 CFR 241.2. If the fuel received a non-waste determination pursuant to the petition process submitted under 40 CFR 241.3(c), you must keep a record which documents how the fuel satisfies the requirements of the petition process.

(3) For an EGU that qualifies as an LEE under § 63.10005(h), you must keep annual records that document that your emissions in the previous stack test(s) continue to qualify the unit for LEE status for an applicable pollutant, and document that there was no change in source operations including fuel composition and operation of air pollution control equipment that would cause emissions of the pollutant to increase within the past year.

(e) If you elect to average emissions consistent with § 63.10009, you must additionally keep a copy of the emissions averaging implementation plan required in § 63.10009(g), all calculations required under § 63.10009, including daily records of heat input or steam generation, as applicable, and monitoring records consistent with § 63.10022.

(f) Regarding startup periods or shutdown periods:

(1) Should you choose to rely on paragraph (1) of the definition of "startup" in § 63.10042 for your EGU, you must keep records of the occurrence and duration of each startup or shutdown.

(2) Should you choose to rely on paragraph (2) of the definition of "startup" in § 63.10042 for your EGU, you must keep records of:

(i) The determination of the maximum possible clean fuel capacity for each EGU;

(ii) The determination of the maximum possible hourly clean fuel heat input and of the hourly clean fuel heat input for each EGU; and

(iii) The information required in § 63.10020(e).

(g) You must keep records of the occurrence and duration of each malfunction of an operation (i.e., process equipment) or the air pollution control and monitoring equipment.

(h) You must keep records of actions taken during periods of malfunction to minimize emissions in accordance with § 63.10000(b), including corrective actions to restore malfunctioning process and air pollution control and monitoring equipment to its normal or usual manner of operation.

(i) You must keep records of the type(s) and amount(s) of fuel used during each startup or shutdown.

(j) If you elect to establish that an EGU qualifies as a limited-use liquid oil-fired EGU, you must keep records of the type(s) and amount(s) of fuel use in each calendar quarter to document that the capacity factor limitation for that subcategory is met.

[77 FR 9464, Feb. 16, 2012, as amended at 79 FR 68792, Nov. 19, 2014; 81 FR 20189, Apr. 6, 2016]

§ 63.10033  In what form and how long must I keep my records?

(a) Your records must be in a form suitable and readily available for expeditious review, according to § 63.10(b)(1).

(b) As specified in § 63.10(b)(1), you must keep each record for 5 years following the date of each occurrence, measurement, maintenance, corrective action, report, or record.

(c) You must keep each record on site for at least 2 years after the date of each occurrence, measurement, maintenance, corrective action, report, or record, according to § 63.10(b)(1). You can keep the records off site for the remaining 3 years.

**Environmental Protection Agency**  §75.73

(ii) Measure heat input from each affected unit, using a flow monitor and a $CO_2$ or $O_2$ diluent monitor in the duct from each affected unit; or

(2) For units that are eligible to use appendix D to this part, use the procedures in appendix D to this part to determine heat input rate for the unit. However, the use of a fuel flowmeter in a common pipe header and the provisions of sections 2.1.2.1 and 2.1.2.2 of appendix D of this part are not applicable to any unit that is using the provisions of this subpart to monitor, record, and report $NO_X$ mass emissions under a State or federal $NO_X$ mass emission reduction program and that shares a common pipe with a nonaffected unit.

(f) [Reserved]

(g) *Procedures for apportioning heat input to the unit level.* If the owner or operator of a unit using the common stack monitoring provisions in paragraphs (a) or (b) of this section does not monitor and record heat input at the unit level and the owner or operator is required to do so under an applicable State or federal $NO_X$ mass emission reduction program, apportion heat input from the common stack to each unit according to §75.16(e)(3).

[63 FR 57507, Oct. 27, 1998, as amended at 67 FR 40445, June 12, 2002; 73 FR 4358, Jan. 24, 2008]

**§75.73   Recordkeeping and reporting.**

(a) *General recordkeeping provisions.* The owner or operator of any affected unit and each non-affected unit under §75.72(b)(2)(ii) shall maintain for each affected unit and each non-affected unit under §75.72(b)(2)(ii) a file of all measurements, data, reports, and other information required by this part at the source in a form suitable for inspection for at least three (3) years from the date of each record. Except for the certification data required in §75.57(a)(4) and the initial submission of the monitoring plan required in §75.57(a)(5), the data shall be collected beginning with the earlier of the date of provisional certification or the compliance deadline in §75.70(b). The certification data required in §75.57(a)(4) shall be collected beginning with the date of the first certification test performed. The file shall contain the following information:

(1) The information required in §§75.57(a)(2), (a)(4), (a)(5), (a)(6), (b), (c)(2), (d), (g), and (h).

(2) The information required in §§75.58(b)(2) or (b)(3) (for units with add-on $NO_X$ emission controls), as applicable, (d) (as applicable for units using Appendix E to this part), and (f) (as applicable for units using the low mass emissions unit provisions of §75.19).

(3) For each hour when the unit is operating, $NO_X$ mass emissions, calculated in accordance with section 8.1 of appendix F to this part.

(4) During the second and third calendar quarters, cumulative ozone season heat input and cumulative ozone season operating hours.

(5) Heat input and $NO_X$ methodologies for the hour.

(6) *Specific heat input record provisions for gas-fired or oil-fired units using the procedures in appendix D to this part.* In lieu of the information required in §75.57(c)(2), the owner or operator shall record the information in §75.58(c) for each affected gas-fired or oil-fired unit and each non-affected gas- or oil-fired unit under §75.72(b)(2)(ii) for which the owner or operator is using the procedures in appendix D to this part for estimating heat input.

(7) *Specific $NO_X$ record provisions for gas-fired or oil-fired units using the optional low mass emissions excepted methodology in §75.19.* In lieu of recording the information in §§75.57(b), (c)(2), (d), and (g), the owner or operator shall record, for each hour when the unit is operating for any portion of the hour, the following information for each affected low mass emissions unit for which the owner or operator is using the low mass emissions excepted methodology in §75.19(c):

(i) Date and hour;

(ii) If one type of fuel is combusted in the hour, fuel type (pipeline natural gas, natural gas, residual oil, or diesel fuel) or, if more than one type of fuel is combusted in the hour, the fuel type which results in the highest emission factors for $NO_X$;

(iii) Average hourly $NO_X$ emission rate (in lb/mmBtu, rounded to the nearest thousandth); and

(iv) Hourly $NO_X$ mass emissions (in lbs, rounded to the nearest tenth).

343

ADD37

(8) Formulas from monitoring plan for total $NO_X$ mass.

(b) *Certification, quality assurance and quality control record provisions.* The owner or operator of any affected unit shall record the applicable information in § 75.59 for each affected unit or group of units monitored at a common stack and each non-affected unit under § 75.72(b)(2)(ii).

(c) *Monitoring plan recordkeeping provisions*—(1) *General provisions.* The owner or operator of an affected unit shall prepare and maintain a monitoring plan for each affected unit or group of units monitored at a common stack and each non-affected unit under § 75.72(b)(2)(ii). Except as provided in paragraph (d) or (f) of this section, a monitoring plan shall contain sufficient information on the continuous emission monitoring systems, excepted methodology under § 75.19, or excepted monitoring systems under appendix D or E to this part and the use of data derived from these systems to demonstrate that all the unit's $NO_X$ emissions are monitored and reported.

(2) Whenever the owner or operator makes a replacement, modification, or change in the certified continuous emission monitoring system, excepted methodology under § 75.19, excepted monitoring system under appendix D or E to this part, or alternative monitoring system under subpart E of this part, including a change in the automated data acquisition and handling system or in the flue gas handling system, that affects information reported in the monitoring plan (e.g., a change to a serial number for a component of a monitoring system), then the owner or operator shall update the monitoring plan.

(3) *Contents of the monitoring plan for units not subject to an Acid Rain emissions limitation.* Prior to January 1, 2009, each monitoring plan shall contain the information in § 75.53(e)(1) or § 75.53(g)(1) in electronic format and the information in § 75.53(e)(2) or § 75.53(g)(2) in hardcopy format. On and after January 1, 2009, each monitoring plan shall contain the information in § 75.53(g)(1) in electronic format and the information in § 75.53(g)(2) in hardcopy format, only. In addition, to the extent applicable, prior to January 1, 2009,

each monitoring plan shall contain the information in § 75.53(f)(1)(i), (f)(2)(i), and (f)(4) or § 75.53(h)(1)(i), and (h)(2)(i) in electronic format and the information in § 75.53(f)(1)(ii) or § 75.53(h)(1)(ii) and (h)(2)(ii) in hardcopy format. On and after January 1, 2009, each monitoring plan shall contain the information in § 75.53(h)(1)(i), and (h)(2)(i) in electronic format and the information in § 75.53(h)(1)(ii) and (h)(2)(ii) in hardcopy format, only. For units using the low mass emissions excepted methodology under § 75.19, prior to January 1, 2009, the monitoring plan shall include the additional information in § 75.53(f)(5)(i) and (f)(5)(ii) or § 75.53(h)(4)(i) and (h)(4)(ii). On and after January 1, 2009, for units using the low mass emissions excepted methodology under § 75.19 the monitoring plan shall include the additional information in § 75.53(h)(4)(i) and (h)(4)(ii), only. Prior to January 1, 2008, the monitoring plan shall also identify, in electronic format, the reporting schedule for the affected unit (ozone season or quarterly), and the beginning and end dates for the reporting schedule. The monitoring plan also shall include a seasonal controls indicator, and an ozone season fuel-switching flag.

(d) *General reporting provisions.* (1) The designated representative for an affected unit shall comply with all reporting requirements in this section and with any additional requirements set forth in an applicable State or federal $NO_X$ mass emission reduction program that adopts the requirements of this subpart.

(2) The designated representative for an affected unit shall submit the following for each affected unit or group of units monitored at a common stack and each non-affected unit under § 75.72(b)(2)(ii):

(i) Initial certification and recertification applications in accordance with § 75.70(d);

(ii) Monitoring plans in accordance with paragraph (e) of this section; and

(iii) Quarterly reports in accordance with paragraph (f) of this section.

(3) *Other petitions and communications.* The designated representative for an affected unit shall submit petitions, correspondence, application forms, and

petition-related test results in accordance with the provisions in §75.70(h).

(4) *Quality assurance RATA reports.* If requested by the permitting authority, the designated representative of an affected unit shall submit the quality assurance RATA report for each affected unit or group of units monitored at a common stack and each non-affected unit under §75.72(b)(2)(ii) by the later of 45 days after completing a quality assurance RATA according to section 2.3 of appendix B to this part or 15 days of receiving the request. The designated representative shall report the hardcopy information required by §75.59(a)(9) to the permitting authority.

(5) *Notifications.* The designated representative for an affected unit shall submit written notice to the permitting authority according to the provisions in §75.61 for each affected unit or group of units monitored at a common stack and each non-affected unit under §75.72(b)(2)(ii).

(6) *Routine appendix E retest reports.* If requested by the applicable EPA Regional Office, appropriate State, and/or appropriate local air pollution control agency, the designated representative shall submit a hardcopy report within 45 days after completing a required periodic retest according to section 2.2 of appendix E to this part, or within 15 days of receiving the request, whichever is later. The designated representative shall report the hardcopy information required by §75.59(b)(5) to the applicable EPA Regional Office, appropriate State, and/or appropriate local air pollution control agency that requested the hardcopy report.

(e) *Monitoring plan reporting*—(1) *Electronic submission.* The designated representative for an affected unit shall submit to the Administrator a complete, electronic, up-to-date monitoring plan file for each affected unit or group of units monitored at a common stack and each non-affected unit under §75.72(b)(2)(ii), no later than 21 days prior to the initial certification test; at the time of a certification or recertification application submission; and whenever an update of the electronic monitoring plan is required, either under §75.53 or elsewhere in this part.

(2) *Hardcopy submission.* The designated representative of an affected unit shall submit all of the hardcopy information required under §75.53, for each affected unit or group of units monitored at a common stack and each non-affected unit under §75.72(b)(2)(ii), to the permitting authority prior to initial certification. Thereafter, the designated representative shall submit hardcopy information only if that portion of the monitoring plan is revised. The designated representative shall submit the required hardcopy information as follows: no later than 21 days prior to the initial certification test; with any certification or recertification application, if a hardcopy monitoring plan change is associated with the recertification event; and within 30 days of any other event with which a hardcopy monitoring plan change is associated, pursuant to §75.53(b). Electronic submittal of all monitoring plan information, including hardcopy portions, is permissible provided that a paper copy of the hardcopy portions can be furnished upon request.

(f) *Quarterly reports*—(1) *Electronic submission.* The designated representative for an affected unit shall electronically report the data and information in this paragraph (f)(1) and in paragraphs (f)(2) and (3) of this section to the Administrator quarterly, unless the unit has been placed in long-term cold storage (as defined in §72.2 of this chapter). For units placed into long-term cold storage during a reporting quarter, the exemption from submitting quarterly reports begins with the calendar quarter following the date that the unit is placed into long-term cold storage. In such cases, the owner or operator shall submit quarterly reports for the unit beginning with the data from the quarter in which the unit recommences operation (where the initial quarterly report contains hourly data beginning with the first hour of recommenced operation of the unit). Each electronic report must be submitted to the Administrator within 30 days following the end of each calendar quarter. Except as otherwise provided in §75.64(a)(4) and (a)(5), each electronic report shall include the information provided in paragraphs (f)(1)(i) through (1)(vi) of this section, and shall

also include the date of report generation. Prior to January 1, 2009, each report shall include the facility information provided in paragraphs (f)(1)(i)(A) and (B) of this section, for each affected unit or group of units monitored at a common stack. On and after January 1, 2009, only the facility identification information provided in paragraph (f)(1)(i)(A) of this section is required.

(i) Facility information:

(A) Identification, including:

(*1*) Facility/ORISPL number;

(*2*) Calendar quarter and year data contained in the report; and

(*3*) Electronic data reporting format version used for the report.

(B) Location of facility, including:

(*1*) Plant name and facility identification code;

(*2*) EPA AIRS facility system identification code;

(*3*) State facility identification code;

(*4*) Source category/type;

(*5*) Primary SIC code;

(*6*) State postal abbreviation;

(*7*) FIPS county code; and

(*8*) Latitude and longitude.

(ii) The information and hourly data required in paragraphs (a) and (b) of this section, except for:

(A) Descriptions of adjustments, corrective action, and maintenance;

(B) Information which is incompatible with electronic reporting (e.g., field data sheets, lab analyses, quality control plan);

(C) For units with $NO_X$ add-on emission controls that do not elect to use the approved site-specific parametric monitoring procedures for calculation of substitute data, the information in § 75.58(b)(3);

(D) Information required by § 75.57(h) concerning the causes of any missing data periods and the actions taken to cure such causes;

(E) Hardcopy monitoring plan information required by § 75.53 and hardcopy test data and results required by § 75.59;

(F) Records of flow polynomial equations and numerical values required by § 75.59(a)(5)(vi);

(G) Daily fuel sampling information required by § 75.58(c)(3)(i) for units using assumed values under appendix D;

(H) Information required by § 75.59(b)(2) concerning transmitter or transducer accuracy tests;

(I) Stratification test results required as part of the RATA supplementary records under § 75.59(a)(7);

(J) Data and results of RATAs that are aborted or invalidated due to problems with the reference method or operational problems with the unit and data and results of linearity checks that are aborted or invalidated due to operational problems with the unit; and

(K) Supplementary RATA information required under § 75.59(a)(7), except that:

(*1*) The applicable data elements under § 75.59(a)(7)(ii)(A) through (T) and under § 75.59(a)(7)(iii)(A) through (M) shall be reported for flow RATAs at circular or rectangular stacks (or ducts) in which angular compensation for yaw and/or pitch angles is used (*i.e.*, Method 2F or 2G in appendices A–1 and A–2 to part 60 of this chapter), with or without wall effects adjustments;

(*2*) The applicable data elements under § 75.59(a)(7)(ii)(A) through (T) and under § 75.59(a)(7)(iii)(A) through (M) shall be reported for any flow RATA run at a circular stack in which Method 2 in appendices A–1 and A–2 to part 60 of this chapter is used and a wall effects adjustment factor is determined by direct measurement;

(*3*) The data under § 75.59(a)(7)(ii)(T) shall be reported for all flow RATAs at circular stacks in which Method 2 in appendices A–1 and A–2 to part 60 of this chapter is used and a default wall effects adjustment factor is applied; and

(*4*) The data under § 75.59(a)(7)(ix)(A) through (F) shall be reported for all flow RATAs at rectangular stacks or ducts in which Method 2 in appendices A–1 and A–2 to part 60 of this chapter is used and a wall effects adjustment factor is applied.

(iii) Average $NO_X$ emission rate (lb/mmBtu, rounded to the nearest thousandth) during the quarter and cumulative $NO_X$ emission rate for the calendar year.

(iv) Tons of $NO_X$ emitted during quarter, cumulative tons of $NO_X$ emitted during the year, and, during the second

and third calendar quarters, cumulative tons of $NO_X$ emitted during the ozone season.

(v) During the second and third calendar quarters, cumulative heat input for the ozone season.

(vi) Unit or stack or common pipe header operating hours for quarter, cumulative unit, stack or common pipe header operating hours for calendar year, and, during the second and third calendar quarters, cumulative operating hours during the ozone season.

(vii) Reporting period heat input.

(viii) New reporting frequency and begin date of the new reporting frequency (if applicable).

(2) The designated representative shall certify that the component and system identification codes and formulas in the quarterly electronic reports submitted to the Administrator pursuant to paragraph (e) of this section represent current operating conditions.

(3) *Compliance certification.* The designated representative shall submit and sign a compliance certification in support of each quarterly emissions monitoring report based on reasonable inquiry of those persons with primary responsibility for ensuring that all of the unit's emissions are correctly and fully monitored. The certification shall state that:

(i) The monitoring data submitted were recorded in accordance with the applicable requirements of this part, including the quality assurance procedures and specifications; and

(ii) With regard to a unit with add-on emission controls and for all hours where data are substituted in accordance with §75.34(a)(1), the add-on emission controls were operating within the range of parameters listed in the monitoring plan and the substitute values do not systematically underestimate $NO_X$ emissions.

(4) The designated representative shall comply with all of the quarterly reporting requirements in §§75.64(d), (f), and (g).

[64 FR 28624, May 26, 1999, as amended at 67 FR 40446, June 12, 2002; 73 FR 4359, Jan. 24, 2008]

### §75.74 Annual and ozone season monitoring and reporting requirements.

(a) *Annual monitoring requirement.* (1) The owner or operator of an affected unit subject both to an Acid Rain emission limitation and to a State or federal $NO_X$ mass reduction program that adopts the provisions of this part must meet the requirements of this part during the entire calendar year.

(2) The owner or operator of an affected unit subject to a State or federal $NO_X$ mass reduction program that adopts the provisions of this part and that requires monitoring and reporting of hourly emissions on an annual basis must meet the requirements of this part during the entire calendar year.

(b) *Ozone season monitoring requirements.* The owner or operator of an affected unit that is not required to meet the requirements of this subpart on an annual basis under paragraph (a) of this section may either:

(1) Meet the requirements of this subpart on an annual basis; or

(2) Meet the requirements of this subpart during the ozone season, except as specified in paragraph (c) of this section.

(c) If the owner or operator of an affected unit chooses to meet the requirements of this subpart on less than an annual basis in accordance with paragraph (b)(2) of this section, then:

(1) The owner or operator of a unit that uses continuous emissions monitoring systems or a fuel flowmeter to meet any of the requirements of this subpart shall quality assure the hourly ozone season emission data required by this subpart. To achieve this, the owner or operator shall operate, maintain and calibrate each required CEMS and shall perform diagnostic testing and quality assurance testing of each required CEMS or fuel flowmeter according to the applicable provisions of paragraphs (c)(2) through (c)(5) of this section. Except where otherwise noted, the provisions of paragraphs (c)(2) and (c)(3) of this section apply instead of the quality assurance provisions in sections 2.1 through 2.3 of appendix B to this part, and shall be used in lieu of those appendix B provisions.

(2) *Quality assurance requirements prior to the ozone season.* The provisions of this paragraph apply to each ozone

347

**Environmental Protection Agency**          **§ 81.339**

Pennsylvania—1997 8-Hour Ozone NAAQS (Primary and Secondary)

| Designated area | Designation [a] | | Category/classification | |
|---|---|---|---|---|
| | Date [1] | Type | Date [1] | Type |
| Bedford County ................................. | .............. | Unclassifiable/Attainment | | |
| Clinton County ................................. | .............. | Unclassifiable/Attainment | | |
| Fulton County ................................... | .............. | Unclassifiable/Attainment | | |
| Huntingdon County ............................ | .............. | Unclassifiable/Attainment | | |
| Mifflin County ................................... | .............. | Unclassifiable/Attainment | | |
| Montour County ................................. | .............. | Unclassifiable/Attainment | | |
| Union County .................................... | .............. | Unclassifiable/Attainment | | |
| Rest of State | .............. | Unclassifiable/Attainment | | |
| Columbia County ............................... | .............. | Unclassifiable/Attainment | | |
| Crawford County ............................... | .............. | Unclassifiable/Attainment | | |
| Juniata County .................................. | .............. | Unclassifiable/Attainment | | |
| Lawrence County ............................... | .............. | Unclassifiable/Attainment | | |
| Northumberland County .................... | .............. | Unclassifiable/Attainment | | |
| Pike County ...................................... | .............. | Unclassifiable/Attainment | | |
| Schuylkill County .............................. | .............. | Unclassifiable/Attainment | | |
| Snyder County .................................. | .............. | Unclassifiable/Attainment | | |
| Somerset County ............................... | .............. | Unclassifiable/Attainment | | |
| Susquehanna County ......................... | .............. | Unclassifiable/Attainment | | |
| Warren County .................................. | .............. | Unclassifiable/Attainment | | |
| Wayne County ................................... | .............. | Unclassifiable/Attainment | | |

[a] Includes Indian Country located in each county or area, except as otherwise specified.
[1] This date is June 15, 2004, unless otherwise noted.
[2] November 22, 2004.

Pennsylvania—2008 8-Hour Ozone NAAQS (Primary and secondary)

| Designated area | Designation | | Classification | |
|---|---|---|---|---|
| | Date [1] | Type | Date [1] | Type |
| Allentown-Bethlehem-Easton, PA [2] ........................... | .............. | Nonattainment | ................ | Marginal. |
|     Carbon County | | | | |
|     Lehigh County | | | | |
|     Northampton County | | | | |
| Lancaster, PA [2] ................................................... | .............. | Nonattainment | ................ | Marginal. |
|     Lancaster County | | | | |
| Philadelphia-Wilmington-Atlantic City, PA-NJ-MD-DE [2]. | .............. | Nonattainment | 6/3/16 | Marginal.[4] |
|     Bucks County. | | | | |
|     Chester County. | | | | |
|     Delaware County. | | | | |
|     Montgomery County. | | | | |
|     Philadelphia County. | | | | |
| Pittsburgh-Beaver Valley, PA [2] ................................. | .............. | Nonattainment | 6/3/16 | Marginal.[4] |
|     Allegheny County. | | | | |
|     Armstrong County. | | | | |
|     Beaver County. | | | | |
|     Butler County. | | | | |
|     Fayette County. | | | | |
|     Washington County. | | | | |
|     Westmoreland County. | | | | |
| Reading, PA [2] ..................................................... | .............. | Nonattainment | ................ | Marginal. |
|     Berks County | | | | |
| AQCR 151 NE Pennsylvania Intrastate (remainder) [3] | | | | |
|     Bradford County ............................................... | .............. | Unclassifiable/Attainment | | |
|     Lackawanna County .......................................... | .............. | Unclassifiable/Attainment | | |
|     Luzerne County ............................................... | .............. | Unclassifiable/Attainment | | |
|     Monroe County ................................................ | .............. | Unclassifiable/Attainment | | |
|     Pike County .................................................... | .............. | Unclassifiable/Attainment | | |
|     Schuylkill County ............................................. | .............. | Unclassifiable/Attainment | | |
|     Sullivan County ............................................... | .............. | Unclassifiable/Attainment | | |
|     Susquehanna County ........................................ | .............. | Unclassifiable/Attainment | | |
|     Tioga County .................................................. | .............. | Unclassifiable/Attainment | | |
|     Wayne County ................................................ | .............. | Unclassifiable/Attainment | | |
|     Wyoming ........................................................ | .............. | Unclassifiable/Attainment | | |
| AQCR 178 NW Pennsylvania Intrastate [3] | | | | |
|     Cameron County .............................................. | .............. | Unclassifiable/Attainment | | |
|     Clarion County ................................................ | .............. | Unclassifiable/Attainment | | |
|     Clearfield County ............................................. | .............. | Unclassifiable/Attainment | | |
|     Crawford County .............................................. | .............. | Unclassifiable/Attainment | | |
|     Elk County ..................................................... | .............. | Unclassifiable/Attainment | | |

§ 81.339                                                        40 CFR Ch. I (7–1–18 Edition)

Pennsylvania—2008 8-Hour Ozone NAAQS (Primary and secondary)

| Designated area | Designation | | Classification | |
|---|---|---|---|---|
| | Date [1] | Type | Date [1] | Type |
| Erie County ............................................ | .............. | Unclassifiable/Attainment | | |
| Forest County ........................................ | .............. | Unclassifiable/Attainment | | |
| Jefferson County .................................... | .............. | Unclassifiable/Attainment | | |
| Lawrence County .................................... | .............. | Unclassifiable/Attainment | | |
| McKean County ...................................... | .............. | Unclassifiable/Attainment | | |
| Mercer County ....................................... | .............. | Unclassifiable/Attainment | | |
| Potter County ........................................ | .............. | Unclassifiable/Attainment | | |
| Venango County ..................................... | .............. | Unclassifiable/Attainment | | |
| Warren County ....................................... | .............. | Unclassifiable/Attainment | | |
| AQCR 195 Central Pennsylvania Intrastate [3] | | | | |
| Bedford County ...................................... | .............. | Unclassifiable/Attainment | | |
| Blair County ........................................... | .............. | Unclassifiable/Attainment | | |
| Cambria County ..................................... | .............. | Unclassifiable/Attainment | | |
| Centre County ....................................... | .............. | Unclassifiable/Attainment | | |
| Clinton County ....................................... | .............. | Unclassifiable/Attainment | | |
| Columbia County .................................... | .............. | Unclassifiable/Attainment | | |
| Fulton County ........................................ | .............. | Unclassifiable/Attainment | | |
| Huntingdon County ................................. | .............. | Unclassifiable/Attainment | | |
| Juniata County ....................................... | .............. | Unclassifiable/Attainment | | |
| Lycoming County .................................... | .............. | Unclassifiable/Attainment | | |
| Mifflin County ........................................ | .............. | Unclassifiable/Attainment | | |
| Montour County ..................................... | .............. | Unclassifiable/Attainment | | |
| Northumberland County .......................... | .............. | Unclassifiable/Attainment | | |
| Snyder County ....................................... | .............. | Unclassifiable/Attainment | | |
| Somerset County .................................... | .............. | Unclassifiable/Attainment | | |
| Union County ......................................... | .............. | Unclassifiable/Attainment | | |
| AQCR 196 South Central Pennsylvania (remainder) [3] | | | | |
| Adams County ........................................ | .............. | Unclassifiable/Attainment | | |
| Cumberland County ................................ | .............. | Unclassifiable/Attainment | | |
| Dauphin County ..................................... | .............. | Unclassifiable/Attainment | | |
| Franklin County ...................................... | .............. | Unclassifiable/Attainment | | |
| Lebanon County ..................................... | .............. | Unclassifiable/Attainment | | |
| Perry County .......................................... | .............. | Unclassifiable/Attainment | | |
| York County ........................................... | .............. | Unclassifiable/Attainment | | |
| AQCR 197 Southwest Pennsylvania (remainder) [3] | | | | |
| Green County ........................................ | .............. | Unclassifiable/Attainment | | |
| Indiana County ....................................... | .............. | Unclassifiable/Attainment | | |

[1] This date is July 20, 2012, unless otherwise noted.
[2] Excludes Indian country located in each area, unless otherwise noted.
[3] Includes any Indian country in each county or area, unless otherwise specified.
[4] Attainment date is extended to July 20, 2016.

the $NO_X$ Budget Trading Program prior to the applicable commencement date specified in § 75.19(a)(1)(ii) of this chapter.

(d) *Certification/recertification procedures for alternative monitoring systems.* The $NO_X$ authorized account representative of each unit not subject to an Acid Rain emissions limitation for which the owner or operator intends to use an alternative monitoring system approved by the Administrator under subpart E of part 75 of this chapter shall comply with the applicable certification procedures of paragraph (b) of this section before using the system under the $NO_X$ Budget Trading Program. The $NO_X$ authorized account representative shall also comply with the applicable recertification procedures of paragraph (b) of this section. Section 75.20(f) of this chapter shall apply to such alternative monitoring system.

[65 FR 2727, Jan. 18, 2000, as amended at 69 FR 21647, Apr. 21, 2004]

### § 97.72  Out of control periods.

(a) Whenever any emission monitoring system fails to meet the quality assurance or data validation requirements of part 75 of this chapter, data shall be substituted using the applicable procedures in subpart D, subpart H, appendix D, or appendix E of part 75 of this chapter.

(b) *Audit decertification.* Whenever both an audit of an emission monitoring system and a review of the initial certification or recertification application reveal that any system should not have been certified or recertified because it did not meet a particular performance specification or other requirement under § 97.71 or the applicable provisions of part 75 of this chapter, both at the time of the initial certification or recertification application submission and at the time of the audit, the Administrator will issue a notice of disapproval of the certification status of such system. For the purposes of this paragraph, an audit shall be either a field audit or an audit of any information submitted to the permitting authority or the Administrator. By issuing the notice of disapproval, the Administrator revokes prospectively the certification status of the system. The data measured and

recorded by the system shall not be considered valid quality-assured data from the date of issuance of the notification of the revoked certification status until the date and time that the owner or operator completes subsequently approved initial certification or recertification tests for the system. The owner or operator shall follow the initial certification or recertification procedures in § 97.71 for each disapproved system.

[65 FR 2727, Jan. 18, 2000, as amended at 69 FR 21648, Apr. 21, 2004]

### § 97.73  Notifications.

(a) The $NO_X$ authorized account representative for a $NO_X$ Budget unit shall submit written notice to the Administrator, the appropriate EPA Regional Office, and the permitting authority in accordance with § 75.61 of this chapter.

(b) For any unit that does not have an Acid Rain emissions limitation, the permitting authority may waive the requirement to notify the permitting authority in paragraph (a) of this section.

### § 97.74  Recordkeeping and reporting.

(a) *General provisions.* (1) The $NO_X$ authorized account representative shall comply with all recordkeeping and reporting requirements in this section, with the recordkeeping and reporting requirements under § 75.73 of this chapter, and with the requirements of § 97.10(e)(1).

(2) If the $NO_X$ authorized account representative for a $NO_X$ Budget unit subject to an Acid Rain emission limitation who signed and certified any submission that is made under subpart F or G of part 75 of this chapter and that includes data and information required under this subpart or subpart H of part 75 of this chapter is not the same person as the designated representative or the alternative designated representative for the unit under part 72 of this chapter, then the submission must also be signed by the designated representative or the alternative designated representative.

(b) *Monitoring plans.* (1) The owner or operator of a unit subject to an Acid Rain emissions limitation shall comply with requirements of § 75.62 of this chapter, except that the monitoring

229

plan shall also include all of the information required by subpart H of part 75 of this chapter.

(2) The owner or operator of a unit that is not subject to an Acid Rain emissions limitation shall comply with requirements of § 75.62 of this chapter, except that the monitoring plan is only required to include the information required by subpart H of part 75 of this chapter.

(c) *Certification applications.* The NO$_X$ authorized account representative shall submit an application to the Administrator, the appropriate EPA Regional Office, and the permitting authority within 45 days after completing all initial certification or recertification tests required under § 97.71 including the information required under subpart H of part 75 of this chapter.

(d) *Quarterly reports.* The NO$_X$ authorized account representative shall submit quarterly reports, as follows:

(1) If a unit is subject to an Acid Rain emission limitation or if the owner or operator of the NO$_X$ budget unit chooses to meet the annual reporting requirements of this subpart H, the NO$_X$ authorized account representative shall submit a quarterly report for each calendar quarter beginning with:

(i) For a unit for which the owner or operator intends to apply or applies for the early reduction credits under § 97.43, the calendar quarter that covers May 1, 2000 through June 30, 2000. The NO$_X$ mass emission data shall be recorded and reported from the first hour on May 1, 2000; or

(ii) For a unit that commences operation before January 1, 2003 and that is not subject to paragraph (d)(1)(i) of this section, the calendar quarter covering May 1, 2003 through June 30, 2003. The NO$_X$ mass emission data shall be recorded and reported from the first hour on May 1, 2003; or

(iii) For a unit that commences operation on or after January 1, 2003:

(A) The calendar quarter in which the unit commences operation, if unit operation commences during a control period. The NO$_X$ mass emission data shall be recorded and reported from the date and hour when the unit commences operation; or

(B) The calendar quarter which includes May 1 through June 30 of the first control period following the date on which the unit commences operation, if the unit does not commence operation during a control period. The NO$_X$ mass emission data shall be recorded and reported from the first hour on May 1 of that control period; or

(iv) A calendar quarter before the quarter specified in paragraph (d)(1)(i), (d)(1)(ii), or (d)(1)(iii)(B) of this section, if the owner or operator elects to begin reporting early under § 97.70(c)(3).

(2) If a NO$_X$ budget unit is not subject to an Acid Rain emission limitation, then the NO$_X$ authorized account representative shall either:

(i) Meet all of the requirements of part 75 related to monitoring and reporting NO$_X$ mass emissions during the entire year and meet the deadlines specified in paragraph (d)(1) of this section; or

(ii) Submit quarterly reports, documenting NO$_X$ mass emissions from the unit, only for the period from May 1 through September 30 of each year and including the data described in § 75.74(c)(6) of this chapter. The NO$_X$ authorized account representative shall submit such quarterly reports, beginning with:

(A) For a unit for which the owner or operator intends to apply or applies for the early reduction credits under § 97.43, the calendar quarter that covers May 1, 2000 through June 30, 2000. The NO$_X$ mass emission data shall be recorded and reported from the first hour on May 1, 2000; or

(B) For a unit that commences operation before January 1, 2003 and that is not subject to paragraph (d)(2)(ii)(A) of this section, the calendar quarter covering May 1, 2003 through June 30, 2003. The NO$_X$ mass emission data shall be recorded and reported from the first hour on May 1, 2003; or

(C) For a unit that commences operation on or after January 1, 2003 and during a control period, the calendar quarter in which the unit commences operation. The NO$_X$ mass emission data shall be recorded and reported from the date and hour when the unit commences operation; or

(D) For a unit that commences operation on or after January 1, 2003 and not during a control period, the calendar quarter which includes May 1

230

through June 30 of the first control period following the date on which the unit commences operation. The $NO_X$ mass emission data shall be recorded and reported from the first hour on May 1 of that control period.

(3) The $NO_X$ authorized account representative shall submit each quarterly report to the Administrator within 30 days following the end of the calendar quarter covered by the report. Quarterly reports shall be submitted in the manner specified in subpart H of part 75 of this chapter and §75.64 of this chapter.

(i) For units subject to an Acid Rain emissions limitation, quarterly reports shall include all of the data and information required in subpart H of part 75 of this chapter for each $NO_X$ Budget unit (or group of units using a common stack) and the data and information required in subpart G of part 75 of this chapter.

(ii) For units not subject to an Acid Rain emissions limitation, quarterly reports are only required to include all of the data and information required in subpart H of part 75 of this chapter for each $NO_X$ Budget unit (or group of units using a common stack).

(4) *Compliance certification.* The $NO_X$ authorized account representative shall submit to the Administrator a compliance certification in support of each quarterly report based on reasonable inquiry of those persons with primary responsibility for ensuring that all of the unit's emissions are correctly and fully monitored. The certification shall state that:

(i) The monitoring data submitted were recorded in accordance with the applicable requirements of this subpart and part 75 of this chapter, including the quality assurance procedures and specifications;

(ii) For a unit with add-on $NO_X$ emission controls and for all hours where data are substituted in accordance with §75.34(a)(1) of this chapter, the add-on emission controls were operating within the range of parameters listed in the quality assurance/quality control program under appendix B of part 75 of this chapter and the substitute values do not systematically underestimate $NO_X$ emissions; and

(iii) For a unit that is reporting on a control period basis under paragraph (d)(2)(ii) of this section, the $NO_X$ emission rate and $NO_X$ concentration values substituted for missing data under subpart D of part 75 of this chapter are calculated using only values from a control period and do not systematically underestimate $NO_X$ emissions.

[65 FR 2727, Jan. 18, 2000, as amended at 67 FR 21530, Apr. 30, 2002; 69 FR 21648, Apr. 21, 2004]

**§97.75 Petitions.**

(a) The $NO_X$ authorized account representative of a $NO_X$ Budget unit may submit a petition under §75.66 of this chapter to the Administrator requesting approval to apply an alternative to any requirement of this subpart.

(b) Application of an alternative to any requirement of this subpart is in accordance with this subpart only to the extent that the petition is approved by the Administrator under §75.66 of this chapter.

**§97.76 Additional requirements to provide heat input data.**

The owner or operator of a $NO_X$ Budget unit that monitors and reports $NO_X$ mass emissions using a $NO_X$ concentration system and a flow system shall also monitor and report heat input rate at the unit level using the procedures set forth in part 75 of this chapter.

## Subpart I—Individual Unit Opt-ins

**§97.80 Applicability.**

A unit that is in a State (as defined in §97.2), is not a $NO_X$ Budget unit under §97.4(a), is not a unit exempt under §97.4(b), vents all of its emissions to a stack, and is operating, may qualify to be a $NO_X$ Budget opt-in unit under this subpart. A unit that is a $NO_X$ Budget unit under §97.4(a), is covered by an exemption under §97.4(b) or §97.5 that is in effect, or is not operating is not eligible to be a $NO_X$ Budget opt-in unit.

**§97.81 General.**

Except otherwise as provided in this part, a $NO_X$ Budget opt-in unit shall be

231

ing to control of VOC emmissions from offset lithographic printing presses and letterpress printing presses); 25 Pa. Code § 129.74 (relating to control of VOC emissions from fiberglass boat manufacturing materials); 25 Pa. Code § 129.95 (relating to recordkeeping); and 25 Pa. Code § 129.97 (relating to presumptive RACT requirements, RACT emission limitations and petition for alternative compliance schedule).

## § 129.95. Recordkeeping.

(a) The owner and operator of a major $NO_x$ emitting facility or a major VOCs emitting facility shall keep records to demonstrate compliance with §§ 129.91—129.94.

(b) The records shall provide sufficient data and calculations to clearly demonstrate that the requirements of §§ 129.91—129.94 are met.

(c) Data or information required to determine compliance shall be recorded and maintained in a time frame consistent with the averaging period of the requirement.

(d) The records shall be retained for at least 2 years and shall be made available to the Department on request.

(e) An owner or operator claiming that a facility is exempt from the RACT requirements of §§ 129.91—129.94, based on the facility's potential to emit, shall maintain records that clearly demonstrate to the Department that the facility or source is not subject to §§ 129.91—129.94.

### Source

The provisions of this § 129.95 adopted January 14, 1994, effective January 15, 1994, 24 Pa.B. 467.

### Cross References

This section cited in 25 Pa. Code § 129.52a (relating to control of VOC emissions from large appliance and metal furniture surface coating processes); 25 Pa. Code § 129.52b (relating to control of VOC emissions from paper, film and foil surface coating processes); 25 Pa. Code § 129.52c (relating to control of VOC emissions from flat wood paneling surface coating processes); 25 Pa. Code § 129.52d (relating to control of VOC emissions from miscellaneous metal parts surface coating processes, miscellaneous plastic parts surface coating processes and pleasure craft surface coatings); 25 Pa. Code § 129.52e (relating to control of VOC emissions from automobile and light-duty truck assembly coating operations and heavier vehicle coating operations); 25 Pa. Code § 129.63a (relating to control of VOC emissions from industrial cleaning solvents); 25 Pa. Code § 129.67a (relating to control of VOC emissions from flexible packaging printing presses); 25 Pa. Code § 129.67b (relating to control of VOC emissions from offset lithographic printing presses and letterpress printing presses); 25 Pa. Code § 129.74 (relating to control of VOC emissions from fiberglass boat manufacturing materials); and 25 Pa. Code § 129.97 (relating to presumptive RACT requirements, RACT emission limitations and petition for alternative compliance schedule).

## ADDITIONAL RACT REQUIREMENTS FOR MAJOR SOURCES OF $NO_x$ AND VOCs

## § 129.96. Applicability.

(a) The $NO_x$ requirements of this section and §§ 129.97—129.100 apply Statewide to the owner and operator of a major $NO_x$ emitting facility and the VOC requirements of this section and §§ 129.97—129.100 apply Statewide to the owner and operator of a major VOC emitting facility that were in existence on or before July 20, 2012, for which a requirement or emission limitation, or

both, has not been established in §§ 129.51—129.52c, 129.54—129.63, 129.64—129.69, 129.71—129.75, 129.77, 129.101—129.107 and 129.301— 129.310.

(b)  The $NO_x$ requirements of this section and §§ 129.97—129.100 apply Statewide to the owner and operator of a $NO_x$ emitting facility and the VOC requirements of this section and §§ 129.97—129.100 apply Statewide to the owner and operator of a VOC emitting facility when the installation of a new source or a modification or change in operation of an existing source after July 20, 2012, results in the source or facility meeting the definition of a major $NO_x$ emitting facility or a major VOC emitting facility and for which a requirement or an emission limitation, or both, has not been established in §§ 129.51—129.52e, 129.54—129.69, 129.71—129.75, 129.77, 129.101—129.107 and 129.301— 129.310.

(c)  This section and §§ 129.97—129.100 do not apply to the owner and operator of a $NO_x$ air contamination source located at a major $NO_x$ emitting facility that has the potential to emit less than 1 TPY of $NO_x$ or a VOC air contamination source located at a major VOC emitting facility that has the potential to emit less than 1 TPY of VOC.

(d)  This section and §§ 129.97—129.100 do not apply to the owner and operator of a facility which is not a major $NO_x$ emitting facility or a major VOC emitting facility on or before January 1, 2017.

**Authority**

The provisions of this § 129.96 issued under section 5(a)(1) and (8) of the Air Pollution Control Act (35 P.S. § 4005(a)(1) and (8)).

**Source**

The provisions of this § 129.96 adopted April 22, 2016, effective April 23, 2016, 46 Pa.B. 2036; amended August 10, 2018, effective August 11, 2018, 48 Pa.B. 4814. Immediately preceding text appears at serial pages (384191) to (384192).

**Cross References**

This section cited in 25 Pa. Code § 121.1 (relating to definitions); 25 Pa. Code § 129.97 (relating to presumptive RACT requirements, RACT emission limitations and petition for alternative compliance schedule); 25 Pa. Code § 129.98 (relating to facility-wide or system-wide $NO_x$ emissions averaging plan general requirements); 25 Pa. Code § 129.99 (relating to alternative RACT proposal and petition for alternative compliance schedule); and 25 Pa. Code § 129.100 (relating to compliance demonstration and recordkeeping requirements).

### § 129.97.  Presumptive RACT requirements, RACT emission limitations and petition for alternative compliance schedule.

(a)  The owner and operator of a source listed in one or more of subsections (b)—(h) located at a major $NO_x$ emitting facility or major VOC emitting facility subject to § 129.96 (relating to applicability) shall comply with the applicable presumptive RACT requirement or RACT emission limitation, or both, beginning with the specified compliance date as follows, unless an alternative compliance schedule is submitted and approved under subsections (k)—(m) or § 129.99 (relating to alternative RACT proposal and petition for alternative compliance schedule):

(1)  January 1, 2017, for a source subject to § 129.96(a).

*Copyright © 2018 Commonwealth of Pennsylvania*

(2)    January 1, 2017, or 1 year after the date the source meets the definition of a major $NO_x$ emitting facility or major VOC emitting facility, whichever is later, for a source subject to § 129.96(b).

(b)   The owner and operator of a source specified in this subsection, which is located at a major $NO_x$ emitting facility or major VOC emitting facility subject to § 129.96 shall comply with the following:

(1)    The presumptive RACT requirement for a combustion unit with a rated heat input equal to or greater than 20 million Btu/hour and less than 50 million Btu/hour, which is the performance of a biennial tune-up conducted in accordance with the procedures in 40 CFR 63.11223 (relating to how do I demonstrate continuous compliance with the work practice and management practice standards). The biennial tune-up must include, at a minimum, the following:

(i)    Inspection and cleaning or replacement of fuel-burning equipment, including the burners and components, as necessary, for proper operation as specified by the manufacturer.

(ii)    Inspection of the flame pattern and adjustment of the burner, as necessary, to optimize the flame pattern to minimize total emissions of $NO_x$ and, to the extent possible, emissions of CO.

(iii)    Inspection and adjustment, as necessary, of the air-to-fuel ratio control system to ensure proper calibration and operation as specified by the manufacturer.

(393495) No. 528 Nov. 18

129-130.2

(393496) No. 528 Nov. 18 *Copyright © 2018 Commonwealth of Pennsylvania*

(2)  The owner or operator of a combustion unit with an oxygen trim system that maintains an optimum air-to-fuel ratio that would otherwise be subject to a biennial tune-up shall conduct a tune-up of the boiler one time in each 5-year calendar period. The tune-up must include, at a minimum, the following:

(i)  Inspection and cleaning or replacement of fuel-burning equipment, including the burners and components, as necessary, for proper operation as specified by the manufacturer.

(ii)  Inspection of the flame pattern and adjustment of the burner, as necessary, to optimize the flame pattern to minimize total emissions of $NO_x$ and, to the extent possible, emissions of CO.

(iii)  Inspection and adjustment, as necessary, of the air-to-fuel ratio control system to ensure proper calibration and operation as specified by the manufacturer.

(3)  The applicable recordkeeping requirements of § 129.100(d), (e) or (f) (relating to compliance demonstration and recordkeeping requirements).

(c)  The owner and operator of a source specified in this subsection, which is located at a major $NO_x$ emitting facility or major VOC emitting facility subject to § 129.96 shall install, maintain and operate the source in accordance with the manufacturer's specifications and with good operating practices:

(1)  A $NO_x$ air contamination source that has the potential to emit less than 5 TPY of $NO_x$.

(2)  A VOC air contamination source that has the potential to emit less than 2.7 TPY of VOC.

(3)  A boiler or other combustion source with an individual rated gross heat input less than 20 million Btu/hour.

(4)  A combustion turbine with a rated output less than 1,000 bhp.

(5)  A stationary internal combustion engine rated at less than 500 bhp (gross).

(6)  An incinerator, thermal oxidizer or catalytic oxidizer used primarily for air pollution control.

(7)  A fuel-burning unit with an annual capacity factor of less than 5%.

(i)  For a combustion unit, the annual capacity factor is the ratio of the unit's heat input (in million Btu or equivalent units of measure) to the unit's maximum rated hourly heat input rate (in million Btu/hour or equivalent units of measure) multiplied by 8,760 hours during a period of 12 consecutive calendar months.

(ii)  For an electric generating unit, the annual capacity factor is the ratio of the unit's actual electric output (expressed in MWe/hr) to the unit's nameplate capacity (or maximum observed hourly gross load (in MWe/hr) if greater than the nameplate capacity) multiplied by 8,760 hours during a period of 12 consecutive calendar months.

(iii)  For any other unit, the annual capacity factor is the ratio of the unit's actual operating level to the unit's potential operating level during a period of 12 consecutive calendar months.

(8)  An emergency standby engine operating less than 500 hours in a 12-month rolling period.

(d)  Except as specified under subsection (c), the owner and operator of a combustion unit or other combustion source located at a major VOC emitting

(380507) No. 500 Jul. 16

facility subject to § 129.96 shall install, maintain and operate the source in accordance with the manufacturer's specifications and with good operating practices for the control of the VOC emissions from the combustion unit or other combustion source.

(e)   The owner and operator of a municipal solid waste landfill subject to § 129.96 shall comply with the following applicable presumptive RACT requirement:

(1)   For a municipal solid waste landfill constructed on or before May 30, 1991, emission guidelines and compliance times in 40 CFR Part 60, Subpart Cc (relating to emission guidelines and compliance times for municipal solid waste landfills), which are adopted and incorporated by reference in § 122.3 (relating to adoption of standards), and applicable Federal or state plans in 40 CFR Part 62 (relating to approval and promulgation of state plans for designated facilities and pollutants).

(2)   For a municipal solid waste landfill constructed after May 30, 1991, New Source Performance Standards in 40 CFR Part 60, Subpart WWW (relating to standards of performance for municipal solid waste landfills), which are adopted and incorporated by reference in § 122.3.

(f)   The owner and operator of a municipal waste combustor subject to § 129.96 shall comply with the presumptive RACT requirement of 180 ppmvd $NO_x$ @ 7% oxygen.

(g)   Except as specified under subsection (c), the owner and operator of a $NO_x$ air contamination source specified in this subsection, which is located at a major $NO_x$ emitting facility or a VOC air contamination source specified in this subsection, which is located at a major VOC emitting facility subject to § 129.96 may not cause, allow or permit $NO_x$ or VOCs to be emitted from the air contamination source in excess of the applicable presumptive RACT emission limitation:

(1)   A combustion unit or process heater:

(i)   For a natural gas-fired combustion unit or process heater with a rated heat input equal to or greater than 50 million Btu/hour, 0.10 lb $NO_x$/million Btu heat input.

(ii)   For a distillate oil-fired combustion unit or process heater with a rated heat input equal to or greater than 50 million Btu/hour, 0.12 lb $NO_x$/million Btu heat input.

(iii)   For a residual oil-fired or other liquid fuel-fired combustion unit or process heater with a rated heat input equal to or greater than 50 million Btu/hour, 0.20 lb $NO_x$/million Btu heat input.

(iv)   For a refinery gas-fired combustion unit or process heater with a rated heat input equal to or greater than 50 million Btu/hour, 0.25 lb $NO_x$/million Btu heat input.

(v)   For a coal-fired combustion unit with a rated heat input equal to or greater than 50 million Btu/hour and less than 250 million Btu/hour, 0.45 lb $NO_x$/million Btu heat input.

(vi)   For a coal-fired combustion unit with a rated heat input equal to or greater than 250 million Btu/hour that is:

(A)   A circulating fluidized bed combustion unit, 0.16 lb $NO_x$/million Btu heat input.

(B)   A tangentially fired combustion unit, 0.35 lb $NO_x$/million Btu heat input.

*Copyright © 2016 Commonwealth of Pennsylvania*

(C)   Any other type of coal-fired combustion unit, 0.40 lb $NO_x$/million Btu heat input.

(vii)   For any other type of solid fuel-fired combustion unit with a rated heat input equal to or greater than 50 million Btu/hour, 0.25 lb $NO_x$/million Btu heat input.

(viii)   For a coal-fired combustion unit with a selective catalytic reduction system operating with an inlet temperature equal to or greater than 600°F, 0.12 lb $NO_x$/million Btu heat input. Compliance with this emission limit is also required when by-passing the selective catalytic reduction system.

(ix)   For a coal-fired combustion unit with a selective noncatalytic reduction system, the selective noncatalytic reduction system shall be operated with the injection of reagents including ammonia or other $NO_x$-reducing agents when the temperature at the area of the reagent injection is equal to or greater than 1,600°F.

(2)   A combustion turbine:

(i)   For a combined cycle or combined heat and power combustion turbine with a rated output equal to or greater than 1,000 bhp and less than 180 MW when firing:

(A)   Natural gas or a noncommercial gaseous fuel, 42 ppmvd $NO_x$ @ 15% oxygen.

(B)   Fuel oil, 96 ppmvd $NO_x$ @ 15% oxygen.

(C)   Natural gas or a noncommercial gaseous fuel, 5 ppmvd VOC (as propane) @ 15% oxygen.

(D)   Fuel oil, 9 ppmvd VOC (as propane) @ 15% oxygen.

(ii)   For a combined cycle or combined heat and power combustion turbine with a rated output equal to or greater than 180 MW when firing:

(A)   Natural gas or a noncommercial gaseous fuel, 4 ppmvd $NO_x$ @ 15% oxygen.

(B)   Fuel oil, 8 ppmvd $NO_x$ @ 15% oxygen.

(C)   Natural gas or a noncommercial gaseous fuel, 2 ppmvd VOC (as propane) @ 15% oxygen.

(D)   Fuel oil, 2 ppmvd VOC (as propane) @ 15% oxygen.

(iii)   For a simple cycle or regenerative cycle combustion turbine with a rated output equal to or greater than 1,000 bhp and less than 6,000 bhp when firing:

(A)   Natural gas or a noncommercial gaseous fuel, 150 ppmvd $NO_x$ @ 15% oxygen.

(B)   Fuel oil, 150 ppmvd $NO_x$ @ 15% oxygen.

(C)   Natural gas or a noncommercial gaseous fuel, 9 ppmvd VOC (as propane) @ 15% oxygen.

(D)   Fuel oil, 9 ppmvd VOC (as propane) @ 15% oxygen.

(iv)   For a simple cycle or regenerative cycle combustion turbine with a rated output equal to or greater than 6,000 bhp when firing:

(A)   Natural gas or a noncommercial gaseous fuel, 42 ppmvd $NO_x$ @ 15% oxygen.

(B)   Fuel oil, 96 ppmvd $NO_x$ @ 15% oxygen.

(C)   Natural gas or a noncommercial gaseous fuel, 9 ppmvd VOC (as propane) @ 15% oxygen.

(D)   Fuel oil, 9 ppmvd VOC (as propane) @ 15% oxygen.

(380509) No. 500 Jul. 16

(3)    A stationary internal combustion engine:

(i)    For a lean burn stationary internal combustion engine with a rating equal to or greater than 500 bhp fired with:

(A)    Natural gas or a noncommercial gaseous fuel, 3.0 grams $NO_x$/bhp-hr.

(B)    Natural gas or a noncommercial gaseous fuel, liquid fuel or dual-fuel, 1.0 gram VOC/bhp-hr excluding formaldehyde.

(ii)    For a stationary internal combustion engine with a rating equal to or greater than 500 bhp fired with liquid fuel or dual-fuel, 8.0 grams $NO_x$/bhp-hr.

(iii)    For a rich burn stationary internal combustion engine with a rating equal to or greater than 500 bhp fired with:

(A)    Natural gas or a noncommercial gaseous fuel, 2.0 grams $NO_x$/bhp-hr.

(B)    Natural gas or a noncommercial gaseous fuel, 1.0 gram VOC/bhp-hr.

(4)    A unit firing multiple fuels:

(i)    The applicable RACT multiple fuel emission limit shall be determined on a total heat input fuel weighted basis using the following equation:

$$E_{HIweighted} = \frac{\sum_{i=1}^{n} E_i HI_i}{\sum_{i=1}^{n} HI_i}$$

Where:

$E_{HIweighted}$ = The heat input fuel weighted multiple fuel emission rate or emission limitation for the compliance period, expressed in units of measure consistent with the units of measure for the emission limitation.

$E_i$ = The emission rate or emission limit for fuel i during the compliance period, expressed in units of measure consistent with the units of measure for the emission limitation.

$HI_i$ = The total heat input for fuel i during the compliance period.

n = The number of different fuels used during the compliance period.

(ii)    A fuel representing less than 1% of the unit's annual fuel consumption on a heat input basis is excluded when determining the applicable RACT multiple fuel emission limit calculated in accordance with subparagraph (i).

(iii)    The determination in subparagraph (i) does not apply to a stationary internal combustion engine that is subject to the RACT emission limits in paragraph (3).

(h)    The owner and operator of a Portland cement kiln subject to § 129.96 shall comply with the following applicable presumptive RACT emission limitation:

(1)    3.88 pounds of $NO_x$ per ton of clinker produced for a long wet-process cement kiln as defined in § 145.142 (relating to definitions).

(2)    3.44 pounds of $NO_x$ per ton of clinker produced for a long dry-process cement kiln as defined in § 145.142.

(3)    2.36 pounds of $NO_x$ per ton of clinker produced for:

(i)    A preheater cement kiln as defined in § 145.142.

(ii)    A precalciner cement kiln as defined in § 145.142.

(380510) No. 500 Jul. 16    *Copyright © 2016 Commonwealth of Pennsylvania*

(i)   The requirements and emission limitations of this section supersede the requirements and emission limitations of a RACT permit issued to the owner or operator of an air contamination source subject to one or more of subsections (b)—(h) prior to April 23, 2016, under §§ 129.91—129.95 (relating to stationary sources of $NO_x$ and VOCs) to control, reduce or minimize $NO_x$ emissions or VOC emissions, or both, from the air contamination source unless the permit contains more stringent requirements or emission limitations, or both.

(j)   The requirements and emission limitations of this section supersede the requirements and emission limitations of §§ 129.201—129.205, 145.111—145.113 and 145.141—145.146 (relating to additional $NO_x$ requirements; emissions of $NO_x$ from stationary internal combustion engines; and emissions of $NO_x$ from cement manufacturing) unless the requirements or emission limitations of §§ 129.201—129.205, §§ 145.111—145.113 or §§ 145.141—145.146 are more stringent.

(k)   The owner or operator of a major $NO_x$ emitting facility or a major VOC emitting facility subject to § 129.96 that includes an air contamination source subject to one or more of subsections (b)—(h) that cannot meet the applicable presumptive RACT requirement or RACT emission limitation without installation of an air cleaning device may submit a petition, in writing, requesting an alternative compliance schedule in accordance with the following:

(1)   The written petition shall be submitted to the Department or appropriate approved local air pollution control agency as soon as possible but not later than:

(i)   October 24, 2016, for a source subject to § 129.96(a).

(ii)   October 24, 2016, or 6 months after the date that the source meets the definition of a major $NO_x$ emitting facility or major VOC emitting facility, whichever is later, for a source subject to § 129.96(b).

(2)   The written petition must include:

(i)   A description, including make, model and location, of each affected source subject to a RACT requirement or a RACT emission limitation in one or more of subsections (b)—(h).

(ii)   A description of the proposed air cleaning device to be installed.

(iii)   A schedule containing proposed interim dates for completing each phase of the required work to install the air cleaning device described in subparagraph (ii).

(iv)   A proposed interim emission limitation that will be imposed on the affected source until compliance is achieved with the applicable RACT requirement or RACT emission limitation.

(v)   A proposed final compliance date that is as soon as possible but not later than 3 years after the written approval of the petition by the Department or the appropriate approved local air pollution control agency. The approved petition shall be incorporated in an applicable operating permit or plan approval.

(l)   The Department or appropriate approved local air pollution control agency will review the timely and complete written petition requesting an alternative compliance schedule submitted in accordance with subsection (k) and approve or deny the petition in writing.

129-135

(m)  Approval or denial under subsection (l) of the timely and complete petition for an alternative compliance schedule submitted under subsection (k) will be effective on the date the letter of approval or denial of the petition is signed by the authorized representative of the Department or appropriate approved local air pollution control agency.

**Authority**

The provisions of this § 129.97 issued under section 5(a)(1) and (8) of the Air Pollution Control Act (35 P.S. § 4005(a)(1) and (8)).

**Source**

The provisions of this § 129.97 adopted April 22, 2016, effective April 23, 2016, 46 Pa.B. 2036; amended August 10, 2018, effective August 11, 2018, 48 Pa.B. 4814. Immediately preceding text appears at serial pages (384192) to (384193) and (380507) to (380512).

**Cross References**

This section cited in 25 Pa. Code § 121.1 (relating to definitions); 25 Pa. Code § 129.96 (relating to applicability); 25 Pa. Code § 129.98 (relating to facility-wide or system-wide $NO_x$ emissions averaging plan general requirements); 25 Pa. Code § 129.99 (relating to alternative RACT proposal and petition for alternative compliance schedule); and 25 Pa. Code § 129.100 (relating to compliance demonstration and recordkeeping requirements).

### § 129.98.  Facility-wide or system-wide $NO_x$ emissions averaging plan general requirements.

(a)  The owner or operator of a major $NO_x$ emitting facility subject to § 129.96 (relating to applicability) that includes at least one air contamination source subject to a $NO_x$ RACT emission limitation in § 129.97 (relating to presumptive RACT requirements, RACT emission limitations and petition for alternative compliance schedule) that cannot meet the applicable $NO_x$ RACT emission limitation may elect to meet the applicable $NO_x$ RACT emission limitation in § 129.97 by averaging $NO_x$ emissions on either a facility-wide or system-wide basis using a 30-day rolling average. System-wide emissions averaging must be among sources under common control of the same owner or operator within the same ozone nonattainment area in this Commonwealth.

(b)  The owner or operator of each facility that elects to comply with subsection (a) shall submit a written $NO_x$ emissions averaging plan to the Department or appropriate approved local air pollution control agency as part of an application for an operating permit modification or a plan approval, if otherwise required. The application incorporating the requirements of this section shall be submitted by the applicable date as follows:

(1)  October 24, 2016, for a source subject to § 129.96(a).

(2)  October 24, 2016, or 6 months after the date that the source meets the definition of a major $NO_x$ emitting facility, whichever is later, for a source subject to § 129.96(b).

(c)  Each $NO_x$ air contamination source included in the application for an operating permit modification or a plan approval, if otherwise required, for averaging $NO_x$ emissions on either a facility-wide or system-wide basis using a 30-day rolling average submitted under subsection (b) must be an air contamination source subject to a $NO_x$ RACT emission limitation in § 129.97.

(d)  The application for the operating permit modification or the plan approval, if otherwise required, for averaging $NO_x$ emissions on either a facility-wide or system-wide basis using a 30-day rolling average submitted under sub-

<div style="text-align:center">129-136</div>

*Copyright © 2018 Commonwealth of Pennsylvania*

section (b) must demonstrate that the aggregate $NO_x$ emissions emitted by the air contamination sources included in the facility-wide or system-wide $NO_x$ emissions averaging plan using a 30-day rolling average are not greater than the $NO_x$ emissions that would be emitted by the group of included sources if each source complied with the applicable $NO_x$ RACT emission limitation in § 129.97 on a source-specific basis.

(e)   The owner or operator shall calculate the alternative facility-wide or system-wide $NO_x$ RACT emissions limitation using a 30-day rolling average for the air contamination sources included in the application for the operating permit modification or plan approval, if otherwise required, submitted under subsection (b) by using the following equation to sum the emissions for all of the sources included in the $NO_x$ emissions averaging plan:

$$\left[ \sum\nolimits_{i\,=\,1}^{n} Ei_{actual} \right] \leq \left[ \sum\nolimits_{i\,=\,1}^{n} Ei_{allowable} \right]$$

Where:

$Ei_{actual}$ = The actual $NO_x$ mass emissions, including emissions during start-ups, shutdowns and malfunctions, for air contamination source i on a 30-day rolling basis.

$Ei_{allowable}$ = The allowable $NO_x$ mass emissions computed using the allowable emission rate limitations for air contamination source i on a 30-day rolling basis specified in § 129.97. If an air contamination source included in an averaging plan is subject to a numerical emission rate limit that is more stringent than the applicable allowable emission rate limitation in § 129.97, then the numerical emission rate limit shall be used for the calculation of the allowable $NO_x$ mass emissions.

n = The number of air contamination sources included in the $NO_x$ emissions averaging plan.

(f)   The application for the operating permit modification or a plan approval, if otherwise required, specified in subsections (b)—(e) may include facility-wide or system-wide $NO_x$ emissions averaging using a 30-day rolling average only for $NO_x$ emitting sources or $NO_x$ emitting facilities that are owned or operated by the applicant.

(g)   The application for the operating permit modification or a plan approval, if otherwise required, specified in subsections (b)—(f) must include the following information:

   (1)   Identification of each air contamination source included in the $NO_x$ emissions averaging plan.

   (2)   Each air contamination source's applicable emission limitation in § 129.97.

   (3)   Methods for demonstrating compliance and recordkeeping and reporting requirements in accordance with § 129.100 (relating to compliance demonstration and recordkeeping requirements) for each source included in the $NO_x$ emissions averaging plan submitted under subsection (b).

(h)   An air contamination source or facility included in the facility-wide or system-wide $NO_x$ emissions averaging plan submitted in accordance with subsections (b)—(g) may be included in only one facility-wide or system-wide $NO_x$ emissions averaging plan.

(393499) No. 528 Nov.  18

(i)   The Department or appropriate approved local air pollution control agency will issue a modification to the operating permit or a plan approval authorizing the $NO_x$ emissions averaging plan.

(j)   The owner or operator of an air contamination source or facility included in the facility-wide or system-wide $NO_x$ emissions averaging plan submitted in accordance with subsections (b)—(h) shall submit the reports and records specified in subsection (g)(3) to the Department or appropriate approved local air pollution control agency on the schedule specified in subsection (g)(3) to demonstrate compliance with § 129.100.

(k)   The owner or operator of an air contamination source or facility included in a facility-wide or system-wide $NO_x$ emissions averaging plan submitted in accordance with subsections (b)—(h) that achieves emission reductions in accordance with other emission limitations required under the act or the Clean Air Act, or regulations adopted under the act or the Clean Air Act, that are not $NO_x$ RACT emission limitations may not substitute those emission reductions for the emission reductions required by the facility-wide or system-wide $NO_x$ emissions averaging plan submitted to the Department or appropriate approved local air pollution control agency under subsection (b).

(l)   The owner or operator of an air contamination source subject to a $NO_x$ RACT emission limitation in § 129.97 that is not included in a facility-wide or system-wide $NO_x$ emissions averaging plan submitted under subsection (b) shall operate the source in compliance with the applicable $NO_x$ RACT emission limitation in § 129.97.

(m)  The owner and operator of the air contamination sources included in a facility-wide or system-wide $NO_x$ emissions averaging plan submitted under subsection (b) shall be liable for a violation of an applicable $NO_x$ RACT emission limitation at each source included in the $NO_x$ emissions averaging plan.

**Authority**

The provisions of this § 129.98 issued under section 5(a)(1) and (8) of the Air Pollution Control Act (35 P.S. § 4005(a)(1) and (8)).

**Source**

The provisions of this § 129.98 adopted April 22, 2016, effective April 23, 2016, 46 Pa.B. 2036.

**Cross References**

This section cited in 25 Pa. Code § 121.1 (relating to definitions); 25 Pa. Code § 129.96 (relating to applicability); and 25 Pa. Code § 129.100 (relating to compliance demonstration and recordkeeping requirements).

### § 129.99.  Alternative RACT proposal and petition for alternative compliance schedule.

(a)   The owner or operator of an air contamination source subject to § 129.97 (relating to presumptive RACT requirements, RACT emission limitations and petition for alternative compliance schedule) located at a major $NO_x$ emitting facility or major VOC emitting facility subject to § 129.96 (relating to applicability) that cannot meet the applicable presumptive RACT requirement or RACT emission limitation of § 129.97 may propose an alternative RACT requirement or RACT emission limitation in accordance with subsection (d).

(b)   The owner or operator of a $NO_x$ air contamination source with a potential emission rate equal to or greater than 5.0 tons of $NO_x$ per year that is not subject

129-138

to § 129.97 or §§ 129.201—129.205 (relating to additional NO$_x$ requirements) located at a major NO$_x$ emitting facility subject to § 129.96 shall propose a NO$_x$ RACT requirement or RACT emission limitation in accordance with subsection (d).

(c)  The owner or operator of a VOC air contamination source with a potential emission rate equal to or greater than 2.7 tons of VOC per year that is not subject to § 129.97 located at a major VOC emitting facility subject to § 129.96 shall propose a VOC RACT requirement or RACT emission limitation in accordance with subsection (d).

(d)  The owner or operator proposing an alternative RACT requirement or RACT emission limitation under subsection (a), (b) or (c) shall:

(1)  Submit a written RACT proposal in accordance with the procedures in § 129.92(a)(1)—(5), (7)—(10) and (b) (relating to RACT proposal requirements) to the Department or appropriate approved local air pollution control agency as soon as possible but not later than:

(i)  October 24, 2016, for a source subject to § 129.96(a).

(ii)  October 24, 2016, or 6 months after the date that the source meets the definition of a major NO$_x$ emitting facility or major VOC emitting facility, whichever is later, for a source subject to § 129.96(b).

(2)  Be in receipt of an approval issued by the Department or appropriate approved local air pollution control agency in writing through a plan approval or operating permit modification for a RACT proposal submitted under paragraph (1)(ii) prior to the installation, modification or change in the operation of the existing air contamination source that will result in the source or facility meeting the definition of a major NO$_x$ emitting facility or major VOC emitting facility.

(3)  Include in the RACT proposal the proposed alternative NO$_x$ RACT requirement or RACT emission limitation or VOC RACT requirement or RACT emission limitation developed in accordance with the procedures in § 129.92(a)(1)—(5) and (b).

(4)  Include in the RACT proposal a schedule for completing implementation of the RACT requirement or RACT emission limitation as soon as possible but not later than:

(i)  January 1, 2017, for a source subject to § 129.96(a).

(ii)  January 1, 2017, or 1 year after the date that the source meets the definition of a major NO$_x$ emitting facility or major VOC emitting facility, whichever is later, for a source subject to § 129.96(b).

(5)  Include interim dates in the schedule required under paragraph (4) for the:

(i)  Issuance of purchase orders.

(ii)  Start and completion of process, technology and control technology changes.

(iii)  Completion of compliance testing.

(6)  Include in the RACT proposal methods for demonstrating compliance and recordkeeping and reporting requirements in accordance with § 129.100 (relating to compliance demonstration and recordkeeping requirements) for each air contamination source included in the RACT proposal.

(7)  Demonstrate to the satisfaction of the Department or the appropriate approved local air pollution control agency that the proposed requirement or RACT emission limitation is RACT for the air contamination source.

(e)   The Department or appropriate approved local air pollution control agency will:

(1)   Review the timely and complete alternative RACT proposal submitted in accordance with subsection (d).

(2)   Approve the alternative RACT proposal submitted under subsection (d), in writing, if the Department or appropriate approved local air pollution control agency is satisfied that the alternative RACT proposal complies with the requirements of subsection (d) and that the proposed alternative requirement or RACT emission limitation is RACT for the air contamination source.

(3)   Deny or modify the alternative RACT proposal submitted under subsection (d), in writing, if the proposal does not comply with the requirements of subsection (d).

(f)   The proposed alternative RACT requirement or RACT emission limitation and the implementation schedule submitted under subsection (d) will be approved, denied or modified by the Department or appropriate approved local air pollution control agency in accordance with subsection (e) in writing through the issuance of a plan approval or operating permit modification prior to the owner or operator implementing the alternative RACT requirement or RACT emission limitation.

(g)   The emission limit and requirements specified in the plan approval or operating permit issued by the Department or appropriate approved local air pollution control agency under subsection (f) supersede the emission limit and requirements in the existing plan approval or operating permit issued to the owner or operator of the source prior to April 23, 2016, on the date specified in the plan approval or operating permit issued by the Department or appropriate approved local air pollution control agency under subsection (f), except to the extent the existing plan approval or operating permit contains more stringent requirements.

(h)   The Department will submit each alternative RACT requirement or RACT emission limitation approved under subsection (f) to the Administrator of the EPA for approval as a revision to the SIP. The owner and operator of the facility shall bear the costs of public hearings and notifications, including newspaper notices, required for the SIP submittal.

(i)   The owner and operator of a facility proposing to comply with the applicable RACT requirement or RACT emission limitation under subsection (a), (b) or (c) through the installation of an air cleaning device may submit a petition, in writing, requesting an alternative compliance schedule in accordance with the following:

(1)   The written petition requesting an alternative compliance schedule shall be submitted to the Department or appropriate approved local air pollution control agency as soon as possible but not later than:

(i)   October 24, 2016, for a source subject to §  129.96(a).

(ii)   October 24, 2016, or 6 months after the date that the source meets the definition of a major $NO_x$ emitting facility or major VOC emitting facility, whichever is later, for a source subject to §  129.96(b).

(2)   The written petition must include:

(i)   A description, including make, model and location, of each air contamination source subject to a RACT requirement or RACT emission limitation in one or more of subsections (a)—(c).

(ii)   A description of the proposed air cleaning device to be installed.

129-140

          *Copyright © 2018 Commonwealth of Pennsylvania*

(iii)   A schedule containing proposed interim dates for completing each phase of the required work to install the air cleaning device described in subparagraph (ii).

(iv)   A proposed interim emission limitation that will be imposed on the affected air contamination source until compliance is achieved with the applicable RACT requirement or RACT emission limitation.

(v)   A proposed final compliance date that is as soon as possible but not later than 3 years after the approval of the petition by the Department or the appropriate approved local air pollution control agency. If the petition is for the replacement of an existing source, the final compliance date will be determined on a case-by-case basis. The approved petition shall be incorporated in an applicable operating permit or plan approval.

(j)   The Department or appropriate approved local air pollution control agency will review the timely and complete written petition requesting an alternative compliance schedule submitted in accordance with subsection (i) and approve or deny the petition in writing.

(k)   The emission limit and requirements specified in the plan approval or operating permit issued by the Department or appropriate approved local air pollution control agency under subsection (j) supersede the emission limit and requirements in the existing plan approval or operating permit issued to the owner or operator of the source prior to April 23, 2016, on the date specified in the plan approval or operating permit issued by the Department or appropriate approved local air pollution control agency under subsection (j), except to the extent the existing plan approval or operating permit contains more stringent requirements.

(l)   Approval or denial under subsection (j) of the timely and complete petition for an alternative compliance schedule submitted under subsection (i) will be effective on the date the letter of approval or denial of the petition is signed by the authorized representative of the Department or appropriate approved local air pollution control agency.

**Authority**

The provisions of this § 129.99 issued under section 5(a)(1) and (8) of the Air Pollution Control Act (35 P.S. § 4005(a)(1) and (8)).

**Source**

The provisions of this § 129.99 adopted April 22, 2016, effective April 23, 2016, 46 Pa.B. 2036; amended August 10, 2018, effective August 11, 2018, 48 Pa.B. 4814. Immediately preceding text appears at serial pages (380514) to (380517).

**Cross References**

This section cited in 25 Pa. Code § 121.1 (relating to definitions); 25 Pa. Code § 129.96 (relating to applicability); 25 Pa. Code § 129.97 (relating to presumptive RACT requirements, RACT emission limitations and petition for alternative compliance schedule); and 25 Pa. Code § 129.100 (relating to compliance demonstration and recordkeeping requirements).

## § 129.100.  Compliance demonstration and recordkeeping requirements.

(a)   Except as provided in subsection (c), the owner and operator of an air contamination source subject to a $NO_x$ RACT requirement or RACT emission limitation or VOC RACT requirement or RACT emission limitation, or both, listed in § 129.97 (relating to presumptive RACT requirements, RACT emission limitations and petition for alternative compliance schedule) shall demonstrate compliance with the applicable RACT requirement or RACT emission limitation by performing the following monitoring or testing procedures:

129-141

(1)   For an air contamination source with a CEMS, monitoring and testing in accordance with the requirements of Chapter 139, Subchapter C (relating to requirements for source monitoring for stationary sources) using a 30-day rolling average, except municipal waste combustors.

(i)   A 30-day rolling average emission rate for an air contamination source that is a combustion unit shall be expressed in pounds per million Btu and calculated in accordance with the following procedure:

(A)   Sum the total pounds of pollutant emitted from the combustion unit for the current operating day and the previous 29 operating days.

(B)   Sum the total heat input to the combustion unit in million Btu for the current operating day and the previous 29 operating days.

(C)   Divide the total number of pounds of pollutant emitted by the combustion unit for the 30 operating days by the total heat input to the combustion unit for the 30 operating days.

(ii)   A 30-day rolling average emission rate for each applicable RACT emission limitation shall be calculated for an affected air contamination source for each consecutive operating day.

(iii)   Each 30-day rolling average emission rate for an affected air contamination source must include the emissions that occur during the entire operating day, including emissions from start-ups, shutdowns and malfunctions.

(2)   For a Portland cement kiln with a CEMS, monitoring of clinker production rates in accordance with 40 CFR 63.1350(d) (relating to monitoring requirements).

(3)   For a municipal waste combustor with a CEMS, monitoring and testing in accordance with the requirements in Chapter 139, Subchapter C, using a daily average.

(4)   For an air contamination source without a CEMS, monitoring and testing in accordance with a Department-approved emissions source test that meets the requirements of Chapter 139, Subchapter A (relating to sampling and testing methods and procedures). The source test shall be conducted one time in each 5-year calendar period.

(b)   Except as provided in § 129.97(k) and § 129.99(i) (relating to alternative RACT proposal and petition for alternative compliance schedule), the owner and operator of an air contamination source subject to subsection (a) shall demonstrate compliance with the applicable RACT requirement or RACT emission limitation in accordance with the procedures in subsection (a) not later than:

(1)   January 1, 2017, for a source subject to § 129.96(a) (relating to applicability).

(2)   January 1, 2017, or 1 year after the date that the source meets the definition of a major $NO_x$ emitting facility or major VOC emitting facility, whichever is later, for a source subject to § 129.96(b).

(c)   An owner or operator of an air contamination source subject to this section, §§ 129.96 and 129.97 and § 129.98 (relating to facility-wide or system-wide $NO_x$ emissions averaging plan general requirements) may request a waiver from the requirement to demonstrate compliance with the applicable emission limitation listed in § 129.97 if the following requirements are met:

(1)   The request for a waiver is submitted, in writing, to the Department not later than:

Copyright © 2018 Commonwealth of Pennsylvania

(i)    October 24, 2016, for a source subject to § 129.96(a).

(ii)    October 24, 2016, or 6 months after the date that the source meets the definition of a major $NO_x$ emitting facility or major VOC emitting facility, whichever is later, for a source subject to § 129.96(b).

(2)    The request for a waiver demonstrates that a Department-approved emissions source test was performed in accordance with the requirements of Chapter 139, Subchapter A, on or after:

(i)    April 23, 2015, for a source subject to § 129.96(a).

(ii)    April 23, 2015, or within 12 months prior to the date that the source meets the definition of a major $NO_x$ emitting facility or major VOC emitting facility, whichever is later, for a source subject to § 129.96(b).

(3)    The request for a waiver demonstrates to the satisfaction of the Department that the test results show that the source's rate of emissions is in compliance with the source's applicable $NO_x$ emission limitation or VOC emission limitation.

(4)    The Department approves, in writing, the request for a waiver.

(d)    The owner and operator of an air contamination source subject to this section and §§ 129.96—129.99 shall keep records to demonstrate compliance with §§ 129.96—129.99 in the following manner:

(1)    The records must include sufficient data and calculations to demonstrate that the requirements of §§ 129.96—129.99 are met.

(2)    Data or information required to determine compliance shall be recorded and maintained in a time frame consistent with the averaging period of the requirement.

(e)    Beginning with the compliance date specified in § 129.97(a), the owner or operator of an air contamination source claiming that the air contamination source is exempt from the applicable $NO_x$ emission rate threshold specified in § 129.99(b) and the requirements of § 129.97 based on the air contamination source's potential to emit shall maintain records that demonstrate to the Department or appropriate approved local air pollution control agency that the air contamination source is not subject to the specified emission rate threshold.

(f)    Beginning with the compliance date specified in § 129.97(a), the owner or operator of an air contamination source claiming that the air contamination source is exempt from the applicable VOC emission rate threshold specified in § 129.99(c) and the requirements of § 129.97 based on the air contamination source's potential to emit shall maintain records that demonstrate to the Department or appropriate approved local air pollution control agency that the air contamination source is not subject to the specified emission rate threshold.

(g)    The owner or operator of a combustion unit subject to § 129.97(b) shall record each adjustment conducted under the procedures in § 129.97(b). This record must contain, at a minimum:

(1)    The date of the tuning procedure.

(2)    The name of the service company and the technician performing the procedure.

(3)    The final operating rate or load.

(4)    The final $NO_x$ and CO emission rates.

(5)    The final excess oxygen rate.

(6)    Other information required by the applicable operating permit.

129-143

# CHAPTER 139. SAMPLING AND TESTING

**Subchap.**                                                    **Sec.**
A.    **SAMPLING AND TESTING METHODS AND PROCEDURES** ..... **139.1**
B.    **MONITORING DUTIES OF CERTAIN SOURCES** ............. **139.51**
C.    **REQUIREMENTS FOR SOURCE MONITORING**
      **FOR STATIONARY SOURCES** ............................. **139.101**

### Authority

The provisions of this Chapter 139 issued under section 1920-A of The Administrative Code of 1929 (71 P.S. § 510-20); and section 5 of the Air Pollution Control Act (35 P.S. § 4005), unless otherwise noted.

### Source

The provisions of this Chapter 139 adopted March 3, 1972, effective March 20, 1972, 2 Pa.B. 383, unless otherwise noted.

### Cross References

This chapter cited in 25 Pa. Code § 121.1 (relating to definitions); 25 Pa. Code § 123.22 (relating to combustion units); 25 Pa. Code § 123.108 (relating to source emissions monitoring requirements); 25 Pa. Code § 123.110 (relating to source compliance requirements); 25 Pa. Code § 127.12b (relating to plan approval terms and conditions); 25 Pa. Code § 127.207 (relating to creditable emissions decrease or ERC generation and creation); 25 Pa. Code § 127.441 (relating to operating permit terms and conditions); 25 Pa. Code § 129.17 (relating to kraft pulp mills); 25 Pa. Code § 129.51 (relating to general); 25 Pa. Code § 129.52 (relating to surface coating processes); 25 Pa. Code § 129.52a (relating to VOC emissions from large appliance and metal furniture surface coating processes); 25 Pa. Code § 129.52b (relating to control of VOC emissions from paper, film and foil surface coating processes); 25 Pa. Code § 129.52c (relating to control of VOC emissions from flat wood paneling surface coating processes); 25 Pa. Code § 129.52d (relating to control of VOC emissions from miscellaneous metal parts surface coating processes, miscellaneous plastic parts surface coating processes and pleasure craft surface coatings); 25 Pa. Code § 129.52e (relating to control of VOC emissions from automobile and light-duty truck assembly coating operations and heavier vehicle coating operations); 25 Pa. Code § 129.63a (relating to control of VOC emissions from industrial cleaning solvents); 25 Pa. Code § 129.67a (relating to control of VOC emissions from flexible packaging printing presses); 25 Pa. Code § 129.67b (relating to control of VOC emissions from offset lithographic printing presses and letterpress printing presses); 25 Pa. Code § 129.74 (relating to control of VOC emissions from fiberglass boat manufacturing materials); 25 Pa. Code § 129.94 (relating to NO$_x$ RACT emission averaging general requirements); 25 Pa. Code § 129.104 (relating to compliance procedures and monitoring requirements); 25 Pa. Code § 129.204 (relating to emission accountability); 25 Pa. Code § 145.2 (relating to definitions); 25 Pa. Code § 145.70 (relating to general monitoring requirements); 25 Pa. Code § 145.112 (relating to definitions); 25 Pa. Code § 145.113 (relating to standard requirements); 25 Pa. Code § 145.142 (relating to definitions); 25 Pa. Code § 145.143 (relating to standard requirements); and 25 Pa. Code § 250.10 (relating to measurement of regulated substances).

## Subchapter A. SAMPLING AND TESTING METHODS AND PROCEDURES

### GENERAL

Sec.
139.1.    Sampling facilities.
139.2.    Sampling by others.
139.3.    General requirements.
139.4.    References.
139.5.    Revisions to the source testing manual and continuous source monitoring
          manual.

### STATIONARY SOURCES

139.11.    General requirements.
139.12.    Emissions of particulate matter.
139.13.    Emissions of SO$_2$, H$_2$S, TRS and NO$_2$.

139-1

139.14.    Emissions of VOCs.
139.15.    Emissions of other air contaminants.
139.16.    Sulfur in fuel oil.
139.17.    General requirements.
139.18.    Calculation of alternative opacity limitations.
139.21.    [Reserved].

### AMBIENT LEVELS OF AIR CONTAMINANTS

139.31.    General.
139.32.    Sampling and analytical procedures.
139.33.    Incorporation of Federal procedures.

**Cross References**

This subchapter cited in 25 Pa. Code § 129.100 (relating to compliance demonstration and record-keeping requirements); and 25 Pa. Code § 139.52 (relating to monitoring methods and techniques).

### GENERAL

## § 139.1. Sampling facilities.

Upon the request of the Department, the person responsible for a source shall provide adequate sampling ports, safe sampling platforms and adequate utilities for the performance by the Department of tests on the source. The Department will set forth, in the request, the time period within which the facilities shall be provided, as well as the specifications for the facilities.

**Source**

The provisions of this § 139.1 adopted March 3, 1972, effective March 20, 1972, 2 Pa.B. 383.

**Cross References**

This section cited in 25 Pa. Code § 139.17 (relating to general requirements); and 25 Pa. Code § 139.101 (relating to general requirements).

## § 139.2. Sampling by others.

Sampling and testing done by persons other than the Department may be accepted by the Department, provided that:

(1)  The Department has been given reasonable notice of the sampling and testing and has been given reasonable opportunity to observe and participate in the sampling and testing.

(2)  The sampling and testing is conducted under the direct supervision of persons qualified, by training and experience, to conduct the sampling and testing.

(3)  Procedures for the sampling and testing are in accord with the provisions of this chapter.

(4)  The reports of the sampling and testing are accurate and comprehensive.

**Source**

The provisions of this § 139.2 adopted March 3, 1972, effective March 20, 1972, 2 Pa.B. 383.

**Cross References**

This section cited in 25 Pa. Code § 139.17 (relating to general requirements).

## § 139.3.  General requirements.

(a)   The Department will use the methods set forth in this chapter to assess emissions from stationary sources or ambient levels of air contaminants.

(b)   The Department has published a supplement to this chapter entitled ''Source Testing Manual.'' This supplement contains detailed information on source test methods, procedures and guidance for the reporting of emissions to the Department. This supplement is available from the Department by request.

(c)   The performance standards for stationary sources set forth in this chapter permit freedom in the selection of equipment and consistency in obtaining accurate results which are representative of the conditions under which a source is evaluated.

(d)   The sampling and analytical procedures employed to measure ambient levels of air contaminants shall be consistent with obtaining accurate results which are representative of the conditions being evaluated.

**Source**

The provisions of this § 139.3 adopted March 3, 1972, effective March 20, 1972, 2 Pa.B. 383, amended April 27, 1979, effective August 1, 1979, 9 Pa.B. 1447; corrected May 11, 1979, effective August 1, 1979, 9 Pa.B. 1534. Immediately preceding text appears at serial page (35404).

**Cross References**

This section cited in 25 Pa. Code § 139.17 (relating to general requirements).

## § 139.4.  References.

(a)   The references referred to in this chapter are as follows:

(1)   Standards of Performance for New Stationary Sources, 40 CFR Chapter I, Part 60, Appendix A, Current Edition, Superintendent of Documents, Washington, D.C. 20402-9328.

(2)   National Emission Standards for Hazardous Air Pollutants, 40 CFR, Chapter I, Part 61, Appendix B, Current Edition, Superintendent of Documents, Washington, D.C. 20402-9328.

(3)   Requirements for Preparation, Adoption, and Submittal of Implementation Plans, 40 CFR, Chapter I, Part 51, Appendix M, Current Edition, Superintendent of Documents, Washington, D.C. 20402-9328.

(4)   Standards for the Management of Specific Hazardous Wastes and Specific Types of Hazardous Waste Management Facilities, 40 CFR, Chapter I, Part 266, Appendix IX, Current Edition, Superintendent of Documents, Washington, D.C. 20402-9328.

(5)   Source Testing Manual, Commonwealth of Pennsylvania, Department of Environmental Protection, Bureau of Air Quality, Post Office Box 8468, Harrisburg, Pennsylvania 17105-8468, including future revisions as noted in

§ 139.5(b) (relating to revisions to the source testing manual and continuous source monitoring manual).

(6)  *Recommended Standard Method for Continuing Dust Fall Survey (APM-1, Revision 1)*, PR-2 Air Pollution Measurement Commission, J. Air Assoc., 16:372 (1966).

(7)  *Air Pollution Measurements of the National Air Sampling Network: Analyses of Suspended Particulates 1957-1961*, Public Health Service Pub. No. 978, Washington, D.C., 1962.

(8)  Interbranch Chemical Advisory Committee, *Selected Methods for the Measurement of Air Pollutants*, PHS Pub. No. 999-AP-11, Cincinnati, Ohio, 1965, page I-1.

(9)  *Standard Method of Test for Inorganic Fluoride in the Atmosphere*, ASTM Standards on Methods of Atmospheric Sampling and Analyses, Philadelphia, Pennsylvania, 1962, page 67.

(10)  ASTM D 4057, *Practice for Manual Sampling of Petroleum and Petroleum Products*, including updates and revisions.

(11)  ASTM D 445, *Standard Test Method for Kinematic Viscosity of Transparent and Opaque Liquids (and Calculation of Dynamic Viscosity)*, including updates and revisions.

(12)  ASTM D 1266, *Test Methods for Sulfur in Petroleum Products: Lamp Method*, including updates and revisions.

(13)  ASTM D 129, *Test Methods for Sulfur in Petroleum Products: General Bomb Method*, including updates and revisions.

(14)  ASTM D 1552, *Test Methods for Sulfur in Petroleum Products: High-Temperature Method*, including updates and revisions.

(15)  ASTM D 2622, *Test Methods for Sulfur in Petroleum Products by X-Ray Spectrometry*, including updates and revisions.

(16)  *Standard Methods for the Examination of Water and Wastewater,* 14th Ed., *Organic Carbon (total), Combustion-Infrared Method*, American Public Health Association, Washington, D.C.

(17)  Jacobs, M. B. et al., *Ultramicrodetermination of Sulfides in Air*, Anal. Chem., 29:1949 (1957).

(18)  "Sampling procedures for fuel volatility," 40 CFR Part 80, Appendix D (relating to sampling procedures for fuel volatility).

(19)  "Tests for Determining Reid Vapor Pressure (RVP) of Gasoline and Gasoline-Oxygenate Blends," 40 CFR Part 80, Appendix E (relating to test for determining Reid vapor pressure (RVP) of gasoline and gasoline-oxygenate blends).

(20)  ASTM D 4294, *Test Method for Sulfur in Petroleum and Petroleum Products by Energy Dispersive X-ray Fluorescence Spectrometry*, including updates and revisions.

(21)  ASTM D 4177, *Practice for Automatic Sampling of Petroleum and Petroleum Products*, including updates and revisions.

 *Copyright © 2013 Commonwealth of Pennsylvania*

(b)   References to ASTM in this chapter pertain to test methods developed by ASTM International, 100 Barr Harbor Drive, P. O. Box C700, West Conshohocken, PA 19428-2959, www.astm.org.

### Source

The provisions of this § 139.4 adopted March 3, 1972, effective March 20, 1972, 2 Pa.B. 383; amended April 27, 1979, effective August 1, 1979, 9 Pa.B. 1447; corrected May 11, 1979, effective August 1, 1979, 9 Pa.B. 1534; amended June 19, 1981, effective June 20, 1981, 11 Pa.B. 2118; amended August 12, 1983, effective August 13, 1983, 13 Pa.B. 2478; amended May 6, 1988, effective May 7, 1988, 18 Pa.B. 2098; amended May 6, 1988, effective May 7, 1988, 18 Pa.B. 2102; amended November 25, 1994, effective November 26, 1994, 24 Pa.B. 5899; amended October 31, 1997, effective November 1, 1997, 27 Pa.B. 5601; amended October 1, 1999, effective October 2, 1999, 29 Pa.B. 5089; amended June 9, 2000, effective June 10, 2000, 30 Pa.B. 2995; amended February 8, 2013, effective February 9, 2013, 43 Pa.B. 806. Immediately preceding text appears at serial pages (267065) to (267067).

### Cross References

This section cited in 25 Pa. Code § 139.5 (relating to revisions to the source testing manual and continuous source monitoring manual); 25 Pa. Code § 139.12 (relating to emissions of particulate matter); 25 Pa. Code § 139.13 (relating to emissions of $SO_2$, $H_2S$, TRS and $NO_2$); 25 Pa. Code § 139.14 (relating to emissions of VOCs); 25 Pa. Code § 139.16 (relating to sulfur in fuel oil); 25 Pa. Code § 139.17 (relating to general requirements); and 25 Pa. Code § 139.32 (relating to sampling and analytical procedures).

## § 139.5.  Revisions to the source testing manual and continuous source monitoring manual.

(a)   This section describes the procedure that the Department will follow to update and revise the ''Source Testing Manual'' referred to in § 139.4(5) (relating to references) and the ''Continuous Source Monitoring Manual'' referred to in § 139.102(3) (relating to references).

(b)   The Department will provide notice of proposed revisions to the ''Source Testing Manual'' and the ''Continuous Source Monitoring Manual'' in the *Pennsylvania Bulletin*. The notice will describe the proposed revisions and provide the name, address and telephone number of the person from whom the text of the proposed revisions can be obtained.

(c)   The Department will provide an opportunity for comments on the proposed revisions. The comment period will be at least 30 days from the date of the publication of the notice required by subsection (b).

(d)   After the public comment period, the Department will evaluate the comments and finalize the changes to the ''Source Testing Manual'' and the ''Continuous Source Monitoring Manual.''

(e)   The Department will provide notice of the revisions to the ''Source Testing Manual'' and the ''Continuous Source Monitoring Manual'' in the *Pennsylva-*

*nia Bulletin*. The notice will describe the revisions and provide the name, address and telephone number of the person from whom the revised manual can be obtained.

(f)   A person proposing test methods, procedures and guidance for the reporting of emissions different from those contained in the ''Source Testing Manual'' and the ''Continuous Source Monitoring Manual'' shall have the burden of proof to demonstrate that test methods, procedures and guidance accurately characterize the emissions from the source.

**Source**

The provisions of this § 139.5 adopted November 25, 1994, effective November 26, 1994, 24 Pa.B. 5899.

**Cross References**

This section cited in 25 Pa. Code § 139.4 (relating to references); and 25 Pa. Code § 139.12 (relating to emissions of particulate matter).

## STATIONARY SOURCES

### § 139.11.  General requirements.

The following provisions are applicable to source tests for determining emissions from stationary sources:

(1)   Performance tests shall be conducted while the source is operating at maximum routine operating conditions or under such other conditions, within the capacity of the equipment, as may be requested by the Department.

(2)   The Department will consider test results for approval where sufficient information is provided to verify the source conditions existing at the time of the test and where adequate data is available to show the manner in which the test was conducted. Information submitted to the Department shall include, as a minimum, all of the following:

(i)    A thorough source description, including a description of air cleaning devices and the flue.

(ii)   Process conditions, for example, the charging rate of raw material or rate of production of final product, boiler pressure, oven temperature and other conditions which may affect emissions from the process.

(iii)   The location of the sampling ports.

(iv)   Effluent characteristics, including velocity, temperature, moisture content, gas density (percentage of $CO$, $CO_2$, $O_2$ and $N_2$), static and barometric pressures.

(v)    Sample collection techniques employed, including procedures used, equipment descriptions and data to verify that isokinetic sampling for particulate matter collection occurred and that acceptable test conditions were met.

(vi)   Laboratory procedures and results.

139-6

*Copyright © 2014 Commonwealth of Pennsylvania*

(vii)   Calculated results.

Source

The provisions of this § 139.4 adopted March 3, 1972, effective March 20, 1972, 2 Pa.B. 383.

Cross References

This section cited in 25 Pa. Code § 123.45 (relating to alternative opacity limitations); and 25 Pa. Code § 139.17 (relating to general requirements).

## § 139.12.  Emissions of particulate matter.

(a)   Tests for determining emissions of filterable particulate matter from stationary sources to demonstrate compliance with the particulate matter emission standards in §§ 123.11—123.13 (relating to combustion units; incinerators; and processes) shall conform with the following:

   (1)   Test methods for particulate matter emissions shall include dry filters and provide for at least a 95% collection efficiency of particulate matter.

   (2)   Isokinetic sampling procedures shall be used in sampling for particulate matter emissions and the weight determined gravimetrically after the removal of uncombined water.

   (3)   Test methods and procedures shall be equivalent to those specified in § 139.4(5) (relating to references). The equipment shall be inert where appropriate and similar to that specified in § 139.4(1).

   (4)   The minimum sampling time shall be 1 hour or as specified in an applicable standard or by the Department and the minimum sample volume shall be 50 cubic feet or as specified in an applicable standard or by the Department, corrected to standard conditions (dry basis).

   (5)   Results shall be calculated based upon sample train component weights specified in § 139.4(5). Results shall be reported as pounds of particulate matter per hour and in accordance with the units specified in §§ 123.11—123.13.

(b)   The owner or operator of a stationary source subject to emission limitations for PM-10 and $PM_{2.5}$ or to applicability determinations required under Chapter 127, Subchapters D and E (relating to prevention of significant deterioration of air quality; and new source review) shall demonstrate compliance for filterable and condensable PM-10 and $PM_{2.5}$ emissions.

(c)   Compliance with a particulate matter, PM-10 or $PM_{2.5}$ emission limitation issued by the Department prior to January 1, 2011, will not be based on condensable particulate matter unless required under the terms and conditions of a plan approval, operating permit or the State Implementation Plan codified in 40 CFR 52.2020 (relating to identification of plan).

(d)   A compliance demonstration required under subsection (b) or (c) must include the measurement and reporting of filterable and condensable particulate matter. Test methods and procedures used to determine compliance must be equivalent to those specified in § 139.4(5). An owner or operator must obtain the

139-7

Department's prior written approval for the use of methods and procedures that are not prescribed in the Source Testing Manual.

(e) The Source Test Manual referenced in § 139.4(5) is subject to revision in accordance with the procedures in § 139.5 (relating to revisions to the source testing manual and continuous source monitoring manual).

**Source**

The provisions of this § 139.12 adopted March 3, 1972, effective March 20, 1972, 2 Pa.B. 383; amended June 22, 1979, effective July 1, 1979, 9 Pa.B. 2150; corrected June 29, 1979, effective July 1, 1979, 9 Pa.B. 2150; amended November 25, 1994, effective November 26, 1994, 24 Pa.B. 5899; amended December 26, 1997, effective December 27, 1997, 27 Pa.B. 6804; amended May 1, 1998, effective March 7, 1998, 28 Pa.B. 2035; amended April 11, 2014, effective April 12, 2014, 44 Pa.B. 2236. Immediately preceding text appears at serial page (365535).

**Cross References**

This section cited in 25 Pa. Code § 123.45 (relating to alternative opacity limitations); and 25 Pa. Code § 139.17 (relating to general requirements).

## § 139.13. Emissions of $SO_2$, $H_2S$, TRS and $NO_2$.

The following are applicable to tests for determining emissions of $SO_2$, $H_2S$, TRS and $NO_2$ from stationary sources:

(1) Test methods and procedures for sulfur oxides shall be equivalent to or modified to produce results equivalent to those which would be obtained by employing the procedures specified in § 139.4(5) (relating to references). Test methods and procedures for $SO_2$ from combustion sources shall be equivalent to or modified to produce results equivalent to those which would be obtained by employing procedures specified in § 139.4(5). Details for sampling equipment are contained in § 139.4(1) or (5).

(2) Test methods and procedures for HS shall be equivalent to or modified to produce results equivalent to those obtained by employing the procedures specified in § 139.4(5). The equipment shall be inert where appropriate and similar to that specified in § 139.4(1) or (5).

(3) Test methods and procedures for TRS shall be equivalent to or modified to produce results equivalent to those obtained by employing the procedures specified in § 139.4(5). The equipment shall be inert when appropriate and similar to that specified in § 139.4(1).

(4) For determination of emissions of TRS using EPA Method 16, a minimum of 16 injects per test run shall be analyzed. Each test run shall be over a period of at least 3 hours but not more than 6 hours. For determination of TRS emissions using EPA Method 16A, a test run shall consist of either one 3-hour sample or three 60-minute samples. Three test runs constitute a determination for purposes of both EPA Methods.

(5) Test methods and procedures and equipment for NO shall be similar to those specified in § 139.4(1) and (5).

 Copyright © 2014 Commonwealth of Pennsylvania

(6)   For determining emissions of $SO_2$ and $H_2S$, the minimum sampling time shall be 1 hour and the minimum sample volume shall be 30 cubic feet corrected to standard conditions—dry basis.

**Source**

The provisions of this § 139.13 adopted March 3, 1972, effective March 20, 1972, 2 Pa.B. 383; amended April 27, 1979, effective August 1, 1979, 9 Pa.B. 1447; corrected May 11, 1979, effective August 1, 1979, 9 Pa.B. 1534; amended June 19, 1981, effective June 20, 1981, 11 Pa.B. 2132; amended August 12, 1983, effective August 13, 1983, 13 Pa.B. 2478; amended May 6, 1988, effective May 7, 1988, 18 Pa.B. 2102; amended November 25, 1994, effective November 26, 1994, 24 Pa.B. 5899. Immediately preceding text appears at serial pages (128483) to (128484) and (170287).

**Cross References**

This section cited in 25 Pa. Code § 123.45 (relating to alternative opacity limitations).

## § 139.14. Emissions of VOCs.

(a)   The following are applicable to tests for determining volatile organic content:

(1)   Test methods and procedures for the total volatiles content, solids content, exempt solvent content, water content and density of surface coatings shall be equivalent to those specified in § 139.4(1) and (5) (relating to references).

(2)   Test methods and procedures for VOCs in effluent water shall be equivalent to those specified in § 139.4(16), expressed as pentane.

(3)   For determining the solvent content of wastes in dry cleaning facilities, test methods and procedures shall be equivalent to those specified in § 139.4(17).

(4)   Results shall be reported in accordance with the units specified in the appropriate section of Chapter 129 (relating to standards for sources).

(b)   The following are applicable to tests for determining the emissions of VOCs:

(1)   Test methods for VOC emissions shall use a technique having at least a 95% collection efficiency for VOCs.

(2)   Except for those sources or systems specified in this subsection, the test methods and procedures and equipment for VOCs, excluding carbon dioxide, carbon monoxide and methane shall be equivalent to those specified in EPA Method 25 or as specified in § 139.4(5). The owner or operator of a source may exclude ethane from the VOC measurement. If ethane is excluded, the measurement of ethane shall be reported separately.

(3)   For gasoline vapor recovery systems, test methods and procedures and equipment for VOCs shall be equivalent to those specified in EPA Method 25B or as specified in § 139.4(5).

(4)   For determining the magnitude of VOC leaks from petroleum refinery equipment, from synthetic organic chemical and polymer manufacturing equip-

ment and from surface active agent manufacturing equipment, test methods and procedures shall be equivalent to those specified in EPA Method 21 or as specified in § 139.4(5). The owner or operator of a source may exclude methane and ethane from this measurement. If methane and ethane are excluded, the measurement of methane and ethane together shall be reported.

(5)   For determining the VOC leak tightness of truck tanks, test methods and procedures shall be equivalent to those specified in EPA Method 27 or as specified in § 139.4(5).

(6)   For determining the magnitude of VOC leaks from gasoline tank trucks and vapor collection systems, test methods and procedures shall be equivalent to those specified in EPA Method 21 or as specified in § 139.4(5).

(7)   Results shall be reported in accordance with the units specified in the appropriate section of Chapter 129.

(8)   Test methods for the determination of RVP in gasoline shall be in accordance with the procedures in 40 CFR Part 80, Appendix E (relating to test for determining Reid vapor pressure (RVP) of gasoline and gasoline-oxygenate blends).

### Source

The provisions of this § 139.14 adopted March 3, 1972, effective March 20, 1972, 2 Pa.B. 383; amended April 27, 1979, effective August 1, 1979, 9 Pa.B. 1447; corrected May 11, 1979, effective August 1, 1979, 9 Pa.B. 1534; amended June 19, 1981, effective June 20, 1981, 11 Pa.B. 2118; amended August 12, 1983, effective August 13, 1983, 13 Pa.B. 2478; amended August 24, 1984, effective March 24, 1984, 14 Pa.B. 3090; amended May 6, 1988, effective May 7, 1988, 18 Pa.B. 2098; amended November 25, 1994, effective November 26, 1994, 24 Pa.B. 5899; amended October 31, 1997, effective November 1, 1997, 27 Pa.B. 5601; amended June 9, 2000, effective June 10, 2000, 30 Pa.B. 2995. Immediately preceding text appears at serial pages (244316) and (237321) to (237322).

### Cross References

This section cited in 25 Pa. Code § 123.45 (relating to alternative opacity limitations); 25 Pa. Code § 129.58 (relating to petroleum refineries—fugitive sources); 25 Pa. Code § 129.62 (relating to general standards for bulk gasoline terminals, bulk gasoline plants and small gasoline storage tanks); 25 Pa. Code § 129.71 (relating to synthetic organic chemical and polymer manufacturing—fugitive sources); and 25 Pa. Code § 129.81 (relating to organic liquid cargo vessel loading and ballasting).

## § 139.15.  Emissions of other air contaminants.

Test methods and procedures may be modified for determining emissions of contaminants other than particulate matter, $SO_2, H_2S$, total reduced sulfur (TRS) and $NO_2$ from stationary sources in a manner consistent with accepted air pollution testing practices and with obtaining accurate results which are representative of the conditions evaluated. The modifications shall be subject to the approval of the Department and shall be clearly indicated in the report of test results.

*Copyright © 2014 Commonwealth of Pennsylvania*

**Source**

The provisions of this § 139.15 adopted April 27, 1979, effective August 1, 1979, 9 Pa.B. 1447; corrected April 27, 1979, effective August 1, 1979, 9 Pa.B. 1534; amended May 6, 1988, effective May 7, 1988, 18 Pa.B. 2102. Immediately preceding text appears at serial page (92837).

**Cross References**

This section cited in 25 Pa. Code § 123.45 (relating to alternative opacity limitations).

## § 139.16.  Sulfur in fuel oil.

The following apply to tests for the analysis of commercial fuel oil:

(1)   The fuel oil sample for chemical analysis shall be collected in a manner that provides a representative sample. Upon the request of a Department official, the person responsible for the operation of the source shall collect the sample employing the procedures and equipment specified in § 139.4(10) or (21) (relating to references).

(2)   Test methods and procedures for the determination of viscosity shall be that specified in § 139.4(11). The viscosity shall be determined at 100°F.

(3)   Tests methods and procedures for the determination of sulfur shall be those specified in § 139.4(12)—(15) and (20).

(4)   Results shall be reported in accordance with the units specified in § 123.22 (relating to combustion units).

**Source**

The provisions of this § 139.16 adopted April 27, 1979, effective August 1, 1979, 9 Pa.B. 1447; corrected May 11, 1979, effective August 1, 1979, 9 Pa.B. 1534; amended August 12, 1983, effective August 13, 1983, 13 Pa.B. 2478; amended February 8, 2013, effective February 9, 2013, 43 Pa.B. 806. Immediately preceding text appears at serial pages (267072) to (267073).

**Cross References**

This section cited in 25 Pa. Code § 123.22 (relating to combustion units); and 25 Pa. Code § 123.45 (relating to alternative opacity limitations).

## § 139.17.  General requirements.

The following are applicable to source tests for determining alternative opacity limitations under § 123.45 (relating to alternative opacity limitations).

139-10.2

 *Copyright © 2014 Commonwealth of Pennsylvania*

ADD75

(1)    A series of three consecutive performance tests shall be conducted in accordance with the requirements of §§ 139.1—139.4, 139.11 and 139.12. The time period from the beginning of the first test to the end of the third test may not exceed 8 hours.

(2)    The opacity of emissions, as determined in accordance with the measurement technique specified in § 123.45 (relating to alternative opacity limitations), shall be recorded for the entire time period from the beginning of the first performance test to the end of the third performance test.

(3)    If continuous opacity monitoring equipment is required, it shall be installed, operated and maintained in accordance with Subchapter C (relating to requirements for source monitoring for stationary sources).

(4)    If continuous opacity monitoring equipment is not required, visual observation of opacity shall be conducted by the source owner or operator in accordance with the procedures in Appendix A, Method 9 of § 139.102(1) (relating to references).

(5)    Prior to the first performance test, the results of opacity measurements obtained in accordance with the technique specified in § 123.45 will be compared to the results of visual observations conducted by the Department in accordance with Appendix A, Method 9 of § 139.102(1).

(i)    A series of 60 consecutive observations will be conducted by the Department observer at intervals of 15 seconds. The results will be reduced to fifteen 1-minute averages.

(ii)    The opacity measurements obtained by the techniques specified in § 123.45 for the same time period will be reduced to fifteen 1-minute averages corresponding to those calculated in subparagraph (i).

(iii)    If any of the 1-minute averages as calculated in subparagraph (ii) differ by more than 15% opacity from the corresponding 1-minute average as calculated in subparagraph (i), the cause shall be determined and the comparison repeated after appropriate adjustments have been made but before commencement of the first performance test.

(iv)    If the average of the absolute values of the differences between the 1-minute averages as calculated in subparagraph (ii) and the corresponding 1-minute averages as calculated in subparagraph (i) is greater than 7.5% opacity, the cause shall be determined and the comparison repeated after appropriate adjustments have been made but before commencement of the first performance test.

### Source

The provisions of this § 139.17 adopted June 19, 1981, effective June 20, 1981, 11 Pa.B. 2132.

### Cross References

This section cited in 25 Pa. Code § 123.45 (relating to alternative opacity limitations); and 25 Pa. Code § 139.12 (relating to emissions of particulate matter).

### § 139.18. Calculation of alternative opacity limitations.

(a) The results of opacity measurements obtained by the technique specified in § 123.45 (relating to alternative opacity limitations) for the entire time period from the beginning of the first performance test to the end of the third performance test will be reduced to 1-minute averages.

(b) The 1-minute averages which correspond to each of the three performance tests will be used for calculation of the alternative opacity limits and treated as if they represented contiguous data.

(c) The highest 1-minute average as determined in subsection (b) is the alternative opacity limitation not to be exceeded at any time.

(d) The median value of the 1-minute averages as determined in subsection (b) is determined.

(e) One-minute averages equal to or less than the median value calculated in subsection (d) will be eliminated from calculations in subsections (f) and (g).

(f) The mean and modified 95% confidence interval shall be calculated for the remaining 1-minute averages as follows:

$$\overline{X} = \frac{\sum_{i=1}^{n} Xi}{n}$$

$$C.I._m = \frac{2}{n\sqrt{n-1}} \sqrt{n\left(\sum_{i=1}^{n} X^2i\right) - \left(\sum_{i=1}^{n} Xi\right)^2}$$

Xi = individual 1-minute average
n = number of individual 1-minute average (after elimination of averages less than or equal to the median value)
C.I._m = modified 95% confidence interval

(g) The alternative opacity limitation not to be exceeded more than 3 minutes in any 1 hour shall be equal to the sum of the mean and the modified 95% confidence interval as calculated in subsection (f) ($\overline{X}$ + C.I._m, truncated to an integer % opacity.

(h) An hourly average opacity limitation not to be exceeded at any time will be calculated as follows:

(1) The 1-minute averages as determined in subsection (b) will be grouped in discrete hourly time periods starting with the beginning of the first performance test.

(2) A remaining 1-minute averages constituting less than a full hourly time period will be eliminated from calculations in paragraphs (3) and (4).

(3) The mean for each hourly time period will be calculated as follows:

139-12

Copyright © 2019 Commonwealth of Pennsylvania

$$\overline{X} \; = \; \dfrac{\displaystyle\sum_{i=1}^{60} Xi}{60}$$

where: $\overline{X}$ = mean
 $Xi$ = individual 1-minute average

(4)   The hourly average opacity limitation not to be exceeded at any time shall be equal to the highest mean as calculated in paragraph (3) truncated to the nearest integer % opacity.

**Source**

The provisions of this § 139.18 adopted June 19, 1981, effective June 20, 1981, 11 Pa.B. 2132.

**Cross References**

This section cited in 25 Pa. Code § 123.45 (relating to alternative opacity limitations).

## § 139.21. [Reserved].

**Source**

The provisions of this § 139.21 adopted March 3, 1972, effective March 20, 1972, 2 Pa.B. 383; reserved August 12, 1983, effective August 13, 1983, 13 Pa.B. 2478. Immediately preceding text appears at serial page (62546).

## AMBIENT LEVELS OF AIR CONTAMINANTS

## § 139.31. General.

Sections 139.32 and 139.33 (relating to sampling and analytical procedures; and incorporation of Federal procedures) are applicable to methods for determining ambient levels of air contaminants.

**Source**

The provisions of this § 139.31 adopted March 3, 1972, effective March 20, 1972, 2 Pa.B. 383.

## § 139.32. Sampling and analytical procedures.

(a)   Sampling and analytical techniques which may be used directly or employed as reference standards against which other methods may be calibrated shall be as follows:

| Contaminant | Sampling Method | Analytical Method |
|---|---|---|
| Settled particulates (total) | Open top cylinder (6) | Gravimetric (6) |
| Beryllium | High-volume filtration (7) | Spectrographic (7) |
| Flourides (total soluble, as HF) | Filtration plus gas absorption (9) | Thorium-alizarin lake titration (9) |
| Hydrogen sulfide | Gas absorption (18) | Methylene blue method (18) |

139-13

(b)   The numbers following the reference standards in subsection (a) refer to the references contained in § 139.4 (relating to references).

**Source**

The provisions of this § 139.32 adopted March 3, 1972, effective March 20, 1972, 2 Pa.B. 383; amended November 25, 1994, effective November 26, 1994, 24 Pa.B. 5899; amended September 4, 1998, effective September 5, 1998, 28 Pa.B. 4525. Immediately preceding text appears at serial pages (239783) to (239784).

**Cross References**

This section cited in 25 Pa. Code § 139.31 (relating to general); and 25 Pa. Code § 139.33 (relating to incorporation of Federal procedures).

### § 139.33.  Incorporation of Federal procedures.

Sampling and analytical procedures promulgated by the Administrator of the EPA under the Clean Air Act are hereby incorporated, by reference, as part of the techniques listed in § 139.32(a) (relating to sampling and analytical procedures).

**Source**

The provisions of this § 139.33 adopted March 3, 1972, effective March 20, 1972, 2 Pa.B. 383.

**Cross References**

This section cited in 25 Pa. Code § 139.31 (relating to general).

## Subchapter B.  MONITORING DUTIES OF CERTAIN SOURCES

### GENERAL

Sec.
139.51.    Purpose.
139.52.    Monitoring methods and techniques.
139.53.    Filing monitoring reports.
139.61.    [Reserved].
139.62.    [Reserved].

**Cross References**

This subchapter cited in 25 Pa. Code § 139.101 (relating to general requirements).

### GENERAL

### § 139.51.  Purpose.

The intent of this subchapter is to require the periodic monitoring of air contaminants emitted from certain sources which have or are likely to have a sub-

*Copyright © 1998 Commonwealth of Pennsylvania*

stantial impact on the maintenance of ambient air quality standards or may cause air pollution. The identification of sources subject to this subchapter, or the establishment of a specific frequency of source emission monitoring in this subchapter, will not be construed to limit the Department's authority under section 4 of the act (35 P. S. § 4004) or § 127.12 (relating to content of applications) to establish monitoring requirements for other sources, or additional monitoring requirements for sources subject to this subchapter.

<div align="center">Source</div>

The provisions of this § 139.51 adopted August 12, 1977, effective August 29, 1977, 7 Pa.B. 2251; amended March 17, 1989, effective March 18, 1989, 19 Pa.B. 1169. Immediately preceding text appears at serial page (128492).

## § 139.52.  Monitoring methods and techniques.

Persons responsible for the operation of sources subject to monitoring requirements established by order, by condition of plan approval or permit, or under this subchapter, shall:

(1)  Conduct source testing or air sampling and perform analyses in accordance with the requirements of Subchapter A (relating to sampling and testing methods and procedures), or shall install, operate and maintain a device approved by the Department for installation in a flue for the purpose of continuous measurement of specific air contaminants.

(2)  Perform visible emission observations in accordance with the methods for observing and recording visible emissions established pursuant to Chapter 123 (relating to standards for contaminants); provided, however, visible emissions discharged through a flue may also be monitored by use of a device approved by the Department for installation in a stack for the purpose of measuring opacity.

<div align="center">Source</div>

The provisions of this § 139.52 adopted August 12, 1977, effective August 29, 1977, 7 Pa.B. 2251.

<div align="center">Cross References</div>

This section cited in 25 Pa. Code § 139.53 (relating to filing monitoring reports).

## § 139.53.  Filing monitoring reports.

(a)  Persons responsible for the operation of sources subject to monitoring requirements established by order, by condition of plan approval or permit or under this subchapter, shall submit periodic reports of the results of tests, samples or observations conducted, obtained or made in accordance with the methods or techniques referenced in § 139.52 (relating to monitoring methods and techniques). The reports shall be:

(1)  Submitted on forms supplied or in a format specified by the Department.

<div align="center">139-15</div>

(2)    Sworn by the person exercising managerial responsibility over the operation of the source for which monitoring is required.

(3)    Submitted on the schedule established by order, condition of plan approval or permit or this subchapter.

(4)    Submitted to the Regional Air Program Manager for the region of the Department in which the source is located and a copy to the Chief of the Division of Source Testing and Monitoring.

(b)    In addition to the information required under subsection (a) the Department may, by use of a standard form or by written notice, require information regarding test methods, test conditions, operating conditions of the source or other information which may be necessary to properly evaluate the results of emissions monitoring performed at a source.

### Source

The provisions of this § 139.53 adopted August 12, 1977, effective August 29, 1977, 7 Pa.B. 2251; amended August 12, 1983, effective August 13, 1983, 13 Pa.B. 2478; amended April 11, 2014, effective April 12, 2014, 44 Pa.B. 2236. Immediately preceding text appears at serial pages (239785) to (239786).

## § 139.61.  [Reserved].

### Source

The provisions of this § 139.61 adopted August 12, 1977, effective August 29, 1977, 7 Pa.B. 2251; amended August 12, 1983, effective August 13, 1983, 13 Pa.B. 2478; reserved December 26, 1997, effective December 27, 1997, 27 Pa.B. 6804. Immediately preceding text appears at serial pages (233622) to (233623).

## § 139.62.  [Reserved].

### Source

The provisions of this § 139.62 adopted August 4, 1978, effective August 5, 1978, 8 Pa.B. 2164; reserved December 26, 1997, effective December 27, 1997, 27 Pa.B. 6804. Immediately preceding text appears at serial pages (233623) to (233624).

## Subchapter C.  REQUIREMENTS FOR SOURCE MONITORING FOR STATIONARY SOURCES

Sec.
139.101.    General requirements.
139.102.    References.
139.103.    Opacity monitoring requirements.
139.104.    [Reserved].
139.105.    [Reserved].
139.106.    [Reserved].
139.107.    [Reserved].
139.108.    TRS compound monitoring requirements.
139.111.    Waste incinerator monitoring requirements.

139-16

Copyright © 2014 Commonwealth of Pennsylvania

**Cross References**

This subchapter cited in 25 Pa. Code § 123.25 (relating to monitoring requirements); 25 Pa. Code § 123.46 (relating to monitoring requirements); 25 Pa. Code § 123.51 (relating to monitoring requirements); 25 Pa. Code § 129.17 (relating to kraft pulp mills); 25 Pa. Code § 129.18 (relating to municipal waste incinerators); 25 Pa. Code § 129.100 (relating to compliance demonstration and record-keeping requirements); 25 Pa. Code § 129.308 (relating to compliance determination); 25 Pa. Code § 139.17 (relating to general requirements); and 25 Pa. Code § 145.144 (relating to compliance determination).

## § 139.101. General requirements.

This section applies to monitoring systems as defined in the manual referenced in § 139.102(3) (relating to references), installations required or approved under Chapters 122, 124, 127 and 129 or in an order issued under section 4 of the act (35 P.S. § 4004).

(1)   The submittal procedures specified in the publication entitled "Continuous Source Monitoring Manual," available from the Department shall be utilized to obtain Department approval. This publication includes:

(i)    Installation requirements.

(ii)   Performance specifications.

(iii)  Test procedures.

(iv)   Reporting requirements.

(v)    Quality assurance requirements.

(vi)   Administrative procedures for obtaining Department approval.

(2)   The monitoring system installation, certification and operation shall be conducted under the direct supervision of persons qualified by training and experience.

(3)   The monitoring systems may be designed to monitor source emissions or stack emissions if the representativeness of emissions can be verified. The method of conversion of monitoring results to source or stack emissions shall be approved by the Department.

(4)   The location of monitoring devices shall be approved by the Department prior to installation. The selection of the monitoring location shall utilize applicable criteria in the manual referenced in § 139.102(3). The Department has the authority to determine which of the criteria are applicable. The representativeness of the measurements at the chosen monitoring location shall be verified.

(5)   The owner of a monitored source shall maintain records containing monitoring information and report data to the Department as specified in the manual referenced in § 139.102(3). The records shall be maintained for 5 years and be available for inspection by Department personnel.

(6)   The owner of a monitored source shall provide permanent sampling facilities as specified in § 139.1 (relating to sampling facilities) to permit verification testing by the Department. For extractive monitors, calibration gas inlets shall be available as near as possible to the monitor probe inlet to permit

the Department to verify calibration of the monitoring system. Facilities shall be approved by the Department prior to construction.

(7)   Verification testing for monitoring systems shall be in accordance with Subchapter B (relating to monitoring duties of certain sources), and of the manual referenced in §  139.102(3).

(8)   A quality assurance program shall be established and maintained by the owner of the monitored source. This program shall be in accordance with the criteria in the sources listed in §  139.102.

(9)   The Department's approval will be based on the criteria specified in the manual referenced in §  139.102(3). Failure to utilize the specified procedures or to conduct the quality assurance program could result in denying or rescinding the Department's approval.

(10)   The owner of a monitored source shall notify the Department when the monitoring system is inoperative for more than 1 hour during an air pollution episode as specified in Chapter 137 (relating to air pollution episodes). The notice shall be given within 2 hours of the malfunction.

(11)   Manual sampling conducted under Subchapter B may be required if the Department determines that the monitoring system data is not accurate or that the owner of the monitored source does not conduct the quality assurance program specified in the manual referenced in §  139.102(3).

(12)   Required monitoring shall meet at least one of the following minimum data availability requirements unless other data availability requirements are stipulated elsewhere in this title, in a plan approval or permit condition under Chapter 127 (relating to construction, modification, reactivation and operation of sources), or in an order issued under section 4 of the act. For purposes of calculating data availability, ''process down'' time, as specified in the manual referenced in §  139.102(3), shall be considered valid time.

(i)    In each calendar month, at least 90% of the time periods for which an emission standard or an operational parameter applies shall be valid as set forth in the quality assurance section of the manual referenced in §  139.102(3).

(ii)    In each calendar quarter, at least 95% of the hours shall be valid as set forth in the quality assurance section of the manual referenced in §  139.102(3).

(13)   The monitor results shall be expressed in terms of the applicable standard or criteria required. The method used to convert monitor data shall be approved by the Department.

(14)   Monitoring systems shall comply with the applicable performance specifications section of the manual referenced in §  139.102(3). The Department has the authority to determine which of the performance specifications are applicable.

(15)   Verification of calibration standards shall be conducted in accordance with the applicable sampling methods in the Department's ''Source Testing

139-18

*Copyright © 2016 Commonwealth of Pennsylvania*

Manual" or as otherwise approved by the Department. The "Source Testing Manual" may be obtained from the Department.

   (16) The requirements of this section apply to monitoring to demonstrate compliance with emissions standards and process operational parameter criteria.

### Source

   The provisions of this § 139.101 adopted April 27, 1979, effective August 1, 1979, 9 Pa.B. 1447; corrected May 11, 1979, effective August 1, 1979, 9 Pa.B. 1534; amended June 19, 1981, effective June 20, 1981, 11 Pa.B. 2132; amended August 12, 1983, effective August 13, 1983, 13 Pa.B. 2478; amended October 26, 1990, effective October 27, 1990, 20 Pa.B. 5416; amended November 25, 1994, effective November 26, 1994, 24 Pa.B. 5899; corrected January 28, 2000, effective March 7, 1998, 30 Pa.B. 533. Immediately preceding text appears at serial pages (239787) to (239789).

### Cross References

   This section cited in 25 Pa. Code § 123.108 (relating to source emissions monitoring requirements) and 25 Pa. Code § 123.210 (relating to general monitoring and reporting requirements).

## § 139.102. References.

   The following are references of this subchapter:

   (1) "Standards of Performance for New Stationary Sources," 40 CFR Chapter I, Subchapter C, Part 60, Superintendent of Documents, U. S. Government Printing Office, Washington, D.C. 20402-9328.

   (2) "Minimum Emission Monitoring Requirements," 40 CFR Subchapter C, Part 51, Appendix P, Superintendent of Documents, U. S. Government Printing Office, Washington, D.C. 20402-9328.

   (3) "Continuous Source Monitoring Manual," Commonwealth of Pennsylvania, Department of Environmental Resources, Bureau of Air Quality Control, Post Office Box 8468, Harrisburg, Pennsylvania 17105-8468.

### Source

   The provisions of this § 139.102 adopted April 27, 1979, effective August 1, 1979, 9 Pa.B. 1447; corrected May 11, 1979, effective August 1, 1979, 9 Pa.B. 1534; amended August 12, 1983, effective August 13, 1983, 13 Pa.B. 2478; amended October 26, 1990, effective October 27, 1990, 20 Pa.B. 5416; amended November 25, 1994, effective November 26, 1994, 24 Pa.B. 5899. Immediately preceding text appears at serial page (188275).

### Cross References

   This section cited in 25 Pa. Code § 123.108 (relating to source emissions monitoring requirements); 25 Pa. Code § 139.5 (relating to revisions to the source testing manual and continuous source monitoring manual); 25 Pa. Code § 139.17 (relating to general requirements); 25 Pa. Code § 139.101 (relating to general requirements); 25 Pa. Code § 139.103 (relating to opacity monitoring requirements); 25 Pa. Code § 139.108 (relating to TRS compound monitoring requirements); and 25 Pa. Code § 139.111 (relating to municipal waste incinerator monitoring requirements).

## § 139.103. Opacity monitoring requirements.

   This section applies to sources monitoring opacity.

(1)   Opacity measurements shall be converted to represent plume opacity as described in the manual referenced in § 139.102(3) (relating to references). The conversion method shall be approved by the Department.

(2)   Opacity monitoring systems shall meet at least one of the following minimum data availability requirements unless other data availability requirements are stipulated elsewhere in this title for a particular process:

(i)   At least 90% of the hours in each calendar month shall be valid hours as set forth in the quality assurance section of the manual referenced in § 139.102(3).

(ii)   At least 95% of the hours in each calendar quarter shall be valid hours as set forth in the quality assurance section of the manual referenced in § 139.102(3).

**Source**

The provisions of this § 139.103 adopted April 27, 1979, effective August 1, 1979, 9 Pa.B. 1447; corrected May 11, 1979, effective August 1, 1979, 9 Pa.B. 1534; amended June 19, 1981, effective June 20, 1981, 11 Pa.B. 2132; amended October 26, 1990, effective October 27, 1990, 20 Pa.B. 5416; amended November 25, 1994, effective November 26, 1994, 24 Pa.B. 5899. Immediately preceding text appears at serial pages (188275) to (188276).

## § 139.104.  [Reserved].

**Source**

The provisions of this § 139.104 adopted April 27, 1979, effective August 1, 1979, 9 Pa.B. 1447; corrected May 11, 1979, effective August 1, 1979, 9 Pa.B. 1534; amended June 19, 1981, effective June 20, 1981, 11 Pa.B. 2132; amended October 26, 1990, effective October 27, 1990, 20 Pa.B. 5416; amended November 25, 1994, effective November 26, 1994, 24 Pa.B. 5899; amended December 26, 1997, effective December 27, 1997, 27 Pa.B. 6804. Immediately preceding text appears at serial pages (237326) to (237327).

## § 139.105.  [Reserved].

**Source**

The provisions of this § 139.105 adopted August 4, 1978, effective August 5, 1978, 8 Pa.B. 2164; amended June 19, 1981, effective June 20, 1981, 11 Pa.B. 2132; reserved October 26, 1990, effective October 27, 1990, 20 Pa.B. 5416. Immediately preceding text appears at serial page (128500).

## § 139.106.  [Reserved].

**Source**

The provisions of this § 139.106 adopted June 19, 1981, effective June 20, 1981, 11 Pa.B. 2132; reserved October 26, 1990, effective October 27, 1990, 20 Pa.B. 5416. Immediately preceding text appears at serial pages (128500) to (128501).

139-20

## § 139.107.  [Reserved].

**Source**

The provisions of this § 139.107 adopted June 19, 1981, effective June 20, 1981, 11 Pa.B. 2132; reserved October 26, 1990, effective October 27, 1990, 20 Pa.B. 5416. Immediately preceding text appears at serial page (128501).

## § 139.108.  TRS compound monitoring requirements.

This section applies to sources monitoring total reduced sulfur (TRS) emissions. TRS monitoring systems shall meet at least one of the following minimum data availability requirements unless other data availability requirements are stipulated elsewhere in this title for a particular process:

(1)  At least 75% of the 12-hour averages during each calendar month shall be valid 12-hour averages as set forth in the quality assurance section of the manual referenced in § 139.102(3) (relating to references).

(2)  At least 85% of the 12-hour averages in each calendar quarter shall be valid 12-hour averages as set forth in the quality assurance section of the manual referenced in § 139.102(3).

**Source**

The provisions of this § 139.108 adopted May 6, 1988, effective May 7, 1988, 18 Pa.B. 2102; reserved October 26, 1990, effective October 27, 1990, 20 Pa.B. 5416; amended November 25, 1994, effective November 26, 1994, 24 Pa.B. 5899. Immediately preceding text appears at serial page (151715).

## § 139.111.  Waste incinerator monitoring requirements.

This section applies to monitoring systems installed on municipal and hospital waste incinerators.

(1)  Carbon monoxide, combustion efficiency and temperature monitoring systems shall meet the following minimum data availability requirements:

(i)  One hundred percent of the data hours shall be valid hours as set forth in the quality assurance section of the manual referenced in § 139.102(3) (relating to references).

(ii)  At least 90% of the data required to be collected each hour shall be valid data as set forth in the quality assurance section of the manual referenced in § 139.102(3).

(2)  Opacity monitoring systems shall meet the following minimum data availability requirement:  At least 95% of the data hours each day shall be valid hours as set forth in the quality assurance section of the manual referenced in § 139.102(3).

(3)  Hydrogen chloride, sulfur dioxide and nitrogen oxide monitoring systems shall meet the following minimum data availability requirement: At least 90% of the data hours each month shall be valid hours as set forth in the quality assurance section of the manual referenced in § 139.102(3).

**25 § 139.111**          ENVIRONMENTAL PROTECTION          Pt.  I

### Authority

The provisions of this § 139.111 issued under section 5 of the Air Pollution Control Act (35 P. S. § 4005).

### Source

The provisions of this § 139.111 adopted October 26, 1990, effective October 27, 1990, 20 Pa.B. 5416; amended December 26, 1997, effective December 27, 1997, 27 Pa.B. 6804. Immediately preceding text appears at serial page (237328).

[Next page is 141-1.]

139-22

*Copyright © 1998 Commonwealth of Pennsylvania*

ADD87